IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, NOVARTIS AG, NOVARTIS PHARMA AG, NOVARTIS INTERNATIONAL PHARMACEUTICALS LTD, and LTS LOHMANN THERAPIE-SYSTEME AG, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | C. A. No.:  11-1077-RGA CONSOLIDATED |
| v. | ) ) | |
| PAR PHARMACEUTICAL, INC., | ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, NOVARTIS AG, NOVARTIS PHARMA AG, NOVARTIS INTERNATIONAL PHARMACEUTICALS LTD, and LTS LOHMANN THERAPIE-SYSTEME AG, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | C. A. No.:  11-1112-RGA |
| v. | ) ) | |
| WATSON LABORATORIES, INC., WATSON PHARMA, INC., and WATSON PHARMACEUTICALS, INC., | ) ) ) ) | |
| Defendants. | ) | |

## WATSON'S OPENING POST-TRIAL BRIEF ON INVALIDITY

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
P. O. Box 391
Wilmington, DE  19899-0391
(302) 571-6681
msharp@ycst.com

ROTHWELL, FIGG, ERNST & MANBECK, P.C.
E. Anthony Figg
C. Nichole Gifford
Seth E. Cockrum
Brett A. Postal
607 14th Street, N.W., Suite 800
Washington, DC  20005
(202) 783-6040
efigg@rfem.com
ngifford@rfem.com
scockrum@rfem.com
bpostal@rfem.com

*Attorneys for Defendants Watson Laboratories, Inc., Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.), and Actavis, Inc. (f/k/a Watson Pharmaceuticals, Inc.)*

Dated:  September 27, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ..................................................................................................... 1

II.     NATURE AND STAGE OF PROCEEDINGS ................................................................. 2

III.    SUMMARY OF ARGUMENT ...................................................................................... 2

IV.     STATEMENT OF FACTS ........................................................................................... 5

        A.      The Asserted Claims of the Patents-In-Suit ............................................... 5

        B.      The Prior Art and Knowledge of the Person of Ordinary Skill in the Art ............. 7

        C.      There Was A Clear Motivation to Combine the Teachings of the Prior Art to
                Include an Antioxidant in a Rivastigmine Transdermal Patch with a
                Reasonable Expectation of Success ..................................................... 16

        D.      The Parties Agree on the Level of Ordinary Skill ................................... 18

V.      ARGUMENT ........................................................................................................ 18

        A.      Legal Standards Related to Obviousness ............................................... 18

        B.      The Asserted Claims Are Invalid as Obvious in View of the Prior Art ............... 22

VI.     CONCLUSION ..................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Bayer Schering Pharma AG v. Barr Labs., Inc.*
   575 F.3d 1341 (Fed. Cir. 2009) .................................................................... 18, 19

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,*
   424 F.3d 1293 (Fed. Cir. 2005) .......................................................................... 20

*Genentech, Inc. v. Chiron Corp.,*
   112 F.3d 495 (Fed. Cir. 1997) ......................................................................... 6, 22

*Graham v. John Deere Co.,*
   383 U.S. 1 (1966)............................................................................................ 19, 20

*In re Kahn,*
   441 F.3d 977 (Fed. Cir. 2006) ................................................................................ 19

*KSR Int'l Co. v. Teleflex, Inc.,*
   550 U.S. 398 (2007)...................................................................................... passim

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.,*
   485 F.3d 1157 (Fed. Cir. 2007) .......................................................................... 20

*Microsoft Corp. v. i4i Ltd. P'ship,*
   131 S. Ct. 2238 (2011)........................................................................................ 21

*Newell Cos. v. Kenney Mfg. Co.,*
   864 F.2d 757 (Fed. Cir. 1988) ............................................................................ 20

*Norgren Inc. v. ITC,*
   699 F.3d 1317 (Fed. Cir. 2012) .......................................................................... 20

*Pfizer, Inc. v. Apotex, Inc.,*
   480 F.3d 1348 (Fed. Cir. 2007) .......................................................................... 21

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.,*
   491 F.3d 1342 (Fed. Cir. 2007) .......................................................................... 21

*Purdue Pharma Prods. L.P. v. Par Pharm., Inc.,*
   642 F.Supp.2d 329 (D. Del. 2009)...................................................................... 20

*Sciele Pharma, Inc. v. Lupin Ltd.,*
   684 F.3d 1253 (Fed. Cir. 2012) .......................................................................... 21

*Surface Tech., Inc. v. U.S.I.T.C.,*
   801 F.2d 1336 (Fed. Cir. 1986) .......................................................................... 21

*Unigene Laboratories, Inc. v. Apotex, Inc.*,
    655 F.3d 1352 (Fed. Cir. 2011) ................................................................ 7

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
    683 F.3d 1356 (Fed. Cir. 2012) .............................................................. 20

**Statutes**

35 U.S.C. § 103 ...................................................................................... 5, 20, 21

35 U.S.C. § 103(a) ...................................................................................... 18

**Rules**

MPEP § 2111.03 ...................................................................................... 23

## I.   INTRODUCTION

This is a patent infringement case against Defendants, Watson Laboratories, Inc., Actavis Pharma, Inc., and Actavis, Inc. (collectively "Watson" or "Defendants").  Watson Laboratories, Inc. filed an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration ("FDA") seeking approval for the commercial manufacture, use and sale of rivastigmine transdermal systems (4.6 mg/24 hr and 9.5 mg/24 hr) as generic versions of the Exelon® Patches sold by Plaintiffs, Novartis Pharmaceuticals Corporation, Novartis AG, Novartis Pharma AG, Novartis International Pharmaceutical Ltd. and LTS Lohmann Therapie-Systeme AG (collectively, "Plaintiffs" or "Novartis").  The Exelon® Patch is approved for the treatment of dementia associated with Alzheimer's and Parkinson's disease.

Plaintiffs seek to delay FDA approval of Watson's ANDA. They allege that Watson's filing of its ANDA infringes two of the four patents listed in the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book") for the Exelon® Patch, United States patents 6,335,031 ("'031 patent") and 6,316,023 ("'023 patent")(collectively the "patents-in-suit").

The patents-in-suit are "third-generation patents." They do not claim the discovery of rivastigmine as a new drug.  They do not claim the treatment of Alzheimer's disease as a new use of rivastigmine.  Those developments were in the prior art.[1]  Nor were the patents-in-suit the first to describe and claim a rivastigmine transdermal patch.  That specific dosage form is described in

_____

[1]   The basic compound patent claiming the compound N-ethyl, N-methyl-3-[1-(dimethylamino) ethyl]phenyl carbamate (hereinafter "RA7"), which is a racemic mixture containing 50% rivastigmine (*i.e.*, the (S)-enantiomer) and 50% of the (R)-enantiomer, is U.S. patent 4,948,807 (the "'807 patent").  The '807 patent, which is also listed in the Orange Book for the Exelon® Patch, issued in August 1990 and expired in 2012.  Another earlier patent, also owned by Plaintiffs, U.S. patent 5,602,176 (the "'176 patent"), claims and describes enantiomerically pure rivastigmine as a composition of matter, and its use in a transdermal patch for the treatment of Alzheimer's disease. The '176 patent, which is also listed in the Orange Book for the Exelon Patch, issued in February 1997 and expires in February 2014.

detail and identified as a treatment for senile dementia and Alzheimer's disease in British patent application GB 2 203 040 A ("GB '040") published in 1988.

## II.   NATURE AND STAGE OF PROCEEDINGS

Plaintiffs filed a Complaint for infringement against Watson, C.A. No. 11-1112-(RGA)(the "Watson case") on November 9, 2011 (D.I. 1). Watson filed an Answer denying infringement and asserted Counterclaims seeking a declaratory judgment of invalidity and non-infringement. (D.I. 14). The Watson Case was consolidated with C.A. No. 11-1077 (the "Par Case"). (D.I. 37). On August 26, 2013, Plaintiffs and Par reported that they had settled. The Court entered an order staying the Par Case and excused Par from trial. (D.I. 293; 300). A bench trial was held from August 26-29, 2013 in the Watson Case. Pursuant to the Court's briefing schedule, Watson submits this opening post-trial brief with respect to invalidity. (D.I. 303).

