IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, NOVARTIS AG, NOVARTIS PHARMA AG, NOVARTIS INTERNATIONAL PHARMACEUTICALS LTD, and LTS LOHMANN THERAPIE-SYSTEME AG, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C. A. No.: 11-1077-RGA CONSOLIDATED |
| v. | ) ) | |
| PAR PHARMACEUTICAL, INC., | ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, NOVARTIS AG, NOVARTIS PHARMA AG, NOVARTIS INTERNATIONAL PHARMACEUTICALS LTD, and LTS LOHMANN THERAPIE-SYSTEME AG, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C. A. No.: 11-1112-RGA |
| v. | ) ) | **REDACTED - PUBLIC VERSION** |
| WATSON LABORATORIES, INC., WATSON PHARMA, INC., and WATSON PHARMACEUTICALS, INC., | ) ) ) ) | |
| Defendants. | ) | |

## WATSON'S RESPONSIVE POST-TRIAL BRIEF ON NON-INFRINGEMENT

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE 19801
P. O. Box 391
Wilmington, DE  19899-0391
(302) 571-6681
msharp@ycst.com

ROTHWELL, FIGG, ERNST & MANBECK, P.C.
E. Anthony Figg
C. Nichole Gifford
Seth E. Cockrum
Brett A. Postal
607 14th Street, N.W., Suite 800
Washington, DC  20005
(202) 783-6040
efigg@rfem.com
ngifford@rfem.com
scockrum@rfem.com
bpostal@rfem.com

*Attorneys for Defendants Watson Laboratories, Inc., Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.), and Actavis, Inc. (f/k/a Watson Pharmaceuticals, Inc.)*

Dated:  October 25, 2013

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................ ii

TABLE OF AUTHORITIES ................................................................................... iv

I.     INTRODUCTION AND NATURE AND STAGE OF THE PROCEEDINGS ........ 1

II.    SUMMARY OF THE ARGUMENT ....................................................... 1

III.   STATEMENT OF FACTS ................................................................. 6

   A.  Watson Does Not Add an Antioxidant to its ANDA Products.................................. 6

   B.  Whether Oxidative Degradation Will Occur Depends on the Composition of the
       Particular Formulation ................................................................................. 7

   C.  The ▓▓▓ Adhesive Is Irrelevant to the Issue of Infringement ................................... 7

IV.    ARGUMENT ................................................................................ 9

   A.  Legal Standards Regarding Infringement .............................................................. 9

      1.  Plaintiffs Bear the Burden of Proving Infringement and The Burden Never Shifts
          to Defendants to Prove Non-Infringement ................................................... 9

      2.  Infringement ............................................................................................. 10

      3.  The Conclusory Expert Opinions and Circumstantial Evidence on Which
          Plaintiffs Rely Are Not Sufficient to Prove Infringement.................................. 10

   B.  The Court's Construction of the Term "Antioxidant" is Functional ....................... 11

   C.  Plaintiffs Have Not Met Their Burden of Proving that Watson's ANDA Product
       Infringe the "Stabilization" Claims (13, 16 and 18 of the '031 patent).................... 13

      1.  Requirements of the Stabilization Claims................................................... 13

      2.  There is No Evidence That Watson's ANDA Product Is An Oxidizing
          Environment ....................................................................................... 13

         a.  Plaintiffs Did Not Establish that Oxygen is Present in Watson's ANDA Product
             in Amounts Sufficient to Cause Oxidative Degradation ..................................... 14

         b.  Plaintiffs' Peroxide Test Does Not Establish that Watson's ANDA Product is an
             Oxidative Environment ...................................................................... 17

i.    Plaintiffs Did Not Test Watson's Finished ANDA Product for the Presence of Presence of Peroxides.................................................................................. 17

ii.    The Peroxide Value Number Does Not Actually Measure Peroxides.............. 17

iii.    The Results of the Peroxide Value Test Support Watson's Position ............... 17

c.    Plaintiffs Did Not Conduct Any Tests for Residual Monomers or Other Free Radicals in Watson's ANDA Product .................................................................. 20

d.    Watson's Stability Data Does Not Indicate That Watson's ANDA Product Contains Enough Oxygen to Cause a Stability Problem ...................................... 22

3.    There is No Evidence That BHT in Watson's ANDA Product Is Functioning as an Antioxidant to Significantly Reduce Oxidative Degradation ............................. 23

4.    Watson Presented Evidence at Trial Demonstrating That BHT is Not Functioning as an Antioxidant In Watson's ANDA Product ................................... 24

5.    Plaintiffs Have Not Presented Any Evidence that BHT Significantly Reduces Oxidative Degradation in Watson's Product For a Prolonged Period of Time ........ 27

D.    Plaintiffs Have Not Met Their Burden of Proving that Watson's ANDA Product Infringe the "Composition" Claims (3 and 7 of the '031 patent and 2 and 7 of the '023 patent) ............................................................................................................ 28

1.    There is No Evidence That Watson's Product Is An Oxidative Environment.......... 28

2.    There is No Evidence That BHT Reduces Oxidative Degradation of Anything in Watson's ANDA Product ....................................................................................... 29

a.    Plaintiffs Have Only Shown the Presence of Unreacted BHT ............................ 29

b.    Plaintiffs Did Not Test for BHT Daughter Products ........................................... 29

V.    CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Bai v. L & L Wings, Inc.,*
  160 F.3d 1350 (Fed. Cir. 1998) ................................................................ 10

*Bayer AG v. Elan Pharm. Research Corp.,*
  212 F.3d 1241 (Fed. Cir. 2000) ................................................................. 9

*Carroll Touch, Inc. v. Electro Mech. Sys.,*
  15 F.3d 1573 (Fed. Cir. 1993) ................................................................. 10

*Glaxo, Inc. v. Novopharm, Ltd.,*
  110 F.3d 1562 (Fed. Cir. 1997) ........................................................... 1, 10

*Imhaeuser v. Buerk,*
  101 U.S. 647 (1879) ................................................................................ 9

*Lemelson v. United States,*
  752 F.2d 1538 (Fed. Cir. 1985) ................................................................. 9

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995) .................................................................. 10

*Paradox Sec. Sys., Ltd. v. ADT Sec. Servs., Inc.,*
  388 F. App'x 976 (Fed. Cir. 2010) .......................................................... 11

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
  585 F. Supp. 2d 562 (D. Del. 2008),
  *rev'd in part, on other grounds,*
  711 F.3d 1348, 2013 U.S. App. LEXIS 5949, (Fed. Cir. 2013) ............................. 10

*Rohm & Haas Co. v. Brotech Corp.,*
  127 F.3d 1089 (Fed. Cir. 1997) ........................................................... 9, 11

*S. Bravo Sys. v. Containment Techs. Corp.,*
  96 F.3d 1372 (Fed. Cir. 1996) ................................................................. 9

*Terlep v. Brinkmann Corp.,*
  418 F.3d 1379 (Fed. Cir. 2005) .............................................................. 10

*TIP Sys. v. Phillips & Brooks/Gladwin, Inc.,*
  529 F.3d 1364 (Fed. Cir. 2008) ................................................................. 9

*Wahpeton Canvas Co. v. Frontier, Inc.,*
  870 F.2d 1546 (Fed. Cir. 1989) .............................................................. 10

**Statutes**

35 U.S.C. § 271(c) ............................................................................................................... 1, 10, 11

## I.   INTRODUCTION AND NATURE AND STAGE OF THE PROCEEDINGS

Defendants, Watson Laboratories, Inc., Actavis Pharma, Inc., and Actavis, Inc. (collectively "Watson" or "Defendants"), submit this Responsive Post-Trial Brief on Non-Infringement in support of a judgment that the commercial manufacture, use, and sale of Watson's rivastigmine transdermal systems (4.6 mg/24 hr and 9.5 mg/24 hr) ("Watson's ANDA Product") will not infringe the asserted claims of United States patents 6,335,031 ("'031 patent") and 6,316,023 ("'023 patent") (collectively the "patents-in-suit").  Watson submits this brief in response to Plaintiffs', Novartis Pharmaceuticals Corporation, Novartis AG, Novartis Pharma AG, Novartis International Pharmaceutical Ltd. and LTS Lohmann Therapie-Systeme AG (collectively, "Plaintiffs" or "Novartis") Opening Post-Trial Brief Concerning Infringement. Watson incorporates by reference the Nature and Stage of the Proceedings from its Opening Post-Trial Brief. (D.I. 311).

## II.   SUMMARY OF THE ARGUMENT

Plaintiffs have the burden of proving infringement and that burden never shifts to Defendants. *See Glaxo, Inc. v. Novopharm, Ltd.,* 110 F.3d 1562, 1568 (Fed. Cir. 1997) ("As is well-established for infringement actions brought under § 271, a patentee seeking relief under § 271(e)(2) must prove by a preponderance of the evidence that what is to be sold will infringe. That burden is not shifted under § 271(e)(2).")

