```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3

     NOVARTIS PHARMACEUTICALS   :   CIVIL ACTION
 4   CORPORATION, NOVARTIS      :
     AG, NOVARTIS PHARMA AG,    :
 5   NOVARTIS INTERNATIONAL     :
     PHARMACEUTICALS LTD, and   :
 6   LTS LOHMANN                :
     THERAPIE-SYSTEME AG,       :
 7              Plaintiffs,     :
                                :
 8      vs.                     :
                                :
 9   PAR PHARMACEUTICAL,        :
     INC.,                      :   NO. 11-1077-RGA
10              Defendant.      :   CONSOLIDATED
     ------------------------   :
11   NOVARTIS PHARMACEUTICALS   :   CIVIL ACTION
     CORPORATION, NOVARTIS      :
12   AG, NOVARTIS PHARMA AG,    :
     NOVARTIS INTERNATIONAL     :
13   PHARMACEUTICALS LTD, and   :
     LTS LOHMANN                :
14   THERAPIE-SYSTEME AG,       :
                Plaintiffs      :
15                              :
        vs.                     :
16                              :
     WATSON LABORATORIES,       :
17   INC., WATSON PHARMA,       :
     INC., and WATSON           :
18   PHARMACEUTICALS, INC.,     :
                Defendants.     :   NO. 11-1112-RGA
19
                            Wilmington, Delaware
20                          Monday, August 19
                            2:05 o'clock, p.m.
21
                             - - -
22

23   BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

24                          Valerie J. Gunning
                            Official Court Reporter
```

```
 1    APPEARANCES:

 2
             McCARTER & ENGLISH, LLP
 3           BY:  DANIEL M. SILVER, ESQ.

 4
                    -and-
 5

 6           FITZPATRICK, CELLA, HARPER & SCINTO
             BY:  NICHOLAS N. KALLAS, ESQ.,
 7                FILKO PRUGO, ESQ.,
                  CHRISTOPHER LOH, ESQ.,
 8                CHARLOTTE JACOBSEN, ESQ.,
                  DANIEL J. MINION, ESQ.
 9                (New York, New York)

10
                  Counsel for Plaintiffs
11                Novartis Pharmaceuticals Corporation,
                  Novartis AG, Novartis Pharma AG,
12                Novartis International Pharmaceuticals
                  Ltd, and LTS Lohmann Therapie-Systeme
13                AG

14

15
             RICHARDS, LAYTON & FINGER, P.A.
16           BY:  STEVEN J. FINEMAN, ESQ.

17
                    -and-
18

19           LATHAM & WATKINS LLP
             BY:  DANIEL G. BROWN, ESQ.
20                (New York, New York)

21
                  Counsel for Defendants
22                Par Pharmaceutical, Inc.

23

24
```

```
1    APPEARANCES (Continued):

2

           YOUNG CONAWAY STARGATT & TAYLOR LLP
3          BY:  MELANIE K. SHARP, ESQ.

4
                        -and-
5

6          ROTHWELL, FIGG, ERNST & MANBECK, P.C.
           BY:  E. ANTHONY FIGG, ESQ. and
7               C. NICHOLE, GIFFORD, ESQ.
                (Washington, D.C.)
8

9               Counsel for Defendants
                Watson Laboratories, Inc.,
10              Watson Pharma, Inc. and Actavis Inc.
                (f/k/a Watson Pharmaceuticals, Inc.)
11

12                     -   -   -

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the

 4      courtroom, beginning at 2:04 p.m.)

 5

 6              THE COURT:  Good afternoon.

 7      Please be seated.  How is everybody today?

 8              (Counsel respond, "Well, your

 9      Honor.")

10              THE COURT:  All right.  Well,

11      that's good.

12              All right.  So this is the

13      pretrial conference -- hi, Mr. Silver -- I guess

14      in Novartis Pharmaceuticals versus Par and

15      Watson, which I guess is mostly filed under

16      Civil Action No. 11-1077.

17              And, Mr. Silver, I see Mr. Prugo,

18      but you ought to introduce me to the rest of

19      your group.

20              MR. SILVER:  Yes.  Thank you, your

21      Honor.  We might have some new faces today and

22      I'm sure they'll be joining us in the future.

23              So we have Mr. Prugo, Nicholas

24      Kallas, Charlotte Jacobsen, Christopher Loh and
```

```
 1        Daniel Minion, all from Fitzpatrick Cella.

 2        Thank you.

 3                    THE COURT:  Where are you all

 4        located?

 5                    MR. PRUGO:  New York City.

 6                    THE COURT:  New York City.  Okay.

 7        Welcome.

 8                    All right.  Ms. Sharp?  You've got

 9        Mr. Figg, who I keep running into.

10                    MS. SHARP:  I do, your Honor.

11        Melanie Sharp from Young Conaway on behalf of

12        Watson and Actavis.  In addition to Mr. Figg, we

13        have Nikki Gifford, also from the Rothwell Figg

14        firm.

15                    THE COURT:  All right.

16                    MS. SHARP:  I do have a

17        preliminary matter I want to put --

18                    THE COURT:  All right.  You guys

19        are from D.C.; right?

20                    MR. FIGG:  Correct, your Honor.

21                    THE COURT:  Go ahead, Ms. Sharp.

22                    MS. SHARP:  Counsel for plaintiffs

23        and defendants have agreed that there are

24        certain issues that may come up today as to
```

1    which confidentiality would have to be

2    maintained under the protective order.

3    Specifically, issues relating to composition.

4              There are trade secret issues that

5    are covered under the protective order and,

6    again, they may or may not come up.  We're not

7    asking at this point that the Court seal the

8    courtroom, but we don't anticipate a crowd for

9    the pretrial order hearing.

10             The parties are going to continue

11   to explore this issue to try to determine if we

12   can agree on a way to handle it at trial and

13   then present it to your Honor to find if it

14   would be acceptable to your Honor.

15             THE COURT:  All right.  Thank you.

16             Mr. Fineman?  I guess this is

17   Mr. Brown, but I don't know if I've ever seen

18   him before.

19             MR. FINEMAN:  Your Honor, Steve

20   Fineman of Richards, Layton & Finger, on behalf

21   of Par Pharmaceutical.

22             Your Honor, it is my pleasure to

23   introduce to the Court Daniel Brown of Latham &

24   Watkins.

```
 1                      THE COURT:  All right.  And good

 2     afternoon.  I assume, in fact, I have seen a lot

 3     of the other people besides Mr. Figg and

 4     Mr. Prugo, but they did most of the speaking.

 5     That's the reason why I recognize them.

 6                      So I've read the pretrial order

 7     and I've read the, or the proposed joint

 8     pretrial order, and I've read the -- I mean, and

 9     I've read the motions in limine.  And let me

10     just I guess get a couple things.

11                      I assume, Mr. Prugo, you're the

12     lead counsel at trial for Novartis?

13                      MR. PRUGO:  Yes, your Honor, along

14     with my colleague, Mr. Nick Kallas.

15                      THE COURT:  All right.  And Mr.

16     Figg and Mr. Brown, you're the lead counsel for

17     your respective clients?

18                      MR. FIGG:  That's correct, your

19     Honor.

20                      MR. BROWN:  Yes, your Honor.

21                      THE COURT:  All right.  So I was

22     thinking maybe one way, are there various things

23     that are in the pretrial order?  We'll just go

24     through.  And when I read through, I more or
```

1    less thought I knew what I wanted to do about

2    the various things that are in there with

3    possibly one exception, so why don't we just go

4    through and see.

5              First off, this is just a question

6    that's raised.  The 30-month end of the stay, is

7    that roughly February of 2014?

8              MR. PRUGO:  It's late March 2014.

9              THE COURT:  Okay.  And I see, and

10   I have no objection to this, but that you

11   decided you don't want to do any closing

12   arguments; right?

13             MR. FIGG:  We didn't see the need,

14   your Honor, unless you would like to hear them.

15             THE COURT:  Well, why don't we --

16   why doesn't someone remind me to address that

17   around about the end of Tuesday of the trial.

18             Depending on how much time is being

19   used on one thing or another, I have found it

20   sometimes helpful to have a little bit of

21   summing up while everything is fresh in my mind.

22   On the other hand, if you're busy exhausting

23   yourselves and using up all the time, you know,

24   I'm perfectly happy -- I mean, there's obviously

1    going to be post-trial briefing and so let's

2    just keep that as something an I have an open

3    mind about, even though essentially I'm much

4    more likely to have it if all of you tell me you

5    want to have it.  If there's kind of a split

6    disagreement, well, then, you know, I understand

7    maybe it's not necessary to have it.

8             So the first actual dispute in the

9    pretrial order was page 6, which was whether or

10   not the list of witnesses would include a

11   good-faith estimate of how long each witness'

12   testimony will be, which is the plaintiffs'

13   proposal.  And, you know, my view is these are

14   the kinds of things, these are not controlled by

15   rules.  These are controlled by an agreement of

16   the parties, and if parties don't all want to do

17   that, I'm not going to make you do that.

18            It does strike me that when you

19   are giving a list of witnesses and you are

20   giving exhibits that go with them, the parties

21   can probably make relatively informed guesses

22   that are, you know, roughly the same.  So I will

23   go with defendants' proposal there.

24            On page 8, there's the very

1    interesting dispute about demonstrative

2    exhibits.  And what is I guess the -- what I

3    took from this is that the defendants -- I took

4    it that -- actually, what I took from it was

5    that plaintiffs had a more creative automated

6    litigation support person who could make little

7    cartoons on the spot and that's what the

8    argument was about.  Maybe I misunderstood, but

9    it struck me that I like the defendants'

10   proposal slightly better because, as I

11   understand it, basically, defendants are saying

12   that if you are going to add anything to the

13   exhibit other than the kinds of things that you

14   make with the little red pens or that, you know,

15   highlighting, that you do it in advance.  And so

16   that's what seemed to me to be the dispute here.

17   So do I have that right?

18            MR. PRUGO:  Actually, I am not

19   sure that's correct.

20            THE COURT:  All right.  Well, tell

21   me what the dispute is here.

22            MR. PRUGO:  Sure.  What we're

23   proposing is any demonstrative that is made in

24   advance be exchanged.

```
 1                    THE COURT:  Okay.

 2                    MR. PRUGO:  And if you --

 3                    THE COURT:  I'm sorry.

 4                    MR. PRUGO:  Sorry.

 5                    THE COURT:  Is that disagreed?

 6                    MR. FIGG:  That's not disagreed,

 7      your Honor.

 8                    THE COURT:  Okay.

 9                    MR. FIGG:  The question is:  What

10      is a demonstrative?

11                    MR. PRUGO:  And we say a

12      demonstrative is anything that's modified.

13                    THE COURT:  Okay.  And so that's

14      the -- and so when you say "modified," is it you

15      have a great big blowup that has, I don't know,

16      language from the patent, then you highlight

17      part of it in yellow?  That's a demonstrative?

18                    MR. PRUGO:  Yes.

19                    THE COURT:  Okay.

20                    MR. FINEMAN:  Your Honor, I

21      respectfully suggest that if you took five

22      exhibits and you tried to cobble them together

23      and made something out of it, that would be a

24      demonstrative.  Where I simply take a document
```

1    that's coming in as an exhibit in the same

2    manner and I highlight it, that is not a

3    demonstrative which needs to be shared in

4    advance.

5              Your Honor was correct.  It's an

6    artificial distinction between that which the

7    computer in-court person highlights versus

8    having it prepared the night before with a

9    highlighter.  There's no distinction.

10   Distinction without a difference, so those don't

11   need to be exchanged.

12             MR. PRUGO:  They're both

13   demonstratives.

14             THE COURT:  All right.

15             MR. PRUGO:  If I highlight it in

16   the courtroom or I highlight it in advance, it's

17   still a demonstrative exhibit.

18             THE COURT:  All right.

19             MR. PRUGO:  Sorry.

20             THE COURT:  So here's what I

21   think.  If you've got some exhibit and it's

22   coming in and all you're doing is highlighting

23   it in yellow or making little balloons that have

24   a few of the words in it or something else that

```
 1      basically is not a whole lot different than just

 2      showing me the exhibit, you don't have to

 3      exchange that in advance.

 4                   Anything that involves putting two

 5      exhibits on the same page or that involves

 6      changing words, adding photographs, I don't know

 7      what, that's a demonstrative, exchange that in

 8      advance.

 9                   I'm not actually sure how that

10      fits in with the two proposals, but does that

11      work in terms of understanding?

12                   MR. FIGG:  It works for us.

13                   MR. FINEMAN:  It works for us,

14      your Honor.

15                   THE COURT:  Okay.  Thanks.

16                   All right.  So then the next thing

17      was paragraph 36 on page 9, where the plaintiff

18      said -- well, there are actually two -- there's

19      a question as to whether to be admitted

20      evidence, exhibits used for cross-examination or

21      impeachment must be identified in advance.  And

22      I was trying to think, what kind of exhibit

23      would be used for impeachment and moved into

24      evidence?
```

1            MR. PRUGO:  One possibility is a

2      reference from a periodical, for instance.

