IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, NOVARTIS AG, NOVARTIS PHARMA AG, NOVARTIS INTERNATIONAL PHARMACEUTICAL LTD., and LTS LOHMANN THERAPIESYSTEME AG,<br><br>Plaintiffs,<br><br>v.<br><br>PAR PHARMACEUTICAL, INC.,<br><br>Defendant. | Civil Action No. 11-1077-RGA |
| NOVARTIS PHARMACEUTICALS CORPORATION, NOVARTIS AG, NOVARTIS PHARMA AG, NOVARTIS INTERNATIONAL PHARMACEUTICAL LTD., and LTS LOHMANN THERAPIESYSTEME AG,<br><br>Plaintiffs,<br><br>v.<br><br>WATSON LABORATORIES, INC., WATSON PHARMA, INC., and ACTAVIS, INC.,<br><br>Defendants. | Civil Action No. 11-1112-RGA |

MEMORANDUM OPINION

Michael P. Kelly, Esq., McCARTER & ENGLISH, LLP, Wilmington, DE; Nicholas N. Kallas, Esq., FITZPATRICK, CELLA, HARPER & SCINTO, New York, NY; Filko Prugo, Esq., FITZPATRICK, CELLA, HARPER & SCINTO, New York, NY.

Attorneys for Plaintiffs Novartis Pharmaceuticals Corporation, *et al.*

Steven J. Fineman, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Daniel G. Brown, Esq., LATHAM & WATKINS LLP, New York, NY.

    Attorneys for Defendant Par Pharmaceutical, Inc.

March 26, 2014

*Richard G. Andrews*
**ANDREWS, U.S. DISTRICT JUDGE:**

On November 3, 2011, Novartis filed a patent infringement suit against Par and Actavis, alleging that their ANDA submissions covering a rivastigmine transdermal patch infringed several Orange Book-listed patents for Novartis's Exelon® product. (D.I. 1). The Court consolidated the two cases (D.I. 35) and set a trial date for Monday, August 26, 2013. Representatives from Par and Novartis worked feverishly in the days leading up to August 26th, attempting to forge a settlement and avoid the trial.[1] The negotiations were intense. The parties exchanged dozens of emails and numerous versions of draft agreements amidst increasing time pressure. (D.I. 346 at 4 (describing long hours and "the relentless barrage of emails and phone calls")).

By the evening of Sunday, August 25, 2013, both parties believed a settlement had been reached, although the contingencies for that agreement are now in dispute. Each side knew that the deal was subject to regulatory approval. (D.I. 334 at 3-4). In addition, Mr. Waibel knew that final approval by Novartis's corporate executives was required.[2] He believed that he had conveyed this to Par throughout the negotiations, and that the approval was a mere formality. (D.I. 346 at 4). Par claims it was unaware that Novartis executives still needed to grant final approval, believing instead that the ministerial task of obtaining their signatures was all that remained. (D.I. 334 at 8). Because the parties did not realize that there was a misunderstanding at the time, they filed a stipulation to stay the case, the Court signed it,[3] and Par was dismissed from the trial on the morning of August 26th. (D.I. 291). The trial between Novartis and Actavis proceeded as scheduled.

---

[1] Peter Waibel led the negotiations for Novartis; his counterparts for Par were David Silverstein and Lawrence Brown.
[2] These executives were located in Europe, which only added to the negotiation's complications.
[3] Only the risk of failing to achieve regulatory approval was disclosed to the Court.

3

As it turns out, the final approval was not as certain as Mr. Waibel thought. The settlement fell through on August 27, 2013 when Novartis's executives declined to sign the agreement. Novartis's refusal to sign gave rise to the instant motion by Par seeking to have the Court invoke its inherent power to sanction. (D.I. 333). Par asserts that Novartis misrepresented to both Par and the Court that a settlement had been reached, caused Par to enter into a stay that prevented Par from proceeding with the August 2013 trial, and then refused to sign the agreement. (D.I. 334 at 2). According to Par, its harm includes, among other things, delayed entry into the market for its ANDA product, duplicative trial preparation costs, and deprivation of the opportunity to present joint invalidity defenses at the August 2013 trial. (*Id.*). Novartis contends that sanctions based on the Court's inherent power should be reserved for instances of egregious conduct and bad faith, neither of which are involved here. (D.I. 345 at 2). It is Novartis's position that Mr. Waibel acted in good faith, that he "fairly and repeatedly" communicated the need for final management review and approval, and that he "expected in good faith" that Novartis management would approve the deal. (*Id.*).

