IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


NOVARTIS PHARMACEUTICALS, ) Trial Volume 1
CORPORATION,              )
                          )
          Plaintiff,      )
                          ) C.A. No. 11-1077-RGA
v.                        )
                          )
PAR PHARMACEUTICAL, INC., )
                          )
          Defendants.     )


                  Thursday, May 1, 2014
                   8:10 a.m.


                  844 King Street
                  Wilmington, Delaware


BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge


APPEARANCES:


          McCARTER & ENGLISH, LLP
           BY:  DANIEL M. SILVER, ESQ.


                  -and-


          FITZPATRICK CELLA HARPER & SCINTO
          BY:  NICHOLAS N. KALLAS, ESQ.
          BY:  CHARLOTTE JACOBSEN, ESQ.
           BY:  DOMINICK A. CONDE, ESQ.
           BY:  DANIEL MINION, ESQ.
           BY:  CHRISTOPHER LOH, ESQ.

                      Counsel for the Plaintiff

```
1      APPEARANCES CONTINUED:

2

3              RICHARDS LAYTON & FINGER, P.A.
               BY:  STEVEN J. FINEMAN, ESQ.
4
                       -and-
5
               LATHAM & WATKINS, LLP
6              BY:  DANIEL G. BROWN, ESQ.
               BY:  JENNIFER KOH, ESQ.
7              BY:  ROGER CHIN, ESQ.

8                       Counsel for the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    THE CLERK:  All rise.

2                    THE COURT:  Good morning.  Please be

3      seated.

4                    I just wanted to come out and see if

5      there was anything we need to deal with before

6      our official start.

7                    Mr. Silver.

8                    MR. SILVER:  Good morning.  I'd

9      offer to make introductions if Your Honor wants,

10     but I think Your Honor knows all the relevant

11     players.

12                   THE COURT:  I think I know all the

13     people.  I'm not sure of you, sir.

14                   MR. CHIN:  Roger chin.

15                   THE COURT:  Roger Chin.  I think

16     I've heard you on the phone.  Maybe I met you in

17     person, too.

18                   Everyone else, I think I recognize.

19     Anything else?

20                   Mr. Fineman.

21                   MR. FINEMAN:  Good morning, Your

22     Honor.

23                   THE COURT:  Good morning.

24                   MR. FINEMAN:  There are a few, at
```

```
1    least one major housekeeping issues we'd like to

2    take up from the start.  Certain of the documents

3    that are going to be used today were produced by

4    3M Company.

5              THE COURT:  Okay.

6              MR. FINEMAN:  And they are

7    designated highly confidential in the Protective

8    Order.  And I believe --

9              THE COURT:  Okay.  So I'm

10   sympathetic to keeping 3M's products, since

11   they're not actually a party here.  How would you

12   like to handle this?

13             MR. FINEMAN:  We've come up with a

14   couple different ways, Your Honor.  One of the

15   documents that would be used is what is known as

16   the DMF.  The DMF contains trade secrets and very

17   very confidential information, as I understand

18   it.

19             We spoke with Novartis last night

20   and I believe the parties are in contextual

21   agreement.  I believe 3M is in agreement that for

22   the DMF, what we're going to do is we're going to

23   use a redacted version as the actual trial

24   exhibit.
```

1                    THE COURT:  Okay.

2                    MR. FINEMAN:  Neither party will

3      argue at any point that it's an incomplete

4      document or that both parties get the opportunity

5      to put in those pages that they believe they

6      need.  We'll redact the rest.

7                    And if Your Honor is okay with that.

8                    THE COURT:  I'm okay with that if

9      the parties are.

10                   Mr. Silver.

11                   MR. SILVER:  That's fine, Your

12     Honor.

13                   THE COURT:  All right.  That's good.

14                   MR. FINEMAN:  Now, even though we do

15     that, that will protect some of the trade

16     secrets.  But even the remaining pages, we will

17     need to close the courtroom or at least ask Your

18     Honor to close the courtroom while that document

19     is being discussed.

20                   THE COURT:  How much discussion of

21     that document do you expect to have occur?

22                   MR. FINEMAN:  From our side, Your

23     Honor, not much.  It will probably be under 15

24     minutes.

```
 1              THE COURT:  Is it something -- I

 2    kind of vaguely remember.  I might be getting one

 3    trial mixed up with another trial.  Yeah, I

 4    probably am.

 5              Is it possible that whatever is

 6    being shown on, I guess, the screen can just be

 7    sort of tilted toward me and -- because I really,

 8    if at all, prefer not to close the courtroom.

 9              MR. FINEMAN:  Your Honor, we

10    certainly understand and we are cognizant of

11    that.  And we tried to make arrangements for this

12    and what we're proposing is that we only close

13    the courtroom when we're discussing the DMF

14    because that's the, if you will, the crown jewels

15    of the trade secret.

16              So we want to close the courtroom

17    just for that limited period.  We might even make

18    it less than ten minutes, a very short period of

19    time.

20              There will be other documents which

21    are similarly designated, but we've spoken to --

22    3M, Your Honor, is present in the courtroom and

23    is represented by Mr. McCann, so that he's able

24    to speak.
```

```
 1                    THE COURT:  All right.  I know Mr.

 2    McCann.

 3                    MR. FINEMAN:  So if they want to

 4    speak for themselves, Your Honor, they certainly

 5    can.  But as I understand it, what we'll do with

 6    the rest of the documents is we won't ask Your

 7    Honor to close the courtroom.  But we will not

 8    publish on the screen the documents while they're

 9    being used.  And we'd like to reserve the right,

10    Your Honor, to redact the transcript.

11                    THE COURT:  Well, why don't I -- you

12    don't even have to reserve the right to redact

13    the transcript.  If you mean reserve the right to

14    ask to have the transcript redacted, yeah, you

15    got that one, whether you reserve it or not.

16    Whether or not -- I mean, I think -- I hope that

17    everyone knows that I hate to do that.

18                    So that, you know, the best thing is

19    if you can avoid littering the transcript with

20    stuff that 3M rightfully regards as secret.

21                    Then the second best thing is

22    because 3M is actually not a party, you know.

23    There's not that much they can do to prevent what

24    you all say so I would be more sympathetic to
```

```
 1    either 3M itself or to you later on or some

 2    combination, but remembering that it is a public

 3    trial and there is a value to redacting as little

 4    as possible.

 5                 MR. FINEMAN:  That's right, Your

 6    Honor.  And the three parties have tried to

 7    coordinate --

 8                 THE COURT:  Right.  And I do

 9    appreciate that.

10                 MR. FINEMAN:  That's how we propose

11    to address --

12                 THE COURT:  When do you think this

13    closing of the courtroom is because I see, you

14    know, maybe twenty people sitting behind the

15    bench, I have no idea who they are.  I know a lot

16    of them are associated with one or the other

17    side.  I guess what I'm wondering is how do I

18    actually close the courtroom?  Do I require that

19    anyone that you all don't vouch for identify

20    themselves or what?

21                 MR. FINEMAN:  Yes, Your Honor, the

22    DMF was designated outside counsel only, I

23    believe, Your Honor, and someone in this room

24    will correct me if I'm wrong, I don't think the
```

1    parties to this case have had access to this

2    information, it's outside counsel.

3              THE COURT:  So basically what you're

4    saying is people sitting at the table, everyone

5    else except for the person on the computers

6    leaves.

7              MR. FINEMAN:  I think that's right,

8    Your Honor, and we would as I said be very

9    studious to let Your Honor know precisely when we

10   need to close it and when we need to open it and

11   minimize any disruption and minimize the absence

12   of the public to the proceedings.

13             THE COURT:  Okay.  Is there anyone

14   in the courtroom who objects to this?

15             All right.  We'll do that.  And if

16   you can, do you have an idea of when in the

17   proceedings that might be?

18             MR. FINEMAN:  Your Honor, I can't

19   speak for whether Novartis is going to use it.

20   From our side I think at the earliest it will

21   come up late in the afternoon today.

22             THE COURT:  Okay.  Well, all right.

23   Well, in any event, Mr. Silver, do you have

24   anything to add on that.

```
 1                     MR. SILVER:  No, Your Honor.  We'll

 2     confer to see when we need to be prepared to

 3     close the courtroom.

 4                     THE COURT:  Okay.  All right.  Well,

 5     I will do that upon request and again, we just

 6     ask that you all in the first instance be

 7     judicious in what you're requesting.

 8                     MR. FINEMAN:  Absolutely, Your

 9     Honor.

10                     THE COURT:  All right.  And

11     Mr. McCann, does 3M have anything to add?

12                     MR. McCANN:  Not at this time, Your

13     Honor.

14                     THE COURT:  When we close the

15     courtroom for this portion, does that mean that

16     Mr. McCann or somebody associated with him stays

17     or does he leave, too?

18                     MR. FINEMAN:  You know we have no

19     objection to the representative from 3M or their

20     counsel staying because it's, in fact, their

21     confidential information.

22                     THE COURT:  I just wanted to make

23     sure we're all on the same page there.

24                     All right.  Anything else?
```

1              MR. FINEMAN:  Your Honor, the second

2     issue is we had last night what I would call a

3     significant difference of opinion regarding

4     objections to deposition designations, and the

5     propriety of certain counter-designations.  I

6     participated in the meet and confer last night

7     myself, Your Honor, and tried to work it out.  We

8     were unsuccessful.

9              I understand from counsel they would

10    like to speak to us at lunch today in a further

11    effort.  My concern, Your Honor, is these

12    deposition designations in all likelihood will be

13    played this afternoon and we would like to work

14    it out and play the clips.  We're happy as

15    always, Your Honor, to try to work this out.  How

16    would you like to address this at this juncture?

17             THE COURT:  How much volume are you

18    talking about?

19             MR. FINEMAN:  Your Honor, the number

20    of objections to the number of designations was

21    overwhelming.  It was frankly incredible, Your

22    Honor.  Some of the designations had as many as

23    seven or eight different objections, so it's

24    tremendous.

1                    THE COURT:  Okay.  And so the

2       objections are to the so to speak the underlying

3       forms of the question or are they to relevance or

4       to what?

5                    MR. FINEMAN:  Your Honor, they cover

6       the broad spectrum.  It almost looks like a law

7       school hypothetical with how many objections are

8       lodged.

9                    THE COURT:  All right.  Do you have

10      a proposal, Mr. Fineman?

11                   MR. FINEMAN:  Your Honor, it's their

12      objections, their objections to our testimony, so

13      if they would like to maintain objections, as of

14      last night, I specifically asked are they going

15      to drop any of the objections.  Their response

16      was no, they are pressing all their objections.

17                   I would ask, Your Honor, that they

18      argue their objections and then get charged with

19      the time.  We'll meet with them, I'm happy to

20      discuss with them, I'll meet with them right now

21      after we're done.  The second issue --

22                   THE COURT:  I'm sorry, the second

23      issue.

24                   MR. FINEMAN:  The second issue, Your

1    Honor, and again, this is something we can talk

2    about, but I want to flag it for Your Honor so

3    it's not a surprised, it is they have

4    counter-designated and a fair amount of their

5    counter-designations were not in the pretrial

6    order and they were required to be in the

7    pretrial order.  There is a good cause standard

8    for why they could be added.  I asked what the

9    basis was last night.  There was no good cause,

10   Your Honor.  And we can try to address this, but

11   this is something I want to flag with Your Honor

12   because this is going to come up today.

13              THE COURT:  Thank you, Mr. Fineman.

14              Mr. Silver.

15              MR. SILVER:  Your Honor, I hate to

16   take up time arguing over things that can likely

17   be resolved this morning.  I would suggest that

18   we meet and confer at the first break in the

19   trial and if issues are still lingering at that

20   point we can bring that to Your Honor's

21   attention.  There are several objections that we

22   consider to be valid.  We are going to trim those

23   down a little.  Mr. Fineman says there were not

24   in the pretrial order.  We'll take a look at that

```
 1        and hope to resolve that issue as well.

 2                    THE COURT:  Okay.  It seems like

 3        there is probably not a whole lot I can do about

 4        it right now, so having you all try to narrow

 5        down what's in dispute seems like a productive

 6        use of my time.

 7                    Okay.  So anything else?

 8                    MR. FINEMAN:  That's all from our

 9        side, Your Honor.

10                    THE COURT:  Mr. Silver.

11                    MR. SILVER:  That's it for us, Your

12        Honor.

13                    THE COURT:  So we'll take a roughly

14        ten-minute recess and come back and be prepared

15        to start.

16                    All right.

17                    MR. SILVER:  Thank you, Your Honor.

18                    THE COURT:  Thank you.

19                    (A brief recess was taken.)

20                    THE CLERK:  All rise.

21                    THE COURT:  All right.  Good

22        morning.

23                    Let's be seated.  Are we prepared to

24        proceed?
```

```
 1                    MR. SILVER:  Your Honor, one more

 2      housekeeping issue that was just brought to my

 3      attention.  I apologize.

 4                    The defendants do have one fact

 5      witness present that we would ask him to be

 6      sequestered until he testifies.

 7                    THE COURT:  All right.  And I take

 8      it there's no objection to that?

 9                    MR. BROWN:  None, Your Honor.

10                    THE COURT:  All right.  So is the

11      witness sequestered?

12                    MR. BROWN:  He's not here.

13                    MR. FINEMAN:  Who is he?

14                    THE COURT:  Well, even better.

15                    All right.  So go ahead.

16                    Ms. Jacobsen.

17                    MS. JACOBSEN:  Good morning, Your

18      Honor.  I have some books of slides.

19                    May I approach?

20                    THE COURT:  Sure.

21                    MS. JACOBSEN:  Your Honor, Par seeks

22      approval from the FDA to market three

23      Rivastigmine transdermal products.

24                    For the purposes of Your Honor's
```

1    infringement analysis, there's no difference

2    between their products.  They contain the same

3    ingredients and they're just simply different

4    size patches that deliver different size doses of

5    Rivastigmine.

6              The only claim at issue is Claim 7

7    of the '031 patent.  As Your Honor is aware, the

8    claims of the '031 patent fall into two

9    categories.  The first category requires proof

10   that the accused product contain an amount of

11   antioxidant that functions to significantly

12   reduce oxidative degradation over a prolonged

13   period of time in the accused product.

14             And those are the function claims.

15   And they're not at issue in this case.

16             The second category of claims

17   require an affirmative proof that the presence of

18   an antioxidant, but not affirmative proof that

19   it's functioning as such in the accused product

20   for there to be a finding of infringement.

21             And those are the presence claims.

22   And Claim 7 of the '031 patent, the claim at

23   issue, is a presence claim.

24             So with respect to infringement of

 1    Claim 7, there are two questions.  The first:  Is

 2    acetaldehyde an antioxidant?  That is, is it an

 3    agent that reduces objection day active

 4    degradation?

 5                The second question is:  Do Par's

 6    ANDA products contain about 0.01 to about 0.5

 7    percent by weight of acetaldehyde?  And, Your

 8    Honor, we will present evidence, and of course it

 9    is our burden to prove infringement by a

10    preponderance of the evidence, that the answer to

11    both of those questions is yes.

12                Now, I'll start with the second

13    question, because as Your Honor observed at the

14    pretrial conference, there's really no factual

15    dispute here.  The controlling case is a Federal

16    Circuit decision in Sunovion.  And in Sunovion,

17    if an ANDA filer seeks FDA approval to market a

18    generic product that falls within the scope of a

19    valid claim, it's an act of infringement as a

20    matter of law.

21                So how then does the court determine

22    whether Par is seeking approval to manufacture a

23    generic product that falls within the scope of

24    Claim 7 of the '031 patent?  Well, according to

1       the Federal Circuit in the Sunovion, it's by

2       looking at the ANDA specification.  Because that

3       describes the product that Par is asking for

4       approval to manufacture and sell.  It's

5       essentially the blueprint for their products.

6                       Par concedes that its ANDA

7       specification commits its ANDA products to

8       contain not more than 1,000 part per million of

9       acetaldehyde.  One thousand parts per million is

10      0.1 percent of acetaldehyde.

11                      And that means that if Par's's ANDA

12      products are approved, Par will be permitted to

13      make a product with anywhere between 0 and 0.1

14      percent of acetaldehyde.  So if we now compare

15      Par's specification with the '031 patent, we can

16      see that 90 percent of Par's ANDA specification,

17      that's between 0.1 and -- 0.01 and 0.1 fall

18      within the claims range.  And that's without even

19      considering the scope of the claims are about.

20                      And, Your Honor, that's dispositive

21      with respect to infringement of the amount of

22      limitation.

23                      Par will allege that it uses an

24      adhesive that has undergone a rigorous washing

1    process that minimizes the amount of acetaldehyde

2    in its adhesive.  So Par argues that even though

3    its ANDA specification permits it, it won't

4    actually make a product with an amount of

5    acetaldehyde that falls within the claim numeric

6    range.

7              But in Sunovion, the Federal Circuit

8    rejected what the Court called "but I won't do

9    it" defense.  And that's at 731 F.3rd at 1218.

10             And that's once this case is over,

11   there will be nothing to stop Par from going out

12   and making that washing process less rigorous,

13   less time consuming or less expensive and making

14   a product with a hundred, 500, or even a thousand

15   parts per million of acetaldehyde.  And that's

16   entirely acceptable given Par's ANDA

17   specification, but it's not permissible and it's

18   not acceptable given the '031 patent.  And that's

19   because all of those amounts fall within the

20   claimed numeric range.

21             The plaintiffs should not have to go

22   out and test a product that Par actually puts on

23   the market to determine whether or not to bring a

24   second infringement action.

1           The Federal Circuit explained in

2    Sunovion that the Hatch Waxman Act made filing an

3    ANDA a technical act of infringement precisely so

4    that infringement disputes were resolved before

5    approved.

6           Now, Your Honor, at the pretrial

7    conference Par argued that Sunovion was

8    distinguishable because the FDA in that case had

9    mandated infringement.  And, Your Honor, that's

10   not right.

11          The patents claim in issue in

12   Sunovion required that the drug contain not more

13   than 0.25 percent of a particular impurity.  The

14   FDA had requested that the ANDA filing in

15   Sunovion narrow its specification to provide for

16   not more than 0.3 percent.  But even the FDA's

17   range allowed for amounts outside of the claimed

18   range and those are the amounts from 0.25 to 0.3

19   percent.

20          Now, in fact, the ANDA filer hadn't

21   done that, they amended their specification to

22   allow for not more than 0.6 percent, and they

23   said the ANDA specification provided that the

24   product could contain between 0 and 0.6 percent

1     of the impurity.

2              And the ANDA filer had actually

3     represented that all of its products would

4     contain more than 0.3 percent of impurity, so

5     everything that it made would have between 0.3

6     and 0.6 percent of that impurity and none of them

7     would have less than .25, which was what was

8     required by the claim.

9              And nevertheless, the Federal

10    Circuit found infringement as a matter of law

11    because the ANDA specification included products

12    with an amount of impurity that fell within the

13    claimed range, and that's exactly the case here.

14    Par's ANDA specification includes products with

15    amounts of acetaldehyde that fall within the

16    claimed range.

17             And during the pretrial conference,

18    Par also argued that the controlling case was

19    Glaxo v. Novopharm and that in this case, as in

20    that case, Your Honor should consider the ANDA

21    batch products.

22             The Federal Circuit explained in

23    Sunovion that reference to actual samples of a

24    generic composition in Glaxo was necessary

1    because the ANDA specification itself did not

2    resolve the question of infringement in the first

3    instance.

4              And that's at 731 F.3rd at 1279 to

5    80.  And here is why, Your Honor.  The drug at

6    issue in Glaxo split in two crystalline forms,

7    those were form one and form two.  The patent

8    claimed form two as defined by a very specific

9    set of 29 infrared peaks.  The ANDA applicant was

10   seeking to market the other form of the drug,

11   form one, and that drug had 90 percent purity.

12             The ANDA specification revealed the

13   presence of an impurity and that impurity had one

14   of the 29 peaks required by the claim in form

15   two, but the ANDA specification said nothing

16   about whether or not that impurity would have any

17   of the other 28 peaks required by the claim for

18   there to be form two present.  And that's why the

19   ANDA specification did not resolve the question

20   of infringement in the first instance, and why

21   reference to the actual products was necessary.

22   And that's not what we have here.

23             Here as in Sunovion we have a simple

24   matter of comparing the numeric ranges in the

1    '031 patent with Par's ANDA specification.  And

2    Par's ANDA specification alone resolves the

3    question of infringement in the first instance.

4    It describes

5              MS. JACOBSEN:  It describes a

6    product that contains acetaldehyde in the claimed

7    range.  And Your Honor, that should be the end of

8    the infringement inquiry for this claim element.

9              So turning then to the first

10   question:  Is acetaldehyde an antioxidant?  Your

11   Honor has twice construed the term antioxidant to

12   require the presence of an agent that reduces

13   oxidative degradation.

14             And plaintiffs contend that

15   acetaldehyde is just that, an agent that reduces

16   oxidative degradation.  And before I outline

17   plaintiff's proofs, I want to first acknowledge a

18   few things.

19             Acetaldehyde is not listed as an

20   antioxidant in the '031 patent.  It's not listed

21   as an antioxidant in the Handbook of

22   Pharmaceuticals, and it's also not listed in the

23   FDA's inactive ingredient list.

24             And Your Honor will hear Par call

1    acetaldehyde things like an impurity and a

2    residual solvent.  You'll also hear about efforts

3    that Par has taken to try to develop a product

4    without an antioxidant.

5              And, finally, Your Honor will hear

6    about batches of Par's ANDA products that contain

7    no detectable acetaldehyde.

8              But, at the end of the day, as Dr.

9    Davies will testify, there are two facts that, as

10   a matter of basic chemistry, cannot be credibly

11   disputed.

12             The first is that acetaldehyde is a

13   known reducing agent.  And the second is that

14   reducing agents can act as antioxidants.  And Dr.

15   Davies will go over the definition of a reducing

16   agent.

17             But, in a nutshell, reducing agents

18   are agents that are capable of undergoing

19   sacrificial oxidation.  They are more readily

20   oxidized than other compounds in the system.  And

21   that means that they are sacrificially oxidized

22   and can protect other compounds in the system

23   from oxidation.  And that's how they reduce

24   oxidative degradation of other compounds.

1              And there's no dispute that the '031

2    patent, the exemplary antioxidant in the '031

3    patent includes antioxidants that are known to

4    function as reducing agents.  And those are the

5    two highlighted here, ascorbyl palmitate and

6    ascorbic acid.

7              So we know, as a matter of basic

8    chemistry, that acetaldehyde is capable of

9    functioning as an antioxidant.  The question Dr.

10   Davies will address is:  How do we confirm

11   whether it is, in fact, an antioxidant?

12             And Dr. Davies' answer will be

13   simple:  You test it.  And that's exactly what

14   Dr. Davies did.

15             He ran a controlled head-to-head

16   stress test in the presence and absence of

17   acetaldehyde.  And he demonstrated that

18   acetaldehyde causes a statistically significant

19   reduction in the oxidative degradation of

20   Rivastigmine.

21             And before I outline Dr. Davies'

22   testing in more detail, let's go over a few words

23   of terminology.  The first is stress tests.

24             As Dr. Davies will explain, stress

1    tests are a type of test that are designed to

2    speed up the degradation of a drug, so that the

3    degradation can be studied in a relatively short

4    period of time.

5              Stress tests are standard in the

6    pharmaceutical industry.  And, indeed, Par's

7    manufacturing partner, 3M, conducted a stress

8    test during development of Par's ANDA products.

9              Dr. Davies will show Your Honor that

10   the '031 patent confirms that stress tests can be

11   used to test whether an agent reduces oxidative

12   degradation.

13             And second, a head-to-head test,

14   that's one that compares two equivalent

15   compositions that are identical in all respects,

16   safe for one, such as the presence or absence of

17   an antioxidant.

18             Now, Dr. Davies will explain that in

19   designing his test, the first step was to create

20   an oxidizing environment.  And that's because

21   without an oxidizing environment that results in

22   appreciable degradation of Rivastigmine, it's not

23   possible to test whether the agent in question

24   reduces that oxidative degradation.

1            And once Dr. Davies had determined

2    experimentally the proper conditions, he ran the

3    head-to-head stress test. And that's outlined on

4    this slide.

5            So, first, Dr. Davies adds

6    Rivastigmine and an oxidizing agent to a

7    solution.  That's the oxidizing environment.

8            An then he splits that solution into

9    two equal parts.  And he added acetaldehyde to

10   only one of them.  And that meant that he had two

11   identical solutions with only one difference

12   between them, that being the presence of

13   acetaldehyde in one of them.

14           And then Dr. Davies heated up the

15   samples to speed up the degradation and he

16   studied the degradation oxidative degradation of

17   Rivastigmine over time.  And he showed that

18   acetaldehyde causes statistically significant

19   reduction in oxidative degradation of

20   Rivastigmine.  The result, consistent with the

21   literature, calling acetaldehyde a reducing agent

22   and recognizing that reducing agents can act as

23   antioxidants.

24           Now, Your Honor will hear Par

1    criticize the type of test that Dr. Davies

2    conducted, the way that he conducted his test and

3    complain that he didn't conduct additional tests.

4    None of those criticisms will stand close to

5    Rivastigmine.

6              As Dr. Davies will show, Your Honor,

7    literature demonstrating that stress tests are

8    standard in the pharmaceutical industry, and he

9    will show you literature demonstrating that the

10   conditions he used for his test are within the

11   range of conditions that are commonly used,

12   including by 3M.

13             Now, of course, Dr. Davies had to

14   tailor his stress test to the exact drug and

15   antioxidant in issue in this case, but that's

16   standard in the pharmaceutical industry.  Because

17   every drug is different, and not all drugs

18   undergo the same degradation in the same

19   conditions.

20             So Dr. Davies will explain to Your

21   Honor why he selected each of the conditions he

22   did for his stress test and how he determined

23   that those were the proper conditions for his

24   test.

1               Dr. Davies will also explain that

2       the type of head-to-head experiment that he did

3       is really the purist form of scientific

4       experiment.  And that's because it tests only one

5       variable and nothing else.

6               And that allows Dr. Davies and

7       scientists to be certain that the observed

8       difference is due to that one variable.  So his,

9       with only one difference being acetaldehyde, that

10      allowed Dr. Davies to be certain that the

11      reduction in oxidative degradation that he

12      observed was due to acetaldehyde and nothing

13      else.  There's no scientific explanation, other

14      scientific explanation for it.

15              Now, of course, Par's experts could

16      have easily repeated Dr. Davies' stress test.

17      It's a standard experiment and it requires no

18      specialized equipment.

19              And Par's experts could have run any

20      one of these other tests that they say are

21      necessary, but Par's experts ran no experiments.

22              So, finally, Your Honor, Par will

23      point to the long term and accelerated stability

24      testing on batches of the ANDA products with

1    acetaldehyde and with no detectable acetaldehyde

2    and say that there's no reduction in oxidative

3    degradation in the presence of acetaldehyde.

4              But, importantly, those tests are

5    not head-to-head studies where there was only one

6    variable, the presence of acetaldehyde.

7              So it's impossible to draw any

8    conclusions about whether acetaldehyde is an

9    antioxidant from Par's stability data for at

10   least two reasons.

11             The first is Dr. Davies will explain

12   that each of the batches of Par's ANDA products

13   was made with different lots of ingredients.  And

14   that gives rise to batch-to-batch variation, and

15   it means that there are many variables that could

16   have impacted the stability data.

17             And the second reason is that Par

18   only tested one patch at each time point he

19   studied the amount of oxidative degradation and

20   studied the amount of oxidative degradation in

21   one patch at each time.  And as Dr. Davies will

22   explain because of the patch to patch variation

23   we just don't know to what extent the one patch

24   that Par tested is representative of the whole

1    batch which contains tens of thousands of

2    patches.

3              It could be that the patch that Par

4    tested had the lowest amount of degradation or it

5    could have had the highest amount of degradation

6    or it could have been somewhere in the middle, we

7    just don't know.

8              So that brings us back to

9    Dr. Davies' test, which is the only test that

10   will be in this case and was designed to and was

11   capable of assessing whether acetaldehyde is an

12   antioxidant and that test demonstrated that

13   acetaldehyde consistent with the literature

14   produces the oxidative degradation and is now an

15   antioxidant.

16             Just a few words then on validity.

17   Par alleges that if acetaldehyde is an

18   antioxidant and the Claim 7 of the '031 patent is

19   invalid for failing to meet the written

20   description enablement and definiteness

21   requirement of Section 112.  Your Honor, the

22   plaintiff submits that Par will not be able to

23   meet its burden of proving invalidity by clear

24   and convincing evidence.

1                    Now, as plaintiffs understand it,

2      Par's case appears to be that Claim 7 is limited

3      to the antioxidants specifically named in the

4      '031 patent.  And if it includes any other

5      antioxidants, then it fails under 112.

6                    So first, Par says that if a claim

7      term antioxidants includes antioxidants not named

8      in the specification, the term is indefinite.

9      But for a claim term to be indefinite, it has to

10     be incapable of definition.  And plaintiffs, Par

11     and the Court have all provided a definition for

12     the term antioxidants.  And there is no evidence

13     that whether or not a compound meets that

14     definition depends on specific tests used to

15     determine it.

16                    In fact, in this case, the only test

17     that will address whether or not acetaldehyde is

18     an antioxidant will be Dr. Davies' stress test

19     and that confirmed that it is.

20                    So second, Par says that there is no

21     written description for Claim 7 beyond those

22     antioxidants specifically named in the '031

23     patent.  But Your Honor will hear from

24     Dr. Klibanov that the '031 patent provides a

1    written description of inventors' discovery that

2    is susceptible to antioxidants and a written

3    description of a rivastigmine transdermal device

4    containing antioxidants as recited in Claim 7.

5                    And Dr. Klibanov will testify that

6    there is nothing in the '031 patent from a

7    scientific standpoint that will cause a person of

8    ordinary skill in the art to limit antioxidants

9    to those specifically named in the '031 patent.

10                   Dr. Klibanov will explain that a

11   person of ordinary skill in the art in January of

12   1998 would have known that there are many

13   different antioxidants, and the person of

14   ordinary skill in the art would have recognized

15   that the '031 patent does not try to list them

16   all.  And instead, it provides examples of the

17   different types of antioxidants.  And those

18   include some that function as free radial

19   scavengers such as BHD and some that function as

20   reducing agents such as ascorbic acid and

21   ascorbic compound.  The '031 patent also

22   discloses that antioxidants can be experimentally

23   determined to reduce oxidative degradation by

24   stress stability test and as I outlined a moment

1    ago, Dr. Davies will explain that that's exactly

2    what he did, he confirmed using a stress test

3    that acetaldehyde is an antioxidant.

4              Now, while Par's experts may now try

5    to argue that the invention is limited to the

6    antioxidants specifically named in the '031

7    patent, the weakness of Par's case is revealed by

8    the fact that it never made that argument during

9    claim construction.

10             Finally, Par argues that

11   antioxidants beyond those named in the

12   specification are not inadequate.

13             And Dr. Klibanoff will explain that

14   Claim 7 is fully enabled because whether or not a

15   compound is an agent that reduces oxidative

16   degradation can be determined by reference to the

17   '031 patent itself and the scientific literature

18   or testing with and without an antioxidant to

19   determine whether or not it reduces oxidative

20   degradation.  The fact that some testing may be

21   necessary does not mean that the patent is not

22   enabled.

23             As a matter of law, the patent need

24   only set forth one way to make and use the

```
1    invention.  And there is no dispute that the '031

2    patent describes one test that can be used to

3    test whether a compound reduces oxidative

4    degradation and those are the stress stability

5    test.

6              And so in conclusion, Your Honor, we

7    specific fully submit that Par will not present

8    clear and convincing evidence that this

9    presumptively valid claim is invalid.  And we

10   respectfully submit that we will present evidence

11   that it is more likely than not the Par infringes

12   Claim 7 of the '031 patent.

13             Thank you.

14             THE COURT:  Thank you, Ms. Jacobsen.

15             Mr. Brown.

16             MR. BROWN:  Good morning, Your

17   Honor.

18             THE COURT:  Good morning.

19             MR. BROWN:  So Par's case here is

20   pretty simple.  Par's ANDA product does not

21   contain about .01 percent to about .5 percent of

22   antioxidants as required by Claim 1.

23             Could I have Claim 1 up here with

24   this element highlighted.
```

1              Now, Par's ANDA product, the

2       transdermal patch, was developed through a

3       partnership with 3M Corporation.  And actually

4       could I get a slide.  3M is famous for its

5       expertise in adhesives.  They make many, many,

6       both commercial and industrial adhesives.

7       They're one of the top companies in this field,

8       and besides these commercial products they have a

9       very, very strong expertise in adhesives for

10      medical purposes including transdermal patches.

11             And the adhesive is the major

12      ingredient besides rivastigmine in Par's product.

13      I think you recall, you'll see the side-by-side

14      comparison with plaintiff's patch they have a

15      whole bunch of ingredients in there that was

16      necessitated because they couldn't have the same

17      adhesives that delivers the drugs, it sticks to

18      the skin and it contains the drug and it controls

19      all the necessary processes.  An innovated

20      technology, and they succeeded in developing a

21      product that did not use an antioxidant.

22             You're going to hear testimony from

23      Jim DiZio who is an inventor of the washing

24      procedure that's used for purifying 3M adhesive

1    and he's the first named inventor on the patent

2    application in the process.

3                The Court may recall in the August

4    Watson trial Dr. Klibanov testified that he used

5    the 3M patent application that Jim DiZio is the

6    inventor on as evidence that the Watson product

7    infringed.  And Dr. Klibanov specifically

8    testified about the effect that the 3M washing

9    process had on stability.

10               And so this process reliably and

11   demonstrably results in a product that is

12   essentially free of all impurities.  It gets rid

13   of all of the things that are used in the process

14   of making a polymer that are reactive and can

15   cause damage to the product.  And it gets rid of

16   the vast majority of the acetaldehyde and for

17   both, for all of the impurities including

18   acetaldehyde, it seems very, very small amounts

19   in all of the processes that have been made

20   following the ANDA process.

21               And I want to put up two excerpts

22   from the ANDA where Par's ANDA clearly stated to

23   the FDA that they do not use antioxidants.  Here

24   is the side-by-side comparison with the

1       plaintiff's commercial patch and the middle one

2       is the Par product, the transdermal system.  And

3       you can see there is the adhesive, there is

4       something called a pacifier which is isopropyl

5       and there are the components that sticks to the

6       edges of the patch that make it a patch.  And

7       they don't use the rivastigmine modifier, they

8       don't have antioxidant and they don't use an

9       adhesive because they're polymer drug adhesive,

10      they don't have separate drug loading and they

11      don't have the other modifier, so the Par 3M

12      product is a much simpler patch, it doesn't

13      create the problems the plaintiff's patch does

14      and it doesn't use an antioxidant.  In fact,

15      within the ANDA they say the primary pathway

16      pursued by 3M in the development was formulate

17      without an antioxidant.

18              So plaintiff's infringement theory

19      they came up with long into this case was that,

20      that acetaldehyde and antioxidant that's measured

21      in some of the batches of Par's product, sorry,

22      the acetaldehyde, an impurity is measured in some

23      of the batches of Par's product is an

24      antioxidant.

1              So Par and 3M have extensively

2     tested the stability of their products following

3     the well-known validated and standardized FDA

4     stability testing protocols.  This testing

5     corresponds to one of the two testing methods

6     identified in the '031 patent.  I would like to

7     pull up the column here, this is at column four,

8     lines 20 to 30.  Plaintiff's counsel in opening

9     argument says the patent describes one way to

10    test for I believe it was for antioxidant

11    behavior.  This column, she pointed to this, the

12    general description of stress stability test.

13    This column provides the only parameters for

14    stress stability tests that are described in the

15    patent.

16              MR. BROWN:  And, first of all, they

17    are all performed on pharmaceutical compositions.

18    They're not performed as Dr. Davies did his test

19    in a test tube under different conditions.

20              Second, they define the time period

21    and temperature.  So, the first one they describe

22    is a two-month stress test at 60 degrees C.  And

23    the last one they describe as a three-month

24    stress test at 40 degrees C at 75 percent room

1    humidity.

2              And the second one of these tests

3    corresponds to a well-known accelerated stability

4    protocol that all pharmaceutical companies use.

5    It's one of the FDA mandated ones.

6              And so -- and Par has followed this

7    test faithfully or actually 3M followed the test

8    faithfully.  And I want to point out that the

9    plaintiffs are going to be arguing, Well, you

10   should ignore this and you should listen to Dr.

11   Davies' test, and that Davies' test is actually

12   the purist science.

13             But we did not.  There's no dispute

14   we didn't come up with these test parameters for

15   this litigation.  These test parameters were set

16   beforehand, set by the FDA.  And these are

17   generally accepted and reliable in the industry

18   and I'd like to have a look at Par's data for a

19   second to show.

20             So this is -- this slide is the 25

21   degree C, 60 percent room humidity.  That is

22   what's generally to be considered ambient

23   conditions.  This is where the patch sits in the

24   drug store.

1              And Par and 3M have produced tests

2    over the entire course of the shelf life of their

3    product.  And the first two batches I've

4    highlighted up there are batches with no

5    detectable acetaldehyde, and then we have about

6    six other batches that have detectable

7    acetaldehyde.

8              And there's one batch that we gray

9    out for which the room temperature wasn't

10   measured.  So, as you can see, after 24 months at

11   room temperature with no acetaldehyde, there's no

12   degradation.

13             Less than 0.01, when you see the

14   less than sign, what that means is that that's

15   below the measurement level of the device.  And

16   so they couldn't measure any impurities after 24

17   months of the product.

18             And as you go down, as you descend

19   through the different levels of acetaldehyde that

20   was measured in the rollstock for the product,

21   you can see in three of these examples, you have

22   some oxidative degradation in the -- so there's a

23   batch 11280 has .3 and .2.

24             That's a very low level of

1    impurities, but they're forming and there's

2    acetaldehyde.  So it's not stopping that from

3    happening.

4                Then, at the next batch, you have a

5    .1 instead of a less than .1.  That means it was

6    detected.  At one and two batches down, you have

7    another .1.

8                So at room temperature, acetaldehyde

9    is not an agent that reduces oxidative

10   degradation.  But let's look at the exact test

11   that's described in the patent.  This is the next

12   slide.

13               This is the 40 degree C, 75 percent

14   room humidity.  And so now, if you look at the

15   six-month data, one of the two batches with no

16   acetaldehyde has a tiny bit of an impurity

17   showing up under these sort of more extreme

18   conditions.  And as you walk down, you can see

19   very clearly that the addition that's

20   acetaldehyde that is appearing in some of these

21   batches is doing nothing to reduce oxidative

22   degradation.

23               And so this is an objective standard

24   test.  It's the test referenced in the patent.

1    And it shows what we submit very clearly that

2    acetaldehyde is not an agent that reduces

3    oxidative degradation.

4              And plaintiff's counsel noted in

5    opening argument, also, the difference between

6    when we were here last August, they were

7    asserting that the function claims that require a

8    specific proof that the purported antioxidant is

9    working in the product producing oxidative

10   degradation, they're not saying those claims

11   anymore.  And I think in looking at this data, I

12   think the Court can see why.

13             So plaintiffs support their theory

14   that acetaldehyde is an antioxidant with

15   testimony by their expert, Martyn Davies.  He's a

16   pharmaceutical formulator.

17             And the pharmaceutical literature

18   simply does not support the assertion that

19   acetaldehyde is an antioxidant.  And I want to

20   talk a little bit about:  What is acetaldehyde

21   and go through that for a few minutes.  What are

22   the chemical properties?

23             Acetaldehyde is a volatile chemical.

24   If there was a dish of acetaldehyde sitting on

1    the table here, it would probably be boiling

2    because its boiling point is about 68 degrees

3    Fahrenheit.

4              It's also known to be an oxidizing

5    agent, not an antioxidant.  Our expert, Dr.

6    Ganem, is going to testify that when acetaldehyde

7    is exposed to air, it forms peroxides.  It also

8    does not stop the oxidation reaction.

9              The oxidation process is a chain

10   reaction that's propagated by radicals.  And one

11   of the reasons oxidation is a bad reaction for

12   pharmaceuticals and otherwise is because it's a

13   propagated reaction.  It grows and it becomes a

14   chain reaction that causes a lot of damage.

15             And when acetaldehyde reacts with

16   radicals and in an oxidative environment, it

17   forms more radicals.  That is not what an

18   antioxidant does.  And Dr. Ganem is going to tell

19   you about that.

20             So how does Dr. Davies get to his

21   opinion that acetaldehyde is an antioxidant?  It

22   was summarized very well in opening.

23             The first position is that it's

24   known in the literature as a reducing agent.  And

1       it's sort of this logical chain.

2                   Acetaldehyde is sometimes referred

3       to in the literature as a reducing agent.  Some

4       antioxidants work as reducing agents; therefore,

5       according to Dr. Davies, acetaldehyde is an

6       antioxidant.

7                   We think that position doesn't have

8       much merit.  First of all, being a reducing agent

9       just means that here's something that can be

10      oxidized.  The term is usually used in a very,

11      very specific context, in a particular situation,

12      this compound acts as a reducing agent.

13                  And the paint on your car can be

14      oxidized.  That doesn't make it an antioxidant.

15      Lots and lots and lots of compounds can be

16      oxidized.

17                  The vast majority of them are not

18      antioxidants.  Just being a reducing agent

19      doesn't provide, we think, a good evidence that

20      something is an antioxidant.

21                  Dr. Davies' second argument is based

22      on his experimentation and we think this wholly

23      fails to show that acetaldehyde is an

24      antioxidant, i.e. an agent that reduces oxidative

1       degradation.

2                    The type of test that Dr. Davies

3       conducted is called a forced degradation study.

4       He basically, as the schematics showed, he

5       dissolved Rivastigmine in a solvent in a flask

6       with none of the other ingredients that would be

7       found in a pharmaceutical formulation.  And he

8       purported to measure the effect of acetaldehyde.

9                    But forced degradation studies are

10      not designed or used in the pharmaceutical field

11      to determine whether a compound is an

12      antioxidant.  They are not standard in the

13      industry for that purpose.

14                   A standard test is standardized

15      precisely so that results from one test can be

16      compared to results from another test, and you

17      can interpret those results and draw conclusions.

18      The principal purpose in a forced degradation

19      study used for in the pharmaceutical industry and

20      the purpose of the 3M test that plaintiffs are

21      pointing to is to seriously degrade the compounds

22      at very extreme conditions to make the impurities

23      that happen when the drug breaks down.

24                   It's almost like a synthetic

1    process.  I want to get large quantities of these

2    so that my analytical group can do all of the

3    experimental work that they need, so I can now

4    prove I can detect very minute amounts of them in

5    my final process.

6              It's also used to get very general

7    basic chemical information about the drug, but

8    plaintiffs aren't going to be able to point to a

9    single instance in the reported literature where

10   this kind of test that's been used to evaluate an

11   oxidant behavior.  And it's simply not an

12   analytical test.  It's not a test used to measure

13   anything.

14             It's a test used to break your

15   product down, see what happens when it's exposed

16   to extreme conditions.  But that's all it's used

17   for.

18             And we believe that Dr. Davies' test

19   results and testimony are squarely contradicted

20   by the 3M testing that I went through at the

21   beginning here.  And our expert, Dr. Buckton, is

22   going to talk about the validity of those.

23             And, in particular, plaintiff's

24   batch-to-batch variability argument, we don't

1    think that that holds merit, either.  The purpose

2    of an antioxidant is to reduce oxidative

3    degradation.  And if it doesn't do that under

4    normal conditions that are experienced, then it's

5    not an antioxidant.

6              As plaintiff's counsel mentioned, we

7    are going to be allege that Dr. Davies' testing

8    methodology has serious detection and I want to

9    take a minute to explain why, even if you

10   disregard or if you don't believe our criticism

11   of the test, why his test is not credible

12   evidence that acetaldehyde is an antioxidant.

13             This is a little example.  When I

14   was growing up, my older brother used to do this

15   trick for the neighborhood kids.  He would pour

16   gasoline into a dish.  He would light a match and

17   he would extinguish the match into the gasoline.

18   He would take the match, throw it into the

19   gasoline.

20             The doesn't light on fire.  A lot of

21   reasons why that happens.

22             But I would submit that my brother's

23   experiment did not establish that gasoline is

24   flame retardant.  And this is analogous to what

1    Dr. Davies' test is.

2              It's a single experiment under

3    extreme non-standard conditions.  And even if you

4    credit as being a test as being carried out

5    directly, which we seriously dispute Dr. Davies'

6    conditions are not predictive of what will happen

7    in a pharmaceutical product or under any

8    conditions, any other conditions whatsoever or

9    even in a repeat of the same test.

10             And you may recall that before the

11   August trial, we made a Daubert motion regarding

12   Dr. Davies' testing and the Court denied that

13   without prejudice.  And we would submit that, in

14   addition to their relevance as far as

15   admissibility of testing, the Daubert factor is

16   quite a good framework to evaluate the weight

17   that the test should be given.

18             And using this test for this purpose

19   has never been peer-reviewed or published.  It's

20   a single experiment.

21             And Dr. Davies has not established

22   the results repeatable, and he has not

23   established any known or potential rate of error

24   for this test.  There are no standards

1    controlling the operation.

2              Plaintiffs will assert this is a

3    standard test.  But what Dr. Davies will testify

4    to is that it's standard not to conduct a

5    standard test, that everybody does their own

6    thing in the literature, that he sites shows that

7    basically there are no standard procedures in the

8    industry and people do whatever they want because

9    they don't care about reproducibility of the

10   results.

11             Because they're not using the test

12   for purposes of making an evaluation of anything

13   other than identifying the chemical compounds

14   that result in the break up of the drug product.

15             And so the next problem we have with

16   this test, conceptually before you get into

17   details of it is he didn't validate the test, and

18   validating a test means you provide some evidence

19   that it works for its intended purpose, that it's

20   capable of showing, in this case that it would

21   separate antioxidants from things that aren't

22   antioxidants, and he hasn't done that.  He didn't

23   test alpha-tocopherol, he didn't test any

24   antioxidants.  He didn't see what this test does

1    when it stays with the presence of something

2    that's wildly believed to be an antioxidant.

3              So in short we believe Dr. Davies'

4    forced degradation study is exactly the type of

5    litigation test that shouldn't be given much

6    weight and at the end of the day the Court is

7    going to be balancing the test data that 3M did

8    which is under the FDA standard and it's the test

9    identified in the patent versus Dr. Davies' test

10   using conditions that have never been done before

11   for any purpose outside of this litigation.

12             On top of it all, Dr. Davies'

13   results at the very best for plaintiffs show

14   barely any difference.  Nothing like the effect

15   shown in the patent.  In the patent using the

16   standard accelerated stability testing, the

17   amount of degradation products are reduced by

18   approximately four fold, and our expert,

19   Dr. Michniak-Kohn is going to testify that

20   Dr. Davies' experimental results are not

21   statistically significant, Dr. Davies is going to

22   say they are.  His methodology which he

23   establishes statistical significance was

24   established after the fact and that is a serious

```
 1      no no in statistics.  But we think beyond the

 2      statistics when I look at the results there is

 3      hardly any difference and given the other

 4      problems that we have sort of with the test, we

 5      think the Court shouldn't give it very much

 6      weight.

 7                   Now, I would like to put back Claim

 8      1 back up on the screen with the highlighted

 9      element and I want to take a minute to, a brief

10      minute to address plaintiff's Sunovion argument

11      that the Court raised during the pretrial

12      conference.  It's a legal issue.  We're going to

13      address it extensively in posttrial briefing, but

14      I want to address a factor that we believe to be

15      a major distinguishing factor in that case, which

16      is Par's ANDA does not have a specification for

17      an antioxidant.  In fact, our specification says

18      we're not going to have an antioxidant.  And

19      Sunovion addresses the situation, I think the

20      words plaintiff's counsel used was where the ANDA

21      directly addresses the question of infringement,

22      what that means is you look at the ANDA and if

23      you can see infringement without leaving the ANDA

24      you're going to apply the Sunovion standard and
```

1     you don't consider other evidence.

2              But that doesn't apply here and

3     plaintiffs admitted it doesn't apply here because

4     when I sit down Dr. Davies is going to stand up

5     and say something that's not been described in

6     the patent or otherwise as ******an antioxidant

7     is an antioxidant.  So this is very different.

8     In fact, if you look at the Glaxo case, the only

9     reason Sunovion distinguished Glaxo was that from

10    the 90 percent to 0 was form one and they didn't

11    put a label on what was from 90 percent to a

12    hundred percent.  The facts of the case there

13    were only two forms and so they're very well,

14    that very well could be effectively a

15    specification permitting up to ten percent of

16    form two, but the ANDA specification didn't say

17    form two, you had to go outside the ANDA

18    specification to find out if that was or was not

19    in fact form two.  And once you did, you had to

20    consider all the relevant evidence about what the

21    ANDA applicant would likely sell.

22             So we submit that, and we think

23    there is a lot of other reasons to distinguish

24    Sunovion in this case, but we submit that since

```
1     your ANDA specification does not resolve the

2     question of infringement because we say we don't

3     have an antioxidant ******and, therefore, the

4     plaintiffs, and you have to look at other

5     evidence to make that determination, we think

6     that is a significant distinguishing factor of

7     Sunovion.

8                   Now another big difference is that

9     case was based on a piece of paper somebody put

10    into the Court and I believe in that case they

11    actually spike their sample with the other

12    product.  I did want to point in the ANDA

13    specification identified a particular chemical,

14    it was levetiracetam, the specification and the

15    claim element identified the exact same thing.

16    And here, this is different because our ANDA

17    specifications are acetaldehyde, the claim

18    element is for an antioxidant.  And that is

19    something different.

20                  Another different is there are now

21    batches of Par ANDA product that have been

22    manufactured using the ANDA product for which

23    acetaldehyde measurements have been taken, two

24    batches have no detectable acetaldehyde, the
```

1    other six batches the acetaldehyde was measured

2    to be between eight parts per million and 30

3    parts per million.

4              And to cover our actual ANDA product

5    plaintiffs have to resort to the term in the

6    claim and they got to stretch their claim pretty

7    far if they're going to cover the actual product

8    made using the ANDA process, and when we were

9    heading to trial in August, the court in ruling

10   on our Daubert motion cited a case called

11   Cohesive Technologies that the Court believed was

12   relevant to the interpretation, so I wanted to

13   address that case for a couple of minutes.

14             So essentially in the Cohesive

15   Technologies case the Federal Circuit said when

16   you're addressing the lower end of a numerical

17   range you need to look at the function that the

18   numerical range has in the invention.  And here,

19   so if we're going to look at the function of the

20   numerical portion of this element, this was added

21   during prosecution, in response to a rejection by

22   the patent office that the patentees had not

23   enabled all antioxidants at all concentrations so

24   they added the about language to the limitation.

1             And the specification here describes

2    experimental data from only one antioxidant and

3    at two concentration, .1 and .15 and those are

4    both well within the claim, so from the

5    prosecution history, the function of the range is

6    to enable a person of ordinary skill in the art

7    to stabilize a pharmaceutical composition, and if

8    we look at the specification, I would like to

9    pull up column four, line 16 to 30.  Here is the

10   only place in the specification that the

11   numerical range appears and immediately following

12   it, they give two examples where the

13   pharmaceutical compositions of the invention are

14   reducing degradation in one case from 4.46, from

15   1.09 to .25 percent.  While we realize that the

16   Court has construed antioxidants that it does not

17   have to function in the formulation, we submit

18   that when plaintiff's resort to the about

19   limitation to try to capture something that's not

20   within the numerical range, they're bringing back

21   functionality in the claim through the Cohesive

22   Technology, then they have to show that our

23   amount of acetaldehyde functions like the amount,

24   the claimed amounts of antioxidants.

1                     And we submit that this again, same

2      stability data shows unequivocally acetaldehyde

3      doesn't do anything in our product.

4                     And then on infringement, I think

5      the Court knows, discussed in the pretrial

6      conference we also have our declaratory judgement

7      claim for the '023 patent that's in the case, and

8      I want to then jump ahead and talk briefly about

9      our 112 invalidity case that the plaintiffs

10     address in their opening.

11                    If the Court were to credit

12     Dr. Davies's study, that presents a different

13     problem for plaintiffs.  Since those results at

14     least according to plaintiffs are different from

15     the results of 3M's FDA approved stability

16     testing using a test that is specified in the

17     patent, that means using different test methods

18     yields different results.

19                    And the crux, an important

20     components of our indefiniteness test is that

21     under plaintiff's interpretation of how you show

22     infringement, there is no principal way to

23     determine what is or is not an antioxidant.

24     Competitors are entitled to know the scope of the

1    patent.  And even if Dr. Davies' test is one way,

2    there are infinitely other ways and references he

3    cited and otherwise to conduct a forced

4    degradation.  Even if we did ten tests that

5    showed no effect, Dr. Davies can design an

6    eleventh test with some unknown chemical in it,

7    he can come up with some new set of test

8    circumstances that he says show some minor

9    effect, he now can wave that around and say, I

10   discovered a new antioxidant, and that's not a

11   legitimate scope of a claim.  The public is

12   entitled to know and to be able to determine if

13   they're inside or outside the claim, and the case

14   we cite for that and Amagen versus Herch 314

15   F.3rd 1313, the enablement defense is similar.

16   Like the patent office rejection during

17   prosecution we are asserting the full scope of

18   this claim is not enabled and particularly the

19   full scope the plaintiffs are asserting that that

20   the compound doesn't have to be established

21   according to them to be an antioxidant by any

22   established test, nor does it have to be an

23   antioxidant for anything in particular, you know,

24   according to my previous example, I think, you

1    know, the paint on your car can be oxidized, I

2    think the plaintiff's definition would encompass

3    Turtle Wax because I can put Turtle Wax on my car

4    and it can stop oxidizing.  They have really not

5    been able since the scope of their claim that

6    they're asserting is not limited by reducing

7    oxidation of any particular thing under any

8    particular environment, we think they clearly

9    have not enabled a person of ordinary skill in

10   the art to use that scope of compound as an

11   antioxidant in a pharmaceutical formulation.

12              The written description defense is

13   similar, the difference between the written

14   description and the enablement defense

15   conceptually is the written description you look

16   only at what's in the specification and you use

17   ask the question whether the inventors were in

18   possession of the invention as it's claimed, and

19   here, they have described data for one

20   antioxidant, we know in fact they tested one

21   other one, and it didn't work, they have data

22   from two, one worked, one didn't work and from

23   that, they extrapolated to claim any chemical

24   compound in their words capable of reducing

1    oxidation of any other compound any other

2    circumstances in any test and we would submit

3    they don't have written description enablement or

4    definiteness support for that scope.

5                    Thank you, Your Honor.

6                    THE COURT:  Thank you, Mr. Brown.

7                    Novartis, call your first witness.

8                    MS. JACOBSEN:  Plaintiff's first

9    witness is Martyn Davies.  And he'll be providing

10   the infringement testimony.

11                   THE COURT:  Thank you.

12                   THE CLERK:  Please state and spell

13   your full name for the record.

14                   THE WITNESS:  My name is Martyn,

15   M-A-R-T-Y-N, Christopher Davies, D-A-V-I-E-S.

16

17                   MARTYN CHRISTOPHER DAVIES, PH.D.,

18                   the deponent herein, having first

19                   been duly sworn on oath, was

20                   examined and testified as follows:

21                   THE COURT:  Could I just ask both

22   counsel to move the microphone a little closer to

23   your mouth.  You're both very soft spoken and I

24   heard what you said, but it's a challenge.  It

1    shouldn't be a challenge.

2              MS. JACOBSEN:  Yes, Your Honor.

3    Your Honor, can we approach?

4              THE COURT:  Yes.

5              MR. FINEMAN:  Your Honor, quick

6    housekeeping before we start, does Your Honor

7    want to address objections as they come along or

8    would Your Honor want to wait to the end?

9              THE COURT:  You should objection as

10   we come along.

11             MR. FINEMAN:  Thank you.

12             DIRECT EXAMINATION

13   BY MS. JACOBSEN:

14     Q.  Good morning, Dr. Davies.

15     A.  Good morning.

16     Q.  Can you please state your full name for

17   the record?

18     A.  My name is Martyn Christopher Davies.

19     Q.  And Dr. Davies, do you have a binder of

20   documents in front of you there?

21     A.  I do.

22     Q.  And can you turn to tab one, you'll find

23   PTX 50A.  Can you please identify that document

24   for the Court?

1          A.   That's my curriculum vitae.

2                    MS. JACOBSEN:  Your Honor,

3     plaintiffs moved to introduce into evidence PTX

4     50A.

5                    MR. BROWN:  No objection.

6                    THE COURT:  Admitted without

7     objection.

8                    MS. JACOBSEN:  And, Your Honor,

9     based on your comments at the pretrial

10    conference, we don't plan to go through his

11    qualifications.

12                   THE COURT:  I'm satisfied.  Is there

13    any objection to him testifying as an expert?

14                   MR. BROWN:  No, Your Honor.

15                   THE COURT:  You may proceed.

16                   MS. JACOBSEN:  Thank you, Your

17    Honor.

18    BY MS. JACOBSEN:

19         Q.   Dr. Davies, can you please summarize what

20    you were asked to do with respect to Par ANDA

21    products?

22         A.   Yes.  I was asked to see whether Par's

23    ANDA products meet the elements of Claim 7 of the

24    '031 patent.  And in particular I was asked if

1    the acetaldehyde is an antioxidant.  Is it an

2    agent that reduces oxidative degradation.  And

3    also I was asked if acetaldehyde was present in

4    the amounts that are in the claims of Claim 7.

5        Q.  Can you summarize your analysis with

6    respect to the first issue, whether acetaldehyde

7    is an antioxidant?

8        A.  Yes.  It was a matter of, if one looks

9    simply first at the basic chemistry of

10   acetaldehyde, acetaldehyde is firstly known as a

11   reducing agent, and reducing agents act as

12   antioxidants.  And with that basic chemistry

13   understanding, I then undertook an experiment to

14   show that acetaldehyde is an antioxidant.

15       Q.  What type of experiment did you run?

16       A.  I ran a controlled head to head stress

17   test where I created an oxidative environment, I

18   placed the rivastigmine within that environment in

19   the presence or absence of acetaldehyde.  So I

20   created an experiment which in many ways is the

21   simplest form of experiment where there is only

22   one variable.  That one variable being the

23   presence or absence of acetaldehyde

24       A.  And I monitored the degradation that

1    occurred in the assay of the drug in the presence

2    or absence of acetaldehyde.

3        Q.  And what did that experiment show?

4        A.  That experiment showed that acetaldehyde

5    is an agent which reduces oxidative degradation.

6    And it also showed that acetaldehyde is an

7    antioxidant.

8        Q.  Can you summarize your analysis with

9    respect to the second issue, whether Par's ANDA

10   product contains about 0.01 to about 0.5 weight

11   percent of acetaldehyde?

12       A.  Yes.  If you look at Par's specification,

13   the specification cites for acetaldehyde that it

14   can be present in up to a thousand parts per

15   million. That is 0.1 percent which falls directly

16   within the range of the claim.

17       Q.  Is that the specification for all three of

18   Par's ANDA products?

19       A.  That's correct.

20       Q.  What was the basis for Par's ANDA

21   specification for acetaldehyde?

22       A.  Par ran its own evaluation of the toxicity

23   of acetaldehyde and they also measured the levels

24   in their prototype batches at -- they set the

1    specification to up to a thousand parts per

2    million.

3         Q.   Thank you, Dr. Davies.

4              Let's discuss briefly Par's ANDA

5    products and their structure.  And can you please

6    describe Par's ANDA products for the Court?

7         A.   Yes.  A very simple diagram which just

8    illustrates the point.

9              Par has three products.  It has an

10   -- excuse my tremor -- 4.6, a 9.5 and a 13.3

11   milligram per 24-hour patches.  These all contain

12   the same ingredients.

13             They have a backing layer.  They

14   have a release liner.  And they have a single

15   drug-in-adhesive layer.  And that single

16   drug-in-adhesive layer contains Rivastigmine.  It

17   contains the isopropyl myristate, which is the

18   tackifier.  And it contains the acrylate

19   copolymer adhesive, which contains acetaldehyde.

20        Q.   And can you please turn to Tab 2 of your

21   witness book and there you'll find PTX 344.  Can

22   you identify that document for the Court?

23        A.   This is a portion of Par's ANDA which

24   highlights the structure and also the composition

 1     of the three different dosage strengths of Par's

 2     ANDA products.

 3                    MS. JACOBSEN:  And, Your Honor,

 4     plaintiff moves to introduce into evidence PTX

 5     344.

 6                    MR. BROWN:  No objection.

 7                    THE COURT:  Admitted without

 8     objection.

 9                    MS. JACOBSEN:  And for the record

10     Dr. Davies referred to PTX 344 at Page 231.

11     BY MS. JACOBSEN:

12         Q.  Dr. Davies, can you describe how you

13     determined whether Par's ANDA products meet the

14     elements of Claim 7?

15         A.  Yes.  I broke the claim down into the key

16     elements and then I compared those elements with

17     Par's ANDA product to come to my opinion.

18         Q.  And can you walk us through those

19     elements, please, Dr. Davies?

20         A.  Yes, certainly.

21                    It is a transdermal device -- sorry.

22     A transdermal device, which has pharmaceutical

23     composition comprising of therapeutically

24     effective amounts of -- this is Rivastigmine.

1    Has an antioxidant with about 0.01 to about 0.5

2    percent by weight.  A diluent or carrier and

3    wherein the pharmaceutical composition is

4    supported by a substrate.

5        Q.  Dr. Davies, can you please turn to Tab 3

6    of your witness binder?  And there you'll find

7    JTX 1.

8                 Can you please identify that

9    document?

10       A.  That's the '031 patent from which Claim 7

11   shown here is drawn.

12                 MS. JACOBSEN:  And, Your Honor,

13   plaintiff moves to introduce into evidence JTX 1,

14   the '031 patent.

15                 MR. BROWN:  No objection.

16                 THE COURT:  Admitted without

17   objection.

18   BY MS. JACOBSEN:

19       Q.  Dr. Davies, do you have an understanding

20   as to which elements are actually in dispute in

21   this case?

22       A.  Yes.  It's whether or not there's an

23   antioxidant present in Par's products and whether

24   it's present in about 0.01 to about 0.5 percent

1    by weight in the three.

2         Q.  And Dr. Davies, I'd like to start with the

3    first issue, whether Par's ANDA products contain

4    an antioxidant.  Are you aware of how this Court

5    has construed the term antioxidant?

6         A.  Yes.  It says that the antioxidant

7    requires the presence of an agent that reduces

8    oxidative degradation as shown on this slide.

9              MS. JACOBSEN:  And for the record,

10   Dr. Davies is referring to the '031 patent in JTX

11   1 and the Court's claim construction DI-250.

12   BY MS. JACOBSEN:

13        Q.  Do Par's ANDA products contain an

14   antioxidant under the Court's claim construction?

15        A.  Yes, I believe they do.  They contain

16   acetaldehyde.

17              Acetaldehyde, which I will show is

18   known as a reducing agent.  Reducing agents can be

19   antioxidants.  And my test shows that it is an

20   antioxidant.

21        Q.  And how do you know that Par's ANDA

22   products contain acetaldehyde?

23        A.  Well, the specification states quite

24   clearly that it contains acetaldehyde.  Contains

1    acetaldehyde up to the order of a thousand parts

2    per million.

3              3M, who is Par's manufacturer, also

4    detected the acetaldehyde and makes the adhesive.

5    Q.  Dr. Davies, what is an ANDA specification?

6    A.  An ANDA specification is a document

7    submitted to the FDA where a company is seeking

8    regulative approval to market a particular

9    product.  The ANDA specification is a blueprint

10   of all the information the FDA requires for it to

11   be able to assess the products and its

12   suitability for regulatory approval.

13             That includes information related to

14   the manufacture, the properties of the compounds

15   present, and it also includes information

16   pertinently related to the specification.

17             And the company, when it submits its

18   ANDA with those specifications, if that

19   particular ANDA is approved and the product

20   approved for marketing the company can actually

21   manufacture their product to meet those

22   specifications.

23   Q.  Dr. Davies, can you please turn to Tabs 4,

24   5 and 6 of your witness book?  And there you'll

1    find documents marked PTX 348, 349 and 350.

2              And can you please identify those

3    documents?

4       A.  These are the specification for the

5    finished product for the 4.6, the 9.5 and the

6    13.3 milligram, the three different dosage

7    strengths for Par's product respectively.

8       Q.  Can you identify where in Par's ANDA

9    specification the limit for acetaldehyde is set?

10      A.  Yes.  This slide shows -- this is taken

11   from a portion of a finished product

12   specification.  It shows the one for the 13.3

13   milligram per 24 hours.

14             And you see that it has here NMT

15   1000 parts per million acetaldehyde.  The NMT

16   means not more than.

17             And you see the same specification

18   in all three dosage strengths.

19      Q.  What does the parenthetical

20   monomer-related mean?

21      A.  That means that the acetaldehyde is in the

22   adhesive -- it's present within the adhesive.

23   The adhesive that Par mixes with its drug and to

24   create its drug-in-adhesive layer.

1           MS. JACOBSEN:  Plaintiffs move to

2    introduce PTX 348, 349, and 350 into evidence.

3           MR. BROWN:  No objection.

4           THE COURT:  Admitted without

5    objection.

6           MS. JACOBSEN:  And for the record,

7    the pages referred to by Dr. Davies are PTX 348

8    at Page 780, PTX 349 at Page 788, and PTX 350 at

9    Page 796.

10   BY MS. JACOBSEN:

11      Q.  Dr. Davies, how did you analyze whether

12   acetaldehyde is an antioxidant?

13      A.  As I explained, I -- firstly, I looked at

14   the chemistry.  I looked at the chemistry of

15   acetaldehyde.  It's a well-known reducing agent.

16           And reducing agents can act as

17   antioxidants.  And so then I took tests -- a test

18   that demonstrated that acetaldehyde is an agent

19   which reduces oxidative degradation.

20      Q.  Dr. Davies, can you please explain what

21   reducing agents are?

22      A.  It's -- yes.  Reducing agents are agents

23   that will undergo sacrificial oxidation in a

24   mixture such that they help to protect other

1    agents that -- other compounds such as drugs that

2    may be present.  So they're more susceptible, in

3    that sense, to oxidation.

4              So reducing agents can act -- will

5    undergo sacrificial oxidation reducing the level

6    of the oxidative environment; and therefore,

7    helping to protect the drug.

8         Q.  And after you considered the basic

9    chemistry, what was the next step in your

10   analysis?

11        A.  The next step in my analysis was to create

12   an experiment where I undertook a stress test, a

13   controlled stress test which was a head-to-head

14   stress test where I created an oxidative

15   environment where an oxidative environment which

16   would degrade the drug.  And then I compared that

17   oxidation, what would happen if I had a sample

18   with and without acetaldehyde.

19        Q.  And what do you mean with a controlled

20   head-to-head test?

21             MR. BROWN:  Your Honor, in your

22   order denying our Daubert motion, you mentioned

23   that at trial to preserve that, we should renew

24   our Daubert request.  So I'm issuing a Daubert

1    objection to Dr. Davies' testimony and I would

2    request that the Court grant me a continuing

3    objection, so I don't need to do this further

4    during the trial.

5              THE COURT:  Well, I'll grant you a

6    continuing objection to at least this particular

7    testing --

8              MR. BROWN:  Correct.

9              THE COURT:  -- which I think, as I

10   understand, is what you're objecting to.  And

11   basically I think, based on the pretrial ruling,

12   the pretrial ruling, I'll expect Dr. Davies will

13   explain what it's in the test.  And then probably

14   your expert will explain why it's not.

15             And I'll figure that out later on.

16             MR. BROWN:  Thank you, Your Honor.

17             THE COURT:  All right.  You may

18   proceed, Ms. Jacobsen.

19             MS. JACOBSEN:  Thank you.

20   BY MS. JACOBSEN:

21     Q.  So, Dr. Davies, you used the term

22   controlled head-to-head test.  Can you please

23   explain what you meant by that?

24     A.  Yes.  When I'm saying it's a head-to-head

1    test, what I'm saying there is that this is a

2    test where there's only one variable in play.  In

3    this case, it's the presence or absence of

4    acetaldehyde.  Everything else remains the same.

5              So if there -- if I show between

6    these two sets of samples, one of which has no

7    acetaldehyde, one of which has acetaldehyde

8    present, the only difference between these two

9    samples is the absence or presence of

10   acetaldehyde.

11             So if there's any difference between

12   these two samples related to the oxidative

13   degradation of the drug, it could be attributable

14   directly to the presence of just that one

15   variable, i.e. the absence or presence of

16   acetaldehyde.

17       Q.  And what were the results of your stress

18   test?

19       A.  The results of my stress test showed that

20   acetaldehyde reduced the oxidative degradation.

21   It was also -- my stress test showed that

22   acetaldehyde is an antioxidant.

23       Q.  Did you conduct any statistical analysis

24   on your results?

1        A.  Yes, I did.  I conducted statistical

2    analysis to show that the difference between the

3    two samples, the two sets of samples, the only

4    variable in play with or without acetaldehyde was

5    statistically significant.  I showed that it was

6    statistically significant.

7        Q.  And did you draw any conclusions from your

8    experiment?

9        A.  I did.  I drew the conclusion that, based

10   on my experiment, that acetaldehyde is an agent

11   which reduces oxidative degradation.  That backed

12   up what I knew from the literature.

13            And what I knew about acetaldehyde

14   is it is a known reducing agent, and reducing

15   agents can be antioxidants.  And my data clearly

16   shows in this very simple and very straight

17   forward, very pure, in a sense, experiment, that

18   it is.  Acetaldehyde is an antioxidant.

19       Q.  Thank you, Dr. Davies.

20            Does the '031 patent list

21   acetaldehyde as an antioxidant?

22       A.  No, it does not.  It lists exemplary

23   examples.  Sorry.

24            I show this slide here, which lists

1    them, a number of examples in, I believe, it's

2    Column 4.

3        Q.  Did the fact that acetaldehyde is not

4    listed in the '031 patent influence your

5    infringement analysis in any way?

6        A.  No, it does not.  It's not -- this list is

7    not limited to be -- it's not -- pardon.  It

8    doesn't limit the antioxidants that can be used

9    to this specific list.

10           The claims are quite clear that it

11   -- they relate to antioxidants.  They're not

12   limited to specific antioxidants in Claim 1 or

13   Claim 7.

14       Q.  Does the '031 patent describe any reducing

15   agents as antioxidants?

16       A.  Yes, it does.  It describes ascorbic acid

17   and ascorbyl palmitate, both of which are both

18   reducing agents.

19           MS. JACOBSEN:  And for the record,

20   the passage from the '031 patent, JTX 1 that Dr.

21   Davies is referring to is at Column 4, Lines 10

22   to 19.

23   BY MS. JACOBSEN:

24       Q.  Dr. Davies, are you aware of any

1      literature calling acetaldehyde a reducing agent?

2          A.   This is at slide -- a page from Van

3      Nostrand's Concise Encyclopedia of Science.

4      There's a monograph here for acetaldehyde.

5               And it says the compound also is used

6      as a reducing agent.

7               MS. JACOBSEN:  And, Your Honor,

8      Plaintiffs move to introduce into evidence JTX 61.

9               MR. BROWN:  No objection.

10              THE COURT:  Admitted without

11     objection.

12              MS. JACOBSEN:  And for the record,

13     Dr. Davies referred to JTX 61 at Page 5.

14     BY MS. JACOBSEN:

15         Q.   Is there any other evidence that

16     acetaldehyde is capable of being oxidized itself

17     to protect other compounds from oxidation?

18         A.   Yes.  This is a slide, again, from a page

19     taken from a pharmaceutical textbook called

20     Modern Pharmaceutics.

21              And there's a section here on

22     oxidation.  And in the section on oxidation, it

23     talks about, in pharmaceutical dosage forms,

24     oxidation is usually mediated through reaction

1    with atmospheric oxygen and under ambient

2    conditions, a process commonly referred to as

3    autoxidation.

4              And the next paragraph, it goes on

5    to talk about many autoxidation reactions are

6    initiated by trace amounts of impurities, such as

7    metal ions or hydroperoxides.

8              Now, if you look below, there's a

9    table where it talks about some functional groups

10   subject to autoxidation.  And it highlights

11   acetaldehydes here.  Sorry, it highlights

12   aldehydes here.

13             And acetaldehyde is one of the

14   simplest forms of aldehyde.

15   Q.  Why is this relevant to your analysis?

16   A.  It's relevant to my analysis because it

17   demonstrates that -- it shows that aldehydes are,

18   such as acetaldehyde, are subject to

19   autoxidation.  In other words, aldehydes act as

20   reducing agents.

21             MS. JACOBSEN:  Your Honor,

22   plaintiffs move to introduce into evidence JTX

23   106.

24             MR. BROWN:  No objection, Your

1    Honor.

2              THE COURT:  Admitted without

3    objection.

4              MS. JACOBSEN:  And for the record,

5    Dr. Davies referred to JTX 106 at Page 183.

6    BY MS. JACOBSEN:

7       Q.  And Dr. Davies, is there any other

8    evidence that reducing agents can act as

9    antioxidants?

10      A.  Yes.  This is a slide from, again, a page

11   taken from the EMEA Note for Guidance.  EMEA is

12   the European equivalent to the FDA.

13             And there's a section here on

14   antioxidants.  And it shows antioxidants are used

15   to reduce the oxidation of active substances and

16   excipients in the finished product.

17             And it highlights, there are three

18   different types of antioxidants, one of which is

19   reducing agents.  And it says these have a lower

20   redox potential than the drug or excipient they

21   are protecting.  What that means is that the more

22   susceptible to oxidation and they'll

23   sacrificially undergo oxidation so that they're

24   able to protect the drug excipient.

1              It gives an example of ascorbic acid

2      and ascorbic acid is one of the examples that we

3      seen in the '031 patent.

4              MS. JACOBSEN:  Your Honor,

5      plaintiffs move to introduce into evidence JTX

6      105.

7              MR. BROWN:  No objection.

8              THE COURT:  Admitted without

9      objection.

10             MS. JACOBSEN:  And for the record,

11     Dr. Davies referred to JTX 105 at page one of

12     four.

13     BY MS. JACOBSEN:

14        Q.  And Dr. Davies, have you seen any other

15     evidence of reducing agents can act as

16     antioxidants?

17        A.  Yes.  This is another section from Modern

18     Pharmaceutics, and it's a section again dealing

19     with in this case antioxidants.  And talks about

20     mechanistically some antioxidants such as

21     ascorbic acid and ascorbic palmitate, those are

22     the two that I highlighted again from the

23     examples in the '031 patent, act as reducing

24     agents.  They are easily oxidized, preferentially

```
1     undergo autoxidation, thereby consuming oxygen and

2     protecting the drug or excipient.

3               MS. JACOBSEN:  For the record,

4     Dr. Davies referred to JTX 106 at page 203.

5     BY MS. JACOBSEN

6          Q.  Is acetaldehyde listed in the FDA inactive

7     ingredient list?

8          A.  No, it is not.

9          Q.  Are you aware of acetaldehyde being used

10    in pharmaceuticals?

11         A.  Yes, this is the specialty chemicals

12    sourcebook and, again, it's got a monograph for

13    acetaldehyde.  And under the uses, it cites

14    synthetic flavoring agent in foods, beverages and

15    pharmaceuticals.  And it also cites that it's

16    used in the manufacture of pharmaceuticals.

17              And if you look at its regulatory

18    status, its status is GRAS, which is general, the

19    term for generally regarded as safe.  And as

20    given by the FDA --

21         Q.  And Dr. Davies, I think you misspoke, you

22    said generally regarded as safe.  Is it generally

23    recognized as safe?

24         A.  I believe that's true, yes.  Sorry.
```

```
1        Q.  Thank you.

2                And are you aware of any products in

3    which acetaldehyde is permitted to be present?

4        A.  Yes.  The Par product where it's present.

5                MS. JACOBSEN:  Your Honor, plaintiff

6    move to introduce into evidence JTX 63.

7                MR. BROWN:  No objection.

8                THE COURT:  Admitted without

9    objection.

10               MS. JACOBSEN:  And for the record,

11   Dr. Davies referred to JTX 63 at page 7.

12   BY MS. JACOBSEN:

13       Q.  So focusing on rivastigmine specifically,

14   can you explain what happens when rivastigmine is

15   oxidized?

16       A.  Yes.  This is the generally recognized by

17   Par, I don't think there is any dispute about

18   this regarding rivastigmine oxidative degradation

19   pathway.  Here is the rivastigmine molecule, it

20   can undergo oxidation by oxygen or peroxides to

21   form what is called an N-oxide here.  The N-oxide

22   has a very short half life, and it degrades to

23   form, the styrene molecule here.  The styrene

24   molecule is referred to as ECAV by Par.  That
```

1    molecule can undergo further oxidation by oxygen

2    or peroxides to form the ketone, and that's known

3    as impurity 4.

4        Q.  Are oxidative degradation products

5    different if rivastigmine is oxidized by oxygen

6    or peroxide?

7        A.  No, they're the same.  In fact, these are

8    the two key degradation products that are seen

9    for the oxidative degradation of rivastigmine,

10   whether by oxygen or by peroxides.

11       Q.  Can you explain how an agent, reducing

12   agent such as acetaldehyde can act as an

13   antioxidant?

14       A.  Yes.  I have shown it on this slide.

15   Reducing agents such as acetaldehyde will

16   sacrifice themselves and react with the oxygen or

17   peroxides so reducing the oxidative degradation,

18   and they will do that in this case block the

19   conversion of the rivastigmine to the, they'll

20   react with the oxygen or peroxides, they'll also

21   at this point with the conversion of the styrene

22   to ketone, acetaldehyde will sacrifice itself

23   and react with the oxygen and peroxide thereby

24   reducing the oxidative degradation.

```
1          Q.  Dr. Davies, can you please turn to tabs 11

2     and 12 of your witness book and there you'll find

3     JTX 85 and PTX 125.  Can you please identify

4     those documents?

5          A.  Again, they're part of the Actavis

6     technical documents, the first, and then there is

7     also you said 12.

8          Q.  Tab 12, should be PTX 125?

9          A.  I'm sorry, I'm looking at the wrong

10    document.  I apologize.  Tab 12, yes, that's an

11    E-mail correspondence from Actavis.  I'm happy to

12    talk about it, if you wish me to talk about it.

13         Q.  I will.

14              MS. JACOBSEN:  We'll move to

15    introduce as exhibits into evidence JTX 85 and

16    PTX 125.

17              MR. BROWN:  We have an objection to

18    PTX 125 as hearsay.  This is an Actavis E-mail.

19    They're not a party to the litigation, and

20    they're introducing it for I believe statements

21    that are in for the truth of the matter asserted

22    and we would object to PTX 125 on those grounds.

23              THE COURT:  Ms. Jacobsen.

24              MS. JACOBSEN:  This is an E-mail
```

1    from Actavis.  Actavis used to own Par's ANDA.

2    It's an admission against interest by Par's

3    predecessor so it's admissible under 801(d)2(b).

4                    THE COURT:  All right.  Do you agree

5    that Actavis was Par's predecessor?

6                    MR. BROWN:  Actavis was the previous

7    owner of the ANDA, that is correct.

8                    THE COURT:  All right.  I'm going to

9    tentatively admit it.  If it turns out that you

10   want to present in posttrial briefing that this

11   was a mistake, go ahead, but I think it's

12   admissible.  Go ahead.

13                   MS. JACOBSEN:  Thank you, Your

14   Honor.

15                   For the record, Dr. Davies referred

16   to JTX 85 at page 2403 and PTX 125 at page 33980.

17   BY MS. JACOBSEN:

18       Q.  Dr. Davies, I would like to transition now

19   to the experiment that you conducted.  Just so

20   the record is clear, Dr. Davies, can you go to

21   Tab 12 again in your witness book, and that's

22   where PTX 125 is?

23       A.  Yes.

24       Q.  And can you turn to page 980, page ending

```
1      in 980, and can you explain what this document

2      relates to?

3          A.  Yes.  This is called the E-mail from Dale

4      Martin at Actavis, and in the third paragraph

5      down, he's talking about an impurity is an

6      oxidation impurity and its formation is promoted

7      by the presence of oxygen, especially peroxides

8      and like.  So he's recognizing that oxygen and

9      peroxides are responsible for the oxidative

10     degradation of rivastigmine.

11         Q.  Thank you, Dr. Davies.

12             Now I would like to transition to

13     the experiment that you conducted.

14             MS. JACOBSEN:  Sorry, Your Honor.

15     One other matter.  On JTX 85, I understand it's

16     not clear whether that was admitted.

17             THE COURT:  I'm sorry.  It was

18     admitted without objection, or it is now admitted

19     without objection.

20             MS. JACOBSEN:  Thank you, Your

21     Honor.

22     BY MS. JACOBSEN:

23         Q.  Now, I would like to transition to your

24     testing.  Can you briefly explain how you
```

1    approached the design of your experiment?

2        A.   First thing I wanted to do was create

3    conditions where -- such that I created an

4    oxidizing environment such that I could monitor

5    the oxidative degradation of rivastigmine.

6        Q.   Why did you want to create an oxidizing

7    environment?

8        A.   Well, the reason I wanted to do it because

9    I wanted to be able to create an environment

10   where I am replicating the oxidative degradation

11   pathway of rivastigmine so I'm able to show the

12   presence of these two key degradation products,

13   and I wanted to do that at a sufficient level

14   such that I could then undertake an experiment,

15   undertake an experiment where I compared two sets

16   of solutions, one with and without the presence of

17   acetaldehyde to see whether or not acetaldehyde

18   had any influence on the formation of those two

19   degradation products of the oxidative degradation

20   pathway.

21       Q.   What did you do once you established the

22   conditions for an oxidizing environment?

23       A.   Once I established that, I then set up the

24   experiment in a way that I created an experiment

1    where I created two sets of samples, one of which

2    had no acetaldehyde present, one set, another set

3    which had acetaldehyde present.  So I was

4    creating my head to head stress test.

5              The one without acetaldehyde acted as

6    the control for the samples with acetaldehyde.

7    There is only one variable here, the presence or

8    absence of acetaldehyde, therefore, any

9    differences in the levels of these two key

10   components could be attributable to the presence

11   or absence of acetaldehyde.

12       Q.  Dr. Davies, you used the term stress test.

13   What is a stress test?

14       A.  A stress test is a test used widely within

15   the pharmaceutical industry.  And they're used to

16   accelerate the degradation of a drug or excipient

17   so that you can monitor that degradation over a

18   short period of time.

19       Q.  Can stress tests be used to study

20   different degradation pathways?

21       A.  Yes, it can.  And it is used, and it's

22   widely used for that effect.  So, for example,

23   one can study the influence of light, you could

24   study the influence of acid or basic conditions.

1    You could study the influence of oxidation.

2    There are a number of things that one could do.

3        Q.  Can stress tests be used to determine

4    whether something is an antioxidant?

5        A.  Yes, it can.  Because having established

6    with the stress test that you are able to -- a

7    particular pathway as we have shown here, as I

8    will show -- you can in the kind of experiment

9    that I have undertaken, a controlled head to head

10   study, you can show whether or not a molecule is

11   an antioxidant by doing the controlled head to

12   head study by having a control and then having a

13   sample with say in this case acetaldehyde in that

14   stress test.  Any differences in the rate of the

15   degradation could be attributable to the one key

16   variable that's changing, the presence or absence

17   of acetaldehyde.

18       Q.  And is it necessary for all the conditions

19   to be the same to run a head to head test?

20       A.  It is for this, I believe it is, because

21   in that controlled stress test you have a test

22   where there is only one variable in play, so any

23   differences between the two sets of samples could

24   be directly attributable to that one variable.

1            However, if you have multiple

2    variables occurring, the multiple differences

3    between the samples, then you can't be sure that

4    any differences that you do observe could be

5    attributable to the presence or absence in this

6    case of acetaldehyde.

7        Q.  Are stress tests standard in the

8    pharmaceutical industry?

9        A.  Yes, it is.  This is a paper by Alsante.

10   It talks of stress testing is a critical

11   component of drug development.  It says by

12   generating key stress-testing samples (i.e.,

13   partially degraded samples stressed under various

14   conditions), predictive degradation information

15   can be obtained early in the process.  Stress

16   testing can help in the selection of more stable

17   drug substance salt forms and drug formulations.

18            So that can help in the selection of

19   the most appropriate drug forms to use and also

20   which excipients to use to make a stable

21   composition.

22       Q.  Are there any other references discussing

23   the use of stress tests in the pharmaceutical

24   industry?

1          A.  Yes.  There is a reference by Aubry, it

2      talks about the development of stability

3      indicating methods.  And here, it says forced

4      degradation studies typically involve the exposure

5      of representative samples of drug substance or

6      drug product to the relevant stress conditions of

7      light, heat, humidity, acid/base hydrolysis and

8      oxidation.  These experiments play an important

9      role in the drug development process.

10              The results of forced degradation

11      studies can facilitate drug formulation design,

12      in other words, sorting out your formulation such

13      that it's stable, what excipients one would

14      include to be sure that you have stable

15      formulation.  And it's also used with solving of

16      stability-related problems.

17          Q.  Dr. Davies, can you turn to tab 13 and 14

18      of your witness book, and there you will find JTX

19      75 and JTX 221.  Can you identify those

20      documents?

21          A.  Yes, these are the two documents that I

22      have just highlighted pages from, Alsante and the

23      Aubry reference.

24              MS. JACOBSEN:  Your Honor,

1    plaintiffs move to introduce into evidence JTX 75

2    and JTX 221.

3                    MR. BROWN:  No objection.

4                    THE COURT:  Admitted without

5    objection.

6                    MS. JACOBSEN:  For the record,

7    Dr. Davies referred to Alsante as JTX 75 at page

8    60, and JTX 221, that's the Aubry reference, at

9    page 141.

10   BY MS. JACOBSEN:

11       Q.  Dr. Davies, have you conducted stress

12   tests prior to your involvement in this case?

13       A.  Yes, I have.

14       Q.  Can you give me a simple example?

15       A.  The example I conducted such test at both

16   the university and also at Molecular Profiles, for

17   example, recently we were working on a new drug

18   that we were helping to prepare the drug for the

19   formulation for a clinical trial.  The drug is

20   acid labile, the stress test we saw that it was

21   acid labile and through further stress tests we

22   were able to use those stress tests to look at

23   the most appropriate pH modifying excipient to

24   use within that formulation.

1      Q.  Dr. Davies, what does it mean to be acid

2    labile?

3      A.  It means that the drug degrades in a

4    particular environment, such as say for example

5    in your stomach is an acidic environment.  The

6    drug degrades in the acidic environment so we

7    include excipients such that they would help

8    stabilize the drug by acid modifying.

9      Q.  I would like you to take a closer look at

10   the Alsante reference that you discussed a moment

11   ago.  Can you generally describe what this paper

12   is about?

13     A.  Yes.  The Alsante paper was a stress

14   testing benchmarking study, and the authors say

15   to better understand current stress testing

16   practices in the pharmaceutical industry, the

17   authors conducted a benchmarking survey to which

18   twenty pharmaceutical companies responded.  And

19   the authors themselves are from the

20   pharmaceutical industry, they're from Pfizer and

21   they're also from Eli Lily.

22     Q.  Does this paper discuss the use of stress

23   tests to study oxidative degradation?

24     A.  Yes, it does.  It has a section on

1    oxidation, and that section shown again on this

2    page on the slide, here we see that under

3    oxidation it says nineteen companies perform

4    oxidative stress testing on the drug substance.

5    Approximately 65 percent perform oxidative, which

6    I think is about 13, perform oxidative stress

7    testing on the drug product.

8              So that's both on the drug substance

9    and on the drug product.  If you look below, it

10   shows here, that a range of conditions are used,

11   a range of conditions are used or, it shows that

12   you could use peroxide, use radical initiator,

13   pressurized oxygen, transition metal and bubbled

14   oxygen.

15             When you look at below in the figure

16   six from the paper, it shows that those

17   companies, it shows the peroxide, the typical

18   peroxide used is hydrogen peroxide, and it shows

19   a range of typical concentrations, study duration

20   and temperatures are used by those 19 companies.

21             So it's illustrating there are a

22   number of ways that one could conduct  oxidative

23   stress tests.  But the objective is the same in

24   all cases, it's to create an oxidative

1    degradation environment that one could study for

2    the drug.

3         Q.  Why is it the object

4         Q.  Why is that the objective to create an

5    oxidizing environment?

6         A.  Such that one can study the oxidative

7    degradation of the drug and of the drug products

8    that's recited here.

9         Q.  And why does the variability exist?

10        A.  Variability exists because each drug is

11   different.  Each drug has different

12   physicochemical properties and drugs undergo --

13   and kind of undergo oxidative degradation in

14   different ways.

15             So the scientist within the

16   pharmaceutical industry designed their

17   experiments in a way with an understanding that

18   each drug is different.  And they designed their

19   experiments such that they're able to -- that's

20   why there is this variability.

21             And they design their experiments.

22   But in each case, it's the same objective.  Its

23   objective -- the goal is the same, to be able to

24   create an oxidative environment, study the

1    oxidative degradation of the drug or the drug

2    product.

3        Q.  Is any particular level of oxidative

4    degradation necessary to conduct a stress test?

5        A.  Once you achieve a sufficient level such

6    that you're able to monitor the key degradation

7    products over the time scale of the experiment.

8    So, in my particular stress test, I wanted to

9    achieve sufficient degradation such that I was

10   able to distinguish between the samples which had

11   a -- control samples which had no acetaldehyde

12   present and the samples which had acetaldehyde

13   present, to be able to distinguish between those

14   two.

15       Q.  What if there isn't enough degradation to

16   distinguish between the two samples?

17       A.  If you don't generate enough oxidative

18   degradation of the sample then you can't make the

19   -- you can't undertake the experiments to -- to

20   distinguish between these two sets of samples in

21   this head-to-head stress test.

22       Q.  And is the variability in the ways that

23   stress tests can be conducted recognized in the

24   Alsante reference?

1          A.  Yes, it is.  The point goes to the

2     conclusion.  It says, Although the benchmarking

3     survey shows significantly diversified approaches

4     among the participating companies, the diversity

5     is not as great as one might expect based on the

6     lack of clear guidance in literature or in

7     regulatory guidelines.

8               What that's basically saying is that

9     the benchmarking survey is recognizing that there

10    is this diversified approach, but ultimately, the

11    scientists within the pharmaceutical industry

12    that design the experiments within these

13    parameters, because the differently -- because

14    there are all types of differences and you have

15    to tailor your test to the different drugs.

16         Q.  Does Alsante discuss the stress test to

17    study the effect of potential antioxidants?

18         A.  Yes, it does.  Not -- sorry, not

19    explicitly, I should say, but it does talk about

20    the fact that one can undertake stress testing,

21    look at pharmaceutical formulations.

22              So, in addition, it says stress

23    testing can help in the selection of more-stable

24    drug substances, salt forms and drug

1    formulations.  Well, what that's talking about

2    there are excipients.  And if one looks at Figure

3    1 shown here, it shows that there is a -- here it

4    shows predominant reasons for performing the

5    stress test studies and it showed here

6    preformulation and excipient compatibility.

7              Seventeen of twenty companies use

8    stress testing to test the effect of an excipient

9    compatibility on the drug.  And what it's talking

10   about there

11   is that one could use that -- exactly that

12   approach to study the effect of an antioxidant on

13   a drug or an excipient, for that matter.

14             MS. JACOBSEN:  For the record, the

15   portions of Alsante that Dr. Davies referred to

16   in the previous set of slides occur at JTX 75 on

17   Pages 60, 64, 67, 68 and 72.

18   BY MS. JACOBSEN:

19       Q.  Dr. Davies, does the FDA issue guidance on

20   how to perform stress tests?

21       A.  It does.  It's very general guidance and I

22   think that's recognized and cited in this Aubry

23   paper, which I've highlighted on the next slide.

24   And that recognizes this, although it's FDA

1    guidance.  And ICH guidelines provide useful

2    definitions and general comments about forced

3    degradation studies there.

4              And forced degradation studies are

5    another term for stress tests.  Their direction

6    concerning the scope, timing and best practices

7    is very general and lacking in details.

8              That's recognizing what we saw in

9    Alsante, that there are a range of ways to

10   achieve -- that one can undertake stress tests

11   and achieve the same goal, the goal of studying

12   the oxidative degradation of the drug.

13             MS. JACOBSEN:  For the record, Dr.

14   Davies referred to JTX 221 at Page 141.

15   BY MS. JACOBSEN:

16     Q.  Dr. Davies, were you aware of Par ever

17   having performed a stress test?

18     A.  Yes, I am.  They undertook a stress test

19   when they -- they noticed in some accelerated

20   stability and long-term stability studies on their

21   products that prototype batches or other -- they

22   noticed the emergent degradation product.

23             Now, they -- they reasoned that that

24   degradation product was the product of an

1    oxidative degradation.  So Par undertook a stress

2    test where they stressed Rivastigmine in an

3    oxidative environment.  And they -- in doing so,

4    they identified the two key degradation products

5    that I highlighted in my schematic.

6              It showed that one of those key

7    degradation products was, indeed, the degradation

8    product that they were observing.

9        Q.  Did 3M or Par use that test to determine

10   whether any compound was an antioxidant?

11       A.  No, they didn't.  But they could have

12   undertaken such a test because they created an

13   oxidative degradation environment and they could

14   have looked to see the effect of adding an

15   antioxidant to that environment.

16       Q.  And can you please turn to Tab 15 of your

17   witness book?  And there you'll find JTX 162.

18              Can you identify that document?

19       A.  Yes.  This is the work undertaken by 3M,

20   Par's manufacturer where they -- this is a

21   portion that includes the stress test.

22              MS. JACOBSEN:  Your Honor,

23   plaintiff's move to introduce into evidence JTX

24   162.

1              MR. BROWN:  No objection.

2              THE COURT:  Admitted without

3    objection.

4    BY MS. JACOBSEN:

5        Q.  Dr. Davies, I'd like you to turn now to

6    the detail of your stress test.  And can you

7    please give us an overview of your stress test?

8        A.  Yes.  This is a very simple,

9    straightforward schematic which illustrates what

10   I've done here in creating an oxidative

11   environment for Rivastigmine by adding an

12   oxidizing agent in with Rivastigmine.

13              I then split that stock solution

14   into two to create a control and create a sample

15   where I add acetaldehyde.  I then split those

16   samples further into three and I labeled them

17   showing here one, two, three.  C for control, A

18   for acetaldehyde samples.

19              And then I stressed them.  I

20   stressed them at a particular temperature for

21   over a period of time.

22       Q.  And did you analyze what was happening in

23   those samples?

24       A.  Yes.  I took samples at key time points

1    and measured the degradation products.  And I

2    then compared the two sets of data.  I compared

3    the degradation products of the drug levels in

4    control and compared that to the

5    acetaldehyde-added forms.

6         Q.  And who designs the stress test you

7    conducted?

8         A.  I did.

9         Q.  And who carried out the stress test?

10        A.  The stress test was carried out by

11   experienced scientists, Ph.D.-level scientists

12   with molecular profiles under my supervision.

13        Q.  And is the exact stress test with the

14   combination of conditions used described in a

15   single published literature?

16        A.  There is more -- there are many of such

17   tests, stress tests, but it does fall within the

18   framework of the parameters that we saw in

19   Alsante and the like.

20             So the conditions that I used, and

21   I'm going to explain, fall within the same

22   parameters that are used, range of parameters

23   that are used within the pharmaceutical industry,

24   as described -- as highlighted by Alsante.

1        Q.  So I'd like to walk through the test

2    step-by-step now.  What was the first step?

3        A.  The first step was to create a stock

4    solution.  And to create a stock solution, I

5    dissolved the Rivastigmine in a solvent ethyl

6    acetate.  I added T-butyl hydroperoxide, the

7    oxidizing agent to that solution.

8        Q.  And how many stock solutions did you

9    prepare?

10       A.  I prepared a single stock solution.  Now,

11   the reason I did that is because I wanted that

12   single stock solution to be the source of the

13   solutions for the entirety of my test.  And the

14   reason I did that, I wanted to eliminate any

15   variability that may occur if I make multiple

16   solutions.

17            So all these samples come from that

18   single stock solution to eliminate any

19   variability that may occur by preparation of

20   multiple solutions.

21       Q.  And how much Rivastigmine was present in

22   your test samples?

23       A.  It was in the order approximately of .36

24   percent.

1      Q.  And is that the same amount that's present

2   in Par's ANDA products?

3      A.  No, it's not.  When you're doing a stress

4   test, you use a concentration which is sufficient

5   for you to be able to monitor the oxidative

6   degradation of the drug.  And I showed in my

7   preliminary test that using .36 percent was a

8   suitable level such that I could monitor the

9   oxidative degradation in the time scale of the

10   experiment and achieve significant amounts of

11   oxidative degradation such that I could undertake

12   this head-to-head stress test.

13          Par uses a different concentration

14   in their products because their products are

15   designed to achieve a therapeutic effect.  But

16   therapeutic effect is important there.

17          So the amount that Par uses in its

18   product is determined by its need to produce the

19   therapeutic effect.

20      Q.  You indicate on the slide there that you

21   added T-butyl hydroperoxide you added.  Is that

22   also called TBHP?

23      A.  Yes, it is.

24      Q.  And what is TBHP?

1          A.   TBHP is an oxidizing agent.  It's a

2     hydroperoxide.  And I included it in here to

3     create an oxidizing environment.  I particularly

4     included TBHP and I selected TBHP because I

5     wanted to create an anhydrous oxidizing

6     environment.

7               The reason for that is that

8     Rivastigmine also undergoes hydrolysis in water.

9     So I wanted to be sure that I was only watching

10    monitoring, should I say, the oxidative

11    degradation of the drug.

12              To do that, I selected TBHP because

13    it's anhydrous.  It's free from water.

14         Q.   And could you also use hydrogen peroxide?

15         A.   I think -- well, one could have done that

16    experiment, but I think it would not have been

17    the right experiment to do because you would have

18    had two competing degradation processes

19    occurring.  You'd have hydrolysis as well as

20    oxidative degradation.

21              So I wouldn't have done that

22    experiment.  That's why I did the experiment with

23    TBHP because I was able to do that in an

24    anhydrous environment.

1      Q.  And why would you have two competing

2   degradation pathways if you had used hydrogen

3   peroxide?

4      A.  Because hydrogen peroxide is not -- would

5   not be free from available -- free from water.

6   And, in that context, one would -- if one was

7   undertaking an analysis where there was water

8   present, one would see that there were not only

9   oxidative degradation occurring, but the presence

10  of hydrolysis occurring.

11          And I wanted to look just simply at

12  oxidative degradation and that's why I chose an

13  anhydrous environment.

14     Q.  And what does anhydrous mean, Dr. Davies?

15     A.  It's free from water.

16     Q.  And how did you know that you could use a

17  peroxide as the oxidizing agent?

18     A.  Because peroxide -- it's well known that

19  Rivastigmine undergoes oxidative degradation in

20  the presence of peroxides.

21     Q.  Is there any evidence in the literature of

22  the use of peroxide in stress tests?

23     A.  Yes, there is.  I show in this slide a

24  number of examples.

1                    Alsante talks about using peroxides.

2       Aubry talks about using peroxide concentrations.

3       Bianchini talks about using T-butyl hydroperoxide

4       the one that I used.  And the U.S. patent, the

5       '498 patent talks about using T-butyl

6       hydroperoxide as well.  So a number of these

7       papers talk about using peroxide.

8                    MS. JACOBSEN:  Your Honor,

9       plaintiffs move to introduce into evidence JTX 74

10      and JTX 77.

11                   MR. BROWN:  No objection, Your

12      Honor.

13                   THE COURT:  Admitted without

14      objection.

15                   MS. JACOBSEN:  And for the record,

16      Dr. Davies referred to JTX 74 at Column 5, Lines

17      61 to 65.  JTX 75 at Pages 67 to 68.  JTX 77 at

18      Pages 1,056 and JTX 221 at Page 149.

19      BY MS. JACOBSEN:

20         Q.  Dr. Davies, how much TBHP did you use?

21         A.  I used approximately 1.3 percent TBHP in

22      this solution.

23         Q.  And why did you use that amount?

24         A.  That was the amount that I saw in my

1    preliminary work that showed that I could --

2    could obtain sufficient levels of Rivastigmine

3    degradation for my test.  It also falls within the

4    range that is cited within some of these

5    references, for example, the Alsante reference.

6              It talks about one to three percent

7    peroxide levels.  So it falls within such ranges.

8        Q.  Now, you also noted that you added TBHP

9    and Rivastigmine to ethyl acetate.  Why did you

10   use ethyl acetate?

11       A.  Again, because ethyl acetate is anhydrous.

12   Ethyl acetate is free from water.

13             I wanted to just purely look at

14   oxidative degradation, so I chose ethyl acetate

15   for that reason.  So I dissolved Rivastigmine and

16   T-butyl hydroperoxide into ethyl acetate so I

17   would only be watching and observing the

18   oxidative degradation of Rivastigmine, not any

19   other process.

20       Q.  Do you know what solvent 3M and Par used

21   in the stress test that we looked at a moment

22   ago?

23       A.  It used the same, the ethyl acetate.

24       Q.  What was the next step?

```
1                    THE COURT:  Ms. Jacobsen, would this
2       be a convenient time to take a break?
3                    MS. JACOBSEN:  Yes, Your Honor.
4                    THE COURT:  All right.  Let's take a
5       15-minute break.  And could I just ask the
6       defendants, you know, I said at the pretrial
7       conference, I was familiar with Dr. Davies and
8       Dr. Klibanov, and so therefore, skip going
9       through their background.
10                   If you could get me the CVs of your
11      three experts in advance of when they take the
12      stand, then when you admit them, maybe we could
13      skip over their backgrounds, too.  Okay?
14                   MR. BROWN:  We can do that, Your
15      Honor.
16                   THE COURT:  All right.  We'll be in
17      recess.
18                   THE CLERK:  All rise.
19                   (A brief recess was taken.)
20                   THE COURT:  All right.  You may all
21      be seated.  For what it's worth I'm going to try
22      to go to about quarter of 1:00 for lunch.  Okay?
23                   MS. JACOBSEN:  Thank you, Your
24      Honor.
```

1             THE COURT:  Good ahead,

2    Ms. Jacobsen.

3    BY MS. JACOBSEN:

4        Q.  Dr. Davies, before the break, we were

5    about to move to the second step in your stress

6    test.  And can you please explain what that

7    second step was?

8        A.  Yes.  The second step was to separate that

9    stock solution into two parts.  So the one I'm

10   going to -- I have as a control one half I have

11   as a control, the other half I have as the

12   acetaldehyde.  And the way I do that is that I

13   dissolved acetaldehyde in the ethyl acetate

14   solvent and I add it back to this half of the

15   stock solution.

16             I then created a control by adding

17   exactly the same amount of the solvent, ethyl

18   acetate to the control so I maintained the

19   concentrations between the two samples and the

20   only difference between the two samples is the

21   presence or absence of acetaldehyde.

22       Q.  How much acetaldehyde did you add to the

23   test samples?

24       A.  I added approximately 0.0017 percent by

1    weight to the second mixture.

2        Q.  What is the relevance of that amount of

3    acetaldehyde in your stress test?

4        A.  That is the level that was reported in

5    Par's ANDA product, that's the reason why I chose

6    that particular level.

7        Q.  What was the next step?

8        A.  I then separated each of the controls into

9    three separate samples, label them C1, C2, C3.

10   And I did the same for the acetaldehyde, I

11   separated them into three samples labeling, A1,

12   A2, A3.

13            I did that because I wanted to be

14   sure that I was creating a statistically

15   significant test so I could monitor the effect in

16   triplicate measurements for each sample, so that I

17   had undertaken an appropriate statistically

18   significant experiment.

19       Q.  And what did you do next?

20       A.  What I did next is then I stressed those

21   samples.  And I stressed those samples at 60

22   degrees centigrade.

23       Q.  Why did you use an elevated temperature?

24       A.  I used an elevated temperature because in

1    preliminary experiments I had looked at room

2    temperature, I looked at 40 degrees, I looked at

3    60 degrees, and I chose to use 60 degrees because

4    that gave me the greatest amount, the largest

5    amount of the oxidative degradation of the drug.

6              As you increase the temperature, you

7    increase the rate at which the drug degrades, so

8    over the time period of my experiment I was

9    getting more degradation with the higher

10   temperature than I was at 40 and with room

11   temperature, and that's why I chose 60 degrees.

12   Q.  Could you have used room temperature or 40

13   degrees Celsius for your stress test?

14   A.  I could have, but that would taken longer,

15   and the point of the stress test is that one can

16   look at -- one can increase the rate of that

17   degradation and look at it over a shorter period

18   of time.  The same mechanism, the same

19   chemistries occur, although it's just occurring

20   slower at lower temperatures, so you're seeing

21   the same degradation product.

22   Q.  Did you see enough degradation product at

23   room temperature at 40 degrees Celsius to run the

24   stress test in the time that you conducted your

1    stress test at?

2        A.  I didn't think so, and that's why I chose

3    the 60 degrees.  I thought 60 degrees would be

4    over the time frame that I wanted to run the

5    experiment, and I thought that was appropriate, I

6    thought it was sufficient at 60 degrees.

7        Q.  Why was it appropriate to use a

8    temperature that generated sufficient

9    degradation?

10        A.  Over the time scale of the experiment

11    because I used that temperature, I saw as I will

12    show you, I saw the same two key degradation

13    products that one sees for oxidative degradation

14    of rivastigmine, and I saw them in sufficient

15    amounts over the time period of the experiment

16    such that I could then compare the levels of

17    those degradation products in the control sample

18    without acetaldehyde and the samples with

19    acetaldehyde, certain level you had to undertake

20    that head to head stress test.

21        Q.  Could you have done that comparison if you

22    had not seen sufficient levels of degradation?

23        A.  No, I could not have done that.

24        Q.  And why not?

1          A.  Because if you don't see sufficient levels

2     of degradation, then you can't deduce whether or

3     not that this head to head study, the only

4     variable that's changing, the presence or absence

5     of acetaldehyde, and you wouldn't be able to

6     distinguish that affect whether or not

7     acetaldehyde did indeed have an affect, did

8     indeed prevent the oxidative degradation, you got

9     to induce oxidative degradation before you can

10    see the effect of reducing it.

11         Q.  Are there examples in the literature of

12    the use of peroxides at 60 degrees Celsius in

13    stress tests?

14         A.  There is a range of temperatures in the

15    literature and 60 degrees falls within those

16    ranges.  So, for example, Alsante talks about

17    peroxide stress testing ranging from room

18    temperature to greater than 50 degrees

19    centigrade.  The Bianchini testing talks about

20    room temperature up to 100 degrees centigrade.

21    Singh talks about peroxide stress testing up to a

22    hundred degrees centigrade.  And the US patent

23    '498 talks about taking stress testing up to

24    around 60 degrees centigrade.

1        Q.  And what oxidizing agent was used at 60

2    degrees Celsius in the '498 patent?

3        A.  It's the same, the TBHP, the hydroperoxide

4    that I used.

5              MS. JACOBSEN:  Your Honor,

6    plaintiffs introduce into evidence JTX 78.

7              MR. BROWN:  No objection, Your

8    Honor.

9              THE COURT:  Admitted without

10   objection.

11             MS. JACOBSEN:  For the record,

12   Dr. Davies referred to JTX 74 in column five

13   lines 61 to 65, JTX 75 at page 68, JTX 77 at

14   pages 1056 and 1058, and JTX 78 at page four.

15   BY MS. JACOBSEN:

16       Q.  What was the next step, Dr. Davies?

17       A.  The next step, once I incubated my

18   samples, stressed them at 60 degrees C, I then

19   took samples at key time points.  I took samples

20   at three time points, 6, 15 and 21 hours.  I took

21   the samples of those time points because I wanted

22   to see what was happening to the oxidative

23   degradation over a period of time.  I wanted to

24   see how the level of the degradation product was

1    changing as the function of time, over the time

2    scale of my experiment.

3             I then wanted to see whether or not

4    acetaldehyde had any influence over that as a

5    function of time.  My experiment was designed,

6    the only differences, the presence of

7    acetaldehyde.

8    So is acetaldehyde reducing the level of

9    oxidative degradation products at 6, 15 and 21

10   hours across the board, that's what I wanted to

11   see.

12       Q.  Why did you choose those time points?

13       A.  Those time points allow me to as I say,

14   watch the change in the levels of the oxidative

15   degradation as a function of time.  They also

16   allowed me to undertake a good statistical

17   analysis of my data.

18       Q.  And did you conduct any preliminary stress

19   testing to determine whether those were

20   appropriate time points?

21       A.  Yes, I did.  In my preliminary test, I

22   looked at the -- I looked at I think up to around

23   14-and-a-half hours, and after -- with the three

24   different temperatures, and I showed that up to

1    that time point I was getting sufficient

2    degradation, so these three time points were good

3    to use for my stress test as I will go on to

4    show.

5         Q.  Are there examples in the literature of

6    stress tests conducted over this time period?

7         A.  Yes, there are.  So Alsante talks about

8    maximum duration ranging from a day to seven

9    days.  Bianchini talks about stressing anywhere

10   from 7.2 hours to 30 days.  Singh talks about the

11   API was stressed typically between one and 24

12   hours, so the time frame that I'm looking at is

13   typical of what would be employed by scientists

14   undertaking a stress test.

15             MS. JACOBSEN:  For the record,

16   Dr. Davies referred to JTX 75 at pages 67 to 68,

17   JTX 77 at page 1058, and JTX 78 at page four.

18   BY MS. JACOBSEN:

19        Q.  And what did you do with the samples that

20   you collected at each time point?

21        A.  What I did was I then used the technique

22   of high performance liquid chromatography.  High

23   performance liquid chromatography is a standard

24   technique used in the pharmaceutical industry to

1    separate and to identify and quantify the level

2    of drug and drug degradation product.

3        Q.  How does HPLC work?

4        A.  HPLC or high performance liquid

5    chromatography, this is very simple schematic to

6    illustrate the point and I'll show a little video

7    related to that.

8             You have a test sample, your test

9    sample contains a mixture of compounds.  That's

10   injected into the HPLC system where it's carried

11   along by fluid into an HPLC column.  The HPLC

12   column is designed to separate different

13   components of the mixture.  And these will come

14   and pass through the column depending on how they

15   interact with the column at different rates.

16            And then, they will be separated,

17   come off the column and be detected in some way.

18   In this case, I have used light, UV lights as a

19   detection.  And then what you see, you see is a

20   chromatogram where the chromatogram is time as a

21   function of coming off the column, and then

22   detection is the level of detection in the UV

23   detector.

24

1          A.  And the time at which it comes off the

2     column helps to identify the compounds as the

3     level of detection, also helps you to understand

4     how much is present in the sample.  So if we run

5     them in the video, here's a mixture.  It separates

6     it.

7                    One comes off the column.  You see

8     it in this chromatogram.  Next one comes off the

9     column.  You see it in the chromatogram.

10                   Finally the last one comes off the

11    column the slowest.  You see this in the

12    chromatogram.  As I said, we can use the position

13    that it comes off the column to help identify

14    compounds.

15                   We can use also the amount, the area

16    or the peak helps you establish how much is

17    present, sorry, coming off the column.

18         Q.  And what did your HPLC results look like?

19         A.  This is an example of an HPLC printout and

20    it's taken from, excuse me, Control-2 sample at

21    21 hours.  And here we have the chromatogram.  We

22    have time along here in minutes, time it takes to

23    come off the column.

24                   We have the response of the

1    detection shown here.  We have three main peaks

2    that I've highlighted.

3              The main peak in the center here is

4    Rivastigmine.  We're actually looking at the base

5    of the peak.  The peak actually extends beyond

6    what I've shown here.

7              And on the side of that, we have a

8    peak here, which is Impurity 4.  There's a peak

9    here, which is ECAV.

10              Now, how do I know each one of those

11    is other chemicals that I've stated?  Well, I

12    have a standard for Rivastigmine and that

13    standard comes off of this time point.

14              I also was able to obtain a standard

15    for Impurity 4.  And that, again, comes off --

16    the standard came off of this time port.  So

17    that's the standard where the scientists within

18    the pharmaceutical industry use to establish the

19    identity of the peak in this way.

20              I also then looked at this peak.  I

21    didn't have a standard for ECAV.

22              ECAV is -- excuse me.  What I was

23    able to do is take a UV spectrum of the compounds

24    in that peak and the UV spectrum was identical to

1    the same UV spectrum undertaken by Par and their

2    scientists.  So that demonstrated to me that this

3    was ECAV.

4              Now, this is one of my typical HPLC

5    printouts and I just want to point something out.

6    I'm seeing the drug and I'm seeing the two key

7    degradation products in my stress test.

8              And the point of that -- this is the

9    control and the point's sample.  And the point I

10   want to make is I've replicated what is known

11   about the oxidative degradation of Rivastigmine.

12             I've replicated this in a way that

13   I've identified the two key degradation products

14   of Rivastigmine.  So, in my stress test, I'm

15   replicating what is known, the known mechanism

16   for oxidative degradation of Rivastigmine.

17       Q.  And the Rivastigmine and Impurity 4

18   standards that you referred to, was that

19   something you were able to purchase?

20       A.  That's correct.

21       Q.  And do you understand that Dr. Ganem has

22   asserted that other compounds could have been

23   formed by side reactions with TBHP in your stress

24   test?

1        A.   That's correct.

2        Q.   And do you agree?

3        A.   I don't. Dr. Ganem doesn't go -- doesn't

4    tell us what those compounds are equally.  And

5    I've shown in my test and my results.  I've

6    shown that I've identified two key degradation

7    products of -- for the known -- for Rivastigmine

8    undergoing oxidative degradation.

9             But I also undertook a mass-balance

10   analysis where I, through that mass-balance

11   analysis, that these three peaks account for over

12   99 percent of the peaks that come off the column.

13   That demonstrates to me that I am looking at the

14   two key degradation products and the drug in this

15   analysis.

16             And as I will show you, those two

17   key degradation products change as a function of

18   time in a manner which is consistent with the

19   oxidative degradation of Rivastigmine.  So I

20   don't think there's any basis for Dr. Ganem's

21   position there could be other key degradation

22   products formed.  In fact, he doesn't identify

23   what those are.

24        Q.   And when you ran your stress test, what

```
1     did you observe?

2         A.  When I ran my stress test, what I observed

3     that, as a function of time in the control

4     samples, the key degradation products increased

5     as a function of time.  When I compared those

6     samples, control samples to the samples that

7     contain acetaldehyde, I saw that, as a function

8     of time, less of these impurities in degradation

9     products were formed.

10            That demonstrates to me -- and I

11    quite want to show statistically -- there's a

12    statistical significance between the control and

13    the acetaldehyde samples demonstrating that

14    acetaldehyde is reducing the oxidative

15    degradation of Rivastigmine.

16        Q.  And --

17        A.  I have a little figure to demonstrate

18    that.  Okay.

19            So this is the start point.  And at

20    the start point, you see there's the peak for

21    Rivastigmine here.  And I'm going to -- in this

22    short video, I'm going to show -- I'm going to

23    show the control samples in orange and the

24    acetaldehyde samples in purple.
```

1              And for the purpose of this, I'm

2       just going to overlay them, so you can see how

3       they rise as a function of time.  So if we start

4       the video when you're ready.

5              If we go up, the -- the sample is

6       taken up to the first time point at six minutes.

7       And you see that there's a rise in the levels of

8       these two impurities.

9              And the rise in the level of the two

10      impurities is different for the control samples

11      relative to the samples with acetaldehyde.  The

12      acetaldehyde samples are shown in purple.  The

13      control samples are shown in orange.

14             And you see that the control samples

15      are higher than the levels reported for the

16      samples with acetaldehyde actually if you look at

17      the level of Rivastigmine.  There's more

18      Rivastigmine present in the sample shown here

19      with acetaldehyde than there is without

20      acetaldehyde.

21             If we continue onwards, this goes on

22      to the 15-hour mark.  And, again, you're seeing

23      the same effect.  You're seeing the difference

24      becoming more pronounced.

1              You're seeing the level of the

2      control are higher than that for the two key

3      degradation products that acetaldehyde -- you're

4      also seeing when one looks at the drug, you're

5      seeing high levels of the drug relative to that

6      with acetaldehyde present and then without.

7              If one continues onwards to the

8      final time point, there's the 21 hours.  You see

9      that stark difference between the two sets of

10     samples.

11             The control samples are higher in

12     terms of the two impurities relative to that

13     acetaldehyde sample.  And the level of the drug

14     is also higher, as one would expect, in the

15     acetaldehyde sample, because the acetaldehyde

16     compound is reducing the oxidative degradation of

17     the drug.

18     Q.  Thank you, Dr. Davies.  I think you

19     misspoke when you said the first time point was

20     six minutes.

21     A.  I thought I did.  I apologize.

22     Q.  Not at all.  What was the first time

23     point?

24     A.  I wondered if I had said minutes.  It's

1    six hours.

2         Q.   Thank you.

3              Dr. Davies, can you summarize your

4    test results?

5         A.   Yes.   This is a table where I tried to

6    summarize the results and it does show the

7    results.

8              These, I'm showing it in bar charts,

9    and I've done it for the six-hour time, the

10   15-hour time and the 21-hour time.   And in

11   accordance with the bar chart for the six-hour

12   time, what I've done is I've added together the

13   percentages for the two key oxidative degradation

14   products.

15             And, again, I've cut -- color-coded

16   the two sets of samples.   Orange is the control,

17   the without acetaldehyde.

18             The purple is the control -- is the

19   sample with acetaldehyde present in my

20   head-to-head study.

21             And I've given you the total

22   percentages here for comparison and I've done

23   that for each of the time points.   And as you can

24   see, at each point, there's more of the

```
 1    degradation compounds in the sample without

 2    acetaldehyde in the control sample.

 3               There's less degradation products in

 4    each one of the samples with acetaldehyde.  So

 5    there's direct evidence.  There's only one

 6    variable occurring here, the presence or absence

 7    of acetaldehyde.

 8               And it's showing in each case at

 9    each time point, there's less degradation

10    products in the samples with acetaldehyde.

11       Q.  And approximately how much less is there

12    at each time point?

13       A.  It's approximately 30 percent.

14       Q.  Were you able to draw any conclusions from

15    your test results?

16       A.  Yes.  I was able to draw the conclusion

17    that acetaldehyde reduces -- is an agent which

18    reduces the oxidative degradation.  It confirms

19    that acetaldehyde is an antioxidant.

20       Q.  Did you measure whether there was any

21    acetaldehyde left in your test samples after six,

22    15 and 21 hours?

23       A.  No, I did not.

24       Q.  And how did you know the reduction in
```

1    oxidative degradation was due to acetaldehyde?

2         A.  Well, I know it because the data shows me.

3    There's only one variable in play here, the

4    presence or absence of acetaldehyde.  And I

5    designed the experiments in a way that I know

6    acetaldehyde is a known reducing agent.  Reducing

7    agents can act as antioxidants.

8              My test clearly demonstrates that

9    acetaldehyde is an antioxidant.

10        Q.  And Dr. Davies, there is a notation on

11   this slide, P less than 0.05 for all samples.

12   What does that indicate?

13        A.  What that indicates is that one could look

14   at this data, as we have done, and you can

15   consistently see that looking at the bar charts

16   that there is always less in the samples with

17   acetaldehyde relative to the control.  But you

18   can also undertake a statistical analysis.  And I

19   undertook a statistical analysis to see whether

20   or not the data between these two sets of samples

21   at each time point, does it come from the same

22   population, or is it different.  Can I say these

23   two sets of data are statistically different.

24              So I ran what is called a two sample

```
 1    T-test.  This is a standard test used to look at,

 2    to see whether or not two samples are the same or

 3    are they different.  And I showed that -- the P

 4    value here is the notation that's used.  And I

 5    showed with my data, related to the probability

 6    and I showed in my data that there is 95 percent

 7    confidence that these two sets of data are

 8    different.  So I have 95 percent confidence

 9    levels that the samples without acetaldehyde, the

10    control samples, are different than the

11    samples with acetaldehyde.

12       Q.  Do you understand that Par's expert, Dr.

13    Michniak-Kohn disagrees that your results are

14    statistically significant?

15       A.  Yes, I understand that.  I don't think

16    Dr. Michniak-Kohn disagreed with the use of the

17    T-test.  She just disagrees with the way in which

18    I have undertaken that.

19              If we go to the next slide, I can

20    explain that.

21              I undertook this test where I had

22    used what is called a T-test, it's a one-tailed

23    T-test.  What that means is that you have some

24    understanding of the test at the direction at
```

1    which the change may occur.  So I had some

2    expectation that acetaldehyde would either not or

3    it would reduce the oxidative degradation of

4    rivastigmine.

5              Now, I based that on my knowledge of

6    the molecules -- of the reducing agent.  That a

7    reducing agent's known to act as an antioxidant.

8    They reduce the level of oxidative degradation.

9    Dr. Michniak-Kohn suggested that well, you can't

10   assume that.  She suggested that acetaldehyde

11   could not only reduce -- that it not only reduces

12   oxidative degradation, but it could increase the

13   oxidative degradation, the so-called two-tail

14   test.

15             I don't agree with that, but anyway

16   I undertook that test.  One undertakes that test

17   where it could either decrease or increase the

18   oxidative degradation.  I get values of 90 --

19   greater than 90 percent confidence that the two

20   sets of data are statistically significantly

21   different.

22   Q.  And what does that mean if you have 90

23   percent confidence that the two data sets are

24   different?

1          A.   It means that acetaldehyde is an

2     antioxidant for rivastigmine using that approach.

3          Q.   Have you seen any evidence that

4     acetaldehyde can promote oxidative degradation?

5          A.   No, I have not.

6          Q.   Did you consider the Albano and McNesby

7     articles raised by Dr. Ganem?

8          A.   Yes, I did.

9          Q.   Does the Albano reference teach that

10    acetaldehyde promotes oxidation?

11         A.   Well, this paper shows about the free

12    radical activation of acetaldehyde and its role

13    in protein alkylation.  This is a process

14    occurring in vivo in the body.  And the

15    acetaldehyde is oxidized using an enzyme,

16    xanthine oxidase.  Xanthine oxidase is a

17    particular enzyme in the body that is known to

18    change compounds such as acetaldehyde.  And in

19    the case of acetaldehyde forms -- that occurs in

20    the body as an important process that occurs in

21    the body in vivo.  There is no xanthine oxidase in

22    my test and there are no such conditions in my

23    test.

24         Q.   What about the McNesby article?

1           A.  Yes, the McNesby article talks about when

2     exposed to oxygen or air, an aldehyde is slowly

3     oxidized to the corresponding peracid which

4     further reacts with the aldehyde to form the

5     normal acid and the peracid.  But if you read

6     further into the article, it talks about Kagan

7     and Lubarksy were the first to isolate a complex

8     using acetaldehyde and peracid, and their

9     complex were stable at minus 30 degrees

10    centigrade and decomposed to normal acid that

11    would be acetic acid on heating or on treatment

12    with catalyst.

13          So the point is this peracid of

14    acetaldehyde is only stable at minus 30 degrees

15    centigrade, it only exist at that temperature it

16    doesn't exist at temperatures at say above that,

17    so it's not relevant to this particular case.

18          Q.  And is minus 30 degrees Celsius, do you

19    know what that is in Fahrenheit?

20          A.  I think it's -- I'm not really good on

21    Fahrenheit, but I think it's around minus 20.  Is

22    that right?  I'm not very good at that.

23          Q.  If we go back to your statistical

24    analysis, what happens if you run a two-tailed

1      T-test?

2          A.  So if you run the two-tailed T-test, so if

3      you run this two-tailed T-test where you don't --

4      you assume you go either reduce oxidation or

5      increase oxidation, you get a confidence of

6      greater than 90 percent that acetaldehyde is an

7      antioxidant for rivastigmine.

8          Q.  There is a reference there to unequal

9      variance.  What is that?

10         A.  Yes, Dr. Michniak-Kohn suggested that I

11     couldn't assume that the two sets of samples have

12     equal variance.  And here variance relates to

13     this is a statistical term.  It relates to the

14     variation of the data around the mean.

15              Now, I actually set up my experiment

16     in such a way that I used the same number of

17     samples in each data set.  I also only had one

18     variable changing, the presence or absence of

19     acetaldehyde.  In such circumstances the use of

20     equal variance is appropriate.

21              However, I did calculate based on

22     the two-tailed test using unequal variance what

23     the confidence would be, and it showed that the

24     confidence would range from 87 to 94 percent

1    confidence that acetaldehyde is an antioxidant

2    for rivastigmine.

3        Q.  Did you confirm whether your assumption of

4    equal variance was appropriate?

5        A.  Yes.  I did a further test called the

6    statistical test called the F-test.  Using the

7    F-test you can test whether or not two sets of

8    samples, whether the variances are equal or

9    different.  And again, using the F-test I was

10   able to show that, in fact, the two sets of

11   samples had equal variance.

12       Q.  Did you draw any conclusion from that?

13       A.  Yes.  Sorry.  I drew the conclusion that

14   my use of equal variance is appropriate, and it

15   showed that I was getting, even if I used the

16   two-tail test which I don't think is appropriate,

17   I was getting 90 percent or greater confidence

18   that acetaldehyde is an antioxidant for

19   rivastigmine.

20       Q.  Did you conduct any other statistical

21   analysis on your data?

22       A.  I did.  Then I went on to use the

23   technique used linear regression analysis.  In

24   linear regression analysis it looks at the rate

1    in which the two sets of samples form the key

2    degradation products.  And it compares those

3    rates using residuals.  And when you use that

4    approach, I found that I had greater than 99

5    percent confidence that acetaldehyde is an

6    antioxidant for rivastigmine, whether I used a

7    one-tail or a two-tail approach.

8        Q.  Dr. Davies, can you please turn to tab 19

9    in your witness book.  And there you will find

10   JTX 66.

11       A.  Yes.  That's appendix E from my opening

12   report, describing my stress test.

13            MS. JACOBSEN:  Your Honor,

14   plaintiffs move to introduce JTX 66 into

15   evidence.  I believe there was an objection, but

16   I think we have resolved it.

17            MR. BROWN:  Yes, Your Honor, we will

18   not object to this coming in for the data that's

19   in it as long as it doesn't come in for the

20   opinions that are provided in it.  And we have

21   conditioned that on Novartis also introducing

22   into evidence an underlying laboratory notebook

23   and some underlying raw HPLC data, as long as it

24   all comes in.

```
 1                   THE COURT:  So basically the numbers

 2      are in, the opinions are not.

 3                   MR. BROWN:  Correct.

 4                   THE COURT:  Okay.  It's admitted

 5      with that stipulation.

 6                   MS. JACOBSEN:  Thank you, Your

 7      Honor.

 8                   MS. JACOBSEN:  Thank you, Your

 9      Honor.

10      BY MS. JACOBSEN:

11         Q.  And, Dr. Davies, can you turn to Tab 20 in

12      your witness book?  And there you'll find PTX

13      103.

14         A.  Yes.  That's my laboratory notebook and

15      also some -- the HPLC column chromatograms

16      column.

17         Q.  Is that the data underlying stress tests

18      and the data in Appendix E that we just looked

19      at, JTX 66?

20         A.  That's correct.

21                   MS. JACOBSEN:  And, Your Honor,

22      plaintiff would move to introduce into evidence

23      PTX 103.

24                   MR. BROWN:  No objection.
```

```
 1                    THE COURT:  Admitted without

 2   objection.

 3   BY MS. JACOBSEN:

 4      Q.  And then, Dr. Davies, can you please turn

 5   to Tab 43 of your witness book?  It should be the

 6   last tab.

 7                    And you should have JTX 170.

 8      A.  Yes.

 9      Q.  Do you recognize that document?

10      A.  This is my laboratory notebook.

11                    MS. JACOBSEN:  And, Your Honor,

12   plaintiffs move to introduce JTX 170 into

13   evidence.

14                    MR. BROWN:  No objection.

15                    THE COURT:  Admitted without

16   objection.

17   BY MS. JACOBSEN:

18      Q.  And then, Dr. Davies, can you please turn

19   to Tab 21 of your witness book?  And there you'll

20   find PTX 365.

21      A.  Yes.  This is the -- this is a copy of the

22   slide that we were just looking at of the stress

23   test confirming acetaldehyde is an antioxidant.

24                    MS. JACOBSEN:  And, Your Honor,
```

1    plaintiffs move to introduce into evidence PTX

2    365.

3             MR. BROWN:  Your Honor, we object to

4    this as an improper summary.  It contains, among

5    other things, opinions about the list of

6    statistical significance.  And the way the data

7    is presented, we move is argumentative.

8             And while we wouldn't object to a

9    proper summary, but we do object to this data.

10            THE COURT:  Ms. Jacobsen.

11            MS. JACOBSEN:  It's a summary chart

12    of and you see a great deal of numbers and raw

13    data that are provided in Dr. Davies' Appendix E

14    from his report.  The data is just reporting the

15    numbers, and the statistical notation is

16    reporting the results of Dr. Davies' test.

17            THE COURT:  All right.  Well, I'm

18    going to sustain the objection.  I will submit it

19    as a court exhibit, so there is a demonstrative

20    exhibit in the record.

21            It seems to me that Dr. Davies has

22    essentially testified at one time or another to

23    all of these numbers, so I think, I don't know,

24    by not having this as an exhibit, I don't think

1     you're actually losing anything.

2            MS. JACOBSEN:  We haven't read all

3     the percentages into the record and that would be

4     a way of providing all of those percentages to

5     the Court.

6            MR. BROWN:  Your Honor, the

7     Appendix E exhibit that we talked about a minute

8     ago provides all of the data and in a convenient

9     chart form.  This is not providing a summary of

10    the data.

11           The data is readily readable within

12    that document.

13           THE COURT:  I presume you've looked

14    and saw the numbers that are actually in this

15    exhibit that are, in fact, reflected in the

16    record somewhere.

17           MR. BROWN:  I believe.  Well, the

18    numbers that are not reflected in the record

19    somewhere are the totals, the 2.49 and the 3.55.

20    He didn't provide those in his report.

21           THE COURT:  That's the total.  But,

22    for example, the 2.49, the 1.57 and the 0.92 are

23    in the record?

24           MR. BROWN:  Those are in the record.

```
1                    THE COURT:  I can understand I can

2     get the 2.49 from those two numbers.  Okay.  So I

3     think we're arguing about something that's

4     actually not terribly important here.

5                    So let's move it on.  But I will

6     sustain the objection to it coming in as having

7     some independent value.

8                    MS. JACOBSEN:  Thank you, Your

9     Honor.

10    BY MS. JACOBSEN:

11       Q.  So, Dr. Davies, before we move on, can you

12    briefly summarize your opinions with respect to

13    the first issue, which is whether acetaldehyde is

14    an antioxidant?

15       A.  Yes.  I believe acetaldehyde is an agent

16    which reduces oxidative degradation.

17                    I believe my test has shown that and

18    I believe acetaldehyde is an antioxidant.  That

19    confirms the literature that I have cited in

20    terms of acetaldehyde being a reducing agent.

21    Reducing agent is a known antioxidant.

22       Q.  Dr. Davies, did you perform any stress

23    testing on Par's ANDA products?

24       A.  No, I did not.
```

1        Q.  Why not?

2        A.  I was not able to do that because, in my

3    test, I was able to perform a head-to-head test

4    where there's only one variable change.  But in

5    Par's ANDA products, I wasn't able to obtain a

6    product where I was able to compare products with

7    and without acetaldehyde where that was the only

8    variable that they would be changing.

9        Q.  And why were you not able to obtain that

10   product?

11       A.  Because I wasn't able to obtain products

12   where they were adhesive, for instance, with and

13   without acetaldehyde.  I wasn't able to obtain

14   those products.

15            I was also not able to make the

16   products.  The only people who could actually

17   make those products is Par with or without the

18   presence of acetaldehyde, keeping everything else

19   the same.

20       Q.  And, Dr. Davies, did you consider Par's

21   stability data relating to the ANDA products?

22       A.  I did.

23       Q.  And what data did you consider?

24       A.  I considered the data performed, their

1    accelerated stability and also their long-term

2    stability studies on their batches.

3         Q.  And which batches did you consider?

4         A.  There were nine of them.  One of the

5    batches, they didn't test for acetaldehyde.

6              There were two of the batches where

7    it was said there is none detected meaning below

8    limits of detection of acetaldehyde.  And there

9    was six batches where they did detect

10   acetaldehyde.

11        Q.  And what do you understand Par's position

12   to be with respect to this data?

13        A.  I believe Par's position is -- I believe

14   their expert, Dr. Buckton believes that if you

15   compare the level of the degradation products in

16   Par's ANDA batches, those batches which contain

17   no acetaldehyde and compared to the levels of

18   degradation products with those that do contain

19   acetaldehyde, he believes you can conclude that,

20   in fact, acetaldehyde is not an agent to reduce

21   oxidative degradation.

22        Q.  And you mentioned batches of Par's ANDA

23   products where there was no acetaldehyde?

24        A.  Sorry.  Non-detectable.

1      Q.  And do you agree with Dr. Buckton's

2   opinion with respect to this data?

3      A.  I don't because I don't think you can make

4   that determination.  There are two reasons why I

5   believe that's the case.

6           The first reason is important is

7   that you can't set up this head-to-head study

8   where the only variable changing is acetaldehyde.

9   There's nine different batches.

10          The different components of those

11  batches, the dry adhesive, the tackifier, et

12  cetera, there's no batch that's made with the

13  same components.  Different -- different lot

14  numbers are used.  Different lots of the

15  components are used to make those batches.

16          Because of that batch-to-batch

17  variation in the lots used for the different

18  components, there are other variables in play.

19  So, therefore, you can't say, based on that,

20  that -- you can't exclude the effect of other

21  components on the degradation properties that are

22  formed.

23     Q.  And can you illustrate that point by

24  reference to the next slide?

```
 1       A.   Yeah.   I have a slide which illustrates
 2   that point.
 3              This is a very bright, colorful
 4   slide, but I've done it to illustrate a point.
 5   What I've done is that I've shown here the ANDA
 6   batch numbers shown here.  And on the right-hand
 7   side, I'm showing this is the batch where
 8   acetaldehyde was not tested.
 9              There's a line drawn and then
10   there's two batches here.  These are batches
11   where acetaldehyde is not detected.
12              And then, finally, below that
13   further line, these are the batches where
14   acetaldehyde is detected.  Now, what I've done,
15   I'm just showing here the backing layer, the
16   drug-in-adhesive layer and the release liner.
17              And within the drug-in-adhesive
18   layer, I'm showing three key components:  The
19   adhesive, the Rivastigmine, the tackifier.
20              And what I've done is I'm showing
21   here lot numbers of the components.  I'll
22   highlight on the drug adhesive layer.
23              And I've given each lot number, a
24   combination of lot numbers or different color.
```

1    And if you just look at the colors to illustrate

2    the point, no batch is made with the same

3    combination across the board for the backing

4    layer right through the release liner.

5              No batch is made with the same

6    combination of colors.  And that illustrates the

7    point.  There's batch-to-batch variability in the

8    lots that are used to manufacture the product.

9              So, for this reason, that one cannot

10   -- and it's for this reason that one cannot use

11   -- rule out the effect on the variation in the

12   lots used to manufacture the product of the data.

13      Q.  And, Dr. Davies, can you please turn to

14   Tab 24 of your witness book.  You'll find PTX

15   364.

16      A.  Yes.  This is the table from which these

17   lot numbers are drawn.  And that's correct.

18              MS. JACOBSEN:  And, Your Honor,

19   plaintiff's move to introduce into evidence PTX

20   364.

21              MR. BROWN:  No objection.

22              THE COURT:  Admitted without

23   objection.

24              MS. JACOBSEN:  And for the record,

```
1    Dr. Davies is referring to PTX 364 discussing the

2    batch variability.  And the information on this

3    slide also comes from JTX 180, JTX 181, JTX 192,

4    JTX 197, JTX 198, JTX 199, PTX 352 and PTX 353.

5    BY MS. JACOBSEN:

6        Q.  And, Dr. Davies, why was the

7    batch-to-batch variability relevant to your

8    analysis?

9        A.  It's relevant to my analysis because of

10   that batch-to-batch variability.  You cannot

11   conclude from the stability data that

12   acetaldehyde is not an agent that reduces

13   oxidative degradation.

14             Because of this batch-to-batch

15   variability, there are multiple variables at play

16   here.  So, for that reason, you cannot draw that

17   conclusion.

18       Q.  And is there any batch in which

19   acetaldehyde was not detected that is made with

20   the same components as one made with one in which

21   acetaldehyde was detected?

22       A.  Yes.  If one looks at -- I'll show this,

23   if one looks at these top two batches, here, you

24   see --
```

1      Q.  Dr. Davies, sorry to interrupt you, but I

2   think you misheard my question.  Can we just go

3   back to the previous slide just so we're clear.

4   And I was asking you about the batches with

5   acetaldehyde not detected, and acetaldehyde

6   detected.

7            And is there any batch made with the

8   same components or any two batches made with the

9   same component one in which acetaldehyde was

10  detected and one in which acetaldehyde was not

11  detected?

12     A.  There is no -- for these two sets, if we

13  look at the colors, it illustrates the point as I

14  have said before, that no batch has been made

15  with the same combination of lot numbers.  That's

16  important.  That's important because it shows

17  that there is batch-to-batch variable in the lots

18  that one uses, therefore, in the samples which

19  have been tested for acetaldehyde, therefore, one

20  cannot use this information -- there are other

21  variables that are going to be in play that can

22  influence the interpretation of the stability

23  data.  It's not a direct head-to-head comparison.

24     Q.  Thank you, Dr. Davies.

1              And other than the batch-to-batch

2    variability, is there any other reason that you

3    disagree with Par's position regarding its

4    stability data?

5    A.  Yes.  If one looks at -- I was going to

6    talk about it.  If one looks at these two, top

7    two patches, if we move to the next slide I'll

8    explain it.  If you look at these top two

9    patches, these are patches which are produced

10   wherein this case they do have the same

11   combination of lots for the drug-in-adhesive

12   layer, all be it, that one of them, acetaldehyde

13   was not tested.

14              Now, if you look at the stability of

15   these two, these are made with exactly the same

16   ingredients that I have shown, if you look at

17   that stability data, for the 110177, you get for

18   the two impurities values of .2 which is a total

19   of .4 over a six-month period.

20              If you look at the 110110 lot, you

21   getting values of less than .1.

22              Now, that's important because that's

23   illustrating the point.  Even with the same

24   level, same -- using the same lots, we're getting

1    batch-to-batch variability of the components in

2    terms of their stability.

3              There is also another important

4    point to make here is that these values as shown

5    here actually come from a single patch.  And if I

6    go to my next slide I'll show that point.

7              Only one patch is used to determine

8    degradation products.  So you can see here it

9    talks about the impurities and the method test

10   one patch so here you have the data that's

11   generated for the stability data is simply from

12   one patch out of the thousands that are in that

13   particular batch.

14             In that case, I don't think you can

15   use the data from one patch.  Together with my

16   concerns of the lot variability, you can't use

17   that information to draw conclusions about

18   whether acetaldehyde is acting to reduce the

19   oxidative degradation, or is an antioxidant in

20   Par's products.

21             MS. JACOBSEN:  Your Honor, for the

22   record, Dr. Davies referred to PTX 348, page 778,

23   PTX 349 at page 786, and PTX 350 at page 796.

24   And those are the excerpts from Par's ANDA

1    specifications.  And I'm told I misspoke.  The

2    reference to PTX 350 was page 794.  Dr. Davies

3    also referred to the stability data.

4    BY MS. JACOBSEN:

5        Q.  And Dr. Davies, if you can turn to tab 25

6    in your witness book, can you identify that

7    document?

8        A.  Yes, this is a portion of 3M's documents,

9    again, part of their ANDA highlighting stability.

10       Q.  Was that the data that you relied on in

11   preparing the slide on patch-to-patch

12   variability?

13       A.  That's correct.

14              MS. JACOBSEN:  Your Honor,

15   plaintiffs move to introduce into evidence JTX

16   200.

17              MR. BROWN:  No objection.

18              THE COURT:  Admitted without

19   objection.

20              MS. JACOBSEN:  For the record,

21   Dr. Davies referred to JTX 200 at pages 3M 9355

22   and 3M 9357.

23   BY MS. JACOBSEN:

24       Q.  Dr. Davies, let's move to the second

1      issue, whether Par's ANDA describes products that

2      contain about .01 to about 0.5 percent by weight

3      of an antioxidant.

4                  Can you explain the dispute with

5      respect to this claim element?

6         A.  Yes.  The dispute is whether or not the

7      acetaldehyde that's present in Par's product

8      falls within that claimed range.

9         Q.  And does it?

10        A.  It does based on the specification that

11     Par sets for acetaldehyde, the specification

12     states that there could be up to a thousand parts

13     per million which is .1 percent by weight.

14        Q.  Did you compare the amount in Par's

15     specification with the '031 patent?

16        A.  Yes, I did.

17                 As I said, Paris shown on the left on

18     this slide, Par's own specification permits

19     not more than a thousand parts per million or 0.1

20     percent by weight of acetaldehyde.  If you think,

21     that falls within the range of the '031 patent

22     claim of about 0.01 to about 0.5 percent by

23     weight of an antioxidant.

24        Q.  What amounts that are permitted by Par's

1    ANDA specification fall within the claim range of

2    about 0.01 to about 0.5 percent by weight?

3        A.   That would fall -- that would be from a

4    hundred to a thousand parts per million.

5        Q.   And what's that in weight percent?

6        A.   That is 0.01 to 0.1 percent by weight.

7             MS. JACOBSEN:   For the record,

8    Dr. Davies referred to JTX 1, that's the '031

9    patent, and PTX 348, page 780, 349 and 788, 350,

10   and 796?

11       Q.   And Dr. Davies, in providing your answer

12   of what amounts within Par's ANDA specification

13   fall within the claim range, were you also

14   considering in that answer the claim, scope of

15   the claim term about, or was that leaving that

16   aside?

17       A.   Leaving that aside.

18       Q.   And on Par's ANDA specification submitted

19   to the FDA?

20       A.   Yes, they were.

21       Q.   What was the basis for Par's ANDA

22   specification for acetaldehyde?

23       A.   The basis was a scientific evaluation of

24   the acetaldehyde and also measurements of the

```
1    levels in prototype batches and what amount of

2    acetaldehyde were observed in Par's prototypes.

3              As this slide shows, in the

4    prototype patches they measured up to 402 parts

5    per million for one patch, and 224 parts per

6    million for others.  That's 0.04 and 0.02 percent

7    by weight.

8        Q.  And Dr. Davies, could you please turn to

9    tab 26 in your witness binder where you'll find

10   JTX 65?

11       A.  Yes.

12       Q.  Can you identify that document?

13       A.  Yes, this is the document from which the

14   table is drawn.

15             MS. JACOBSEN:  Your Honor,

16   plaintiffs move to introduce into evidence JTX

17   65.

18             MR. BROWN:  No objection.

19             THE COURT:  All right.  Admitted

20   without objection.

21             MS. JACOBSEN:  For the record,

22   Dr. Davies referred to JTX 65 at page 721.

23   BY MS. JACOBSEN:

24       Q.  Dr. Davies, earlier you mentioned that 3M
```

1    detected the presence of acetaldehyde in Par's

2    ANDA products.  What did they report?

3        A.  Yes.  This is a slide that I prepared to

4    show the acetaldehyde content in Par's

5    representative ANDA batches.  I'm showing it for

6    the three dosing strengths.  Two of the batches

7    they had levels that were not detected.  The

8    remainder, six batches show levels ranging from

9    eight through to 30 parts per million of

10   acetaldehyde.

11       Q.  And if Par gains FDA approval, is 300 --

12   sorry, is 30 parts per million the maximum amount

13   of acetaldehyde that Par's ANDA products are

14   permitted to contain?

15       A.  No.  If they gain FDA approval, they would

16   be able to manufacture batches up to a thousand

17   parts per million.  That is up to .1 percent by

18   weight.

19            MS. JACOBSEN:  And Your Honor, for

20   the record, Dr. Davies referred to JTX 180, 181,

21   196, 197, 198, 199, and PTX 352 and 353.  And

22   Your Honor, we move to introduce those exhibits

23   into evidence.

24            MR. BROWN:  No objection, Your

1    Honor.

2              THE COURT:  All right.  So those

3    eight exhibits are admitted without objection.

4    BY MS. JACOBSEN:

5         Q.  Dr. Davies, can you summarize your

6    opinions relating to whether Par's ANDA products

7    meet the disputed elements of Claim 7?

8         A.  I believe I have shown through my analysis

9    of my tests that Par's ANDA products contain an

10   antioxidant acetaldehyde, and I believe that

11   acetaldehyde in Par's ANDA product is present

12   within the claimed ranges of 0.01 to about 0.5

13   percent by weight.

14        Q.  Thank you.

15             Dr. Davies, I would like to turn now

16   to the claim elements that are not in serious

17   disputed.

18             MS. JACOBSEN:  Unfortunately we

19   stipulate that Par stipulated to infringement as

20   Your Honor requested that the parties meet and we

21   weren't able to reach an agreement so we'll make

22   this as quick as possible.

23             THE COURT:  All right.

24   BY MS. JACOBSEN:

1          Q.  So starting with the first claim element,

2     a transdermal device, under the parties' agreed

3     upon construction, are Par's ANDA products

4     transdermal devices?

5          A.  Yes.  It's a medical device for systemic

6     drug administration through intact skin.  Par's

7     product clearly is a transdermal device, a device

8     that's meant to be applied to the skin with a

9     systemic drug administration through the skin.

10         Q.  Can you turn to tab 27, PTX 343.  Do you

11    recognize that document?

12         A.  Yes.  It's the patient prescribing

13    information that shows at the top there, a

14    transdermal system.

15              MS. JACOBSEN:  Your Honor plaintiffs

16    move to introduce into evidence PTX 343.

17              MR. BROWN:  No objection.

18              THE COURT:  Admitted without

19    objection.

20    BY MS. JACOBSEN:

21         Q.  And then the next claim element is a

22    pharmaceutical composition and do Par ANDA

23    products contain a pharmaceutical composition

24    under the agreed upon construction of that term?

1        A.  Yes, it is, it's a composition suitable

2    for pharmaceutical use.  Par represents that it

3    submitted to the FDA ANDA information which, it's

4    about a product that's suitable for

5    pharmaceutical use, for the treatment of

6    patients.

7        Q.  And then the next element, therapeutically

8    effective amount of rivastigmine, is one of those

9    present in Par's ANDA products?

10       A.  Yes.  It's an amount sufficient to produce

11   the desired therapeutic effect.  Par has

12   represented to the FDA that the dose is suitable

13   for treatment of dementia, Alzheimer and

14   associated with Parkinson's disease, of those

15   three dosage strengths.

16       Q.  The next element is a diluent or carrier.

17   Do Parties' ANDA products contain a diluent or

18   carrier under the Par's agreed upon construction?

19

20       A.  Yes.  The inactive ingredient aids in the

21   administration of the drug.  It contains an

22   adhesive.  The adhesive is highlighted in the

23   patent as a diluent or carrier.

24       Q.  And how does the adhesive aid in the

1    administration of Rivastigmine in Par's ANDA

2    products?

3        A.  It aids in the administration because the

4    drug is contained within the adhesive and the

5    drug is released from the adhesive into the skin

6    and for systemic circulation.

7        Q.  And then the last element is:  Did Par's

8    ANDA products meet the limitation:  Wherein the

9    pharmaceutical composition is supported by a

10   substrate?

11       A.  That is supported structurally.  The

12   pharmaceutic backing layer providing structural

13   support for the pharmaceutical.  Par's patch has a

14   backing layer.

15       Q.  And does that backing layer provide

16   structural support?

17       A.  It does.

18           MS. JACOBSEN:  Thank you, Dr.

19   Davies.  We have no more questions at this time.

20           THE COURT:  All right.  Thank you.

21           Mr. Brown.

22           MR. BROWN:  We have some binders and

23   things to hand up, Your Honor.

24           THE COURT:  Surely.

```
 1                    MR. FINEMAN:  Your Honor, permission
 2      to approach?
 3                    THE COURT:  Sure.
 4                    MR. BROWN:  Permission to approach
 5      the witness, Your Honor?
 6                    THE COURT:  Sure.  Yes.
 7                        CROSS-EXAMINATION
 8      BY MR. BROWN:
 9          Q.  Good morning, Dr. Davies.
10          A.  Good morning to you.
11          Q.  I'm Dan Brown.  We met at your deposition.
12                    I'm representing Par.  I have a few
13      questions to ask you today regarding your
14      testimony on direct.
15                    You just testified on direct
16      examination that part of your basis for
17      concluding that acetaldehyde is an antioxidant is
18      that it is, in your words, a known reducing
19      agent; correct?
20          A.  That's correct.
21          Q.  And I'd like to turn to Exhibit JTX 060.
22      It's one of the binders that we provided to you.
23                    Doctor, it's one that has JTX
24      exhibits in it.  Can you find JTX 060?
```

1                 And this is the Van Nostrand

2      dictionary that you cited in support of your

3      assertion that acetaldehyde is a known reducing

4      agent.  And can we have that entry blown up on

5      the screen, please?

6          A.  I don't seem to have it.

7                 MR. KALLAS:  We don't have it,

8      either.

9      BY MR. BROWN:

10         Q.  In that case, I'll just go to -- can I

11     have Davies' Slide 8 up?

12                And this is a slide that you used on

13     direct examination for JTX 061, which is Van

14     Nostrand's Concise Encyclopedia of Science.

15                And am I correct that Van Nostrand's

16     Concise Encyclopedia of Science, despite

17     referring to acetaldehyde as a reducing agent,

18     never uses the term antioxidant to refer to

19     acetaldehyde?

20         A.  That's correct.

21         Q.  And if you could also turn in your

22     original binder that you used on direct

23     examination to Tab 10, which is JTX 063.

24                And I'd like to have actually

```
1      Davies' Slide 12 up.  And that is the Specialty

2      Chemicals Sourcebook that you relied on on direct

3      examination; correct?

4          A.  That's correct.

5          Q.  And despite limited -- despite enumerating

6      a variety of possible uses for acetaldehyde here,

7      the Specialty Chemicals Sourcebook does not

8      identify acetaldehyde as an antioxidant; correct?

9          A.  That's correct.

10          Q.  And, Dr. Davies, if I see a particular

11      chemical compound referred to in the literature

12      as a reducing agent, isn't it correct that you

13      have no opinion as to whether that means it's an

14      antioxidant?

15          A.  I believe -- I think I've said in my

16      depositions, it can be an antioxidant.  Correct.

17          Q.  Well, Dr. Davies, without conducting an

18      experiment on a reducing agent, you don't know

19      whether it's an antioxidant or a prooxidant;

20      correct?

21          A.  I'm not sure that's correct.

22          Q.  Well, you don't have an opinion, one way

23      or the other; correct?

24          A.  Well, for acetaldehyde, I certainly do.
```

1    Acetaldehyde is a reducing agent, a known

2    reducing agent.  And I've shown that it is an

3    antioxidant.

4         Q.  My question is more general.  It relates

5    to the relationship between reducing agents and

6    antioxidants.  And if I see a compound referred

7    to in the literature as a reducing agent, without

8    conducting an experiment, you don't have an

9    opinion, one way or the other, about whether that

10   compound going to be an antioxidant or a

11   prooxidant; correct?

12        A.  I think, as I've said, reducing agents can

13   be antioxidants, as I've said it at my

14   deposition.

15        Q.  Can they also be prooxidants?

16        A.  I don't think so, in the context of the

17   work that I've undertaken here.  No.

18        Q.  Well, Doctor, could you find your

19   deposition transcript in front of you?  You

20   recall when I took your deposition in this matter

21   and I'd like you to find the June 5th version of

22   your deposition transcript and go to Page 177.

23        A.  Thank you.

24        Q.  And I'm reading from Page 177, Lines 5 to

```
1        19.   And the question:   "So, before you conduct

2     -- let me start over.   Before you conduct any

3     experiment on a reducing agent, can you determine

4     whether it is an antioxidant or a prooxidant?

5                    "Answer:   Again, I have not been

6     asked to consider that in the context of what I

7     did.   You're talking very generally there.   But

8     in the context of what I did, acetaldehyde, a

9     known reducing agent, which is subject to

10    oxidation-reducing agents known to be

11    antioxidants in the context of my experiment, I

12    had every expectation that acetaldehyde would act

13    as an antioxidant and I've shown that."

14                    Was that the correct question and

15    answer?

16         A.   That's correct.

17         Q.   And while you have provided an opinion

18    that acetaldehyde is a known reducing agent, you

19    also have no opinion about whether it is a known

20    oxidizing agent; correct?

21         A.   Well, it depends what you mean by opinion.

22    In the context of the work I've done, I believe

23    it's a reducing agent.

24         Q.   But you don't have an opinion about
```

```
1      whether it's also a known oxidizing agent;

2      correct?

3          A.  You mean as a prooxidant; I don't believe

4      it is in the context of the work.

5          Q.  Well, if you can turn ahead in your June

6      5th deposition transcript to Page 180.

7                   And I'm reading from Page 180, Line

8      14.

9                   "Question:  Are there different

10     conditions under which acetaldehyde is a known

11     oxidizing agent that is subject to being reduced?

12                  "Answer:  Again, you know, I've not

13     been asked to consider that.  I have been asked

14     to consider the conditions, the kind of

15     conditions that the stress test, which

16     demonstrates the acetaldehyde, a known reducing

17     agent acts as an antioxidant that is susceptible

18     to oxidization and that is able to inhibit the

19     degradation of Rivastigmine in an oxidizing

20     environment."

21                  So as of the day of your deposition,

22     you did not have an opinion about whether

23     acetaldehyde is also a known oxidizing agent;

24     correct?
```

```
 1          A.  I wasn't asked to consider that.  That's

 2    correct.

 3                MS. JACOBSEN:  Sorry.  I object.

 4                That was an incomplete -- the

 5    previous question and answer of Dr. Davies'

 6    deposition was specifically on this topic, and he

 7    gave complete answers.  And the two questions --

 8    and Mr. Brown didn't show the Court those.

 9                THE COURT:  I'm sorry.  Your

10    objection is?

11                MS. JACOBSEN:  That was an

12    incomplete part of the deposition testimony.  The

13    previous question and answer addresses this

14    issue.

15                THE COURT:  All right.  Well, on --

16    actually why don't we take care of this now.  Can

17    you ask him about the previous question and

18    answer?

19                MR. BROWN:  Certainly, Your Honor.

20                MS. JACOBSEN:  Page 80, Lines 5 to

21    13.

22    BY MR. BROWN:

23          Q.  And from Page 180, Lines 5 to 13.

24                "Question:  Is acetaldehyde also a
```

```
 1    known oxidizing agent that is subject to being

 2    reduced?

 3              "Answer:  Acetaldehyde is a known

 4    reducing agent that is susceptible to oxidation

 5    in the context of the work that we're doing here

 6    in the context of this experiment.  I have shown

 7    that and proven it -- that it acts as an

 8    antioxidant in the context of the work of my

 9    experiments."

10              THE COURT:  All right.  For what

11    it's worth, I don't actually think that needed to

12    be read to be complete, but it also causes no

13    harm.

14              Go ahead, Mr. Brown.

15    BY MR. BROWN:

16        Q.  I'd like you to turn to JTX 1, the '031

17    patent.  Now, you studied this patent carefully

18    in forming your opinions in this case; am I

19    correct?

20        A.  Correct.

21        Q.  And I'd like to put up a section of the

22    patent.  This is at Column 4, Lines 10 to 19.

23    And this is the section of the patent where they

24    list the particular antioxidants that they
```

1    describe.  And I'd like to look at the first

2    compounds listed here as an antioxidant

3    tocopherol acetate.

4              You agree that tocopherol acetate is

5    an antioxidant; correct?

6        A.   It's listed in the patent.  Correct.

7        Q.   But you don't have any opinion as to

8    whether it's a reducing agent; correct?

9        A.   I don't believe it is an reducing agent.

10       Q.   At the time of your deposition, you didn't

11   have an opinion, one way or the other; correct?

12       A.   That's correct.

13       Q.   And looking at this list of antioxidants,

14   I'd next like to focus on ascorbyl palmitate.

15   Ascorbyl palmitate being listed as an

16   antioxidant, you have no opinion whether ascorbyl

17   palmitate would increase the oxidative

18   degradation of acetaldehyde in a transdermal

19   patch, isn't that correct?

20       A.   I do.  It depends which patch you're

21   talking about.

22       Q.   In any rivastigmine transdermal patch, do

23   you have an opinion one way or the other whether

24   adding ascorbyl palmitate could cause an increase

1       in oxidative degradation in that patch?

2           A.  I have an opinion based on the reading of

3       the patent that ascorbyl palmitate will act as an

4       antioxidant to reduce oxidative degradation.

5           Q.  Let's look at page 161 of your June 5th

6       deposition transcript.  And I'm reading from page

7       161 line 15 to page 162 line nine.

8               "QUESTION:  Is it possible for

9       ascorbyl palmitate to increase the oxidation of

10      an active ingredient in a particular

11      pharmaceutical formulation?

12              "ANSWER:  Again, I have not been

13      asked to consider that.  I have not considered

14      that.  That's not what I was asked to do, but I

15      believe Dr. Klibanov has talked at length about

16      these things.  Please tell me, give me an

17      example, show me.

18              "QUESTION:  Well, is it possible

19      that ascorbyl palmitate even though it's listed

20      here as an antioxidant could increase the

21      oxidation of rivastigmine and a transdermal

22      patch.

23              "ANSWER:  Again, I have not been

24      asked to give an opinion on that."

1              That was your answer; correct?

2       A.  You read it correct, but what you said

3  summarized what I just said, you're asking me very

4  general questions.  You're asking me about a

5  specific issue, but I go on to talk about if you

6  go read down page 162, the patent is teaching me,

7  the patent is teaching me that, so it's clear that

8  I'm relying on the patent to teach you that, and

9  the antioxidants that are listed in this list, you

10  are trying to steer me to some other issue, but I

11  didn't know what you were talking about.

12      Q.  Dr. Davies, if you continue on to the next

13  page at the top, line three to ten:

14              "QUESTION:  So based on that

15  teaching, if I put ascorbyl palmitate into a

16  formulation, is it possible that the ascorbyl

17  palmitate will increase the oxidation of

18  rivastigmine?

19              "ANSWER:  Again, you have asked me

20  this before, and I say I have not been asked to

21  consider that."

22              Isn't that, in fact, the answer you

23  gave me?

24      A.  Yes.  And I also said it's a very really

1    vague question, doesn't make sense, based on the

2    teaching of the patent.  I go on to say the

3    patent clearly teaches you that antioxidants can

4    have a positive effect on these two formulations.

5    That's what I say.  And you go on to ask me that

6    question over and over again.

7        Q.  Doctor, I would like now to go to DTX 526.

8    And this is Van Nostrand's Encyclopedia of

9    Chemistry.  You're familiar with this reference;

10   correct?

11           Let me know when you find it.  And I

12   want to blow up an entry that's on the bottom

13   second column and going to the first line of the

14   second page.  Can you pull that up, Bill.  And I

15   want to read this section into the record.

16           An antioxidant ties up the peroxy

17   radicals so that they are incapable of

18   propagating the reaction chain or to decompose

19   the hydroperoxides in such a manner that carbonyl

20   groups and additional free radicals are not

21   formed.  The former, which are called

22   chain-breaking antioxidants, free-radical

23   scavengers, or inhibitors, are usually hindered

24   phenols or amines.  The latter, called peroxide

1    decomposers, are generally sulfur compounds or

2    organophosphites.

3              I just have a few questions for you

4    about this discussion.  Now, alpha-tocopherol is

5    a well-known antioxidant; correct?

6         A.  I'm sorry.

7         Q.  Alpha-tocopherol is a well-known

8    antioxidant; correct?

9         A.  It's listed in the patent.

10        Q.  That's one of the categories of

11   antioxidants Dr. Klibanov testified in the Watson

12   trial was a quintessential antioxidant; right?

13        A.  I don't recall him saying that.

14        Q.  Well, alpha-tocopherol is the only

15   antioxidant for which there is data provided in

16   the '031 patent; correct?

17        A.  I believe that's correct, specific data,

18   but the patent talks about the range of

19   antioxidants.

20        Q.  But the data all comes from

21   alpha-tocopherol; correct?

22        A.  I believe that's correct.

23        Q.  And isn't it correct that you have no

24   opinion about whether alpha-tocopherol is a

1    hindered phenyl or an amine?

2        A.  I believe it is, yeah, based on my

3    definition, that's correct.

4        Q.  And, in fact, you have no opinion about

5    whether alpha-tocopherol functions as an

6    antioxidant by working as a free radical

7    scavenger or by working as a peroxide decomposer;

8    isn't that correct?

9        A.  Based on my deposition, I believe it is a

10   free radical scavenger.

11       Q.  That's a opinion you didn't have at your

12   deposition that you have today?

13       A.  That's correct, I was tired, correct.

14       Q.  And, in fact, for the list of compounds in

15   the '031 patent that we looked at a few minutes

16   ago at column four, lines 11 to 19, going down

17   that list, you haven't formed an opinion as to

18   whether each one of those compounds would be a

19   hindered phenyl, an amine, a sulphur compound or

20   an organophosphites, isn't that correct?

21       A.  I wasn't asked, correct.

22       Q.  Dr. Davies, I would like to ask you some

23   questions about first about the experiment that

24   you conducted that you testified about on direct

1    examination, JTX 66.  Can you find JTX 66,

2    Dr. Davies?

3        A.  I don't have it.

4             MR. BROWN:  Permission to approach.

5             THE COURT:  Yes.

6    BY MR. BROWN:

7        Q.  Dr. Davies, you agree that this type of

8    test that's reported here in JTX 66 can be

9    referred to as a forced degradation study?

10       A.  Yes.

11       Q.  And you also refer to it as a stress test;

12   correct?

13       A.  Sorry, I apologize.  It's known as a

14   forced degradation study as well as a stress test;

15   correct.

16       Q.  And Dr. Davies, isn't it true that you are

17   not aware of a single instance in the published

18   literature where a forced degradation study was

19   used to evaluate whether a particular chemical

20   compound served as an antioxidant in a finished

21   pharmaceutical dosage form?

22       A.  I disagree.

23       Q.  Well, Dr. Davies, do you recall at your

24   deposition that I asked you several times to

1       identify any literature reference of which you

2       are aware in which a forced degradation study was

3       used to evaluate whether or not a particular

4       compound served as an antioxidant?

5           A.  I do, and I replied at length.  I replied

6       that I rely on the literature that I cited in my

7       reports.  I talked about it at length.

8           Q.  Do you recall that I asked you to prepare

9       a list for me of every published literature

10      reference of which you were aware that described

11      using a forced degradation study to evaluate

12      whether a compound was an antioxidant?

13          A.  I do, indeed.

14          Q.  And could you turn to DTX 105, which is

15      Davies 17.

16              Now, Dr. Davies, DTX 105 is, in

17      fact, a list you prepared for me at the

18      deposition of every literature reference of which

19      you are aware where a forced degradation study

20      was used to evaluate whether a compound was an

21      antioxidant; correct?

22          A.  This is the sheet.  As I told you at the

23      time, I provided a list of -- I provided many

24      references which I relied on in my reports.  I

1        told you at the time and on a number of occasions

2        on a repeated questioning that I relied on those

3        papers from my reports.

4                    MR. BROWN:  Your Honor, Par would

5        move to admit DTX 105 into evidence.

6                    MS. JACOBSEN:  No objection.

7                    THE COURT:  Admitted without

8        objection.

9        BY MR. BROWN:

10           Q.  Can you give me a citation right now,

11       Doctor?

12           A.  I can give you examples that I described

13       in my reports and depositions, the example, the

14       example of the Alsante.

15           Q.  Thank you, Doctor.  We'll get to that in a

16       minute.

17                    Now, I would like to look for a

18       minute at JTX 1, the '031 patent, at column four,

19       line 20 to 30.  And now here, Doctor, am I

20       correct that the '031 patent describes conditions

21       for two stress tests?

22           A.  I'm sorry, I didn't hear you.

23           Q.  Am I correct that this section of the '031

24       patent, column four, lines 20 to 30, describes

```
1      two different sets of conditions for stress

2      tests; correct?

3          A.  That's correct.

4          Q.  One of those tests was conducted at three

5      months at 40 degrees C and 75 percent room

6      humidity; correct?

7          A.  Correct.

8          Q.  And the other test was run for two months

9      at 60 degrees C; correct?

10         A.  Correct.

11         Q.  And both of these tests were conducted on

12     quote, the pharmaceutical composition of the

13     present invention; correct?

14         A.  That's correct.

15         Q.  Now, I would like to refer now back to JTX

16     66.  Your forced degradation study.  You were the

17     person who designed this forced degradation study;

18     correct?

19         A.  I was.

20         Q.  And in addition to the forced degradation

21     study, you have done a total of two other tests

22     that you relied on over the course of this action

23     for your opinions regarding Par's ANDA products;

24     correct?
```

1          A.  You mean the peroxide and the oxygen

2     level?

3          Q.  That's exactly what I mean.

4          A.  I see.  Okay.  Yes, correct.

5          Q.  And the peroxide value test and the oxygen

6     saturation test, are those the two tests you're

7     referring to?

8          A.  I believe so.

9          Q.  And you designed and conducted the

10    peroxide value test and the oxygen saturation

11    test in February of 2013 in response to opinions

12    that Par's experts provided in the case; correct?

13         A.  That's correct.

14         Q.  And could you please turn to DTX 111.  And

15    DTX 111 is the laboratory notebook work -- let me

16    restate the question.

17              DTX 111 is the laboratory notebook

18    that reports all of the work done in connection

19    with the peroxide value test and the oxygen

20    saturation tests that you conducted in February

21    of 2013; correct?

22         A.  I believe that's the case.

23              MR. BROWN:  Par would move to admit

24    DTX 111.

```
1              MS. JACOBSEN:  No objection.

2              THE COURT:  Admitted without

3    objection.

4              MS. JACOBSEN:  No objection.

5              THE COURT:  Admitted without

6    objection.

7    BY MR. BROWN:

8       Q.  Now, if you could now turn to JTX 170 in

9    your binder.

10             Now, JTX 170 is the laboratory

11   notebook that records the laboratory work that

12   went into your forced degradation study that we

13   looked at at JTX 066; correct?

14      A.  I'm sorry.  I'm trying to find it.

15             That's correct.

16      Q.  And the cover, the date on the cover of

17   this notebook tells you that it was generated on

18   October 29th, 2012; correct?

19      A.  Correct.

20      Q.  So I'm going to start a timeline that

21   we've put together and I want to put that date up

22   on the timeline.

23             MR. BROWN:  So, Bill, can you put up

24   the timeline with that date showing?
```

1    BY MR. BROWN:

2        Q.  Now, it didn't take you very long to

3    design the forced degradation study; correct?

4        A.  In what sense?  Once I decided to do that

5    test, correct.  About a week.

6        Q.  And in your opinions in this case

7    regarding the forced degradation study, JTX 066,

8    you were not relying on any testing that you or

9    anyone on your behalf conducted prior to

10   October 29th, 2012; correct?

11       A.  No, I'm not.

12       Q.  And when you designed the forced

13   degradation study, you expected that it would

14   take about a week or so; correct?

15       A.  That's correct.  When I made that decision

16   to do it, yes.

17       Q.  And the process of conducting the

18   experimental testing for the forced degradation

19   study took about ten days running from October

20   29th to November 7th, 2012; correct?

21       A.  Correct.  That's running the experiment.

22   Then I had to analyze the data.

23       Q.  So I want to add that November 7th date to

24   our timeline.  Now, the Rivastigmine active

```
1    ingredient that you used in the forced

2    degradation study was shipped directly to you in

3    the United Kingdom from the 3M Company; correct?

4         A.  That's correct.

5         Q.  And if you could find JTX 33.  JTX 33 is a

6    chain of custody document that you prepared in

7    this case; correct?

8         A.  That's correct.

9         Q.  And if you could turn to Page 4, there's a

10   section entitled Actavis' Rivastigmine sample.

11   Do you see that?

12        A.  That's correct.

13        Q.  And you understand that Par now owns the

14   ANDA that previously belonged to Actavis;

15   correct?

16        A.  That's correct.

17        Q.  And so this chain of custody document

18   demonstrates that you received the sample of

19   Rivastigmine active ingredient from 3M on

20   September 10th, 2012; correct?

21        A.  That's correct.

22        Q.  And I'd like to put that date onto the

23   timeline.  And after you received the sample on

24   September 10th, you stored that sample at
```

```
1      Molecular Profiles until you used it beginning

2      around October 29th; correct?

3          A.  That's correct.

4          Q.  Now, in addition to the Rivastigmine

5      active ingredient that you received on

6      September 10th, you received a number of other

7      samples in this matter from 3M Corporation

8      relating to the Par product; correct?

9          A.  That's correct.

10         Q.  In fact, before you conducted any work in

11     this case, you requested a variety of samples

12     relating to the Par 3M patch; correct?

13         A.  I believe that's correct.

14         Q.  Could you please look at DTX 113 in the

15     binder in front of you?

16             DTX 113 is an April 20th, 2012

17     letter from Novartis' counsel, Chris Loh;

18     correct?

19         A.  That's correct.

20         Q.  And now I'd also like you to turn to DTX

21     120.  This is a document Entitled Plaintiffs'

22     Third Set of Requests to Actavis for the

23     Production of Documents and Things.  And it's

24     dated May 1st, 2012.
```

```
 1                    I'm going to come back to DTX 113

 2     and 120 in a second.  I'd like to go now to DTX

 3     112.

 4                    Now, this is a letter dated June 1,

 5     2012 from Novartis' counsel, Chris Loh.  And I'd

 6     like to blow up the first sentence in the second

 7     paragraph of DTX.  The first sentence in the

 8     second paragraph, please.

 9                    And there it says, As I mentioned

10     during that call, our April 20, 2012 and May 1,

11     2012 requests for samples of Actavis' ANDA

12     products and the active ingredients, excipients

13     and materials used therein were determined in

14     consultation with our expert.

15                    And now I want to blow up -- if we

16     can leave that on there, I want to blow up the

17     rest of it.  The following paragraph continues:

18     "To clarify matters, our expert, Martyn Davies,

19     believes that the requested sample quantities are

20     reasonable and necessary in view of three

21     enumerated items; correct?

22         A.   That's correct.  That's what it says.

23         Q.   And number three is the number of tests he

24     has in mind; correct?
```

1     A.  Correct.

2     Q.  And, in fact, you believed, based on your

3   experience in undertaking work on pharmaceutical

4   formulations, that you required the sample

5   quantities referenced in the April 20th and May

6   1st requests shown in DTX 113 and DTX 120?

7     A.  That's correct.  Because I didn't know

8   what experiments I would be doing, so I wanted to

9   have sufficient numbers so I could do the

10   experiments if they were required.

11     Q.  Dr. Davies, your research and work at

12   Molecular Profiles relates to the development and

13   characterization of pharmaceutical dosage forms

14   in drugs; correct?

15     A.  That's correct.

16     Q.  And isn't it true that in view of your

17   experience in undertaking work on pharmaceutical

18   formulations, you thought that the samples

19   identified in DTX 113 and DTX 120 were reasonable

20   and necessary?

21     A.  Oh, absolutely, of that type.  When I

22   was -- before so I'd have sufficient samples, so

23   if I wanted to do some experiments.

24     Q.  Well, let's look back at DTX 113 and see

1    what you thought were reasonable and necessary,

2    and if I can blow up the list provided there.

3              It included 200 patches of the 4.6

4    milligram product.  Another 200 patches of the

5    9.5 milligram product.  200 empty pouches.

6              Five square meters of the 3M

7    Scotchpak laminate backing.  Five square meters

8    of Scotchpak release liner.

9              Another five square meters of the 3M

10   Scotchpak in process release liner.  One kilogram

11   of the 3M R-27149 solvated acrylate copolymer

12   adhesive.

13             One kilogram is about 2.2 pounds;

14   correct?

15   A.  I have no idea what it is in pounds.

16   Q.  And a hundred grams of the Cognis

17   isopropyl myristate tackifier.  Ten grams of the

18   Rivastigmine API and one five-gallon core carboy.

19             Those are the materials that you

20   thought were reasonable and necessary in this

21   case; correct?

22   A.  That's correct.

23   Q.  Now, could you please turn to DTX 114?

24             Now, this is a letter dated August

```
1     3, 2012 from 3M to yourself at your address at

2     Molecular Profiles in the U.K.; correct?

3          A.  That's correct.

4          Q.  And 3M sent you by FedEx the samples you

5     requested; isn't that correct?

6          A.  I believe that's correct.  They were

7     requested by counsel.  That's correct.

8          Q.  And you, in fact, received the items

9     listed here, one to ten in this letter?

10         A.  That's correct.

11         Q.  And after you received the ten enumerated

12    items here from 3M, you put them in your store

13    room at Molecular Profiles; correct?

14         A.  I did.

15         Q.  And do you see at the top of this letter,

16    DTX 114, that 3M designated the materials that it

17    gave you Highly Confidential Outside Counsel

18    Only?

19         A.  Yes.

20         Q.  And you, in fact, honored that

21    designation; correct?

22         A.  Yes.

23         Q.  And from the time you received the samples

24    in August 2012 until February 2013, when your
```

1    experiments in this case were complete, none of

2    the samples that 3M shipped to you ever left the

3    premises of Molecular Profiles; correct?

4        A.  That's my understanding.  Correct.

5        Q.  Now, turning to the second page of DTX 114

6    at the very end, it states that 3M is not

7    enclosing the requested Rivastigmine active

8    ingredient samples.

9            Do you see that?

10       A.  I do.

11       Q.  And you received those as we looked at a

12   minute ago on September 10th; correct?

13       A.  That's correct.

14       Q.  So I'd like to add this August 3rd

15   shipment to the time line.

16           Now, Doctor, isn't it correct that

17   in the forced degradation study that you relied

18   on for your infringement positions in this case

19   you, in fact, used none of the materials that

20   were shipped to you with the August 3rd, 2012 3M

21   shipment?

22       A.  That's correct.

23       Q.  And am I correct that at no time between

24   August 3rd, 2012 and October 29th, 2012 were you

1       in the process of conducting any experiments that

2       you are relying on in this case for your opinions

3       regarding the Par ANDA Rivastigmine patch?

4           A.  That's correct.

5           Q.  I'd like you to turn in your binder to DTX

6       568.  This document is entitled Plaintiffs'

7       Second Supplemental Responses to Actavis'

8       Interrogatories Number 1 and 2.

9                   And I'd like you to first turn to

10      Page 15 of this document.  And do you see the

11      document is dated August 23rd, 2012?

12          A.  I do.

13          Q.  And this is before you received the active

14      ingredient Rivastigmine from 3M; correct?

15          A.  That's correct.

16          Q.  And I'd like you to turn back to Page 11.

17      And do you see at Page 11 purports a claim chart

18      with the '031 patent claim elements in the first

19      column, and in the second column it states how

20      claim elements are met by the Actavis' ANDA

21      product, which is now the Par ANDA product;

22      correct?

23          A.  I see that.

24          Q.  And I'd like to blow up Element B all the

1    way through to the second column.

2              And under Element B, the

3    interrogatory response states, "Plaintiffs are in

4    the process of testing Actavis' ANDA products to

5    identify and quantify the antioxidant(s) expect

6    such testing to be complete in two to

7    two-and-one-half months, and will provide

8    supplemental responses at that time or earlier,

9    if the testing is completed sooner than expected.

10              So I have some questions for you

11   about this statement.  Now, as of the August 23rd

12   date of this response, none of the testing that

13   you have disclosed and relied on in this

14   litigation regarding the Par ANDA product was in

15   the process of being conducted; correct?

16        A.   That's correct.

17        Q.   Regarding the Par ANDA products was in the

18   process of being conducted; correct?

19        A.   That's correct.

20        Q.   So the testing of Actavis' ANDA products

21   to identify and identify the antioxidant

22   referenced in this response does not refer to any

23   of the testing that you referred to in this case;

24   correct?

```
 1          A.  Correct.  I don't know what this refers
 2    to.
 3          Q.  I would like to focus on the next
 4    statement that plaintiffs quote, expect such
 5    testing to be complete in two to two-and-a-half
 6    months.
 7              I would like to go back to the
 8    timeline.  And you will agree with me, will you
 9    not, the very beginning of the first experiment
10    you were relying on in this litigation,
11    specifically the October 29th date of your
12    laboratory notebook occurred two to
13    two-and-a-half months after the August 23rd date
14    of this interrogatory response?
15          A.  I accept that.
16          Q.  Well, I would like to see if we can shed a
17    little more light about what might have been
18    referred to in this interrogatory response since
19    you said you don't seem to know.
20              MR. BROWN:  Permission to approach.
21              THE COURT:  Sure.
22    BY MR. BROWN:
23          Q.  Now, what I have handed you, Doctor, is a
24    transcript of a discovery proceeding that
```

1    occurred in this court.  This is DI-77 in this

2    action.  It occurred on July 1st, 2012.  And I

3    want to put up a section of the discovery

4    proceeding that runs from page 13 line 19 to page

5    14 line 9.  And in this section of the

6    transcript, Novartis' counsel, Mr. Prugo, is

7    telling the Court that Novartis needs extra time

8    for discovery in the case because of the testing

9    of the ANDA products will take about three

10   months.

11             And, in fact, he says, The testing

12   will take about three months.  And there are the

13   three months that are talked about in this

14   specification, so the whole point here is that

15   you have to have a stable active ingredient, and

16   the accelerated stability testing described in

17   the specification is three months long.

18             So, Doctor, I want to ask you about

19   that statement.  Isn't it true that as of August

20   23rd, 2012, you believe that the correct test for

21   antioxidant behavior was the three-month

22   stability testing described in the '031 patent

23   specification?

24       A.  No.  But I didn't say this, this is

1    somebody else's words, not mine.

2         Q.  Isn't it a fact, Doctor, that you designed

3    and conducted your forced degradation study only

4    after you knew the results of whatever testing is

5    described in the August 23rd interrogatory

6    response?

7         A.  No.  I designed my testing as I described

8    in my direct, because I couldn't do that

9    head-to-head study.

10        Q.  Doctor, did you or did you not know the

11   results of the testing that's being described in

12   the August 23rd, 2012 discovery response when you

13   designed your October 29th test?

14        A.  No.  Sorry, you mean at this time, in this

15   -- how could I?

16        Q.  My question relates to the time that you

17   designed your October 29 test, and my question

18   for you is:  Did you or did you not know the

19   results of the testing that's described in the

20   August 23rd, 2012 discovery response when you

21   designed your test?

22        A.  I don't know what that test is.  This is

23   somebody else's words, not my test.

24        Q.  Doctor, since you were the only person

1    that had Actavis' ANDA products that had been

2    shipped to plaintiffs, who else could have been

3    doing that test?

4         A.  I have no idea.  I don't know what this is

5    related to.  It's nothing to do with me, it has

6    to do with the lawyers.

7         Q.  Now, Doctor, on direct examination, you

8    said you did not see enough degradation at 40

9    degrees C or room temperature to do the forced

10   degradation experiment on the time schedule you

11   had in mind; correct?

12        A.  That's correct.

13        Q.  And your opening expert reports in this

14   case were due November 19th, 2012; correct?

15        A.  That's correct.

16        Q.  And so isn't the lack of time that you're

17   complaining about something that happened because

18   we don't have any evidence of what you were doing

19   before October 29th, 2012 with all of these

20   materials?

21        A.  No.  It's purely come down to the design

22   of the experiment.  Over the time scale I wanted

23   to study the experiment, that's why I chose 60

24   degrees, again, faster.

1        Q.  So it only took you a week to design it;

2    right?

3        A.  That's about right.

4        Q.  And it took you about another week to do

5    it?

6        A.  Correct.

7        Q.  So if you started it back in September

8    when you got the active ingredient, you would

9    have had months and months to look for the

10   results; correct?

11       A.  But then as you know, I was doing lots of

12   things at that time.  I was also doing the work

13   for the other; art -- what was the other part

14   of the case, the Watson case.  I also had my

15   other work to do, my university work and the

16   like.  So I designed that test and I did that

17   test I think in an appropriate manner.

18       Q.  So, Doctor, you're telling us that the

19   reason you didn't start your test until October

20   29th, 2012 is because of the testing you were

21   doing in the Watson case and other work at the

22   university and not because you were awaiting

23   results of a different test?

24       A.  Correct.  Due to the fact that I was doing

1    multiple things at that time, and I was -- made

2    the decision to run that specific test based on

3    what I saw in the ANDA, what I saw in the -- for

4    the information that I had related to the

5    products, and I decided to run that test.

6        Q.  I would like to go to your -- I would like

7    to switch topics now, Doctor, and go to your

8    slide 26.

9               THE COURT:  Mr. Brown, if you're

10   switching topics, would this be a good time to

11   break for lunch?

12              MR. BROWN:  It would be perfect.

13   Thank you, Your Honor.

14              THE COURT:  So we'll take an

15   approximately one-hour recess.  And, Dr. Davies,

16   you can't talk with your lawyers during this

17   break.  And do you have these resumes that I want

18   to look at?

19              MR. FINEMAN:  Yes.

20              MR. BROWN:  Your Honor, we have the

21   CV's for two of our experts, the third one won't

22   be testifying until tomorrow.

23              THE COURT:  That will be fine.  All

24   right.  Thanks.  We'll be in recess.  See you

1    again at quarter to 2:00.

2                    (A brief recess was taken.)

3                    THE CLERK:  All rise.

4                    THE COURT:  All right.  Good

5    afternoon, everybody.  Be seated, please.

6                    Are we ready to continue, Mr. Brown?

7                    MR. BROWN:  Yes.  And, Your Honor,

8    during the examination before lunch, there were a

9    few exhibits that I had neglected to move for

10   admission.

11                   I'd like to go ahead and move for

12   admission of JTX 33, DTX 112, 113, 114, 120, 526

13   and 568.

14                   MS. JACOBSEN:  No objection.

15                   THE COURT:  All right.  They're all

16   admitted without objection.

17   BY MR. BROWN:

18       Q.  Good afternoon, Dr. Davies.

19       A.  Good afternoon.

20       Q.  Could I have Slide 26 up from the direct

21   examination?

22                   Now, I want to ask you just a couple

23   questions about the stock solution that's

24   referenced there in the left-hand column.  And

1    the Rivastigmine concentration that you have

2    there is approximately .36 percent; correct?

3        A.  That's correct.

4        Q.  And in your stock solution, you have 1.3

5    percent approximately of T-butyl hydroperoxide;

6    correct?

7        A.  That's correct.

8        Q.  And that's roughly three times as much of

9    the peroxide as there is of the active ingredient

10   Rivastigmine; correct?

11       A.  Correct.

12       Q.  And you would agree that in a normal

13   pharmaceutical product, you're not likely to

14   encounter three times as many peroxides as the

15   active ingredients?

16       A.  I am not sure of that.  Well, of course,

17   there would be less peroxides, of course.

18       Q.  Now, Doctor, in your forced degradation

19   study, you didn't test any known antioxidant such

20   as alpha tocopherol using the same experimental

21   protocol to see if it would prove effective under

22   the conditions of your experiments; correct?

23       A.  That's correct.  I didn't need to.

24       Q.  And, in fact, you didn't test any of the

1      compounds listed in Column 4, Lines 11 to 19 to

2      see if your test would demonstrate an antioxidant

3      effect for those known antioxidant compounds;

4      correct?

5          A.  That's correct.

6          Q.  Can I have up Davies' Slide 22?

7              And I believe you testified on

8      direct that for all of the vials that you have

9      here, C1 C2, C3, A1, A2 and A3, you never

10     measured the amounts of acetaldehyde in any of

11     those vials at any of the time points in your

12     study; correct?

13         A.  That's correct.

14         Q.  And you never did a control experiment

15     where you measured the amount of acetaldehyde in

16     a vial stored at 60 degrees C over 21 hours to

17     see what happens to the acetaldehyde under those

18     conditions?

19         A.  Well, I did a control.  I did do that

20     experiment.

21         Q.  And in your experiment, you also did not

22     measure the oxygen content of any of the six

23     vials that you were measuring; correct?

24         A.  That's correct.

1        Q.  And, Doctor, are you aware that the

2    reaction of acetaldehyde with oxygen or air

3    produces peroxides?

4        A.  I am aware.  It can produce peroxides.

5    Correct.

6        Q.  Now, in this litigation, you did

7    measure -- you did conduct an oxygen saturation

8    measurement on Par's ANDA product to see if there

9    was oxygen there; correct?

10       A.  That's correct.

11       Q.  And you provided the opinion that Par's

12   product does, in fact, have oxygen in it;

13   correct?

14       A.  That's correct.

15       Q.  Now, I'd like to look at one of your

16   experiments in particular and can you find JTX

17   066 in the binder?

18       A.  I've got it.

19       Q.  And I'd like to look at Pages 8 and 9.

20   Can we go forward to that?

21               And I'd like to focus particularly

22   on Sample A3 at the 15-hour time point and sample

23   A3 at the 21-hour time point.

24               And so, in looking at these data,

1    the middle value there is the value for

2    Rivastigmine and I want to ask you about that.

3              So, at the 15-hour time point, the

4    raw area value you measured for Rivastigmine was

5    6,937 units; correct?

6        A.  Correct.

7        Q.  And at the 21-hour time period time point,

8    the raw area of Rivastigmine that you measured

9    was 10,185 area units; correct?

10       A.  That's correct.

11       Q.  And so the raw area for the Rivastigmine

12   peak actually increased by approximately 50

13   percent in the experiment; correct?

14       A.  That particular volume, that's correct.

15   But, of course, I explained that in the context

16   of this work, that all the other peaks increased

17   pro rata.  And I say that for that A3 sample, the

18   21 hours that I believe the top of the vial may

19   have been not sealed properly in the HPLC system,

20   so we may have lost some solvent.

21       Q.  Because it's not possible that the amount

22   of Rivastigmine would increase in that time

23   period; correct?

24       A.  That's correct.

1      Q.  And --

2      A.  That's why all the degradants relative to

3  each other stay the same.

4      Q.  And the conclusion you drew upon looking

5  at the data was that it is possible that this

6  increase in the raw data was due to evaporation

7  of a portion of the solvent in that vial upon

8  loosening of the seal for that vial; correct?

9      A.  That's correct.

10     Q.  Now, if you could turn to JTX 170, that's

11  the laboratory notebook for this experiment.

12  There is no reference to any loosened seal or

13  evaporated solvent recorded in the lab notebook

14  for this experiment; correct?

15     A.  There is a record that we subsequently

16  re-analyzed that Sample three times just to

17  double-check.

18     Q.  Understood.  But no one wrote down that

19  the seal was loose and the solvent evaporated;

20  correct?

21     A.  I would have to check it, but I don't have

22  it in front of me.

23     Q.  170 is in the Davies cross exhibit binders

24  of JTX and PTX exhibits.  Can you confirm that

1    for me?

2        A.  That's correct, it just says it's done in

3    triplicate.

4        Q.  So now at the various time points of your

5    experiment including the end, you also didn't

6    measure the amount of solution that was left in

7    each vial; correct?

8        A.  That's correct, I didn't need to.

9        Q.  And so there is no way of knowing if any

10   of the other seals also allowed some of the

11   solvent to evaporate; correct?

12       A.  No.  That's incorrect.  Consistency of the

13   data shows as I explained in my reports, shows

14   that they were sealed.

15       Q.  Doctor, you were not physically present in

16   the lab the day the vials were placed in the oven

17   and the day the measurements were taken; correct?

18       A.  That's correct.

19       Q.  Acetaldehyde boils at around 20 degrees

20   Celsius; correct?

21       A.  Pure acetaldehyde does, correct.

22       Q.  And in your experiment at 60 degrees C,

23   you were 40 degrees above acetaldehyde's boiling

24   point; correct?

1       A.  Correct, the boiling point of pure

2   acetaldehyde.

3       Q.  So if we assume that your supposition that

4   the result in the A3 vial was caused by solvent

5   evaporation, do you know if all the solvent had

6   evaporated out when the seal broke -- sorry.  Do

7   you know if all of the acetaldehyde had

8   evaporated out when the seal broke?

9       A.  No, because if you look at the data, you

10  look at the data relative to degradation relative

11  to the drug on that particular sample, it's the

12  same relative ratios that you see in the other

13  two vials for that time point, so, no.

14      Q.  So you're inferring the presence of

15  acetaldehyde from your results; correct?

16      A.  I know it's there because we put it in

17  there, and it's in a sealed system.  It's there.

18  The results show that.

19      Q.  Thank you, Doctor.

20          I want to move on and ask you a

21  little -- a couple of questions about the

22  statistical discussion that you provided on

23  direct examination.

24          Doctor, you first provided the

1      results of your forced degradation study in your

2      opening expert report that was served on November

3      19, 2012; correct?

4          A.   That's correct.

5          Q.   At that time the only statistical analysis

6      you provided was a T-test using a one-tailed

7      distribution; correct?

8          A.   That's correct, I felt that was

9      appropriate.

10         Q.   And you subsequently provided the

11     statistical analysis using the two-sided T-test

12     and the linear regression model that you

13     discussed here; correct?

14              You didn't give an audible answer,

15     but I think you nodded your head yes?

16         A.   Sorry, I can't hear you.

17         Q.   I'm sorry.  After the November 19th

18     report, at a subsequent time you provided the

19     statistical analysis using the two-sided T-test

20     and the linear regression model; correct?

21         A.   That's correct, in response to

22     Dr. Michniak-Kohn's comments.

23         Q.   And a one-tailed T-test is appropriate

24     only when the investigator has an a priori

1    expectation of the direction of the result;

2    correct?

3        A.  I think that's correct.  And I did have --

4    as I explained on direct, I did have that

5    expectation.

6        Q.  And in this case you used the one-tailed

7    T-test rather than a two-tailed test because you

8    had an a priori expectation that acetaldehyde

9    would reduce the oxidative degradation of

10   rivastigmine rather than increase it; correct?

11       A.  Not quite correct.  I had the expectation

12   either it has no effect or it would reduce the

13   oxidative degradation, so it's in one direction.

14       Q.  And you based your a priori expectation

15   that acetaldehyde would reduce or

16   have no effect on the degradation of rivastigmine

17   in part on your knowledge that acetaldehyde was a

18   known reducing agent; correct?

19       A.  In part, correct.

20       Q.  So a couple of questions about that.

21           Dr. Davies, you provided opinions in

22   the August trial against Watson about the

23   compound BHT; correct?

24       A.  Correct.

```
1        Q.   And BHT is a known antioxidant; correct?

2        A.   Correct.

3        Q.   And ascorbyl palmitate is another known

4     antioxidant; correct?

5        A.   They are listed in the patent, that's

6     correct.

7        Q.   And ascorbyl palmitate is one of the

8     antioxidants that you call a reducing agent;

9     right?

10       A.   That's correct.

11       Q.   Let's go to JTX 187.  Can find that in the

12    binder?

13            MR. BROWN:  We would move to admit

14    JTX 170 if it wasn't already admitted.

15            MS. JACOBSEN:  No objection.

16            THE COURT:  Admitted without

17    objection.

18    BY MR. BROWN:

19       Q.   You have seen JTX 187 before; correct?

20       A.   I'm not sure I have.

21       Q.   Well, Doctor, JTX 187 is the

22    pharmaceutical development report prepared by one

23    of the plaintiffs here, LTS Lohmann, and I

24    believe you testified that a pharmaceutical
```

 1    development report is a document that is often

 2    included in an ANDA to give the regulatory

 3    authority a general idea of how a formulation was

 4    developed; correct?

 5         A.   That can be done, absolutely, I agree.

 6         Q.   I would like you to turn to page 504454.

 7    I'm putting it up on the screen now.  This page

 8    shows the oxidative degradation pathway that you

 9    testified about on direct examination; correct?

10         A.   Correct.

11         Q.   And the two oxidation impurities that you

12    measured in your forced degradation study are the

13    ones identified here as 802-95 and 213-95;

14    correct?

15         A.   That's correct.

16         Q.   213-95 is the compound known as Impurity

17    4?

18         A.   Correct.

19         Q.   And 802-95, also called styrene, is the

20    compound known as ECAV; correct?

21         A.   Correct.

22         Q.   And I'd like to turn ahead in JTX 187 to

23    Page N504460.

24              And I want to blow up Table 5 from

1    this report on the screen, along with the text

2    immediately above the table.  And in the text

3    above the table, it says two antioxidants

4    ascorbyl-palmitate and tocopherol have been added

5    as single substances in a concentration of 0.1

6    percent and in combination to formulation 2200.

7    The TDS have been packed in Barex-pouches and

8    stored at 60 degrees C for eight weeks.

9              In Table 5, the detected amounts of

10   the two main degradation products are listed.

11   And you understand TDS means transdermal system;

12   correct?

13      A.  I believe that's the case.

14      Q.  I'd like to look at what they found out

15   about ascorbyl-palmitate in this study.  So I'd

16   first like to look at the first two lines of the

17   study, the formulation 2200 with no antioxidants

18   and the addition of .1 percent tocopherol.

19              Can you describe the effect that

20   adding .1 percent tocopherol had on formulation

21   2200?

22      A.  Again, I -- well, I haven't been asked to

23   comment on this, but it appears to reduce the

24   level, the overall levels of the ketone or

1    styrene.

2       Q.  In fact, it substantially reduces the

3    ketone and the styrene; correct?

4       A.  Well, I agree it's reducing significantly.

5    Yeah.

6       Q.  So now I'd like to compare the second

7    line.  Excuse me.

8            Yeah.  I'd like to compare the

9    second line with the fourth line.  And the only

10   difference between those two formulations,

11   Doctor, is the addition of .1 percent

12   ascorbyl-palmitate; correct?

13      A.  Actually, I don't -- well, that's what it

14   says here.  I haven't read this document.  So

15   that's what it says here.

16      Q.  Well, let's look at the effect that they

17   observed in this experiment between those two

18   formulations.  The amount of the 213-95 ketone

19   approximately doubled; correct?

20      A.  It goes -- I agree.

21      Q.  And the amount of ECAV 802-95 went from

22   .66 to 2.18 percent; correct?

23      A.  That's correct.

24      Q.  So it basically tripled?

1        A.  Of that order.

2        Q.  So, Doctor, if you had formed an a priori

3    expectation before this experiment that adding

4    ascorbyl-palmitate could only reduce rather than

5    increase the oxidation of Rivastigmine, you would

6    have been wrong; correct?

7        A.  No, because if you look at the total

8    amount of the two key degradation amounts,

9    irrespective of the three examples shown, they're

10   much lower than the degradation products of the

11   2200.

12            So if you add up the degradation

13   products for the 2200, that's of the order of

14   five percent.  Then if you add up the other

15   degradants, then it's much lower in each case.

16       Q.  But, Doctor --

17       A.  So I wouldn't make that assumption.

18       Q.  But, Doctor --

19       A.  Make the assumption -- three compounds are

20   all acting as antioxidants because they're

21   reducing the oxidative degradation to the

22   compounds.

23            I mean, I haven't read this in

24   detail, so you're just showing me a small portion

1    of this.  But just as a scientist just sitting

2    here, you know, you've got three, three

3    antioxidants.

4              So, and they're all reducing the

5    level of oxidative degradation of the two

6    degradation products.

7    Q.  Doctor, the only difference between the

8    second experiment and the fourth experiment is

9    the addition of the ascorbyl palmitate; correct?

10   A.  I don't know that in detail, but I -- you

11   know, I can see it over here.  Ascorbyl palmitate

12   is ascorbyl palmitate.

13   Q.  I'd like you to turn to JTX 91.

14             And this is a document that you

15   cited in your surreply report in this case and

16   you've read this document; correct?

17   A.  I have.  That's correct.

18   Q.  And this reference reports work done by

19   researchers at Pfizer to evaluate the effect of

20   an antioxidant BHT on their drug formulation;

21   correct?

22   A.  Yes, on their coatings.  That's correct.

23   Q.  And I want to go to Page 123 of the

24   reference and I want to blow up a section where

1    they're reporting their conclusions.

2              Yes.  And I'm highlighting a

3    sentence there where they reported a conclusion

4    that I'm going to read, "Surprisingly, the core

5    containing BHT at a concentration equivalent to

6    the two percent BHT coating had higher levels of

7    the sulfoxide degradant.  Due to the instability

8    of BHT and the stability of the BHT radical

9    species, BHT radicals can enhance its oxidation

10   in the core.

11             So, Dr. Davies, if these researchers

12   had formed an a priori expectation that the known

13   antioxidant BHT could only decrease oxidation

14   rather than enhance it, they would have been

15   wrong; isn't that correct?

16        A.  I don't agree.

17        Q.  You don't agree with the conclusion the

18   researchers reached here?

19        A.  No.  I don't agree with your comments.

20   That's supposition.

21        Q.  Dr. Davies, I'd now like to go and talk

22   about the parameters for the stress test that you

23   talked about on direct examination.

24             First, I'd like to turn to DTX 591.

1    This is a document published by the U.S.

2    Department of Health and Human Services; correct?

3         A.  Yes, I agree.

4         Q.  And this document sets forth guidelines

5    for stability testing of new drug substances and

6    products; correct?

7         A.  That's what it says.

8         Q.  And I would like to turn to Page 7 of DTX

9    591 and I'm going to blow up the tables on the

10   bottom of the page.  And this table in this

11   document is describing two different tests;

12   correct?

13        A.  Sorry, which page are you on?  Sorry.

14        Q.  Page seven.

15        A.  Thank you.  Yes, it is.

16        Q.  One test is called long-term testing;

17   correct?

18        A.  That's correct.

19        Q.  And the other test is called accelerated

20   testing; correct?

21        A.  That's correct.

22        Q.  And for each of those tests the guidance

23   specifies a temperature at which it is to occur;

24   correct?

1     A.  That's correct.

2     Q.  And for each test the guidance also

3  specifies a relative humidity?

4     A.  That's correct.

5     Q.  And the guidance also specifies a minimum

6  time period; correct?

7     A.  That is correct.

8     Q.  And you agree that the tests set forth in

9  this table are standard tests; correct?

10    A.  I agree they're one form of test.

11    Q.  And, in fact, you believe that these are

12 standard tests within the meaning of the '031

13 patent; correct?

14    A.  They're a type of test, I agree.

15    Q.  And within the meaning of the '031 patent;

16 correct?

17    A.  Depends what you mean by that.  They're

18 certainly the kind of tests one can use and as I

19 described the process.

20    Q.  And, in fact, the lower test called

21 accelerated testing, those conditions match one

22 of the two stress tests that we saw earlier that

23 were described in column four of the '031 patent;

24 correct?

1       A.   That's correct, the temperature and the

2   humidity.

3       Q.   But it's your opinion that the standard

4   tests that may be used for purposes of the '031

5   patent are broader than those shown in the

6   patent; is that correct?

7       A.   I believe somebody skilled would

8   understand reading the patent that stress tests

9   that are described would describe such tests but

10   also would describe other tests that are known

11   stress tests that are known to pharmaceutical

12   scientists; correct.

13       Q.   And if you could turn to DTX -- well, I

14   believe -- could you find JTX 75 in the binder

15   that you used on direct examination.

16       A.   Thank you.

17       Q.   This is the Alsante reference you talked

18   about; correct?

19       A.   That's correct.

20       Q.   And when I asked you earlier about

21   identifying a reference that described using a

22   forced degradation study to determine if a

23   compound was an antioxidant, you referenced the

24   Alsante reference.   I would like you to tell me

1    if you can find the word "antioxidant" anywhere

2    in this document?

3        A.   Well, the document doesn't mention the

4    word antioxidant.  As we discussed at my

5    deposition, it does mention the word excipient,

6    and antioxidant is an excipient and it talks

7    about using stress tests as I indicated in my

8    direct for the selection of more stable drugs and

9    drug formulation.  It talks about drug excipient

10   compatibilities.

11       Q.   Doctor, I want to blow up a section of the

12   first page of the Alsante reference in the middle

13   portion there.  And there is a section within

14   this paragraph that I want to highlight.  It

15   starts at the beginning, because the ICH

16   definition leaves the details of the

17   investigation to the pharmaceutical researcher,

18   the practices that companies use to conduct

19   stress testing studies can vary tremendously and,

20   therefore, have a significant effect on the

21   quality of the analytical methodology used

22   throughout the industry.

23            You believe that what Alsante has

24   reported here is a correct characterization of

1    the use of the stress testing; correct?

2        A.  Well, I think it's saying what I indicated

3    with that, with guidance from the ICH, but the

4    details are left to the individual researchers,

5    but ultimately all achieving the same objective,

6    and that's what's accepted by the FDA when they

7    review such tests.

8        Q.  I would like to look at some of the

9    parameters that you went through on direct

10   examination.  First on page 62 of the reference,

11   there is a sentence in here that says, pull it

12   up, the second sentence under the heading how

13   stress testing studies are conducted, says most

14   companies attempt to induce at least five to 20

15   percent degradation of the drug substance before

16   considering stress testing to be complete.

17            My question for you, Doctor, is, you

18   did not induce at least five percent degradation

19   in any of the vials in your forced degradation

20   study; correct?

21       A.  That's correct, I induced about

22   three-and-a-half percent.  That was sufficient

23   for me to be able to compare the two samples, the

24   control versus the acetaldehyde.

```
 1        Q.  I would like to move forward to page 67 of

 2    the reference, below the heading oxidation.

 3              And I would like to blow up the last

 4    sentence before the heading peroxides, and that

 5    sentence says, For example, in the peroxide pie

 6    chart that shows typical temperatures, 84 percent

 7    of the companies selected ambient to 30 degrees

 8    C, 11 percent selected 31 to 50 degrees C, and

 9    only five percent selected greater than 50

10    degrees C.

11              And my question for you is, Doctor,

12    in your forced degradation study, you did not use

13    a temperature that falls within what 95 percent

14    of the companies in this review selected, namely

15    a temperature somewhere between ambient and 50

16    degrees C; correct?

17        A.  I agree.  It fell in the range that was

18    cited within the publication.

19        Q.  Now, proceeding to the first sentence

20    under the heading peroxides, the first sentence

21    says all companies use hydrogen peroxide.

22        A.  That's correct.

23        Q.  And you did not use hydrogen peroxide in

24    your forced degradation experiment; correct?
```

1        A.  That's correct.  That doesn't mean all

2   companies used it in every experiment, of course,

3   it just means that it's available for them to

4   use.

5        Q.  The Alsante reference doesn't refer to

6   tocopherol as hydrogen peroxide; correct?

7        A.  That's correct.

8        Q.  Now, the last sentence of this section

9   states that the maximum study duration selected

10  was the same for one and seven days, 37 percent

11  for both.  And your study duration was for less

12  than one day; correct?

13       A.  It's approximately one day.  It was

14  twenty-one hours, I accept that, just under one

15  day.  That was sufficient for my experiment.

16       Q.  The next heading on page 67 is radical

17  initiator.  You did not use a radical initiator

18  in your forced degradation study; correct?

19       A.  That's correct.  And 15 of the companies

20  also didn't use it.  You see N equals five, it

21  doesn't mean that you use it every time.

22       Q.  Doctor, do you know how many different

23  radical initiators there are that you would

24  consider standard in the industry for a stress

1    test?

2        A.   There could be a number.  I don't know the

3    exact number.

4        Q.   The next heading on page 67 is transition

5    metals.  And this section describes transition

6    metals that could be used because they promote

7    oxidative degradation; correct?

8        A.   That's correct.

9        Q.   And there are two more categories of

10   stress tests described here for oxidation

11   purposes, pressured oxygen and bubbled oxygen;

12   correct?

13       A.   That's correct.

14       Q.   And you didn't use either pressured oxygen

15   or bubbled oxygen in your study; correct?

16       A.   That's correct.

17       Q.   Dr. Davies, if you were testing a proposed

18   antioxidant called compound X to evaluate whether

19   or not it was an antioxidant, isn't it a fact

20   that you have not considered whether doing a

21   peroxide test, a radical initiator test, a

22   transition metal test, a pressured oxygen test

23   and a bubbled oxygen test would all give you the

24   same result?

1      A.  No, I don't think that's the case.  I

2   think I considered that, but as I have said, you

3   design the test to address the specific drug that

4   you're looking at.  And all achieve the same

5   objective if they're suitably designed.  In other

6   words, they generate the oxidative degradation

7   drug.

8      Q.  Doctor, I would like you to turn in your

9   deposition binder to the April 2nd, 2014

10  deposition.

11     Q.  And turn to -- please turn to Page 361.

12  And I'm reading from Line 12.

13          "Question:  So if you were testing a

14  proposed antioxidant, Compound X, to evaluate

15  whether or not it was an antioxidant, would doing

16  a peroxide test, a radical initiator test, a

17  transition metal test, a pressure oxygen test and

18  a bubble oxygen test all give you the same

19  result?

20          "Answer:  Again, as a scientist, one

21  would -- if one doesn't know that, one would have

22  to think about that, give it some thought.  It's

23  not something that I have been asked to consider.

24          But clearly these documents, as I've

1     highlighted, there's a number of different ways

2     the industry uses to undertake oxidation stress

3     tests.  And the diversity reflects the diversity

4     of drugs and the different susceptibility to

5     oxidation and the different formulations."

6               Is that the answer you gave me?

7          A.  Yes, absolutely.  It's absolutely correct.

8          Q.  And I'd like to switch topics for a

9     moment.

10              Doctor, for the batches of Par's

11    rollstock where no acetaldehyde has been

12    measured, you believe that one possible

13    explanation for why those batches contain no

14    detectable acetaldehyde is that the acetaldehyde

15    may have been consumed in an oxidation reaction;

16    correct?

17         A.  Maybe I missed your question.  Are you

18    saying there was a batch which -- where the

19    acetaldehyde wasn't measured, in other words?

20         Q.  Let me restate the question.  You remember

21    there were two batches that you talked about on

22    direct where there was not a detectable amount of

23    acetaldehyde present; correct?

24         A.  Yes.

1      Q.  And you believe that one possible

2   explanation for why those batches contained no

3   detectable acetaldehyde is that the acetaldehyde

4   may have been consumed in an oxidation reaction;

5   correct?

6      A.  That's possible.

7      Q.  It's also possible that acetaldehyde

8   evaporates; correct?

9      A.  It depends.  In that context, I think it

10  would be difficult because it's in the patch.

11     Q.  Dr. Davies, after the Par product is

12  manufactured, isn't it true that you don't have

13  the information to know if there's any

14  acetaldehyde in the patch a month later?

15     A.  Well,.

16         At one month later.

17     Q.  Yes.

18     A.  Certainly, there was an example of a patch

19  that I highlighted in my reports which was made

20  and then packaged one month later.

21             And that was represented to the FDA

22  as the final formulation had a level of

23  acetaldehyde.  So the FDA has represented the

24  final finished product has that level of

1    acetaldehyde.

2         Q.  Well, Doctor, during your direct

3    testimony, you provided testimony regarding Par's

4    specification for acetaldehyde from PTX 348.  Do

5    you recall that?

6         A.  Thank you.  Yeah.

7         Q.  And could you find Page Par 780, which is

8    where I think you got your information from?

9    Now, I'd like to blow up the entire top section.

10   Not that, the second chart, but the top section.

11                 And in the method column, do you see

12   where it says Report three sample results?

13        A.  I do.

14        Q.  And below that, it says report results

15   from rollstock?

16        A.  It does.

17        Q.  And Dr. Davies, isn't it correct that you

18   have never seen a specification that requires Par

19   or 3M to measure the amount of acetaldehyde

20   directly in their finished patches?

21        A.  I think this shows that it's measured in

22   the rollstock, but then Par -- Par then says to

23   the FDA -- if you look at the front of this

24   document, it says the finished product

1     specification, in other words, the finished final

2     product in the patent, in the pouch

3     specification, and it's representing that's the

4     boundaries of acetaldehyde.

5          Q.  Doctor, you have never seen any data for

6     an acetaldehyde measurement taken on a finished

7     patch; correct?

8          A.  I disagree.  These are -- this is data

9     that is represented to the FDA on the finished

10    final products.

11         Q.  My question is:  You have never seen data

12    for an acetaldehyde measurement taken on a

13    finished patch; correct?

14         A.  That's been taken on a finished patch.

15    This is the rolls of the stock that is then cut

16    and put into the patches.  And they measure it

17    there.

18         Q.  Well, let's go to your deposition, your

19    April 2nd deposition, Page 320.

20              And I'm reading from Line 6 to 12.

21              "Question:  Have you seen any

22    acetaldehyde measurements that were taken on

23    finished patches?

24              "Answer:  I believe the results that

 1    I have seen are based on rollstock."

 2                Is that the question and answer from

 3    the deposition?

 4        A.   That's correct.  That is what I said.

 5                And then I go on to say, if you look

 6    underneath, I've relied on Par's representations

 7    of the FDA based on the acetaldehyde they

 8    measured in their product.  And that's what they

 9    represented to the FDA.

10                That's what I just told you --

11    talked to you about.  So, if you read further on

12    down the line, you know, you see exactly what I

13    just told you.

14        Q.   And, Doctor, even though you asked for and

15    received 400 patches of Par's ANDA product, you

16    haven't produced any testing of the acetaldehyde

17    content of any of those patches, have you?

18        A.   That's correct.  I've relied on Par's

19    testing.

20                MR. BROWN:  Thank you.  Par has no

21    further questions.

22                THE COURT:  All right.  Thank you.

23                Any redirect, Ms. Jacobsen?

24                    REDIRECT EXAMINATION

```
 1    BY MS. JACOBSEN:

 2        Q.  Just a couple of questions, Dr. Davies.

 3            Dr. Davies, do you recall Par's

 4    counsel asking you questions on cross-examination

 5    regarding whether you had a positive control in

 6    your stress test?

 7        A.  Yes, I do.

 8        Q.  And I believe you said that you didn't

 9    need to include one?

10        A.  That's correct.

11        Q.  And why was that?

12        A.  Well, I already knew that Rivastigmine

13    would degrade, undergo oxidative degradation in

14    the presence of peroxides.

15            So I already knew that from the

16    data.  And I -- my own data shows that, in fact,

17    that's exactly what happens.

18            The two key degradation products

19    that I observed are the key degradation products

20    that result from the presence of peroxide.  I

21    already knew -- if I placed something, another

22    antioxidant against that system, that antioxidant

23    would have reduced the level of degradation, just

24    like acetaldehyde would.  I wouldn't have any
```

1    other expectation because I was creating the

2    right kind of oxidative degradation.

3        Q.  Dr. Davies, do you recall Par's counsel

4    asking you questions about your stress test

5    containing oxygen?

6        A.  Yes.

7        Q.  And would the presence of oxygen have

8    altered the results of your stress test?

9        A.  No.  Whether it's by oxygen or peroxides,

10   you see the same effect.  You see the same two

11   key degradation products.  That's what I showed

12   in my direct, that's what Par believed based on

13   their documentation as well.

14       Q.  And finally --

15       A.  It won't change the oxidative degradation

16   of the drug.

17       Q.  And Dr. Davies, do you recall Par's

18   counsel asking you questions on cross-examination

19   about the temperature at which you conducted your

20   stress test?

21       A.  Yes.

22       Q.  And I believe he asked you if it was at 40

23   degrees Celsius above the boiling point of

24   acetaldehyde, do you recall?

1        A.  Yes.

2        Q.  Would acetaldehyde in your opinion have

3    been a gas in your stress test?

4        A.  No.  It would have been -- it's very much

5    present in the solution.  The reason for that is

6    that acetaldehyde on its own is a pure material

7    at that particular boiling point.  However, when

8    you mix it in with a solvent, it then takes the

9    -- it then alters the boiling point of the

10   material, and it's somewhere between the two

11   materials' boiling point.

12              Now, that's important because that

13   means that acetaldehyde would have stayed within

14   the solvent of my test.  But then you have to

15   look at the results.  Two key degradation

16   products formed and there is less formed in the

17   solvent with acetaldehyde present, showing that

18   it is present, it is acting as an antioxidant.

19              MS. JACOBSEN:  Thank you,

20   Dr. Davies.  I have no further questions.

21              THE COURT:  Thank you.  Dr. Davies,

22   you can step down.

23              Does Novartis have anything more on

24   this infringement case?

1              MS. JACOBSEN:  No, Your Honor.

2              THE COURT:  All right.  So you rest?

3              MS. JACOBSEN:  We rest.

4              THE COURT:  All right.  Mr. Brown.

5              MR. BROWN:  Two quick things, Your

6       Honor, from Dr. Davies' cross.  I again neglected

7       to admit a couple of exhibits, JTX 91 and DTX

8       591, we would like to move those for admission

9       now.  It's the article and the FDA guidance.

10             MS. JACOBSEN:  We have no objection.

11             THE COURT:  Admitted without

12      objection.

13             MR. BROWN:  DTX 591.

14             Par now calls Dr. Bruce Ganem.

15             THE COURT:  All right.

16             MR. SILVER:  Your Honor, one

17      housekeeping matter.  We have swapped out some

18      team members.  Sitting at the counsel table with

19      me will be Daniel Minion and Dominick Conde.  I

20      don't know if they have been before Your Honor

21      before.

22             THE COURT:  Welcome gentleman.

23             MR. SILVER:  Thank you.

24             THE CLERK:  Please state and spell

1    your full name for the ready.

2                    THE WITNESS:  Yes.  My name is

3    Bruce, B-R-U-C-E, Ganem, G-A-N-E-M.

4

5                    BRUCE GANEM, PH.D.,

6            the deponent herein, having first

7               been duly sworn on oath, was

8               examined and testified as follows:

9                    MR. CHIN:  Your Honor, may I

10   approach to pass up a pen?

11                    THE COURT:  Yes.

12                    MR. CHIN:  Your Honor, may we also

13   approach to hand up a couple of binders?

14                    THE COURT:  Sure.

15                    DIRECT EXAMINATION.

16   BY MR. CHIN:

17       Q.  Good afternoon, Dr. Ganem.

18       A.  Good afternoon.

19       Q.  Could you please introduce yourself to the

20   Court?

21       A.  Yes.  My name is Bruce Ganem.  I hold an

22   endowed chair at the Department of Chemistry and

23   Chemical Biology at Cornell University in Ithaca,

24   New York.  I held that chair and I also serve as

1    chair of my department.

2        Q.  What is your particular focus within the

3    field of chemistry?

4        A.  I'm an organic chemist and I'm

5    particularly interested in developing reaction

6    pathways to biologically active natural products.

7    That often involves developing new oxidation and

8    reduction reactions which are a core part of

9    organic chemistry.

10       Q.  Could you turn to DTX 524 in your book.

11       A.  Yes.

12       Q.  Could you identify this document?

13       A.  Yes.  This is my current CV.

14       Q.  Does DTX 524 provide an accurate

15   description of your professional credentials?

16       A.  I believe it does.

17            MR. CHIN:  Your Honor, Par moves the

18   admission of DTX 524.

19            MR. MINION:  No objection.

20   BY MR. CHIN:

21       Q.  Dr. Ganem, has any of your work involved

22   the development of pharmaceutical products?

23       A.  Yes, it has.  Several years ago my lab

24   discovered and developed a new reduction reaction

1    that has been used to greatly amplify and improve

2    the synthesis for the important anticancer drug

3    Taxol which is used in treating almost all solid

4    tumors.  The drug used to come from a very rare

5    plant that was threatened biologically.  We can

6    use make the drug from ordinary garden variety

7    trees, it accounts for about a third of the

8    world's supply today.

9              MR. CHIN:  Your Honor, Par offers

10   Dr. Ganem as an expert in organic chemistry

11   including oxidation and reduction reactions.

12             MR. MINION:  No objection, Your

13   Honor.

14             THE COURT:  All right.  You may

15   proceed.

16   BY MR. CHIN:

17     Q.  I would like to turn to some of the issues

18   in this case.  Can you explain to the Court what

19   is oxidation?

20     A.  Yes.  Simply put, oxidation is the process

21   by which electrons are removed from a chemical

22   compound.

23     Q.  Can you generally describe how oxidation

24   occurs?

```
1          A.  Yes.  Typically when a compound loses one

2     or more electrons, it transfers those compounds,

3     those electrons to another compound, a different

4     substance which accepts those electrons and is

5     thus reduced.  So the process of oxidating,

6     oxidizing one compound goes hand in hand with a

7     concomitant reduction of some other substance and

8     that tandem process is generally referred to as a

9     redox process.

10         Q.  Redox is short for reduction and

11    oxidation?

12         A.  Yes.

13         Q.  What is oxidative degradation?

14         A.  So oxidative degradation is the process by

15    which the oxidation level of chemical compound

16    results in the decomposition.

17         Q.  And have you prepared a slide to

18    illustrate this?

19         A.  Yes, I have.

20         Q.  So --

21         A.  So I'll explain to the Court what I call

22    the core cycle of oxidative degradation.  This

23    process begins with some organic compounds, the

24    organic compounds undergoing oxidative
```

1    degradation, which is oxidized by something to

2    produce this, what we call, radical.

3              But it's a chemical radical

4    different from an ordinary type of radical.  It

5    has just one electron.

6              And that radical R dot will react

7    with a molecule of oxygen in the atmosphere to

8    produce another radical.  This is called a peroxy

9    radical at the bottom of the slide.  Both of

10   these compounds are highlighted in red because

11   they represent the process of oxidative

12   degradation.

13             Now, continuing the process in this,

14   peroxy radical encounters another organic

15   molecule such as the substance being degraded RH.

16   The peroxy radical will abstract the hydrogen and

17   be reduced, thus forming now a peroxide, a

18   hydroperoxide compound here and regenerating the

19   initial radical at the top of the slide R dot.

20             And so this process, first of all,

21   is a chain reaction.  It can propagate itself

22   many, many times, going around and around this

23   cycle driving the transformation of an organic

24   compound to the oxidative degradation products.

1      It's the core engine of oxidative degradation.

2          Q.  Are you aware that the Court has given a

3      definition of the term antioxidant in this case?

4          A.  Yes, I am.  The definition shown on the

5      slide, I understand the Court has agreed that an

6      antioxidant is an agent that reduces oxidative

7      degradation.  And I have adopted that definition

8      in forming my opinions.

9          Q.  Can you turn to JTX 1 in your book?  This

10     is the '031 patent which has already been

11     admitted into evidence.

12         A.  Yes, I'm there.

13         Q.  Did you have an opportunity to study the

14     '031 patent in connection with your work on this

15     case?

16         A.  I did.

17         Q.  And I'd like to draw your attention to

18     Column 4, Lines 10 through 19.

19             Do you see that this passage lists

20     several antioxidant compounds that have been

21     discussed today?

22         A.  Yes, it has been several times.

23         Q.  In your experience, do these compounds

24     qualify as antioxidants to chemists?

1       A.  Yes.  They're all well-known antioxidants

2    for which extensive published literature exists.

3       Q.  And can we turn back to Slide Number 2,

4    the cycle.  Can you describe how the antioxidants

5    that were listed in the '031 patent act to reduce

6    oxidative degradation?

7       A.  I can.  So all of those antioxidants shown

8    in the '031 patent have the unique ability to

9    shut down or suppress this cycle of oxidative

10   degradation in several ways.

11              One, for example, is if the radical

12   at the top of the slide encounters a molecule of

13   antioxidant, the antioxidant will reduce this

14   radical by adding an H to it to form RH.  That

15   immediately shuts down the ability of this

16   radical to drive further degradation.

17              But the unique ability of the

18   antioxidant to do that is caused by the

19   antioxidant now forming a radical, which is very

20   stable.  Typically can't do anything.  It can't

21   engage in the cycle.

22              So that's one example of how an

23   antioxidant can shut down this process.  And

24   quickly another is simply that the antioxidant

1    can react with this red peroxy radical at the

2    bottom, get -- radical gets reduced by accepting

3    a hydrogen to form this peroxide.  And, again, a

4    very stable antioxidant radical, which does not

5    contribute to oxidative degradation.

6        Q.  Does aldehyde form a stable radical?

7        A.  No, quite to the contrary.  Acetaldehyde

8    can form a radical, but it's a highly reactive

9    radical that can itself contribute to oxidative

10   degradation.

11       Q.  Can a radical of acetaldehyde break this

12   cycle of oxidative degradation?

13       A.  No, quite to the contrary.  An

14   acetaldehyde radical can actually engage in much

15   of this same process and enhance oxidative

16   degradation.

17       Q.  You're aware that plaintiffs are

18   contending that acetaldehyde is an antioxidant?

19       A.  Yes, I am.

20       Q.  Did you find acetaldehyde listed in the

21   '031 patent as an antioxidant?

22       A.  No, I did not find it anywhere in the

23   patent.

24       Q.  How commonly is acetaldehyde used as a

1    reagent in chemical reactions?

2        A.  Well, as we heard earlier today,

3    acetaldehyde is a well-known chemical compound.

4    And organic chemists use acetaldehyde all the

5    time as a synthetic building block for preparing

6    other compounds.

7        Q.  In your 40 years of experience as a

8    chemistry professor, have you ever heard of

9    acetaldehyde reported as an antioxidant?

10       A.  No, never.

11       Q.  In your opinion, is acetaldehyde an

12   antioxidant?

13       A.  No, it is not and chemists do not consider

14   it to be an antioxidant.

15       Q.  Is acetaldehyde a reducing agent?

16       A.  Yes, it is.

17       Q.  What does it mean to be a reducing agent?

18       A.  So, for a substance to be a reducing agent

19   that simply means that it will reduce some other

20   chemical substance and, in turn, become oxidized

21   as would happen in any combined redox process.

22       Q.  In your opinion, does acetaldehyde qualify

23   as an antioxidant because it can be a reducing

24   agent?

1          A.  No, not at all.  Lot of compounds can be

2     reducing agents, but that does not mean that they

3     can disrupt this engine, this cycle of oxidative

4     degradation.

5          Q.  In your opinion, does acetaldehyde qualify

6     as an antioxidant because it can be oxidized

7     itself?

8          A.  No, not at all.

9          Q.  What can happen if acetaldehyde is

10    oxidized itself?

11         A.  Well, if acetaldehyde gets oxidized, as I

12    mentioned before, it can do so by forming a

13    reactive free radical and in turn actually

14    enhance oxidative degradation.

15         Q.  Is that behavior reported anywhere?

16         A.  Well, yes.  We've heard in the courtroom

17    today mention that acetaldehyde can form a

18    reactive peroxide.

19              It turns out whenever you purchase a

20    sample of acetaldehyde, it comes with a serious

21    warning label that indicates the potential for

22    peroxide formation to occur and the compound

23    should be treated accordingly.  The mechanisms by

24    which that happens have been well worked out in

```
1     the chemical literature.

2          Q.  Can you turn to JTX 086 in your book?

3          A.  Yes, I'm there.

4          Q.  Do you recognize this document?

5          A.  I do.  This is a review article I've

6     relied on that describes the chemical mechanisms

7     by which acetaldehyde undergoes oxidation.

8          Q.  What journal is it from?

9          A.  This is from the journal Chemical Reviews,

10    which is the principal review journal of my

11    professional society, American Chemical Society.

12              MR. CHIN:  Your Honor, Par moves the

13    admission of JTX 086.

14              MR. MINION:  No objection.

15    BY MR. CHIN:

16         Q.  Can we turn to Page 335 and have the

17    chemical equations presented on the screen?

18              Dr. Ganem, can you describe for the

19    Court what these equations show?

20         A.  Yes, I can.  So I direct the Court's

21    attention to a series of chemical equations

22    numbered four through eight.  And these react --

23    these equations indicate that the process by

24    which an aldehyde here shown on the left of
```

1    equation four, RCHO can undergo an oxidation

2    using molecular oxygen to form what turns out to

3    be a variety of reactive chemical radicals.

4              So with Mr. Smith's help, I'll try

5    to highlight these for the Court.  The first

6    radical, reactive radical that's formed is a

7    radical R dot shown here on the right side of the

8    equation four.  That radical can then react as

9    shown in equation five with molecular oxygen to

10   form this radical peroxy radical in equation

11   five, which is another reactive radical.

12             In fact, these are the very same

13   radicals we saw in that oxidative cycle I

14   mentioned.  But, furthermore, we see the

15   formation of acyl RCO.  That's RCO dot on

16   equation six, and it appears again on the product

17   side of equation eight.

18             Thank you.

19             And in addition an acyl radical can

20   combine with molecular oxygen to form this

21   reactive radical shown on the right side of

22   equation seven.  So we see here four different

23   chemical radicals.  One of them appears twice in

24   the overall cascade of reactions.  All of which

1    are reactive enough to contribute to oxidative

2    degradation.

3        Q.  How do all of these reactive radicals

4    generated by acetaldehyde compare to the

5    oxidative degradation cycle that you described

6    earlier?

7        A.  Well, as I mentioned, at least two of them

8    are chemically equivalent to the two that we saw,

9    and others, such as this peroxy radical is

10   similar in structure, the one on equation seven

11   is similar in reactivity and structure to the one

12   on equation five and I think chemist consider

13   acetaldehyde an extremely reactive radical.

14       Q.  Do you recall that Dr. Davies mentioned a

15   negative 30 degree threshold that's mentioned in

16   the Chemical Reviews article in his testimony this

17   morning?

18       A.  Yes, I do recall that.  Dr. Davies pointed

19   out something having to do with a low temperature

20   limit to what's possible here.  But actually he

21   was quoting from some studies that lead to this

22   understanding of reactive pathways.  That

23   temperature threshold has nothing to do with

24   these equations.  All of these processes can

1    occur readily at room temperature.

2        Q.  Are the chemical reactions that you

3    discussed here consistent with acetaldehyde being

4    a reducing agent?

5        A.  Yes, they are.  Because to be a reducing

6    agent means that the compound gets oxidized.  And

7    if you look overall at what happens, an aldehyde

8    such as acetaldehyde shown here at the start is

9    eventually converted into a peroxy carboxylic acid

10   shown here at the product of equation eight. So in

11   sum the reaction is a net oxidation of the

12   aldehyde.

13       Q.  Are the chemical reactions that you have

14   discussed and shown here consistent with

15   acetaldehyde being an antioxidant?

16       A.  No, I don't think so.  As I say, this

17   process is producing a variety of quite chemical

18   radicals that would not suppress oxidative

19   degradation, they would actually enhance and

20   contribute to it.

21       Q.  I would like to change to a slightly

22   different topic.  Were you in court -- you were

23   in court earlier today when Dr. Davies described

24   his experiment testing, rivastigmine and

1      acetaldehyde in the presence of TBHP?

2          A.  Yes, I was here throughout that.

3          Q.  Have you had an opportunity to study the

4      data and records relating to Dr. Davies's

5      experiment?

6          A.  I did.

7          Q.  Do you consider Dr. Davies's experiment to

8      be an appropriate model for the oxidative

9      degradation of rivastigmine by oxygen?

10         A.  No, I don't.  And the reason I don't is

11     because Dr. Davies doesn't use oxygen in his

12     study, he uses TBHP, the peroxide compound.

13         Q.  How is TBHP different than oxygen?

14         A.  TBHP is different from molecular oxygen in

15     several ways.  To begin with, TBHP seeks out

16     negative charge, TBHP is also a protic, meaning

17     slightly acidic compound whereas molecular oxygen

18     has no property.  As we heard earlier today, TBHP

19     is a liquid whereas we're all familiar with the

20     fact that oxygen is a highly diffusible gas.

21         Q.  Do those differences effect the oxidation

22     process?

23         A.  Yes, they certainly can.  Among other

24     things, TBHP, the hydroperoxide can perform

1    direct oxidation of chemical compounds.  For

2    example, TBHP will directly oxidize an aldehyde

3    such as acetaldehyde to a carboxylic acid and TBHP

4    will directly oxidize amine such as rivastigmine

5    to the amine oxide.

6         Q.  Can you describe these direct reactions

7    that you just alluded to?

8         A.  Yes, I have them on a slide for the Court.

9    So on the top slide I show acetaldehyde

10   undergoing a known reaction with TBHP in which

11   the aldehyde gets oxidized to acetic acid.  And

12   at the bottom of the slide I show rivastigmine

13   pointing especially to the nitrogen on the right

14   side of this molecule which undergoes an

15   oxidation with TBHP to form the amine oxide that

16   we heard about.

17        Q.  How important are these direct reactions

18   under the conditions of Dr. Davies's experiment?

19        A.  So as I said, in Dr. Davies's experiment

20   he used a very large excess of TBHP, so given

21   that, I would have assumed that these are the

22   dominant processes in his reaction, that

23   oxidation by air would play a minimal role, if

24   any, in his experiments.

1          Q.  Does Dr. Davies's experiment reflect how

2    acetaldehyde would affect oxidative degradation

3    of rivastigmine by oxygen?

4          A.  No, as I just said, there is very little

5    oxygen in Dr. Davies's experiments.  In fact, I

6    was able to calculate that the amount of oxygen

7    in the experiment he described is about

8    approximately two orders of magnitude less than

9    the amount of TBHP that he put into his

10   experiments.  So again, I would assume that it

11   would be very unlikely that in the Davies

12   experiments one is seeing very much oxidation

13   caused by molecular oxygen.

14         Q.  Is the Davies' experiment an appropriate

15   model for oxidative degradation by oxygen?

16         A.  No, for that reason, I don't think so.

17         Q.  Have you reached any conclusions regarding

18   the design and methodology of Dr. Davies's

19   experiment?

20         A.  Yes.  So in my opinion Dr. Davies's

21   experiment is not a scientifically valid way to

22   test the oxidation of rivastigmine by oxygen.  It

23   first of all -- or the effect of acetaldehyde on

24   that process.

1      Q.  What is your concern about the scientific

2   validity that you just alluded to?

3      A.  Well, I have several concerns.  To begin

4   with, Dr. Davies does not use any method,

5   Dr. Davies's experiment doesn't use any method I

6   have ever encountered, any valid scientific

7   method that I know of to test for the antioxidant

8   capabilities of a chemical compound.  But putting

9   that aside, there are additional concerns I have

10   in both the execution and methodology of his

11   experiment.

12      Q.  What would be needed for a validated

13   scientific method in such a study?

14      A.   Well, I think the Court has heard this

15   already this morning, and I don't want to bore

16   you, Your Honor, but the fact is in my opinion, a

17   scientifically -- for a test of an antioxidant to

18   be a scientifically valid method, the test should

19   first of all show that known antioxidants display

20   the expected antioxidant behavior that's been

21   reported for them, and likewise, compounds that

22   are known not to have any antioxidant activity

23   should be shown in the Davies test likewise to

24   exhibit no such activity.  And absent those

1    controls, those validations, I don't think one

2    can draw any conclusions from an experiment.

3        Q.  You also referred to issues of

4    methodology.  What were you concerned about

5    there?

6        A.  Well, I have three main concerns and I

7    have summarized them for the Court on a slide.

8            So to begin with, in my opinion,

9    Dr. Davies fails to account for numerous other

10   components that are produced in his reaction, and

11   in particularly, those that might be generated by

12   side reactions with TBHP.

13           Secondly, Dr. Davies in my opinion

14   fails to account for the possibility of what is

15   called co-elution of these other components in

16   the HPLC.  And finally, it's my opinion that

17   Dr. Davies has improperly used a form of data

18   normalization that I believe obscures errors in

19   his experiments and actually represents them as

20   real results.

21       Q.  Perhaps we can start with the first bullet

22   point.  Can you explain why you consider failing

23   to account for other components to be a flaw in

24   the experiment?

1        A.  Yes, I can.  So Dr. Davies's bases his

2    entire analysis on the assumption that only three

3    chemical substances are involved in his

4    experiment.  The rivastigmine, which he recovers

5    unreacted and the two impurities we have heard

6    about, impurity 4 and ECAV.

7                    However, when we look at

8    Dr. Davies's data in the test samples, the A1,

9    A2, and A3 samples and look at the HPLC

10   chromatogram of those experiments, one sees

11   numerous other minor compounds that show up as

12   peaks in the chromatogram all across the

13   chromatogram.  And Dr. Davies simply ignores

14   these other compounds and does not characterize

15   them.  He, I think to put it harshly, he pretends

16   they don't exist and bases his analysis only on

17   three compounds I mentioned.

18       Q.  Did Dr. Davies attempt to address your

19   criticism about ignoring other components?

20       A.  I raised this concern in one of my expert

21   reports and Dr. Davies replied as I think we

22   heard him say today, that he could account for 99

23   percent of the mass in his experiment.  He

24   referred to that as a 99 percent mass balance.

1              When I looked at his data with that

2       in mind, I discovered that Dr. Davies

3       inappropriately included a large solvent peak

4       that is used, you used solvent to inject your

5       HPLC sample into the chromatogram.  I think he

6       inappropriately included that solvent in his mass

7       balance.

8              MR. MINION:  Objection.

9              THE COURT:  Yes.

10             MR. MINION:  It seems like Dr. Ganem

11      is offering a sure reply to Dr. Davies's reply

12      report.  He only has one main expert report.

13             MR. CHIN:  Your Honor, Dr.

14             MR. CHIN:  Your Honor, Dr. Ganem had

15      a couple of different paragraphs explaining the

16      missing other components.  Dr. Davies responded

17      in his surreply.  I think Dr. Ganem is entitled

18      to explain why he believes it, in his opinion

19      that he sets forth, is a valid opinion in light

20      of Dr. Davies' response --

21             THE COURT:  Was his response before

22      the two professors were deposed?

23             MR. CHIN:  All of this was prior to

24      the deposition.  There were three reports.

```
 1                    Dr. Davies set forth his experiment.

 2    Dr. Ganem set forth his criticisms.  And then and

 3    only then did Dr. Davies say he had an

 4    appropriate mass balance.

 5                    Then depositions were taken.  That's

 6    the record.  If we had to have a surreply for

 7    every single response to a response, I don't

 8    think we'd ever end up submitting expert reports.

 9                    THE COURT:  Well, that's probably

10    true.  So basically what you are saying, what I'm

11    about to hear is not in any expert report.

12                    THE COURT:  Well, that's --

13                    MR. CHIN:  The substance of it is in

14    the expert report, Dr. Ganem set forth his

15    criticism of the lack of accounting for other

16    components and he merely explained why that is an

17    appropriate criticism in light of what Dr. Davies

18    said in his rebuttal report and his last three

19    reports before depositions.

20                    We're not getting into any new data.

21    They're not getting into any new substance.

22                    THE COURT:  You have something more

23    to say?

24                    MR. MINION:  I do.  I want to say
```

1          two things:  That what he was going into, what

2     Dr. Ganem was about to go into talking about, the

3     solvent peak and that wasn't in any of the

4     reports, not in Dr. Davies' report, not in

5     Dr. Ganem's report.

6                    And I would like to point out that

7     after the depositions were over, Dr. Ganem did

8     supplement his expert report and he did not put

9     this new opinion in.

10                   THE COURT:  Is that right, Mr. Chin?

11                   MR. CHIN:  It was a one-page

12    supplemental to make some minor corrections to an

13    entirely unrelated issue.  This issue did not

14    occur and it was to correct an error that was

15    raised during the deposition.

16                   THE COURT:  All right.  Well, I

17    think you -- what you can actually do, you can

18    probably make a point of what he made in his

19    report, first report.  So why don't you stick to

20    that.

21                   So I'll sustain the objection.

22                   MR. MINION:  Thank you, Your Honor.

23                   MR. CHIN:  If you can just give me a

24    minute to --

1              THE COURT:  Yes.

2              MR. CHIN: -- find the precise

3    language of the original report.

4    BY MR. CHIN:

5        Q.  Dr. Ganem, can you describe for me

6    approximately how much of the non-volatile

7    analytes that Dr. Davies failed to account or

8    correct for?

9        A.  Yes, I think I can.  In Dr. Davies'

10   experiment, it was about 92 to 93 percent of a

11   material that was unreactive Rivastigmine.  That

12   leaves about seven or eight percent for the

13   impurities of the reaction product.

14             But what Dr. Davies failed to

15   account for, about one-fifth of that -- 20

16   percent.

17       Q.  And what conclusions do you draw from

18   failing to account for about one-fifth of the

19   impurities?

20       A.  Well, my concern as a scientist is that a

21   large amount of undocumented material, it goes

22   unrecognized.  Some of this could have been

23   formed, as I mentioned already, by the side

24   reactions or direct reactions of TBHP with --

1      with these impurities, Impurity 4 and ECAV.

2                  The net result of that is that it

3      would alter the -- it would distort the actual

4      percentages of those two impurities.  And I

5      believe this is important because, as we heard

6      earlier today, Dr. Davies experiment relies on

7      measuring minute differences between these

8      impurity peaks, Impurity 4, ECAV and I'm

9      concerned that these other components could have

10     distorted that.

11        Q.  Dr. Ganem, have you served as an editor or

12     a reviewer for peer-reviewed journals in the

13     chemistry literature?

14        A.  Yes, for over a dozen years, I was the

15     U.S. executive editor for a journal called

16     International Journal of Organic Chemistry.

17                  We typically handle about 500 papers

18     a year in that office.

19        Q.  In your opinion, would a scientific study

20     that fails to account for other components in the

21     system, as you discussed, be acceptable for

22     publication in a peer-reviewed journal?

23        A.  No, generally not.

24        Q.  Let's turn to your second bullet point,

```
1       the co-elution issue that you mentioned.  Can you

2       describe why you believe failure to account for

3       co-elution of these components is a flaw in the

4       Davies experiment?

5           A.  Yes.  Well, as I just described to the

6       Court --

7                   THE COURT:  Can you first describe

8       what co-elution is?

9                   THE WITNESS:  I'll describe that.

10      Give me just a moment.

11                  THE COURT:  Okay.

12                  THE WITNESS:  So I mentioned there

13      was about 20 percent of these other products that

14      went uncharacterized.  And when one looks at one

15      of the HPLC chromatograms that Dr. Davies did in

16      this experiment, these other minor things are

17      spread across the entire spectrum frequently

18      bracketing one on either side of a peak of

19      interest, such as Impurity 4 of ECAV.

20                  Now, sometimes they're so close that

21      the tail of one peak begins to merge a rise of

22      another peak.  That is, they overlap.

23                  And when peaks overlap like this,

24      the possibility exists of co-elution, which means
```

1    the two different compounds are coming out

2    together, at least in part.  That's what

3    co-elution is and it's not an uncommon experience

4    of HPLC analysis, especially when peaks are close

5    together.

6              So the concern I have about this

7    co-elution, different compounds showing up in the

8    same peak, is that this is another factor that

9    can distort the actual amount of a particular

10   impurity.  It could either contribute to or

11   detract from the actual amount of the compound

12   that's present.

13             And I think any good scientist would

14   be concerned about that when, again, the

15   differences being measured are such minute

16   percent differences between control experiments

17   and the test experiments.

18             Did I explain co-elution for you?

19             THE COURT:  Yes.  I get it.  Yes.

20   BY MR. CHIN:

21     Q.  Now, you heard this morning how Dr. Davies

22   had identified the peaks, Impurity 4 and ECAV.

23   Does that account for collusion?

24     A.  So I raised this concern about co-elution.

1    This is one of my replies to Dr. Davies and he

2    responded, first of all, by saying in the case of

3    ECAV, he had taken a UV spectrum.  We heard him

4    testify to that today.

5              Now, a UV spectrum will tell you

6    whether you have the compounds you believe you

7    have.  But other components can be present in a

8    sample without -- that would not distort the

9    ultraviolet spectrum.  So that's not a very good

10   explanation or response to my concern.

11             It indicates of Impurity 4, pardon

12   me, the other impurity Dr. Davies responded

13   simply by saying that he had shown that was ECAV

14   by using an authentic standard.  And I understand

15   that, but that doesn't diminish the possibility

16   of co-elution.  So he really did not address my

17   concerns.

18      Q.  And, finally, if we can turn to the third

19   bullet point, improper data normalization.  Can

20   you explain why you find that to be a flaw in the

21   experiments?

22      A.  Yes, I can.  And to do so, it helps if I

23   can show Dr. Davies' summary of his own data on a

24   slide.

1          Thank you.

2          So this is from Dr. Davies' summary

3     of his experiment in which he reports the results

4     of his three control experiments, the absence of

5     acetaldehyde and in the presence of acetaldehyde.

6          And we see he's measuring the three

7     compounds I have spoken about, Rivastigmine,

8     Impurity 4 and ECAV.

9          Now, Dr. Davies, I've already

10    pointed out, I think, has erroneously decided to

11    ignore these other minor peaks.  But to make

12    matters worse, he simply shows the yields of

13    these three compounds in a way that they all add

14    up almost magically to a perfect hundred-percent

15    yield.  And he achieves this by a process of data

16    normalization.

17         It's a simple arithmetic maneuver

18    that takes the sum of each of the -- the sum of

19    all the areas of these peaks and calls that 100

20    percent.  And then you take a fraction of each of

21    these and you guarantee that the yields will turn

22    out to be 100 percent.

23         My concern about this is that this

24    maneuver, this arithmetic maneuver can easily

1    hide serious flaws in the data.

2        Q.  In actuality, accounting for all of the

3    material, including impurities in the test tubes,

4    has he, in fact, accounted for a hundred percent?

5        A.  Well, I think by this mathematical

6    slight-of-hand, it looks as though he has

7    accounted for everything.  But if you look at the

8    chromatogram, these are these other unidentified

9    peaks that

10   I've mentioned.

11       Q.  Now, you had indicated that this technique

12   has a potential to hide significant errors.  Did

13   you see any specific examples of errors in

14   technique?

15       A.  Actually I did.  Yes, I did.

16            And it's the same error Mr. Brown

17   pointed out earlier today, but I won't insult the

18   Court by showing the data that I'm particularly

19   concerned about.  It was the A3 sample at 15

20   hours.

21            If Mr. Smith can pull that up for

22   me.  Thank you.

23            This is from his Appendix E, his

24   summary of his experiment.  Here are the

1     individual tubes for A3 taken, I believe, at the

2     15-hour point where we've already heard that

3     Dr. Davies got a raw measurement of the

4     Rivastigmine at about 6,937 units, which he

5     pointed out represented a 98.39 percent yield.

6               Then, if we compare this tube A3

7     data to the 21-hour point, the same tube at 21

8     hours, as we've already heard, has almost

9     magically increased in the raw data, accounts for

10    Rivastigmine by about 50 percent to 10,185.

11              So once sees 50 percent increase in

12    the area for that peak.  But in the normalized

13    yield calculation, we magically see the yield go

14    from 98.39 down to 97.74.

15              Now, as a journal editor or an

16    author, if I had a data point like this, this

17    would immediately be tossed out because clearly

18    something went very wrong in this experiment.

19    And yet, it was included in Dr. Davies final

20    analysis.  This is inappropriate, in my opinion.

21    Q.  When you received Dr. Davies' final

22    analysis with his opening expert report, did it

23    acknowledge this problem?

24    A.  No, but I asked him about it.  I raised

1    this point in my reply report and he responded,

2    as we heard mentioned earlier today, that one

3    explanation might be a loose seal on this tube,

4    which would lead to solvent evaporation and a

5    concentration effect that would increase the

6    measured area in this loosened tube.

7         Q.  Is it appropriate to include such data in

8    the calculations?

9         A.  No.  I think this data point should have

10   been tossed out.  But, more importantly, the

11   concern I have is that if the tube was leaking,

12   one could confidently assume that some

13   acetaldehyde would escape from that tube.  It

14   would be a high vapor pressure of acetaldehyde at

15   60 degrees.  And over a prolonged period of time,

16   I would think a substantial amount of

17   acetaldehyde would have escaped along with

18   solvent.  So that totally compromises this

19   experimental data point.

20        Q.  Taking into account the issues you've

21   discussed about study design and methodology, in

22   your opinion, can Dr. Davies' experiment be

23   scientifically relied upon to show that

24   acetaldehyde is an antioxidant?

1        A.  In my opinion, given the concerns that

2   I've raised, I don't think any scientifically

3   valid conclusions could be drawn from the

4   experiment run by Dr. Davies.

5               MR. CHIN:  Thank you, Dr. Ganem.

6               THE COURT:  I'm sorry, sir.  Can you

7   just tell me your name again?

8               MR. MINION:  Dan Minion.

9               THE COURT:  Minion.  Thank you.

10              Mr. Minion, you may proceed

11                   CROSS-EXAMINATION

12  BY MR. MINION:

13       Q.  Good to see you again, Dr. Ganem.

14       A.  Good afternoon, Mr. Minion.  Good to see

15  you, too.

16       Q.  So let's you and I talk a little

17  chemistry.  Okay?

18       A.  Happy to do so.

19       Q.  All right.  You agree that Rivastigmine is

20  susceptible to oxidative degradation?

21       A.  Yes.

22       Q.  And there's no question it's established

23  scientifically that Rivastigmine undergoes

24  oxidative degradation to form ECAV in Impurity 4?

1      A.  Yes, I would agree with that.

2      Q.  Can you put -- thank you.

3           You recognize this slide, Dr. Ganem?

4      A.  I think this may have been an earlier

5  slide shown today.  I certainly recognize the

6  compounds.  Yes.

7      Q.  All right.  Dr. Davies walked through

8  this.

9           He talked about the pathway of

10  oxidative degradation of Rivastigmine.

11     A.  Yes.

12     Q.  And you recognize the oxidative

13  degradation impurities ECAV and Impurity 4?

14     A.  I do recognize them.

15     Q.  Those are the correct structures of those

16  compounds?

17     A.  Yes, I believe so.

18     Q.  And the first step of the oxidative

19  degradation pathway that Dr. Davies walked

20  through is an oxidation of Rivastigmine to the

21  amine oxide.  That's what he has there; correct?

22     A.  That's correct.

23     Q.  And that is the same structure that you

24  had in on your slide showing the reaction of

1    rivastigmine with tertbutyl hydroperoxide?

2        A.  Correct, I pointed out that's the product

3    with direct oxidation.

4        Q.  Once the amine oxide is formed, it's

5    eliminated to ECAV?

6        A.  Yes, that's a good technical term.  It's

7    an elimination reaction.

8        Q.  And then it's further oxidized to impurity

9    4?

10       A.  Yes.  Dr. Davies said that this is one

11   path to ketone, to the ketone shown as impurity

12   four.

13       Q.  One of the ways that antioxidants work is

14   by undergoing oxidation themselves before the

15   compound they are protecting; correct?

16       A.  That's one mechanism, yes.

17       Q.  That's how reducing agents like ascorbic

18   acid work?

19       A.  Agreed.

20       Q.  You noted in your direct examination you

21   looked at the specific antioxidants that are

22   listed in the '031 patent?

23       A.  I acknowledged the ones that are listed

24   there.

```
1        Q.   You saw ascorbic acid on the list?

2        A.   I believe so.

3        Q.   That's a well-known antioxidant?

4        A.   Yes, it is.  It's vitamin C.

5        Q.   It's a reducing agent?

6        A.   Yes.

7        Q.   And, of course, ascorbic acid is

8    susceptible to oxidation?

9        A.   Yes.

10       Q.   And when ascorbic acid acts as an

11   antioxidant, it sacrifices itself by being

12   preferentially oxidized over the compound that it

13   protects?

14       A.   I would agree that ascorbic acid acts as

15   an antioxidant by getting oxidized, yes.

16       Q.   And you agree that any chemical compound

17   that is a known reducing agent must, in fact, be

18   subject to oxidation?

19       A.   Well, that's a bit flowery language, but

20   yes, all reducing agents do get oxidized.

21       Q.   And you agree that acetaldehyde is

22   susceptible to oxidation?

23       A.   I do.

24       Q.   And I believe when you were going through
```

```
1     the photo chemical degradation of acetaldehyde in

2     the McNesby article, you commented that

3     acetaldehyde is oxidized readily at room

4     temperature?

5        A.  I think what I said was that my opinion

6     these reactions to form these radicals could

7     occur at room temperature, yes, I may have said

8     readily.

9        Q.  That's the oxidation of acetaldehyde by

10    air?

11       A.  I think what I said yes, the radicals

12    would form under air oxidation fairly readily.

13       Q.  And acetaldehyde can be oxidized by

14    peroxides?

15       A.  Yes.

16       Q.  For example, you noted that acetaldehyde

17    can be oxidized by tertbutyl hydroperoxide?

18       A.  That's correct.

19       Q.  You will agree by the very fact that

20    acetaldehyde can be oxidized, it is capable of

21    acting as an antioxidant?

22       A.  I'm not sure what you mean capable,

23    counselor.  We know that an antioxidant works by

24    getting oxidized, so to be -- if a compound is a
```

1    reducing agent, it has potential to be an

2    antioxidant.

3        Q.  But you never actually studied the

4    potential role of acetaldehyde as an antioxidant?

5        A.  No, I never conducted any experiments.

6        Q.  And in forming your opinions in this case,

7    you did not consider whether acetaldehyde can

8    function as an antioxidant?

9        A.  I'm sorry, would you repeat your question?

10       Q.  In forming your opinions, you did not

11   consider whether acetaldehyde can function as an

12   antioxidant?

13       A.  Well, I think the question that you asked

14   and can be answered by saying acetaldehyde can be

15   oxidized, so that means that at least it meets

16   the minimal requirement that it could function as

17   an antioxidant.  I think even Dr. Davies conceded

18   that point.

19       Q.  But in forming your opinions, you set out

20   to establish that acetaldehyde cannot function as

21   an antioxidant for rivastigmine?

22       A.  I'm not sure.  I honestly am not sure how

23   to answer your question.  I'm not sure I

24   understand what you're driving at.

1       Q.  We talked about this at your deposition,

2    right, the question of whether acetaldehyde can

3    function as an antioxidant and whether

4    acetaldehyde cannot function as an antioxidant in

5    your opinion, those are distinctly different

6    questions?

7       A.  Yes, that's fine.

8       Q.  And the question that you set out to

9    answer to establish was that acetaldehyde cannot

10   function as an antioxidant for rivastigmine?

11      A.  I think it's correct to say I did consider

12   that question.  I tried to consider both sides of

13   the question in forming my opinion.

14      Q.  So you did a literature search to find

15   some basis to support your opinion that

16   acetaldehyde cannot be an antioxidant for

17   rivastigmine.  Do you remember that search?

18      A.  I think I do, yes.

19      Q.  And as a result of those searches, you put

20   forth an opinion regarding the oxidation

21   potential of those two compounds, acetaldehyde

22   and rivastigmine?

23      A.  Well, I did.  But as you know, I withdrew

24   my report on that, that section of my report

1    because of an error I made.

2        Q.  We're going to get to your supplemental

3    report, but let's go back to your original

4    opinion.  We're talking about oxidation

5    potentials.  You talked a little bit about redox

6    reactions in your direct examination?

7        A.  I did, but I did not mention oxidation

8    potentials in my exam.

9        Q.  You agree that an oxidation potential is

10   the tendency of a compound to be oxidized?

11       A.  Yes.

12       Q.  In other words, the higher the compounds

13   oxidation potential, the more easily it's

14   oxidized?

15           MR. CHIN:  Your Honor, I have an

16   objection.  I think this is going beyond the

17   scope of direct.

18           THE COURT:  I'll allow it.

19   BY MR. MINION:

20       Q.  Do you want me to give you that one again?

21       A.  Yes, please.

22       Q.  Talking about oxidation potentials.  The

23   higher, the more positive the compound's

24   oxidation potential, the more easily the compound

1    can be oxidized?

2        A.  That's generally true, yes.

3        Q.  So if a compound has a more positive

4    oxidation potential compared to another compound,

5    that means it's more easily oxidized?

6        A.  Well, as you know, counselor, we have to

7    be concerned about these being measured under

8    identical conditions, but if you want me to

9    stipulate that in fact we're talking about

10   oxidation potentials being measured under

11   identical conditions using identical electrodes,

12   then what you say is generally true.

13       Q.  Now, you provided an opinion that

14   acetaldehyde cannot function as an antioxidant

15   for rivastigmine because acetaldehyde has a lower

16   oxidation potential than rivastigmine?

17       A.  You know, I don't recall exactly how I

18   phrased it, but as I told you, I made a

19   conversion error when I did some of my

20   calculations and I quickly withdrew my report

21   when I found my error.

22       Q.  I have your report.  Do you need to

23   refresh your recollection of what your opinion

24   was?

1       A.  Well, since I withdrew that section of my

2    report, I'm not sure why we're talking about it.

3       Q.  I said we're going to get to your

4    supplemental report in a minute, but I want to

5    talk about the way you set out in your opinions

6    in this case, and we'll come there eventually,

7    but in your original opinion you looked in the

8    literature to look at oxidation potentials and as

9    a result of that analysis, you set forth an

10   opinion that acetaldehyde cannot function as an

11   antioxidant for rivastigmine because acetaldehyde

12   has a lower oxidation potential than

13   rivastigmine?

14      A.  Okay.  So if you allow me to stipulate

15   again that we're talking about an opinion that I

16   later withdrew, I think that is what I had in my

17   original report, yes.

18      Q.  You were comparing standard oxidation

19   potential, or you thought at the time you were

20   comparing standard oxidation potentials?

21      A.  That's correct.

22      Q.  And you looked in the literature and you

23   determined that the standard oxidation potential

24   of acetaldehyde is 0.60 volts?

1      A.  I think that may have been the number,

2  yes.

3      Q.  But you weren't able to find any reference

4  providing an oxidation potential for

5  rivastigmine?

6      A.  That's correct.  So far as I could tell,

7  the oxidation potential for rivastigmine was not

8  available in the literature, so I found several

9  analogous compounds in forming my opinion.

10     Q.  Was that the Lindsay Smith article?

11     A.  Yes, I believe so.

12     Q.  And the Lindsay Smith article talks about

13  oxidation potentials of N-N dimethyl benzyl

14  amines, substituted N-N dimethyl benzyl amines?

15     A.  I believe that's correct.

16     Q.  And those share a similar chemical

17  structure to rivastigmine?

18     A.  Yes.  They would have just this, just this

19  part right here, not that part.

20     Q.  But in the Lindsay Smith article where

21  rivastigmine has the carbamate functionality, the

22  Lindsay Smith article had like trifluoromethyl and

23  nitro and different substituted N-N dimethyl

24  benzyl amines?

1        A.   Honestly, counselor, I don't recall.   It's

2    been over a year since I looked at the Lindsay

3    Smith article and as I pointed out several times,

4    once I withdrew my opinion, I have not considered

5    that article any further.

6        Q.   Okay.   I agree.   I have your expert report

7    if you have to refresh your recollection at any

8    time, just let me know.

9             Now, you looked at the Lindsay Smith

10   article and you calculated the oxidation

11   potential of rivastigmine to be between 1.0 and

12   1.05 volts, higher than that of acetaldehyde?

13       A.   I honestly don't remember what I

14   calculated from a year and three months ago.   As

15   I say, this is ancient history and I assume when

16   I withdrew my report that that would indicate

17   that I was not offering that opinion.

18       Q.   You recall that you calculated the

19   oxidation potential of rivastigmine to be higher

20   than that of acetaldehyde?

21       A.   I think that's correct.   What I was

22   calculating was an estimate for rivastigmine

23   based on the analogs in that paper.

24       Q.   But your calculation was wrong?

1          A.  I did use a conversion factor incorrectly,

2     yes.

3          Q.  You added when you should have subtracted?

4          A.  It was a mistake which I quickly withdrew

5     my opinion.

6          Q.  When you subtracted instead of added, you

7     discovered that the calculated oxidation

8     potential for rivastigmine was .52 to .57?

9          A.  Again, I don't remember the number, but

10    the relative position of the numbers changed,

11    yes.

12         Q.  And as you have mentioned, subsequent to

13    your deposition you have withdrawn the section of

14    your expert report relating to oxidation

15    potentials?

16         A.  Yes, after I discovered my error, I simply

17    withdrew that report, that opinion, that section

18    of my report.

19         Q.  Because the Lindsay Smith article does not

20    provide a valid basis for comparison of

21    rivastigmine and acetaldehyde?

22         A.  Well, I withdrew it because in the end

23    there was just too much uncertainty to draw any

24    solid conclusion that I felt I could rely on.

1      Q.  Because the Lindsay Smith article talks

2  about oxidation peak potentials?

3      A.  As I said, I realized I could not make a

4  comparison that would be reliable one.

5      Q.  Getting back to the question of whether

6  acetaldehyde is an antioxidant, you testified

7  that the sacrificial oxidation of acetaldehyde

8  could promote the oxidation of other compounds?

9      A.  That's not quite correct, counselor.  I

10  simply testified that the oxidation of

11  acetaldehyde, I have not spoken about sacrificial

12  oxidation today.

13      Q.  But your opinion is that if acetaldehyde

14  is oxidized, it might form a peracid compound?

15      A.  If acetaldehyde is oxidized, it is known

16  to form a peracid, yes.

17      Q.  But you agree that acetaldehyde can also

18  be oxidized to acetic acid?

19      A.  Yes, that's true.

20      Q.  And acetaldehyde?

21      A.  And acetaldehyde can also be reduced.

22      Q.  And acetic acid is not a known oxidizing

23  agent; right?

24      A.  No, that wouldn't be correctly true.

```
1     Acetic acid could be an oxidizing agent and it
2     would in turn be reduced to, for example,
3     acetaldehyde or even to ethyl alcohol.
4        Q.  You agree that acetic acid is not a free
5     radical?
6        A.  Acetic acid per se is not a free radical,
7     that is correct.
8        Q.  And you're not aware of any testing that
9     shows that acetaldehyde increases the oxidative
10    degradation of rivastigmine?
11       A.  No.  As I said, I did not conduct any
12    testing on my own.
13       Q.  And you did not opine in your expert
14    report that acetaldehyde was acting as a
15    prooxidant based on Par's stability testing data?
16       A.  I made no mention of prooxidants anywhere
17    in my reports, in my report.
18       Q.  You did not opine that acetaldehyde could
19    promote the oxidation that -- actually let me
20    rephrase that.
21           You did not opine that acetaldehyde
22    promotes the oxidative degradation of
23    rivastigmine based on Par's stability testing
24    data?
```

1      A.  From what I know of Par's stability

2  testing data, acetaldehyde does absolutely

3  nothing at all.

4      Q.  Now, you said you acknowledge that you

5  didn't do any testing in this case?

6      A.  Well, first of all, I did, I did

7  acknowledge that.  I wasn't asked to consider

8  doing that, and because of conflict rules at my

9  university, I'm not permitted to do that.

10      Q.  So you had several criticisms in your

11  direct examination of Dr. Davies's methodologies?

12      A.  Yes, these were technical criticisms.

13      Q.  Now, you could have as a scientist gone

14  through and repeated Dr. Davies's stress test?

15      A.  Well, I have explained why I really can't

16  do that at Cornell.

17      Q.  So in this case, you were prevented from

18  repeating Dr. Davies's stress test?

19      A.  Well, I'll try to be as clear as I can.

20  My university considers external consulting

21  activities like these to be the sort of things

22  I can't use university resources for, it's a

23  conflict of interest and a conflict of

24  commitment.  See I just can't do it, and I'm the

1    head of my university's conflict committee so I

2    have to set a good example.

3        Q.  You could have asked someone else to do

4    it; right?

5        A.  I'm not sure what you mean by that.  I

6    can't ask anyone at my university to do it.  I

7    couldn't ask one of my graduate students to do

8    it.

9        Q.  You could have asked someone outside of

10   the university?

11       A.  I guess I could have.  I didn't consider

12   that.

13       Q.  Well, let's come at it a different

14   direction.  Notwithstanding your agreement with

15   the university, if you had permission to repeat

16   Dr. Davies's tests, you could have done so?

17       A.  Oh, it's not technically difficult, that's

18   true, I could have done it.

19       Q.  And you would have had ample time to

20   repeat those tests?

21       A.  Well, from what I heard about the time

22   Dr. Davies spent doing it, if I had the protocol

23   available, it doesn't sound like it would take a

24   lot of time.  I'm just not sure it would be the

1    appropriate test to do.

2        Q.  But someone other than you could have

3    rerun these tests to see if they could isolate

4    and characterize any other degradation products

5    besides ECAV and Impurity 4 in the reaction

6    mixtures?

7        A.  I think Dr. Davies could have done that,

8    too, he just chose not to.

9        Q.  Anyone on Par's side could have done that

10   as well?

11       A.  I can't speak for Par.

12       Q.  And someone could have repeated Dr. Davies

13   experiments to see -- to answer your question of

14   whether there were any other co-eluting compounds

15   in the peaks of ECAV and Impurity 4?

16       A.  I think that would be straightforward.

17       Q.  But as far as you know, that wasn't done?

18       A.  Insofar as I know.

19       Q.  You talked about potential errors in

20   Dr. Davies's test.  You're not a statistician,

21   are you?

22       A.  No, I'm not.

23       Q.  And determining whether differences in

24   oxidative degradation products between two

1    samples -- sorry, determining whether the

2    differences in oxidative degradation products

3    between two samples were statistically

4    significant is not an area you have done much

5    work in?

6         A.  Correct.

7         Q.  And you didn't conduct any independent

8    statistical analyses of Dr. Davies's data?

9         A.  That's right.

10        Q.  But you did have the underlying data?

11        A.  I had the data that was presented, I think

12   it's called appendix E, Dr. Davies's experimental

13   report.

14        Q.  All right.  So let's talk about tests to

15   determine whether a compound in a transdermal

16   formulation is acting as an antioxidant.  Am I

17   correct that it is your opinion that the only way

18   to determine if a compound in a transdermal

19   device is acting as an antioxidant is to conduct

20   a stability experiment comparing two sets of

21   patches, one set of patches that contain the

22   compound and one set of patches that did not

23   contain the compound?

24        A.  So you asked me that question in my

1    deposition, and at the time it was an entirely

2    hypothetical question.  If you don't mind my

3    reminding you, you didn't mention what we were

4    testing.  You didn't mention what the control and

5    test would be.  And I think I answered by saying

6    it would be desirable to set up the test that

7    way, yes.

8         Q.  Desirable to set up the test with one set

9    of patches that contain the compound in question

10   and one set of patches that didn't?

11        A.  Yes.

12        Q.  And you testified that in your opinion to

13   be a valid test, the two sets of samples should

14   be made identically?

15        A.  I believe what I said was that would be

16   desirable, yes.

17        Q.  At the same manufacturing site?

18        A.  I think I said that, yes.

19        Q.  Using the same process?

20        A.  May I finish?

21        Q.  Go ahead, sir.

22        A.  I said that it would be desirable.  Thank

23   you.

24        Q.  Using the same processes?

1          A.  Yes, that's likely what I said.

2          Q.  And having both sets of materials made

3     using the same batches of starting materials?

4          A.  I said that would also be desirable.

5          Q.  From the same lot numbers?

6          A.  If possible, yes.

7          Q.  But the bottom line is that the two sets

8     should be made under virtually identical

9     conditions?

10         A.  Well, just to be clear, I said you know,

11    one is faced with designing this hypothetical

12    test with, you know, no specific compounds being

13    named, it was compound A I think we used at my

14    deposition, I said it would be desirable to try

15    to achieve those goals if possible, yes.

16         Q.  That the patches should be made under

17    virtually identical conditions?

18         A.  As close as possible I said would be

19    desirable, yes.

20         Q.  To have a valid test to determine whether

21    the antioxidant is functioning, whether the

22    compound is functioning as an antioxidant?

23         A.  Well, I think again, we were talking about

24    testing a patch for an unspecified property and I

1    said that that would be desirable.

2        Q.  And without having two identical sets of

3    patches, one set with the compound, and one set

4    without the compound, you cannot think of a way

5    of determining whether the compound is acting as

6    an antioxidant?

7        A.  I don't recall saying that.

8            MR. MINION:  Sorry, Your Honor.  May

9    I approach.

10           THE COURT:  You may.

11           THE WITNESS:  Thank you, Your Honor.

12           MR. MINION:  I'm very sorry.

13   BY MR. MINION:

14       Q.  Take a look at page 127, line five.

15       A.  Okay.

16       Q.  "Question:  Just like your original

17   methodology, that methodology requires a second

18   batch of patches that do not contain the alpha

19   tocopherol?

20           "ANSWER:  Correct.

21           "QUESTION:  Now, if you're not

22   provided a second batch of patches that have no

23   alpha tocopherol, in your opinion, is there any

24   valid way of determining whether alpha tocopherol

```
1     is acting as an antioxidant in the composition?

2                "ANSWER:  No, not that I can think

3     of."

4                MR. CHIN:  Your Honor, I think the

5     basis of this testimony is talking about that

6     methodology that they had discussed previously,

7     just earlier in the deposition.

8                THE COURT:  All right.  You can

9     bring it up on redirect.

10               Go ahead, Mr. Minion.

11    BY MR. MINION:

12        Q.  Those are the questions and answers that

13    you gave in your deposition?

14        A.  Yes.  Thanks for refreshing my memory.

15               MR. MINION:  I have no more

16    questions, Your Honor.

17               THE COURT:  All right.  Mr. Chin,

18    how convenient.

19               REDIRECT EXAMINATION

20    BY MR. CHIN:

21        Q.  Dr. Ganem, when Mr. Minion was asking you

22    about that methodology in your deposition, what

23    was he referring to?

24        A.  I believe he was referring to a more or
```

```
1    less entirely hypothetical question about patches

2    being tested.  And I might have to refresh my

3    memory.

4         Q.  If you can just explain, in a general

5    sense, I guess or perhaps I can --

6              MR. MINION:  Objection, Your Honor.

7    I object that the witness is reading from his

8    deposition.

9              THE WITNESS:  Well, I'm not supposed

10   to read from the deposition?

11             MR. CHIN:  I'll just rephrase the

12   question.

13             THE COURT:  All right.  Go ahead,

14   Mr. Chin.

15   BY MR. CHIN:

16        Q.  Was Mr. Minion asking about Rivastigmine?

17        A.  No.

18        Q.  Was Mr. Minute asking about any type of

19   Par product?

20        A.  No.

21        Q.  Was Mr. Minion asking about FDA

22   guidance-related products?

23        A.  No, he was not.

24        Q.  Was it a hypothetical situation?
```

1       A.  Yes, it was a hypothetical situation.  He

2   was careful to structure his question that way.

3       Q.  Mr. Minion, during his cross-examination,

4   made reference a couple times to sacrificial

5   oxidation.  Have you seen any evidence in this

6   case or heard any evidence from Dr. Davies that

7   acetaldehyde undergoes sacrificial oxidation?

8       A.  I only heard Dr. Davies this morning

9   mention that a compound that is a reducing agent

10  undergoes sacrificial oxidation.  And that is not

11  my understanding of the definition of reducing

12  agent and no freshman chemistry student would

13  accept that, either.

14              The reducing agent refers to a

15  compound that simply undergoes oxidation.

16  There's no restrictive adjective that goes along

17  with that word oxidating.

18      Q.  Mr. Minion also asked you about the issue

19  of oxidation potentials that was raised earlier

20  on in this case.  And you, I think, had indicated

21  that you had made or the corrections were needed

22  to conversion of oxidation potentials.

23              Based on the corrected oxidation

24  potentials, was there any information that you

1    saw that suggested that acetaldehyde is an

2    antioxidant?

3        A.   No.  And as I say, when I discovered my

4    error, misapplying this correction factor, I

5    withdrew my opinion on that matter.

6        Q.   I believe Dr. Klibanov had responded to

7    your expert report on the issue of oxidation

8    potentials?

9        A.   Yes, he did.  Dr. Klibanov, whom I know,

10   also -- well, perhaps I can only say that he made

11   no mention of any misapplication or correction

12   factor so it went undetected until my deposition.

13       Q.   Both you and Dr. Klibanov missed the

14   conversion?

15       A.   Apparently so.

16            MR. CHIN:  I have no further

17   questions.

18            THE COURT:  All right.  Thank you,

19   Mr. Chin.

20            Dr. Ganem, you can step down.

21            THE WITNESS:  Thank you.

22            THE COURT:  So why don't we take our

23   afternoon break of 15 minutes and come back then

24   at about somewhere between ten and five of 4:00

1    to finish out for the day.

2                    THE CLERK:  All rise.

3                    (A brief recess was taken.)

4                    THE CLERK:  All rise.  All right

5    please be seated.  Mr. Fineman.

6                    MR. FINEMAN:  Yes, Your Honor.  We

7    have a short housekeeping matter on

8    confidentiality, Your Honor.

9                    THE COURT:  Okay.

10                    MR. FINEMAN:  I believe that during

11   Dr. Davies' examination, two exhibits were used

12   JTX 065 and JTX 200.

13                    And we've conferred with 3M and we

14   would like to place those exhibits under seal and

15   3M would like to reserve the right to review the

16   transcript and then propose redactions.

17                    THE COURT:  I'm sorry, that cannot

18   be right.  What were the exhibit numbers?

19                    MR. FINEMAN:  I have written down

20   JTX 065 and JTX 200.

21                    THE COURT:  G?

22                    MR. FINEMAN:  J, Joint Trial.

23                    THE COURT:  Sorry.  Sorry.

24                    You say 65 and 200?

1              MR. FINEMAN:  That's correct, Your

2      Honor.

3              THE COURT:  All right.  So we'll put

4      them under seal.

5              We'll place them under seal and 3M

6      can look at the transcript and weigh in on that

7      in due course.  Okay.

8              MR. FINEMAN:  Yes, Your Honor.  And

9      when Dr. Dizio is testifying, there will be a use

10     of JTX-065 again; however, this one will have --

11     this will not be the same copy of JTX-065 that

12     plaintiff was using because this is with the --

13              THE COURT:  Redactions?

14              MR. FINEMAN:  Exactly.

15              THE COURT:  Right.

16              MR. FINEMAN:  More accurate, Your

17     Honor, less than complete.

18              THE COURT:  Okay.  All right.

19              MR. FINEMAN:  And we'll work that

20     out.

21              THE COURT:  Okay.  Well, that's

22     good.

23              MR. FINEMAN:  Thank you, Your Honor.

24     Your Honor, at this time, Par calls James DiZio.

```
 1                    THE COURT:   All right.

 2                    MR. FINEMAN:  Your Honor, I'm

 3      informed that it was not 200.  It was 177.

 4                    THE COURT:   Okay.

 5                    THE CLERK:  Can you state and spell

 6      your full name for the record.

 7                    THE WITNESS: My name is James Dizio.

 8      It's J-A-M-E-S D-I-Z as in zebra I-O.

 9                    THE CLERK: Please place your left

10      hand on the Bible and raise your right hand.

11

12                         JAMES DiZIO,

13                    the witness herein, having first

14                    been duly sworn on oath, was examined

15                    and testified as follows:

16                    THE CLERK:  Thank you.  Please be

17      seated.

18                    MR. FINEMAN: Your Honor, permission

19      to approach?

20                    THE WITNESS:  Thank you.

21                       DIRECT EXAMINATION

22      BY MR. FINEMAN:

23         Q.  Good afternoon, sir.

24         A.  Good afternoon.
```

1      Q.  Could you please introduce yourself to the

2  Court?

3      A.  Yes.  I'm James Dizio.

4      Q.  Could you please briefly describe your

5  educational background?

6      A.  Yes.  I have a B.S. degree in civil

7  engineering.  I worked as a mechanical engineer

8  for about four years and then I went back to

9  school and got a Ph.D. in organic chemistry,

10  synthetic organic chemistry from the University

11  of Illinois, one of the top schools in the

12  country for that type of chemistry.

13      Q.  Where are you currently employed?

14      A.  3M.  It's a great company.

15      Q.  How long have you been employed by 3M?

16      A.  Well, since 1991, so 23 years.

17      Q.  What position do you hold at 3M?

18      A.  I'm a lead chemist in the materials

19  resource division.

20      Q.  What are your responsibilities as lead

21  chemist in the materials resource division?

22      A.  I -- I -- you know, I invent, develop, and

23  I scale molecules and polymers for, you know, all

24  of 3M's business divisions.  3M has many business

 1    divisions.

 2              The materials resource division is

 3    like 3M's internal chemical company.

 4      Q.  Does any of your work relate to

 5    pharmaceutical products?

 6      A.  Yes.  You know, in the last few years,

 7    I've been focusing on medical products in

 8    general.  You know, U.S. population is getting

 9    older.  I don't want to say anybody in here, but

10    the U.S. population is getting older, and you

11    know, 3M is the perfect place.  I mean it.

12              3M is the perfect place to innovate

13    for this population and we are.

14      Q.  Do these pharmaceutical products include

15    transdermal drug delivery patches?

16      A.  Yes.

17      Q.  Can you please describe 3M's experience

18    with transdermal drug delivery patches?

19      A.  Yes.  3M -- 3M is an innovator in these

20    patches.  I'd say 3M has been working in

21    transdermal patches for probably 30 years.

22              And so, you know, we've made

23    single-layer patches.  We've made multilayer drug

24    in adhesive patches, and I'd say that the patches

1    we make are industry standards.

2        Q.  Does 3M engage in FDA good manufacturing

3    practices with respect to medicinal products such

4    as transdermal drug delivery products?

5        A.  Yes, we have.  You know, yes, and we

6    follow every FDA guideline.

7                We follow good manufacturing

8    practices.  And by good manufacturing practices,

9    it's a detailed way to do procedures.  You know,

10    3M makes a lot of products.

11                We make a lot of products.  But when

12    it comes to medical, there's good manufacturing

13    practices.  And that's a cut above industry

14    practice.

15                You have to be very detailed so, and

16    we actually surpassed all the requirements we're

17    asked to do and we surpass them.  You know, we

18    surpass them because we want to.  And we surpass

19    them because it's good for the customer.

20                And, you know, the customer knows

21    that and that's why they buy from 3M.

22        Q.  Now, Dr. Dizio, I'd like to turn your

23    attention to 3M's Rivastigmine transdermal patch

24    and its development?

1          A.   Yeah.

2          Q.   Were you involved in the development of

3     the Rivastigmine transdermal patch product that

4     3M developed that's the subject to this

5     litigation?

6          A.   Yes.  Yes.

7               I developed the adhesive system 3M

8     cleverly calls it R-217149.

9          Q.   What was your role?

10         A.   My role is to -- is to develop and scale

11    the R-27149 for a variety of drugs that we're

12    looking at.

13         Q.   How did you first become involved with the

14    Rivastigmine transdermal patch product?

15         A.   I was approached by the drug delivery

16    systems.  So, again, 3M has many different

17    companies, in essence, that we all work together.

18              One was called drug delivery systems

19    division.  And I was approached by people there

20    and they said, "Hey, Jim, can you make an

21    adhesive for these variety of drugs that we're

22    looking at making patches for?"  And I said,

23    "Yes.  I certainly can."

24         Q.   What requirements, if any, did the drug

```
1    delivery systems division communicate to you

2    about the adhesive they were looking for?

3        A.  Well, it's a variety of requirements with

4    a delivery patch.  First and foremost, the drug

5    has to be stable to live in the patch.  It has to

6    be compatible with the patch.

7                  And, you know, you want to -- so

8    that -- well, that you know you need to figure

9    out what monomers go into that polymer, so that

10   adhesive will be compatible.  So that's number

11   one.

12                 Then you have to think about

13   molecular weight.  You know, when they formulate,

14   you wouldn't want the patch slipping all around

15   your skin.  That's not going to be any good.

16                 You have to make sure the polymer

17   you can get of a certain molecular weight, and

18   it's got to be a polymer, which we can

19   sufficiently clean.  You can't clean every

20   polymer, so we know and we are very serious about

21   this.

22                 In 3M, if you're going to work on

23   medical product, you're going to use an

24   exceptionally clean adhesive.  So it's got to be
```

1    an adhesive where you design this thing such that

2    it can be cleaned.  And we do that.

3              We do that especially because when

4    you clean that adhesive, then you can, for drug

5    delivery systems for formulators, they can

6    minimize what goes into that formulation because

7    they're quite stable.

8    Q.  How did you go about achieving an

9    exceptionally clean adhesive?

10   A.  As I was -- well, you -- well, okay.  So

11   you make a polymer.

12             And when you say make a polymer, I

13   mean, you start with the parts.  They're called

14   monomers.  And you have an initiator.

15             This initiator starts the chain

16   reaction that makes this big polymer.  But when

17   you're done with that, you know there's going to

18   be monomers, initiators left.  They're

19   impurities.  They're residuals.

20             And there's things, side reactions

21   you don't know about.  And you just want to get

22   rid of them.

23             So we wash the material, a washing.

24   So we clean the materials such that there's only

1    polymer left.  And then many times, we will

2    distill solvent, so we can get rid of any boilers

3    or we can adjust the solvent system.

4              MR. FINEMAN:  Your Honor, at this

5    time, we respectfully ask that the Court close

6    the courtroom to the public and to those not

7    entitled to access to 3M's highly confidential

8    information for a brief period.

9              THE COURT:  All right.  So I would

10   ask anybody who's not sitting at counsel table or

11   otherwise designated to please leave the

12   courtroom.  I don't think, based on what I've

13   been told, this is going to be more than fifteen

14   minutes.

15             All right.  So I see outside experts

16   on one side who I recognize, outside experts that

17   I'm guessing on the other side, attorneys that I

18   recognize, 3M, there is people over there, but --

19   so we're good; right?

20             MR. FINEMAN:  Yes, Your Honor.

21             THE COURT:  Go ahead, Mr. Fineman.

22             MR. FINEMAN:  Thank you, Your Honor.

23   BY MR. FINEMAN:

24        Q.  Dr. DiZio can you please turn to JTX 177

1      in your binder?

2          A.  I'm there.

3          Q.  Do you recognize this document?

4          A.  Yes.  Yes.  This is the drug master file

5      which we call the DMF.  This is the DMF for

6      solvated acrylate copolymer adhesive, R-27149.

7          Q.  Is R-27149 the adhesive in the

8      rivastigmine transdermal patch that 3M makes?

9          A.  Yes.

10             MR. FINEMAN:  Your Honor, since I

11     not sure if JTX 177 is in the record, at this

12     time to the extent it's not in, Par moves the

13     admission of JTX 177.

14             MR. MINION:  No objection.

15             THE COURT:  If it's not admitted,

16     it's admitted without objection.

17     BY MR. FINEMAN:

18         Q.  What does this document generally

19     describe?

20         A.  This document would describe the adhesive

21     R-27149 and the process it uses to make it.

22         Q.  Did you draft any parts of this document?

23         A.  Yes, I submitted drafts for sections two

24     and three.

1          Q.   Can you please turn to section three on

2     page 25614 entitled synthetic route of

3     manufacture?

4          A.   I'm there.

5          Q.   Can you please describe the steps

6     described in the DMF and manufacture of the

7     R-27149 in general terms?



300





```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
```

14       Q.   Did you reach a conclusion of what is the

15   effect of the washing distillation steps?

16       A.   Yes, the effect is to clean the polymers

17   substantially so that it meets the specs, it

18   doesn't have residuals, doesn't have initiators,

19   it doesn't have things you're not looking for.

20   You're left with polymer.

21       Q.   Is the commercial manufacturing process

22   described in the DMF the process that 3M used to

23   prepare the R-27149 adhesive contained in the

24   rivastigmine transdermal patch product that 3M

1    developed?

2        A.  Well, now you're getting exact.  And yes,

3    it is.  It is the process.  But we reserve the

4    right to change some temperatures slightly and to

5    change time slightly because like we said, we're

6    looking for a certain way, we're looking for

7    certain viscosities, we're looking for certain

8    percent solids, so we may change some

9    temperatures slightly to get it.

10       Q.  Did you develop this manufacturing

11   process?

12       A.  Yes.

13       Q.  Has 3M filed any patent applications on

14   this manufacturing process?

15       A.  Yes.

16       Q.  Can you please turn in your binder to JTX

17   017, and when you get there, sir, my question is,

18   do you recognize this document?

19       A.  I'm there.  And I do recognize the

20   document.  This is the patent application

21   WO-2012/012417 Al, it's the patent application for

22   the process we just discussed.

23            MR. FINEMAN:  At this time, Your

24   Honor, Par moves the admission of JTX 017 into

```
 1    evidence.

 2                  MR. MINION:  No objection, Your

 3    Honor.

 4                  THE COURT:  It's admitted.

 5    BY MR. FINEMAN:

 6        Q.  Are you a named inventor on this patent

 7    application?

 8        A.  Yes.

 9        Q.  Can you please turn to the general and

10    detailed descriptions of the copolymer solvent

11    washing process on page 17 of the application?

12        A.  I'm there.

13        Q.  Did you draft these section of the patent

14    application?

15        A.  Yes, I submitted drafts.  These are the

16    drafts.

17        Q.  Do these sections describe the washing and

18    distillation steps in the manufacturing process

19    3M used to prepare the R-27149 adhesive?

20        A.  Where in general, yes, they describe the

21    process that then went to the manufacturing

22    plant.  These actually when you look at the

23    numbers, like if you look at line number 13, it

24    says a hundred grams of copolymer A is added
```

1     to -- a hundred grams, that's my lab.

2                      So it's not the manufacturing, it's

3     not 10,000 pounds, so yes, this is a general

4     description of what went to the manufacturing

5     plant, but these actually describe my own bench

6     scale or lab scale experiments.

7         Q.  Now, do you have an understanding that

8     there is a contention that rivastigmine

9     transdermal patch product 3M developed contained

10    acetaldehyde?

11        A.  Yes.  But acetaldehyde would be an

12    impurity to us.  We're looking to get rid of

13    impurities.

14        Q.  Where does that acetaldehyde come from?

15        A.  It's an impurity that comes from the

16    manufacturing of the polymer, specifically one of

17    the parts is vinylacetate and that vinylacetate

18    can have side reactions that create acetaldehyde,

19    the impurity.

20        Q.  Does 3M ever add acetaldehyde to its

21    R-27149 adhesive for the rivastigmine transdermal

22    patch that 3M developed?

23        A.  No, absolutely not.

24        Q.  I want to put JTX 065 up on the screen and

1    bring up table one on page 721.  And I would like

2    to walk you through some of the information here,

3    if that's okay with you, Dr. DiZio?

4         A.  Ready.

5         Q.  Do you see the batch that has 300 parts

6    per million acetaldehyde?

7         A.  Yes.

8         Q.  Do you see the comments in the table?

9         A.  There is various comments.  I see the

10   comment on the right-hand side and left, yes.

11        Q.  What, if anything, do the comments in the

12   table tell you about this batch?

13        A.  Well, if you -- okay.  If you go to the

14   first column, you'll see in parenthesis, 236.

15   That is a batch number for a polymer made in the

16   manufacturing plant.  And if you go to the very

17   right, you'll see the words unwashed adhesive.

18   So this is, you know, how I described it, you

19   make, you wash, and you distill.  This is to

20   make.  And it means we did not wash it, nor

21   distill it, but it is made in the manufacturing

22   plant, it's just not washed.

23        Q.  And what about the batches below this one

24   that contain between 211 and 402 parts per million

1    adhesive lot.  What if anything do the comments

2    in the table tell you about those batches?

3         A.  Again, if you look at the acetaldehyde,

4    the first column, this is a suffix, ED 2. So

5    that's me, and so that is my lab scale first ever

6    made batch.  In fact, there wasn't even a process

7    back then.  This is the first time I ever tried to

8    make, wash the material.  I didn't even distill

9    it.  So this is my first ever experiment. And so

10   it's a lab scale, bench scale wash, but really the

11   way I wash it, I wash it well, I got

12   to admit, I do wash it well, but you know, this

13   is a very viscous polymer, so when I'm washing it

14   and trying to get the methanol to interact with

15   the polymer, I'm shaking it by hand, I'm not

16   doing a very good job, or I'm not doing as good a

17   job as the manufacturing plant can do.

18             It's indeed a good job, but it's not

19   like the manufacturing plant.  I don't have the

20   equipment.  So this is my first ever material.

21   It's not distilled, either.

22        Q.  Are there any of the batches in this table

23   representative of the process that's described in

24   the DMF in your patent application?

```
1        A.  Yes.  The lots 20,007 and 20,008, if you

2    look on the first column.  So I picked those

3    because those are manufacturing batches, they're

4    lots seven and eight, so you know, we got pretty

5    good at making this after a few batches, right,

6    you can't look at the first batches, but you can

7    certainly look at the most recent batches, and

8    lot seven and eight, we would have gotten pretty

9    good at washing and distilling and doing this

10   process in the plant so they would be the most

11   representative on this page of a manufacturing

12   plant.

13       Q.  How does the manufacturing scale process

14   differ from your bench scale process?

15       A.  Well, the manufacturing process can do

16   much better job in intimately washing this

17   material.  Imagine, you know, when I'm in my lab,

18   you can image like I'm doing a good job, but I'm

19   not like a great washing machine.  This in this

20   plant there are these big impellers that just

21   beat the heck out of this polymer and intimately

22   mix it with the washing solution and therefore

23   you can get a much better washing of the polymer.

24   In my lab I can do a good job, but the
```

1    manufacturing plant can do a better job.

2        Q.  Does 3M prepare batches for commercial

3    marketing on the bench scale?

4        A.  No.

5            MR. FINEMAN:  Thank you, Dr. DiZio.

6    No further questions at this time.

7            THE COURT:  Thank you, Mr. Fineman.

8            Mr. Minion.

9            MR. MINION:  Thank you, Your Honor.

10   BY MR. MINION:

11       Q.  Hi, Dr. DiZio.

12       A.  Hi.

13       Q.  Let's talk a little bit more about your

14   involvement with the R-27149 adhesive.  It's my

15   understanding you began working on the R-27149

16   adhesive around five years ago?

17       A.  That's about correct, yes

18

19       Q.  And prior to that, you had never developed

20   an adhesive for use in a transdermal product?

21       A.  That's correct.  I developed adhesives for

22   the many business divisions in 3M and this would

23   have been my first drug delivery one.

24       Q.  You don't know who actually first

1    synthesized the R27149 adhesive?

2        A.  I know that representatives of materials

3    resource division made the polymer years ago, the

4    unwashed version.

5        Q.  And so you testified you looked to the

6    DMF.  You testified that the R27149 adhesive is

7    washed?

8        A.  The R27149 adhesive is washed and

9    distilled.  Yes.

10       Q.  And it's washed until specifications are

11   met?

12       A.  Yes.  It is washed until specifications

13   are met.

14       Q.  But you don't know the specification for

15   acetaldehyde in the R27149 adhesive?

16       A.  Well, the washing process, in general,

17   we're washing to get out -- actually the beauty

18   of the way we wash, it's expensive and we pay for

19   it, and the beauty of it is that you wash out

20   things that you know about, which we're checking

21   for and things we didn't know about.  So we know

22   we're getting rid of almost any impurity.

23       Q.  Well, let me take a step back.  R27149

24   adhesive is washed?

1       A.   Yes.

2       Q.   All right.  Not for a set number of times?

3       A.   The DMF shows three times.

4       Q.   Right.  But it's washed until the

5  specifications for the adhesive are met?

6       A.   And when you rely on the process, as we

7  currently do, and you look at the data from the

8  process, it takes three washes.

9       Q.   But you do not know the specification for

10  acetaldehyde in the R-27149 adhesive?

11      A.   The specification for acetaldehyde, I know

12  that, once again, we are ridding the system of

13  impurities.  There's -- you know, we

14  indiscriminately rid the system from impurities.

15  And --

16      Q.   That's not my question.  I'm asking about

17  the specific specification number for

18  acetaldehyde that's allowed in the manufacturing

19  process to be acceptable.

20      A.   Well, when you look at the data that is on

21  that chart, you'll see that when we do follow

22  this process, which we have to by GMP guidelines

23  and how we've set up the DMF, we will get a

24  percentage of -- well, we'll get a certain PPMs

1        of acetaldehyde.  And it's stated in that chart.

2            Q.  But you don't know the number of PPMs of

3        acetaldehyde that are allowed to be in the

4        product to meet specification?

5            A.  To meet specification toxicological

6        specifications, 3M has people from drug delivery

7        systems, submitted paperwork and experiments that

8        would give them toxicological limit.  Now, we, in

9        the plant, we wash this baby until we meet

10       specifications from the monomers which get the

11       acetaldehyde down to levels you see in that test.

12           Q.  Do you know the number for acetaldehyde in

13       the specification?

14           A.  The toxicological limit?

15           Q.  The amount of acetaldehyde that's allowed

16       in the product.

17           A.  The -- well, you know, it's too simplistic

18       to say that.  There's different reasons and

19       acetaldehyde is -- if there is a specification,

20       it is a toxicology specification.

21                So, for instance, if you say what's

22       the specification for water, oh, huge because

23       water is not toxic.  And so neither is -- not

24       really is acetaldehyde.

1      Q.  You've never done any testing to determine

2   the acetaldehyde content of the R27149 adhesive?

3      A.  I have never done that.  No.

4      Q.  All right.  That's because you're not an

5   analytical chemist?

6      A.  Because I'm not part of that team.

7      Q.  So you're not involved with the team that

8   does analytical testing of the R27149 adhesive?

9      A.  I'm not part of that team.  Well, I'm part

10  of the -- yes.  I'm not part of the analytical

11  team.  I'm part of the team from which analytical

12  is also a part.

13     Q.  Understood.  You mentioned that, as a

14  result of your work on the R27149 adhesive, you

15  filed a patent application?

16     A.  We followed the -- we are required to

17  follow a DMF and the FDA guidelines, and so we

18  follow the DMF and FDA guidelines.

19     Q.  I'm sorry.  I think you misheard my

20  question.

21          I think you mentioned on your direct

22  examination that, as a result of your work on the

23  washing procedure of the R27149 adhesive, you

24  filed a patent application.

1        A.  That is correct.

2        Q.  Okay.  Now, in that patent application,

3    there's no discussion of acetaldehyde.

4        A.  It's an impurity.  There's no discussion

5    of it.

6        Q.  Can you put up JTX 017?  Actually you

7    should have it in your binder as well, Dr. Dizio.

8            If you turn to Page 5 of the patent,

9    and you see at Line 6, it discusses what the

10   patent term, what essentially free of any added

11   antioxidant means?

12       A.  Yes.  I see those words.

13       Q.  We've got it up here.  It should be on

14   your screen as well.

15       A.  Yeah.

16       Q.  The patent says, "As used herein,

17   'essentially free of any added antioxidant'

18   refers to a transdermal adhesive composition to

19   which no antioxidant has been added for the

20   purpose of preventing a pharmaceutically active

21   compound susceptible to oxidative degradation

22   from forming total drug impurities in excess of

23   two percent within two years at room temperature

24   or two months at 60 degrees Celsius with ambient

1    humidity.  For certain embodiments, preferably

2    less than 0.1 percent, more preferably less than

3    0.05 percent, most preferably less than 0.01

4    percent antioxidant is present in the transdermal

5    adhesive composition, which is 'essentially free

6    of any added antioxidant'".

7              Have I read that correctly?

8        A.  You did.

9        Q.  Now, when it says for certain embodiments

10   preferably less than 0.1 percent of antioxidant is

11   present in the transdermal adhesive.  0.1 percent

12   is a thousand PPM; correct?

13       A.  That's correct.

14       Q.  So a transdermal formulation containing

15   1,000 PPM antioxidant would satisfy the definition

16   in your patent application as being "essentially

17   free of any added antioxidant"?

18       A.  Now, again, you're asking me about the

19   wording of the patent; right, and this isn't -- I

20   don't know.  See, again, I'm not a lawyer and I

21   am a chemist and I scale things up.

22              I make sure that the customer is

23   well satisfied and the FDA is satisfied.  This is

24   a paragraph in the text of a patent and I see

1    what it says.

2              And I can tell you that when it

3    comes to the process that I do in 3M for drug

4    delivery systems, I look to get rid of anything

5    and everything from that polymer.  I don't look

6    to add anything.  It is the spirit of what I do

7    to give clean polymer.

8        Q.  I'm going to ask you some questions now

9    about the extent of your involvement with 3M's

10   Rivastigmine patches.  All right.

11             We talked about your adhesive.  I

12   want to talk about 3M's actual patches.

13       A.  Okay.

14       Q.  You're not involved with the formulation

15   of 3M's Rivastigmine patches; right?

16       A.  I am part of the team and, you know, the

17   good part about 3M and I really mean this, is

18   that we trust each other.  And we all have

19   different jobs to do.

20             My job is to give them the cleanest

21   reagent I can possibly give them.  Why?  Because

22   that simplifies their job.

23             And I trust that they do their job

24   well.  So it's too simplistic to say, no, I'm not

1    involved in the patch.  What is true is that I

2    give them the cleanest reagent I can possibly do

3    and that aids in their job.

4        Q.  You've not been present for the

5    formulation of the adhesive or for the

6    Rivastigmine transdermal patch with its

7    components?

8        A.  No, because, once again, that would cause

9    me not to work on other products in 3M.  I trust

10    what my formulators are doing.

11        Q.  And you never actually prepared an active

12    drug in the transdermal formulation?

13        A.  No, it wouldn't be necessary.

14        Q.  Including Rivastigmine?

15        A.  Including Rivastigmine.

16        Q.  And you've never researched whether

17    Rivastigmine is susceptible to oxidative

18    degradation?

19        A.  I have not.

20        Q.  And you never personally reviewed the

21    results of any stability testing on Rivastigmine?

22        A.  I have not.  Now, once again, you know, we

23    all work as a team.  And if we all overlapped on

24    each other's responsibilities, first off, 3M

1    would not be a great company.

2              We have certain responsibilities and

3    we know -- we know what others need and we

4    deliver that.  So just because I haven't done

5    that, actually that's a good thing.

6       Q.  I'm trying to establish where you are in

7    the whole scheme of things.

8       A.  I'm an essential part of that team as I'm

9    on many teams on 3M.

10      Q.  But with respect to 3M's Rivastigmine

11   patches, you're not part of the analytical team?

12      A.  I am not an analytical chemist.  No.

13      Q.  And you've never seen a certificate of

14   analysis for any of the batches of 3M's

15   Rivastigmine patches?

16      A.  No.

17      Q.  And you've not investigated the

18   acetaldehyde content of 3M's Rivastigmine

19   patches?

20      A.  I have not.  I look to rid the system of

21   it.

22      Q.  But you don't recall seeing any data

23   related to acetaldehyde content in 3M's

24   Rivastigmine patches?

1          A.  Say it again, Dan.

2          Q.  You don't recall seeing data related to

3     acetaldehyde content in 3M's Rivastigmine

4     patches?

5          A.  Well, that was one of the examples I just

6     saw here today.  That's one of the -- I see data

7     in these hand-outs.

8          Q.  That's for the adhesive.  I'm talking for

9     the Rivastigmine patches.

10         A.  Oh, no, I haven't seen that.  Again, we're

11    looking to rid the system of impurities.

12              I think, you know -- you have to.

13    We don't want it.  We don't want anything we

14    don't know about.

15         Q.  I asked you about the manufacture of 3M's

16    Rivastigmine patches.  You've never actually seen

17    3M's Rivastigmine patches being manufactured?

18         A.  No, they are in California.  I have other

19    jobs to do.

20         Q.  And you've never seen a document

21    describing how 3M formulates its Rivastigmine

22    patches?

23         A.  I know that the formulation is -- because

24    of what I'm giving them is probably fairly

```
 1     simple.  But, no, I would -- that would be

 2     formulated in the coating plant.

 3         Q.  So you don't know the components of 3M's

 4     Rivastigmine patches?

 5         A.  I know what I supply and I know that

 6     because I supply an exceptionally clean adhesive

 7     and that I only give them the polymer, they can

 8     minimize the reagents that they put in there.

 9         Q.  You supplied polymer in the past; right?

10         A.  I supplied polymer to drug delivery

11     systems, yes, and to other business units.

12         Q.  All right.  But if 3M in the future were

13     to manufacture Rivastigmine patches on behalf of

14     Par pharmaceuticals, you do not know what

15     adhesive 3M would use in that formulation?

16         A.  What adhesive 3M would use?

17         Q.  Correct.

18         A.  That's an interesting question.  I mean,

19     that's like saying if you had to start all over

20     again, what would you do?

21             I think if I had to start all over

22     again and drug delivery had to start all over

23     again, we'd do the same thing.  So almost like

24     you're from drug delivery saying, Hey, Jim, let's
```

```
 1    make an adhesive for a patch.  We have a history

 2    with a certain adhesive and we know it works.

 3               So my guess is we would pick the

 4    same group.  Right?

 5        Q.  But you don't know; right?

 6        A.  But you don't know, either.  I mean, who

 7    would know?

 8               It's like saying, Hey, make a patch.

 9    Well, with this -- if they -- if we're going to

10    use the adhesive that we developed for this drug,

11    we're going to use the adhesive I developed.

12    Yes.

13        Q.  Okay.  But if 3M were to manufacture a

14    Rivastigmine transdermal formulation

15    incorporating the R27149 adhesive, you do not

16    have an understanding of how that adhesive would

17    be prepared?

18        A.  I have the adhesive being prepared.

19    Again, and we have a DMF and that DMF details how

20    to do it.

21               We are going to follow that because

22    that's what we've told the FDA again it's -- and

23    it's good for the customer and I'm very proud.

24    3M is very proud of this adhesive.  This is good
```

1    for the customer.  This adhesive is exceptionally

2    clean.

3              It is a minimalist.  When you make a

4    medical product, you don't want to add stuff.

5    You want to have the minimum that you possibly

6    can have.

7              It's just generally a good idea.

8    But it costs money to do it and that's why people

9    like 3M, because we spend the money to do that.

10    Q.  If 3M were to manufacture Rivastigmine

11    transdermal formulation incorporating the R27149

12    adhesive, you do not have an understanding of how

13    that R27149 adhesive would be prepared in the

14    future?

15    A.  I -- okay.  So it's almost like you're

16    saying, Hey, anything can happen.  But anything

17    can't happen.  This is business.

18              In business, you've spent the money

19    to scale a product.  You paid people like me and

20    my team to do an exceptional job for the

21    customer.  It would be unlikely that you would

22    not go there.

23              It would -- it would be almost

24    impossible.  But so I think we would use the

1    adhesive scaled for this purpose.

2              MR. MINION:  No more questions, Your

3    Honor.

4              THE COURT:  All right.  Any

5    redirect, Mr. Fineman?

6              MR. FINEMAN:  No redirect at this

7    time, Your Honor.  We have no objection to

8    reopening the courtroom.

9              THE COURT:  Okay.  Well, let's if

10   somebody -- if I can ask Ms. Lester to go back

11   and -- in any event, Dr. Dizio, you may step

12   down.

13             THE WITNESS:  Thank you.  Judge, the

14   book?

15             THE COURT:  Leave the book there.

16             THE WITNESS:  Okay.

17             THE COURT:  They'll take care of it.

18             All right.  What's next?

19             MR. FINEMAN:  Your Honor, at this

20   time, Par will be playing certain video

21   deposition designations.  Although I think we may

22   still have a couple small issues.

23             THE COURT:  All right.  Well, start

24   playing them.

```
 1                    MR. FINEMAN:  Thank you, Your Honor.

 2                    MR. SILVER:  I think we may be able

 3     to address them on the front end, if we can.  Mr.

 4     Loh is here.

 5                    THE COURT:  All right.  I'm charging

 6     the time to you all.

 7                    So, go ahead.

 8                    MR. LOH:  Just briefly, Your Honor,

 9     the substance of the testimony that you're about

10     to see comes from an inventor and two, 30(b)(6)

11     witnesses, one Novartis, one LTS.

12                    It's not clear from opposing counsel

13     what they intend to use the testimony for.  They

14     indicated it's both for infringement and

15     validity.  Based on the substance, we believe

16     it's probably more related to validity.

17                    And, as Your Honor knows from the

18     pretrial order in this case, those issues are

19     written description, definiteness and enablement.

20     Each of these inquiries is one that is assessed

21     from the objective standpoint of the person of

22     ordinary skill in the art.  And it's from his

23     perspective looking at the '031 patent and the

24     disclosures therein.
```

1              The testimony that you're going to

2    see is about what the inventors, Novartis and LTS

3    did and believed before the '031 patent was even

4    filed by the Patent Office.  So, for that reason,

5    we'd submit that the deposition testimony that

6    you're about to see is, in fact, irrelevant to

7    the validity issues in this case.

8              Additionally, to the extent that

9    they're going to transform this fact testimony

10   into opinion testimony relating to the person of

11   ordinary skill in the art used, we don't think

12   there's a foundation for that.  And so we think

13   this testimony is also improper opinion testimony

14   and there's no foundation to offer this

15   particular testimony as that of the person of

16   ordinary skill.

17             That's the basis for our objection.

18             THE COURT:  All right.  Well, I'm

19   going to overrule your objections, not because I

20   think you're misstating the law, but because I'm

21   going to charge the time of playing this to Par.

22   If it turns out to be irrelevant, tough.  Then,

23   it's just irrelevant.

24             MR. LOH:  Understood.  Thank you,

```
 1    Your Honor.
 2                MR. FINEMAN:  Your Honor, I think
 3    there is an issue with one counter designation in
 4    the third deposition, the Ogorka deposition while
 5    we're --
 6                THE COURT:  Why don't we play the
 7    first two deposition and then I'll hear you on
 8    the third one.
 9                MR. FINEMAN:  I was going to say I'm
10    going to try to work it out with Mr. Silver while
11    we're playing it.
12                THE COURT:  All right.  Even better.
13                (Beginning of videotape deposition
14    excerpt:)
15        Q.  Can you state your name for the record?
16        A.  Harry Tiemessen.
17        Q.  But you're aware that antioxidants act as
18    reactive oxygen scavengers?
19                MR. MINION:  Objection to form.
20                THE WITNESS:  I think I heard of
21    that, yes.
22        Q.  Dr. Tiemessen, you've been handed what's
23    been marked as Tiemessen Exhibit Number 20, Bates
24    labeled N0257460 through N0257466; is that
```

```
1    correct?

2         A.  That's correct.

3         Q.  And this is United States Patent Number

4    6,316,023; is that right?

5         A.  That's right.

6         Q.  Are you familiar with this document?

7         A.  Yes.

8         Q.  And are you listed as an inventor on this

9    patent?

10        A.  That's correct.

11        Q.  If I could direct you to Column 4 of the

12   patent, which is N0257462.

13        A.  Which column?

14        Q.  Column 4.

15        A.  Four, okay.

16        Q.  Line 14, it states, "The applicant has

17   found that an effective stabilizing effect is

18   surprisingly achieved when the antioxidant is

19   selected from tocopherol, esters thereof, e.g.,

20   tocopherol acetate, ascorbyl palmitate acetic

21   acid, butylhydroxytoluene, butylhydroxyanisole or

22   propyl gallate, preferably alpha tocopherol or

23   ascorbyl palmitate."

24             Did I read that correctly?
```

1          A.  You read that correctly.

2          Q.  And so there's a listing here of

3     antioxidants; is that correct?

4          A.  That's correct.

5          Q.  And as those compounds are antioxidants, a

6     pharmaceutical formulator would understand that

7     those compounds can be added to a formulation to

8     stabilize that formulation; is that correct?

9               MR. MINION:  Objection to form.

10              THE WITNESS:  These antioxidants,

11    they can be used in a certain set of

12    circumstances for certain compounds, certain

13    formulations to -- to stabilize and to reduce the

14    level of oxidation.

15         Q.  And a --

16         A.  But it's not -- not that you take just one

17    and put them in and it works.  That is not the

18    case.  It can even be worse if you add an

19    antioxidant.  So this is high level of

20    fine-tuning that's required on that.

21         Q.  Did Sandoz or Novartis ever test any

22    antioxidants listed here for use in the

23    rivastigmine transdermal system other than alpha

24    tocopherol and ascorbyl palmitate?

1          A.   Not that I'm aware of.

2          Q.   We talked just a bit a few minutes ago --

3     well, you said that Novartis never assessed acetic

4     acid, butylhydroxytoulene, butylhydroxyanisole,

5     propyl gallate.  How do you know that those

6     antioxidants would have a stabilizing effect on

7     rivastigmine?

8               MR. MINION:  I object as outside the

9     scope of the 30(b)(6) notice.

10              (Witness peruses the exhibit.)

11              MR. MINION:  And to form.

12              THE WITNESS:  I think it have to be

13    investigated.

14         Q.   So you're not aware -- I'm sorry.  You're

15    not aware of any if the antioxidants in that list

16    other than alpha tocopherol, would have a

17    stabilizing effect on rivastigmine in a

18    rivastigmine transdermal system?

19              MR. MINION:  Objection to form.

20    Outside the scope of the 30(b)(6) notice.

21              THE WITNESS:  I have not seen these

22    data.

23              (End of testimony)

24         Q.   What's your current job title there?

1        A.  I'm heading the project management

2    department in LTS.

3        Q.  And when did you start in that position?

4    Sorry.

5        A.  I started with LTS in November 1997.  The

6    Exelon patch was the first project which I took

7    responsibility for when I started at LTS.

8        Q.  You don't have any independent knowledge

9    of the testing aside from the documents?

10       A.  I was not at LTS at this time, so I just

11   know what I know from reading the documents.

12       Q.  Let's start with that.  So after they

13   confirmed that they believed the degradation was

14   oxidative in nature, what was the next step?

15       A.  After they had identified the structure of

16   the two degradation products and the possible

17   pathways, they started to look into ways on how

18   to reduce the amount of degradation.

19       Q.  In what ways did they evaluate?

20       A.  Based upon the information I'm aware of,

21   since they know it was oxidative degradation

22   based upon the data, they tested antioxidants in

23   order to find out whether that would have an

24   impact on the formation of the degradation

1    products.

2         Q.  Which antioxidants did they test?

3         A.  Based upon the data I had access to, they

4    tested tocopherol, ascorbyl palmitate, and the

5    combination of both.

6         Q.  So you're not aware of any other

7    antioxidants?

8         A.  I'm not.

9         Q.  Why did the working group believe that

10   these antioxidants would reduce the amount of

11   degradation?

12             MR. MINION:  Objection to form.

13             THE WITNESS:  I think there was no

14   -- I would use another word.  I think there was

15   no belief.  They were just making trials in order

16   to find out whether antioxidant would be able to

17   reduce the level of degradation which was

18   observed.

19        Q.  What were the results of the testing of

20   the tocopherol and the ascorbyl palmitate?

21        A.  Astonishingly and unexpectedly, it turned

22   out that the vitamin E was having the best impact

23   on the formation of the degradation products.

24        Q.  So you're saying it was astonishing that

1    an antioxidant would prevent oxidation?

2        A.  It's astonishingly because you can't

3    predict which kind -- whether an antioxidant --

4    it's not predictable.  You may be successful.

5    You may not be successful.  And it's not

6    predictable which kind of antioxidant is working.

7        Q.  So it's not predictable that an

8    antioxidant stops oxidation?

9            MR. MINION:  Objection to form.

10       A.  It's not predictable that any kind of

11   antioxidant is stopping any kind of oxidation.

12       Q.  So you're saying it's entirely

13   unpredictable that you have no way of knowing

14   whether or not an antioxidant could stop

15   oxidation?

16           MR. MINION:  Objection to the form.

17   Outside the scope of the 30(b)(6) notice.

18           THE WITNESS:  That's not what I'm

19   saying, what I'm saying is it's unpredictable in

20   respect to a specific API -- specific formulation

21   which antioxidant is going to work.  You can't

22   predict.  You have to run a series of experiments

23   in order to find out whether at all and which one

24   is doing the job.

1     Q.  To reduce the degradation of rivastigmine,

2   you'd have to select an antioxidant that was

3   effective with respect to rivastigmine; right?

4              MR. MINION:  Objection to form.

5              THE WITNESS:  That's not correct.

6   What I'm saying it must be effective for the API

7   in combination of the formulation, the API is

8   composed in.

9     Q.  So you're saying that not every

10  antioxidant would be effective with respect to

11  rivastigmine in a transdermal system; right?

12             MR. MINION:  Objection to form.

13  Outside the scope of the 30(b)(6) witness.

14             THE WITNESS:  What I'm saying, it's

15  not predictable which antioxidant would work and

16  would result in reduction of the amount of

17  degradation products observed.

18             (End of testimony).

19             MR. FINEMAN:  Your Honor, I believe

20  we worked everything out.  We need a couple of

21  minutes for technical purposes.

22             THE COURT:  All right.

23             MR. FINEMAN:  In the meantime, it

24  will give me an opportunity to clear up my under

```
 1    seal document issue.  I consulted with Mr. McCann

 2    while we were talking about the video clips as

 3    well, so the record is clear, Your Honor, it is

 4    JTX 65, JTX 177, and JTX 200 that should be

 5    placed under seal.  And of those three, JTX 177

 6    is the DMF that we would coordinate with Novartis

 7    to make sure Your Honor has a copy.

 8              THE COURT:  All right.  Then those

 9    three documents are under seal.

10              MR. FINEMAN:  Thank you, Your Honor.

11              THE COURT:  All right.  So are you

12    working on getting this next video ready?

13              MR. FINEMAN:  Yes, I think it should

14    only be a minute.

15              THE COURT:  By the way, the last

16    deposition witness who I assume is Mr. Theobald,

17    does he have a first name?

18              MR. FINEMAN:  I believe it's Frank,

19    Your Honor.

20              THE COURT:  All right:

21               (Deposition testimony).

22              THE WITNESS:  My name is Joerg

23    Ogorka.  I'm living in Germany.  The street name

24    is Im  Steinbrunnen -- sorry, 19/3, 79585 Steinen
```

1    in Germany.

2         Q.  Would you consider adding an antioxidant

3    to prevent oxidation to be a common-sense

4    solution?

5         A.  You're talking in general terms or do you

6    talk about the Exelon patch?

7         Q.  Let's talk about in general terms first.

8         A.  In general terms, considering to prevent

9    or slow down oxidation by means of an antioxidant

10   is something which you may consider.  What is

11   uncertain, though, is how to prevent.  There are

12   -- depending on what the situation is, you may

13   exclude oxygen, for example.  You cannot predict

14   which antioxidant will be effective.  That is

15   very much compound-specific and chemistry related

16   to the compound and also how the antioxidant

17   works.  There is some chemical interaction that

18   is not predictable.

19              So it's not something -- it's not an

20   obvious solution you can offer right away.  There

21   requires a lot of experimentation to identify the

22   right antioxidant and even more experimentation

23   to establish the adequate level of this.

24        Q.  As a general matter, though, adding an

1    antioxidant to prevent or minimize oxidation

2    would be something that would be common sense to

3    attempt; is that right?

4                    MR. MINION:  Objection to form.

5                    THE WITNESS:  There are many ways to

6    address instability and degradation.  So --

7         Q.  I want to be clear.  I'm talking about

8    oxidation.  So not --

9         A.  I'm talking also there -- I guess you may

10   want to look into other ways, for example,

11   excluding oxygen, as an option.  If you know any

12   -- any excipient could do any oxidation, might

13   exclude this one.

14                   But, yes, using antioxidant is one

15   of the means one could consider once you have

16   established the mechanism and know it's

17   oxidation, which is not obvious right away.  It

18   requires a lot of experimentation, structure

19   elucidation and chemical know-how to understand

20   is this an oxidative pathway that led to the

21   degradation perhaps or is this anything else.

22        Q.  Which antioxidants are you aware of that

23   LTS or Sandoz tested in the Exelon patch?

24        A.  I'm aware of tocopherol and ascorbyl

1    palmitate.

2        Q.  Would you agree that they had been used in

3    pharmaceutical formulations prior to 1995?

4        A.  As I said, I don't know other examples.  I

5    just think it has been known before, yeah; but I

6    don't have examples.

7            But what was not known, maybe if I

8    just add this, is that the tocopherol did a much

9    better job as antioxidant than the ascorbyl

10   palmitate.  That was clearly unobvious.  Because

11   if you would have guessed prior, you would have

12   thought it might be the other way around.

13       Q.  You're saying that it's unobvious that an

14   antioxidant would stop oxidation?

15       A.  No, it was unobvious to see how good the

16   effect was, in terms of effectiveness.  You could

17   see that the effectiveness of this tocopherol was

18   much better than the one of ascorbyl palmitate.

19   And the effectiveness meaning the level of

20   resulting degradation products out of Exelon over

21   time, this was unpredictable.  That required the

22   experiments to be made to then establish this.

23       Q.  So it was unpredictable that tocopherol

24   reduced the amount of oxidation?

1        A.  First of all, it's unpredictable whether

2    or not it would reduce the amount of degradation

3    products from Exelon.  This is unpredictable as

4    you can see as it was unpredictable that the

5    ascorbyl palmitate was not a good antioxidant.

6    That's why I say it is unpredictable which one

7    would work.  That's why a series of different

8    options were tried.  And the clear

9    differentiation of tocopherol being superior to

10   others, that was unpredictable.

11       Q.  So you're saying that it was unpredictable

12   that when you tested tocopherol and ascorbyl

13   palmitate, tocopherol worked better than ascorbyl

14   palmitate?

15       A.  As an antioxidant, yes.

16       Q.  You've just been handed a document marked

17   as Exhibit 1.  And if you look at the bottom

18   right corner, it's bearing Bates number LTS

19   0055040 through LTS 0055063.  This document

20   appears to be a fax and attachment from yourself

21   to Paul Gargiulo.  The subject is ENA TDS market

22   formulation development report.  Did I read that

23   correctly?

24                   THE WITNESS:  You have

1      Q.  So you're saying now while your company is

2    in litigation asserting patents that require an

3    antioxidant, that all of a sudden it has to be a

4    suitable antioxidant; is that right?

5      A.  I don't think that you say all of a sudden

6    it has to be.  I mean, it has been there all the

7    time, as you see when you look at the data of the

8    document.  You see the huge difference of the

9    unsuitability -- the suitability of tocopherol

10   and the unsuitability of ascorbyl palmitate, these

11   data are there.  It's not a new statement from my

12   perspective.  It's just -- as we discussed this,

13   is clearly showing that the data speak for

14   themselves, so to speak, that you cannot just

15   take any antioxidant and then have solved the

16   problem.

17     Q.  Is ascorbyl palmitate a suitable

18   antioxidant for rivastigmine?

19     A.  Ascorbyl palmitate looks like not to be

20   suitable for the purpose.

21     Q.  So not an antioxidant that you would test

22   would necessarily be suitable for rivastigmine;

23   right?

24     A.  That is true, what you're saying, not any

1    antioxidant you would select or test would give

2    you a suitable antioxidant for Exelon patch.

3        Q.  But knowing that the Exelon patch was

4    subject to oxidation, here you could assume that

5    the addition of antioxidants would reduce that

6    degradation?

7                MR. MINION:  Objection to form.

8        A.  That was a driving rationale for testing

9    there.

10       Q.  But then the testing would determine

11   whether or not the antioxidant actually worked;

12   is that right?

13       A.  The testing would show which one is the

14   one, and what is the effect of this antioxidant

15   in terms of, in terms of reducing the speed of

16   oxidation, yeah.

17       Q.  And would you agree that it was reasonable

18   to assume that tocopherol or ascorbyl palmitate

19   may reduce the degradation --

20               MR. MINION:  Objection to form.

21       Q.  -- in the transdermal patch?

22               MR. MINION:  Objection to form.

23               THE WITNESS:  That was -- that was

24   the hypothesis that some of these antioxidants

```
 1    that we tested would work, and of course any hope

 2    that you put into your work saying hopefully one

 3    of these candidates I'm putting in there will in

 4    the end prove.

 5              MR. BROWN:  So, Your Honor, we're

 6    finished with the deposition clips.  Our next

 7    witness will be Dr. Graham Buckton.  We think,

 8    given the time, it's probably appropriate to

 9    start tomorrow morning.

10              THE COURT:  All right.  Well, so I'm

11    just going to charge you three minutes and

12    anymore minutes I have to use up today.

13              MR. BROWN:  Three minutes is fine,

14    Your Honor.

15              THE COURT:  So we're done.  So I can

16    see that, subject to any adjustments, if there

17    are any, you're very close to both having used

18    three and a half hours.  You'll get the exact

19    time tomorrow morning.

20              Just in terms of -- so, we have Dr.

21    Buckton.  We have some other expert whose resume

22    I haven't seen for your side and then we have

23    Dr. Klibanov.  And that's kind of what we're

24    expecting for tomorrow; right?
```

```
 1            MR. BROWN:  Correct, that I believe,

 2     is the rest of the case, Your Honor.

 3            MR. KALLAS:  Your Honor, they're

 4     bringing Dr. Buckton on two issues,

 5     noninfringement and I assume they're bringing him

 6     back after the experts you haven't seen the CV of

 7     after that, to do the 112 issues.  Then we'll

 8     have Dr. Klibanov.

 9            THE COURT:  Can't we do the

10     noninfringement all at once?

11            MR. KALLAS:  Well, we can if he

12     separate them.  If you recall from the pretrial

13     order, their infringement case has blurred with

14     their 112 case.  And we're at a loss.  It's a

15     moving target and we're at a loss as what is 112.

16            THE COURT:  I ruled at the pretrial

17     they have to finish infringement before they can

18     start on --

19            MR. KALLAS:  The Pretrial Order

20     specifically says infringement should finish and

21     then you start invalidity.  That's our

22     preference.

23            I know I don't want to inconvenience

24     the witness.  He's going to be here.
```

1                     THE COURT:  No.  No.  I'm not too

2        worried.  He gets paid well for his

3        inconvenience.

4                     Is that what you're planning on

5        doing, Mr. Martin -- sorry, Mr. Brown?

6                     MR. BROWN:  We were planning to

7        bring him one time and have him take the stand

8        and testify.  I think that's the normal course of

9        things.  We're happy to do it however the court

10       wants us to do it.

11                    MR. KALLAS:  Your Honor, our problem

12       is, as we said at the pretrial conference,

13       they're blurring the issues.  You then said you

14       would allow Dr. Klibanov to handle it, whatever

15       they came forward with.

16                    But unless we know what's

17       infringement and 112.

18                    THE COURT:  So, Mr. Brown seems to

19       be agreeable.  So Dr. Buckton, if he's the first

20       witness tomorrow, will testify on

21       noninfringement.  They can cross-examine on

22       noninfringement.  You can rest your

23       noninfringement case and then you can proceed

24       with your invalidity case and call whichever one

 1    you want.

 2              And you can call them, you know.

 3    You can rest and start over again with him or you

 4    can call your other expert.  Right?

 5              MR. BROWN:  That's fine, Your Honor.

 6              THE COURT:  All right.  So, as a

 7    practical matter, do we think this is going to

 8    take another seven hours tomorrow?

 9              MR. KALLAS:  They're all his

10    witnesses except for Dr. Klibanov, you know.

11              THE COURT:  You say they're all his

12    witnesses.  He has two.  You have one; right?

13              MR. KALLAS:  Well, put it this way,

14    he has the majority of -- I misspoke, Your Honor.

15    He has the majority of witnesses.

16              Depending on how much they do with

17    112 is how much Dr. Klibanov will have to

18    respond.  I can't imagine Dr. Klibanov's more

19    than 45 minutes.  But, again, I don't know what

20    their actual plan is.

21              THE COURT:  All right.  Is there

22    anything else you want to me to address tonight

23    or tomorrow morning?  Well, I guess you can't

24    tell me what you want me to address tomorrow

```
1    morning.

2                    Is there anything you want me to

3    address tonight?

4                    MR. FINEMAN:  I'd just like to hand

5    up Dr. Michniak-Kohn's CV.

6                    THE COURT:  Oh, okay.  Thank you.

7                    All right.  Did I give you back the

8    other two that you had handed up earlier or, I

9    mean, I looked at them and I'll give them back,

10   so we don't have extra copies floating around.  I

11   will look at Dr. Michniak-Kohn's overnight.

12                   Anything else before -- so, do you

13   want me to come out tomorrow morning sometime

14   before we actually start to see whether you have

15   any problems or --

16                   MR. BROWN:  I think that's probably

17   a good idea like today, Your Honor.

18                   THE COURT:  Well, and did you have a

19   little trouble getting in the courthouse this

20   morning?

21                   MR. FINEMAN:  Pretty smooth, Your

22   Honor.

23                   THE COURT:  Oh, do we --

24                   (Following a discussion held off the
```

```
1    record:)

2              THE COURT:  Okay.  So I think -- all

3    right.  Well, so I'll plan to sort of just come

4    out and see what's happening with you all at 8:00

5    tomorrow.  We'll start at 8:30.

6              And if we need to discuss things

7    between 8:00 and 8:30, that's on my time, not

8    yours.  Okay?

9              MR. BROWN:  Thank you, Your Honor

10   list.

11             THE COURT:  All right.  So I'll see

12   you tomorrow, then.

13             THE CLERK:  All rise.

14             (Court was recessed at 5:02 p.m.)

15

16

17

18

19

20

21

22

23

24
```

```
 1    State of Delaware)
                       )
 2    New Castle County)

 3
                    CERTIFICATE OF REPORTER
 4

 5               I, Heather M. Triozzi, Certified
      Professional Reporter, Registered Professional
 6    Reporter and Notary Public in the State of
      Delaware, do hereby certify that the foregoing
 7    record, Pages 1 to 346 inclusive, is a true and
      accurate transcription of the above-captioned
 8    proceeding on the 1st day of May, 2014, in
      Wilmington.
 9          IN WITNESS WHEREOF, this 1st day of
      May, 2014, at Wilmington.

10

11                         /s/Heather M. Triozzi, CSR,
      RPR
12                         Heather M. Triozzi, CSR, RPR
                           Cert. No:  184-PS
13                         Exp:  Permanent

14

15

16    DATED:  May 1, 2014

17

18

19

20

21

22

23

24
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# Index Redacted In Its Entirety.