## III.   SUMMARY OF ARGUMENT

By January 1998, the priority date of the patents-in-suit, rivastigmine was recognized to be an active acetylcholinesterase inhibitor that was well-tolerated and had a long duration of action. It had shown efficacy for treating Alzheimer's disease in human clinical trials, and an oral rivastigmine formulation had already been approved in Switzerland. Also, GB '040 disclosed that rivastigmine exhibited good skin penetration and described specific examples of transdermal formulations of the drug.

The advantages of transdermal administration of drugs were well documented by 1998, particularly for centrally acting drugs like rivastigmine used for treating chronic diseases. These advantages included sustained and controlled administration and avoidance of frequent dosing, avoidance of uncertainties of administration through the gastrointestinal tract, and uniform delivery rates and blood levels of the drug. With respect to rivastigmine specifically, GB '040 explained that transdermal delivery produced a long-lasting, dose-dependent inhibition of acetylcholinesterase and

2

avoided the rapid onset of effects after oral administration or subcutaneous injection.

For these reasons, by January 1998, rivastigmine was an attractive candidate for development as a therapeutic agent for treating Alzheimer's disease and similar debilitating brain disorders. In addition, transdermal formulations of rivastigmine were expressly disclosed in GB '040 as attractive alternatives to capsule and injectable formulations. However, at that time, Plaintiffs held blocking patents that precluded any other company from introducing such a product to the market for many years.[2]

Anticipating a need to offer a next-generation of their successful capsule product (and, of course, undeterred by their own blocking patents), Plaintiffs undertook the development of a transdermal rivastigmine product. They followed the teachings of GB '040 to develop a conventional drug-in-polymer matrix-type rivastigmine patch. During routine stability testing of their patch, Plaintiffs' scientists found an unacceptable level of rivastigmine degradation. They determined that the degradation pathway was oxidation, one of the most common pathways by which a drug can degrade in pharmaceutical formulations. (JTX188 at 1507). They solved this problem by adding a conventional antioxidant.

Plaintiffs mistakenly believed that they were the first to discover that rivastigmine was susceptible to oxidative degradation and base their argument for validity almost entirely on their alleged discovery of that already-known problem. Plaintiffs were <u>not</u> the first to recognize that rivastigmine was susceptible to oxidation, or that an antioxidant would protect rivastigmine against oxidative degradation. Two prior art references, the '807 patent and the Elmalem publication, taught that rivastigmine was susceptible to oxidative degradation and that the addition of an antioxidant would protect rivastigmine from oxidative degradation. (JTX 096 at col. 7, ll. 51-53;

---

[2] *See* fn.1, *supra.*

JTX 159 at 1060).  That evidence, published by the researchers at Hebrew University who first discovered, synthesized and studied $RA_7$, the racemic compound that contains rivastigmine, in combination with the other prior art that existed prior to January 1998, is fatal to the validity of all of the asserted claims.

Given the disclosures in the '807 patent and the Elmalem publication regarding the addition of an antioxidant to $RA_7$, Plaintiffs' observation that rivastigmine was susceptible to oxidative degradation was obvious.  The problem of oxidative degradation of the drug in pharmaceutical compositions and the use of an antioxidant for the purpose of reducing oxidative degradation (*i.e.*, stabilizing a drug in a pharmaceutical composition for a prolonged period of time) were well-known long before 1998.  (Tr. 630:14-645:17; JTX188 at 1507).[3]  It was also well known that whether or not a compound actually degrades is dependent on the composition in which the compound is formulated. (Tr. 396:22-398:7; Tr. 598:23-599:9; Tr. 276:7-277:19; Tr. 792:20-793:9). As was established at trial (and not disputed), the FDA requires stability testing for all pharmaceutical products and testing the stability of the active ingredient is a routine and necessary part of any drug development project.  (JTX095; Tr. 700:5-19).  Any person of ordinary skill would have conducted the same stability studies performed by Plaintiffs' scientists and would have addressed any oxidative degradation identified during such routine stability testing by the conventional means of adding an antioxidant to a rivastigmine pharmaceutical composition, including a transdermal patch. (Tr. 679:15-680:15).[4]  The '807 patent and Elmalem publication taught that rivastigmine was susceptible to oxidative degradation and identified the addition of an antioxidant as an effective

---

[3] Citations to the Trial Transcript are cited herein as "(Tr. __:__-__:__)."

[4] Alternatively, as discussed in detail in Section IV.C, a person of ordinary skill in January 1998 would have been motivated to include an antioxidant in a transdermal system for the purpose of stabilizing the polymers in the adhesive, regardless of the particular active pharmaceutical ingredient ("API") contained in the patch.  (Tr. 648:6-17).

solution for rivastigmine compositions.  (Tr. 674:3-15 and 701:16-703:1).  Because some

environments are much more oxidative than others, the '807 patent recognized that antioxidants

could be added to rivastigmine compositions "as required."  (JTX096; Tr. 703:18-704:1).  In

selecting the particular antioxidant and the amount of antioxidant, a person of ordinary skill in the

art would have utilized a reference such as *The Handbook of Pharmaceutical Excipients* ("The

Handbook") to select safe and approved antioxidants.  (Tr. 675:10-676:1 and 701:16-702:16).

Indeed, all of the antioxidants listed in the patents-in-suit were identified in the Handbook for use in

pharmaceutical compositions in amounts that overlap with the claimed range.  (Tr. 630:14-645:17;

DTX007-DTX012).

Finally, Plaintiffs' patentability arguments are not commensurate with the scope of their

broad composition claims.  Plaintiffs sought and obtained a broad claim construction of claims 2

and 7 of the '023 patent and claims 3 and 7 of the '031 patent.  These claims, as construed by the

Court, require the presence of rivastigmine and an antioxidant but do not require the antioxidant to

reduce oxidative degradation of rivastigmine.  (D.I. 250).  Thus, these claims are rendered obvious

by prior art teaching inclusion of an antioxidant in the composition for any reason.  For the reasons

explained at trial and discussed herein, the asserted claims of the patents-in-suit are invalid under 35

U.S.C. § 103 as obvious.

## IV.    STATEMENT OF FACTS

### A.    The Asserted Claims of the Patents-In-Suit

The '031 and '023 patents are related patents.  The patents share common inventors, have

the same specification, claim the benefit of the same priority date, and expire on the same day

pursuant to a terminal disclaimer.  On the first day of trial, Plaintiffs narrowed the claims asserted

against Watson to only seven claims.  Claims 3 and 7 of the '031 patent and claims 2 and 7 of the

'023 patent are the broader "composition" claims.  These claims are generally directed to

5

pharmaceutical compositions of rivastigmine, such as transdermal devices, which contain an antioxidant. The Court has defined antioxidant as "an agent that reduces oxidative degradation." (D.I. 250). Claims 13, 16 and 18 of the '031 patent are the narrower "stabilizing" claims, that further require, *inter alia*, an amount of antioxidant that will significantly reduce degradation of Compound A (rivastigmine) over a prolonged period of time.

All of the claims of the patents in suit are "open-ended" claims that use the transitional phrase "comprising" in the preamble. (JTX001 at cols. 8-10; JTX002 at col. 8). "'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *See Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997); (Tr. 623:7-10).

The chemical name for rivastigmine (Compound A) is (S)-N-ethyl, N-methyl-3-[1-(dimethylamino)ethyl] phenyl carbamate. $RA_7$ is a racemic compound made up of its individual enantiomers, **(S)**-N-ethyl, N-methyl-3[1-(dimethylamino)ethyl]phenyl carbamate (rivastigmine) and **(R)**-N-ethyl, N-methyl-3[1-(dimethylamino)ethyl] phenyl carbamate in equal amounts. (Tr. 602:2-603:22; 622:20-24). None of the asserted claims contains a limitation regarding the enantiomeric purity of rivastigmine. Nor do any of the asserted claims require that the rivastigmine employed in the claimed composition or method be free or "substantially free" of the (R)-enantiomer, as required by the prior art '176 patent. *See e.g.*, JTX 098, at col. 9, claim 1.