The claims of the patents-in-suit can be divided into two categories:  the broad composition/device claims and the narrower stabilization claims.  The broad claims require the presence of an "antioxidant," which the Court has held to be a functional term meaning "an agent that reduces oxidative degradation." [1]  Thus, to establish infringement of the broad claims, it was

---

[1]  Plaintiffs argue incorrectly that the Court's functional definition of "antioxidant" requires only the "presence" of something called an antioxidant or that has been used as an antioxidant in other contexts and does not require proof that the accused composition contains an agent that reduces oxidative degradation in the claimed composition.  That argument distorts the Court's holding, which was only that the term "antioxidant" does not embody a requirement that oxidative

Plaintiffs' burden to prove that Watson's ANDA composition contains an agent that reduces oxidative degradation of some component of the composition. They failed to do so.

The stabilization claims required Plaintiffs to prove that the exceedingly small amounts of BHT in Watson's product significantly reduce the oxidative degradation of rivastigmine over a prolonged period of time. Plaintiffs did not present evidence proving that BHT in Watson's product would significantly reduce oxidative degradation over a prolonged period of time.

Two important facts are not disputed:

- Whether rivastigmine undergoes oxidative degradation in a particular composition depends on the components of the composition -- some compositions are oxidative, others are not.

- To know whether rivastigmine oxidatively degrades in a particular composition and, if so, whether a putative antioxidant reduces that degradation, requires testing.

The crux of the parties' dispute regarding infringement is whether Plaintiffs' testing proved infringement. It did not. Plaintiffs' testing was superficial and incomplete. The Court gave Plaintiffs four months to conduct testing, and, at Plaintiffs' insistence, Watson produced large quantities of its ANDA product and the components used in its manufacture. Nevertheless, the only tests that Plaintiffs reported were done in the last few weeks before the close of fact discovery and after receiving Watson's expert reports. The only tests that Plaintiffs conducted to address the questions of whether the adhesive system of Watson's ANDA product is an oxidative environment and whether BHT is functioning as an antioxidant to reduce oxidative degradation were an oxygen sensor test and a peroxide value number test. Both of those tests were done after Watson submitted its expert's opening report. The results of those tests fell far short of proving whether the composition of Watson's ANDA product is oxidative, and thus capable of causing oxidative

---

degradation of rivastigmine be reduced. *See* Section IV.B, *infra*. The exclusion of a requirement for reduction of rivastigmine degradation, however, is of no significance, because Plaintiffs have not argued that the BHT in Watson's product reduces degradation of anything other than rivastigmine.

2

degradation of rivastigmine. Moreover, they do not address in any meaningful way whether the small amounts of BHT that adventitiously are present in one of Watson's adhesives would reduce any such degradation if it did occur. *Id.* Watson introduced evidence showing that BHT is not functioning as an antioxidant in Watson's ANDA product. Recognizing the weaknesses of their case, Plaintiffs emphasize that they are permitted to rely on circumstantial evidence and they must only meet the "more-likely-than-not" burden. But, they fail even to meet that burden. Plaintiffs ask the Court to fill the gaps in their evidence by relying on pure speculation and unsupported and illogical conclusory opinions of their expert.

The issues surrounding Plaintiffs' evidence of alleged infringement are summarized as follows: First, Plaintiffs' expert found, at a single time point, very small amounts (at the very bottom of the broad claim range) of unreacted BHT in the adhesive system used in Watson's product. However, the presence of unreacted BHT does not establish that the BHT is functioning as an antioxidant (*i.e.* an agent that reduces oxidative degradation) in Watson's ANDA product, as required by all of the asserted claims, much less that the BHT is significantly reducing oxidative degradation for a prolonged period of time as required by the stabilization claims. When BHT reduces oxidative degradation, it reacts to form an easily detectable daughter product – a phenoxy-radical. Plaintiffs did not report the results of any analysis for the BHT phenoxy-radical. The mere presence of unreacted BHT reveals nothing about whether Watson's ANDA product contains an "agent that reduces oxidative degradation."

Second, Plaintiffs assert that oxygen that is introduced during manufacture causes the oxidative degradation of rivastigmine in Watson's product. Plaintiffs rely on the results of an oxygen sensor test performed on the gases in an unmeasured headspace of the very thin packaged product to support their argument that molecular oxygen is allegedly present in some unknown amount in the adhesive layers of Watson's ANDA product. Plaintiffs want the court to assume,

3

without the results of any testing on Watson's ANDA product, that this unknown amount of oxygen allegedly present in the product packaging causes oxidative degradation of rivastigmine in Watson's ANDA product and to assume further that the BHT reduces that degradation. The Court has no basis for making such assumptions. For molecular oxygen to cause oxidative degradation of rivastigmine, it must have both the power to oxidize the drug and must be present in a sufficient amount. In the absence of metal ions or radicals that react with molecular oxygen to produce reactive oxygen radicals or forced conditions, such as high temperature, molecular oxygen does not have the power to oxidize rivastigmine. Plaintiffs did not report an analysis for metal contaminants or reactive radicals, therefore, they have not established that molecular oxygen even if present in the product creates an oxidative environment. Moreover, oxygen is not merely a catalyst or initiator, it is consumed in the oxidative degradation of rivastigmine. Therefore, it must be present in a sufficient amount. Plaintiffs did not even determine the amount of oxygen in the pouches containing Watson's product, much less in the adhesive systems themselves.

Third, Plaintiffs assert that peroxides cause the oxidative degradation of rivastigmine and rely on the results of a peroxide value test performed on bulk adhesives (in the form supplied to Watson from its supplier) to support their argument that those adhesives contain oxidative peroxides. However, Plaintiffs did not report testing of Watson's ANDA product for residual peroxide. The peroxide value test performed by Plaintiffs' expert does not measure peroxide, but instead measures anything that will oxidize iodide to iodine, which includes substances that will not oxidize rivastigmine. Moreover, according to a patent owned by Plaintiff, LTS, the peroxide values determined by Plaintiffs' expert demonstrate that Watson's adhesive system is not oxidative and that no antioxidant is required.

Fourth, Plaintiffs assert that residual monomers and other polymer initiators cause the oxidative degradation of rivastigmine and ask the Court to assume that some unknown and untested

4

amount of these components are present in Watson's ANDA product in an amount to cause significant oxidative degradation of rivastigmine. Again, Plaintiffs ask the Court to speculate based on incomplete testing. Residual monomers are not themselves oxidative. For residual monomers to cause oxidative degradation, there must be another impurity, such as a free radical or a heavy metal ion, present to catalyze the formation of the monomer radical which is capable of oxidation. Plaintiffs did not conduct any tests for such impurities in the adhesives used in the Watson product or in Watson's finished ANDA product. Plaintiffs also ask the Court to assume that a polymerization initiator, ████, would be carried through the manufacturing process into the final ████ adhesive and then carried through the patch manufacturing process into Watson's ANDA product. Again, Plaintiffs never tested to determine if residual ████ is present in the Watson ANDA product and there is no evidence that it is.

Finally, Plaintiffs assert that because Watson's product is shelf-stable, it must be assumed that BHT is reducing oxidative degradation over a prolonged period of time. However, a more plausible explanation is that, as shown by Dr. Davies' peroxide value test and the LTS patent, Watson's adhesive system is not an oxidative environment that causes degradation of rivastigmine. Plaintiffs did not report any tests showing that the miniscule amount of BHT present in Watson's ANDA product is capable of reducing oxidative degradation of the drug in a transdermal composition. Watson's ████ adhesive testing upon which Plaintiffs rely is irrelevant because: (1) Watson's ANDA product does not contain ████, (2) ████ is made with a ████████ ████████ that is not present in the adhesives Watson uses in its ANDA product; (3) Plaintiffs have conducted no tests demonstrating the oxidative potential of Watson's ANDA product adhesives is in any way similar to that of ████; and (4) the ████ formulations that Watson tested ████████████████████████████ ████████ Moreover, a "snapshot" of one data point is not sufficient to show BHT

significantly reduces oxidative degradation over a prolonged period of time.

## III.   STATEMENT OF FACTS

### A.   Watson Does Not Add an Antioxidant to its ANDA Products

Neither Watson nor its suppliers adds an antioxidant to any component of the ANDA

product. (Tr. 399:2-401:21; JTX 56 at 1823; JTX 183 at 5; JTX 23 at 1). BHT is not identified in

any of Watson's product development reports for the formulation used in Watson's ANDA product,

and BHT is not mentioned anywhere in Watson's ANDA. (Tr. 278:4-9; 412:11-13). The ▮▮▮▮▮

▮▮▮▮▮▮ used in Watson's ANDA product is an acrylic adhesive that is supplied to Watson by a

third party, ▮▮▮▮▮▮▮▮▮▮▮▮ (Tr. 399:17-19). ▮▮▮▮▮ does not add BHT to the ▮▮▮

adhesive, nor does it use BHT at any point in the manufacturing process for the ▮▮▮ adhesive.[2]

(Tr. 399:20-401:21; JTX 56 at 1823; JTX 183 at 5; JTX 23 at 1).