3            THE COURT:  But you mean written

4      by the same person who is testifying?

5            MR. PRUGO:  No.  It could be

6      written by somebody else, a third party.

7            THE COURT:  See, I wouldn't regard

8      that as impeachment.  That's, you know,

9      different evidence to prove the contrary.  So if

10     you are going to do that, you've got to identify

11     that in advance or I guess by 5:30 the day

12     before.

13            MR. PRUGO:  That's what we would

14     like and that's what we proposed, your Honor.

15            THE COURT:  All right.  So to me,

16     impeachment is like a prior, the deposition of a

17     witness.  You know, if you are going to

18     cross-examine them about it.  Typically, those

19     are -- I mean, they're impeachment, so they are

20     not actually moved into evidence.  But it

21     strikes me that if you have references or

22     whatever else that might be used during

23     cross-examination, if you are actually moving

24     them into evidence, it strikes me they really

1    should only be coming in if they have some

2    substantive value.  In that case, they ought to

3    be identified in advance.

4              So I guess I'm going with the

5    plaintiffs' proposal.  Okay?

6              MR. FIGG:  Yes.  I think I

7    understand your ruling, your Honor.  We have

8    some issues in this case about testing that was

9    done.

10              Testing has been done on both

11    sides, and so there may be a document that would

12    be used to impeach a witness' testimony that the

13    testing was appropriate or was appropriately

14    done.  And that could be, as Mr. Prugo said, it

15    could be in the form of a journal article:  Did

16    you think about this when you --

17              THE COURT:  If you are going to do

18    something like that, then it should be

19    identified in advance.

20              MR. FIGG:  Okay.  I understand.

21    Thank you.

22              THE COURT:  So basically I think

23    I'm going with the plaintiffs' proposal there.

24              So did I get from paragraphs 37

```
 1        and 38 in the attached exhibits that the

 2        plaintiff plans to call three witnesses live and

 3        the defendants plan to call six witnesses live?

 4                    MR. PRUGO:  That's right.  We have

 5        three witnesses, your Honor.

 6                    MR. FIGG:  Watson plans to call

 7        two witnesses live.

 8                    THE COURT:  And you have four,

 9        Mr. Brown?

10                    MR. BROWN:  We have four, correct.

11                    THE COURT:  Okay.  All right.  And

12        I did see that there were some other people

13        testifying by deposition or whatever, but nine

14        live witnesses seems like a pretty manageable

15        number.

16                    Okay.  So paragraph 41, which has

17        to do with I guess the counter-designations of

18        transcripts or videos of the witnesses who will

19        be testifying by deposition.  And if I

20        understood the plaintiffs' proposal correctly,

21        it is that you would play, or either party, but

22        it's your proposal the proponent would play what

23        they want to play followed by the other side

24        playing what they want to play?
```

```
1                        MR. PRUGO:  That's correct, your

2           Honor.

3                        THE COURT:  Okay.  I don't want to

4           do that.  It would make a lot more sense to me,

5           because usually the reason for

6           counter-designations is supposedly context, and

7           if you separate them out, I'm not going to get

8           the context.  So I would prefer to have them

9           done, you know, basically played in the order in

10          which they occurred in the deposition with the

11          designations and the counter-designations, and

12          you all can figure out between you for any

13          particular deposition how much time goes to one

14          side, how much time goes to the other side, and

15          provide that information to the courtroom

16          deputy.  Okay?

17                        MR. FIGG:  Yes, that's fine.

18                        MR. FINEMAN:  Fine, your Honor.

19                        THE COURT:  Okay.  So basically

20          adopting the defendants' proposal there.

21                        Okay.  Paragraph 44.  I take it

22          the question here is whether or not an expert

23          deposition testimony can be used at trial if the

24          expert has not signed and filed it or signed it.
```

```
 1              MR. PRUGO:  I think that -- I
 2      don't actually believe that the defendants are
 3      objecting in that technical ground.
 4              THE COURT:  Well --
 5              MR. PRUGO:  There's a motion in
 6      limine in play and that's probably what this is
 7      addressed to.
 8              MR. FINEMAN:  Yes.
 9              THE COURT:  This has to do with
10      calling the other side's experts.
11              MR. PRUGO:  I imagine it does.
12              MR. FINEMAN:  I think we can
13      address this in a different context.  I think
14      we're all on the same page as to what this
15      provision means.  I think we can accede to
16      plaintiffs.
17              THE COURT:  Okay.
18              MR. FINEMAN:  As long as we
19      understand that other objections on other
20      grounds --
21              THE COURT:  Well, no.  I saw the
22      motion in limine of one side, I forget who, but
23      one side, they want -- you want to use
24      deposition excerpts.  Somebody wants to use
```

1    deposition excerpts of the other side's experts.

2                    MR. PRUGO:  Right.

3                    MR. FINEMAN:  Correct.

4                    THE COURT:  And just to preview

5    that, I'm going to say no, if they are actually

6    showing up in court.  But we can argue it later,

7    but I just wanted to tell you the answer now.

8                    MR. FINEMAN:  Good time for me to

9    sit down, your Honor.

10                   THE COURT:  Okay.  All right.  The

11   order of proof.  And this is the one where I

12   actually had -- where I thought it might be

13   helpful to just have people explain to me the

14   relevant advantages and disadvantages from their

15   point of view of doing this.

16                   But I assume what this basically

17   has to do with is infringement cases, and the

18   plaintiff wants to do the infringement case

19   against Watson, I guess.  Yes, Watson first, and

20   then the infringement case against Par.  And so

21   the thought that occurred to me was that

22   literally, there would be quite a bit of

23   redundancy here.

24                   And so I was wondering -- and I

1    was trying to think, because I've some ANDA

2    trials before, but I've never actually both, had

3    two defendants both contesting infringement, so

4    it has never actually come up for me before.

5                    Mr. Prugo, I take it that's your

6    idea.  Why does this make sense?

7                    MR. PRUGO:  I think it will be

8    easier for you to follow the testimony.  We have

9    two very distinct products with different

10   components and different names.  You are going

11   to hear all sorts of chemical names, different

12   adhesives, different names and different

13   structures, and it will just be easier we think

14   to present the evidence and for you to follow

15   the evidence if we do it separate.  That's

16   really what it boils down to.

17                    THE COURT:  So as I recall of your

18   three witnesses, one of them is the inventor and

19   presumably that person is only being called kind

20   of during the infringement case; right?

21                    MR. PRUGO:  Well, actually, it's

22   one of the issues we wanted to address with your

23   Honor.  Some judges like the inventor called in

24   the infringement case, others in the invalidity

1    part, phase of the trial.  That would be our

2    preference, if it's okay with you, in terms of

3    the infringement case.  It will be two experts,

4    Dr. Davies and Dr. Klibanov.

5                    THE COURT:  Then I'm going to hear

6    from Dr. Davies and Dr. Klibanov again on the

7    validity part of the case?

8                    MR. PRUGO:  Correct.

9                    THE COURT:  So under this --

10                   MR. PRUGO:  Actually, only Dr.

11   Klibanov.

12                   THE COURT:  But so the way you

13   propose doing it is, and, you know, forget the

14   order here, but Davies testifies, Klibanov

15   testifies.  They both get cross-examined.

16   Watson calls anybody it's going to call.  Then

17   Davies testifies, Klibanov testifies, they both

18   get cross-examined.  Par calls whomever it is

19   going to call.  Then we move on to invalidity.

20   And then I'm going to hear from Klibanov.  Well,

21   Klibanov a third time?

22                   MR. PRUGO:  That's correct, your

23   Honor.  Now, obviously, we don't want to be

24   redundant.  That does not make sense.

```
1               THE COURT:  Well, how --

2               MR. PRUGO:  Given that we're on

3    the clock, we'll have to make sure we're not

4    redundant.  Again, there are very different

5    products, so the analysis is different.

6               THE COURT:  Well, so how would

7    you -- and Dr. Davies, he did two different

8    kinds of, or he did different testing on the

9    different products?  I mean, I guess he did.

10              MR. PRUGO:  That's correct.  And

11   actually my colleague just reminded me that Dr.

12   Klibanov doesn't come back for the Par

13   infringement part of the case.  So it will be

14   Dr. Davies or Dr. Klibanov, Watson, and Dr.

15   Davies for Par and the inventor and Dr. Klibanov

16   on the invalidity part.

17              THE COURT:  Actually, I'm going to

18   hear from both of them under your thing twice?

19              MR. PRUGO:  Correct.

20              THE COURT:  All right.  Go ahead,

21   Mr. Fineman.

22              MR. FINEMAN:  Your Honor, I'm

23   going to pick up where I think you just left

24   off.  I think that's not correct.  I think you
```

```
 1    would hear from Dr. Davies three times.
 2                    THE COURT:  Well, they say they're
 3    not calling him in the invalidity portion of the
 4    case.
 5                    MR. FINEMAN:  Okay.  Okay.  Then
 6    only twice.
 7                    Your Honor, basic principles, I
 8    think that this is a single trial.  Plaintiffs
 9    should put on their proofs and then they should
10    rest their case and defendants should put on
11    their rebuttal case, if plaintiffs have
12    satisfied their burden of proof.  That's basic
13    principles.  Neither defendant should have to
14    put on their noninfringement case until
15    plaintiffs have completed putting on their
16    case-in-chief.  That is the first basic
17    principle.
18                    THE COURT:  Well, I mean,
19    basically, though, what they are saying is,
20    they've got two separate cases on infringement
21    and so if they go bing, bing, bing, Watson,
22    we're done, then I guess if Watson is going to
23    say, you know, just as a matter of law, they
24    didn't put on enough evidence, assuming that I
```

```
 1        overrule that, then they put on their case.

 2                    How is that different than what

 3        you are saying is basic principles?

 4                    MR. FINEMAN:  Well, it would be

 5        much more efficient, it would seem, and I'm sure

 6        that Mr. Brown and Mr. Figg and Ms. Gifford will

 7        correct me if I'm wrong, but although there are

 8        certainly differences between their proofs and

 9        the parties' products, I do believe Dr. Davies

10        did some testing that overlaps between the two.

11        And it certainly seems more efficient to have a

12        witness on the stand once than twice.  On the

13        issue of infringement, no matter how you would

14        separate it, it seems that is the more efficient

15        use.  We have confidence your Honor will be able

16        to differentiate between the two cases.

17                    THE COURT:  I appreciate your

18        saying that, but --

19                    MR. FIGG:  May I add one point,

20        your Honor?

21                    THE COURT:  Sure.  Go ahead.

22                    MR. FIGG:  I think I disagree a

23        little bit with Mr. Prugo on the degree of

24        overlap of issues.
```

```
 1              One of the issues in this case
 2      will be whether the defendants' products are
 3      formulated in such a way that they would cause
 4      the drug to degrade at all, because if the drug
 5      doesn't degrade, then obviously there's nothing
 6      that is reducing that degradation.
 7              The position they take against
 8      Watson could impact whether the Par product is
 9      formulated in such a WAY that it would do that.
10      The position they take on Par could impact
11      whether Watson's product does that.  In other
12      words, positions they take against one defendant
13      could end up being inconsistent with positions
14      they are taking against the other defendant.
15              THE COURT:  Even though you would
16      think as the finder of fact, I'd probably hold
17      that against them, wouldn't you?
18              MR. FIGG:  You might do that, but
19      I think we also should be able to hear what the
20      witness has said.
21              First of all, if the Court adopts
22      this procedure, I think it should be up to the
23      defendants as to which ones should be able to
24      have to put on their defense to this first.
```

1          THE COURT:  Well, that's a

2     separate issue.  We can talk about that.

3          MR. FIGG:  I agree, that's a

4     separate issue.  But if that witness is on the

5     witness stand talking about one defendant's

6     product, the other defendant may very well like

7     to cross-examine him on what he said when he was

8     addressing the other party's product, and this

9     separation that the plaintiffs are proposing

10    would not allow that to happen.

11         THE COURT:  Right.  Mr. Prugo, do

12    you have anything further to say?