## I. LEGAL STANDARD

"Our legal system will endure only so long as members of society continue to believe that our courts endeavor to provide untainted, unbiased forums in which justice may be found and done. Thus, it is beyond peradventure that district courts have broad authority to preserve and protect their essential functions." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 (3d Cir. 1995). The Federal Rules of Civil Procedure permit district courts to impose sanctions on litigants and parties that do not satisfy minimum standards of conduct. *See, e.g.*, FED. R. CIV. P. 11 (allowing sanctions for improper pleadings, motions, or other papers). Congress has also provided district courts with authority to sanction litigants. *See, e.g.*, 28

U.S.C. § 1927 (2012) (establishing liability for "unreasonably and vexatiously" multiplying proceedings in a case). In addition to these rules and statutes, the Supreme Court has held that district courts have inherent power to enact sanctions if warranted by the conduct in question. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-50 (1991) ("[I]f in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.").

Despite being inherently vested in the Court, the imposition of sanctions pursuant to this authority must be undertaken sparingly. *Id.* at 44 ("Because of their very potency, inherent powers must be exercised with restraint and discretion."). "Generally, a court's inherent power should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exists." *Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995). The guiding principles for applying sanctions under the court's inherent authority are similar to those of the Federal Rules. *See Republic of Philippines*, 43 F.3d at 74. The first step is to evaluate the conduct and explain why it warrants sanctions. *Id.* In order for the court to utilize its inherent power to impose sanctions, the existence of bad faith is generally required. *Martin*, 63 F.3d at 1265 ("Usually, the inherent power that a district court retains to sanction attorneys also requires bad faith."); *Landon v. Hunt*, 938 F.2d 450, 454 (3d Cir. 1991) ("[A] prerequisite for the exercise of the district court's inherent power to sanction is a finding of bad faith conduct."). *But see Republic of Philippines*, 43 F.3d at 74 n.11 (noting that "[*Landon*'s] statement should not be read to require a finding of bad faith in every case, regardless of the sanction contemplated," because it focused on the assessment of attorneys' fees). Other factors to consider include whether there is a pattern of wrongdoing, the severity of the wrongdoing, and whether the wrongdoing causes prejudice to the opponent or hampers the administration of justice. *Republic of Philippines*, 43

5

F.3d at 74. Second, the court must evaluate the array of possible sanctions and explain why a lesser sanction to the one selected is inadequate or inappropriate. *Id.* The court is not required to "exhaust all other sanctioning mechanisms prior to resorting to its inherent power," *Landon*, 938 F.2d at 454, but the court must justify its choice of sanction from the list of alternatives. *Republic of Philippines*, 43 F.3d at 74.

## II. DISCUSSION

After reviewing the parties' briefs and cited evidence in light of the standard identified above, the Court is not persuaded that Novartis engaged in sanctionable conduct. The morass of emails in the days leading up to trial are by no means a model of clarity, but any uncertainty or miscommunication regarding what final approval was still required cannot, in the Court's view, be attributed to bad faith, vexatious conduct, or an intent to deceive. These were high-level business talks being conducted in the shadow of an impending trial, and the Court appreciates both parties' efforts to resolve the case outside of the judicial process.

The first prong of the analysis, whether sanctions are warranted in this case, turns on whether Mr. Waibel acted in bad faith during the negotiations. *See Republic of Philippines*, 43 F.3d at 74; *Martin*, 63 F.3d at 1265. The email trail shows Mr. Waibel reminding Messrs. Silverstein and Brown that final approval by Novartis was required on both August 24th and the morning of August 25th. (D.I. 337-7 at 25 ("In the interest of time, I am providing these comments now. I am still waiting for final review at Novartis, but the terms related specifically to time periods should be change[d]."); D.I. 337-11 at 16 ("I can agree that subject to a final review of the license agreement to be supplied by David, Novartis agrees to be bound by the agreement as reached with Par at this point in time."); *see also* D.I. 346 at 2 (identifying five

6

other emails from August 23rd through 25th where Mr. Waibel expressed the need for approval or review by Novartis)).