The prosecution histories confirm that the claims of the patents-in-suit do not preclude the presence of the (R)-enantiomer. (JTX003; JTX004). During prosecution of the '031 patent, the patent examiner stated that rivastigmine in the claimed pharmaceutical compositions must be substantially free of the (R)-enantiomer to be used in the proposed treatment, and rejected the claims. (JTX003 at N0001062; Tr. 626:14-627:9). However, rather than amend the claims, Plaintiffs argued that a purity limitation was not required, because the (R)-enantiomer is not

6

detrimental to the proposed treatments.  (JTX003 at N0001075; Tr. 627:10-628:18).  Accordingly, Plaintiffs' own statements during prosecution confirm that the asserted claims of the patents-in-suit are not limited by enantiomeric purity. (Tr. 625:1-629:4).  In other words, a reference to rivastigmine in the asserted claims would cover the use of the racemic compound, $RA_7$, or any other mixture in which rivastigmine is present in any amount.  (*Id.*).  Thus, the disclosure of $RA_7$ in the prior art includes rivastigmine.

## B.    The Prior Art and Knowledge of the Person of Ordinary Skill in the Art

### 1.    The Prior Art Identified Rivastigmine as a Compound Useful for the Treatment for Alzheimer's Disease Prior to January 1998

As of January 1998, the prior art identified rivastigmine as a compound useful for treating Alzheimer's disease.[5] GB '040, the closest prior art to the patents-in-suit, claims and describes rivastigmine and its pharmaceutically acceptable acid addition salts, which are referred to in the application as "compounds according to the invention." (JTX097 at 2).  GB '040 teaches that the compounds of the invention "exhibit a particular marked and selective inhibition of the acetylcholinesterase," (JTX097 at 2) "exhibit pharmacological activity as indicated in standard tests and are therefore useful as pharmaceutical agents," (JTX097 at 3) "reach the central nervous system rapidly" (JTX097 at 3) "exert a brain region-selective inhibition of acetylcholinesterase activity," (JTX097 at 3) "have a long duration of action" (JTX097 at 3) and are "well-tolerated." (JTX097 at 9).  Additionally, GB '040 provides that the compounds according to the invention are useful for the treatment of senile dementia and Alzheimer's disease. (JTX097 at 9).

In 1991, Albert Enz, the inventor named on GB '040 published an article about rivastigmine

---

[5] Defendants do not agree that the "lead formulation" case upon which Plaintiffs rely, *Unigene Laboratories, Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1361-62 (Fed. Cir. 2011), is applicable to this case, but even if it were, a person of ordinary skill would have been directed to a rivastigmine transdermal formulation for development .

(referred to as SDZ ENA 713) in the Annals of the New York Academy of Science series entitled

"Aging and Alzheimer's Disease." (JTX156). Dr. Enz and his colleagues reported the results of

human clinical studies confirming that rivastigmine is "a centrally selective, long-acting

acetylcholinesterase inhibitor" and indicated that rivastigmine was being examined as a

symptomatic treatment for Alzheimer's disease. (JTX156 at 273-274). By 1997, rivastigmine

capsules already had been approved as a treatment for Alzheimer's disease in Switzerland. (Tr.

819:21-820:5). Additionally, the prior art '807 patent, issued in 1990, identified $RA_7$ as one of the

most preferred compounds that "produce inhibition of brain acetylcholinesterase after parenteral

administration of significantly longer duration than that induced by physostigmine or miotine."

(JTX096 at col. 12, ll. 55-68). The '807 patent also explained that rivastigmine exhibited increased

bioavailability, provided a greater safety margin (therapeutic ratio), and decreased toxicity as

compared to physostigmine, a known acetylcholinesterase inhibitor used clinically at that time.

(JTX096 at col. 12, ll. 55-68).

### 2. The Prior Art Recognized the Benefits of Transdermal Drug Delivery for Rivastigmine and Many Other Pharmaceutical Compositions

The benefits of transdermal drug delivery were well known in the field of pharmaceutical

drug development prior to 1998, both for rivastigmine and for other drugs suitable for systemic

administration through the skin. With respect to rivastigmine in particular, GB '040 disclosed that

rivastigmine exhibited "good skin penetration when administered percutaneously." (JTX097 at 13).

GB '040 further explained that transdermal administration of rivastigmine is superior to other

dosage forms because it "induces a long-lasting, dose-dependent inhibition of AChE activity" and

that "[i]n contrast to the rapid onset of the effect after either oral or subcutaneous application, the

AChE inhibition occurs slowly after [the transdermal] application route (max. > 2 hours) without

affecting the brain region selective AChE inhibition." *Id.* Table 2 of GB '040 provides the results

8

of test data showing that "twenty-four hours after transdermal application, the AChE activity is still inhibited in the central and peripheral regions," whereas, after the same amount of time, orally administered rivastigmine "has no effect on the enzyme." (JTX097 at 14-15). Finally, GB '040 explained that "a drug . . . may require a relatively low quantity in the transdermal composition when compared with the oral daily dose, since the first pass effect will be avoided." (JTX097 at 17).

It was also well-known prior to 1998 that transdermal delivery provided advantages over other dosage forms for any drug suitable for systemic delivery through the skin. For example, U.S. patent 4,917,896, which issued in April 1990, provides that:

> Among other advantages, [transdermal] administration can provide a comfortable, convenient, and safe way of giving many drugs now taken orally or infused into veins or injected intramuscularly. Using skin as the portal for drug entry offers unique potential, because transdermal delivery permits close control over drug absorption. For example, it avoids factors that can cause unpredictable absorption from the gastrointestinal tract, including: changes in acidity, motility, and food content. It also avoids initial metabolism of the drug by the liver. Thus, controlled drug entry through skin can achieve a high degree of control over blood concentrations of drug. Close control over drug concentrations in blood can translate readily into safer and more comfortable treatment.

(DTX126 at col. 1, ll. 25-42). Transdermal drug delivery was also known to be particularly beneficial to patients with a chronic disease because:

> Many such patients have difficulty following regimens requiring several doses daily of medications that repeatedly cause unpleasant symptoms. They find the same drugs much more acceptable when administered in transdermal systems that require application infrequently – in some cases, only once or twice weekly – and that reduce adverse effects.

(DTX 126 at col. 1, ll. 48-54); *see also* Tr. 687:9-689:1.

### 3.    GB '040 Describes a Rivastigmine Transdermal Patch

GB '040 provides a starting point for the development of a rivastigmine transdermal patch and discloses all of the limitations of the asserted claims of patents-in-suit, with the exception of an antioxidant. First, GB '040 discloses the free base form and the acid addition salt form of rivastigmine, including the hydrogen tartrate salt form and provides that "[t]he free base may be prepared from the racemate by separation of the enantiomers in accordance with known methods."

9

(JTX097 at 2). Second, GB '040 provides that the disclosed compounds can be incorporated into transdermal pharmaceutical products. In addition to the disclosures discussed above, GB '040 discloses that rivastigmine can be incorporated into solid transdermal pharmaceutical compositions described in European Patent Application No. 155,229 ("EP '229"). (JTX097 at 16). Example 2 of GB '040 discloses a transdermal patch utilizing a backing layer to support the pharmaceutical composition. (JTX097 at 19). Third, GB '040 discloses a "therapeutically effective dose of rivastigmine" as well as specific amounts of rivastigmine that overlap within the ranges claimed by the patents-in-suit. (JTX097 at 17; Tr. 607:12-608:14 and 606:21-607:9). For example, GB '040 provides that the amount of active ingredient in the transdermal product can be from about 1 to about 20% by weight of the active agent, and Example 2 specifically describes a transdermal patch containing 20% rivastigmine. (JTX097 at 19). Finally, GB '040 describes the use of a pharmaceutical carrier or diluent in rivastigmine pharmaceutical compositions. (JTX 097 at 16).

### 4. The '807 Patent and Elmalem Taught That Rivastigmine Is Susceptible to Oxidative Degradation and that an Antioxidant Would Reduce the Oxidative Degradation of Rivastigmine

Plaintiffs were not the first to "discover" that rivastigmine is susceptible to oxidative degradation. The '807 patent and Elmalem taught persons of ordinary skill that rivastigmine is susceptible to oxidative degradation and that, if oxidative degradation is observed in a particular formulation of the drug, that degradation can be reduced by the inclusion of an antioxidant. (JTX096 at col. 7, ll. 51-53; JTX159 at 1060; Tr. 614:11-615:13 and 672:5-16).