Plaintiffs' expert, Dr. Davies, reported that he found from ▮▮▮▮▮▮▮▮▮▮ of unreacted

BHT in the adhesive system used in Watson's ANDA product. Plaintiffs repeatedly state that

Watson tried to develop stable product without an antioxidant and failed. Plaintiffs' circular

argument is based on the erroneous assumption that BHT is functioning as an antioxidant in

Watson's product. (Pl. Br., 1). Plaintiffs, however, did no testing of the adhesive ▮▮▮ adhesive or

of Watson's finished product without the BHT or with varying levels of BHT, and they have no

evidence to support their assertion that Watson's product is stable because of BHT. In assuming that

BHT functions as an antioxidant, Plaintiffs ignore the fact that the stability of Watson's product can

be achieved by selecting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Tr.

460:5-461:2). Plaintiffs have not presented any evidence that the small amounts of BHT at the

levels detected by Dr. Davies could reduce oxidative degradation of rivastigmine in any

formulation, much less in the environment of Watson's ANDA product. (Tr. 473:4-10). Other than

their own self-serving assumptions, Plaintiffs have no real data or evidence to indicate why

Watson's ANDA product is stable.

**B.      Whether Oxidative Degradation Will Occur Depends on the Composition of the Particular Formulation**

It is undisputed that whether or not a pharmaceutical composition undergoes oxidative

degradation is highly dependent on the specific composition. (Tr. 396:22-398:2; 598:23-599:9;

276:13-17; 793:4-17). Further, whether or not a compound acts as antioxidant, *i.e.*, an agent that

reduces oxidative degradation, in any composition is dependent on the particular composition. (Tr.

408:17-21). Dr. Klibanov acknowledged that whether a compound is functioning as an antioxidant

depends on the composition in which the compound is found. (Tr. 277:14-19). Simply because a

compound acts as an antioxidant to reduce oxidative degradation in one composition does not mean

that the same compound will act as an antioxidant in a different composition. (Tr. 396:15-398:7).

Therefore, to determine whether a compound is acting as an antioxidant in a specific composition,

testing must be conducted on that specific composition. (Tr. 396:15-398:7).

**C.      The ███ Adhesive Is Irrelevant to the Issue of Infringement**

Remarkably, Plaintiffs have never tested the combination of BHT and rivastigmine either in

connection with this case or during their own product development. (Tr. 264:3-9). As a result,

Plaintiffs have not presented a single piece of evidence demonstrating that BHT in the range of

████████ could reduce oxidative degradation of rivastigmine in any formulation, much less

in the particular formulation used for Watson's ANDA product. (Tr. 473:4-10).

Rather, to support their argument that the BHT functions as an antioxidant in Watson's

ANDA product, Plaintiffs rely on Watson's documentation regarding early development tests with a

different adhesive referred to as the ████ adhesive. Plaintiffs' characterization of the ████

7

adhesive formulation as a "prototype" for Watson's ANDA product is incorrect. (Pl. Br.,11). It was a completely different formulation that Watson investigated during the early stages of product development and decided not to pursue. Watson's ANDA product does not use the ▮▮▮ adhesive. (JTX 56 at 1823). Moreover, the ▮▮▮ adhesive formulations are very different adhesive blends, containing different constituents than the ▮▮▮▮▮▮ adhesives used in Watson's ANDA product. (Tr. 474:9-475:5). Notably, the ▮▮▮ adhesive blends upon which Plaintiffs rely are made using as a polymerization initiator ▮▮▮▮▮▮▮▮▮▮▮ (Tr. 479:20-480:18; JTX 32 at 285091). Because ▮▮▮▮▮▮ is such a powerful oxidant, and was used in such a high amount in the production of the ▮▮▮ adhesive, it is unremarkable that Watson explored formulations including BHT with the ▮▮▮ adhesive.

Plaintiffs have made no effort to show that the ▮▮▮ adhesive was comparable to the adhesives used in Watson's ANDA product. They did not request samples of the ▮▮▮, and they report no testing of that adhesive. They did not determine its peroxide value, nor did they analyze it for ▮▮▮▮▮▮ metal ions, reactive radicals or anything else. They therefore have no basis to argue that the oxidative environment of the adhesive system of Watson's ANDA product is in any way comparable to that of ▮▮▮.

Unlike the ▮▮▮ adhesive blends, the ▮▮▮ adhesive used in Watson's ANDA product is not made with ▮▮▮▮▮▮▮▮ (Tr. 481:20-482:17). In fact, there is no evidence that the ▮▮▮ adhesive uses a polymerization initiator. (*Id.*) Thus, Plaintiffs' contention that the alleged BHT would behave in the same manner in the ▮▮▮ adhesive as it would in adhesives made using ▮▮▮▮▮▮ is not supported by fact or evidence.

Plaintiffs' reliance on the ▮▮▮ adhesive formulation testing by Watson must also fail for the separate and independent reason that the ▮▮▮ adhesive formulation contains ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Tr. 478:21:479:19;

*compare* JTX 205 at 25917 with JTX 41 at 2).   It would be scientifically unsound for the Court to rely on testing of a different formulation, using a different adhesive with different ingredients in different amounts, and containing an order of magnitude more BHT, to infer anything about Watson's ANDA product.  (Tr. 483:14-23).

## IV.   ARGUMENT

### A.   Legal Standards Regarding Infringement

#### 1.   Plaintiffs Bear the Burden of Proving Infringement and the Burden Never Shifts to Defendants to Prove Non-Infringement

Plaintiffs bear the burden of proving infringement by a preponderance of the evidence.  *See S. Bravo Sys. v. Containment Techs. Corp.*, 96 F.3d 1372, 1376 (Fed. Cir. 1996).  To show literal infringement of a patent, a patentee must introduce sufficient evidence to prove by a preponderance of the evidence that the accused product or process meets every element or limitation of a claim. *Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) *citing Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985); *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1379 (Fed. Cir. 2008).  Therefore, "[i]f any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

The Court inquired whether it could draw any adverse inference based on the fact that Watson did not conduct testing of its own product in support of non-infringement.  No such adverse inference is permitted.  Since at least 1880, the law has placed the burden of proving infringement on the patentee and that burden never shifts to Defendants to prove non-infringement. *Imhaeuser v. Buerk*, 101 U.S. 647, 662 (1880) ("[T]he burden to prove infringement never shifts if the charge is denied in the plea or answer.").  Plaintiffs agree that the court cannot draw an adverse inference, but then erroneously assert that the Defendants' decision not to present evidence of non-infringement is relevant in weighing the evidence of infringement.  The cases Plaintiffs cite do not support that

9

proposition. Moreover, the law is clear that "[the accused infringer's] failure to contest the presence

of a particular claim element in its accused devices is not a tacit admission that the element is

present. Rather, the burden of establishing infringement remains at all times with the patentee."

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 562, 565 (D. Del.

2008), *rev'd in part, on other grounds*, 711 F.3d 1348, 2013 U.S. App. LEXIS 5949, (Fed. Cir.

2013); *see also See Glaxo,* 110 F.3d at 1568 ("As is well-established for infringement actions

brought under § 271, a patentee seeking relief under § 271(e)(2) must prove by a preponderance of

the evidence that what is to be sold will infringe. That burden is not shifted under § 271(e)(2)").

### 2. Infringement

An infringement determination requires a two-step analysis. *See Markman v. Westview*

*Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995); *see also Terlep v. Brinkmann Corp.*, 418 F.3d

1379, 1381 (Fed. Cir. 2005). "First, the claim must be properly construed to determine its scope

and meaning." *Carroll Touch, Inc. v. Electro Mech. Sys.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993); *see*

*also Markman*, 52 F.3d at 976. Second, the claim, as properly construed, must be compared to

Watson's ANDA product. *See Markman*, 52 F.3d at 976; *Carroll Touch, Inc.*, 15 F.3d at 1576.

Comparison of the claims to Watson's ANDA product is a question of fact. *See Bai v. L & L*

*Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). "[A] dependent claim includes all the

limitations of the claim from which it depends." *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d

1546, 1553 (Fed. Cir. 1989). Accordingly, if Watson's ANDA product does not infringe an

independent claim, the product does not infringe any claim dependent thereon. *Id.*

### 3. The Conclusory Expert Opinions and Circumstantial Evidence on Which Plaintiffs Rely Are Not Sufficient to Prove Infringement

In their opening brief, Plaintiffs allege that circumstantial evidence alone may be sufficient

to prove infringement. (Pl. Br., 3). Although Plaintiffs are permitted to rest their case on

circumstantial evidence and/or conclusory expert opinions, nothing requires the Court, as the finder

10

of fact, to accept such unsupported assertions. As the Federal Circuit has explained, there is a

"distinction between a proffer of evidence and the sufficiency of the proffered evidence: 'In short,

[the patentee] was permitted to rest its prima facie case on [the] expert testimony, including charts,

that the patents were infringed, and the District Court was free to accept or reject that evidence.

Nothing in the rules or in our jurisprudence requires the fact finder to credit the unsupported

assertions of an expert witness.'" *See Rohm & Haas Co.*, 127 F.3d at 1092 (finding that Plaintiffs

who relied on their expert's conclusory opinion failed to satisfy their burden of proving

infringement of two claim elements); *see also Paradox Sec. Sys., Ltd. v. ADT Sec. Servs., Inc.*, 388

F. App'x 976, 981-982 (Fed. Cir. 2010) (unpublished) (affirming JMOL that accused products did

not infringe because the expert testimony presented only conclusory statements and pointed to no

structure introduced into evidence that met the limitation).