13         MR. PRUGO:  No, your Honor.  I

14    just think they're two very distinct products,

15    two different cases.  We should be putting them

16    up sequentially and that makes the most sense

17    for the witnesses, and we think in order to

18    understand infringement proofs, it will make the

19    most sense for you as well.

20         THE COURT:  Does everyone agree

21    this is essentially a discretionary sort of

22    decision?

23         MR. PRUGO:  Yes, your Honor.

24         MR. FIGG:  Yes.

```
 1              MR. BROWN:  Yes, your Honor.

 2              THE COURT:  Okay.  Mr. Fineman is

 3    grimacing.

 4              MR. FINEMAN:  Your Honor, I'm just

 5    thinking about, to answer your question,

 6    technically as to whether they need to finish

 7    putting on their case-in-chief.

 8              THE COURT:  Well, the way -- okay.

 9              Mr. Prugo, couldn't you accomplish

10    essentially the same thing by saying, call Dr.

11    Davies, Klibanov, whichever one -- Davies, I

12    guess you said.  All right, Dr. Davies.  What's

13    your background, qualifications?  Fine.  All

14    right.  Do you have some opinions about Watson's

15    infringement?  Yes.  Explain them.  All right.

16    Thank you.

17              Now, do you have some opinions

18    about Par's infringement?  Explain them.  I

19    mean, isn't that essentially what you are

20    proposing to do, you're just proposing to do

21    with cross-examination in between that, turning

22    to Par?

23              MR. PRUGO:  Almost.  You also have

24    to add their witnesses as well, of course.  So
```

 1       it would be Dr. Davies, Dr. Klibanov, for

 2       instance, and you would have the respective

 3       cross-examinations, close the case, so I think

 4       that takes care of that procedural issue that

 5       was just raised, and then they put on their

 6       case.

 7                 So what you get in one sequence,

 8       in one shot, is all the evidence on infringement

 9       with respect to one product, and then we move on

10       to the next phase of the case.  They really are

11       two distinct products, two different cases that

12       happen to be consolidated.

13                 Go to the next case.  Have Dr.

14       Davies come up.  Obviously, we wouldn't be

15       repetitive.  We're not going through his

16       qualifications again, explaining the tests that

17       he ran, you know, if he has already explained

18       what those tests are.  Go through the proofs,

19       have them cross-examine Dr. Davies and then have

20       them put on their noninfringement case, keeping

21       in mind that --

22                 THE COURT:  Keeping in mind that?

23                 MR. PRUGO:  -- they'll have

24       different noninfringement experts.

```
 1                    THE COURT:  Right.  Right.  Right.

 2        Right.

 3                    MR. FIGG:  Your Honor,

 4        essentially, what this would mean is that the

 5        party going first would not have any opportunity

 6        to address infringement positions taken with

 7        respect to the second defendant either with

 8        cross-examination or with their rebuttal

 9        testimony, and this was not the way it was done

10        pretrial.  They submitted expert reports.  They

11        addressed both parties' products in the expert

12        reports.  The defendants submitted counter

13        expert's reports and responded to them.  We took

14        a single deposition of all of the experts.  We

15        didn't divide it up in the way that's being

16        proposed.  I just think this could be

17        prejudicial.

18                    In response to your question, I,

19        frankly, don't know the answer, whether it's

20        discretionary or not.  If they present testimony

21        in the second part of their infringement case,

22        and if Watson is required to go first -- if they

23        present testimony in the second part of their

24        infringement case that's prejudicial to Watson
```

```
 1    and Watson had no opportunity to either

 2    cross-examine their witnesses --

 3                    THE COURT:  Well, you say

 4    prejudicial.  I mean, presumably, if it's in the

 5    Par case, they can't use it against you.

 6                    MR. PRUGO:  That's exactly right,

 7    your Honor.

 8                    MR. FIGG:  Well, your Honor has

 9    heard it.  And then we're going to have motions

10    to strike things in their post-trial brief

11    because they're relying on something they said

12    in the Par case to support --

13                    THE COURT:  Well, I mean, again, I

14    think that's something, that if I were to do

15    what they want, yet there may be motions, but if

16    they were citing the Par case for the Watson

17    group, presumably, they would agree at least in

18    theory, you should win.

19                    MR. FIGG:  Well, I am trying to

20    think of why they are proposing this, your

21    Honor, and I don't want to talk about motives.

22    But I do --

23                    THE COURT:  Well, why not the

24    motive they offered?  It's difficult stuff.  I'm
```

1    not a scientist.  Maybe it will help me.

2                    MR. FIGG:  I agree the chemistry

3    is going to use terms that will have to be

4    explained, but they'll only have to be explained

5    once if they present this testimony against both

6    defendants in a consolidated way and we respond

7    in a consolidated way.

8                    THE COURT:  Yes, Mr. Fineman?

9                    MR. FINEMAN:  Your Honor, I'm just

10   going to suggest that, again, I think your Honor

11   was getting there, which was, there really is no

12   difference for them to just do it in a

13   traditional way.  In other words, I think your

14   Honor had suggested earlier, they say expert X

15   testifies, testifies, testifies.  Okay.  Now

16   we're going to turn to the other defendants'

17   product.  There's just no reason to deviate from

18   that standard of practice.

19                    THE COURT:  But you would agree

20   that under that scenario, basically, all the

21   evidence of the plaintiffs' case in the

22   post-trial briefing, they can use it against

23   both sides?

24                    MR. FINEMAN:  I need to think

```
 1        about that, your Honor.  There might be some
 2        evidentiary issues either way.
 3                    THE COURT:  Well, I mean, I guess
 4        there could be hearsay or some other kind of
 5        thing.  Maybe it's an admission by one but not
 6        by the other of something.
 7                    MR. FINEMAN:  That's an example,
 8        your Honor.  I just don't want to foreclose
 9        other things.
10                    THE COURT:  Right.
11                    MR. FINEMAN:  There are a lot of
12        things I can't think about, your Honor.
13                    THE COURT:  All right.  Well, it's
14        an interesting suggestion, but, Mr. Prugo, I
15        would like you to just call your witnesses in
16        your infringement case once and put on your
17        infringement case against both defendants at
18        once and then they will have to pick as to -- I
19        don't want them to mix and match their defenses,
20        but they should -- and they've got different
21        experts, so they should then put on their
22        defense.  One defendant's defense, the second
23        defendant's defense.  All right?
24                    MR. PRUGO:  Your Honor, could we
```

1    have one person cross-examining one witness at a

2    time and limit it to that?

3              THE COURT:  I don't think we can

4    have -- I think that Dr. -- whoever has

5    testified -- if it is, in fact, the case, as I

6    think you have said it is, or actually,

7    Mr. Fineman said, somebody said, Dr. Klibanov is

8    only testifying against Watson, then presumably

9    he'll only be cross-examined by one person.  But

10   if Dr. Davies is testifying against both, he's

11   going to be cross-examined by two.  And

12   presumably they will coordinate so they don't

13   have too much repetitive cross-examination, but

14   I don't think you can expect Watson to

15   cross-examine about whether or not Par

16   infringes.  Right?

17             MR. PRUGO:  I understand, your

18   Honor, but we're going to consolidate the

19   testimony.  I would think we would consolidate

20   the cross-examination as well, but, of course,

21   if you're inclined to allow them to do that...

22             THE COURT:  Well, I mean, the

23   defendants have agreed, Dr. Klibanov, if he's

24   only testifying against Watson, he has only been

1    cross-examined by Mr. Figg presumably or

2    somebody on Mr. Figg's side; right?

3                    MR. BROWN:  Your Honor, in his

4    expert report, Dr. Klibanov did provide opinions

5    in relation to the Par product.

6                    THE COURT:  But apparently he's

7    not going to at trial.

8                    Is he going to provide opinions

9    against -- somebody said he wasn't.

10                   MR. PRUGO:  They had opinions

11   initially relating to something called oxidation

12   potentials.

13                   THE COURT:  That's now out.

14                   MR. PRUGO:  They withdrew their

15   opinions in light of Dr. Klibanov and actually

16   the deposition of their expert, so those are

17   out, so I don't think Dr. Klibanov is coming in.

18   He certainly won't be testifying about oxidation

19   potentials.

20                   MR. BROWN:  If Dr. Klibanov

21   doesn't testify at all relevant to the Par

22   products, then we won't need to cross-examine

23   him.

24                   THE COURT:  I think he has just

```
1    represented that he's not going to.
2              MR. PRUGO:  Right.  And I just
3    want to be very careful with the word
4    "relevant."  I mean, you've heard the argument
5    now that, you know, what one expert says may be
6    important vis-a-vis another, the other side's
7    product, and now where do we draw this relevancy
8    line?  That's my concern here, your Honor.
9    That's why I'm asking for one attorney per
10   expert witness.
11             MR. FINEMAN:  Your Honor, I don't
12   think it's fair to have either Par's lead
13   counsel or Watson's lead counsel have to argue
14   and cross-examine the witness for the
15   noninfringement of another company's product.
16             THE COURT:  Right.  Well, that's
17   only a problem for you because I think -- this
18   is what I'm inclined to say.  Mr. Prugo is all
19   but representing that nothing Dr. Klibanov is
20   going to say is going to be used against Par.
21   If, in fact, that's the representation, then I'm
22   not going to let Par cross-examine Dr. Klibanov.
23   And if later on in the briefing, you know, some
24   associate slips something by Mr. Prugo using Dr.
```

```
 1        Klibanov's testimony against, you know, Par, I
 2        will expect you to respond appropriately.
 3                      MR. PRUGO:  That sounds fair, your
 4        Honor.
 5                      MR. BROWN:  That sounds fair.
 6                      MR. FIGG:  Yes.  I think that sort
 7        of fits into the general rule that cross should
 8        be limited to direct, but with respect to Dr.
 9        Davies, I just want to make sure --
10                      THE COURT:  Dr. Davies, you can
11        both cross-examine.
12                      MR. FIGG:  Okay.  Thank you.
13                      THE COURT:  And so that also does
14        bring up the topic, which maybe doesn't make so
15        much difference under the circumstances.  Is
16        there any particular reason, other than to have
17        order, as to why plaintiffs wanted Watson to go
18        first?
19                      MR. PRUGO:  No, your Honor.
20                      THE COURT:  All right.  So then
21        why don't we do this.  In terms of the openings
22        and the cross-examination of Dr. Davies, it
23        ought to be consistent, but I will let Watson
24        and Par figure out in the next two days who is
```

```
1      going to go first and who is going to go second

2      and tell the plaintiffs, because they should

3      know who is going first and who is going second.

4                  MR. FIGG:  That's fine with us,

5      your Honor.

6                  THE COURT:  Is that something you

7      know right now or do you need to discuss it?

8                  MR. FIGG:  Well, it might be

9      useful, if your Honor understood.  Dr. Davies,

10     with respect to Watson, all he did was tested

11     the product and presented his test results, and

12     I presume that's all he's going to do on the

13     witness stand here.  He didn't offer --

14                 THE COURT:  Wait.  You're telling

15     me too much information.

16                 MR. FIGG:  Well, he did not offer

17     any opinions about the Watson product.  He

18     simply did the testing and presented his test

19     results.

20                 THE COURT:  Okay.

21                 MR. FIGG:  With respect to Par,

22     he actually offered opinions about why he

23     believes --

24                 THE COURT:  Well, that's nice, but
```

```
 1      why don't you just figure out one side or the
 2      other goes first.
 3                      MR. FIGG:  We can do that.
 4                      THE COURT:  Okay.
 5                      MR. FIGG:  We have not done it,
 6      but we will.
 7                      MR. PRUGO:  Do we have a time for
 8      Wednesday?
 9                      THE COURT:  Wednesday.
10                      MR. PRUGO:  What time?
11                      THE COURT:  How about 5:00 p.m.?
12                      MR. PRUGO:  That sounds fine.  All
13      this discussion, all this back and forth about
14      who did what and when and who testified about
15      what, that's part of the reason we also wanted
16      to keep the two cases separate.  We think you
17      avoid all these debates and all these issues,
18      just put up the cases in sequence.  I'm just
19      throwing it up there.
20                      THE COURT:  Okay.  No harm in
21      trying.
22                      All right.  So does that resolve
23      the order of proof issue?
24                      MR. FIGG:  Yes your Honor.
```

```
 1                    MR. PRUGO:  Yes, your Honor.
 2                    THE COURT:  All right.  Do
 3      defendants have -- do you have experts who are
 4      testifying on the same thing?  In other words,
 5      you've got your noninfringement experts.  I
 6      understand they're separate.
 7                    On the invalidity side, do you --
 8      you know, you've got one expert, I guess, and
 9      they've got at least two, I guess.  Are they --
10      not harmonious, but are they addressing
11      different issues?
12                    MR. FIGG:  Yes.  The defendants
13      have their separate experts on the infringement
14      issue.
15                    THE COURT:  Right.
16                    MR. FIGG:  And a common expert on
17      invalidity.
18                    THE COURT:  Okay.  All right.
19      Good.  So that means on invalidity, one attorney
20      will be doing the questioning for the
21      defendants; right?
22                    MR. FIGG:  Yes, I think that's
23      right.
24                    MR. BROWN:  Well, we have more
```

```
 1     than one expert that addresses the invalidity

 2     issues, but one attorney.

 3                    THE COURT:  Well, whatever -- Mr.

 4     Figg is frowning.

 5                    MR. FIGG:  I'm just trying to

 6     understand.  Go ahead.

 7                    MR. PRUGO:  We'd appreciate

 8     clarity as well who the other, the experts are.

 9                    MR. FIGG:  Oh.

10                    MR. BROWN:  Our expert has offered

11     some 112 invalidity positions in the reports.

12                    MR. FIGG:  Yes.

13                    THE COURT:  Okay.  So basically I

14     mean if you have a 112 expert and there's also a

15     103 expert or 102 expert, or however different

16     experts you have, as long as I don't have two

17     defense experts both saying 112 or 103, there's

18     only one obviousness expert?

19                    MR. BROWN:  Correct.

20                    THE COURT:  Okay.

21                    MR. BROWN:  And one attorney.  If

22     Mr. Figg is doing the direct, it will only be

23     Mr. Figg.

24                    THE COURT:  Okay.  Good.  All
```

1    right.