However, there are portions of the email correspondence that, when viewed by themselves, could be read as suggesting that final approval had already occurred. For example, on August 24th Mr. Waibel stated that the parties had agreed to final terms. (D.I. 337-9 at 2 ("With respect to our review of the final terms we recently discussed, which can be agreed to at this point, there will be an additional, minor change to the regulatory review section in the settlement. I will forward as soon as I get it.")). This could be interpreted as indicating that Novartis's executives had approved the terms of the deal, but this was prior to the reminder Mr. Waibel gave on August 25th that final approval had yet to occur. In addition, at 2:01 p.m. on August 25th, when asked about the status of his "efforts to secure signatures for Novartis," Mr. Waibel said, "You have our email exchange that both Parties have an agreement." (D.I. 337-14 at 34-35 ("You have our email exchange that both Parties have an agreement. I should be able to begin execution of [the] agreement tomorrow morning, with signature from at least 1 Novartis entity tomorrow, and will have all signatures within the next 96 hours, as discussed.").

Mr. Waibel explained in his declaration that he did not reiterate the requirement for final approval by Novartis in every correspondence because he thought it would be redundant and he believed Par knew that final approval was still necessary when he sent the email at 2:01 p.m. on August 25th. (D.I. 346 at 3 ("It is correct that I did not explicitly include the caveat concerning the need for Novartis' final internal review in every one of the flurry of emails exchanged by the parties during the weekend before the scheduled trial. However, I recall repeating this caveat during phone conversations over the weekend with Messrs. Silverstein and Brown, and assumed after so many written and oral repetitions that it was understood."). Moreover, at 5:54 p.m. on

7

August 25th, Mr. Waibel inquired as to whether a draft document he received from Mr. Silverstein was "for final review." (D.I. 346-4 at 18 ("Question on revision control. This is the redline, did you send a clean copy (the one which Par signed) or if there are no issues, do I need to accept the changes and execute this version. If you sent this version for my convenience for final review—greatly appreciated, that's what it has been used for. Again, assuming there are no changes, just want the execution copies to match.")). This email response suggests that this final version would be presented to the Novartis executives for their "final review," which comports with Mr. Waibel's version of events.

It is also worth noting that Mr. Waibel was so certain the settlement would occur that he did not even tell his own trial team it was still contingent on final approval. (D.I. 346 at 4 ("I also believed in good faith that final Novartis approval would occur. Thus, I did not advise Novartis' trial counsel that expected approval was still pending when I authorized them to sign the stipulation staying Par's case and representing to the Court that the parties had agreed to settle."). These actions are consistent with his position that signatures from Novartis executives were expected to be forthcoming.

Efficiency and redundancy aside, there can be little doubt that explicitly reciting every contingency in each email would have avoided any misperception. After reading the email correspondence, Par's conclusion that final approval had been obtained is understandable. A misunderstanding, however, does not rise to the level of bad faith or egregious conduct, particularly in light of Mr. Waibel's representation, which I accept, that he believed Par understood the need for final approval. *See Martin*, 63 F.3d at 1265 (counseling against imposition of sanctions under the court's inherent power unless the offender's conduct was egregious). Par also argues that attorneys' fees are appropriate here because Novartis delayed

8

and disrupted litigation. (D.I. 334 at 15 (citing *Chambers*, 501 U.S. at 46)). Any delay or disruption, however, is a factor that a court could use to determine whether the accused party acted in bad faith—a finding that this Court has made in the negative. *Chambers*, 501 U.S. at 45-46 (listing "delaying or disrupting the litigation or [] hampering enforcement of a court order" as a subset of a party acting "in bad faith, vexatiously, wantonly, or for oppressive reasons"). The other factors to be considered, including patterns and severity of wrongdoing, do not favor the imposition of sanctions either. Therefore, Par has failed to establish the first prong of the analysis because Novartis's conduct does not warrant sanctions.[4] *See Republic of Philippines*, 43 F.3d at 74. There is no need for the Court to evaluate the range of possible sanctions, nor whether those sanctions are properly tailored to redress Par's alleged harm.

## III. CONCLUSION

For the reasons set forth above, the Defendant's motion for sanctions is denied. A separate order consistent with this memorandum opinion will follow.

---

[4] The Court expects that had Mr. Waibel told his own trial team that the agreement was contingent upon Novartis signatures that were less than guaranteed, Novartis's trial counsel would likely have discussed it with Par's counsel before the morning of August 26th, and would certainly have disclosed the existence of this risk to the Court on August 26th. What would have happened as a consequence I cannot say, but the matter would have been resolved then with full awareness of all the relevant factors. It is regrettable that this did not occur.

9