### a. The Teachings of the '807 Patent

The '807 patent is directed to "novel phenyl carbamates which are useful as pharmaceutical compositions having anticholinesterase activity." (JTX 096, col. 1, ll. 9-12). The phenyl carbamates of the '807 patent were developed as alternatives to physostigmine, "a potent anti-cholinesterase agent" that exhibited poor chemical stability. (JTX096 at col. 3, ll. 25-39). The '807 patent defines

10

the compounds encompassed by general formula I, including rivastigmine, as the "compounds of the invention." (JTX096 at col. 4, ll. 21-53). Although the '807 patent discloses a general formula for a large number of phenyl carbamates, the patent specifically directs one of ordinary skill to rivastigmine. (Tr. 610:18-20; 611:5-612:17). $RA_7$ is a racemic compound that necessarily includes rivastigmine. (Tr. 602:2-603:22; 621:17-622:4). $RA_7$ is one of only eight preferred compounds identified in the patent, and one of only three compounds claimed by the '807 patent. (Tr. 611:5-612:6; JTX096 at col. 5, ll. 39-50 and col. 14, claim 3).

At trial, Plaintiffs attempted to distinguish the asserted claims from the '807 patent and Elmalem by arguing that their claims specify the use of the (S)-enantiomer (*i.e.*, rivastigmine) and the two prior art references describe pharmaceutical compositions of the racemic mixture (*i.e.*, $RA_7$). This argument fails for at least two reasons. First, it is undisputed that one-half of $RA_7$ is rivastigmine. (Tr. 628:19-629:4; 851:13-14). There also is no dispute that oxidation of these molecules is not stereoselective.[6] As a result, a person of ordinary skill would have recognized from the '807 patent and Elmalem that both enantiomers of $RA_7$ were susceptible to oxidative degradation and that an antioxidant could be used to reduce oxidative degradation of both enantiomers. Second, all of the asserted claims are open-ended. They require the presence of the (S)-enantiomer, but do not exclude the presence of any other substance, including the (R)-enantiomer. Therefore, the claims encompass compositions containing $RA_7$. *See* Section V.A.4.

In comparison to physostigmine, the compounds of the '807 patent are di-substituted carbamates rather than mono-substituted carbamates. (Tr. 936:19-939:21.) Thus, the compounds of the '807 patent are considerably less susceptible to degradation by hydrolysis (reaction with water)

---

[6] Although enantiomers may have different physical, chemical or pharmacological properties, the oxidative degradation of rivastigmine is not stereospecific. Thus, one of ordinary skill would have understood that rivastigmine oxidizes in the same manner as $RA_7$. (Tr. 672:17-24; 851:20-852:3).

than physostigmine. (Tr. 940:2-23). However, this increased stability toward hydrolytic degradation did not address an additional degradation pathway, *i.e.*, oxidative degradation, to which the compounds are also susceptible. All of the compounds of general formula I provided in the '807 patent, however, are phenyl carbamates that have a tertiary amine functional group. (Tr. 616:21-617:2; 621:1-4; JTX 096 at col. 4, ll. 21-53). By January 1998, it was known that tertiary amines were susceptible to oxidative degradation, and that oxidation at the site of the tertiary amine occurs through the formation of an N-oxide. (Tr. 973:8-974:3). Thus, while the compounds of the '807 patent, such as RA7, exhibited reduced hydrolytic degradation, they all contained tertiary amine groups that were the site of oxidative degradation. (Tr. 940:2-23; 973:8-974:3). Therefore, despite the fact that the compounds of the '807 patent exhibited improved *overall* chemical stability (as a result of improved hydrolytic stability), a person of ordinary skill would have understood that those compounds were still susceptible to *oxidative* degradation. (Tr. 941:14-942:7).

In fact, the '807 patent recognized that the compounds disclosed therein, including RA7, remained susceptible to oxidative degradation, as it expressly suggests the use of antioxidants with the "compounds of the present invention." (Tr. 621:17-622:4). The '807 patent discloses that the compounds may contain a "physiologically acceptable vehicle, carrier, excipient, binder, preservative, stabilizer, flavor, etc. in a unit dosage form as called for by accepted pharmaceutical practice" and that "buffers, preservatives, antioxidants and the like can be incorporated, as required." (Tr. 613:21-614:10; JTX096 at col. 7, ll. 48-50). The '807 patent discloses that "preferred antioxidants for use with the compounds of the present invention include sodium metabisulphite and ascorbic acid." (JTX096 at col. 7, ll. 51-53). This statement, generally refers to antioxidants for use with the "compounds of the present invention" and is not specific to any particular type of formulation, suggesting that an antioxidant may be appropriate to prevent oxidative degradation of the compounds of the invention in diverse formulation environments. (Tr.

12

615:1-13; JTX096 at col. 7, ll. 51-53).  Thus, these disclosures in the '807 patent taught persons of

ordinary skill that rivastigmine was susceptible to oxidative degradation and that, if oxidative

degradation were observed in a particular formulation of the drug, that degradation could be

reduced by including an antioxidant, such as ascorbic acid.  (Tr. 615:1-13).

### a.   The Elmalem Article

Elmalem et al., "Antagonism of Morphine-Induced Respiratory Depression by Novel

Anticholinesterase Agents," Neuropharmacology, Vol. 20, No. 10, at 1060 (1991) ("Elmalem") was

published in 1991.  (JTX159)  Two of the authors on Elmalem are inventors on the '807 patent.

(Tr. 653:13-24).  Elmalem describes a study comparing the ability of three particular carbamate

compounds of interest, ($RA_6$, $RA_7$ and $RA_{15}$), with the acetylcholinesterase inhibitor,

physostigmine, for their ability to counteract morphine-induced respiratory depression.  (Tr. 654:18-

655:2).  Elmalem uses the term "drug" to refer specifically to the drug compounds being tested in

the study, $RA_6$, $RA_7$, $RA_{15}$ and physostigmine.  (Tr. 660:2-9; JTX159 at 1060).  Elmalem describes

preparing pharmaceutical compositions (i.e., sterile injectable solutions) of each "drug," and

injecting them into rabbits.  (Tr. 655:11-22).  Elmalem expressly teaches that "[a]ll drugs were

made up freshly in sterile saline, which included an equal weight of sodium metabisulphite, to

prevent oxidation." (Tr. 670:2-6; JTX159 at 1060) (emphasis added).

As discussed above, one of ordinary skill would have understood that the disclosure of $RA_7$

in Elmalem necessarily includes rivastigmine. (Tr. 602:2-603:22 and 621:17-622:4).  Although

Plaintiffs and their expert, Dr. Klibanov, attempt to distort the teachings of the reference, Elmalem

unmistakably taught one of ordinary skill that rivastigmine was susceptible to oxidative degradation

and to add an antioxidant to the pharmaceutical composition to prevent it. (Tr. 672:5-16).

### 5.   The Handbook of Pharmaceutical Excipients Identified Well-Known Antioxidants and Their Amounts for Use in Pharmaceutical Compositions

Antioxidants are substances capable of reducing oxidative degradation of other molecules. (JTX188 at 1507).  For this reason, antioxidants are commonly added to pharmaceutical compositions that are subject to oxidative degradation.  (JTX188 at 1507; DTX007-DTX012). There are a limited number of antioxidants that are commonly incorporated into and approved for use in pharmaceutical compositions, and a person of ordinary skill would typically refer to a reference book that identified these antioxidants, such as *The Handbook of Pharmaceutical Excipients*, Second Edition (Ainley Wade & Paul J. Weller, eds. 1994)(the "Handbook").  (Tr. 567:15-17 and 586:19-587:9).  The Handbook is a frequently used resource for pharmaceutical formulators that describes the physical and chemical nature of excipients in every product that has been approved in Europe, USA and Japan (Tr. 586:19-587:9 and 631:9-632:7; *e.g.* DTX007).