**B.     The Court's Construction of the Term "Antioxidant" is Functional**

The claims at issue in this dispute can be divided into two groups. One group, which

Watson refers to as the "stabilization claims" include claims 13, 16 and 18 of the '031 patent.

These claims cover, *inter alia*, rivastigmine in combination with "an amount of antioxidant effective

to stabilize [rivastigmine] from degradation." (JTX 1, claims). The Court has defined "an amount

of antioxidant effective to stabilize [rivastigmine] from degradation" as "an amount of antioxidant

that will significantly reduce degradation of [rivastigmine] over a prolonged period of time." (D.I.

150 at 2-3). The Court also construed the term "stabilizing" to mean "significantly reducing

degradation over a prolonged period of time." (*Id.* at 3). The Court did not expressly define "a

prolonged period of time" but cited a statement from the patents-in-suit characterizing a prolonged

period of time as 2 years as an example of what the patentee considered to be "stable." (*Id.*)

The second group of claims, which Watson refers to as the "composition" claims and

Plaintiffs misleadingly refer to as the "presence" claims, includes claims 2 and 7 of the '023 patent

11

and claims 3 and 7 of the '031 patent. These claims cover pharmaceutical compositions and devices that include, *inter alia*, rivastigmine and an antioxidant. The definition of "antioxidant" adopted by the Court, "an agent that reduces oxidative degradation," plainly recognizes that the term is a functional limitation that requires a reduction of oxidative degradation in the claimed composition. As the Court's definition recognizes and Federal Circuit precedent requires, terms like "antioxidant" identify the component functionally by what it does, not what it is. The Court's Order explained:

> The patents repeatedly disclose the combination of Compound A and the antioxidant without specifically requiring that the antioxidant affect Compound A. It would be improper to preclude those embodiments by limiting "antioxidant" to require that interaction. It is also improper to impute the antioxidant's stabilizing effect on Compound A, explicitly claimed in some claims, into claims that do not contain that explicit limitation. The flip side of that coin is that it is also improper to construe "antioxidant" to require that it reduce degradation of Compound A, and therefore render superfluous or redundant the explicit limitation in some claims that the antioxidant stabilize Compound A.

(D.I. 150, 2) (internal citations omitted). Thus, while the Court declined to construe "antioxidant" to embody a requirement to reduce degradation of <u>Compound A</u> (rivastigmine), the Court nowhere stated in its Order that only the "presence" of something called an antioxidant is required.

Plaintiffs' argument that the Court's construction does not require that the antioxidant have any "function" in the accused product makes no sense.[3] In fact it is inconsistent with Plaintiffs' theory of infringement in the Par case. Plaintiffs argued that Par's formulation infringes the broad claims because it contained a compound that allegedly reduced oxidative degradation even though

---

[3] Plaintiffs may attempt to argue that Watson has changed its position regarding claim construction. However, Watson has consistently taken the position that the term "antioxidant" as defined by the Court is a functional term (D.I. 269, Ex. 3b, 65, n.12). Acknowledging that it was not sure of the proper interpretation of the Court's claim construction and in an effort to seek clarification, Watson raised this issue in the proposed joint pretrial order and at the pretrial conference. The Court instructed the parties to try to reach agreement on a stipulation that included an interpretation of the court's construction. The parties attempted to reach agreement, and Watson proposed a stipulation in accordance with how it understood Plaintiffs to be interpreting the Court's construction. Plaintiffs refused to enter into any stipulation that interpreted or characterized the Court's claim construction in any way. Therefore, Watson presented evidence at trial and provides its understanding of the claim construction herein based on the words the Court used to define "antioxidant," *i.e.*, "an agent that reduces oxidative degradation," which is a functional term.

that compound was not known to be an antioxidant. (D.I. 269, Ex. 3, 75-76).

Because the Court's definition of "antioxidant" requires the presence of an agent that reduces oxidative degradation of some component in the claimed composition, Plaintiffs have failed to prove that Watson infringes those claims. Plaintiffs have not presented evidence showing the small amount of BHT in Watson's ANDA product reduces oxidative degradation of anything.

### C.  Plaintiffs Have Not Met Their Burden of Proving that Watson's ANDA Product Infringe the "Stabilization" Claims (13, 16 and 18 of the '031 patent)

#### 1.  Requirements of the Stabilization Claims

To prove infringement of claims 13, 16 and 18 of the '031 patent, Plaintiffs must establish that: (1) rivastigmine oxidatively degrades in Watson's product; (2) BHT is significantly reducing the oxidative degradation of rivastigmine in Watson's product; and (3) the significant reduction of the oxidative degradation of rivastigmine occurs over a prolonged period of time. Plaintiffs failed to meet their burden of proving infringement of these claims. (Tr. 415:10-14; 417:7-419:1).

Dr. Davies' identification of trace amounts of unreacted BHT in the ███ adhesive used in Watson's ANDA product does not establish that the BHT is functioning as an antioxidant (*i.e.*, reducing oxidative degradation), much less that the BHT is significantly reducing oxidative degradation for a prolonged period of time as required by the stabilization claims. (Tr. 494:1-18). Rather, Dr. Davies' identification of small amounts of BHT in the ███ adhesive only demonstrates that BHT, which has not undergone any reaction, is present in that adhesive. (*Id.*) Plaintiffs have only established that Watson's ANDA product contains unreacted BHT and have failed to establish that it is anything more than a "spectator" molecule.

#### 2.  There is No Evidence That Watson's ANDA Product Is An Oxidizing Environment

Acrylic adhesives are not inherently oxidative or unstable. (Tr. 421:1-6). For oxidative degradation to occur in in these polymer environments, a reactive oxygen-containing substance

must be present in an amount sufficient to cause oxidative degradation. (Tr. 421:7-19). Contrary to Plaintiffs assertions, none of the evidence presented at trial demonstrates that reactive oxygen, peroxides or other impurities are present, in Watson's ANDA product in amounts (either individually or in aggregate) that would be sufficient to cause significant oxidative degradation of rivastigmine over a prolonged period of time.

<blockquote>a.   <b>Plaintiffs Did Not Establish that Oxygen is Present in Watson's ANDA Product in Amounts Sufficient to Cause Oxidative Degradation</b></blockquote>

Plaintiffs did not present any evidence at trial to show that oxygen is actually present in the adhesive system of Watson's ANDA product. (Tr. 288:15-289:4; 443:1-444:20). It is not disputed that oxygen is capable of oxidizing rivastigmine under forced conditions or in the presence of metal ions or radicals, but every witness who testified at trial agreed that whether or not rivastigmine will degrade is dependent on the particular environment. *See* Section III.B above. Moreover, the oxidative degradation of rivastigmine requires oxygen to be present in an amount sufficient to cause oxidative degradation in the Watson patch. (Tr. 288:21-289:4). Plaintiffs never tested Watson's finished patch or any of its components for the presence of oxygen. (Tr. 288:15-20, 371:1-24). Nor did Plaintiffs ever measure, or even attempt to estimate, the <u>amount</u> of oxygen in the Watson's finished product or its packaging. (Tr. 287:12-288:3, 372:14-373:5, 443:1-444:20).

Instead, Plaintiffs rely on the results of a test designed by their expert Dr. Davies using an oxygen sensor which measures only the concentration (and not the amount) of oxygen of the atmosphere being tested. (Tr. 287:11-288:3, 371:14-373:5; JTX 54). Dr. Davies' directed his assistant (outside of his presence) to insert a needle into the "headspace" of the pouch (the area between top of the patch itself and the top of the product packaging). (Tr. 340:15-341:12, 370:13-21). Dr. Davies admitted that he did not attempt to insert the needle of the oxygen sensor into the adhesive layers of the rivastigmine patch because the adhesive layer is very thin and he thought that it would block the sensor. (Tr. 351:11-22). The limitations of the test designed by Dr. Davies,

however, do not excuse Plaintiffs from their burden of proving infringement. Dr. Davies made no attempt to determine whether oxygen is present in the adhesive layers or, if so, in what amount. Indeed, Plaintiffs did not even establish whether, or the extent to which, oxygen is soluble in the adhesives used in Watson's patch. (Tr. 298:6-23).

Assuming the oxygen sensor test was performed correctly (which is unknown because the person who did it and the only person who witnessed it did not testify), the results indicate that the concentration of oxygen in the gases in the headspace of the pouch was similar to the concentration of oxygen in ambient air. (Tr. 340:8-14; JTX 54). Knowing the concentration of oxygen, however, reveals nothing about the amount of oxygen that is present in the pouch, much less in the adhesive. Nor does it provide any information about whether that amount of oxygen, if any, would be sufficient to cause oxidative degradation of rivastigmine. (Tr. 443:1-444:20).