2              So do I have it -- I guess I have

3    one other question, which is, it wasn't clear to

4    me.  Par is only supposedly infringing one

5    patent.  Watson supposedly is infringing both

6    patents.  I couldn't tell a hundred percent.

7              Is Watson basically stipulating

8    that under the claim construction, it infringes

9    one of the patents and arguing about the other,

10   or what?

11             MR. FIGG:  Your Honor, this brings

12   up a question about claim construction.  The

13   claim construction that your Honor adopted for

14   the term antioxidant is the claim construction

15   that plaintiffs presented at the very beginning

16   of this case and when we exchanged terms.  And

17   our understanding at that time was derived only

18   from the expert reports that were exchanged.

19   That's the only exchange the parties had.  And

20   the plaintiffs' position at that early stage

21   more or less coincided with our position and we

22   didn't really think there was much of a claim

23   construction issue on that.

24             THE COURT:  But, nevertheless, it

1     got ponied up.

2               MR. FIGG:  Now there is a claim

3     construction, and our understanding of the

4     Court's claim construction is that what we've

5     been calling the broad composition claims, like

6     claim 1 of each of the patents, requires only

7     that something nominally an antioxidant,

8     something called an antioxidant is present in

9     the product, and there is no requirement for a

10    showing that that antioxidant is reducing

11    oxidative degradation of the drug rivastigmine

12    or anything else in that composition.  That all

13    that is required is a showing that it's present,

14    and it's present in the amounts that are

15    required by the claim.

16              THE COURT:  Right, because there

17    are some claims it needs to be present and other

18    claims it needs to do something?

19              MR. FIGG:  That's right.  And if

20    we have correctly understood your Honor's

21    construction, and we think that's the

22    understanding that the plaintiffs are operating

23    under, then we don't have a basis for saying

24    there's no infringement of those broad

1    composition claims.  On the other hand, the

2    construction that was actually adopted was a

3    substance that reduces oxidative degradation,

4    which sort of implies that there has to be a

5    showing that it is reducing oxidative

6    degradation.

7               If there is a requirement that

8    there be a showing that there actually is a

9    reduction of oxidative degradation, then we

10   would not agree.  We would contest infringement.

11              THE COURT:  All right.  And it's a

12   little bit hazy in my mind right now, but isn't

13   what I said something like, you've got some

14   claims where it expressly says it has got to

15   reduce oxidative degradation and there are other

16   claims where it just says an antioxidant?  And,

17   you know, one with many principles is, you

18   shouldn't construe different terms to mean the

19   same thing.

20              MR. FIGG:  Well, I don't want to

21   reargue claim construction.  There are two sets

22   of claims and the way we believe we understand

23   your Honor's construction is in your opinion you

24   said it would be improper to read into this term

1    a requirement for any particular amount or

2    effect.  And so that's how we have construed

3    your Honor's construction as saying all that's

4    required is the mere presence, no showing that

5    anything is required of that.  And, of course,

6    if that is the construction, then we don't have

7    a basis for saying there's no infringement, but

8    we have to have a very strong basis for saying

9    the claims are invalid.

10                 THE COURT:  Right.  Right.  Let me

11   just ask.  Mr. Prugo, is your understanding of

12   the order based on the same as what Mr. Figg is

13   saying there?

14                 MR. PRUGO:  Essentially, it's

15   correct to say that some claims require proof

16   the antioxidant is actually functioning whereas

17   other claims not require proof that the

18   antioxidant is functioning.  And I do think Mr.

19   Figg misspoke, however.  There are amount ranges

20   in these claims.  There's not just any amount.

21   You have to show that it's there in a particular

22   amount.

23                 THE COURT:  All right.  Well --

24                 MR. FIGG:  Well, may I just

```
 1        clarify?  When I said "amount," I was more or
 2        less quoting from your Honor's opinion.  And I
 3        think what you were saying is the word
 4        "antioxidant" doesn't carry with it a
 5        requirement for an amount.  That's separately
 6        provided.
 7                    THE COURT:  All right.
 8                    MR. FIGG:  The sentence I'm
 9        referring to says, the claims for a method of
10        stabilizing compound A require the antioxidant
11        be present in an amount effective to stabilize
12        compound A.  You said that a few minutes ago.
13        Whereas the claims for the composition and some
14        claims for the transdermal device do not
15        explicitly limit the antioxidant's amount or
16        effect.  And that's how we arrive at our
17        understanding of what your Honor's order is.
18                    THE COURT:  Right.  All right.
19        Well, so -- all right.  So in these things, it's
20        not good to speak other than in writing because
21        you don't know what nuances might be lost.  But
22        basically, so if your interpretation is also Mr.
23        Prugo's interpretation, then basically, why
24        don't you perhaps reduce to a stipulation or
```

1    something that the parties agree under the

2    Court's construction that these claims would be

3    infringed, and then, you know, some day down the

4    road if it happens to be the Federal Circuit is

5    looking at it and they don't like the Court's

6    construction, you'll get relief.

7                MR. PRUGO:  Your Honor, we think

8    that makes sense, and we would take it one step

9    further.  For the other claims that require

10   showing of the antioxidant's functioning,

11   there's really no serious debate that the other

12   elements in those claims are met.  We think it

13   would streamline the litigation tremendously if

14   we also had agreement with respect to those

15   other elements.

16                THE COURT:  Well, you should

17   discuss that between yourselves.  I mean, I'm

18   just saying that since -- you know, what I am

19   hearing is essentially that Watson at least

20   doesn't really want to put on evidence -- well,

21   I think what I'm hearing is that they won't have

22   any defense to infringement on these.  They're

23   more or less conceding that.  They obviously

24   don't concede that the construction is right.

```
 1        So under the circumstances it seems like it

 2        would advance everybody's position to stipulate

 3        to that and, you know, put on proof about the

 4        other ones, put on the invalidity case.  I mean,

 5        who knows how it will all come out in the wash?

 6        But it seems like that's an issue that it would

 7        benefit review later on to resolve by

 8        stipulation.  But in the end, you know, I can't

 9        make you stipulate.

10                  MR. PRUGO:  We agree it's the

11        right process, your Honor.

12                  MR. FIGG:  I agree, your Honor.

13        We tried to really tee this issue up in our part

14        of the joint, proposed joint pretrial order.  In

15        paragraphs -- paragraph 3 of Exhibit 12, we lay

16        out in there with some precision what we

17        understood the Court's claim construction to be

18        and what impact that would have on our position

19        on infringement of those claims.

20                  So we can work out a stipulation

21        that is predicated on that understanding of the

22        claims, Court's claim construction, and as your

23        Honor says, you know, we'll preserve all other

24        rights on appeal.
```

```
 1                    THE COURT:  Okay.

 2                    MR. FIGG:  Okay.

 3                    THE COURT:  That sounds good.

 4                    All right.  So are there any -- so

 5      here's where I think we stand otherwise.  The

 6      only motion that was pending I dealt with on

 7      Friday.  We've got the motions in limine here,

 8      which I am prepared to deal with today.

 9                    We ought to talk -- and so the

10      pretrial order said, and I told you before, we

11      had four days for this trial.  How many hours

12      was each side -- how many hours of trial are we

13      all expecting to have?

14                    MR. PRUGO:  That's really up to

15      you, your Honor.  I think we calculated 14 hours

16      a side.  So 14 for us and 14 total for the

17      defendants.

18                    THE COURT:  Okay.  All right.  All

19      right.  Well, then, we start at 8:30 on -- we'll

20      start at 8:30.

21                    MR. FIGG:  Go ahead, your Honor.

22                    THE COURT:  I was going to say

23      we'll start at 8:30 on Monday and the general

24      schedule will be 8:30 to 5 Monday through
```

```
 1    Thursday.  And there will be an hour for lunch.
 2    There will be two 15-minute breaks, one in the
 3    morning, one in the afternoon, and that should
 4    give us seven hours a day.
 5                    MR. FIGG:  Yes.
 6                    THE COURT:  And we'll be counting
 7    minutes.  If we lose a minute or two here, we'll
 8    stay until 5:05 and catch them back up.  Okay?
 9                    MR. FIGG:  Yes.
10                    THE COURT:  In terms of the -- I
11    take it there are no witness scheduling issues
12    with your various experts, and -- I mean, I'm
13    guessing that for the most part they're
14    basically going to be here the entire time?
15                    MR. PRUGO:  Well, your Honor, that
16    is true, but I do have some witness scheduling
17    issues I'd like to address with you.
18                    THE COURT:  Okay.
19                    MR. PRUGO:  We already touched on
20    one earlier in terms of the inventor.  If we
21    have your permission, we'd like to bring the
22    inventor in in the invalidity case, if that's
23    okay.
24                    THE COURT:  Well, he's your
```

1    witness.  You can bring him up whenever you

2    want.

3                    MR. PRUGO:  Oh, sure.  Some

4    judges -- certainly, Judge sleet, for instance,

5    has a preference as to when you bring the

6    inventor.

7                    THE COURT:  Judge who?

8                    MR. PRUGO:  Sleet.

9                    THE COURT:  Yes, I've heard of

10   him.

11                   MR. PRUGO:  He has a preference as

12   to when you bring the inventor.  If you are open

13   to us deciding, we are happy to go by that, and

14   we would like to bring him in in the invalidity

15   phase of the case.  We think that makes most

16   sense.

17                   THE COURT:  Is there an objection

18   by you all?

19                   MR. FIGG:  We don't have a problem

20   with that, your Honor.  I will say that this

21   particular individual made statements, factual

22   statements during his deposition that we think

23   are relevant to our noninfringement position and

24   our expert will be referring to those statements

```
 1      that the inventor made.  He explained them in

 2      his expert report.  It's no surprise to the

 3      plaintiffs that he is relying on that

 4      information.  But it's fine with us if we

 5      cross-examine that witness on those points when

 6      he arrives to testify during their --

 7                    THE COURT:  All right.  It sounds

 8      like we're in harmony here.  Right, Mr. Prugo?

 9                    MR. PRUGO:  Certainly in terms of

10      the inventor showing up in the invalidity phase

11      of the case, your Honor.

12                    THE COURT:  Okay.

13                    MR. PRUGO:  A couple of -- sorry,

14      your Honor.  A couple of other --

15                    THE COURT:  Sorry.  You go ahead.

16                    MR. PRUGO:  A couple other

17      logistics in terms of the witnesses.

18                    Are you okay with witnesses being

19      taken out of order?  So, for instance, if one

20      expert has done the testing, but another expert

21      is --

22                    THE COURT:  I don't care which

23      order they testify in.

24                    MR. PRUGO:  That's fine.  And
```

1    that's okay, even if the first witness is

2    referring to testing that's not yet in evidence?

3                    THE COURT:  You know, you're

4    making a promise.  I assume you'll keep your

5    promise.

6                    MR. PRUGO:  We will.  Thank you.

7                    A couple of other logistical

8    issues.  Live Note.  We understand we need your

9    permission to have Live Note in the courtroom.