The Handbook provides an overview of antioxidants suitable for inclusion in a pharmaceutical composition, and describes the typical amount of each antioxidant.  (Tr. 629:20-24 and 631:9-632:7).  Not only are all of the antioxidants claimed in the patents-in-suit identified in the Handbook, but the concentrations of antioxidants identified in the Handbook also overlap the concentration ranges of the antioxidants claimed in the patents-in-suit.  (Tr. 630:14-645:17; DTX007- DTX012).  Moreover, selecting a particular antioxidant for use in a composition and determining the optimal amount of antioxidant necessary to counteract any oxidative degradation observed during routine stability testing would have been a matter of routine for one of skill in the art well prior to January 12, 1998. (Tr. 701:16-703:1).

### 6. The '572 Patent Taught the Use of an Antioxidant in a Transdermal System for Reasons Unrelated to the Particular API

United States patent 5,580,572 issued in December 1996.  The '572 patent describes a transdermal system for delivering the hormones oestrogen and progestogen.  (JTX110 at col. 2, ll. 10-13; Tr. 647:11-17).  The '572 patent teaches the use of an antioxidant in a transdermal system

for the purpose of stabilizing the copolymers (components of the adhesive) not the API. (JTX110 at col. 4, ll. 47-52; Tr. 648:6-17). The specification of the '572 patent explains that the antioxidants for use in the transdermal system are those "agents widely used by persons skilled in the art." (JTX110 at col. 4, ll. 47-52). Further the antioxidant can be included in the range of 0.01 to 1 parts per 100 parts by weight (*i.e.*, 0.01 to 1 percent by weight), which overlaps with the concentration ranges of antioxidants claimed in the patents-in-suit. (JTX110 at col. 16, l. 23; Tr. 648:18-649:3).

The '572 patent is just one example of several transdermal patches in the prior art that included an antioxidant as of January 1998. U.S. patent 4,917,896 discloses the use of antioxidants, including ascorbic acid and sodium metabisulphite, in a halperidol transdermal system. (DTX126; Tr. 974:4-976:16). Additionally, U.S. patent 5,254,348 discloses the use of antioxidants with a tulobuterol transdermal device. (DTX127; Tr. 979:21-981:10). Thus, a person of ordinary skill would have understood that the polymer matrix of a transdermal system could include an antioxidant to stabilize the polymer as described in the '572 patent. (JTX 110 at col. 4, ll. 47-52; Tr. 648:6-17).

Additionally, antioxidants have been used in the manufacture of polymers for decades to prevent premature polymerization of monomers and control molecular weight. (Tr. 402:2-403:17). Antioxidants, like BHT, were ubiquitous in polymer formulations as of January 1998. (Tr. 402:2-403:17). A person of ordinary skill therefore would have understood that polymers used in transdermal drug delivery systems thus included antioxidants for reasons unrelated to stabilizing the particular active ingredient in the product. (Tr. 648:6-17).

### 7.    The Structure of Transdermal Patch Layers Were Well Known

As of January 1998, one of ordinary skill in the art would have been familiar with the structural elements (e.g. a backing layer, a release liner and various arrangements of the polymer and adhesive layers) commonly used in a transdermal patch. GB '040 states that "agents of the

15

invention may be administered in any conventional liquid or solid transdermal pharmaceutical compositions, *e.g.* as described in Remington's Pharmaceutical Sciences, 16th Edition . . . the contents of which are incorporate herein by reference." (JTX097 at 16). Thus, one of ordinary skill would have been familiar with the conventional structural components of a transdermal patch. GB '040 also references EP '229 with respect to a reservoir or a polymeric matrix for a transdermal patch. (JTX097 at 16; Tr. 691:17-692:6). EP '229 describes a drug and adhesive layer as either a solid reservoir or polymer matrix. (JTX109; Tr. 693:6-694:10). EP '229 also discloses a backing layer on one side of the drug and adhesive layer and a release liner or protective peel strip on the other side of the drug and adhesive layer. (JTX109; Tr. 693:6-694:10). EP '229 further discloses an optional second adhesive layer interposed between the drug and adhesive layer and the release liner. (JTX109; Tr. 693:6-694:10).

### C.   There Was A Clear Motivation to Combine the Teachings of the Prior Art to Include an Antioxidant in a Rivastigmine Transdermal Patch with a Reasonable Expectation of Success

As of January 1998, one of ordinary skill in the art would have been motivated to develop a rivastigmine transdermal patch based on the information provided by the GB '040 patent. It is undisputed that the prior art GB '040 patent application discloses that rivastigmine pharmaceutical compositions are effective acetylcholinesterase inhibitors useful for the treatment of dementia and Alzheimer's disease. (JTX 097 at 9). GB '040 also recognized the benefits of a rivastigmine transdermal device over other suitable dosage forms. (JTX 097 at 13).

The patents-in-suit erroneously assert that "[b]efore the finding by the present applicant that an anti-oxidant is necessary in compositions of this invention, it was hitherto thought unnecessary." (JTX 001 at col. 4, ll. 7-9). To the contrary, the problem of oxidative degradation, is the same problem recognized in the '807 patent and Elmalem and that was solved in the prior art by the addition of an antioxidant. (JTX096 at col. 7, ll. 51-53; JTX159 at 1060). Both the '807

16

patent and Elmalem taught one of skill that rivastigmine is susceptible to oxidative degradation, and that the addition of an antioxidant protects rivastigmine from oxidative degradation. (JTX 096 at col. 7, ll. 51-53; JTX 159 at 1060). This evidence, published by the researchers who first synthesized and studied RA$_7$, demonstrates that the named inventors on the patents-in-suit were not the first to recognize that rivastigmine was susceptible to oxidation, or that an antioxidant would protect rivastigmine against oxidative degradation.

Because of the teaching in the '807 patent and the related Elmalem publication that rivastigmine is susceptible to oxidative degradation, one of ordinary skill would have conducted routine stability testing on any formulation of rivastigmine and would have been motivated to add an antioxidant to a rivastigmine pharmaceutical composition or transdermal patch to address any oxidative degradation identified during such testing. (Tr. 701:16-703:1). Oxidative degradation is one of the most common causes of degradation in pharmaceutical compositions (JTX188 at 1507), and if a stability problem was identified during routine product testing, as of January 1998, a small number of known techniques were available in 1998 for reducing oxidative degradation (Tr. 569:16-570:18; 797:10-799:24). The use of an antioxidant for the purpose of reducing oxidative degradation (i.e., stabilizing a drug in a pharmaceutical composition for a prolonged period of time) was a simple and well-known solution. (Tr. 688:12-689:1). Separate and apart from the prior art's teaching that rivastigmine is susceptible to oxidative degradation, routine stability testing would have revealed, as it did to the inventors of the asserted claims, the oxidative degradation. Indeed, because oxidative degradation is a common pathway of degradation (JTX188 at 1507), this would not have been an unexpected problem. Thus, contrary to Plaintiffs' position, even the identification of the alleged problem (i.e., the oxidative degradation of rivastigmine) would have been obvious.

Although a person of ordinary skill in the art would have used routine testing to determine the particular antioxidant and the specific amount, he or she would have done so with the full

17

expectation that one or more of the commonly used pharmaceutically acceptable antioxidants, in the amounts identified in the prior art, would have the desired effect. (Tr. 701:16-702:16). This is so because the specific antioxidants identified in the '031 and '023 patents were commonly known and used in pharmaceuticals and food products in the same amounts claimed by the patents-in-suit. (Tr. 630:14-645:17; DTX007-DTX012).

### D. The Parties Agree on the Level of Ordinary Skill

The parties' experts agree on the level of education and experience of a person of ordinary skill in the art. Defendants' Expert Dr. Kibbe has opined that a person of ordinary skill:

> would have had an advanced degree in the field of pharmaceutics or an equivalent advanced degree in chemistry or pharmaceutical chemistry. They could have also had an advanced degree in material engineering and so on. They should have had at least two years of experience developing pharmaceutical formulations, either in industry or in academia. If they were trained as a Bachelor's or Master's they could make up the advanced knowledge by simply practicing and working within the industry for a longer period of time, and practical experience includes both in the industry and in academia or even with the National Institutes of Health.