As Dr. Sessler explained, for oxidative degradation to occur, oxygen must have both the "power" to oxidize rivastigmine and must be present in a sufficient "amount." (Tr. 443:1-444:20). Oxygen is a weak oxidant in an organic environment, such as the polymer adhesive formulations at issue here. (*Id.*). In that type of environment, the mere presence of molecular oxygen alone will not cause oxidative degradation. (*Id.*). Rather, to be an oxidant under such conditions, oxygen must react with another substance, such as a metal ion, to form reactive oxygen species that are capable of oxidizing rivastigmine. (Tr. 420:1-24, 456:2-22). Plaintiffs, however, conducted no tests to determine if metal ions or any such substances are present in the Watson ANDA product. (Tr. 283:2-9, 456:23-457:2). Furthermore, Plaintiffs never experimentally determined or offered any expert testimony identifying how much oxygen would be required to cause a significant amount of oxidative degradation of rivastigmine in Watson's patch. (Tr. 444:8-20, 445:13-18). Plaintiffs also never measured the solubility of oxygen in the adhesive systems of Watson's patch or in the individual adhesives used in Watson's patch. (Tr. 289:6-23).

15

The amount of oxygen also is important. Reactive oxygen species are not merely a catalyst or initiator. When rivastigmine is oxidized, oxygen is consumed, as it is incorporated into the principal degradation products. Thus, to have significant oxidative degradation, there must be significant reactive oxygen. In effect, Plaintiffs ask the court to assume that whatever amount of oxygen may be present in the headspace of the product packaging, if any, will diffuse into the patch over time and that the amount of oxygen that allegedly diffuses into the patch, if any, would be sufficient to cause a significant amount of oxidative degradation of rivastigmine in the patch. Plaintiffs provided no evidence, other than Dr. Klibanov's conclusory opinion, to support those assumptions, and Plaintiffs' assumptions are invalid for several reasons. First, during the manufacturing process, Watson ████████████████████████████████ (Tr. 451:5-15; JTX 56 at 1832). ████████████████████████████████████████

████████████████████████████████████████████ (Tr. 453:9-23). Second, ████████████████████████████████████

████████████████████████████████████[4] (Tr. 449:22-450:13; JTX 56 at 1830, 1834). Watson uses ████████████████████████████

██████████ (Tr. 450:14-21). Therefore, the only source of oxygen that could be available to cause degradation in the patch would be the small amount, if any, that is trapped inside the pouch before it is sealed. Finally, for oxidative degradation of rivastigmine to occur, an atom of oxygen is required to form both the N-oxide and the ketone degradant. (Tr. 260:23-261:13, 428:5-429:5). Without knowing the amount of oxygen, if any, in the adhesive system of the patch itself, it is impossible to determine whether enough oxygen is present to form the rivastigmine degradants. (Tr. 443:1-444:20). Of course, if the oxygen does not diffuse into the patch, the oxygen is not

---

[4] Plaintiffs refer to a schematic illustration of Watson's product that exaggerates the size and effect of the dimples in separating the pouch wall from the patch. (Pl. Br., 4). Dr. Klibanov acknowledged that the schematic is not to scale. (Tr. 93:6-94:6).

sufficiently soluble in the adhesive formulation, there are no metal ions or other substances present to catalyze the formation of reactive oxygen species, or the amount of oxygen available inside the closed environment of the pouch is too small, then the rivastigmine in Watson's ANDA patch would not undergo a significant amount of oxidative degradation.

**b.    Plaintiffs' Peroxide Test Does Not Establish that Watson's ANDA Product is an Oxidative Environment**

**i.    Plaintiffs Did Not Test Watson's Finished ANDA Product for the Presence of Presence of Peroxides**

Plaintiffs did not present any evidence at trial showing that peroxides are present in Watson's finished ANDA Product. (Tr. 429:22-430:21, 436:3-437:11, 481:20-482:19). In support of their argument that Watson's ANDA product contains peroxides, Plaintiffs rely on the results of a "peroxide value number" test conducted by Dr. Davies. (JTX 53). Dr. Davies did not test Watson's finished patches, but rather tested samples of the ████████ adhesives in the bulk form supplied to Watson ███████████████████████████████████ ████████ (Tr. 360:16-361:3; JTX 23 at 1; JTX 53; JTX 183 at 5).

**ii.    The Peroxide Value Number Does Not Actually Measure Peroxides**

Plaintiffs also ask the Court to ignore the fact that the peroxide value test does not actually measure for the presence of peroxides. At trial, Dr. Sessler and Dr. Klibanov testified that the peroxide test used by Dr. Davies is not a test for the peroxide functional group, but instead actually measures for the presence of any substance that can oxidize iodide to iodine. (Tr. 286:3-8, 286:21-287:4; 429:22-430:21). As Dr. Sessler explained, numerous substances other than peroxides can oxidize iodide to iodine, which is a fairly easy oxidation. (Tr. 429:22-430:21). However, not everything that will convert iodide to iodine is capable of oxidizing rivastigmine. (*Id.*).

**iii.    The Results of the Peroxide Value Test Support Watson's Position**

The results of Dr. Davies' peroxide value test establish that the adhesives used in Watson's

ANDA product do not present an oxidative degradation problem. (Tr. 366:6-20, 429:22-430:21,

432:7-436:2; JTX 53; JTX 74, 7:14-36). Dr. Davies conducted his peroxide value number test on

both the ▇▇▇▇▇▇ bulk adhesives. (Tr. 360:16-361:3). Dr. Davies obtained peroxide

values of ▇▇▇▇ for the ▇▇▇ adhesive and ▇▇▇▇▇ for the ▇▇▇ adhesive. (Tr.

366:6-20; JTX 53; JTX 218). These results do not prove that Watson' ANDA Product is an

oxidative environment. (Tr. 442:18-24). To the contrary, Watson presented evidence from one of

Plaintiffs' own patents showing that the results of the peroxide test establish that Watson's ANDA

product is not an oxidizing environment. U.S. patent 6,699,498 (the "LTS patent"), assigned to

Plaintiff, Lohmann Therapie-Systeme AG ("LTS"), explains that transdermal systems having a

peroxide value below 5 demonstrate good stability. (JTX 74, 7:14-32). The pertinent passage from

the LTS patent explains that:

> Regarding the tolerable upper limit of the peroxide content of the constituents in contact
> with the active substance, an upper peroxide number of 20, better still 10, preferably 5,
> should not be exceeded... In view of the fact that this reaction needs time and is retarded by
> the consumption of active oxygen, there is a good chance—with a peroxide number of 10,
> and under certain circumstances an upper limit of 20—that the system will be sufficiently
> stable for 2 years. Improved stability is of course achieved by reduced the peroxide loading
> further (preferably to a PON [peroxide number] of 5 or less) . . . .")

(*Id.*) Using the calculation set forth in the LTS patent, and assuming the maximum peroxide

number obtained by Dr. Davies for each adhesive used in the Watson ANDA product is accurate,

the total peroxide number for the Watson ANDA product is only ▇▇▇ (Tr. 435:5-21). According

to the LTS patent, the peroxide values determined by Dr. Davies are far below what LTS considers

to be acceptable levels for transdermal systems that exhibit sufficient stability for two years.[5] (JTX

---

[5] Plaintiffs may argue that the peroxide number of the ▇▇▇ adhesive was low because of the
presence of BHT. However, Plaintiffs made no effort to determine what effect, if any, ▇▇▇▇▇
▇▇▇▇ BHT would have on the peroxide number. Moreover, no evidence has been introduced to
even suggest the ▇▇▇ adhesive contains any "oxidative" components, such as a peroxide, that
would potentially cause a high peroxide number. The ▇▇▇ adhesive is the only component
Plaintiffs allege to contain residual peroxides or monomers, but the peroxide number for the ▇▇▇

18

74, 7:14-36). Thus, Plaintiffs' patent establishes that Watson's product falls within a "safe zone"
wherein peroxides are not problematic for a transdermal product. (Tr. 366:6-20, 429:22-
430:21,432:7-436:2; JTX 53; JTX 74, 7:14-36). Because the adhesives used in the Watson ANDA
product are already within this safe zone (without taking into account that the reported values may
be high), there is no need to add an antioxidant, or take other precautionary measures to reduce
peroxides in Watson's ANDA product. (Tr. 529:2-530:15, 558:5-560:11).[6]

As Dr. Sessler explained, for Watson's ANDA product to be an oxidative environment, both
the "power" and the "amount" of the potential oxidizing agent are important. (Tr. 429:22-430:21;
431:6-433:8). In their opening brief, Plaintiffs focus on the "power" aspect of Dr. Sessler's
testimony and ignore the "amount" aspect. (Pl. Br., 11, 16). Plaintiffs mischaracterize Dr. Sessler's
testimony in clear contravention of the teachings of the LTS patent. (Pl. Br., 17-18, 23). Dr.
Davies' peroxide value number establishes that the Watson ANDA product is not an oxidative
environment according to the information provided by the LTS patent. (Tr. 433:9-436:2).