10                   THE COURT:  Nicole, do they submit

11   a form?  Live Note?  I don't know.  What is Live

12   Note?

13                   MR. PRUGO:  It's basically a feed

14   from the Court Reporter to our computer so that

15   we can see what the testimony is.

16                   THE COURT:  Well, as far as I'm

17   concerned --

18                   DEPUTY CLERK:  We've never had

19   that before.

20                   THE COURT:  Hold on a second.  Is

21   this something where this would be to all

22   parties?

23                   MR. PRUGO:  Yes, indeed.  And

24   actually Mr. Figg's experience is the same as

1    mine.  In every case we've done in Delaware,

2    we've had Live Note.

3              THE COURT:  Well, why don't you

4    submit a one-sentence letter or something saying

5    both parties would like to have this and that

6    will remind us to follow up, because the Court

7    Reporter who are doing it are from Hawkins, and

8    I have no objection to doing it, but I don't

9    want to promise things on behalf of people that

10   I'm not a hundred-percent sure about.

11             MR. PRUGO:  Sure.  If the Court

12   Reporters can't do it for whatever technical

13   reason, that's fine, your Honor.

14             THE COURT:  But if you've done it

15   with other judges here, I'm sure they will be

16   able to do it.

17             MR. PRUGO:  We have.

18             THE COURT:  And I assume that you

19   probably pay for the privilege, so they like

20   that, too.

21             MR. PRUGO:  Fair enough.

22             THE COURT:  But do send just a

23   one-sentence letter so that we make sure to

24   follow up.

```
 1                    MR. PRUGO:  Sure.  We will do

 2        that, your Honor.

 3                    One last logistical issue.  In

 4        terms of moving documents into evidence, I'm not

 5        sure what your preference is, but we would --

 6        our preference would be to have the attorney

 7        actually doing the examination formally ask to

 8        move a document into evidence when they're ready

 9        to do that and that way we can deal with the

10        objections.

11                    THE COURT:  Well, is there an

12        objection to doing it like that?

13                    MR. FIGG:  I think that's fine,

14        your Honor.  If I understand what Mr. Prugo --

15                    THE COURT:  He's saying it's the

16        old-fashioned way.

17                    MR. FIGG:  So we show the witness

18        the document.  Please identify this.

19                    THE COURT:  Well, he can skip all

20        of that stuff.  He just wants to have -- I mean,

21        if you all have exchanged your stuff and you

22        know that there's no objection, it's just to

23        create a, sort of a, what some people call a

24        realtime record as to what's being introduced
```

```
 1      into evidence.

 2                  MR. FIGG:  Yes.

 3                  THE COURT:  And I'm fine with

 4      that.

 5                  MR. FIGG:  I am, too.  I think

 6      Mr. Brown is as well.

 7                  MR. BROWN:  Yes.

 8                  THE COURT:  I'm sorry.  I figured

 9      at that point Mr. Figg was speaking for the both

10      of you.

11                  All right.  So we will do that.

12      And just on that note, and maybe this is now

13      standard practice, I've seen it in the last two

14      ANDA cases.  In the post-trial briefing, it

15      would be nice to have all the exhibits that are

16      actually referred to in the briefs on a DVD.  I

17      assume this is kind of standard at this point,

18      but it's a big help to me in dealing with

19      briefing.

20                  Yes, Mr. Brown?

21                  MR. BROWN:  Just, I wanted to

22      revisit an issue we were talking about a second

23      ago, which is the testimony of the inventor that

24      they, the plaintiffs want to call in the
```

1       invalidity portion of the case.

2                   THE COURT:  Right.

3                   MR. BROWN:  I would just note we

4       have identified that individual as a witness for

5       our case-in-chief and I would presume that the

6       normal course of, what's normally done is, when

7       that witness is called, they're called once, and

8       we're able to examine that witness beyond the

9       scope of whatever they put on for direct

10      examination if they said something helpful for

11      our infringement case.

12                  THE COURT:  Okay.  I think I

13      understand what you are saying is, but for an

14      agreement to call them in their case, you would

15      call them in your case, and therefore you'd like

16      to be able to direct exam beyond the scope of

17      whatever it is they do in their case?

18                  MR. BROWN:  Exactly.

19                  THE COURT:  All right.  Sounds

20      reasonable.

21                  Mr. Prugo?

22                  MR. PRUGO:  It does sound

23      reasonable, your Honor.

24                  THE COURT:  Okay.

```
 1                    MR. FIGG:  And just for the

 2        record, that is what I meant when I said he has

 3        said things that we think is important in our

 4        infringement part of the case.

 5                    THE COURT:  Okay.  Points to

 6        Mr. Brown for being clear.

 7                    MR. FIGG:  For clarifying.

 8                    THE COURT:  All right.  Is there

 9        anything else in terms of issues or anything

10        else that we need to discuss other than the

11        motions in limine?

12                    MS. SHARP:  Your Honor, a

13        relatively minor point.  Do you want witness

14        notebooks?

15                    THE COURT:  You know, if you are

16        going to have them shown to me -- I think it's

17        good to have a witness notebook for the witness.

18                    MS. SHARP:  I was wondering if the

19        Court was interested in also having binders.

20                    THE COURT:  No.  For me

21        personally, at this point, if you have a big

22        screen over there, I'm usually looking at it

23        anyhow, so one less binder, I guess.  But still

24        it's nice to have a binder, one binder for my
```

```
1    law clerk.
2              MS. SHARP:  Understood.  Thank
3    you.
4              MR. BROWN:  One other minor issue,
5    your Honor.  In addition to the confidentiality
6    issues of the parties that Ms. Sharp testified
7    earlier, we're calling a third-party witness
8    from 3M Corporation and 3M counsel has told me
9    that they consider portions of that testimony to
10   be confidential and they're going to want to
11   move to close the courtroom during some limited
12   part of that.
13             THE COURT:  Well, you know, I
14   start from this premise, which is just because
15   it's confidential doesn't get you anywhere.  You
16   know, talking about trade secret, okay.  That
17   might get you somewhere, but just because
18   somebody says it's confidential, if we followed
19   that, we'd close the courtroom Monday morning
20   and not open it again until Thursday.
21             So what --
22             MR. BROWN:  This individual
23   invented the polymer that's used as the adhesive
24   for the Par product.  3M does consider certain
```

```
 1    aspects of that process by which that is made to

 2    be highly confidential.  I don't want to

 3    over-speak for them as to --

 4                THE COURT:  Is 3M's counsel going

 5    to show up with their witness?

 6                MR. BROWN:  They are going to be

 7    attending trial.  In-house counsel will be

 8    attending trial.  He can speak more directly as

 9    to what their position is when they are here.

10                THE COURT:  All right.  So for

11    these purposes, you are going to be representing

12    3M's interests?

13                MR. BROWN:  I very much hate to

14    say that.

15                THE COURT:  Okay.  Well, why don't

16    you talk with 3M and see.  You know, it might be

17    if they want something, somebody ought to submit

18    something in writing, you know, before the end

19    of the week, under seal, giving me something

20    that is as brief as possible to read that would

21    let me do good about closing the courtroom

22    because as I know some of you know, I hate

23    closing the courtroom or otherwise designating

24    anything that occurs in court as confidential.
```

1    Okay?

2                    MR. BROWN:  Understood.

3                    THE COURT:  All right.  All right.

4                    MR. FIGG:  Just by way, on the

5    witness availability issue, I have one thing I

6    would just like to make the Court and plaintiffs

7    aware of.  I don't think it's going to be a

8    problem, but it turns out our trial has been

9    scheduled for the opening week of class for one

10   of our witnesses, expert witnesses, who is a

11   teacher, and he has been struggling with not

12   being there for the opening week of class.  So

13   what he's going to do is he's going to be here

14   Monday, leave Monday night, teach a class

15   Tuesday morning, come back as soon as he's done

16   with that.

17                    I don't think it's going to be a

18   problem because -- it's Dr. Kibbe.  I don't

19   think he's going to be required to testify

20   during that period.

21                    THE COURT:  Okay.  Well, I mean --

22                    MR. FIGG:  But I just wanted to

23   make it clear that, you know, he probably won't

24   be here until --

```
1                    THE COURT:  Where does he teach?
2                    MR. FIGG:  He's in Wilkes-Barre,
3       Pennsylvania, so it's not that far away.
4                    THE COURT:  Oh.
5                    MR. FIGG:  I don't think it's
6       going to cause any disruption at all.
7                    THE COURT:  Okay.
8                    MR. FIGG:  But I just wanted
9       to --
10                   THE COURT:  If we have a hurricane
11      that passes through Northeast Pennsylvania --
12                   MR. FIGG:  Yes, something like
13      that.
14                   THE COURT:  -- you'll have a
15      record it's beyond your control.
16                   Okay.  Anything else on those
17      subjects?
18                   MR. PRUGO:  Just on that, on that
19      topic.  Obviously, we cannot -- if, for whatever
20      reason, Dr. Kibbe can't show up, we can't put up
21      our validity defenses not having heard what he
22      has to say.  I that's the only caveat.
23                   THE COURT:  Right.
24                   MR. FIGG:  Well, yes --
```

```
 1              MR. PRUGO:  No, I understand you
 2    are saying it's unlikely to be a problem.
 3              MR. FIGG:  Yes.
 4              MR. PRUGO:  I'm just making it
 5    clear, that would be a problem in terms of
 6    scheduling the trial.
 7              THE COURT:  How long do you all --
 8    the portion of the total time, how much of it do
 9    you think is going to be devoted to
10    infringement, how much is going to be devoted to
11    invalidity?
12              MR. FIGG:  Well, roughly, about
13    half and half, I think, because --
14              THE COURT:  Okay.
15              MR. FIGG:  Yes.
16              THE COURT:  Mr. Prugo, what do you
17    think?
18              MR. PRUGO:  Just a guess.  I think
19    Mr. Figg is probably right, half and half, but
20    it's really a guess at this point.
21              THE COURT:  Okay.  Would Dr. Kibbe
22    be your first invalidity witness?
23              MR. FIGG:  That's right.  So our
24    best --
```

```
 1                    THE COURT:  So you don't expect
 2        him to be here on Tuesday?
 3                    MR. FIGG:  Tuesday morning.
 4                    THE COURT:  Oh, okay.
 5                    MR. FIGG:  Yes.  I don't think
 6        we'll get through the infringement case before
 7        he's required to show up.
 8                    THE COURT:  Okay.  All right.
 9        Well, if it is, then that's kind of found time.
10                    That reminds me of one other
11        thing, which is the last time I had an ANDA
12        trial, and this is my own stupid fault, I sat
13        and listened to some expert witness go through
14        20 minutes of qualifications.  All of these
15        people have resumés or CVs, and so I'm kind of
16        thinking that I'd like to hear about one minute
17        maximum of qualifications.
18                    The first thing you do is
19        introduce the resume and, you know, I haven't
20        yet seen a case where somebody said, well, this
21        guy has a Ph.D. from Stanford and that one got a
22        Ph.D. from MIT and one is better than the other.
23        And it does not seem like you have any
24        disagreement that they're all qualified.  You
```

```
 1      may not agree that everything that they did

 2      meets -- you know, is scientifically reliable.

 3      But let's try and keep the, you know, highlight

 4      and then move on into the substance.  Okay?

 5                     MR. FIGG:  Yes.

 6                     MR. PRUGO:  Yes.

 7                     THE COURT:  All right.  That

 8      should cut out two hours.

 9                     All right.  So anything else?  All

10      right.  Let me tell you what I think about the

11      motions in limine, which is, there was a motion

12      in limine number 1 by the plaintiff, had to do

13      with the relevance of the inventor's testimony

14      to obviousness or nonobviousness and, you know,

15      it seems to me that the testimony is extremely

16      limited in that regard, but also seems to me

17      there's no particular issue for me to decide in

18      advance of trial.  So if the inventor is

19      testifying to something that for some reason

20      or other strikes, I guess, the defendants as

21      being -- well, I guess the defendants are the

22      ones who are going to be objecting, he should

23      object, but there's nothing that I can really

24      decide in advance.
```

1              On the motion in limine number 2,

2     there seemed to be three objections.  One was

3     combination of the '572 patent and the Elmalem

4     E-l-m-a-l-e-m, reference, which, as I understand

5     it defendants admit is not in Dr. Kibbe's report

6     as a combination.  I mean, there are references

7     to the '572 in regards to other things.  There

8     are references to Elmalem, but they aren't a

9     specific combination that's supposed to make the

10    invention obvious.