(Tr. 589:1-590:3). Plaintiffs' expert Dr. Klibanov generally agrees. (Tr. 817:13-818:21).

## V. ARGUMENT

### A. Legal Standards Related to Obviousness

#### 1. The Supreme Court Explained the Proper Obviousness Analysis in *KSR Int'l Co. v. Telflex, Inc.*

A patent is invalid as obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art…." 35 U.S.C. § 103(a); *see also KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007). The determination of obviousness is a question of law for the Court. *Bayer Schering Pharma AG v. Barr Labs., Inc.* 575 F.3d 1341, 1346 (Fed. Cir. 2009). The obviousness analysis requires that "the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be

ascertained; and the level of ordinary skill in the pertinent art resolved." *KSR*, 550 U.S. at 406

(quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

Obviousness can be established by identifying one or more reasons that would have

prompted a person of skill in the relevant field to combine the publicly known elements in the way

the patent in suit does. *KSR*, 550 U.S. at 418. However, a determination that a claimed invention

would have been obvious "need not seek out precise teachings directed to the specific subject matter

of the challenged claim, for a court can take account of the inferences and creative steps that a

person of ordinary skill in the art would employ." *Id.* As long as the person of ordinary skill would

have been motivated to combine references by the prior art taken as a whole, it is not necessary that

the references be combined for the same reasons contemplated by the inventor. *In re Kahn*, 441

F.3d 977, 990 (Fed. Cir. 2006) ("the law does not require that the references be combined for the

reasons contemplated by the inventor") (citations omitted). Thus, the analysis is not limited to the

problem that the patentee was trying to solve but "[u]nder the correct analysis, any need or problem

known in the field of endeavor at the time of invention and addressed by the patent can provide a

reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420.

In deciding obviousness, rather than focus on the "particular motivation" or the "avowed

purpose" of the patentee, what matters to a proper obviousness analysis is "the objective reach of

the claim." *KSR*, 550 U.S. at 419. Simply put, "[i]f the claim extends to what is obvious, it is

invalid under § 103." *Id.* To determine whether a claimed invention is obvious, "a court must ask

whether the improvement is more than the predictable use of prior art elements according to their

established functions." *Id.* at 417. "A person of ordinary skill often will be able to fit the teachings

of multiple patents together like pieces of a puzzle" – this is still obvious. *Id.* at 420; *see also Bayer*

*Schering Pharma AG*, 575 F.3d at 1347. "The combination of familiar elements according to

known methods is likely to be obvious when it does no more than yield predictable results." *KSR*,

550 U.S. at 416.  A combination that is obvious to try may render a patent obvious under § 103:

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product not of innovation, but of ordinary skill and common sense.

*Id.* at 421; *see also Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1161-62 (Fed. Cir. 2007).  After evaluating the three primary obviousness factors, the court will examine "secondary objective evidence of nonobviousness, such as commercial success, unexpected results, long-felt need, and industry recognition.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).  These factors must be considered but they do not control the obviousness inquiry.  *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988).  A strong case for obviousness may not be outweighed by the secondary considerations. *See, e.g., KSR*, 550 U.S. at 413, 426; *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1363 (Fed. Cir. 2012).

## 2. An Invention is Obvious If the Prior Art Recognized the Problem to Be Solved and Taught the Solution to the Problem

"One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claim." *KSR*, 550 U.S. at 419-20; *Norgren Inc. v. ITC*, 699 F.3d 1317, 1324 (Fed. Cir. 2012)(affirming invalidity of claims under § 103 where the claimed invention solved known problems by the use of an obvious solution).  "One of ordinary skill in the art need not see the identical problem addressed in a prior art reference to be motivated to apply its teachings." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1322-23 (Fed. Cir. 2005).  When the differences between the prior art and the claimed invention would have been established as part of routine experimentation, the claimed invention is obvious. *See Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, 642 F.Supp.2d 329, 371-72 (D. Del. 2009)  (The prior art

20

"either expressely discloses the remaining limitations or contains differences that would have been established as a part of the routine experimentation involved in incorporating tramadol as an active ingredient."). The fact that testing may be required by the patentee to verify the teachings of the prior art does not confer patentability to the claims. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1366 (Fed. Cir. 2007) ("that [the patentee] had to verify through testing the expected traits of each acid addition salt is of no consequence because it does not compel a conclusion of non-obviousness here.") In fact, testing and experimentation required to *verify* physiochemical characteristics (*e.g.*, chemical and physical stability) is distinguishable from "trial and error procedures" required to make a *discovery* for purposes of determining patentability. *Id.* at 1367-68.

### 3.    The Fact that Some of the Prior Art References Were Considered By the Examiner Does Not Preclude a Finding of Invalidity

The fact that a reference was previously considered by the PTO does not preclude a finding of invalidity. *See Sciele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012); *Surface Tech., Inc. v. U.S.I.T.C.*, 801 F.2d 1336, 1340-41 (Fed. Cir. 1986). A finding of invalidity may be appropriate where the reference was considered by the PTO, but the Examiner failed to give proper consideration to the teachings of that reference. *See Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1366 (Fed. Cir. 2007).[7] In fact, "[w]hether a reference was previously considered by the PTO, the burden of proof is the same: clear and convincing evidence." *Sciele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012) *citing Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2250 (2011). "The burden does not suddenly change to something higher – 'extremely clear and convincing evidence' or 'crystal clear and convincing evidence' – simply because the prior art references were considered by the PTO." *Sciele Pharma, Inc.*, 684 F.3d at 1260. "In short,

---

[7] During prosecution of the patents-in-suit, the examiner failed to raise *any* prior art rejections. (JTX003; JTX004.)

there is no heightened or added burden that applies to invalidity defenses that are based upon references that were before the Patent Office." *Id.*

### 4. The Teachings of the '807 Patent and Elmalem are Relevant to the Claims of the Patents-In-Suit

The claims of the patent in suit contain no purity limitation and do not exclude the racemate or other compositions containing more (R)-enantiomer than (S)-enantiomer, as Dr. Klibanov erroneously asserted at trial. (Tr. 963:23-964:16).  To the contrary, all of the claims of the patents in suit are "open-ended" claims that use the transitional phrase "comprising" in the preamble of the claim. (JTX 001 at cols. 8-10; JTX 002 at col. 8). "'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." See *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997); *see also* MPEP § 2111.03.  This means that the claimed invention of the patents-in-suit must contain the specified amount of rivastigmine (the S-enantiomer), but compositions that contain additional ingredients (including the R-enantiomer) are also covered. Plaintiffs admitted as much during prosecution of the patents-in-suit, when they asserted that the claims are not limited to the (S)-enantiomer and do not exclude compounds that also contain the R-enantiomer. (JTX003 at N0001075; Tr. 625:1-629:4).  Moreover, a person of ordinary skill would have understood that rivastigmine (the (S)-enantiomer) is susceptible to oxidation in the same manner as $RA_7$ (the racemate) as taught by the '807 patent and Elmalem.  (Tr. 672:17-24; 851:20-852:3).  Thus, whether the claim cover the racemate is irrelevant to whether a person of ordinary skill in the art would have included an antioxidant in a formulation containing rivastigmine.

### B.   The Asserted Claims Are Invalid as Obvious in View of the Prior Art

#### 1.   Claim 2 of the '023 Patent and Claim 3 of the '031 Patent Would Have Been Obvious

Claim 2 of the '023 patent and claim 3 of the '031 patent would have been obvious over the prior art as of January 1998. These claims are directed to similar subject matter as indicated below:

| Claim 3 of the '031 Patent As an Independent Claim | Claim 2 of the '023 Patent As an Independent Claim |
|---|---|
| A pharmaceutical composition comprising: | A pharmaceutical composition comprising |
| (a) a therapeutically effective amount of [rivastigmine] in free base or acid addition salt form (Compound A); | 1 to 40 weight percent of [rivastigmine] in the form of a free base or acid addition salt |
| (b) about 0.01 to about 0.5 percent by weight of an antioxidant that is tocopherol, esters thereof, ascorbic acid, butylhydroxytoluene, butylhydroxyanisole or propyl gallate, based on the weight of the composition, and | 0.01 to 0.5 weight percent of an antioxidant selected from the group consisting of tocopherol, esters of tocopherol, ascorbic acid, esters of ascorbic acid, butylhydroxytoluene, butylhydroxyanisole, propyl gallate, and combinations thereof, |
| (c) a diluent or carrier. | and a diluent or carrier, |
| | wherein the weight percents are based on the total weight of the pharmaceutical composition |

As of January 1998, claim 2 of the '023 patent and claim 3 of the '031 patent would have been obvious to a person of ordinary skill in view of GB'040 in combination with either the '807 patent or Elmalem and the Handbook. Not only does this combination of prior art teach a person of ordinary skill every feature of these claims, but the prior art motivates a person of ordinary skill to configure these elements in a composition as set forth in the claims.