As a result, Plaintiffs cannot rely on Dr. Davies' peroxide value number to support their
erroneous argument that peroxides are causing oxidative degradation of rivastigmine in Watson's
product, much less for the proposition that BHT is significantly reducing oxidative degradation as
required by all of the stabilization claims.[7] Professor Klibanov's conclusory opinions to the

---

adhesive is also extremely low despite the absence of BHT. Thus, there is no evidence to suggest
the peroxide number of the ▮▮▮▮adhesive would be higher if there was no BHT.
[6] Dr. Sessler explained the LTS patent "divides the world into 20-and-above peroxide number, and
20-and-below." (Tr. 529:2-530:15, 558:19-560:12). He further explained that if the peroxide value
is above 20, then reducing agents may be used to lower the peroxide number, but if you're below 20
then no treatment is necessary. (Id.). Moreover, Dr. Sessler explained that if the peroxide number is
above 20 and treatment with a reducing agent is performed, then an added benefit in stability may
be obtained by using an antioxidant. (Id.). Because the peroxide number obtained by Dr. Davies is
below 20, addition of an antioxidant does not improve the stability of the Watson product. (Id.)
[7] In their opening brief, Plaintiffs assert the LTS patent is only concerned with peroxide degradation
after precautionary measures such as excluding oxygen or adding an antioxidant have been taken.
(Pl. Br., 17). Plaintiffs further assert that "because the Watson ANDA products contain
oxygen…the LTS patent does not address the need for an antioxidant in Watson's ANDA

contrary are contradicted by LTS's patent and are unsupported by evidence.

Plaintiffs also assert that ███████████████████ creates an oxidative environment in the ████ adhesive supplied to Watson. (Pl. Br., 17). But, Plaintiffs never tested the ████ adhesive for the presence of ███████████████ (Tr. 254:14-20, 436:9-437:3). Rather, the only evidence Plaintiffs presented in support of their assertion is a hearsay comment in an informal email from someone who was never deposed and did not testify at trial. (Pl. Br., 21). Additionally, that uncorroborated comment is inconsistent with other evidence presented at trial. In particular, the certificates of analysis for the ████ adhesive do not identify ████ as a residual component in that adhesive.[8] (Tr. 253:13-18) Despite this inconsistency, Plaintiffs made no effort to test the ████ adhesive to determine if residual ████ was present, either in the bulk adhesive or in Watson's finished ANDA product. (Tr. 254:14-20) Such testing would be required because even if ████ is used in the manufacture of the ████, that does not mean that it would be present in the final ████ adhesive product, much less in the Watson finished ANDA product. As Dr. Sessler explained, ███████████████████ during the manufacture of the ████ adhesive, and when serving its role as a ████████ it is consumed during the process. (Tr. 439:13-24). Thus, Plaintiffs have presented no evidence that the ████ adhesive actually contains peroxides. (Tr. 436:9-437:11).

### c. Plaintiffs Did Not Conduct Any Tests for Residual Monomers or Other Free Radicals in Watson's ANDA Product

Plaintiffs assert that residual monomers can cause oxidative degradation and further allege

---

Products." (Pl. Br., 17). (Id.) As an initial matter, as discussed above in Section IV.C.2.a, Plaintiffs have introduced no evidence proving oxygen is present in the Watson ANDA product. Regardless, Plaintiffs' assertions are in clear contravention to the LTS patent which states when "materials are virtually free from peroxides [they] may be used without concern..." (JTX 74, 7:8-10). Moreover, the LTS patent explains that peroxides can be formed with trace amounts of oxygen in the adhesive. (JTX 74, 1:57 – 2:19). So even assuming oxygen is present in the Watson ANDA product, the LTS patent us there is no need to include an antioxidant.
[8] Dr Davies' very low peroxide value for the bulk ████ adhesive is further evidence that ████ is not present in that adhesive.

residual monomers are present in Watson's ANDA product. (Pl. Br., 18-19). But Dr. Sessler

explained that residual monomers are not themselves oxidative.[9] (Tr. 457:3-8, 458:14-19). For

residual monomers to cause oxidative degradation, there must be another impurity, such as a radical

or metal ion, present to catalyze the formation of a monomer radical that can cause oxidation. (Tr.

458:14-459:12). Plaintiffs did not conduct any tests for residual monomers, or any other impurities,

either in the adhesives used by Watson or in Watson's finished product. (Tr. 377:20-378:16, 428:1-

4, 456:23-457:12). Nor did Plaintiffs conduct any tests to determine whether residual monomers in

the ▆▆▆ adhesive create an oxidative environment in the Watson ANDA product. (Tr. 462:6-9).

Plaintiffs assert ▆▆▆ an ingredient used in the manufacturing process for the ▆▆▆

adhesive would cause oxidative degradation in the Watson ANDA product. (Pl. Br., 18-19). Dr.

Klibanov's opinion that ▆▆▆ is carried through the manufacturing process into the final ▆▆▆

adhesive and then again through the patch manufacturing process into Watson's ANDA product is

pure conjecture, unsupported by any evidence. Plaintiffs never conducted any testing to determine

if ▆▆▆▆ is in the Watson ANDA product, and ▆▆▆ does not appear on the certificates of

analysis for the ▆▆▆ adhesive. (Tr. 248:12-251:22; JTX 23 at 1; JTX 30; JTX 186) Because

Plaintiffs did not conduct any testing, there is no evidence that the Watson's ANDA product

contains a free radical source that can lead to oxidative degradation of rivastigmine.

Plaintiffs assert that the 3M patent application provides "an operational teaching" that the

levels of residual monomers in the ▆▆▆ adhesive are sufficient to cause significant oxidative

degradation of rivastigmine. (Pl. Br., 19). Plaintiffs are incorrect. The 3M patent application

teaches that levels of residual monomers below "200 ppm of total unreacted monomer, based upon

the *total weight of the adhesive*" are not sufficient to cause significant oxidative degradation. (JTX

---

[9] Dr. Sessler acknowledged detection of residual monomers can be a surrogate for the detection of
monomer radicals. (Tr. 526:9-15). But this does not mean the residual monomers themselves are
oxidative.

17, 6:11-17) (emphasis added). Significantly, in asserting that the Watson ANDA products contain an excess of total unreacted monomers, Plaintiffs did not account for the total weight of adhesive in the product. (Pl. Br. 22-3).

Plaintiffs did not test the Watson ANDA product for residual monomers, and instead rely on the certificates of analysis issued by ▮▮▮▮ for the bulk ▮▮▮ adhesive. (Tr. 185:5-15, 378:9-13).[10] Accordingly, Dr. Klibanov's opinion that residual monomers are still present in the Watson ANDA product in the reported amounts following the manufacturing process has no evidentiary support. Moreover, the ▮▮▮ adhesive comprises only ▮▮▮ of the total weight of adhesive in the Watson product.[11] One certificate of analysis for the ▮▮▮ adhesive indicates the total amount of residual monomers is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[12] When the total weight of ▮▮▮ adhesive in the Watson ANDA product is considered, and even assuming no loss of residual monomers during the manufacturing process, the Watson ANDA product can only contain a maximum of ▮▮▮▮▮▮[13] Because ▮▮▮▮▮▮▮▮ threshold established by the 3M patent application, it is clear there is not enough residual monomer in the Watson ANDA product to cause significant degradation of rivastigmine. (JTX 17, 6:11-17).

### d. Watson's Stability Data Does Not Indicate That Watson's ANDA Product Contains Enough Oxygen to Cause a Stability Problem

Plaintiffs assert that Watson's ANDA product must be an oxidizing environment because

---

[10] The ▮▮▮ adhesive is the only adhesive alleged to contain residual monomers. (Pl. Br., 18).
[11] Watson has two ANDA products, a 4.6 mg/day and a 9.5mg/day, which contain the same components in the same ratios. (JTX 56 at1823). The ▮▮▮ only accounts for ▮▮▮ of the total weight of the adhesive in the final Watson ANDA product, e.g., the 4.6 mg/day Watson ANDA product contains ▮▮▮ of adhesive, but the ▮▮▮ adhesive only accounts for ▮▮▮ of the adhesive weight. (*Id.*).
[12] One certificate for the ▮▮▮ adhesive reports ▮▮▮ of residual monomers are present. (JTX 186)(reporting 606 ppm of residual monomers). ▮▮▮▮▮▮ is marginally above the 200 ppm level described in the 3M patent application; however, the ▮▮▮▮▮ starting figure is taken from a certificate of analysis for the bulk adhesive and does not account for loss of residual monomer that occurs during the manufacturing process. (Tr. 255:13-256:1).
[13] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22

Watson's stability data show that minute quantities of the ketone degradant of rivastigmine form under accelerated stability testing. (Pl. Br., 24). But Plaintiffs have introduced no evidence that the ketone degradant actually forms in the Watson ANDA product.[14] Moreover, the relevant issue is whether BHT in the Watson ANDA product significantly reduces the degradation of rivastigmine over a prolonged period of time. Plaintiffs have failed to present any evidence that BHT has such a function in Watson's ANDA product. As Dr. Sessler acknowledged, Watson's accelerated stability data indicates the ketone degradant forms in very low quantities. (Tr. 489:1-490:24; JTX 195 at 78375). But simply because a minute quantity of rivastigmine oxidizes does not mean that the Watson ANDA product is sufficiently oxidative such that significant degradation of rivastigmine occurs over a prolonged period of time without the presence of BHT.