11              I think the defendants knew about

12    plaintiffs' construction of the patent, at least

13    by October 2012, which is when the joint claim

14    chart was, and so Dr. Kibbe not anticipating

15    that the plaintiffs' construction would be

16    adopted, I don't think that is an answer, and I

17    notice also that he was filing rebuttal reports

18    at least as late as February 28th.  That's

19    Exhibit 5 to defendants' opposition, so they

20    could have said something if he wanted.

21              So I don't think the failure to

22    disclose the '572 patent and the Elmalem

23    combination is substantially justified.  Federal

24    Rule of Civil Procedure 37(c)(1).  Dr. Kibbe

1    could have supplemented at some time after the

2    claim construction on June 21st, and I gather he

3    hasn't.

4              There is, I think, prejudice to

5    plaintiffs because they've not deposed Dr. Kibbe

6    on it and their own expert has not addressed it.

7              I also note the defendants have

8    four other invalidity defenses and lots of

9    obviousness ones besides that, so it seems to me

10   the harm to the -- so it doesn't seem to me that

11   defendants are losing a whole lot by not having

12   that.

13             So I would grant the motion in

14   limine, what I'm calling motion in limine number

15   2 as two testimony that the '572 patent and

16   Elmalem make the invention obvious.

17                  On the --

18             MR. FIGG:  Your Honor, if I may,

19   may I?

20             THE COURT:  Yes.  Go ahead.

21             MR. FIGG:  If you look at Exhibit

22   1 attached to the plaintiffs' report, the last

23   sentence of Dr. Kibbe's report that they refer

24   to there expresses the opinion that the

```
 1        invention would have been obvious over the GB
 2        '040 patent together with the '807 and the '572.
 3                      THE COURT:  Right.
 4                      MR. FIGG:  So you are not ruling
 5        on that part?
 6                      THE COURT:  No, no, no.
 7                      MR. FIGG:  Okay.
 8                      THE COURT:  You can do that.
 9                      MR. FIGG:  All right.
10                      THE COURT:  Just one combination,
11        '572 and Elmalem.
12                      MR. FIGG:  I've got you.  Thank
13        you.
14                      THE COURT:  Okay.  On what I've
15        got to refer to here as the new art, which I
16        think is the way plaintiff characterized it in
17        their motion in limine.
18                      Oh, okay.  Defendants, I guess,
19        have some transdermal patches that include an
20        antioxidant that are listed in the pretrial
21        order and I saw that four of them were brought
22        up in the cross-examination of Dr. Klibanov, and
23        I think they can cross-examine Dr. Klibanov with
24        the four that they brought up before and
```

1     whatever other ones they have now.  I mean, it's

2     cross-examination.  But I don't think, and I

3     didn't see any representation that they would,

4     that defendants' experts can testify to

5     something that's not in their reports, and I

6     gather these are not in their reports.

7               So to the extent the request was

8     that defendants not mention these patents, I'm

9     not going to grant that.  To the extent that

10    these -- the patentee's transdermal patches.  To

11    the extent that the request is -- so I just said

12    to the extent the request is that the

13    transdermal patches not be mentioned, I decline

14    to do that.  To the extent that the transdermal

15    patches are something that are not discussed in

16    the defendants' expert reports, they can't

17    discuss them.  And I assume they are not in the

18    defendants expert reports.  Right?

19               MR. FIGG:  That is correct, your

20    Honor.

21               THE COURT:  Okay.  So then on the

22    new motivation, I read that a couple of times

23    and it was in the end hard for me to say in

24    advance what I think on that one, so I'm

1    essentially going to pass.

2              Dr. Kibbe and Dr. Sessler can

3    testify to what is in their reports.  I am not

4    sure that will support defendants' facts about

5    motivation to combine the GB '040 patent and the

6    '572 patent, but that's not really a motion in

7    limine issue, that's a post-trial finding of

8    fact issue, I think, but I'm not really deciding

9    anything on that one in particular.

10             MR. FIGG:  Your Honor, this is a

11   fairly important point to us in terms of just

12   getting ready for trial, and the -- as we said,

13   we've always felt that plaintiffs' claim

14   construction was a bit of a moving target here,

15   but certainly the effect of the Court's

16   construction of the broad claims is that if

17   there was a reason to put an antioxidant in a

18   rivastigmine pharmaceutical composition, that is

19   now highly relevant to those claims based on the

20   way they have --

21             THE COURT:  Wasn't it always

22   highly relevant?

23             MR. FIGG:  Let me give you an

24   example.  The '572 patent describes putting an

1    antioxidant in a transdermal system for the

2    purpose of stabilizing the polymer, and that

3    was fully explained in Dr. Kibbe's declaration,

4    and he cited that for the simple point that it's

5    not -- that there is prior art that shows that

6    you can put an antioxidant in a transdermal

7    system, and so there's not something inherently

8    unique about a transdermal system to prevent you

9    from doing that.

10            Now that reference is far more

11   relevant.  And Dr. Kibbe said, and if you look

12   at the very end of Exhibit 3 to the plaintiffs'

13   motion, he sort of ended his opinion on this by

14   saying, the patents-in-suit do not claim a

15   composition containing a trace amount of a known

16   oxidant, antioxidant, where the antioxidant is

17   only needed to stabilize the adhesive polymer

18   and not the API.

19            Well, he believed that to be a

20   true statement when he made it because he didn't

21   think that the plaintiffs were arguing that

22   putting the antioxidant in for that reason -- in

23   fact, Dr. Klibanov went out of his way to argue

24   that the '572 patent is not relevant because the

```
 1     antioxidant is there to stabilize the polymer

 2     and not the API, not the pharmaceutical

 3     ingredient.

 4               Well, it's obvious now that what

 5     Dr. Kibbe said what the patents-in-suit do not

 6     claim, they, in fact, do claim.  That's the

 7     result of your Honor's claim construction.

 8               And Dr. Sessler pointed out in his

 9     report that there is prior art going back for

10     decades describing the use of anti-oxidants in

11     polymer systems.  Indeed, the polymer system --

12               THE COURT:  And so I've said you

13     can use that.

14               MR. FIGG:  Okay.

15               THE COURT:  I mean, if it's in his

16     report, you can use it.

17               MR. PRUGO:  I guess that's the

18     key, your Honor.

19               MR. FIGG:  But Dr. Kibbe will also

20     say, here is a -- here is an entirely -- here is

21     a reason for combining an antioxidant in a

22     rivastigmine composition that has nothing to do

23     with stabilizing rivastigmine, because that's

24     the construction the plaintiffs asked for and
```

1    got.

2                    THE COURT:  Is that in his report?

3                    MR. FIGG:  What is in his report

4    is he discussed the '572 reference at length,

5    saying it describes a transdermal formulation --

6                    THE COURT:  Yes.

7                    MR. FIGG:  -- with an antioxidant

8    in it.

9                    What he said was, the claims don't

10   cover adding an antioxidant to stabilize the

11   polymer, but now we know that his understanding

12   of the claim was incorrect when he wrote that.

13   And so he should not be precluded from saying,

14   offering the opinion that a reason for adding an

15   antioxidant to a transdermal system is because

16   they are there to stabilize the polymers.

17                   THE COURT:  Well, and so, I'm

18   sorry.  They are there to stabilize the

19   polymers.  Is that in his reports?

20                   MR. FIGG:  He says they are there

21   to stabilize the polymers in his report.  What

22   he didn't say --

23                   THE COURT:  What is it you want

24   him to say now?

1          MR. FIGG:  We want him to be able

2     to say, and the way these claims have been

3     construed, that is an alternative reason that

4     these claims are invalid, because as now

5     construed, they cover transdermal systems that

6     contain antioxidants for purposes of stabilizing

7     the polymer.

8               THE COURT:  Mr. Prugo?

9               MR. PRUGO:  What you're hearing,

10    your Honor, is a new opinion.  That's the bottom

11    line.  The analysis is no different than the

12    analysis I have just set forth with respect to

13    Elmalem and the '572 patent.

14               They've known about our claim

15    construction for a long time.  It's clear

16    they've known about our claim construction.  All

17    you have to do is read their motion in limine.

18    If they wanted to get these opinions in, they

19    should have supplemented the expert reports.

20    You can't now spring this on us less than a

21    month before trial.

22               THE COURT:  Well, and, I mean, you

23    know, we are a week from trial and, you know, I

24    think that, in fact, if it's not in their expert

1    reports, it's not -- it should not come in.

2              MR. FIGG:  Well, your Honor, it

3    should hardly be a surprise to plaintiffs.

4              THE COURT:  Well, but --

5              MR. FIGG:  Well, let --

6              THE COURT:  I'm sorry, but I mean

7    when you say it should hardly be a surprise, the

8    law kind of defines what a surprise is.  If it's

9    in the expert report, it's not a surprise.  If

10   it's not in the expert report, it's a surprise.

11             MR. FIGG:  Well, your Honor, what

12   was in the expert report was that the '572

13   patent discloses the use of antioxidants in

14   polymer systems for transdermal devices.  Dr.

15   Kibbe said that this demonstrates that there is

16   no teaching away or prohibition against using

17   antioxidants in transdermal devices.

18             Dr. Sessler said in his report --

19             THE COURT:  Well, wait, wait,

20   wait.  So, I mean, if Dr. Kibbe said there's no

21   teaching away, he can say again, there's no

22   teaching away.

23             MR. FIGG:  Yes.  But, your Honor,

24   it's very clear that the claim -- your Honor

```
 1      pointed it out during the claim construction

 2      hearing.  When plaintiffs asked for and got this

 3      construction that basically said, all you have

 4      to have to satisfy these claims is that there be

 5      an antioxidant present, it doesn't have to be

 6      doing anything, I don't think that they could

 7      have taken that position without understanding

 8      that this prior art that shows antioxidants in

 9      transdermal systems was going to be highly

10      relevant to their claims.  This is not something

11      that they should feign ignorance about, your

12      Honor.

13                  THE COURT:  Well, I don't think

14      they're feigning ignorance.  I mean, I think --

15      you know, when you're writing expert reports

16      before the claim construction is done, you've

17      got to anticipate the various possibilities.

18      And, you know, one of the things is at some

19      point, the expert has to put on paper the claim

20      construction has caused me to have a theory

21      which, because I had no idea the judge was going

22      to go off in such a direction, but now that he

23      has, here's my new -- here's a relevant, here's

24      some relevant information.
```

```
 1              MR. FIGG:  Dr. Kibbe didn't know
 2      the plaintiffs were going to go off in such a
 3      direction.
 4              THE COURT:  Well, I --
 5              MR. FIGG:  And so I really think
 6      this is -- this is giving them the advantage of
 7      a, of a, frankly, a shifting position during the
 8      period that expert reports -- and we explained
 9      in our response to their motion the evolution of
10      Dr. Klibanov's report, which is the only thing
11      we had to understand how they thought these
12      claims should be construed.
13              And it's very clear to us what
14      happened, is that they saw our noninfringement
15      position and they started then asking for a much
16      broader construction.
17              But Dr. Kibbe gave them every
18      piece of information.  Between Dr. Kibbe and Dr.
19      Sessler, they had every piece of information
20      that will be presented at trial on the fact that
21      using antioxidants to stabilize polymer systems
22      was known in the prior art, was known well
23      before their patent applications were filed.
24      The only thing they're complaining about is Dr.
```

1    Kibbe, instead of saying the patents don't claim

2    such a composition, they're complaining that he

3    didn't say the patents do such a composition and

4    therefore they are invalid because of that.

5    It's just that final conclusion from the

6    scientific evidence that he and Dr. Sessler

7    presented that this is an alternative reason

8    that these claims as now so broadly construed

9    are invalid.

10                  MR. PRUGO:  Your Honor?

11                  THE COURT:  Yes?

12                  MR. PRUGO:  There's a big

13   difference between what Mr. Figg said Dr. Kibbe

14   said in his report, which is, there's no

15   prohibition against putting an antioxidant in

16   the transdermal patch and then saying, what

17   they're trying to do now is, we make this

18   specific combination between GB '040 and the

19   '562 patent based on knowledge relating to the

20   manufacture of polymers.  That's new.  It's not

21   in his reports.  It's too late.