GB '040 teaches pharmaceutical compositions comprising both a therapeutically effective amount of rivastigmine and 1 to 40 weight percent of rivastigmine in the form of a free base or acid addition salt. (Tr. 673:18-674:2). GB '040 further teaches rivastigmine pharmaceutical compositions comprising diluents or carriers. (Tr. 676:14-19). As discussed above in Section IV.C, a person of ordinary skill would have been motivated to include an antioxidant in a rivastigmine pharmaceutical composition based on the disclosure of the '807 patent and Elmalem. (Tr. 674:3-15). Further, the claimed amounts of antioxidants and specific antioxidants were obvious amounts and types of antioxidants as disclosed by the Handbook. (Tr. 675:5-9; 676:7-13). Specifically, the

23

Handbook discloses antioxidants for use with pharmaceutical compositions, including tocopherols, ascorbic acid, BHA, BHT and propyl gallate, in amounts that overlap and/or encompass the claimed range of 0.01 to 0.5 percent by weight. (Tr. 630:14-644:22; 675:10-18). Finally, a person of ordinary skill would have understood that the weight percentages would have been based on the total weight of the pharmaceutical composition. (Tr. 676:20-677:3).

In view of the above, a person of ordinary skill would have recognized that all the claimed elements were known in the prior art and could have been combined and predictably used according to their established functions. *KSR*, 550 U.S. at 416. Thus, claim 2 of the '023 patent and claim 3 of the '031 patent would have been obvious over GB '040 in combination with either the '807 patent or Elmalem and the Handbook.

As of January 1998, claim 2 of the '023 patent and claim 3 of the '031 patent would also have been obvious to a person of ordinary skill in view of GB '040 in combination with the '572 patent and the Handbook. In addition to describing pharmaceutical compositions more generally, GB '040 describes transdermal compositions comprising rivastigmine. (Tr. 690:23-691:2). GB '040 discloses that the transdermal compositions can include a polymer matrix without limitation to the type of polymer matrix. (JTX097 at 16). As an example of a polymer matrix for use with the transdermal devices described therein, GB '040 discloses "a hydrophilic polymer as described in European Patent Application No. 155,229." (JTX097 at 16).

A person of ordinary skill in the art would have recognized that another example of a polymer matrix for use with the compositions of GB '040 includes the polymer matrix disclosed in the '572 patent. The '572 patent discloses a polymer matrix for use with transdermal compositions. (Tr. 647:11-17). The polymer matrix of the '572 patent would be encompassed by the claims of the patents-in-suit. (Tr. 652:11-15). Furthermore, the polymer matrix of the '572 patent includes an antioxidant that is used to reduce oxidative degradation of the polymer matrix. (Tr. 652:20-23).

24

The antioxidant in the polymer matrix of the '572 patent is used in an amount from 0.01 to 1 percent, which overlaps the claimed range of antioxidant amounts. (Tr. 648:18-649:3).

In determining an appropriate antioxidant, the Handbook describes the claimed antioxidants for use in pharmaceutical compositions. (DTX007-DTX012; JTX096 at col. 7, ll. 51-53). In view of the above, a person of ordinary skill would have recognized that all the claimed elements were known in the prior art and could have combined and predictably used according to their established functions. *KSR*, 550 U.S. at 416. Thus, claim 2 of the '023 patent and claim 3 of the '031 patent would have been obvious over GB '040 in combination with the '572 patent and the Handbook.

> **2.      Claim 7 of the '023 Patent and Claim 7 of the '031 Patent Would Have Been Obvious**

Claim 7 of the '023 patent and claim 7 of the '031 patent would have been obvious over the prior art as of January 1998. These claims are similar to the above-described claims, with the added limitation of restricting the pharmaceutical composition to a transdermal device. (JTX001, claim 7; JTX002, claim 7). Claim 7 of the '031 patent further provides that "the pharmaceutical composition is supported by a substrate." (JTX001, claim 7). These claims are reproduced below:

| Claim 7 of the '031 Patent As an Independent Claim | Claim 7 of the '023 Patent |
|---|---|
| A transdermal device comprising: | A transdermal device comprising: |
| a pharmaceutical composition comprising | a pharmaceutical composition comprising |
| (a)   a therapeutically effective amount of [rivastigmine] in free base or acid addition salt form (Compound A); | 1 to 40 weight percent of [rivastigmine] in the form of a free base or acid addition salt, |
| (b)   about 0.01 to about 0.5 percent by weight of an antioxidant, based on the weight of the composition, and | 0.01 to 0.5 weight percent of an antioxidant |
| (c)   a diluent or carrier, | and a diluent or carrier, |
| wherein the pharmaceutical composition is supported by a substrate. | wherein the weight percents are based on the total weight of the pharmaceutical composition |

As of January 1998, claim 7 of the '023 patent and claim 7 of the '031 patent would have

25

been obvious to a person of ordinary skill in view of GB '040 in combination with either the '807 patent or Elmalem and the Handbook. As described above, this combination of prior art teaches pharmaceutical compositions comprising rivastigmine in the claimed amounts, an antioxidant in the claimed amounts, and a diluent or carrier.

A transdermal device comprising such a pharmaceutical composition would have been obvious to a person of ordinary skill based on this same combination of references. In addition to describing pharmaceutical compositions more generally, GB '040 describes transdermal compositions comprising rivastigmine. (Tr. 677:15-20). As Dr. Klibanov admitted at trial, GB '040 further discloses why a person of ordinary skill would be interested in pursuing a transdermal dosage form of rivastigmine. (Tr. 906:9-907:4). Specifically, GB '040 discloses that rivastigmine has good penetrability through the skin and does not have compatibility issues with transdermal materials. (Tr. 906:9-907:4). Thus, the transdermal device as claimed in claim 7 of the '023 patent would have been obvious to a person of ordinary skill as of January 1998.

The limitation of claim 7 of the '031 patent providing "wherein the pharmaceutical composition is supported by a substrate" also does not confer patentability to the claims because this limitation is taught by GB '040. Example 2 of GB '040 discloses a transdermal rivastigmine composition. (JTX097 at 19). The pharmaceutical composition comprising rivastigmine "is spread on top of an aluminised polyester foil (thickness 23 microns) using a convention apparatus, to produce a film of thickness 0.2 mm when wet." (JTX097 at 19). As described by Dr. Kibbe, the aluminum polyester foil acts as a substrate or backing layer for the transdermal device. (Tr. 679:6-14). Accordingly, GB '040 not only teaches a transdermal rivastigmine device, but one that is supported by a substrate. (Tr. 679:6-14). Therefore, the transdermal device of claim 7 of the '031 patent would have been obvious to a person of ordinary skill in view of GB '040 in combination with either the '807 patent or Elmalem and the Handbook.