Indeed, as Dr. Sessler discussed at length, Dr. Davies peroxide number testing demonstrates the adhesives used in the Watson ANDA product are not sufficiently oxidative to present a stability problem. (Tr. 442:18-24). The highest peroxide values obtained by Dr. Davies are for the ▮▮▮▮ adhesive, which is the only adhesive Plaintiffs allege to contain peroxides, residual monomers, or other potential oxidizing agents. (Tr. 366:16-20; JTX 53). Yet these values were still well within the "safe zone" established by the LTS patent for transdermal formulations where the environment is not sufficiently oxidative to cause a stability problem. (Tr. 425:4-426:17, 433:9-435:4) *see also* (JTX 74, 7:18-31)(explaining that a transdermal patch with a peroxide number below 10 will be sufficiently stable for 2 years). Thus, as Dr. Sessler also explained, the peroxide number obtained by Dr. Davies for the Watson ANDA product means that "we don't have to worry" about oxidative degradation of rivastigmine in the Watson ANDA product. (Tr. 442:18-24).

### 3.   There is No Evidence That BHT in Watson's ANDA Product Is Functioning as an Antioxidant to Significantly Reduce Oxidative Degradation

---

[14] The amount of ketone degradant detected in Watson's stability studies is unchanged within the limits of precision, and could be due to a trace impurity present in the API before the accused composition is formed. (Tr. 490:5-491:4; JTX 195 at 78375). Plaintiffs have not shown otherwise.

23

Plaintiffs rely on Dr. Klibanov's conclusory opinion that BHT reduces oxidative degradation in Watson's ANDA product without any supporting evidence. (Pl. Br., 20). In doing so, they assume (incorrectly) that excluding oxygen and/or adding an antioxidant are the only ways to prevent oxidative degradation in a transdermal product. Plaintiffs' assumption ignores evidence presented by Watson showing there are other ways to prevent oxidative degradation in a transdermal product. (Tr. 411:4-18, 460:5-461:2; JTX 74; JTX 17).

The LTS patent teaches the risk of oxidative degradation can be avoided by keeping the peroxide value number below 20. (Tr. 432:7-433:8, 434:5-435:4; JTX 74) As explained above in Section IV.C.2.iii, the peroxide value number Dr. Davies determined for Watson's ANDA product is far below the threshold set by the LTS patent. The patents in suit also recognize that "compound A may be in any of a wide variety of pharmaceutical diluents and carriers known in the art. The diluent or carrier may contain trace amounts of free radicals without affecting the stability of the pharmaceutical composition of the invention." (JTX 1, 1:43-47). Therefore, the presence of some amount of free radicals in a transdermal system does not necessarily lead to an oxidative degradation problem. Plaintiffs never tested for free radicals in Watson's ANDA product and did not present any evidence as to what amount of residual monomers would cause significant degradation. (Tr. 378:9-16). Plaintiffs want it both ways, admitting in their patent that some free radicals are acceptable, but assuming for purposes of infringement that any amount is unacceptable.

As Dr. Sessler explained, the most likely explanation for the lack of significant oxidative degradation in the Watson ANDA product is not that BHT is serving as an antioxidant. (Tr. 411:4-412:4). Rather, the more likely explanation is that the Watson ANDA product is not oxidative, as demonstrated by Dr. Davies peroxide value test. (Tr. 366:6-20, 433:9-434:4, 435:5-436:2; JTX 53; JTX 218). That conclusion is supported by evidence, rather than Plaintiffs' conjecture.

**4.    Watson Presented Evidence at Trial Demonstrating That BHT is Not Functioning as an Antioxidant in Watson's ANDA Product**

24

Dr. Sessler explained at trial that when BHT acts as an antioxidant in a transdermal adhesive patch a characteristic "footprint" is formed. Essentially, if an antioxidant is protecting rivastigmine in a transdermal system, more styrene degradant is formed as compared to ketone degradant. (Tr. 483:22-485:10). In contrast, when there is not a functioning antioxidant, both degradants are formed in an approximate one-to-one ratio. *Id.*

Dr. Sessler explained the scientific basis for this "footprint" utilizing a faucet analogy. (Tr. 485:14-486:20). In Dr. Sessler's faucet analogy, the formation of the ketone degradant can be viewed as the end product of a pathway with two steps.[15] First rivastigmine degrades to the styrene degradant, and then the styrene degradant oxidizes to the ketone degradant. (Tr.139:6-140:23). The ketone degradant requires an oxygen atom source, and can form only through oxidation. (Tr. 261:4-13, 477:13-478:2). In contrast, the styrene degradant does not require an oxygen atom source, and can be formed by a non-oxidative pathway. (Tr. 415:15-416:2, 478:3-20). Thus, it makes scientific sense that a functioning antioxidant in a transdermal product results in less ketone degradant being formed as compared to styrene degradant because the functioning antioxidant can inhibit oxidation to the ketone but will not prevent formation of the styrene. (Tr. 477:20-478:20, 485:11-486:20).

Plaintiffs erroneously assert that Dr. Sessler somehow "modified" his view on the characteristic "footprint" that a functioning antioxidant exerts in a transdermal patch to exclude data on bulk rivastigmine. (Pl. Br., 25-26). To the contrary, Dr. Sessler testified the bulk rivastigmine data fits perfectly within his faucet analogy.[16] (Tr. 491:5-493:22).

In a transdermal system, oxygen has to go through the polymer matrix, react with potential impurities, and react with rivastigmine to initiate the oxidative degradation process. (Tr. 492:22-

---

[15] An intermediate degradant, the N-oxide degradant, forms prior to the styrene degradant. (Tr. 139:6-140:23). It also requires an oxygen atom source. (Tr. 259:18-261:3)

[16] Dr. Sessler had not previously considered bulk rivastigmine data because he focused on data relating to the transdermal adhesive systems that are the focus of the Watson ANDA. (Tr. 484:16-485:5; 550:4-16).

493:2). In contrast, bulk rivastigmine is not in a polymeric formulation and exists under conditions completely different from the Watson's ANDA product.[17] (Tr. 247:5-248:11, 491:10-492:21). Importantly, oxygen is not a limiting factor for the bulk rivastigmine conditions, whereas oxygen is a limiting factor in the Watson ANDA product. (Tr. 491:10-493:2). Dr. Sessler explained the excess oxygen will react with the styrene degradant and convert it into the ketone degradant. (Tr. 493:3-22). As a result, more of the ketone degradant is formed. (Id.).

Plaintiffs' conducted studies to determine the proportion of degradation products formed in a transdermal system in the presence and absence of antioxidants. (JTX 187 at 504460). In Table 5 of JTX 187, the formulation labeled "2200" does not contain a functioning antioxidant, and the degradation ratios are at a near one-to-one ratio. (Tr. 486:21-487:22; JTX 187 at 504460). The other formulations tested contain functioning antioxidants, and have degradation ratios that are not in a near one-to-one.[18] (Id.) Thus, Plaintiffs' own stability studies show that when an antioxidant functions to reduce oxidative degradation of rivastigmine in a transdermal formulation it produces a characteristic footprint. (Tr. 486:21-487:22; JTX 187 at 504460).

Watson's accelerated stability data for its ANDA products show that under forcing conditions the styrene and ketone degradants are produced in a near one-to-one ratio. (Tr. 488:10-490:15; JTX 195 at 78375). Plaintiffs again misconstrue both Dr. Sessler's testimony and the Watson data, by arguing the Watson data proves that a functioning antioxidant is present. (Pl. Br. at 26-7). But Dr. Sessler testified the numbers associated with the degradation products in the Watson accelerated stability studies are very small numbers at the limits of precision. (Tr. 490:5-491:4). Dr.

---

[17] Watson's and Novartis' bulk rivastigmine data show the same bulk "footprint." (Tr. 493:11-22).
[18] Plaintiffs again mischaracterize Dr. Sessler's testimony by suggesting he "discarded" Watson's longstanding argument that ascorbyl palmitate did not work as an antioxidant. (Pl. Br., 26). Dr. Sessler did no such thing. Instead, Dr. Sessler noted that the ratios held true even if the functioning antioxidant was not sufficient to proceed with a final product. (Tr. 487:1-14, 551:7-552:9). Simply because an antioxidant can function to reduce one of the degradation products does not mean it is suitable for use in the final product. Testing is required to make that determination. (Tr. 471:1-472:13, 562:22-563:7). Plaintiffs' formulators agree. (Tr. 564:16-565:1; JTX 187 at 504461).

Sessler further testified that within the limit of precision of these measurements, it is clear there is not a functioning antioxidant in the Watson ANDA product. *Id.* On cross-examination, Dr. Sessler confirmed that, to a scientist, these numbers are the same within error. (Tr. 552:10-24). Moreover, Dr. Sessler pointed out that it is not fair for Plaintiffs to "cherry-pick data," and that when all of the data is considered, Plaintiffs cannot make a case that the Watson ANDA product contains a functioning antioxidant. (Tr. 555:8-556:3). Thus, Watson's data confirms there is not a functioning antioxidant in the Watson ANDA product. (*Id.*). Plaintiffs' expert did not dispute Dr. Sessler's testimony on this point.