22                  MR. FIGG:  Well, your Honor --

23                  MR. PRUGO:  If they wanted to put

24   it in the report, they could have done that a

| | |
|---|---|
| 1 | long time ago. |
| 2 | MR. FIGG:  As I pointed out |
| 3 | earlier, we looked at Exhibit 1 to their motion. |
| 4 | Dr. Kibbe did say that the subject matter of |
| 5 | claim 2, and he's talking about the '031 patent |
| 6 | here, would have been obvious to a person of |
| 7 | ordinary skill in the art in view of the |
| 8 | combination of GB '040, the '807 patent and the |
| 9 | '572 patent. |
| 10 | THE COURT:  And -- |
| 11 | MR. FIGG:  So he did include the |
| 12 | '572 patent in that basis for invalidity. |
| 13 | THE COURT:  Well, and I guess this |
| 14 | issue boils down to whether -- because, right, |
| 15 | he does say that, you know, I understood the |
| 16 | objection here.  Is the objection here because |
| 17 | he does say combination of '040 and '807, or |
| 18 | combination of '040, '807, '572?  The objection |
| 19 | is to his testifying as to why people might |
| 20 | have wanted to put these patents together; |
| 21 | right? |
| 22 | MR. PRUGO:  That's correct, |
| 23 | because what they are trying to present is a new |
| 24 | motivation to combine. |

```
 1                    THE COURT:  Right.  Right.  Okay.

 2       That's what I thought.

 3                    And there's already one motivation

 4       to combine that's in here.  Not the one that Mr.

 5       Figg is now --

 6                    MR. PRUGO:  Whatever is in here,

 7       we have no problem with, but the new motivation,

 8       we just can't accept that they can, at this late

 9       stage, bring it into the trial.

10                    THE COURT:  All right.

11                    MR. FIGG:  Well, your Honor, if I

12       may just add one more thing.  Dr. Sessler said

13       in his report with respect to a polymer system

14       that contained an antioxidant fortuitously,

15       because it was part of the polymer system, he

16       said in his expert report that --

17                    THE COURT:  This is about the BHT?

18                    MR. FIGG:  That was -- no.  There

19       are was -- the GB '040 patent, your Honor,

20       contains an example for a transdermal patch.

21                    THE COURT:  Okay.

22                    MR. FIGG:  There is evidence that

23       one of the additives to the polymer in that, in

24       that example contained an antioxidant.
```

1          Dr. Sessler was arguing that that

2     simply shows that antioxidants have routes into

3     these products through the polymer system.  He

4     also said in a footnote that, if, of course, the

5     claims merely required the presence of an

6     antioxidant, that would be an anticipatory

7     reference.  He said that in his report.

8          THE COURT:  It does not look to

9     me, though maybe I'm wrong, but the part that's

10     attached to this motion in limine is the part

11     that you are relying on right now.

12          MR. FIGG:  Well, I guess I'm

13     responding to the argument that I'm hearing.  In

14     other words, it was clear in the expert, in our

15     experts' reports that if these claims were

16     construed to require only that you -- that an

17     antioxidant find its way into a transdermal

18     polymer system, then references like Example 2

19     of the '040 patent and the '572 patent and the

20     prior art that Dr. Sessler described that has

21     been around for decades of teaching the use of

22     antioxidants in polymer systems would all become

23     highly relevant.  It was simply our

24     understanding and our expert's understanding

1      that that was not the claim construction that

2      was being advocated.

3                    THE COURT:  Oh, okay.  You know,

4      I'm looking at the wrong set of exhibits.  I do

5      see what you are referring to.

6                    MR. PRUGO:  Your Honor, I think I

7      can short-circuit this.

8                    THE COURT:  Yes?

9                    MR. PRUGO:  Dr. Sessler never

10     mentioned the '572 patent.  So whatever he said

11     in his report has nothing to do with the

12     motivation to combine GB '040 and the '572

13     patent.  He couldn't have set that forth because

14     he does not mention the '572 patent, not to

15     mention that's an infringement report and there

16     are other issues we have with that particular

17     disclosure.  But the bottom line is, he does not

18     talk about the '572 patent.

19                    MR. FIGG:  Your Honor, I simply

20     don't -- we have fully disclosed in these expert

21     reports that the '572 patent discloses

22     transdermal systems with an antioxidant in them,

23     because the antioxidant was added to stabilize

24     the polymer.  There are several other references

1       that Dr. Sessler cited that show that

2       antioxidants have been used for decades in

3       polymer systems that are used to make the

4       adhesives in transdermal systems.

5                    Dr. Sessler also testified in his

6       expert report or stated in his expert report

7       that the very example of the '040 patent

8       describing a transdermal system used a component

9       that contained an antioxidant.

10                   So we certainly think that we're

11      entitled to demonstrate that there were sundry

12      ways that an antioxidant would be used in a

13      transdermal system together with an -- with

14      rivastigmine.

15                   What I think they are complaining

16      about is Dr. Kibbe didn't expressly say, you

17      would combine this polymer to make a transdermal

18      system for rivastigmine and therefore it would

19      be obvious to put that in there.  But that was

20      certainly not anything that a reasonable person

21      reading this would not have understood.  That he

22      was saying that if the claims actually covered

23      that --

24                        THE COURT:  All right.

```
 1                    MR. FIGG:  -- this would be

 2       relevant.  I don't want to repeat myself.

 3                    THE COURT:  Well, no, no.  We have

 4       reached a point of diminishing return, but that

 5       may not be because of you.

 6                    Look, I don't want to give you any

 7       more work than you already have, but I'm going

 8       to -- and my inclination is to do what I said I

 9       was going to do.

10                    But, Mr. Figg, I will give you

11       until, you know, midnight -- no.  That's mean.

12       Until 6:00 o'clock tomorrow night to, you know,

13       write me a letter and attach whichever, or if

14       it's already in the pretrial order, just cite it

15       some way so that I can easily find it.  Just lay

16       out what your argument is as to -- and, you

17       know, highlight some way so it's easy for the

18       brain-impaired to follow as to exactly what the

19       testimony is that you want to offer that is not,

20       you know, in my opinion, explicitly or fairly

21       implicit in the reports.  And I will give Mr.

22       Prugo until 6:00 p.m. Wednesday to respond and I

23       will take another look at it.  Okay?

24                    MR. FIGG:  Of course, your Honor,
```

1    but I've been thinking.  There may be an

2    alternative way of dealing with this.  If we can

3    simply put in the testimony from Dr. Kibbe and

4    Dr. Sessler about what was known in the prior

5    art about the use of antioxidants in polymer

6    systems and polymer systems that are used in

7    transdermal systems, whether or not that prior

8    art renders the claims at issue invalid is

9    actually a question of law for the Court to

10   decide.

11              THE COURT:  Yes, but it certainly

12   helps me to have an expert saying, connecting

13   the dots.

14              MR. FIGG:  I am perfectly willing

15   to forego having Dr. Kibbe sort of finish the

16   sentence and say, therefore, it is my opinion

17   the claim would have been invalid.

18              THE COURT:  Well, this other stuff

19   you are talking about --

20              MR. FIGG:  But we should be able

21   to make that argument in our post-trial brief.

22              THE COURT:  The other stuff that

23   you are talking about, is that in the reports?

24              MR. FIGG:  Yes.

```
 1                    THE COURT:  Mr. Prugo, your

 2       opinion on that?

 3                    MR. PRUGO:  If he is -- if Mr.

 4       Figg is representing that Dr. Kibbe and Dr.

 5       Sessler will say nothing that's not in the

 6       report, and my fear is the, what we think is in

 7       the report is different, because obviously Mr.

 8       Figg thinks some things are implicit versus

 9       explicit.

10                    I like the lighter route, your

11       Honor.  Let's have them put in a letter what

12       they want him to say and we're happy to brief it

13       because we don't think it's there.

14                    THE COURT:  Well, why don't we do

15       this.  I have no problem with the two of you --

16       in fact, I would encourage the two of you to

17       talk about it and maybe there's something else

18       you can come up with, but in the meantime I

19       would like to get a letter from each of you

20       according to the schedule I set so that if I do

21       exclude this, which, after all, is my

22       inclination, it's done with full understanding

23       of what your argument is.  Okay?

24                    MR. FIGG:  Yes, of course.
```

```
 1                    THE COURT:  All right.  Okay.
 2      Because this is the way it appears on my page,
 3      let me just go to defendants' motion in limine
 4      number 1.  And I do appreciate the defendants
 5      only had one motion in limine.  If I could, I
 6      would give you an award for that.
 7                    And as I indicated, to me -- and I
 8      looked at the case, because I couldn't actually
 9      believe that it said what the defendants said it
10      said or maybe the plaintiff.  I forget.  I get
11      things mixed up here.
12                    This is the plaintiff has the
13      defense experts on its witness list and had the
14      designated -- designated some parts of the
15      depositions; right?
16                    MR. BROWN:  Yes.
17                    THE COURT:  And basically for the
18      five witnesses that we're talking about, the
19      full expectation is that they're all going to be
20      here live and in person; right?
21                    MR. BROWN:  Correct, your Honor.
22                    THE COURT:  Okay.  So, you know,
23      the section of the rule, and I realize there are
24      some canons of construction, but it starts off
```

```
 1    with, unavailable witnesses.  These people are

 2    available and so I just don't think that a Rule

 3    32(a)(4)(B) applies.  And if it turns out that

 4    the witnesses are not here, which, you know, I

 5    understand the only way that would happen is,

 6    you know, act of God or something else close to

 7    it, you know, then we're in a different

 8    ballpark.

 9                 So I would grant the defendants'

10    motion in limine.  Okay?

11                 MR. PRUGO:  Your Honor, just one

12    point on that.  That actually is fine so long as

13    we have some leeway in cross-examination to

14    elicit the testimony that we got at the

15    deposition.

16                 THE COURT:  I think that's

17    reasonable because I take it -- when you say

18    "some leeway," are you talking about out of

19    order, so to speak, or are you talking about

20    something else?

21                 MR. PRUGO:  Well, what I'm

22    referring to specifically is, obviously, there

23    will be a direct, and maybe the information that

24    we got or obtained or elicited during the
```

```
 1      deposition does not fall squarely within the

 2      boundaries of direct.

 3                      THE COURT:  So it would be beyond

 4      the scope?

 5                      MR. PRUGO:  That's correct.

 6                      THE COURT:  They already know

 7      what scope you have in mind because you've

 8      designated --

 9                      MR. PRUGO:  We've designated it,

10      yes.

11                      THE COURT:  All right.  Well, that

12      seems reasonable to me.

13                      Does it seem reasonable to the

14      defendants?

15                      MR. BROWN:  I'm not sure, your

16      Honor.  In general, I believe, when an expert

17      testifies, material that's beyond the scope of

18      whatever they testified is normally not allowed

19      into evidence.

20                      THE COURT:  Well, right, but, in

21      other words, the whole reason that I'm not

22      letting them put in the depositions is because

23      they're going to show up live.

24                      MR. BROWN:  Well, as far as them
```

```
1      putting in the depositions of our expert

2      directly, I mean, it seems to me that falls

3      within the rule.  They didn't serve an expert

4      report on our expert and tell us they were going

5      to get opinions from our expert.

6                   THE COURT:  I don't think they

7      have to do that.

8                   MR. BROWN:  Okay.  Well, we just

9      reserve our objection.

10                  THE COURT:  Okay.  All right.

11     Well, I will let you do what you've asked, Mr.

12     Prugo.

13                  MR. PRUGO:  Thank you, your Honor.

14                  THE COURT:  And, Mr. Brown, if you

15     actually really want to preserve the objection,

16     you'd better object during the trial.  Okay?

17                  MR. BROWN:  Understood.

18                  THE COURT:  All right.  So motion

19     in limine number 3.  There were two issues here.

20                  So issue number 1 is, do the trace

21     units of BHT function as an antioxidant in

22     Watson's ANDA product?  And Dr. Sessler, who is

23     Watson's expert, discussed the relevant effects

24     on the two degradation products.  And I didn't
```

1   see a discussion of the one-to-one ratio, which

2   was, I think this is referring to the expert

3   report, which was, however, discussed in the

4   deposition.

5           I don't see that as really being

6   anything more than an elaboration on his

7   opinion, so I'm going to allow him to testify

8   about the one-to-one ratio and the plaintiffs'

9   motion in limine is denied on that point.

10          On the second point, Dr. Sessler

11  said in his deposition at pages 30 to 31, it's

12  Exhibit 4, I think, that positive peroxide test

13  would not necessarily mean peroxide is present.

14  And I think that gives sufficient notice to

15  plaintiff of Dr. Sessler's trial testimony, so

16  I'm not going to exclude that either.

17          So I would deny this motion in

18  limine on both of the grounds raised.