As of January 1998, claim 7 of the '023 patent and claim 7 of the '031 patent would also have been obvious to a person of ordinary skill in view of GB '040 in combination with the '572 patent.  As discussed above, GB '040 teaches a person of ordinary skill a transdermal device as outlined in claim 7 of the '023 patent and claim 7 of the '031 patent with the lone exception being that it fails to discuss a transdermal device comprising 0.01 to 0.5 weight percent of an antioxidant.  A person of ordinary skill would have recognized that the polymer matrix disclosed in the '572 patent would be a pharmaceutically acceptable polymer matrix for use with a transdermal device, such as the transdermal devices described in GB '040.  (Tr. 650:11-651:3).  The '572 patent discloses a polymer matrix for use with transdermal compositions.  (Tr. 647:11-14).  Furthermore, the polymer matrix of the '572 patent includes an antioxidant that is used to reduce oxidative degradation of the polymer matrix.  (Tr. 652:20-23).  The antioxidant in the polymer matrix of the '572 patent is used in an amount from 0.01 to 1 percent, which overlaps the claimed range of antioxidant amounts.  (Tr. 648:18-649:3).  Therefore, the transdermal device of GB '040 in combination with the polymer matrix of the '572 patent renders claim 7 of the '023 patent and claim 7 of the '031 patent invalid as obvious.

### 3.    Claim 13 of the '031 Patent Would Have Been Obvious

Claim 13 of the '031 patent would have been obvious over the prior art as of January 1998.  Claim 13 of the '031 patent is a dependent claim depending from claim 11.  As written in independent form, claim 13 recites:

> A transdermal device comprising a backing layer, a layer comprising a therapeutically effective amount of [rivastigmine] (Compound A) and an amount of antioxidant effective to stabilize Compound A from degradation in a polymer matrix, a release-liner and, disposed between the layer comprising Compound A in a polymer matrix and the release-liner, a discrete layer of adhesive material for releasably fixing said transdermal device to a patient's skin, wherein the antioxidant is tocopherol, esters thereof, ascorbic acid, butylhydroxytoluene, butylhydroxyanisole, or propyl gallate.

As of January 1998, claim 13 of the '031 patent would have been obvious to a person of

ordinary skill in view of GB '040 in combination with EP '229, the '807 patent, and optionally the Handbook. GB '040 discloses transdermal devices of rivastigmine comprising rivastigmine in a polymer matrix. In describing the transdermal structure of the devices, GB '040 explicitly refers to EP '229. (JTX097 at 16). EP '229 discloses all of the transdermal structural limitations of claim 13 of the '031 patent. (Tr. 693:6-694:10). More specifically, EP '229 describes that transdermal devices commonly comprise a backing layer or substrate, a layer with an active ingredient in a polymer matrix, a release liner, and optionally an additional adhesive layer located between the polymer matrix layer and release-liner. (Tr. 693:6-694:10). The adhesive layer of EP '229 allows for the transdermal device to be affixed to the skin of a user. (Tr. 693:6-694:10). In view of GB '040's explicit reference to EP '229, a person of ordinary skill would have been motivated to produce a transdermal device with the structural elements outlined in claim 13 of the '031 patent.

The disclosure of the '807 patent would have further motivated a person of ordinary skill to include an antioxidant in an amount effective to stabilize rivastigmine in the polymer matrix, if the specific formulation required such an antioxidant. (JTX096 at col. 7, ll. 48-53). The '807 patent discloses that preferred antioxidants for use with compounds of the invention include ascorbic acid. (JTX096 at col. 7, ll. 51-53). $RA_7$, which includes 50% rivastigmine, is among the compounds of the invention disclosed by the '807 patent. (JTX096, col. 5, ll. 40-50). The purpose of the disclosure of the '807 patent is to produce pharmaceutical compositions useful for the treatment of several disorders including Alzheimer's disease. (Tr. 696:2-10). The '807 patent further discloses the manufacture of these pharmaceutical compositions should be in accordance with "accepted pharmaceutical practice." (JTX096 at col 7, l. 24; Tr. 696:13-19). Thus, a person of ordinary skill would understand that the '807 patent's disclosure to use an antioxidant with the compounds of the invention would mean that the antioxidant should be added in an amount sufficient to produce a stable product for the shelf life of the product. (Tr. 696:24-697:16 and 701:16-702:5). A person of

28

ordinary skill would have been capable of adding an amount of an antioxidant to stabilize rivastigmine as of January 1998 by performing routine stability testing that were promulgated by FDA. *See, e.g.*, JTX095. In fact, a person of ordinary skill would not consider including any other amount of an antioxidant (*i.e.*, any amount of antioxidant that would not be sufficient to stabilize rivastigmine). (Tr. 704:10-17). Thus, GB '040, EP '229 and the '807 patent render obvious a transdermal device comprising a polymer matrix with rivastigmine and an antioxidant in an amount effective to stabilize rivastigmine from degradation as set forth in claim 13 of the '031 patent.

While the '807 patent discloses one of the antioxidants recited in claim 13 of the '031 patent (*i.e.*, ascorbic acid), the Handbook provides further guidance on the selection of an antioxidant. Specifically, the Handbook discloses antioxidants for use with pharmaceutical compositions including tocopherols, ascorbic acid, BHA, BHT and propyl gallate. Thus, a person of ordinary skill would have considered the antioxidants set forth in claim 13 of the '031 patent to be obvious in further view of the Handbook.

### 4.    Claims 16 and 18 of the '031 Patent Would Have Been Obvious

Claims 16 and 18 of the '031 patent would have been obvious over the prior art as of January 1998. Claims 16 and 18 of the '031 patent are dependent claims depending from claim 15. Claim 15 of the '031 patent recites:

> A method of stabilizing [rivastigmine] in free base or acid addition salt form (Compound A), wherein the method comprises forming a composition by combining Compound A with an amount of anti-oxidant effective to stabilize Compound A from degradation.

(JTX001, claim 15). Claim 16 further restricts the antioxidant to one of "tocopherol, esters thereof, ascorbic acid, butylhydroxytoluene, butylhydroxyanisole or propyl gallate." (JTX001, claim 16). Claim 18 further restricts the amount of antioxidant to between about 0.01 to about 0.5% by weight based on the weight of the composition. (JTX001, claim 18).

As of January 1998, claim 16 of the '031 patent would have been obvious to a person of

29

ordinary skill in view of the '807 patent. The '807 patent discloses forming a pharmaceutical composition by combining $RA_7$, which contains 50% rivastigmine, with an amount of antioxidant effective to stabilize rivastigmine from degradation. (JTX096 at col. 7, ll. 51-53). The '807 patent discloses adding an antioxidant, such as ascorbic acid, with compounds of the invention including $RA_7$. (JTX096 at col. 7, ll. 51-53; Tr. 703:18-704:1). Further, as discussed above, a person of ordinary skill would understand the disclosure of the '807 patent to teach the use of an antioxidant in an amount effective to stabilize rivastigmine from degradation. Thus, the subject matter of claim 15 of the '031 patent is obvious over the '807 patent.

Claim 16 merely limits the specific antioxidant used in the method of claim 15, and the '807 patent discloses one of these claimed antioxidants, ascorbic acid. Thus, a person of ordinary skill would have recognized that the '807 patent discloses all of the elements of claim 16 of the '031 patent. Therefore, claim 16 of the '031 patent would have been obvious over the '807 patent.

Claim 18 of the '031 patent would have been obvious to a person of ordinary skill as of this same date in view of the '807 patent in combination with the Handbook. Claim 18 further narrows claim 15 by limiting the amount of an antioxidant. (JTX001, claim 18). The Handbook teaches a person of ordinary skill that antioxidants were commonly used in pharmaceutical products in amounts that overlap and/or encompass the claimed range of 0.01 to 0.5 percent by weight. (Tr. 644:23-645:12). Thus, claim 18 of the '031 patent would have been obvious over the '807 patent in combination with the Handbook.

## VI.   CONCLUSION

For the reasons set forth herein and based on the evidence presented at trial, Watson requests that this Court find the asserted claims of the '031 and '023 patents invalid.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert M. Vrana*

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6681
msharp@ycst.com

ROTHWELL, FIGG, ERNST & MANBECK, P.C.
E. Anthony Figg
C. Nichole Gifford
Seth E. Cockrum
Brett A. Postal
607 14th Street, N.W., Suite 800
Washington, DC 20005
(202) 783-6040
efigg@rfem.com
ngifford@rfem.com
scockrum@rfem.com
bpostal@rfem.com

*Attorneys for Defendants Watson Laboratories, Inc., Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.), and Actavis, Inc. (f/k/a Watson Pharmaceuticals, Inc.)*