### 5.   Plaintiffs Have Not Presented Any Evidence that BHT Significantly Reduces Oxidative Degradation in Watson's Product For a Prolonged Period of Time

Plaintiffs have failed to prove BHT is capable of <u>significantly reducing oxidative degradation of rivastigmine for a prolonged period of time</u> as required by the stabilization claims. As Dr. Sessler explained, to determine if BHT is significantly reducing oxidative degradation for a prolonged period of time, it is necessary to conduct an experiment that measures BHT levels over time, but Dr. Davies only detected the presence of trace amounts of BHT in Watson's ANDA product at a single point in time. (Tr. 377:11-18, 417:7-11-418:9, 508:6-14). Dr. Sessler further explained that if the concentration of BHT decreases over time, then it is likely BHT has served as an antioxidant. (Tr. 507:15-508:5). However, if the concentration of BHT does not change, then it is likely that BHT has exerted no effect. (*Id.*). But one cannot infer from a single time point that a significant reduction occurs for a prolonged period of time. (Tr. 417:7-16).

Testing is required to demonstrate that BHT is capable of significantly reducing the oxidative degradation of rivastigmine in the Watson ANDA product, and whether it will do so for a prolonged period of time. (Tr. 396:19-398:7, 417:11-418:9, 473:11-20, 464:4-465:9, 508:6-14). Plaintiffs expert, Dr. Klibanov agreed that to know whether an excipient, such as an antioxidant, will impact the stability of an active ingredient against oxidation, testing is required. (Tr. 267:13-

27

19, 269:8-271:4). The inventors of Plaintiffs' product also understand and agree testing is required to show an antioxidant functions in a particular formulation. (Tr. 562:22-563:7, 564:8-565:1).[19]

Accelerated stability testing of Watson's ANDA product could have been performed in the time allotted for Plaintiffs testing, and would have provided evidence as to whether or not BHT has any functional role in Watson's ANDA product. (Tr. 504:20-507:14). Plaintiffs were provided with adequate sample materials and were given enough time to conduct such testing. Indeed, during fact discovery, Plaintiffs represented to the Court that the reasons they needed such large quantities of samples and more than three months to conduct testing because they were planning to conduct accelerated stability testing. (D.I. 77, 13:24-14:9). Plaintiffs, however, did not perform any of these time-course experiments, or at least did not report the results from any such testing. (Tr. 377:11-18). Dr. Davies' "snapshot" of one data point is not sufficient to show that BHT is functioning as an antioxidant to reduce oxidative degradation in Watson's ANDA product. (Tr. 504:20-507:3). Plaintiffs have provided no evidence showing changes in the BHT in Watson's ANDA product over time, and have simply failed to demonstrate that BHT has a stabilizing effect in the Watson ANDA product. (Tr. 377:11-18, 414:22-415:14, 472:18-473:10, 504:24-508:14).

**D.    Plaintiffs Have Not Met Their Burden of Proving that Watson's ANDA Product Infringe the "Composition" Claims (3 and 7 of the '031 patent and 2 and 7 of the '023 patent)**

**1.    There is No Evidence That Watson's Product Is An Oxidative Environment**

To prove infringement of the broad composition and device claims, Plaintiffs must establish both that: (1) Watson's ANDA product is an oxidative environment; and (2) BHT reduces oxidative degradation of something in the Watson ANDA product. As explained above, in Section IV.C.2, Plaintiffs have failed to show that Watson's ANDA product is an oxidative environment.

---

[19] Testing performed during Plaintiffs' product development involved, *inter alia*, accelerated stability testing using control samples and samples containing tocopherol and ascorbyl palmitate alone and in combination. (JTX187 at 504460).

### 2.   There is No Evidence That BHT Reduces Oxidative Degradation of Anything in Watson's ANDA Product

#### a.   Plaintiffs Have Only Shown the Presence of Unreacted BHT

Although Dr. Davies identified a trace amount of BHT in the ████ adhesive used in Watson's ANDA product, the presence of unreacted BHT provides no information as to whether the BHT functions as an antioxidant in Watson's ANDA product. (Tr. 417:7-418:9). Plaintiffs have not presented evidence to establish that the small amount of BHT found in Watson's ANDA product is anything other than an unreactive, spectator molecule.

#### b.   Plaintiffs Did Not Test for BHT Daughter Products

One of the characteristic peaks Dr. Davies used to identify BHT is the sterically hindered phenol that is seen at approximately 3650 cm$^{-1}$. (Tr. 316:6-317:8, 502:12-503:12; JTX 40; JTX 35 at 10, 21). This hindered phenol group is generally present in BHT that has not undergone any reaction. (Tr. 502:12-504:11). When BHT reacts as an antioxidant, a stabilized BHT-derived radical is formed, *e.g.*, the BHT phenoxy-radical, that lacks the hindered phenol and can be detected. (Tr. 261:14-262:14, 502:12-503:12; JTX 184). However, Plaintiffs made no effort to identify either the BHT phenoxy-radical, or any other BHT daughter products. (Tr. 500:15-501:17; JTX 184, 1266). At least some, if not all, of these daughter products lack the hindered phenol and therefore exhibit an IR spectrum very different from that of BHT. (Tr. 496:2-21; JTX 184 at 1266). Moreover, the BHT phenoxy-radical could also be detected via other common detection methods, such as EPR spectroscopy. (Tr. 497:3-12). As Dr. Sessler explained, tests to detect the BHT daughter products could have been done in an afternoon. (Tr. 500:15-13, 504:12-19). In contrast to merely identifying unreacted BHT, those tests would have revealed whether BHT has actually has reduced oxidative degradation. Plaintiffs either did not do such testing or did not rely on the results of those tests. Based on the evidence, the most plausible scenario is the BHT in Watson's ANDA has not reacted and so has not reduced oxidative degradation in Watson's product. (Tr. 494:6-16).

Plaintiffs assert that detection of the BHT phenoxy-radical in the Watson ANDA product would be "useless." (Pl. Br., 27). Plaintiffs are wrong. Detection of the BHT phenoxy-radical would have provided important evidence that BHT in the Watson ANDA product is an "agent that reduces oxidative degradation" as required by the Court's claim construction. (D.I. 250, 1-2).

Plaintiffs have erroneously characterized the Court's construction of antioxidant as only requiring the "presence" of something called an antioxidant because the Court determined the term did not require the antioxidant to exert a stabilizing effect on rivastigmine. (Pl. Br., 6-7). But the construction still requires a function, *i.e.*, "reduc[ing] oxidative degradation," for the purported antioxidant. As explained in Watson's claim construction briefing, the Federal Circuit has consistently recognized that terms like antioxidant (*e.g.*, lubricant, antiadherent, etc.) are functional because they describe the ingredient by what it does, not what it is. *See* D.I. 224 at 13-14. The Court's functional definition of "antioxidant" is consistent with this Federal Circuit precedent.

Moreover, as Dr. Sessler repeatedly explained at trial, to demonstrate that a chemical reaction has occurred, such as BHT's acting as an "agent that reduces oxidative degradation," a change in the molecule must be shown. (Tr. 417:7-418:9). It is not enough to simply assume the molecule has reacted; testing must be done to show that a reaction has occurred. (*Id.*) Accordingly, tests demonstrating that the BHT phenoxy-radical has formed would have provided evidence that it is more likely than not that the BHT in the Watson ANDA product has functioned as an "agent that reduces oxidative degradation." (Tr. 533:4-14). It is inconceivable how such evidence could be considered "useless."

## V.   CONCLUSION

For the reasons set forth herein and based on the evidence presented at trial, Watson requests that this Court find that the commercial manufacture, use, and sale of Watson's ANDA product will not infringe the asserted claims of the patents-in-suit.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert M. Vrana*

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Robert M. Vrana (No. 5666)
Rodney Square
1000 North King Street
Wilmington, DE  19801
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6681
msharp@ycst.com

ROTHWELL, FIGG, ERNST & MANBECK, P.C.
E. Anthony Figg
C. Nichole Gifford
Seth E. Cockrum
Brett A. Postal
607 14th Street, N.W., Suite 800
Washington, DC  20005
(202) 783-6040
efigg@rfem.com
ngifford@rfem.com
scockrum@rfem.com
bpostal@rfem.com

Dated:  October 25, 2013

*Attorneys for Defendants Watson Laboratories, Inc., Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.), and Actavis, Inc. (f/k/a Watson Pharmaceuticals, Inc.)*

01:14284224.1

## CERTIFICATE OF SERVICE

I, Robert M. Vrana, Esquire, hereby certify that on October 25, 2013, I caused to be electronically filed a true and correct copy of Watson's Responsive Post-Trial Brief on Non-Infringement, with the Clerk of the Court using CM/ECF, and also caused a copy to be served on the counsel of record in the manner indicated:

**BY E-MAIL (by agreement of counsel):**

Michael P. Kelly
Daniel M. Silver
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE  19801
mkelly@mccarter.com
dsilver@mccarter.com

Nicholas N. Kallas
Filko Prugo
Fitzpatrick, Cella, Harper & Scinto
1290 Avenue of the Americas
New York, NY  10104-3800
nkallas@fchs.com
fprugo@fchs.com

*/s/ Robert M. Vrana*

Robert M. Vrana (No. 5666)