19          Yes, ma'am?

20          MS. JACOBSEN:  Your Honor,

21  Charlotte Jacobsen.  Can I just address one

22  point?  That is the defendants' statement of

23  facts goes beyond even what is in Dr. Sessler's

24  deposition.  And they apply that one-to-one

1    ratio to testing of Watson's ANDA product.  That

2    wasn't identified by Dr. Sessler in his expert

3    report or at the deposition, and so plaintiffs

4    don't know what testing they are referring to or

5    how it applies.  We've got no notice of that

6    extension of what was at Dr. Sessler's

7    deposition.

8            THE COURT:  Mr. Figg?

9            MR. FIGG:  What Dr. Sessler said,

10   he was asked about this testing that Watson had

11   done, and plaintiffs' attorney asked Dr. Sessler

12   at his deposition to confirm that that testing

13   showed that this antioxidant was inhibiting

14   degradation of rivastigmine.

15           And he said, it shows when it's

16   inhibiting degradation of rivastigmine and when

17   it's not inhibiting.  And what we have here is

18   this characteristic pattern of the two

19   degradants of rivastigmine that are an indicator

20   of whether an antioxidant is functioning or not.

21           And Dr. Sessler has taught, and it

22   is in both sides' experts witnesses what that

23   pattern is in plaintiffs' product, because we

24   have --

```
 1                    THE COURT:  Plaintiffs' product?

 2                    MR. FIGG:  Plaintiffs' product and

 3     in Watson's product.  That is clearly in

 4     evidence.  And I think, frankly, one should have

 5     understood what Dr. Sessler was saying was, what

 6     we see here is a ratio of these degradants that

 7     is indicative of whether the antioxidant is

 8     serving the function of protecting rivastigmine

 9     against degradation or not.  He wasn't saying

10     that just to be, you know, as a matter of

11     academic curiosity.

12                    THE COURT:  All right.  So, miss

13     Jacobsen, what is your point now?

14                    MS. JACOBSEN:  Sorry, your Honor?

15                    THE COURT:  What is your point?

16     Respond to what Mr. Figg just said.

17                    MS. JACOBSEN:  Right.  Well, the

18     testing that Mr. Figg is referring to, it hasn't

19     been identified in the expert reports or

20     discussed at the deposition.  And so we have not

21     had an opportunity to test that with Dr.

22     Sessler.

23                    But --

24                    THE COURT:  My impression is that
```

1    that was, that he was talking about it as sort

2    of a matter of theory.

3                    MR. FIGG:  Yes.  But the documents

4    that describe the testing of the products for

5    these degradation products is in evidence for

6    both plaintiff -- it's not in evidence, but they

7    were attached as exhibits and explained in

8    connection both with the plaintiffs' product

9    and with Watson's product.  Those documents

10   have been part of this case from the very

11   beginning.

12                   And so what Dr. Sessler was saying

13   is that you can look at that and there is a

14   characteristic pattern which tells us whether

15   it's working or not.

16                   MS. JACOBSEN:  Your Honor, if you

17   are not going to let it in, we just ask that our

18   experts have an opportunity to address that

19   testimony at trial and the arguments that were

20   only raised at deposition.

21                   THE COURT:  This would be

22   essentially whether the ratio of the degradation

23   products, what the meaning of that is?

24                   MS. JACOBSEN:  Right.  Whether or

1       not that is -- whether or not Dr. Sessler is

2       correct in what he's saying in his opinion and

3       also whether or not the test, peroxide test, is

4       an appropriate test.

5                       THE COURT:  And so this is

6       responding -- your point is essentially that you

7       would like your experts to be able to respond to

8       what Dr. Sessler said at his deposition?

9                       MS. JACOBSEN:  Yes, your Honor.

10                      THE COURT:  Keyword there being

11      deposition?

12                      MS. JACOBSEN:  Yes, your Honor.

13                      THE COURT:  Okay.  And, Mr. Figg,

14      what is your response to that?

15                      MR. FIGG:  Yes.  I don't have a

16      problem.  If the question being asked is, can

17      their experts, when they are responding to Dr.

18      Sessler's point, respond to it?  Of course, they

19      can.

20                      THE COURT:  Okay.  Well, it seems

21      like we've achieved harmony.  So the motion in

22      limine is still denied, but plaintiff will be

23      able to respond in kind, so to speak.

24                      Okay?  So is there anything else

1      to discuss today?

2                   MR. PRUGO:  Yes, your Honor.  We

3      were just served with -- and this is by the Par

4      defendants, I'm told, I have not seen it -- a

5      second supplemental Buckton report, expert

6      report.

7                   THE COURT:  Second supplemental

8      what?

9                   MR. PRUGO:  Dr. Buckton is one of

10     Par's experts.

11                  THE COURT:  Okay.  I don't think

12     he's an expert who raised himself to my -- he's

13     just a name on a piece of paper right now.

14                  So second supplemental report.

15     Okay.  Well, why don't you read it.  I guess you

16     all are looking at it electronically.  Read it

17     and talk to the plaintiffs, and --

18                  MR. PRUGO:  Just flagging the

19     issue.

20                  THE COURT:  Okay.

21                  MR. PRUGO:  Maybe something we

22     need to address with your Honor.

23                  THE COURT:  Well, why don't you

24     address it first with each other.

```
1              MR. PRUGO:  We certainly will do

2       that.

3              THE COURT:  All right.  Anything

4       else?

5              MS. SHARP:  Your Honor, I would

6       only note that as predicted, only the parties

7       were present in the courtroom throughout this

8       hearing.

9              THE COURT:  Okay.  And that has to

10      do with the --

11             MS. SHARP:  With our agreement at

12      the outset.

13             THE COURT:  Okay.  I take it since

14      I didn't hear anything more, that nothing was

15      said that actually causes anybody any concern?

16             MR. FIGG:  There was reference to

17      the Watson product and what it contains, and it

18      was very brief and might require redaction of

19      one or two sentences from the transcript.  I

20      think that's all we --

21             THE COURT:  Okay.  Well, why

22      don't -- I'm trying to think, how is this going

23      to go at trial where they are trying to prove

24      infringement, which presumably has something to
```

1     do with what's in your product?  How are they

2     going to do this in public if what's in your

3     product is a secret?

4                    MR. FIGG:  Well, your Honor, that

5     was -- that was the point we were teeing up.

6                    THE COURT:  Okay.  Well, it's

7     becoming clear to me now.  I mean, yes.

8                    Mr. Fineman, were you going to

9     stand up and help me here?

10                    MR. FINEMAN:  Yes.  I think that

11     the easiest way of handling this when it comes

12     up in these trials, the attorneys on both sides

13     have a very good idea of what this confidential

14     information is.

15                    THE COURT:  I'm sure.

16                    MR. FINEMAN:  Particularly from

17     the exchange of direct examination exhibits, I

18     think we'll all have a sense of when it's

19     coming.  And when it comes, I think it's

20     incumbent upon the party who is doing the

21     examination to raise with the Court that

22     confidential information of the other side --

23     and I'm using "confidential" to constitute that

24     which requires -- under your Honor's protocol,

```
1     that it's coming and request respectfully that

2     it be sealed for that limited duration of the

3     examination.  Your Honor can look out in the

4     gallery and see if anyone who shouldn't be here

5     is here.

6                    THE COURT:  Typically, there are

7     like 30 people out there.  I'm not going to know

8     who is supposed to be here or not.

9                    MR. FINEMAN:  I think the parties

10    can assist the Court with that and just close

11    the courtroom and ask those people to leave for

12    that limited duration of examination, and it's

13    incumbent upon the attorneys to say when it's

14    concluded and to be as abbreviated as possible.

15                   THE COURT:  All right.  Is there a

16    particular rule, the Rules of Civil Procedure

17    that allows me to do this?  Anybody?

18                   MS. SHARP:  Your Honor, I don't

19    think there's a particular rule, but if it's

20    information which is confidential and protected

21    under trade secret, and the parties agree that

22    it's information -- in addition, the parties

23    agree that it's information that would not go

24    into the public domain, Mr. Fineman has
```

 1   described the ordinary procedure in these cases.

 2                    THE COURT:  Okay.  And I mean,

 3   that does sound like something I've heard

 4   before, and I do agree that the way you've

 5   prefaced it is kind of a right way to preface

 6   is.

 7                    Since I gather it's defendants who

 8   have information that they are trying to

 9   protect, I would find it -- you know, do we

10   know, was there at one point some Court of

11   Appeals case or something else that sort of said

12   how to do this, or is this just everyone knows

13   this is how you do it because it's how we've

14   done it forever?

15                    MS. SHARP:  Honestly, I would have

16   to go back and look at that, but this is the way

17   that we've done it for --

18                    THE COURT:  Close to forever?

19                    MS. SHARP:  Well, I haven't been

20   alive quite that long, but for a couple decades,

21   this is how we've done it.

22                    THE COURT:  Okay.

23                    MS. SHARP:  Typically, it's very,

24   very limited.

```
1                    THE COURT:  All right.  Well, I
2        don't really care, and I don't need anything
3        from the plaintiffs about it, because I assume
4        you don't really -- you don't have much of a dog
5        in this fight; right?
6                    MR. PRUGO:  I'm sorry, your Honor?
7        This is certainly not our issue.
8                    I guess the one question I have,
9        the one problem I have listening to this is, I
10       don't know exactly what they are referring to.
11       I don't know what they think is a trade secret.
12       I don't know if we have agreement on what a
13       trade secret is.
14                   THE COURT:  Well, okay.  So that
15       suggests a certain amount of conversation back
16       and forth because I do appreciate what
17       Mr. Fineman and Ms. Sharp said, the general gist
18       of which is, you should have a pretty good idea
19       of what they have in mind, but maybe it's good
20       to have an exact idea of what they have in mind.
21       And so it would obviously help reach the skids
22       if they, as much as possible, told you exactly
23       what they want to protect.
24                   And I would certainly appreciate,
```

```
 1     as far as I'm concerned, you know, Friday at
 2     noon would be fine, some letter just telling me
 3     not so much the procedure -- well, if there's --
 4     you know, maybe there's nothing to be done other
 5     than to just take it as it comes, but if there's
 6     something, since you're the ones who are going
 7     to be looking to seal the courtroom, if you
 8     could give me whatever you could by Friday at
 9     noon just saying, you know, ideally, Judge,
10     here's a Third Circuit case that says do this or
11     this kind of procedure, you know, because my
12     natural inclination is not to seal anything
13     unless it's really, really clear to me that I
14     should be doing so, and so it would just help me
15     having read that case, I will have listened to
16     your request with more clarity than I might
17     otherwise do.
18               And if there's a question about
19     compositions Mr. Figg has raised, the Court
20     Reporter will give you a chance to designate
21     that, and if it is, in fact, basically, you want
22     to redact two lines where the composition was
23     described, certainly, I would be inclined to
24     seal that, or redact it from the public record.
```

```
 1        Okay?

 2                      Anything else?

 3                      MR. PRUGO:  Not from plaintiffs,

 4        your Honor.

 5                      THE COURT:  All right.

 6                      MR. FIGG:  No, your Honor.

 7                      MR. BROWN:  No, your Honor.

 8                      THE COURT:  So I will look forward

 9        to the letters that we discussed from Mr. Figg

10        and Mr. Prugo, and then from either Ms. Sharp or

11        Mr. Fineman, I don't really care who, Friday at

12        noon.  And otherwise, if something comes up, you

13        know, I don't like to say this, but call me if

14        there's a problem because time is running out,

15        or call my Chambers, and if there's something we

16        need to discuss, we will get on the phone and

17        discuss it.  Otherwise, the last thing I have

18        for you is, as the Delaware lawyers know,

19        sometimes getting into the courthouse on Monday

20        morning is hard, so I would in all events be

21        here -- you know, allow yourself plenty of time.

22        And you might want to check and see whether

23        there are any other trials going on, because if

24        we've got jurors coming in, you could be waiting
```

1    a long time to get in.  Okay?  Otherwise, we

2    should be ready to go at 8:30 on Monday.

3                    Yes?

4                    MR. SILVER:  Your Honor, just one

5    question on that note.  Can we arrange with your

6    Honor's Chambers to come into the courtroom late

7    Friday afternoon and get set up to start

8    promptly at 8:30 Monday morning?

9                    THE COURT:  All right.  Well, my

10   regular courtroom deputy is not with us right

11   this minute, but I understand there's a request

12   in to the courtroom deputy from the defendants,

13   and I don't know what the timing is, but work

14   with her.  She'll get you in at some point where

15   you can do what you need to set it up.  Okay?

16                    MR. SILVER:  Thank you, your

17   Honor.

18                    THE COURT:  All right.  Thank you

19   very much.  We'll be in recess.  See you next

20   week.

21                    (Hearing concluded at 3:55 p.m.)

22                         -   -   -

23

24