IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


NOVARTIS PHARMACEUTICALS, ) Trial Volume 2
CORPORATION,                )
                            )
          Plaintiff,        )
                            ) C.A. No. 11-1077-RGA
v.                          )
                            )
PAR PHARMACEUTICAL, INC.,   )
                            )
          Defendants.       )


                    Friday, May 2, 2014
                    8:10 a.m.


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge


APPEARANCES:


        McCARTER & ENGLISH, LLP
        BY:  DANIEL M. SILVER, ESQ.


             -and-

        FITZPATRICK CELLA HARPER & SCINTO
        BY:  NICHOLAS N. KALLAS, ESQ.
        BY:  CHARLOTTE JACOBSEN, ESQ.
         BY:  DOMINICK A. CONDE, ESQ.
        BY:  DANIEL MINION, ESQ.
        BY:  CHRISTOPHER LOH, ESQ.

                    Counsel for the Plaintiff

```
1      APPEARANCES CONTINUED:

2

3              RICHARDS LAYTON & FINGER, P.A.
                 BY:  STEVEN J. FINEMAN, ESQ.
4
                      -and-
5
                LATHAM & WATKINS, LLP
6               BY:  DANIEL G. BROWN, ESQ.
                BY:  JENNIFER KOH, ESQ.
7               BY:  ROGER CHIN, ESQ.

8                      Counsel for the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1          THE COURT:  Good morning.  Are we

2     ready to proceed?

3          MR. KALLAS:  Yes, Your Honor.

4          THE COURT:  Before we proceed,

5     Mr. Chin, is there somebody on the Par side, the

6     three depositions that were played at the end of

7     yesterday, what was their relevance?

8          MR. CHIN:  So the three depositions

9     are being offered for the invalidity part of the

10    case.

11         THE COURT:  All right.  And they are

12    relevant how?  I understand the invalidity, I

13    understand what part of the case.  What do they

14    have to do with invalidity?

15         MR. CHIN:  They demonstrate that

16    with respect to the full scope of the claims that

17    the inventors themselves were unable to get one

18    of the identifying products to work and did not

19    know about the others.

20         THE COURT:  All right.  Okay.  Let's

21    go.

22         MR. CHIN:  We have one issue with an

23    exhibit that we need to correct.

24         MR. FINEMAN:  No dispute, Your

1    Honor, just to correct something.  Page 205 of

2    the transcript there was a discussion of the JTX

3    187.  JTX 187 was not admitted.  Par moves JTX

4    187.  I understand there is no objection.

5              MR. KALLAS:  No objection, Your

6    Honor.

7              THE COURT:  JTX 187 is admitted

8    without objection.

9              MR. FINEMAN:  And two other

10   clarifications, Your Honor.  I'm speaking on

11   behalf of both sides.  I believe that in the

12   record, JTX 078 appears as JTX 68, so it should

13   be 78.  And PTX 343 appears as 363.

14             THE COURT:  Well, both parties

15   agree, that's a good thing to talk to the court

16   reporter about and they can make those changes,

17   but it's now on the record.

18             All right.  Are we ready to proceed?

19             MR. CHIN:  I believe we are.  Par

20   calls Dr. Michniak-Kohn.

21             THE COURT:  I did look at her

22   resume.

23             MR. CHIN:  May I approach to hand up

24   a couple of binders?

```
 1                    THE COURT:  Sure.

 2                    THE CLERK:  Please state and spell

 3       your full name for the record.

 4                    THE WITNESS:  My name is Bozena,

 5       that's B-O-Z-E-N-A, Michniak-Kohn, and that's

 6       M-I-C-H-N-I-A-K - K-O-H-N.

 7

 8                    BOZENA MICHNIAK-KOHN, PH.D.,

 9                    the deponent herein, having first

10                    been duly sworn on oath, was

11                    examined and testified as follows:

12                    MR. CHIN:  I just need to get copies

13       for everybody.

14                    THE COURT:  That's all right.

15                    DIRECT EXAMINATION

16       BY MR. CHIN:

17          Q.  Good morning, Dr. Michniak-Kohn.  Could

18       you please introduce yourself to the Court?

19          A.  Yes.  I'm Dr. Bozena Michniak-Kohn.  I'm a

20       professor of pharmaceutics at the Ernest Mario

21       School of Pharmacy at Rutgers University in

22       Piscataway, New Jersey.  And I'm also the

23       director for the Center for Dermal Research as

24       well as the director for the lab for drug
```

1       delivery of the New Jersey Center for

2       Biomaterials, that's also Rutgers University.

3           Q.  What is your area of expertise?

4           A.  So my area of expertise is transdermal and

5       topical pharmaceutical dosage forms and dosage

6       forms in general, and in particular formulations

7       such as transdermal patches, lotions, ointments,

8       nano carriers and topical formulations.  And in

9       addition I'm familiar with the standard testing

10      methodologies that are used in the pharmaceutical

11      industry.

12          Q.  Could you turn to DTX 534 in your binder.

13          A.  Yes, I can.

14          Q.  What is this document?

15          A.  This is my CV.

16          Q.  Does DTX 534 provide an accurate summary

17      of your professional credentials?

18          A.  Yes, it does.

19              MR. CHIN:  Par moves the admission

20      of DTX 534 into evidence.

21              MR. CONDE:  No objection.

22              THE COURT:  Admitted without

23      objection.

24              MR. CHIN:  And Par also offers Dr.

1    Michniak-Kohn as an expert in transdermal drug

2    forms and pharmaceutical standards for evaluating

3    drug products.

4              MR. CONDE:  No objection with a

5    qualification that that doesn't include statistic

6    as her expertise.

7              THE COURT:  All right.  Mr. Chin.

8              MR. CHIN:  Perhaps we need to cover

9    that area.

10             THE COURT:  I think so, the rest of

11   it is fine.

12             THE COURT:  I mean, the rest of it

13   is fine, but if she is going to testify about

14   statistics, I think you better lay a little more

15   foundation.

16   BY MR. CHIN:

17      Q.  Dr. Michniak-Kohn, do you use statistics

18   in your work in testing pharmaceutical products?

19      A.  Yes.  In fact, for all of my publications,

20   et cetera, we constantly, in every day, use

21   statistics for all of the evaluations of any

22   data.

23      Q.  What is your role in setting up

24   statistical plans for pharmaceutical studies that

1    you conduct and supervise?

2         A.  Well, I basically work with statisticians

3    or work by myself to evaluate what the design of

4    experiments will be for any particular study.

5    Depends how big it is and what kind of study it

6    is, but I use that constantly.

7              And I've, obviously, been educated

8    in statistical analyses because that's part of

9    any basic scientist's work.

10        Q.  Do you use statistical reference books in

11   your own work?

12        A.  Of course.  I've got several at my shop?

13             MR. CHIN:  Your Honor, we would

14   offer Dr. Michniak-Kohn, also, as an expert in

15   pharmaceutical testing, to the extent that that

16   encompasses statistics.  We're not offering her

17   as statistics expert, per se.

18             THE COURT:  All right.  I understand

19   that.

20             Is there any objection?

21             MR. CONDE:  No objection with that

22   qualification, Your Honor.

23             THE COURT:  Okay.  Thank you, Mr.

24   Chin.

1              And, again, I'm sorry the gentleman

2    for Novartis, who are you?

3              MR. CONDE:  Dominick Conde.

4              THE COURT:  Conde?

5              MR. CONDE:  Conde, yes, sir.

6              THE COURT:  Okay.  Go ahead, Mr. Chin.

7    BY MR. BROWN:

8         Q.  Dr. Michniak, what were you asked to do in

9    this case?

10        A.  I was asked to look at some reports that

11   Dr. Davies had submitted and see if there was any

12   evidence for the oxidative degradation --

13   acetaldehyde to perform any oxidative

14   degradation.

15        Q.  And what did you conclude?

16        A.  If I could have my first slide, please.

17             So, first of all, Dr. Davies'

18   experiments were flawed and really didn't show

19   that acetaldehyde reduces oxidative degradation.

20   There are three main points that we need to

21   consider and that is:  First of all, that the

22   Dr. Davies' experiment did not model conditions

23   of a transdermal patch.

24             Number two, inappropriately added

1    peroxide, even though Par's ANDA products are

2    substantially free of peroxide.

3              And, finally, fails to show any

4    statistically significant results.

5        Q.  I understand you were not available to

6    attend trial yesterday due to your professional

7    obligations, but did you have an opportunity to

8    at least review the -- briefly review the

9    transcript of Dr. Davies' testimony from

10   yesterday about his experiments?

11       A.  Yes, I did.

12       Q.  And did you also have an opportunity to

13   study the data and reports that Dr. Davies

14   generated in connection with his experiments?

15       A.  Yes, I did.

16       Q.  I'd like to focus on the first bullet

17   point, and if we could have that highlighted.  It

18   states that the Davies' experiment does not model

19   the conditions of a transdermal patch.

20              What type of dosage form is Par's

21   product?

22       A.  The Par product is a transdermal drug

23   delivery system.  In other words, a patch.

24       Q.  Can you turn to JTX 068 in your binder?

1      Do you recognize this document?

2          A.  Yes, I do.

3          Q.  What is this document?

4          A.  This is the proposed draft package insert

5      for the Par ANDA product, the Rivastigmine

6      transdermal drug system.

7                  MR. CHIN:  Your Honor, Par moves for

8      the admission of Exhibit 068.

9                  MR. CONDE:  No objection, Your

10     Honor.

11                 THE COURT:  Admitted without

12     objection.

13     BY MR. CHIN:

14         Q.  I'd like to turn to Page 221.  And, in

15     particular, the diagram near the bottom.

16                 Layer two is labeled

17     drug-in-adhesive (acrylic) matrix.  What is the

18     drug-in-adhesive matrix in Par's product?

19         A.  So layer two or the drug-in-adhesive

20     (acrylic) matrix is basically a mixture of long

21     polymer chains in which the active agent, the

22     Rivastigmine, is uniformly distributed.  And it

23     has another action as well, because it's

24     obviously a drug-in-adhesive.

1          So that portion of the patch sticks

2     the patch onto the skin of the patient when it's

3     put on.

4          Q.  What happens when the patient removes the

5     backing and applies the patch to their skin?

6          A.  So when they remove the backing, obviously

7     the first thing is it sticks to the skin.  And

8     then the second thing is that the Rivastigmine

9     now has a chance to exit the patch.

10          And we basically create what is

11     known as a concentration gradient because it's a

12     high level of Rivastigmine in the patch.  Nothing

13     on the skin at the beginning.

14          So there's a big driving force to

15     drive the Rivastigmine out of the patch into the

16     -- into the skin.  And, obviously, into the

17     systemic circulation of the patient.

18          Q.  What did Dr. Davies' test in his

19     experiment?

20          A.  Dr. Davies tested a solution of

21     Rivastigmine.

22          Q.  Does it matter that Dr. Davies tested a

23     solution instead of a transdermal patch?

24          A.  Absolutely.  Because, as we see, the

1    transdermal patch is more of a solid system with

2    this network of polymers.  And Dr. Davies tested

3    a solution and those two environments are

4    different from each other.

5                So there are no -- there was no

6    relevance.  And, in fact, in each of those

7    environments, the chemical kinetics are going to

8    be very, very different.

9    Q.  Now, what do you mean by kinetics?

10   A.  If I can have the next slide, please.

11               So reaction kinetics concerns two

12   things.  They concern the rate of a reaction and

13   the properties of that, and also the activation

14   energy of chemical reactions.

15               Now, what I mean by that, just to

16   explain it, it really means whether a reaction

17   would proceed at all and whether it would happen

18   in either environment.

19               And there are three factors that

20   affect reaction kinetics.

21               Number one, it's the degree of

22   contact between molecules, the physical state of

23   the medium.  And I know I'm using a lot of words

24   here.

1          So to put it in more simple terms,

2     the physical state of the medium would be whether

3     it's a solid, a liquid or a gas.  We won't be

4     considering gases.

5          Secondly, the temperature.

6          And, thirdly, the concentration of

7     the substances in the medium.

8     Q.  How does Par's product compare with the

9     Davies' experiment with respect to these reaction

10    kinetics?

11    A.  If I can have the next slide, please.

12          So, in this slide, what I did is I

13    took those three kinetic factors.  So we see on

14    the left-hand side that we've got physical state

15    contact listed, temperature and concentration.

16    And then the green refers to the transdermal

17    patch or Par's ANDA product.  And the orangey

18    pink refers to the conditions in Davies'

19    experiment.

20    Q.  Let's focus on the first kinetic factor,

21    physical state and contact.  How does the first

22    factor affect reaction kinetics?

23    A.  So we notice that in these two situations,

24    we're actually talking about a particular

1    physical state.  So we're talking about a solid

2    or a liquid.

3              So, in a liquid, molecules are able,

4    in fact, to move around much faster and they're

5    freer to move around, whereas in a solid, they

6    have more restrictive movement.  So it's more

7    difficult for them to move.

8              So it's more difficult for them to

9    move.  So by looking at liquids, acetaldehyde,

10   for example, probably could react more likely in

11   a liquid solution than it would be when it's

12   immobilized in a patch.

13   Q.  And with respect to the first kinetic

14   factor, how does Dr. Davies' experiment compare

15   with the transdermal patch?

16   A.  As I just mentioned, Dr. Davies used a

17   liquid solution and definitely in that state with

18   those acetaldehyde molecules it would be more

19   likely that you could -- you would see a chemical

20   reaction than you would ever see in a solid

21   structured polymatrix that's present in the Par

22   ANDA product.

23   Q.  And taking your second kinetic factor can

24   you explain how temperature affects the reaction

1    of kinetics?

2         A.  It's generally known in science that the

3    higher the temperature the faster the chemical

4    reaction rates proceed and there is a general

5    rule that for every increase in ten degrees

6    centigrade, you can double reaction rates.

7                   And again, just to illustrate it

8    with a simple example, if we take cookie dough

9    and we just leave it out at room temperature,

10   nothing much happens, but if you increase the

11   temperature, you put it in an oven, you can even

12   have a short period of time and hopefully you get

13   cookies at the end.  What that is trying to

14   illustrate basically is that conditions are very

15   important and high temperatures can encourage

16   reactions to happen.  Whereas in a solid

17   situation, in a low room temperatures that may

18   not happen at all.

19        Q.  Can you turn to JTX 68 in your binder.

20   This is the label that we just looked at a bit

21   earlier and I would like to turn to page 233 this

22   time.  Does this provide information about the

23   temperature under which the Par product is to be

24   stored?

1        A.  Yes.  If we look halfway down that slide,

2    it says how should I store rivastigmine

3    transdermal system.  And we're told that we have

4    to store rivastigmine transdermal system at 59

5    degrees Farenheit to 86 degrees Farenheit, 15

6    degrees centigrade to 30 degrees centigrade,

7    essentially what that means is at room

8    temperature.

9        Q.  And can we turn back to slide number five.

10   With respect to the second kinetic factor, how

11   does Dr. Davies's experiment compare with the Par

12   transdermal patch?

13       A.  So again, comparing Dr. Davies's

14   experiment, Dr. Davies used a rather high

15   temperature of 140 degrees Farenheit, 60 degrees

16   centigrade, whereas Par's ANDA products are

17   stored at room temperature so it was more likely

18   in the Davies experiment that any molecules would

19   have a chance to react.

20       Q.  And taking your third kinetic factor, can

21   you explain how concentration affects reaction

22   kinetics?

23       A.  So again a general rule in science is that

24   the higher the concentration the more likely you

1    have a chance of a chemical reaction, in other

2    words, you have more molecules so if you have

3    more molecules are they're more likely to react.

4              So again, in conclusion, if you have

5    high concentrations and I can probably give you

6    an illustration, nitroglycerin, if we have a high

7    concentration of nitroglycerin then we have an

8    explosive situation, it's an explosive mixture,

9    but nitroglycerin at very high dilute

10   concentrations or low concentrations is used for

11   patients to treat angina and we don't have bombs

12   going off.

13             So in conclusion, the concentration

14   makes a big effect.  It's in every equation in

15   science.  The more you have of a certain

16   molecule, the more likely it is to be able to

17   react.

18   Q.  And can you briefly describe the

19   concentration of the Par components of the Par

20   products?

21   A.  Yes, I can.  If I can have the next slide,

22   please.  So what I've listed here on the left we

23   have the components, and then on the right we

24   have the amounts, and we have rivastigmine listed,

1    which is obviously the reactive agent.

2        The acetate copolymer adhesive and the

3    isopropyl myristate, if you take them from the

4    slide, acetate copolymer adhesive is the highest

5    concentration, 74 percent.

6        Q.  Can we turn back to slide number five.

7    With respect to the third factor, how does

8    Dr. Davies' experiment compare with the Par

9    product with respect to the excipients?

10       A.  So we just saw from a previous slide that

11   the Par's transdermal patch contains adhesive in

12   the fact that the adhesive is in high

13   concentration.  Dr. Davies' experiment on the

14   other hand omitted both of those components

15   totally, and none was present, and the conclusion

16   from that is that by missing those components of

17   course, those molecules didn't have the adhesive

18   and the tackifier to work into, so again the

19   likelihood of anything happening with molecular

20   reaction rates in the Davies experiment was much

21   higher.

22       Q.  And how does Dr. Davies' experiment

23   compare with the Par product with respect to

24   peroxides?

1      A.  Well, first of all, the Par's transdermal

2      patch is substantially free of peroxides, whereas

3      in the Dr. Davies experiments he added a large

4      amount of peroxide, in fact he added TBHP which

5      is not even present in the Par ANDA products.  So

6      again we have two radically different

7      environments here comparing Dr. Davies'

8      experiment and what actually happens in the

9      transdermal patch.

10     Q.  And can you turn to JTX 53 in your binder?

11         THE COURT:  Actually, Mr. Chin, on

12     the third point there, you said the greater the

13     concentration the more the reaction, general rule

14     of science; right?

15         THE WITNESS:  Correct.

16         THE COURT:  And so what is there a

17     greater amount of concentration in Dr. Davies'

18     experiment than in the transdermal patch, there

19     was a greater concentration of what?

20         THE WITNESS:  No.  On that point I

21     was discussing the concentration of the

22     excipients and the fact that there were

23     excipients in the transdermal patch but none in

24     the Davies' experiment.  But in general if you

1      have more of -- in theory, we're covering both of

2      these points, sorry, Your Honor, both the

3      excipients and the peroxide because if you have a

4      large amount of peroxide and that was my next

5      point, you have a high concentration of the

6      peroxide, lots of molecules so you would get a

7      high reaction.

8              THE COURT:  So it's not the absence

9      really of the adhesive and the tackifier, and

10     other than the fact that we talk about the

11     peroxide, that means the concentration of the

12     peroxide is greater?

13             THE WITNESS:  I was trying to give

14     you the theory first on what the effect of

15     greater concentration is, so the more molecule

16     you have, the more likely it is to react.

17     However, I broke these down to excipients and

18     peroxide, and looking at the adhesive which is in

19     high concentration, it's not there in the Davies

20     experimental all.

21             THE COURT:  Okay.  I got your point.

22     Thank you.

23     BY MR. CHIN:

24         Q.  And Dr. Michniak, does the presence of a

1    large amount of adhesive in the transdermal patch

2    have any affect on any reaction between

3    acetaldehyde and other components?

4        A.  Of course because the facts and we covered

5    that the adhesive is actually high concentration

6    and that is that polymer network making it more

7    of a solid component, so of course in that

8    environment those molecules are far less likely

9    to meet each other and reacted than they would be

10   in a solution that's lacking all of these solid

11   like polymer network.

12       Q.  Turning to the issue of peroxides, could

13   you turn to JTX 53 in your binder.  Do you

14   recognize this document?

15       A.  Yes, I do.

16       Q.  And what is it?

17       A.  This is Dr. Davies' experiment on looking

18   at the peroxide content in Par's adhesives and

19   excipients.

20       Q.  And what does Dr. Davies' data show?

21       A.  Well, if we take that document and look at

22   the very last page, there is a table there on the

23   section B, and what we see there is on the

24   left-hand side there are listed raw ingredients.

1    Basically what Dr. Davies did is he took the raw

2    ingredients that are included in Par's

3    transdermal patch and the acetate copolymer

4    adhesive and the isopropyl myristate and the

5    peroxide values are listed we see that the

6    acetate copolymer adhesive we have 1.12 and 1.16

7    and for the isopropyl myristate we have 0.9 and

8    1.12.

9        Q.  What does these ranges mean?

10       A.  Actually those values are extremely low.

11   In fact, we can say that these raw materials are

12   substantially free of any peroxide at all.

13       Q.  Can you turn to JTX 74 in your binder.

14   And this patent has been

15   BY MR. CHIN:

16       Q.  And this patent has been previously

17   admitted into evidence.  Do you recognize this

18   document?

19       A.  Yes.  It's the US patent '498, the LTS

20   Lohman patent that discusses peroxide numbers.

21       Q.  Can you turn to Column 6, Lines 8 through

22   20?  What does this passage describe?

23       A.  So what we see in this passage is that

24   it's talking about a transdermal therapeutic

1    system.  And then if we look at line, I think it

2    will be, 13 in the middle there, it talks about

3    substantially free of hydroperoxides.

4              And hydroperoxides are a type of

5    peroxide.  So we see the statement that I

6    actually just used.

7              If we look towards the end of that,

8    the bottom of that slide, we see a reference to

9    peroxide numbers, PON, of not more than 20,

10   preferably not more than ten with particular

11   preference, not more than five.

12             So what we're learning here that in

13   this patent, there is an explanation of what

14   substantially free of hydroperoxide means.  And

15   those high values means that or it gives an

16   explanation of how peroxide values and

17   substantially free of hydroperoxides are related.

18        Q.  And what does this passage tell you about

19   peroxide numbers of the range 0.9 from 1.16 that

20   we were discussing previously?

21        A.  So those values in the raw ingredients

22   that are use for the Par ANDA product were

23   extremely low.  And, in fact, I correctly used

24   that term, substantially free of peroxides.

1          Q.  Can we turn back to Slide 5?

2                How does the amount of peroxide that

3     Dr. Davies measured in the raw materials used in

4     the Par product compare to the amount of peroxide

5     that's used in his experiment?

6          A.  So, as I mentioned previously, a large

7     amount of peroxide was used in the Davies'

8     experiment, the TBHP.  It was about 10,000 times

9     what would ever be present in the Par transdermal

10    patch, which we decided is substantially free of

11    peroxides.

12         Q.  And how does that affect the possibility

13    of any reaction with peroxide in acetaldehyde?

14         A.  Well, we see that the environment, as far

15    as peroxide is concerned, is drastically

16    different.  If you have 10,000 times of something

17    in one environment and hardly anything in the

18    other, then that's a big difference.  So we

19    cannot extrapolate from one model to or from the

20    Davies' model to the transdermal patch.

21         Q.  Can we turn back to your summary slide,

22    Slide 303?

23                We've covered the first two bullet

24    points, I believe.  And I'd like to focus on your

1    third bullet point, fails to show any

2    statistically significant results.

3                    At the time that Dr. Davies

4    conducted his study, how did he analyze whether

5    or not his data showed any statistical

6    significance?

7        A.  He used the one-sided T test.

8        Q.  What is a T test?

9        A.  A T test basically is a statistical method

10   that you use to determine whether there is a

11   difference between two sets of data.  Usually a

12   control set and the test set.

13                   And basically it's dangerous to look

14   at data like that.  And, for example, I saw some

15   bar charts and some slides from yesterday where,

16   you know, scientists can, of course, draw bar

17   charts.  But you cannot look at bar chart and

18   then see a difference and then say, There will be

19   a difference because that's deceiving.

20                   So, in fact, what should be done is

21   a proper statistical analysis of the data before

22   you make any conclusions.

23       Q.  In your opinion, did Dr. Davies'

24   experiment show any statistically significant

1    antioxidant effect of acetaldehyde?

2        A.  In my opinion, no, it didn't because it

3    wasn't statistically significant.

4        Q.  And how did you reach that conclusion?

5        A.  Well, he used a one-sided T test where he

6    should have probably properly used a two-sided T

7    test.

8        Q.  Can you turn to DTX 540 in your binder?

9            Do you recognize this document?

10       A.  540.  Yes, I do.

11       Q.  What is this document?

12       A.  This is a book by Altman called Practical

13   Statistics for Medical Research.

14       Q.  Do you presently use this book in your own

15   work on statistical analysis in pharmaceutical

16   testing?

17       A.  Yes.  Among the very many books on

18   statistics that I have on my shelf, I have this

19   book.

20       Q.  Is this textbook considered a reliable

21   authority in the research community?

22       A.  Absolutely.

23           MR. CHIN:  Par moves for the

24   admission of DTX 540 into evidence.

1          MR. CONDE:  No objection.

2          THE COURT:  Just as a matter of

3    curiosity, is this the entire book or --

4          MR. CHIN:  No, it's an excerpt.

5          THE COURT:  Okay.

6          MR. CHIN:  We can save some space on

7    your shelf.

8          THE COURT:  I'm sorry.  Admitted

9    without objection.

10   BY MR. CHIN:

11       Q.  Can you turn to Page 171?

12          I'd like to focus on the top half of

13   the page.  What does this passage in the

14   statistics textbook describe?

15       A.  So if we look towards the second paragraph

16   in the middle of the page, we see a reference to

17   what we just talked about, the one-sided tests

18   and it says that one-sided tests are rarely

19   appropriate.

20          And, in fact, if we read on after

21   this, it says that even when we have strong prior

22   expectations of an outcome from comparing those

23   two sets of data, we cannot be sure that we're

24   right.  So, even if you do have that, you really

1    scientifically should not make assumptions and

2    prejudge yourself.

3              And what this passage also tells us,

4    that if we look at the top of this slide, it

5    refers to a two-sided T test. And the sentence

6    after that tells us that, in the vast majority of

7    cases, this is the correct procedure to use.

8         Q.  How do these principles apply to

9    Dr. Davies' statistical analysis?

10        A.  Well, first of all, Dr. Davies' used a

11   one-sided T test, which we see from here that

12   it's probably not the best choice.  There are

13   very rare circumstances where you might have a

14   strong prior expectation.

15             But we know about acetaldehyde.  We

16   have a dispute right now.

17             So we don't know and we shouldn't

18   make that prejudgment.  So the correct approach

19   would have been for Dr. Davies to say, I can't

20   prejudge.  I shouldn't be doing it and I should

21   have done a two-sided T test.

22        Q.  Did you analyze Dr. Davies' data using a

23   two-sided T test?

24        A.  I did.  And if I can have the next slide.

1           So what I did in this slide is I've

2      listed the time, the 6 hours, 15 hours, 21 hours

3      and the Impurity 4, EVAC and the Rivastigmine.

4      This is straight out of Dr. Davies' report.

5           And I recalculated the P-values

6      according to a two-sided T test.

7           Q.  What is a P-value?

8           A.  So, a P-value is a way, again, of telling

9      the difference between those two sets of data

10     that -- the control and the test.  And a P-value

11     of P equals 0.05 or less is considered by the

12     entire scientific community as being

13     statistically significant.

14          So the idea is you don't draw those

15     bar graphs and look at differences visually, even

16     though you might see a difference.  You really

17     have to apply a test.

18          You calculate your P-value and then

19     say, Is it equal or below .05?

20          So that's standard across the board.

21     So what I did when I received Dr. Davies' report

22     is I basically saw the one-sided T test and

23     realized that that's absolutely not the way to

24     go.

1          And I recalculated things with those

2     -- these P-values.  And as we see, looking at

3     those nine numbers, that the lowest number is

4     .051 and the highest is .130.  That's the range.

5          And, in fact, all of those nine

6     points basically, according to any scientist, are

7     not statistically significant.

8     Q.  In your opinion, could you draw a

9     scientifically reliable conclusion from data that

10    is above 0.05?

11    A.  Absolutely not.  In fact, the scientific

12    community has decided that that is the bar that

13    every peer-reviewed paper looks at, every study

14    looks at and most all scientists consider that to

15    be the right approach.

16    Q.  And although you were not able to attend

17    trial yesterday, did you have an opportunity to

18    review Dr. Davies' slides?

19    A.  Yes, I did.

20    Q.  And can we take a look at PDX 144, which

21    is Dr. Davies' summary of his statistical

22    analysis.

23          Does Dr. Davies' statistical

24    analysis demonstrate that he obtained

1      statistically significant results?

2          A.  No, it doesn't illustrate at all that he

3      got statistical significance because, obviously,

4      he used a one-sided T test analyzing his data.

5                  And, of course, the problem with

6      that is that you really have to do one test when

7      you design your experiments at the beginning.

8      What he did is go back and do all of these other

9      tests and basically massage the data.

10                 Because you're really not allowed to

11     do statistics after you've got the data because

12     it introduces bias, because you can look at the

13     data and then say, Well, I'm going to try, you

14     know, four tests and see which one might give me

15     statistical significance.

16                 That's an absolute no-no.  The way

17     you design an experiment, you start at the

18     beginning.

19                 You say, This is my hypothesis.

20     This is the appropriate statistical analysis that

21     I should be doing and then I run the experiment.

22                 I shouldn't be running the

23     experiment and then saying, You know, it didn't

24     quite work the first time, so I'm going to go

1    back and find a test that I can match and get

2    statistical significance.

3              That's absolutely not the way to go.

4         Q.  And is this rule about changing the

5    statistical analysis something that's recognized

6    in the industry?

7         A.  Absolutely.  In fact, you know,

8    pharmaceutical people working in the

9    pharmaceutical industry are scientists.  So it's

10   a basic scientific principle.

11             And, in addition, of course, if we

12   look at clinical trials, I mean, that's a good

13   example probably.  You know, the FDA even

14   mandates before you do a clinical trial that you

15   make the hypothesis in what you're planning to

16   do.  Obviously, design the experiment correctly,

17   but also to plan your statistics before you run

18   the clinical trial.

19             We'd be in a lot of trouble if

20   people did the clinical trial and then said, You

21   know, on this drug, then they went back and did a

22   statistical test and said, Oh, my drug works.

23   And, in fact, really it did not work.  We would

24   really be in trouble.

1        Q.  I'd like to recap some of the issues that

2    you raised in your testimony today about

3    Dr. Davies' experiment.  If we could turn back to

4    Slide 5.

5              Here you pointed out a few

6    differences you identified between the

7    transdermal patch and the Davies' experiment.

8    Starting with the first variability, physical

9    state and contact, how did that approach taken by

10   Dr. Davies affect the results?

11       A.  So Dr. Davies' approach basically was bias

12   in favor of finding an antioxidant action because

13   he chose to use a liquid solution rather than

14   using the actual product, the transdermal patch

15   or even a version of that, he went straight to a

16   liquid, so again we can't extrapolate from the

17   Davies experiment to what's happening or may be

18   happening in the transdermal patch.

19       Q.  And next is temperature, how did the

20   approach taken by Dr. Davies affect the results?

21       A.  Again, Dr. Davies' approach was bias in

22   finding an antioxidant action because he

23   conducted his experiment at a much higher

24   temperature and we decided that higher

1    temperatures speed up chemical reactions.  So

2    again, we can not extrapolate what happens in the

3    Davies experiment versus what may or may not

4    happen in Par's ANDA product.

5        Q.  And next is the concentration of

6    excipient.  How did the approach taken by

7    Dr. Davies affect results?

8        A.  So, again, to recap that Dr. Davies'

9    approach was again bias because in favor of

10    finding an antioxidant action because he totally

11    omitted one of the major components of the

12    transdermal patch, he had no adhesive, no

13    tackifier in his experiment so we can't

14    extrapolate and compare those two situations.  We

15    have got two totally different environments.

16        Q.  Next is peroxide, how did the approach

17    taken by Dr. Davies affect the results?

18        A.  Again, Dr. Davies' approach was bias in

19    favor of finding an antioxidant action because he

20    added a large amount of peroxide when we know

21    that the Par ANDA product is substantially free

22    of peroxide.  So, again, those two situations

23    cannot be compared.

24        Q.  And finally we discussed statistical

1       tests.  How did the one-sided T-test taken by

2       Dr. Davies affect results?

3           A.  So Dr. Davies' approach was bias in favor

4       of finding an antioxidant action because by using

5       a one-sided T-test not only was he incorrect, but

6       a one-sided T-test allowed him to find

7       statistical differences and that's generally true

8       if you do a one-sided T-test, it allows you to

9       sometimes to find statistical differences that

10      aren't real at all.  So again, we can't

11      extrapolate.

12          Q.  And in your opinion, does Dr. Davies

13      provide evidence that acetaldehyde reduces

14      oxidative degradation?

15          A.  Sorry.  Could you repeat.

16          Q.  In your opinion, does Dr. Davies provide

17      evidence that acetaldehyde reduces oxidative

18      degradation?

19          A.  Absolutely not, because first of all, the

20      Davies experiment was a totally wrong model for

21      the transdermal patch.  Those two situations are

22      very, very different as we learned today.

23                  And number two, his statistics was

24      totally wrong so he found statistical difference

1    where there wasn't or used the wrong test, in

2    other words.  And finally, he had a totally

3    systemic bias in all the design of experiments he

4    did in favor of finding an antioxidant action.

5                    MR. CHIN:  Thank you.  I have no

6    further questions.

7                    THE COURT:  Thank you Mr. Chin.

8                    Mr. Conde.

9                    MR. CONDE:  May I approach, Your

10   Honor?

11                   THE COURT:  Yes.

12                        CROSS-EXAMINATION

13   BY MR. CONDE:

14       Q.  Good morning, Doctor.

15       A.  Good morning.

16       Q.  Chemistry is not something you're

17   comfortable opining on; correct, Doctor?

18       A.  Depends on how you define chemistry.  My

19   degree is not in chemistry, but my degree is in

20   pharmaceutical sciences that includes a large --

21   a lot of chemistry.

22       Q.  You don't recall saying at your deposition

23   that chemistry is not something you're

24   comfortable in opining on, Doctor?

1          A.  Again, depends on what you're talking

2     about chemistry.  I am not a synthetic chemist

3     and I don't do synthetic chemistry, definitely.

4          Q.  And the chemistry aspects of this case is

5     not something you researched in forming your

6     opinions; correct?

7          A.  Again, depends on how you define

8     chemistry.

9          Q.  The organic chemistry aspects of this

10    case; correct?

11         A.  Organic synthetic aspects.

12         Q.  And as to Par's products, you do not know

13    how the adhesive used in Par's product is

14    prepared; right?

15         A.  I do know because I have seen a lot of

16    materials and reviewed a lot of supplemental

17    materials on how these types of polymers are

18    prepared.

19         Q.  And you don't talk about how these

20    polymers are prepared in your expert report;

21    right?

22         A.  As far as I can recall, no, but I did look

23    at materials about this.

24         Q.  Now, at the end of your direct testimony,

1    you identified five things that you criticized

2    Dr. Davies' testing on.  Do you recall that?

3        A.  Yes, I do.

4        Q.  You have not done any testing to confirm

5    that your criticisms are correct; right?

6        A.  I was not asked to perform any testing.  I

7    mean, if I was, I may have accepted the offer.

8        Q.  So you didn't volunteer to do any testing

9    to confirm that any of those criticisms that you

10   gave at the end of your direct testimony were

11   accurate; right?

12       A.  Well, I was asked to opine on materials on

13   a study of Dr. Davies' work, but I'm a busy

14   person as well, so I didn't volunteer.

15       Q.  And you have not done any analytical

16   testing on Par's ANDA product; right?

17       A.  No, I did not do any analytical testing,

18   but again, I reviewed a lot of materials that

19   concerned the Par's ANDA product and the testing

20   that was done.

21       Q.  But you did not yourself do any analytical

22   testing on Par's product; correct?

23       A.  Did I go to the lab and do any testing?

24   No, I did not.

1     Q.  And I think you testified at your

2     deposition that you could have repeated

3     Dr. Davies' testing; right?

4     A.  Well, I could have put rivastigmine and

5     made the solution, of course.

6     Q.  And you could have repeated his testing;

7     right?

8     A.  If I had every single detail and

9     information, one assumes that an experiment can

10    be repeated.

11    Q.  And you did not make any attempt to repeat

12    Dr. Davies' test; right?

13    A.  No, I was not asked to repeat any tests.

14    Q.  And you didn't volunteer to repeat his

15    test, did you?

16    A.  Again, I'm rather busy, so if I'm not

17    asked, I probably wouldn't have volunteered.

18    Q.  We will stipulate that everyone is busy.

19    You didn't volunteer to repeat Dr. Davies' test;

20    right?

21    A.  I wasn't asked to, so I didn't volunteer.

22    Q.  Now, much of your testimony went to the

23    issue of whether Par -- whether acetaldehyde

24    functioned as an antioxidant in Par's patch;

1    right?

2        A.  Correct.

3        Q.  And you know that Claim 7 isn't directed

4    to the function of acetaldehyde in Par's patch;

5    right?

6        A.  I don't -- you would have to point me to

7    what Claim 7 exactly is.

8                MR. CONDE:  Can you put Claim 1.

9    Could you please put up the demonstrative with

10    the definition of antioxidant.

11    BY MR. CONDE:

12        Q.  So are you familiar with the Court's claim

13    construction as to the term antioxidant?

14        A.  Yes, I recall seeing the claim

15    construction.

16        Q.  And you know that that construction does

17    not include a function element to it; right?

18        A.  I don't recall exactly what the exact

19    wording was.

20        Q.  Let's see if we can put the exact wording

21    up on the screen.  Bear with us for a moment,

22    please.  So if we look up on PDX 105, it says

23    antioxidant requires the presence of an agent

24    that reduces oxidative degradation.  Are you

1    familiar with that definition, Doctor?

2         A.  Yes, I am.

3         Q.  And it does not require a function

4    element, does it?

5         A.  Could you define function?

6         Q.  It doesn't use the word function, does it?

7         A.  No, it doesn't use the word function.

8         Q.  And also you discussed a lot about

9    peroxides on your direct; correct?

10        A.  Yes, I did.

11        Q.  And Claim 7 doesn't require plaintiffs to

12   prove that there are any peroxides in Par's

13   product; right?

14        A.  Again, I am not familiar with exact

15   wording on Claim 7.

16        Q.  We can put the whole claim back up.  Would

17   you please do that, Mr. Hoy.  And we're on PDX

18   103.  There is Claim 7.

19             Claim 7 doesn't recite the need to

20   prove that there is a peroxide in Par's product;

21   right, Doctor?

22        A.  No, I don't see the word peroxide there.

23        Q.  Mr. Hoy, could you please go to JTX 74

24   which is the '498 patent.  And I believe this is

1    also in your exhibit book, but it probably would

2    be easiest just to follow it up on the screen.

3              Could you first start at the place

4    that Dr. Michniak-Kohn started in her direct.

5    Let me get the right cite which as at column five

6    line -- I'm sorry.  My apologies.

7    A.  It was actually column six.

8    Q.  Thank you.  Column six, lines eight to

9    about 20.  And you cited to this, this column and

10   these lines in support of your opinions; right,

11   Doctor?

12   A.  Yes, I did.

13   Q.  So now let's leave this and go to column

14   seven, line eight in the same patent.  And at

15   column seven, line eight in the '498 patent says,

16   "Following this treatment, the materials are

17   virtually free from peroxides and may be used

18   without concern even if loaded considerably

19   beforehand."

20              Do you see that?

21   A.  Yes, I do.

22   Q.  And it goes on to say, "An additional

23   improvement in stability may be achieved by the

24   addition of antioxidants which retard or suppress

1    the formation of new peroxides during the storage

2    of the systems."

3              Do you see that?

4        A.  Yes, I do.

5        Q.  So the '498 patent acknowledges that even

6    after you do the treatment, one could still add

7    antioxidants; right?

8        A.  Yes, it does.

9        Q.  Now, in your direct, you talked about

10   Dr. Davies' testing and the fact that he used a

11   peroxide to do the testing, the stress test;

12   right?

13       A.  Correct.

14       Q.  And you agree that peroxides can cause the

15   oxidative degradation of rivastigmine; right?

16       A.  In general or in a certain situation?

17       Q.  Let's start in general.

18       A.  Yes, in general, in chemistry, yes.

19       Q.  And one of the techniques used by

20   pharmaceutical companies to assess oxidative

21   stability by stress testing is to use peroxides;

22   right?

23       A.  Correct.

24       A.  Correct.

1          Q.  And a lot of articles mention the use of

2     peroxides to conduct oxidative degradation stress

3     testing; right?

4          A.  There are all articles, indeed.

5          Q.  Right.  And the specific peroxide that

6     Dr. Davies used was T-butyl hydroperoxide; right?

7          A.  Correct, was the TBHP.

8          Q.  And TBHP was actually mentioned in the

9     '498 patent as one of the things you could use

10    for stress tests; right?

11         A.  Correct.  But stress testing --

12         Q.  So it was well known that you could use

13    TBHP for stress testing pharmaceutical active

14    ingredients; right?

15         A.  For stress testing, for example, for

16    forced degradation studies, yes, it's used.  But

17    I was talking more about the stability product,

18    the stability testing of the final product.

19              There's a big difference between

20    those two things.

21         Q.  Now, you're familiar with the FDA's

22    stability testing guidelines; right, Doctor?

23         A.  I'm familiar.

24         Q.  And one of the FDA's recommendations for

1    drug product stability testing is 40 degrees

2    Celsius, 75 percent relative humidity for six

3    months; right?

4        A.  Correct.

5        Q.  And that's known as accelerated stability

6    testing; right?

7        A.  Correct.

8        Q.  And it's standard practice to use

9    accelerated stability testing; right?

10       A.  To use accelerated stability testing,

11   though, for the final product because that

12   passage refers to finished final product.

13       Q.  And it refers to finished final product

14   because you're worried about the commercial use

15   of the product; right?

16       A.  Exactly.

17       Q.  And you know that that test uses a higher

18   temperature to accelerate the degradation that

19   might occur; right?

20       A.  Yes.  It recommends that you can use a

21   higher temperature, but not 60 -- you know, 60

22   degrees is pretty, pretty high.  And also we need

23   to make a note that the FDA guidelines refer to

24   the finished product, not to a solution of

1    Rivastigmine, which is additional differences in

2    the environment, which again, makes it impossible

3    to extrapolate.

4        Q.  The FDA does not provide any guidelines

5    for determining the antioxidant effect of an

6    excipient in a drug product; right?

7        A.  For an oxidative degradation experiment,

8    no, it doesn't.  But, obviously, it provides

9    guidelines for stability studies.

10        Q.  Let me go back and ask the question again:

11   The FDA does not provide any guidelines for

12   determining the antioxidant effect of an

13   excipient in a drug product; right?

14        A.  No.  Those are non-standardized tests.

15        Q.  And Par's ANDA stability studies in the

16   final product were not designed to answer the

17   question of what the antioxidant effect of

18   acetaldehyde was in the Rivastigmine product;

19   right?

20        A.  No, not really because the final testing

21   of any pharmaceutical product, you know -- forget

22   even the Par ANDA product -- is looking at the

23   stability of that finished product.

24                So if there's something going on in

1    those final tests, they hope to pick it up.  And

2    as far as the materials that I saw, there was

3    hardly any problems with any impurities there.  The

4    Rivastigmine specs were fine and it was

5    substantially free of peroxides.

6        Q.  Doctor, can you please turn to Page 176 of

7    your deposition?

8        A.  I'm there.

9        Q.  Okay.  So Dr. Kohn, look at Line 4.  You

10   were asked:

11              "Question:  But I'm asking, are you

12   suggesting that when Par designed these studies,

13   one of the questions they were asking was what

14   the antioxidant effect of -- of acetaldehyde was

15   on Rivastigmine in their ANDA products?

16              "Answer:  No, they were following

17   FDA guidelines with a finished product that they

18   hoped would reach, like every company, the

19   specifications of keeping the amounts of the drug

20   in the specifications.  So they followed the

21   guidelines.  Obviously there is no FDA guidelines

22   on what you are describing.  These are the

23   stability studies on the finished product."

24              Were you asked this question and did

1    you give that answer?

2         A.  Yes.  And it's the same answer I just

3    said.

4         Q.  So, let's go.

5                   Now, FDA does not provide specific

6    tests for conduct oxidative stress testing;

7    right?

8         A.  Correct.  But does provide the final

9    stability guidance.

10        Q.  Okay.  My question was stress testing.  So

11   let's limit the answer to my question.

12                  You agree that the FDA does not

13   provide specific tests for conducting oxidative

14   stress testing?

15        A.  So let's talk about stress testing --

16        Q.  Doctor --

17        A.  -- being a forced degradation study.  We

18   just need to define it.

19        Q.  Okay.  We can define that like this.

20        A.  So forced degradation studies stress tests

21   are not specifically guided by the FDA.  Those

22   initial tests that you do at the beginning before

23   you do your research and development of a

24   product, no, they're not standardized.

1       Q.  And notwithstanding the lack of standard

2   procedures, stress testing is routinely done in

3   the pharmaceutical industry; right?

4       A.  Yes.  I would absolutely agree it has to

5   be done.

6       Q.  Okay.  Now, Doctor, you criticized

7   Dr. Davies for doing statistical analysis after

8   his test was run; right?

9       A.  Correct.

10      Q.  And you did statistical analysis on his

11  data after the test was run as well; right?

12      A.  I did, but for the reason to show that he

13  was incorrect in his methodology.  But not to

14  just -- I don't conduct tests after the -- after

15  I'm finished with my design of experiments.

16      Q.  And you testified that 0.05 is the only

17  correct P-value that any scientist ever used.

18  Did I understand you correctly?

19      A.  No.  What I said is that the scientific

20  community regards P -- excuse me, P equals or

21  lower than 0.05 between two test groups as being

22  statistically significant.

23              Of course, you can see papers that

24  look at P less than .0001, for example.

1       Q.  Right.  But let me restate the question.

2                So am I correct that you believe

3       that having a P-value of 0.05 or less is the only

4       correct way to determine whether something is

5       statistically significant?

6       A.  That is the scientifically reliable way

7       that's accepted in the community.

8       Q.  And 0.05 corresponds to a 95-percent

9       confidence interval; right?

10      A.  About.

11               MR. CONDE:  May I approach, Your

12      Honor?

13               THE COURT:  Yes.

14               MR. CONDE:  Can you please put up on

15      the screen JTX 92, Mr. Hoy?

16      BY MR. CONDE:

17      Q.  And could you please go to Page 101?

18               And could you please -- I'm sorry,

19      page -- right there.  There we go.

20               And could you highlight the right

21      side on the upper left?  There's an equation and

22      then right below that equation, go to that full

23      paragraph right there.

24               Yes.  Okay.

1           And this is a reference that you

2    cited in your report; right, Dr. Michniak-Kohn?

3         A.  Yes, I did.

4         Q.  Okay.  And this is a discussion on what's

5    referred to as confidence intervals; right?

6         A.  Yes.  It seems as though that's what

7    they're discussing.

8         Q.  And there's an equation for the confidence

9    interval and then it says the confidence

10   coefficient.  That's the same thing as a

11   confident interval; right?

12        A.  Yes.  I think it's a synonym for that.

13        Q.  Okay.  So the exhibit you rely on, DTX 92,

14   says the confidence interval is a number related

15   to the level of confidence we want.  Typical

16   values are 90, 95 and 99 with 95 being the most

17   common.

18           Do you see that Dr. Michniak-Kohn?

19        A.  Yes.  I see that.

20        Q.  So 90 percent is an acceptable confidence

21   level; right?

22        A.  With the proximate value --

23        Q.  Ninety percent is accepted by this

24   textbook that you relied on in your report;

1    right, Dr. Kohn?

2        A.  Well, 95 being the most common.

3        Q.  And 90 percent is also one of the typical

4    values; right?

5        A.  But most people wouldn't use that as being

6    particularly strong at all.

7        Q.  The textbook you relied on said 90 percent

8    is a typical value that people rely on; right?

9        A.  No.  They just give a range of values that

10   could be used.  But, again, any peer-reviewed

11   paper would look at P less than or equal to .05,

12   which is approximately 95.  But if you get a

13   better value, you know, like a 99, then,

14   obviously, that makes the statistics even

15   stronger.

16              MR. CONDE:  And, Mr. Hoy, could you

17   please go to Plaintiff's PDX 144?

18   BY MR. CONDE:

19       Q.  And I think you used this slide on your

20   direct; right, Dr. Kohn?  It's up on the screen?

21       A.  Oh, yes.  Yes, I did.

22       Q.  And you don't dispute the confidence

23   interval values that are on this slide that

24   Dr. Davies calculated them correctly; right?

1    A.  Well, apart from my initial calculation

2    with proving that the one-tailed T test was not

3    correct, I did not do anymore statistics because

4    it's just improper to do this.

5    Q.  This isn't statistics, this is taking the

6    P value you said and converting it to a

7    confidence level; right?

8    A.  Well, what was your question exactly?

9    Q.  So Dr. Davies took the P-values that he

10   calculated and converted it to a confidence

11   interval; right, a percentage?

12   A.  Yes, he did.

13   Q.  And you don't dispute his calculation of

14   these confidence intervals based on the P values

15   that were obtained?

16   A.  As I have to mention that I did not go

17   back and start doing all the recalculations on

18   the statistics because I feel that that's a very

19   scientifically unreliable way to go, so I did not

20   do that.

21   Q.  Dr. Michniak-Kohn, to say it's a 95

22   percent confidence interval means that you have a

23   95 percent confidence that the differences in the

24   two values are real; right?

1    A.  Yes, if it is an appropriate test in the

2    first place.

3    Q.  So doing the two-tailed T-test even under

4    your analysis using unequal variants you would

5    have an 87 percent confidence that the difference

6    between Dr. Davies' values with acetaldehyde

7    versus without acetaldehyde are real; right?

8    A.  Well, I repeated the test and as we saw

9    from my slide that all of those nine values weren't

10   statistically significant.

11   Q.  So let's go back to my question.  So you'd

12   agreed that even based on your statistical

13   analysis, you can say that you have an at least

14   87 percent confidence that the difference between

15   the data with acetaldehyde versus without

16   acetaldehyde is real?

17   A.  But I didn't do the exact conversion with

18   the equation.

19   Q.  Assume these conversions are correct, that

20   tells us that you would have an 87 percent level

21   of confidence that the difference between the

22   data without acetaldehyde and with acetaldehyde

23   is real; right?

24   A.  Well, that makes the assumption that that

1    was correctly calculated.

2        Q.  Now, on direct you talked about reaction

3    kinetics; right?

4        A.  Of course I did.

5        Q.  And can we have the meaning of antioxidant

6    on the screen again, Mr. Hoy, please.

7            Okay.  So here is the meaning of

8    antioxidant, PDX 105.  The meaning of antioxidant

9    doesn't make any mention of reaction kinetics,

10   does it?

11       A.  This particular sentence does not.

12       Q.  And you testified about the restriction of

13   movement on direct, and you did acknowledge that

14   regardless of the fact that there might be some

15   restriction of movement, antioxidants are used in

16   formulations; right?

17       A.  Well, in general in the pharmaceutical

18   industry, antioxidants are used.

19       Q.  Right.  And they're used in tablets, for

20   example; right?

21       A.  They're used in tablets.

22       Q.  And tablets have a restriction of movement

23   as well; right?

24       A.  Tablets have some restricted movement, I

1    agree.  But again we haven't established the

2    acetaldehyde as an antioxidant, so --

3        Q.  And antioxidants, in fact, are used in

4    Novartis's patch; right?

5        A.  Antioxidants, yes, are used.

6        Q.  And there would be a restriction of

7    movement in Novartis's Exelon patch; right?

8        A.  It is a transdermal patch.

9        Q.  So there would be a restriction of

10    movement with that patch as well; right?

11        A.  Yes, there would be, but then you're

12    working with particular antioxidants and we don't

13    know whether acetaldehyde does that or not.

14        Q.  So, Doctor, you did not do any statistical

15    analysis of Par's stability data, did you?

16        A.  No, I did not do any statistical analyses.

17    I did see the data.  It was pretty convincing and I

18    don't think the FDA required any

19    statistical analyses, either.

20        Q.  So the answer is you didn't do any

21    statistical analysis on Par's ANDA product to

22    determine whether acetaldehyde present in those

23    patches had an antioxidant effect; right?

24        A.  Are you talking about the -- which

1    experiments are you talking about?

2        Q.  You're familiar with Par's stability data?

3        A.  Yes.

4        Q.  Did you do any analysis of that data to

5    see whether there was a statistical significant

6    showing that acetaldehyde would or would not have

7    an antioxidant effect?

8        A.  No, I did not, because for two reasons,

9    there the rivastigmine was within specs and the

10   impurities were so low that some of those were

11   zero, so you can't really do statistics on low

12   values or not detectable values or zeros, so no,

13   I did not.

14       Q.  So because the values of degradants were

15   so low, you couldn't do any statistical analysis

16   on that data; right?

17       A.  It certainly wasn't meaningfully so I

18   didn't do that kind of data.

19       Q.  Let's assume for the moment that you made

20   two batches of Par's product, one patch had

21   acetaldehyde and the other batch did not.  Okay?

22       A.  Okay.

23       Q.  And then you put both of those batches,

24   you put -- you put one patch from each batch and

1    you subjected to accelerated stability testing

2    which would be 40 degrees celsius at 45 percent

3    relative humidity.  Are you with me?

4        A.  I'm with you.

5        Q.  At the end of six months you would take

6    out of both of those patches and you would

7    conduct HPLC to see how much degradant was in the

8    two patches.  Okay?

9        A.  Okay.

10       Q.  And the results of that show that the

11   amount of rivastigmine was within specification

12   and that the formation of Impurity 4 and ECAV

13   were the same in both patches.  Are you with me?

14       A.  Okay.

15       Q.  So based on that data from one patch from

16   each batch, you would not be able to conclude

17   that acetaldehyde has no effect on the oxidative

18   degradation of rivastigmine; right?

19       A.  Based on solely that data, no.

20       Q.  And you would not be able to reach that

21   conclusion because you won't be able to conduct

22   good statistical analysis; right?

23       A.  Not only that, but I would have done more

24   studies.  These would have been part of other

1    studies that would have been done in the

2    industry.

3        Q.  And that's because having taken only one

4    patch is not sufficient to do statistical

5    analysis; right?

6        A.  Well, the FDA guidelines say that you can

7    take one patch from a batch.

8        Q.  That's not my question.  My question is:

9    The reason you can't reach the conclusion that

10   acetaldehyde has no effect from my hypothetical

11   because having taken only one batch does not

12   allow you to do good statistical analysis; right?

13       A.  You had a hypothetical case that you

14   presented, which means that it's not a real case,

15   it's a theoretical case.  Nobody just takes one

16   patch from two batches and runs data.  In the

17   pharmaceutical industry, you make batches all the

18   time, so even if you take one batch and one

19   transdermal patch from a batch, you're still

20   testing numerous batches, so really it's not a

21   true N equals one, it's much more than that.

22       Q.  So let me just go back to my question.  I

23   just want an answer to my question.  Based on my

24   hypothetical would it be correct to say that you

1    would not be able to conduct good statistical

2    analysis because you only took one patch from

3    each batch?

4        A.  Well, it follows FDA guidelines, but

5    again, it's not -- your hypothetical is not real

6    life, nobody just prepares two batches and then

7    does one batch out of each.  It's just not real

8    life.

9        Q.  Doctor, let's go to page 203 of your

10   deposition.  And let's go at line nine and

11   starting at line nine, the question was:

12              "Can I conclude from that that my

13   hypothesis is true, that acetaldehyde has no

14   effect on oxidative degradation between lots zero

15   and lots one?

16              And you know that in this

17   hypothetical is the same one I just outlined, one

18   lot had acetaldehyde and the other one did not;

19   right?

20       A.  Correct.

21       Q.  Okay.  And then you say:

22              "Did the rivastigmine content change

23   in your two hypothetical batches?

24              "ANSWER:  I mean if you were doing a

1    true stability test you would have also have your

2    rivastigmine content.

3                "QUESTION:  The rivastigmine content

4    for both is within specification.

5                ANSWER:  So again I would argue the

6    same thing.  The bleep is so small it could be

7    within experimental error.  I mean, you haven't

8    done good statistics because we have only taken

9    one patch and it's an N equals one.  I don't

10   think I would be making conclusions.

11               Were you asked that question and

12   gave those answers?

13       A.  Yes, I did, but I still state the same

14   thing.

15               MR. CONDE:  I have nothing further,

16   Your Honor.

17               THE WITNESS:  I said the same thing.

18               MR. CONDE:  Nothing further.

19               THE COURT:  Thank you.

20               Mr. Chin.

21                   REDIRECT EXAMINATION

22   BY MR. CHIN:

23       Q.  Dr. Michniak, I would like to follow-up on

24   this hypothetical system.  I believe Mr. Conde

1    had referred to it as lot zero and lot one?

2        A.  Correct.

3        Q.  Can you describe for me how that

4    hypothetical situation of having lot zero and lot

5    one compares to the 3M stability testing that was

6    actually performed on the Par products?

7        A.  It's a hypothetical because you would

8    never do a series of tests on a batch and just do

9    one out of each, and finish at that.  The FDA

10   recognizes that the pharmaceutical industries

11   continually produce in different batches, so you

12   can't use like half of your batch to do quality

13   control of.

14             So they recognize that they're

15   producing a lot of batches and it's enough to

16   take one transdermal patch out of the whole lot

17   of batches and then that is your number of

18   replicates.  You're producing all these batches

19   and then you're able to do a real, real life

20   perspective on what's happen with the patches.

21             In fact, it would be very bad to do

22   the hypothetical case because what happens if a

23   manufacturer changes your ingredients.  You

24   really have to test a whole series of batches and

1    I think the FDA just recognized that you can't

2    take like fifty percent of each batch, you would

3    be wasting it all on testing.

4        Q.  Did the Par stability test perform tests

5    on more batches than just a lot zero and a lot

6    one?

7        A.  Of course they did.

8        Q.  I would like to turn back to JTX 92, we

9    had that, actually we don't need to bring it up,

10   but you recall that in JTX 92 Dawson Statistic

11   textbook, there is a reference to a 90, 95 and 99

12   percent confidence?

13       A.  I'm getting lost in my documents.

14       Q.  If you can't find it readily, I can just

15   ask the question in the abstract.  You recall the

16   discussion about a 90, 95 and 99 percent

17   confidence intervals?

18       A.  Yes.

19       Q.  For what purpose -- and I think you had

20   discussed with Mr. Conde that a 90 percent

21   confidence interval roughly depending on the math

22   translates to a P of 0.1?

23       A.  Yes.

24       A.  Yes.

1    Q.  For what purpose would people use a

2    confidence interval of 90 percent or P as .1?

3    A.  Just to show a slight trend, but it

4    wouldn't be relied upon to make scientific

5    conclusions because, again, there's scientific

6    literature that has accepted that P equal or less

7    than 0.05 is your main kind of barrier.  Because

8    people put things below saying oh, it's much

9    stronger statistically and "values above that".

10            But everyone knows that that's just

11    the trend and you don't make major conclusions

12    based on that.

13    Q.  In the peer-reviewed literature, is there

14    a definitive and clear cutoff for statistical

15    significance that's recognized to be able to

16    publish a scientific conclusion that's drawn?

17    A.  Of course.  It's what I've been saying the

18    P equal to or less than .05.  And I know that my

19    papers would be rejected if I start making

20    conclusions at higher P-values.  You know, like

21    with all mathematical calculations, you can

22    calculate all kinds of P-values.

23            So the scientific community said,

24    Well, where is the cutoff, the statistical

1    significance?  And that's what they've decided.

2    I mean, it's not my decision.  It's science has

3    decided.

4        Q.  Now, there were also some questions that

5    you were asked about articles that used TBHP in

6    oxidative stress testing.  Do you recall that?

7        A.  Yes, I was.

8        Q.  And I think you point out that that's also

9    known as forced degradation?

10       A.  Correct.

11       Q.  Can you describe for me the purpose for

12   which TBHP is used in these forced degradation

13   tests?

14       A.  So that's why I brought up the term forced

15   degradation studies because those kind of studies

16   are done across the industry.  They're not

17   standardized in the sense that the FDA has

18   mandated that this is what you have to do.

19                  And they're done right upfront

20   before you even start your research and

21   development.  For example, learn about the drug

22   and, you know, if you stress test it, if we're

23   using the forced degradation study as stress

24   testing, stress test under extreme conditions

1    because that gives -- you have all the chemical

2    information on how you start preparing a dosage

3    form.

4                If you don't know that, you don't

5    know whether you can expose your drug to heat,

6    for example, what's going to happen.  Then you

7    have to have the reaction take place fast, get

8    enough of your degradation products to be able to

9    test as you do your research and development,

10   whether those degradation products are appearing.

11               And you have to have enough of them.

12   So you do these forced degradation studies for

13   those reasons to learn about the chemistry of the

14   active ingredient or excipients by the way --

15   that goes into the dosage form and also to get

16   enough of the substance to be able to use it as a

17   standard for your further analytical testing.

18               So there's, obviously, a role and

19   very important role for forced degradation

20   studies in the industry.

21       Q.  Do people in the pharmaceutical industry

22   use these forced degradation oxidative stress

23   tests to determine the stability of finished

24   pharmaceutical products?

1    A.  No, these tests are, as I just mentioned,

2    done upfront before you start developing or

3    during your development of your pharmaceutical

4    dosage form.  But the FDA tells us what needs to

5    be done to evaluate stability of a finished

6    product.

7              And those two are very different.

8              MR. CHIN:  Thank you.

9              MR. CONDE:  Your Honor, may I have

10   one more minute, please?  A recross?

11             THE COURT:  No, I understand what

12   you're asking for.  Did Mr. Chin ask something

13   that was beyond the scope of what was brought up

14   in your cross-examination?

15             MR. CONDE:  She started to go into

16   more details of what Par actually does about

17   testing the patches and it's clearly not correct.

18   So I wanted to --

19             THE COURT:  All right.  So, no, you

20   can't do anymore.

21             Doctor, I do have one question.  Say

22   in the last five years, how many times have you

23   testified in Court as an expert?

24             THE WITNESS:  In Court?  I'd have to

1    admit to the Court that this is my first time.

2                THE COURT:  Well, everybody starts

3    with a first time.

4                THE WITNESS:  Yes.

5                THE COURT:  Thank you.

6                THE WITNESS:  Thank you, Your Honor.

7                THE COURT:  Mr. Chin.

8                MR. CHIN:  Your Honor, Par calls Dr.

9    Graham Buckton.

10               THE COURT:  All right.

11               THE CLERK:  Please state and spell

12   your full name for the record.

13               THE WITNESS:  My name is Graham

14   Buckton.  That's G-R-A-H-A-M B-U-C-K-T-O-N.

15               THE CLERK:  Please place your left

16   hand on the Bible and raise your right hand.

17                   GRAHAM BUCKTON, Ph.D.,.

18               the witness herein, having first

19               been duly sworn on oath, was examined

20               and testified as follows:

21               THE CLERK:  Thank you.  Please be

22   seated.

23               MS. KOH:  Your Honor, may I

24   approach?

1          THE COURT:  Yes.

2               DIRECT EXAMINATION

3   BY MS. KOH:

4        Q.  Good morning.

5        A.  Good morning.

6        Q.  Could you please state your full name?

7        A.  It's Graham Buckton.

8        Q.  Could you please briefly describe your

9   relevant employment?

10       A.  Yes.  I'm employed 30 percent of my time

11  at the University College of London, School of

12  Pharmacy as professor of pharmaceutics.  And 70

13  percent of my time in Buckton Consulting.

14            I was previously -- I was founder

15  and chairman and chief executive officer of

16  Pharmaterials from 2000 to 2012.

17            And I also worked with U.K.

18  Regulatory Committees from 2004 until now.  U.K.

19  Regulatory Committees, which unlike the FDA, the

20  U.K. has a scheme where expert committees look at

21  the assessments that are being made of new

22  products and decide whether they should receive a

23  marketing authorization.

24            So, each month I would receive five

1    or ten regulatory submissions.

2        Q.  And you mentioned your involvement with

3    Pharmaterials.  What is Pharmaterials?

4        A.  Pharmaterials was a company that spun out

5    of a school of pharmacy in London, which I founded.

6    And it provides service to industrial companies,

7    and in terms of materials, characterization,

8    formulation, manufacturing, analytical development

9    and stability testing.

10       Q.  And have you served as an editor or on an

11   editorial board for peer-reviewed journals?

12       A.  Yes, I was an editor of International

13   Journal of Pharmaceutics for ten years.  I served

14   on a number of editorial boards, including

15   Pharmaceutical Research, AAPS Journal and AAPS

16   PharmSciTech.

17               And I served on the Steering

18   Committee of the Handbook for Pharmaceutical

19   Excipients.

20       Q.  You mentioned the Handbook of

21   Pharmaceutical Excipients.  What is the handbook?

22       A.  The handbook is a comprehensive listing of

23   the excipients that are used in pharmaceutical

24   products.

1    Q.  And you mentioned you're on the Steering

2    Committee for the handbook.  What does the

3    Steering Committee do?

4    A.  Steering committee meets twice each year

5    to review the monographs to review the excipients

6    that are going to be included into the handbook

7    and to decide whether the monographs are correct

8    and reasonable.

9    Q.  Could you please turn to Tab 1 in your

10   binder, which is DTX 503A?

11              Could you please identify this

12   document?

13   A.  That's my CV.

14   Q.  Does this CV at DTX 503A accurately

15   reflect your background and experience?

16   A.  To the best of my knowledge, it does, yes.

17              MS. KOH:  Par moves for the

18   admission of DTX 503A into evidence.

19              MR. CONDE:  No objection.

20              THE COURT:  All right.  Admitted

21   without objection.

22              MS. KOH:  Par offers Dr. Buckton as

23   an expert on drug substance testing, formulation

24   development and stability testing of

1    pharmaceutical products.

2                MR. CONDE:  No objection, Your

3    Honor.

4                THE COURT:  All right.  You may

5    proceed.

6    BY MS. KOH:

7        Q.  Dr. Buckton, which party retained you to

8    testify as an expert in this case?

9        A.  That was Par.

10       Q.  And what has Par retained you to do?

11       A.  To review the relevant documents and to

12   give an opinion on whether Par's ANDA product

13   infringes the claims of the patents and also to

14   comment on the validity of the patent.

15       Q.  Have you been in the courtroom throughout

16   trial so far?

17       A.  Yes, I have.

18       Q.  And have you heard all the fact and expert

19   testimony that has been presented to date?

20       A.  Yes, I have.

21       Q.  And have you considered that testimony in

22   offering your opinions today?

23       A.  Yes, I have.

24                MR. CONDE:  Your Honor, I don't mean

1    to interrupt, but we had an agreement, I think,

2    that Professor Buckton's going to do his

3    infringement portion and then make a clean break

4    and then do his invalidity portion, so that we

5    have a sense as to what his invalidity arguments

6    are.  As you may recall, at the pretrial

7    conference, it was discussed about this.

8            THE COURT:  That's what I thought I

9    said at the end of yesterday.  That makes me

10   think that's not what we're doing.

11           Are we doing something different?

12           MS. KOH:  We can do something

13   different.

14           MR. CONDE:  I just want to be clear

15   on that.

16           THE COURT:  Even though, I have to

17   say, you know, I was thinking about it last night

18   afterwards and it's not as though he says

19   something now and when invalidity comes up, you

20   know, if you say, Well, geeh, he said that during

21   the infringement portion.  I'm going to say, Oh,

22   okay.  It doesn't count.

23           I mean, so I'm not actually -- only

24   because I said that this is the way we'd do it

1    last night, the more I thought about it, I'm not

2    actually sure it makes any sense.  But, in any

3    event, Ms. Koh, if you're able to do it like

4    that, it would be good.  Okay?

5              MS. KOH:  We will do that.  Sure.

6    BY MS. KOH:

7       Q.  Dr. Buckton, what is your opinion on

8    whether Par's ANDA products infringe the '031

9    patent?

10      A.  My opinion is they don't infringe.

11      Q.  And do you have a summary of your reasons

12   why?

13      A.  Yes, I do.  I have a slide for that.

14             My summary that Par does not

15   infringe the '031 patent because Par's ANDA

16   products do not contain an antioxidant.  The

17   evidence does not establish that acetaldehyde is

18   an antioxidant.

19             Acetaldehyde is not present in Par's

20   ANDA products in the claimed range of about 0.01

21   to about 0.5 percent by weight.

22             And the amount of acetaldehyde in

23   Par's ANDA products does not meet the about

24   limitation because it does not function to

1      stabilize Rivastigmine in the composition.

2          Q.  Could you please turn to Tab 2 which is

3      JTX 1 in your binder?  What is this document?

4          A.  It's the '031 patent.

5          Q.  And have you reviewed the '031 patent?

6          A.  Yes, I have.

7          Q.  Do you have an understanding of what claim

8      plaintiffs are asserting that Par infringes?

9          A.  Yes, I do.  It's -- I have a slide with

10     the claim on it.

11              Claim 7, as I think you've seen,

12     Claim 7 incorporates Claim 1 as part of it.

13         Q.  Well, what does Claim 7 require?

14         A.  Claim 7 requires a transdermal device and

15     it's a pharmaceutical composition.  And, among

16     other things, Claim 7 requires that there is an

17     about 0.01 to about 0.5 percent by weight of an

18     antioxidant present based on the weight of the

19     composition.

20         Q.  Do you understand that the Court has

21     provided a construction of the terms used in

22     Claim 7?

23         A.  Yes, I do.

24         Q.  And have you reviewed the Claim

1      Construction Order?

2          A.  Yes, I have.

3          Q.  And have you applied the Court's claim

4      construction in your analysis in this case?

5          A.  Yes, I have.

6          Q.  So going back to the '031 patent, can you

7      tell the Court what the patent describes?

8          A.  Yes.  I've also prepared a slide for this.

9      The patent has three aspects that it talks about.

10             The first aspect, it says a

11     pharmaceutical composition comprising Compound A

12     in free base or salt form and an antioxidant.

13     And it says the pharmaceutical compositions of

14     the present invention show a reduction in

15     degradation by products in stress stability

16     tests.  That's the first aspect.

17             The second -- that was on Column 1,

18     Lines 34 to 39.  The second aspect at Column 4 at

19     Lines 4 to 7 says, in another aspect, the present

20     invention provides the use of an antioxidant to

21     stabilize a pharmaceutical composition containing

22     Compound A.  Compound A is Rivastigmine.

23             And then the third aspect, which is

24     found in Column 4, Lines 33 to 39 largely

1    describes a transdermal device and aspects

2    relating to a transdermal device which you would

3    administer Compound A.

4        Q.  Is there any difference between these

5    three aspects?

6        A.  I think the third one, as I just said,

7    describes the device, aspect one and aspect two.

8    To me, there are no differences between because

9    they require a pharmaceutical composition of

10   Compound A, and they require an antioxidant and

11   they require that you show a reduction in

12   degradation by-products by stress stability

13   tests.  And then that seems to me to relate to

14   both of those aspects.

15       Q.  How did the patent describe the use of an

16   antioxidant to stabilize compound A to reduce

17   degradation by-products?

18       A.  I have a slide for this as well.  The

19   patent at column four lines 20 to 30 describes

20   two tests, the first test I summarize both of

21   them in the table so the first test is a 60

22   degree centigrade for two months.  And the patent

23   looks at a formulation, pharmaceutical

24   formulation in which there is no antioxidant and

1    compares it to a pharmaceutical formulation in

2    which there is 0.1 alpha-tocopherol as an

3    antioxidant and the degradation products are 4.46

4    percent where there is no antioxidant present and

5    1.3 percent when the alpha-tocopherol antioxidant

6    is there.

7                And I follow this up with a further

8    test at 40 degrees C, 75 percent relative

9    humidity for a period of three months and again I

10   compare a formulation with no antioxidant to a

11   formulation with 0.15 percent antioxidant which

12   is alpha-tocopherol with a degradation is 1.19 to

13   0.25 percent.

14      Q.  What's the approximate reduction in

15   degradation of by-products after an antioxidant was

16   added?

17      A.  Roughly speaking for both of those it's

18   about a quarter.

19      Q.  And is the approach described at column

20   four, lines 20 through 30 of the '031 patent used

21   in the pharmaceutical industry?

22      A.  Yes, this is typical of what I have seen

23   in the pharmaceutical industry that you have

24   perhaps a rapid stress test looking at a

1    formulation at 60 degrees C for a short period of

2    time to give you a rapid indication of what

3    happens, followed up by a stress which is rather

4    near to room temperature in line with regulatory

5    guidelines which is 40 degrees centigrade and 75

6    percent relative humidity and ultimately you

7    would progress to ambient storage, that's where

8    you would go.  But this is exactly what I would

9    expect the industry to do.

10    Q.  Does the '031 patent specification

11    indicate the concentration range for antioxidant

12    in the composition?

13    A.  Yes, it does.  And we have a look at a

14    slide for this.  This is column four, lines 15 to

15    17.  At the start of that it says the antioxidant

16    may be conveniently present in an amount of from

17    about 0.01 to about 0.5 percent.

18    Q.  And does the '031 patent specification

19    describe any examples of the use of an

20    antioxidant outside of the range of about 0.01 to

21    about 0.5 percent?

22    A.  No, it doesn't.  There are two examples

23    that I just talked about a few moments ago, and

24    this continues on to use those concentrations one

1    of those examples, 0.15 percent and the other

2    example used 0.1 percent so those are the two

3    examples in the patent.

4        Q.  Did you consider any other information as

5    to what the claimed range encompasses?

6        A.  Yes, I did.  I looked at the file

7    prosecution history.

8        Q.  Could you please turn to tab three in your

9    binder which is DTX 249.  Could you please

10   identify this document?

11       A.  This is a section of that file prosecution

12   history.

13            MS. KOH:  Par moves the admission of

14   DTX 249.

15            MR. CONDE:  No objection.

16            THE COURT:  Admitted without

17   objection.

18   BY MS. KOH:

19       Q.  If you can turn to page 1078 of DTX 249.

20   Does the prosecution history of the '031 patent

21   indicate the purpose of the range limitation?

22       A.  Yes, I believe it does.  The first section

23   of that I pulled out here on the slide says that

24   the examiner also rejected the claims on the

1    basis that the specification does not enable the

2    use of any amount of antioxidant in the

3    composition to achieve the stabilization of

4    compound A.  At that stage there was no range

5    limitation, there was no concentration term in

6    what has now become Claim 1 of the '031 patent.

7               And the examiner continued saying

8    that that isn't viable because there are no data

9    to enable any amount of antioxidant, and the

10   response to that was to include the range

11   limitation of about 0.01 to about 0.5 percent by

12   weight in order to enable the patent.

13      Q.  Does the prosecution history indicate what

14   about in the range limitation means?

15      A.  Yes, it does.  And it says here that given

16   the use of about in the claim, applicants do not

17   surrender embodiments where an infringer copies

18   the invention by using amounts outside of the

19   exact claimed numeric range.  Skip a little bit,

20   more specifically, where an infringer uses some

21   excess of antioxidant needed for stabilization.

22               So it's clear to me from the

23   statement that they're envisioning a situation

24   where there is an antioxidant functioning within

1    the claimed range, and it clearly would be wrong

2    if someone just added a small excess of that

3    antioxidant in order to still function but be

4    outside of the claimed range.  That would seem

5    inappropriate.

6            So I understand why the applicants

7    wanted to protect particularly in excess of

8    antioxidant needed for stabilization.  There is

9    no similar argument below the claimed range, so

10   about in terms of its meaning below the claimed

11   range isn't given that kind of explanation, and

12   that is the reason that wasn't deemed to be

13   enabled in the previous section that I read out.

14   So I don't see such a clear reason for deviating

15   below the claimed range.

16       Q.  Does the range limitation include amounts

17   that are capable of functioning but have not been

18   shown to function as an antioxidant in the

19   composition?

20       A.  No.  The file history talks about

21   functionality, and the need to function.  It

22   doesn't describe an antioxidant that may be

23   capable of functioning, capable of functioning

24   would imply not functioning, something either is

1    or it isn't functioning.

2    Q.  Going back to your summary of

3    noninfringement opinion, what is your first

4    noninfringement opinion?

5    A.  My first opinion is that Par does not

6    infringe the '031 patent because Par's ANDA

7    products do not contain an antioxidant.

8    Q.  Now, there has been some discussion about

9    Par's ANDA products already, but could you please

10    describe what are Par's ANDA products at issue?

11    A.  Par's ANDA products are three different

12    versions of a transdermal delivery system.

13    Q.  Could you please describe briefly for the

14    Court the structure of Par's ANDA product?

15    A.  I think, yes, I can.  We have seen this,

16    it's a drug-in-adhesive matrix.  On top of it is

17    a backing layer, on bottom of it is a release

18    liner which is removed just before you apply it

19    to the skin.

20    Q.  Could you turn to tab four of your binder

21    which is DTX 595.  Could you please describe what

22    this document is?

23    A.  This is the quality overall summary of

24    Par's ANDA.

1          MS. KOH:  Par moves the admission of

2     DTX 595 into evidence.

3          MR. CONDE:  No objection, Your

4     Honor.

5          THE COURT:  Admitted without

6     objection.

7     BY MS. KOH:

8          Q.  If you could please turn to page 231 from

9     DTX 595.  Could you please explain what the table

10    on this page shows.

11         A.  Yes.  The table is the components

12    composition and function of the components.  And

13    to simplify it, I have put a slide on the screen

14    which describes the three different strengths of

15    Par's ANDA products, the 4.6 milligram and the

16    9.5 and the 13.3 milligram strengths.  They all

17    consist of rivastigmine as an active ingredient.

18    They all consist of acetate copolymer adhesive,

19    that's the R-27149 and they all consist of

20    isopropyl myristate as a tackifier, and those add

21    up to a hundred percent of what is called the drug

22    in adhesive.

23              They also have two films, Scotchpak

24    9732 backing film and Scotchpak 9744 release

1    liner.

2        Q.  Could you please turn to page 232 of the

3    same document.  Could you please explain what

4    this page shows, the chart at the bottom?

5        A.  The chart at the bottom.  Okay.  So this

6    is a chart going over two pages which I have

7    reproduced here.  And this compares the Exelon

8    patch and its ingredients to the proposed Par ANDA

9    transdermal system.  And in particular what I

10   wanted to highlight was the Exelon patch has

11   vitamin E present which is an antioxidant, and

12   the proposed Par product has N/A, not applicable,

13   because it doesn't have an antioxidant as part of

14   its formulation.

15       Q.  And is vitamin E tocopherol?

16       A.  It is.

17       Q.  Can you explain why an antioxidant may be

18   needed in the one formulation but not in another

19   formulation of the same active ingredient?

20       A.  Yes.  It's different formulations have

21   different properties and different reasons why

22   something may react in one and not react in the

23   other.  So it's to do with the formulation.

24       Q.  Could you please turn to tab six which is

1    JTX 71 in your binder.  What is this document?

2        A.  This is the pharmaceutical development

3    part of Par's ANDA.

4            MS. KOH:  Par moves the admission of

5    JTX 71 into evidence.

6            MR. CONDE:  No objection, Your

7    Honor.

8            THE COURT:  Admitted without

9    objection.

10   BY MS. KOH:

11       Q.  Could you please turn to page 1071 of JTX

12   71.  Did Par or 3M address oxidative degradation

13   when developing Par's ANDA product?

14       A.  Yes, they did.  And this section just

15   before we get to section 4.1 which is highlighted

16   on the screen, it says since 3M designs and

17   prepares adhesives internally, the opportunity to

18   purify our adhesives allows for minimization of

19   adhesive impurities that may contribute to drug

20   degradation.  The primary pathway pursued by 3M

21   was to formulate without an antioxidant.

22       Q.  And how did 3M minimize the adhesive

23   impurities that might contribute to drug

24   degradation?

[Lines 1–18 redacted]

Q.   Did 3M test the stability of formulations

using the adhesive?

A.   Yes, it did.

Q.   Could you please turn to page ACR-1088 of

JTX 71.  What do these pages show?

A.   This talks about the stability test and

1    the section at the top and the results, I don't

2    know if they can pull out a little bit.  To

3    evaluate the stability of rivastigmine in an

4    adhesive only DIA formulation, a representative

5    DIA formulation was prepared and placed on

6    informal stability under ambient and accelerated

7    conditions, 25 degrees C, 60 percent relative

8    humidity and the accelerated condition was 40

9    degrees C and 75 percent relative humidity.  And

10   it says the results of the informal stability

11   six-month pull point says that the use of

12   antioxidant is not indicated to stabilize

13   rivastigmine in R-27149 adhesive based

14   formulations.

15       Q.  Does this statement that you just read

16   from page 1088 of JTX 71 referring to instability

17   studies, does it relate to Par's ANDA products at

18   all?

19       A.  It does relate to them.  This is the

20   polymer and rivastigmine only system , so there is

21   no tackifier present, so it isn't the absolute

22   final formulation, so it

23   wasn't exactly Par's ANDA product, but it would

24   relate to what happened in Par's ANDA product.

1    Q.  Based on your review of Par's ANDA, do

2    Par's ANDA products contain an antioxidant?

3    A.  No, they don't.

4    Q.  Could you turn back to your summary of

5    opinions.  What is your second opinion?

6    A.  My second opinion is the evidence does not

7    establish that acetaldehyde is an antioxidant.

8    Q.  Now, do you agree with Dr. Davies that

9    acetaldehyde is an antioxidant?

10    A.  No, I don't.

11    Q.  And what are your reasons?

12    A.  I have a slide for this.  Acetaldehyde is

13    not an antioxidant.  Firstly because acetaldehyde

14    is not listed in the '031 patent as an

15    antioxidant.  Secondly, because it is not listed

16    in the Handbook of Pharmaceutical Excipients or

17    other pharmaceutical literature as an

18    antioxidant.  And thirdly because acetaldehyde

19    has never been used as and is not recognized as

20    an antioxidant.  And finally, the stability data

21    show that acetaldehyde has no effect on the

22    stability of rivastigmine.

23    Q.  Could you please explain your first reason

24    why acetaldehyde is not an antioxidant?

1    A.  The first reason it simply is not listed

2    in the '031 patent as an antioxidant.

3    Q.  Could you please go into that further?

4    A.  Yes.  This is the section from the patent

5    which describes column four lines 10 to 15, the

6    antioxidants, and it says effective stabilizing

7    effect is surprisingly achieved when the

8    antioxidant is selected from tocopherol, esters

9    thereof, e.g., tocopherol acetate, ascorbyl

10   palmitate, ascorbic acid, butylhydroxytoluene,

11   butylhydroxyanisole, or propyl gallate,

12   preferably alpha-tocopherol or ascorbyl

13   palmitate.

14            Those are the antioxidants that you

15   should select from, from the words that are

16   used in the patent.

17   Q.  Are any of the antioxidants listed in

18   column four, lines 10 through 15 not generally

19   known to be antioxidants?

20   A.  No, all of these are well known

21   pharmaceutical antioxidants which are seen in

22   standard pharmaceutical texts.

23   Q.  Could you please explain your second

24   reason why acetaldehyde is not an antioxidant?

1          A.  The second reason is that acetaldehyde is

2     not listed in the Handbook of Pharmaceutical

3     Excipients or other pharmaceutical literature as

4     an antioxidant.

5          Q.  Could you turn to tab eight which is DTX

6     505 in your binder.  What is this document?

7          A.  This is an excerpt from the Handbook of

8     Pharmaceutical Excipients.

9               MS. KOH:  Par moves the admission of

10    DTX 505 into evidence.

11              MR. CONDE:  No objection, Your

12    Honor.

13              THE COURT:  Admitted without

14    objection.

15    BY MS. KOH:

16         Q.  Does the Handbook of Pharmaceutical

17    Excipients list antioxidants?

18         A.  Yes, it does.  The part of the index is on

19    page 857, and it lists antioxidants, and it lists a

20    long list of antioxidants in that section.  And

21    acetaldehyde is obviously not listed in that list

22    of antioxidants which are the ones that are known

23    in the pharmaceutical domain.

24         Q.  Is acetaldehyde identified anywhere else

1    in the Handbook of Pharmaceutical Excipients?

2        A.  No, it isn't listed anywhere in the

3    Handbook of Pharmaceutical Excipients so it's not

4    listed as any other type of excipient either, so

5    it's nowhere else.

6        Q.  Is acetaldehyde identified in any other

7    pharmaceutical literature as an antioxidant?

8        A.  Not that I'm aware of, no.

9        Q.  Going back to your summary, could you

10   please explain your third reason why acetaldehyde

11   is not an antioxidant?

12       A.  The third reason is acetaldehyde has never

13   been used and is not recognized as an

14   antioxidant.

15       Q.  Is there a source to turn to find a list

16   of excipients that have previously been used in

17   pharmaceutical products?

18       A.  Yes, there is.  There is the FDA inactive

19   ingredient list.

20       Q.  Is acetaldehyde listed on the FDA inactive

21   ingredient list as an excipient that has been

22   used in a pharmaceutical?

23       A.  No, it has not.  I have a screen shot, if

24   you type in acetaldehyde, it comes back with no

1    records matched your search.  Which means that in

2    none of the products that the FDA has licensed is

3    acetaldehyde present in any form, never mind as

4    an antioxidant, it's not present as an excipient

5    in any of them.

6        Q.  Would a person of ordinary skill in the

7    art recognize acetaldehyde as an excipient?

8        A.  No, they won't.

9        Q.  Could you please explain your fourth

10    reason why acetaldehyde is not an antioxidant?

11        A.  The fourth reason is the stability data

12    shows that acetaldehyde has no effect on the

13    stability

14    of rivastigmine.

15        Q.  What are methods for testing stability of

16    a drug product?

17        A.  Methods for testing stability are

18    long-term storage, that's the gold standard if

19    you like.  You store a product at ambient

20    conditions for its shelf life, and that's as good

21    as you can do, that's the true stability of the

22    drug product.  And then there are accelerated

23    conditions that you can use because if you have a

24    two-year shelf life you can't reasonably wait two

1    years to find out whether your first formulation

2    is stable or not, so you have accelerated

3    conditions that you can use to get data rather

4    quicker.

5        Q.  Are there

6        Q.  Are there standards for conducting

7    accelerated and long-term stability testing?

8        A.  Yes.  For example, there are FDA

9    standards.

10       Q.  Would you please turn to Tab 9, DTX 591 in

11   your binder?  What is this document?

12       A.  This is the FDA standard for stability

13   testing of new drug substance and products.

14            MS. KOH:  Par moves the admission of

15   DTX 591 into evidence.

16            MR. CONDE:  No objection, Your

17   Honor.

18            THE COURT:  Admitted without

19   objection.

20   BY MS. KOH:

21       Q.  Could you please turn to Page 7 of DTX

22   591?  What does this page show?

23       A.  The section of the bottom of this and

24   straddling over to the next page, it gives the

1    standard conditions that the FDA have for storing

2    a drug product for stability.  And first one is

3    long-term testing.

4              And long-term testing is room

5    temperature testing.  And as I said, that's the

6    absolute gold standard, as it were.

7              And that's 25 degrees C, 60 percent

8    relative humidity for a relative period of 12

9    months, carrying onto the full shelf life of the

10   product.

11             And intermediate testing is,

12   obviously, slightly accelerated 30 degrees

13   Centigrade and 60 percent relative humidity for a

14   period of 12 months.  And the accelerated

15   condition, which obviously is more stressed data.

16             Accelerated test is 40 degrees C, 75

17   percent relative humidity for a period of six

18   months.

19     Q.  Can accelerated or long-term stability

20   testing be used to show whether an antioxidant is

21   needed in a formulation?

22     A.  Yes, they can.  So if you were to make a

23   formulation and store it on accelerated or

24   long-term stability, if it were unstable, you

1      would be able to observe that in your study and

2      you would be able to test by including an

3      antioxidant and see if it would stabilize it and

4      see

5      if it would function.

6          Q.  Can accelerated or long-term stability

7      testing be used to show whether a compound is

8      acting as an antioxidant?

9          A.  Yes, it can.  As I just said, if you make

10     a pharmaceutical composition with and without

11     the compound as in the patent

12     where there's a formulation without and a

13     formulation with an antioxidant, you can compare

14     them and see if it's active.

15         Q.  Are there any other sources that describe

16     testing to determine whether a compound is acting

17     as an antioxidant?

18         A.  Yes.  There are -- there European

19     guidelines, EMEA guidelines, also.

20         Q.  Could you please turn to Tab 10 in your

21     binder, JTX 105?  And what is this document?

22         A.  This is a Note for Guidance on Inclusion

23     of Antioxidants and Antimicrobial Preservatives

24     in Medicinal Products.

1        Q.  This is the EMEA document?

2        A.  This is the EMEA document, which is the

3    European kind of equivalent of the FDA.

4        Q.  And could you please turn to Page 2 of JTX

5    105?  And what does this page say?

6        A.  If I would be able to call out the top

7    paragraph, just that's about right.  Yes.

8               The efficacy of antioxidants must be

9    assessed in the finished product in conditions

10   which simulate actual use by measuring the extent

11   of degradation in the finished product with and

12   without the antioxidant.

13              So that the first paragraph there is

14   very clear that it's necessary to understand the

15   workings of an antioxidant within the context of

16   a pharmaceutical formulation and to test it

17   within a pharmaceutical formulation.

18              And the second paragraph is

19   important, too.  It says that antioxidants should

20   only be included in a formulation if it has been

21   proved that their use cannot be avoided.

22              So it's not something you would go

23   to as the first thing you would consider.  And it

24   says that you should regularly look at

1    manufacturing process and optimize those to

2    minimize the potential for oxidation.

3              In line with where we are, the Par

4    product where the formulation and the manufacturing

5    process is being optimized to avoid the need for

6    using an antioxidant.

7       Q.  Does the method described in the EMEA

8    guidelines that you just described relate to the

9    methods in the '031 patent?

10      A.  Yes, it does.  As it says with EMEA

11   guidelines you just heard, you should do your

12   formulations with and without an antioxidant

13   present to establish whether the antioxidant is

14   functioning in that product.

15             So the guidelines are in line with how

16   the test was run in the '031 patent.

17      Q.  What is your conclusion as to what are

18   these standard tests for determining whether a

19   compound is an antioxidant?

20      A.  Standard test is to take a formulation

21   with and without an antioxidant and to stress

22   them initially at a rapid high temperature like

23   60 degrees, which was used in the patent, and

24   then subsequently following it up at conditions

1   in line with the regulatory conditions, such as

2   40 degrees Centigrade and 75 percent relative

3   humidity, which was used in the patent.

4              And, ultimately, if you're going to

5   use that, you would carry on to long-term use

6   storage, 25 degrees C, as the FDA would require.

7   So that's it as it would go down.

8       Q.  And what is your support that accelerated

9   stability tests are the standard test for

10  determining whether a compound is an antioxidant?

11      A.  Accelerated stability testing in the

12  formulation, is what's described in the '031 patent

13  and is what's described in the FDA guidelines.  And

14  it's what's described in the EMEA guidelines.

15             So that's my support.

16      Q.  Have you seen any accelerated stability

17  testing data relevant to the question of whether

18  acetaldehyde is an antioxidant?

19      A.  Yes.  I've seen stability testing data on

20  the Par product.

21      Q.  Let's talk about Par's ANDA products.

22  Were acetaldehyde levels measured in batches of

23  Par's ANDA product?

24      A.  Yes, they were.

1      Q.  And could you please go through those?

2      A.  So measured -- this is a table of

3  different batches of Par's ANDA product.  The

4  first line is lot 110110, 4.6-milligram patch and

5  tested three repeat tests.

6            It's not detected.  So it's not a

7  detectable amount three times.  And I think a

8  reasonable conclusion from that is that there's

9  none present.

10            So I put that as a mean of zero

11  parts per million on the basis that it's not

12  detectable by those methods.

13            The next line is 110111

14  9.5-milligram patch.  Again, there was no

15  acetaldehyde detected.  So I put that as a mean

16  of zero parts per million of acetaldehyde.

17            The next one is 110280 9.5-milligram

18  patch, tested three times, 13, 13 and 14 parts

19  per million.  And that's a mean of 13 parts per

20  million.

21            And 110281 of 4.6-milligram patch

22  tested at 14, 16 and 15 parts per million.  So

23  that's a mean of 15 parts per million.

24            And 110319 is the 9.5-milligram

1    patch tested at 13, 13 and 10 parts per million.

2    That's a mean of 12 parts per million.

3              The next one -- excuse me.  The next

4    one is 110320 4.6-milligram patch and it was

5    tested at 11, 8 and 12 parts per million.  So

6    that's a mean of ten parts per million.

7              The next one is 130108,

8    13.3-milligam patch, tested 30, 25 and 21 parts

9    per million, which is a mean of 25 parts per

10   million.

11             The last one is 130140 -- sorry,

12   130141, which is a 13.3-milligram patch, which

13   was tested at 25, 26 and 23 parts per million.

14   And a mean of 25 parts per million.

15             So, for me, the not detected takes

16   this from a range of zero to the largest single

17   number was 30 parts per million.  And the mean

18   range from, I would say, zero not detected

19   certainly up to 25 parts per million.

20             And in terms of a percentage in the

21   formulation, that's from nothing up to 0.0025 in

22   the formulation.

23      Q.  Could you please turn to Tab 11 in your

24   binder, please which is DTX 585B.

1          Does this document provide the

2    acetaldehyde measured in the table you just

3    presented?

4         A.  Yes, it does.

5          MS. KOH:  Par moves the admission of

6    DTX 585B into evidence.

7          MR. CONDE:  No objection, Your

8    Honor.

9          THE COURT:  Admitted without

10   objection.

11   BY MS. KOH:

12        Q.  And the sources at the bottom of DTX 585B

13   include JTX 180, JTX 181, JTX 169, JTX 197, JTX

14   198, JTX 199, DTX 617 and DTX 618.

15          Has Par run stability tests on the

16   ANDA product for which it measured acetaldehyde

17   levels?

18        A.  Yes, it has.

19        Q.  And could you please walk us through that

20   data?

21        A.  Sure.  These data are the summary of the

22   stability testing data at 25 degrees C and 60

23   percent relative humidity, which are the

24   long-term stability data.  As I said, these are

1    the gold standard that you look to.

2              And they take us out all the way to

3    shelf life of the products.  So the top two rows

4    here in yellow take us from batch 110110 from

5    initial all the way out to 24 months.

6              And these are the oxidative

7    degradation breakdown products, Impurity 4 and

8    ECAV for that two-year period.  And the other

9    highlighted in yellow is 110111 and that goes all

10   the way out to 24 months.  So the top two rows of

11   this show that if you have zero for not detected

12   or zero, as I would say, acetaldehyde in those

13   two batches, there was no degradation at all.  It

14   would be measured over the entire shelf life of

15   Par's ANDA product.

16             And for me, if you have no detection

17   of any oxidative degradation products in the

18   data, that the absolute room temperature data for

19   the whole shelf life of the product, there's no

20   way that situation can be improved by the

21   inclusion of acetaldehyde.

22             It's as stable as it can possibly

23   be.  If you look at the other data on here, the

24   one that's grayed out is 110177.  And for this

1    batch, there was no measurement of acetaldehyde

2    so this is grayed out because I don't know whether

3    it contains any acetaldehyde or not.

4              It's an unknown in that respect.

5    That was entirely stable through the entire

6    two-year shelf life, too.  And the other batches

7    going down here are the various batches for which

8    acetaldehyde has been measured and detected.

9              And we just talked about those a few

10   moments ago.  A few of them don't go out to the

11   full shelf life because there hasn't been long

12   enough storage yet to take them out the 24-month

13   time period.  So they only have nine months

14   available so far.

15             But I would say all of these data

16   demonstrate a remarkable stable product, which is

17   showing no meaningful evidence of oxidative

18   degradation and absolutely no evidence at all

19   that acetaldehyde can reduce oxidative

20   degradation because the product is clearly stable

21   without any need for it.

22             And I've then also put data of the

23   accelerated conditions.  So the next slide is 30

24   degrees C and 65 percent relative humidity.  And

1    again, the first two rows are the ones with zero

2    acetaldehyde.  And they are both accelerated

3    stability studies stability testing and they're

4    both remarkably stable.

5              There is nothing at all to be talked

6    about.  0.1 I wouldn't say was any great meaning.

7              And it reverts to less than 0.1 on

8    the last time point.  So there's no degradation

9    to talk about in the first one.

10             It's a very modest hint of

11   degradation.  At the very end, that's a very

12   stable compound and very stable formulation or

13   very stable formulation rather.

14             If you look at the other dates on

15   there, there are incidences here and there of a

16   measured amount of degradation.  But the story of

17   this slide is very clearly one of a stable

18   formulation and one that I can see no evidence

19   whatsoever that acetaldehyde is reducing any

20   degradation.

21             There's nothing to support that, in

22   my view.  The data are very clean, very clear and

23   it's a stable product for which there can be no

24   reduction really in degradation by acetaldehyde.

1          And the final data says 40 degrees C

2     and 75 percent relative humidity and this is the

3     most stress, the most accelerated condition.  And

4     inevitably, in this condition, there will be more

5     degradation for compounds which is liable to

6     oxidative degradation.

7          We know that is the case.  So

8     inevitably numbers at the end of this will start

9     to develop.  This column here will start to show

10    some measurable numbers for degradation.

11         But the story here is very much the

12    same.  Throughout the storage, these materials

13    are stable.  They never go out of specification.

14         I see no evidence even in this

15    stress condition.  I see no evidence of

16    acetaldehyde protecting against oxidative

17    degradation.  And I would stress the most

18    important data we would consider are real-time

19    storage.

20         These are not least important

21    because these are the ones you use to get your

22    first indication of what's happening.  But

23    they're -- the really important ones are the

24    real-time storage.  Each of the three conditions,

1    I see no evidence at all for any reduction in

2    degradation of Rivastigmine in this composition

3    by the presence of acetaldehyde.

4        Q.  Dr. Buckton, if you could please turn to

5    Tab 12 in your binder, which is DTX 588B.  Does

6    DTX 588B provide the stability data for the 25

7    degrees, 60 percent RH condition that you just

8    discussed?

9        A.  Yes, it does.

10            MS. KOH:  Par moves the admission of

11   DTX 588B into evidence.

12            MR. CONDE:  No objection, Your

13   Honor.

14            THE COURT:  All right.  Admitted

15   without objection.

16   BY MS. KOH:

17       Q.  And could you please turn to Tab 12A and

18   12 -- 12A which is DTX 578 and Tab 12B, which is

19   DTX 600.  And do those documents provide the raw

20   data for the stability testing data you just

21   presented?

22       A.  I think that's right.

23            MS. KOH:  Par moves for the

24   admission of DTX 578 and DTX 600 into evidence.

1        MR. CONDE:  No objection, Your

2   Honor.

3        THE COURT:  Admitted without

4   objection.

5   BY MS. KOH:

6        Q.  And can you please turn to Tab 13 in your

7   binder, Dr. Buckton, which is DTX 587B and does

8   DTX 587B provide stability testing data that you

9   presented for the 30 degrees 65 RH data that you

10  just discussed?

11       A.  That's correct.

12       Q.  And could you please turn to Tab 13A in

13  your binder, which is JTX 193?  And does JTX 193

14  provide the raw data underlying the stability

15  testing data in DTX 587B?

16       A.  Say that again, please.

17       Q.  Sure.  Does JTX 193 provide the raw data

18  underlying the stability testing data in DTX

19  587B?

20       A.  What was the tab again?

21       Q.  Sorry.  13A.  Tab 13A.

22       A.  I'm sorry, yes.  It does.

23            Thank you.

24            MS. KOH:  Par moves for the

1    admission of JTX 193 into evidence.

2            MR. CONDE:  No objection, Your

3    Honor.

4            THE COURT:  Admitted without

5    objection.

6    BY MS. KOH:

7        Q.  And if you could please turn to Tab 14 in

8    your binder which is DTX 586B.  Does DTX 586B

9    provide stability data for the 40, 75 condition

10   that you just discussed?

11       A.  Yes, it does.

12       Q.  And if you could please turn to Tab 14A,

13   which is JTX 200, Tab 14B, which is PTX 140, Tab

14   14C, which is PTX 138, and Tab 14D, which is PTX

15   141?

16           And do those documents JTX 200, PTX

17   140, PTX 138 and PTX 141 provide the raw data for

18   the underlying stability testing data in DTX

19   586B?

20       A.  I think they do.  Yes.

21           MS. KOH:  Par moves for the

22   admission of JTX 200, PTX 140, PTX 138, and PTX

23   141 into evidence.

24           MR. CONDE:  No objection, Your

1    Honor.

2                THE COURT:  Admitted without

3    objection.

4    BY MS. KOH:

5        Q.  Dr. Buckton, are the stability testing

6    data for Par's ANDA products reliable?

7        A.  Yes, they're reliable.  They're stability

8    testing data generated by validated methods and

9    submitted to the FDA.  So, yes, they are.

10       Q.  And what is the specification for the

11   degradation products ECAV and Impurity 4 in Par's

12   ANDA product?

13       A.  The specification is 0.5 percent for each

14   of them.  So each of them individually 0.5

15   percent.

16       Q.  And is this a not more than 0. --

17       A.  I apologize.  That's not more than 0.5

18   percent.

19       Q.  What is your conclusion based on the

20   accelerated and long-term stability data as to

21   whether acetaldehyde is an antioxidant?

22       A.  I see no support for that it's an

23   antioxidant and I don't see any reduction in

24   oxidative degradation of Rivastigmine in the

1    presence of acetaldehyde.

2        Q.  Dr. Buckton, do you believe that the

3    accelerated and long-term stability tests for Par's

4    ANDA product were set up for the

5    express purpose to see whether or not

6    acetaldehyde was an antioxidant?

7        A.  No.  I don't believe that's why they were

8    set up.

9        Q.  And why not?

10       A.  I don't think that's what anyone would do.

11   I don't think anyone would view acetaldehyde as

12   an antioxidant, so I don't think you would set up

13   tests for that purpose.  You would set up to look

14   at the stability testing of their product.

15       Q.  If the accelerated and long-term stability

16   testing tests are not set up for the purpose of

17   evaluating acetaldehyde as an antioxidant, do

18   those tests still allow you to draw that

19   conclusion?

20       A.  Yes.  I believe they do.  The experimental

21   design allows you to have batches with acetaldehyde

22   and batches without acetaldehyde in pharmaceutical

23   formulations.  So I think it

24   allows you to draw those conclusions.

1    Q.  Did you hear Dr. Davies' criticism that

2    you improperly compared Par's ANDA batches

3    because they were made from different lots of

4    ingredients?

5    A.  Yes.  I heard that criticism.

6    Q.  And what's your response to that

7    criticism?

8    A.  I don't think it's valid for a few

9    reasons, firstly the regulatory authorities

10   actually want you to do that, it's a good thing

11   to do.  If you can demonstrate that a product is

12   uniformly stable with a wide range of lots and

13   different batches, it's very good evidence that

14   you have a product which is uniformly stable

15   rather than a freak observation with one off

16   response, for example.

17                So it's a good thing.  And I think

18   the data is internally consistent so it's a

19   coherent data set all of which demonstrate

20   stability and all of which can be relied upon to

21   support the same overall view.

22   Q.  Can we return to your summary of

23   noninfringement positions.  Can you please

24   explain your third reason why Par's ANDA products

1    do not infringe Claim 7?

2        A.  The reason is acetaldehyde is not present

3    in Par's ANDA products in the claimed range of

4    about 0.01 to about 0.5 percent by weight.

5        Q.  Is there any purpose for acetaldehyde in

6    Par's ANDA products?

7        A.  No, there isn't.  It's there as a residual

8    solvent, it isn't there for any purpose, if it's

9    there at all.  Actually there are some batches, I

10    don't think it's there at all.

11        Q.  Could you briefly explain what is a

12    residual solvent?

13        A.  Residual solvent is a volatile organic

14    material which is either used during the

15    manufacture of an API or excipient or formulation

16    or generated during the manufacture of an API or

17    excipient.

18        Q.  What levels of residual solvents should a

19    drug product contain?

20        A.  It should be as low as you can possible

21    manage, it's not there to have any function,

22    they're not generally desirable things, so you

23    should minimize it or remove it would be your

24    goals.

1    Q.  Is a residual solvent the same as a

2    pharmaceutical excipient?

3    A.  They're very different.  A pharmaceutical

4    excipient is there for a particular reason, a

5    residual solvent is not.  I have a slide which

6    compares those things.  A residual solvent

7    doesn't have a functional purpose.  It's there as

8    an unfortunate consequence and something you

9    don't want to have present.  An excipient is

10   there for a functional purpose, you have it there

11   for a deliberate intent to achieve something in

12   the formulation.

13            A residual solvent is not there at a

14   set concentration.  The goal is to remove it and

15   not have it present.  Whereas to achieve a

16   functional purpose, an excipient must be there in

17   a certain amount and it will have a defined

18   amount in the pharmaceutical formulation.

19            A residual solvent will have a not

20   more than specification, and the desire to keep

21   it low or preferably eliminate it entirely from

22   the formulation whereas that is not the case with

23   an excipient which will be there at a set

24   concentration or a particular functional purpose

1    for which it is being investigated to perform.

2        Q.  Does Par's ANDA include a specification

3    for an amount of antioxidant in the final

4    pharmaceutical composition?

5        A.  No, it doesn't.  Par doesn't have a

6    specification for antioxidant firstly because

7    there is no named antioxidant in Par's ANDA

8    product, and secondly because there is no

9    material in Par's ANDA product that's functioning

10   as an antioxidant.  So whether named or not

11   named, there was no specification in Par's ANDA

12   product or an antioxidant.

13       Q.  Do you recall Dr. Davies' testimony that

14   the Par ANDA specification allows up to one

15   thousand parts per million for 0.1 weight percent

16   acetaldehyde in the final pharmaceutical

17   composition?

18       A.  Yes, I do.

19       Q.  Do you agree that Par's ANDA products

20   contain 0.1 weight percent acetaldehyde?

21       A.  No, I don't.  I think it was set for a

22   specification, but the expectation because of the

23   washing process that we have heard about is that

24   it will be very low or no acetaldehyde in Par's

1     ANDA product.

2        Q.  And does the not more than one thousand

3     parts per million specification for acetaldehyde

4     include zero parts per million?

5        A.  Yes, it does.

6        Q.  What did you conclude about the function

7     of acetaldehyde in Par's ANDA products from the

8     not more than one thousand parts per million

9     specification?

10        A.  My conclusion it's not there to have a

11     functional purpose, the goal is to keep it to a

12     low level and ideally to reduce it if possible

13     from the formulation, remove it if possible from

14     the formulation.

15        Q.  Do you recall Dr. Davies' testimony that

16     acetaldehyde was present in amounts up to 400

17     parts per million or 0.04 weight percent in patch

18     samples?

19        A.  I do.

20        Q.  Do you agree that Par's ANDA products

21     contain 0.04 weight percent acetaldehyde?

22        A.  No, I don't.  Those are the ones that Dr.

23     DiZio had talked about which were done in his lab

24     with him shaking by hand to his best efforts and

1    they're not representative of the process in

2    Par's ANDA products so those figures are not

3    relevant to Par's ANDA products.

4        Q.  Are you aware of any batch of Par's ANDA

5    products that has levels of acetaldehyde

6    approaching 400 or 1,000 parts per million?

7        A.  No.  The numbers that I presented earlier

8    were the only patches of Par's ANDA products and

9    the highest mean value there was 25 parts per

10   million.

11       Q.  Now, you spoke about the measured amounts

12   of acetaldehyde in batches of Par's ANDA products

13   earlier.  Can we put that slide up again.  Do

14   these measured amounts of acetaldehyde fall

15   within the claimed range of about 0.01 to about

16   0.5 percent by weight?

17       A.  No, they don't.  So the single largest

18   mean value there as I said is 25 parts per

19   million which is 0.025 percent, which is 25

20   percent of the lowest range of the claim.  And to

21   say that they're numerically about the same would

22   not be right.  It's like taking a job that pays a

23   hundred thousand dollars a year and getting paid

24   $25,000 a year and saying you got paid about the

1    same, it's just not numerically about the same.

2        Q.  Let's go back to your summary of

3    noninfringement opinion.  What is your fourth

4    opinion?

5        A.  The fourth opinion is that the amount of

6    acetaldehyde in Par's ANDA products does not meet

7    the about limitation because it does not function

8    to stabilize rivastigmine in the composition.

9        Q.  Did you review any data that informed your

10   opinion as to whether the amount of acetaldehyde

11   in Par's ANDA products function to stabilize

12   rivastigmine?

13       A.  Yes, I have talked about Par's stability

14   data already, but those are the data, yes.  So

15   this is the other 25 C data again, I'll talk

16   through it again, but my conclusion was that it's

17   perfectly stable with no acetaldehyde present and

18   acetaldehyde doesn't function to reduce the

19   degradation.

20       Q.  Could you please summarize your reasons

21   why 0.003 weight percent acetaldehyde or less in

22   Par's ANDA products does not meet the claim

23   limitation about 0.01 to about 0.5 weight

24   percent?

1    A.  Yes, I have a slide for that.  0.003

2    percent is 70 percent less than 0.01, and as I just

3    said, that's numerically not about the same.

4    There is no description in the patent about the

5    use of an antioxidant in 0.003 percent or less.

6    The range limitation was added to enable an

7    amount of antioxidant in the composition to

8    stabilize rivastigmine, so that's why the

9    concentration term was put into the patent.

10                  And applicants did not intend to

11    deviate at the lower end of the range to include

12    amounts that do not stabilize rivastigmine.  My

13    understanding is that below the claimed range was

14    not enabled because there was no evidence that it

15    supported the stability of rivastigmine in a

16    pharmaceutical composition.

17                  It would seem to me that the about

18    limitation if it were to be used could only work

19    if it were to stabilize rivastigmine below that

20    range.  The Par stability data shows that

21    acetaldehyde at 0.003 percent or less does not

22    function to stabilize rivastigmine in Par's ANDA

23    products so I don't believe it can meet the about

24    limitation if that's related to functionality and

1    lack of enablement at the bottom end of the

2    range.

3        Q.  Now, in his direct testimony, Dr. Davies

4    discussed a study that he performed.  Was

5    Dr. Davies' study relevant to your analysis at

6    all?

7        A.  No, it wasn't.

8        Q.  How would you describe Dr. Davies' study?

9        A.  I would describe it as a nonstandard

10   adaptation of a forced degradation study.

11       Q.  Have you ever seen Dr. Davies' study used

12   before?

13       A.  No, I haven't, I have only seen it here.

14   I haven't seen that kind of study before.

15       Q.  Could you please turn back to tab nine,

16   which is DTX 591 in your binder.  Are standard

17   forced degradation studies described in the FDA

18   guidelines?

19       A.  Yes, they are.

20       Q.  Could you please walk us through that?

21       A.  Sure.  If you go to page 12 of these

22   guidelines, towards the bottom, it talks about

23   stress testing on drug substance and those are

24   forced degradation studies.  And if you could blow

1    that up.  It says these studies are undertaken to

2    elucidate intrinsic stability characteristics,

3    and it says such testing is part of the

4    development strategy and normally carried out

5    under more severe conditions than those used for

6    accelerated tests.  So it tells you that these

7    are tests carried out on severe conditions.

8                   The purpose of the test it says

9    below is to provide data on forced degradation,

10   forced decomposition products and decomposition

11   mechanisms for the drug substance.

12                   And it also says that the severe

13   conditions that may be encountered during this

14   process can -- if you carry over to the next

15   page, just to summarized, I should have summarize

16   before I moved on, it says these are severe

17   conditions that are designed to put an extreme

18   stress on to a material and the purpose of that

19   extreme stress is if we go on to page 13, it

20   says, these studies should -- the second

21   paragraph.  The first paragraph down.

22                   These studies should establish the

23   inherent stability characteristics of the

24   molecule such as the degradation pathways and

1    lead to the identification of degradation

2    products and hence support the suitability of the

3    proposed analytical procedures.  The detailed

4    nature of the studies will depend on the

5    individual drug substance and type of drug

6    product.

7              What it tells you here is the

8    function of the forced degradation study is to

9    use an extreme stress and the extreme stress is

10   to produce a large amount of degradant and the

11   purpose of the large amount of degradant is to

12   allow you to develop your analytical procedures

13   and also to allow identification of the

14   degradants that are being produced.

15             It further says just towards the end

16   of this section, in a paragraph it says it is

17   recognized, it is recognized that some

18   degradation pathways can be complex and that

19   under forcing conditions decomposition products

20   may be observed which are unlikely to be formed

21   under accelerated or long-term testing.  This

22   means that the processes that occur under extreme

23   conditions are understood to give you fast

24   information about degradants, but also understood

1    to be unreliable and not necessarily predictive

2    of processes and mechanisms that will occur in

3    pharmaceutical products at more conventional

4    conditions.

5              So this has a particular purpose,

6    the forced degradation studies are understood to

7    have a particular purpose to allow you to

8    identify degradants, but not to allow you to

9    believe that those mechanisms and processes that

10   occur are relevant to what happens in a

11   pharmaceutical product.

12   Q.  Is the standard forced degradation study

13   used in the pharmaceutical industry to identify

14   whether a compound is an antioxidant?

15   A.  No, it isn't.  It's used for the function

16   that I just said, and not to investigate adding

17   something into a forced degradation study to see

18   if it's an antioxidant.  I haven't seen that done

19   before.

20   Q.  Are there standard parameters for

21   conducting forced degradation studies?

22   A.  No, there aren't.  I think we have also

23   heard from other people that your goal here is to

24   produce a large amount of degradant in a very

1     short period of time and to a very large extent

2     you're left to your own call as to how you might

3     want to do that.

4                    And that would cover the range that

5     Dr. Davies talked about yesterday, very wide

6     ranges of temperature, I think he talked about

7     ambient to a hundred degrees C, I think he talked

8     about a whole range of times from maybe one hour

9     up to a month or something like that, I think it

10    was a very wide range of times he talked about,

11    and obviously a wide range of conditions in the

12    experiment.  So you have a pretty much a blank

13    canvas, pretty much an infinite amount of things

14    you can do.

15    Q.  Does the '031 patent provide any guidance

16    for conducting forced degradation studies to

17    determine whether a compound is an antioxidant?

18    A.   No, it doesn't.  The '031 patent talks

19    about accelerated testing on the pharmaceutical

20    product with and without an antioxidant which is

21    in my view the correct way of doing this kind of

22    experimentation, it doesn't talk about forced

23    degradation studies which I don't think are how

24    people would do this experimentation.

1    Q.  Is a forced degradation study different

2    from an accelerated stability test?

3    A.  Yes, it is.  I tried to explain that, but

4    I will summarize that on a slide that I had, just

5    to be clear.  The forced degradation studies are

6    carried out on the active pharmaceutical

7    ingredient.  Accelerated stability tests are

8    carried out on the formulations.  The conditions

9    for the forced degradation studies are extreme

10   conditions whereas the accelerated stability

11   test, the purpose of those is to speed data

12   collection but to be relevant to the product.

13   Everything you do to speed data correction can

14   make the situation nonpredictable to the product,

15   it's possible.  So the more you stress a system,

16   the further you move away from the ambient

17   storage conditions which are the absolute

18   standard you're trying to get to, the less

19   reliable the data will be.

20           But nonetheless, the goal of the

21   accelerated stability test is to speed data

22   collection but to be relevant to the product.

23   The reason for doing it as I said, the forced

24   degradation study is to make and identify a

1    degradation product and to allow development.

2    The reason for an accelerated stability test is

3    to assess stability issues and predict realtime

4    performance of product stability and realtime

5    shelf life a slightly accelerated test.

6              In terms of whether it achieves

7    prediction of a product performance, I think

8    everyone, the FDA guidelines I just read and

9    people working in the field would say that it's

10   unlikely the forced degradation study is going to

11   predict what happens in a pharmaceutical product.

12             The best expectation you may get is

13   you have the same degradation products obtained

14   from the forced degradation study that you will

15   also see in the product.  But in terms of

16   predictions, accelerated stability tests to be

17   predictive of product performance are much more

18   likely as you get closer to conditions of

19   realtime performance and realtime shelf life.  In

20   terms of guidance of conditions, the forced

21   degradation study on the API has no fixed method,

22   no clear guidance for the conditions that you would

23   use, whereas accelerated stability test have

24   clear guidance such as the 40 degrees C, 75 percent

1    relative humidity, but obviously there

2    are options to use other conditions initially to

3    collect data more rapidly, that's possible, but

4    ultimately you would come closer to realtime

5    storage.

6              And then are these the standard

7    tests to see if something is an antioxidant, forced

8    degradation study is not a standard test

9    for that, whereas an accelerated stability test

10   on a formulation is a standard test for that?

11             THE COURT:  All right.  I think we

12   probably ought to take our morning break.  We'll

13   take a fifteen-minute recess and then we'll come

14   back.

15             MR. SILVER:  Your Honor, could we

16   have an estimate of the time either before the

17   break or when we resume?

18             THE COURT:  We'll give you one when

19   we come back.

20             MR. SILVER:  Thank you, Your Honor.

21             (A brief recess was taken.)

22             THE COURT:  All right.  Let's be

23   seated.

24             MS. KOH:  Before we continue there

1    are a couple of exhibits that I have failed to

2    move into evidence, so Par moves DTX 587B which

3    is tab 13 in the binder, and DTX 586B which is

4    tab 14 in the binder.

5                    MR. CONDE:  No objection, Your

6    Honor.

7                    THE COURT:  Admitted without

8    objection.

9                    MS. KOH:  And also I had previously

10   mentioned DTX 617 which is the same as PTX 352

11   which was admitted into evidence yesterday.  And

12   I had mentioned DTX 618 which is the same as PTX

13   353 which was admitted into evidence yesterday as

14   well.

15   BY MS. KOH:

16       Q.  Dr. Buckton, do you recall that Dr. Davies

17   discussed the Alsante reference, which is JTX 75,

18   in his direct testimony?

19       A.  Yes, I do.

20       Q.  And did you review the Alsante reference?

21       A.  Yes, I did.

22       Q.  Does the Alsante reference support

23   Dr. Davies' view that his study is a standard

24   test?

1    A.  No, it doesn't.  I don't see anything in

2    Alsante reference that describes use of an

3    antioxidant in a forced degradation study,

4    nothing to support that.

5    Q.  Could we please put up slide PDX 115 from

6    Dr. Davies' direct testimony.  Do you have a

7    response to what Dr. Davies testified about the

8    Alsante reference on this slide?

9    A.  I think the first sentence, the stress

10   testing is a critical component of drug

11   development is right.  That by doing key stress

12   testing you can understand the mechanisms by

13   which an active substance will degrade.  And

14   inevitably you do these things for a reason and

15   the reason for the stress testing is it can help

16   you making decisions further downstream.

17            But I think to highlight stress

18   testing can help in the selection of more stable

19   drug substance salt forms in my experience would

20   relate to a form of degradation which is the

21   degradation in the presence of water.  We would

22   change salt forms routinely in the compound

23   relative to hydrolysis.  So this relates to a wide

24   range of possible stress tests.  It doesn't

1    relate specifically to oxidative degradation, and

2    once it's clear that a forced degradation study

3    is undertaken to learn about the drug substance

4    and its degradation routes and obviously that

5    learning has to be applied somewhere otherwise it

6    would have been a pointless endeavor.  This

7    doesn't give an endorsement of putting an

8    antioxidant into a forced degradation study, that

9    link is not made in this reference really in any

10   of the other references that I have seen.

11       Q.  Dr. Davies also mentioned excipient

12   compatibility test.  Can you explain what's an

13   excipient compatibility test?

14       A.  Yes, I can.  When you start with first

15   development process, you will maybe have a wide

16   range of excipients which could serve the same

17   function, and it would be sensible to have a way

18   of deciding which was the best one to select for

19   your early formulation development work.

20             One way we go about doing that is to

21   perform a stress test to see whether the

22   excipient itself causes any degradation of the

23   drug substance.  And that would be a crude, rough

24   and ready stress test done by a variety of

1    different experimental methods and it would allow

2    us to understand whether the drug substance was

3    broken down by excipient A but not by excipient B

4    in which case you would use excipient B in your

5    early formulation work.

6              The reason for this is to have your

7    first decent go of having a pharmaceutical

8    product.  The trouble with the stress test in

9    these condition is you can get false positive

10   results which false positive results are you

11   would see a degradation process occurring in a

12   more extreme stress which wouldn't actually

13   happen in a pharmaceutical product and you could

14   get false negative results and the false negative

15   is the other way, you don't see a degradation

16   process occur in your initial stress test and

17   that ultimately it proves that there was a

18   degradation that happened in the pharmaceutical

19   formulation when you made it.

20             So excipient compatibility is a

21   rough and ready way by which we limit the first

22   excipients that we will use in our first

23   formulation and we will put that on a standard

24   accelerated stress test and move on from there,

1    so it's just a crude way.

2        Q.  Are excipient compatibility studies used

3    to assess whether a compound is an antioxidant?

4        A.  I've never seen that done.  And the reason

5    for that is you would do your excipient

6    compatibility test with the expectation that you

7    would make a formulation, which was essentially

8    going to be a good formulation in your first

9    effort.

10               So the goal would be to make

11   something that wasn't degrading.  Then when you

12   make your first formulation and you see an issue,

13   if you see some degradation in that formulation,

14   would you then consider resolving that issue?

15   And part of that process for resolving it, if it

16   happened to be oxidation, might include adding an

17   antioxidant.

18               That's not the only way you would

19   resolve that issue.  It's one way you would

20   conceive of doing it.

21               So the concept of adding an

22   antioxidant would come downstream.  It wouldn't

23   be undertaken in an excipient compatibility test

24   because you wouldn't really start off by

1    formulating to fail.

2              You would try formulating to get a

3    product that was going to work.  If it doesn't

4    work, you would conceive of adding an antioxidant

5    at a later stage.

6        Q.  Is Dr. Davies' study a peer-reviewed

7    study?

8        A.  No, it isn't.

9        Q.  Does Dr. Davies' study allow you to

10   predict what will happen in a pharmaceutical

11   formulation containing a similar amount of

12   acetaldehyde?

13       A.  No, it doesn't.  I don't see how you can

14   extrapolate from that test.  For a pharmaceutical

15   formulation, you would need to run the test in

16   formulation.

17       Q.  Are antioxidants formulation specific?

18       A.  Yes, they are.  So it's possible that one

19   would have an antioxidant that will work in one

20   formulation, but will not work in another

21   formulation.  And I have a slide relating to

22   that.

23              MR. CONDE:  Your Honor, we object to

24   to putting up the slide on infringement and part

1    because we saw this testimony yesterday.  This is

2    just a snippet taken out of context.  And it

3    just, it is not appropriate for the witness to go

4    up and put up a snippet of a slide out of context

5    in his direct testimony.

6              THE COURT:  All right.  Well, I'll

7    overrule the objection.

8              THE WITNESS:  Can I go?  Okay.

9              So this is the deposition of Dr.

10   Frank Theobald, who was the project manager on the

11   Exelon project.  And he was asked, To reduce the

12   degradation of Rivastigmine, you'd have to select

13   an antioxidant that was effective with respect to

14   Rivastigmine; right?

15             And his reply was:  That's not

16   correct.  What I'm saying, it must be effective

17   for the API in combination of the formulation the

18   API is composed in, which is in line with my view

19   as well that antioxidants are formulation

20   specific.  And whether they will work in a

21   formulation is something that you need to

22   investigate.

23      Q.  Do you have an example of a formulation

24   where one antioxidant works, but another

1    antioxidant doesn't?

2        A.  Yes, I do.  And I think we've seen it

3    earlier, but it's -- and I've answered it.

4        Q.  And can you please turn to Tab 15 in your

5    binder?

6            MR. CONDE:  Your Honor, we object to

7    the use of this exhibit.  It was not cited in his

8    expert report for any purpose.

9            THE COURT:  Is that right?

10           MS. KOH:  Dr. Buckton's expert

11   report on Paragraph 87 cites the testimony of Dr.

12   Ogorka and the testimony cited in that paragraph

13   is referring to this document, which is DTX 80,

14   which was Ogorka Deposition Exhibit 1.

15           MR. CONDE:  The problem with that,

16   Your Honor, is we don't know how Dr. Buckton is

17   going to use the exhibit.

18           THE COURT:  All right.  Well, I'll

19   overrule the objection.  Go ahead.

20   BY MS. KOH:

21       Q.  What is this document, DTX 80?

22       A.  This is a fax from Dr. Ogorka with a

23   Market Formulation Development Report from LTS.

24       Q.  And if you could please turn to Page

1    55051.

2         A.  What was the number?  Sorry.

3         Q.  Sure.  55051.

4              Could you please describe this

5    study?

6         A.  Yes.  This was a study of a formulation,

7    which was called 2200.  And that formulation was

8    found to degrade to two oxidative degradation

9    products that we've already heard and spoken

10   about, the ketone and the styrene.  2.8 percent

11   of ketone and 2.26 percent of the styrene.

12              Similar formulation was made with

13   0.1 percent tocopherol included and the

14   degradation reduced to 0.29 percent for the

15   ketone and 0.66 percent for the styrene.

16              Similar formulation was made this

17   time including 0.1 percent ascorbyl palmitate,

18   which is another one of the antioxidants listed

19   in the '031 patent.  And this time the ketone

20   went to 0.78 percent.  So it was lower than the

21   2.8 where no antioxidant was present.

22              The styrene went to 2.82 percent,

23   which is slightly higher than the 2.26 percent

24   with no antioxidant was present.  And then the

1    final formulation was a combination of the two

2    antioxidants 0.1 percent of ascorbyl palmitate

3    and 0.1 percent of tocopherol.  This time the

4    ketone was 0.61 percent rather than 2.8 percent

5    and the styrene was essentially unchanged at 2.18

6    percent rather than 2.26 percent.

7              And what these data show to me is

8    that the alpha tocopherol was effective in

9    reducing the oxidative degradation formulation,

10   the formulation that was included by itself and

11   the low level of degradation, substantially low.

12             The ascorbyl palmitate was not

13   effective in reducing the oxidative degradation

14   because one of the degradants remained higher,

15   maybe slightly higher, but essentially remains

16   very high.  And to have one degradation very high

17   degradant is as bad as you need.

18             It's not successful if you have one

19   degradant which is reduced a bit and one that

20   stays high.  You really need to reduce the

21   degradation of both degradants.  And ascorbyl

22   palmitate and alpha tocopherol together didn't

23   perform as well as the alpha tocopherol alone, and

24   they were somewhere in between the ketone and

1    pretty much no improvement for the styrene

2    degradant.

3              So what we can see here is the alpha

4    tocopherol worked.  Ascorbyl palmitate didn't

5    work.  And the combination of the ascorbyl

6    palmitate and alpha tocopherol didn't work.

7              And so what it shows to me is what

8    I've been talking about just now is that an

9    antioxidant in a formulation has to be

10   investigated to see if it works.  And it isn't

11   necessarily true that any antioxidant will

12   function in any formulation.

13             MS. KOH:  Par moves the admission of

14   DTX 80 into evidence.

15             MR. CONDE:  Subject to our

16   objection, Your Honor.

17             THE COURT:  All right.  Admitted

18   over objection.

19   BY MS. KOH:

20     Q.  Did plaintiffs also conclude whether

21   ascorbyl palmitate was unsuitable as an

22   antioxidant?

23     A.  Yes, they did.  And the deposition

24   testimony we just talked about made that

1    conclusion.

2                    This was Dr. Ogorka's deposition

3    testimony, and talking about these data.  The

4    underlined bit I have, he talked about the

5    unsuitability of ascorbyl palmitate.

6                    And the follow-up question was:  Is

7    ascorbyl palmitate a suitable antioxidant for

8    Rivastigmine?  And his answer was, ascorbyl

9    palmitate looks like not to be suitable for the

10   purpose.

11                   So his conclusion was the same as

12   mine.

13       Q.  Do you have an example of an active

14   pharmaceutical ingredient that required an

15   antioxidant in one formulation to be stable, but

16   did not need an antioxidant in another

17   formulation?

18       A.  Well, the example would be the Exelon

19   patch and Par's ANDA product.  The Exelon patch

20   does require an antioxidant and Par's ANDA

21   product does not require an antioxidant.

22       Q.  What is your final conclusion as to

23   whether Par's ANDA products infringe Claim 7 of

24   the '031 patent?

1          A.  My conclusion is they do not infringe.

2          Q.  Could you please turn to Tab 16, which is

3     JTX 2 in your binder?  And what is this document?

4          A.  This is the '023 patent.

5               MS. KOH:  Par moves admission of JTX

6     2 into evidence.

7               MR. CONDE:  No objection, Your

8     Honor.

9               THE COURT:  All right.  Why are we

10    doing this, Ms. Koh?

11              MS. KOH:  It's for our declaratory

12    judgment of noninfringement on the 4.5.

13              THE COURT:  I don't remember, but I

14    thought we decided that we'd know the answer to

15    -- whatever the answer to that case is whatever

16    happens in response to this case.

17              Am I wrong?

18              MS. KOH:  We just have one question

19    on that.

20              THE COURT:  All right.  Let me just

21    ask:  Am I remembering this wrongly?

22              MR. CONDE:  No, Your Honor, I

23    believe you recall correctly.

24              THE COURT:  All right.  Well, I

1    guess you're ready to ask a question.  You might

2    as well ask the question.

3                But I reserve the right to strike it

4    after you do so.  Okay?

5                MS. KOH:  Okay.  Your Honor.

6    BY MS. KOH:

7        Q.  Dr. Buckton, do you have an opinion as to

8    whether Par's ANDA products infringe the claim of

9    the '023 patent?

10               THE COURT:  Okay.  Well, actually

11   I'm going to strike the question because that

12   makes no -- it makes no sense to be asking that,

13   unless you're going to try that here.  And you're

14   not trying that here.

15               MS. KOH:  Okay.

16               THE COURT:  Okay?

17               MS. KOH:  Okay.

18               THE COURT:  I mean, we did say this

19   at the pretrial conference.

20               MS. KOH:  Okay.  I just wanted to

21   make sure in case we needed something in

22   evidence.

23               THE COURT:  Okay.  Just to state to

24   make sure that I'm not misremembering things, Mr.

1      Kallas or somebody, if I decide or it is decided

2      by whoever makes a decision that the Par products

3      don't infringe Claim 7 of the '031 patent,

4      there's a stipulation that they don't also

5      infringe any claims of the '023 patent?

6              MR. KALLAS:  With the exception of

7      the 13.3 product isn't in this case.

8              THE COURT:  Which said if it became

9      relevant we'd have to expedite a trial on that?

10             MR. KALLAS:  I think that's correct,

11     Your Honor.

12             THE COURT:  Okay.

13             MR. KALLAS:  That's my recollection.

14             THE COURT:  Well, in any event,

15     you're the representative of Novartis, so

16     you're --

17             MR. KALLAS:  Yes, Your Honor.

18             THE COURT:  Okay.  Thank you.

19             Go ahead, Ms. Koh.  Onto something

20     else.

21             MS. KOH:  Okay.  No further

22     questions with respect to infringement.

23             THE COURT:  All right.  Thank you,

24     Ms. Koh.

1          Cross-examination.

2                MR. CONDE:  May I approach, Your

3     Honor?

4                THE COURT:  You may.

5                MR. CONDE:  I have a stack of

6     binders, unfortunately.

7                CROSS-EXAMINATION

8     BY MR. CONDE:

9        Q.  Good morning, Dr. Buckton.

10       A.  Good morning.

11       Q.  Nice to see you again.

12       A.  And you.

13       Q.  Let's discuss your background first.

14    You're not a chemist; correct?

15       A.  I'm pharmaceutical formulator, so I do

16    physical chemistry.  I don't do synthetic

17    chemistry.

18       Q.  And you don't talk about structures of

19    compound because generally that's not your thing;

20    right?

21       A.  That's quite right.

22       Q.  And apart from this case you would not

23    generally know the structures of impurities of

24    rivastigmine; right?

1       A.  That's right.

2       Q.  And you're not qualified to opine on a

3   mechanism of oxidative degradation; right?

4       A.  That's quite right.

5       Q.  You have not done any work on oxidative

6   degradation on active ingredients in transdermal

7   devices; right?

8       A.  So I didn't quite catch your question.

9       Q.  Sure.  You have not done any work on the

10  oxidative degradation of active ingredients in

11  transdermal devices?

12      A.  I don't remember whether I have.  I don't

13  think I have.  We have worked on transdermal

14  devices within Pharmaterials, but I don't know that

15  we

16  have done oxidative degradation of that, so I

17  think that may well be true.

18      Q.  You know there is a list of antioxidants

19  in the '031 patent?

20      A.  I do, yes.

21      Q.  And you know those antioxidants all work

22  in different ways?

23      A.  I do know they work in different ways,

24  yes.

1    Q.  And you're not able to tell me how each of

2    those antioxidants are meant to act?

3    A.  I am -- as I think I have talked about

4    before, I don't keep kind of an encyclopedia

5    record of how each antioxidant functions in terms

6    of its mechanism.  I know a few of them.  If you

7    put a whole list in front of me, I couldn't do

8    them all.  If you put a list of maybe ten, I

9    won't get them all.

10    Q.  You don't get bogged down with how

11    different antioxidants are meant to function;

12    right?

13    A.  That sounds good to me.  I think that's

14    right, yes.

15    Q.  Now, Mr. Hoy, could you please go to slide

16    PDX 201.  And you're familiar with Claim 7,

17    right, Dr. Buckton?

18    A.  Yes, I am.

19    Q.  And I think you said it's your view that

20    if a compound is an antioxidant in a formulation,

21    first the formulation without an -- let me start

22    over.

23         I think it's your view that in

24    determining whether an antioxidant is needed,

1    first you must know that the formulation without

2    an antioxidant must show significant degradation;

3    right?

4        A.  To know whether an antioxidant is needed,

5    for me, you add an antioxidant if you have

6    significant degradation, if you don't have

7    significant degradation, you don't add an

8    antioxidant, so that sounds correct.

9        Q.  So Claim 7 doesn't have a requirement that

10   there be a significant degradation without an

11   antioxidant; right?

12       A.  Claim 7 just talks about the range in

13   which an antioxidant would be present.  It

14   doesn't talk about a significant degradation, no.

15   I guess I should say that I just said in my

16   direct that I believe the about limitations on

17   that certainly below must relate to

18   functionality.

19       Q.  But my question was directed to whether

20   there needs to be significant degradation without

21   an antioxidant to meet the requirements of Claim

22   7.  There does not, correct?

23       A.  I think there might in relation to about.

24       Q.  Put aside about, other than that, there is

1    not; right?

2        A.  Well, so you want me to do part of Claim

3    7?

4        Q.  Well, I want you to consider the .01 to

5    .5.

6        A.  Without the about?

7        Q.  Right.

8        A.  I think I'm less clear on whether -- I'm

9    sorry, I have forgotten your first question.

10        Q.  Does Claim 7 require significant

11    degradation with the absence of an antioxidant?

12        A.  The meaning of antioxidant is not linked

13    to a function, but in terms of the

14    concentrations, I'm not so clear.  What I read

15    from the file history, it does seem to me to be a

16    functional concentration.

17        Q.  Claim 7 doesn't use the word significant

18    degradation anywhere in it, does it?

19        A.  I can agree that Claim 7 doesn't use the

20    word significant degradation.

21        Q.  And Claim 7 doesn't say anything about

22    comparing formulation with an antioxidant and

23    without an antioxidant; right?

24        A.  The claim itself doesn't, in terms of

1    understanding how you may or may not fall within

2    the claim, perhaps you do.

3        Q.  And there is no stability requirement in

4    Claim 7, either; right?

5        A.  Outside of what I have just talked about

6    in my direct, talked about the meaning of about

7    and the concentration range which I think does

8    have a stability requirement.

9        Q.  Aside from that, there is no stability

10   requirement in Claim 7; right?

11       A.  It's a little difficult to do aside from

12   that, because that's part of Claim 7, but if we

13   strike that bit that's highlighted out, without

14   that bit that's highlighted that's true.

15       Q.  Claim 7 doesn't make mention the word

16   stability; right?

17       A.  Well, I think I have explained in my

18   direct and I think about 0.01 to about 0.5

19   percent by weight because of my link to look at

20   the file history would suggest that does relate

21   to functionality and stability.

22       Q.  When the court construed Claim 7, no where

23   in that construction does it use the word

24   stability?

1    A.  The construction was for antioxidant as I

2    understood it.

3    Q.  And it doesn't include the word stability?

4    A.  The word antioxidant did not include the

5    word stability.

6    Q.  And the word antioxidant did not include

7    the term shelf life?

8    A.  Construction of the word antioxidant did

9    not include the word shelf life.

10   Q.  Now, you agree that reducing agents are

11   one type of antioxidant; right?

12   A.  I have agreed that some antioxidants are

13   kind of like if you like sacrificial

14   antioxidants, they could be called reducing

15   agents, as opposed to all reducing agents are

16   antioxidants.

17   Q.  And ascorbic acid is a type of antioxidant

18   that is a reducing agent; right?

19   A.  That's true.

20   Q.  Now, Mr. Hoy, could you go to slide PDX

21   204.  And PDX 204 is from page 003 of Modern

22   Pharmaceutics, which is JTX 106.  You can use the

23   book, but we can just look at the screen would

24   probably be easier.

1              And the heading on that page

2    reference to antioxidants; right.  You may have

3    to look at the actual document, I apologize.

4         A.  Where is the actual document?

5         Q.  JTX 106 in your book.

6         A.  What page number is that, sir?

7         Q.  Page 203.

8         A.  Thank you.

9         Q.  I think we have put the actual document

10   the screen.

11             The heading on page 203 says

12   antioxidant and chelating agents; right?

13        A.  Yes.

14        Q.  And the first sentence says antioxidants

15   and chelating agents are used to protect drugs

16   against autoxidation; right?

17        A.  Right.

18        Q.  I think you made reference to that, the

19   sacrificial oxidation concept; right?

20        A.  Correct.

21        Q.  And it goes on to say --

22        A.  That's one way antioxidants work, see,

23   sorry to interrupt.

24        Q.  It goes on to say, "Mechanistically, some

1    antioxidants, such as ascorbic acid, ascorbyl

2    palmitate, sodium bisulfite, sodium

3    metabisulfite, sodium sulfite, acetone sodium

4    bisulfite, sodium formaldehyde, sulfoxylate,

5    thioglycerol, and thioglycolic acid, act as

6    reducing agents."  Right?

7         A.  Right.

8         Q.  And this also says that some

9    antioxidants -- so this says that some

10   antioxidants may be reducing agents; right?

11        A.  That's correct.

12        Q.  And in the next sentence on page 203, a

13   reference which you rely on, says these

14   antioxidants quote are easily oxidized,

15   preferentially undergo autoxidation, thereby

16   consuming oxygen and protecting the drug or

17   excipient.  Do you see that?

18        A.  I do.

19        Q.  So again, that means that the antioxidant

20   undergoes oxidation before the compound to be

21   protected is oxidized; right?

22        A.  For those ones listed there.

23        Q.  Let's go to page 183 in the document

24   itself, please.

         1        A.  Yes.

         2        Q.  And could you blow up -- yes, table two.

         3             So table two lists some functional

         4     groups that undergo autoxidation; right?

         5        A.  That's the heading, yes, indeed.

         6        Q.  That means these compounds are reducing

         7     agents that could undergo oxidation before the

         8     compound to be protected is oxidized; right?

         9        A.  Well, I think these are functional groups

        10     of compounds, some of those compounds containing

        11     these functional groups could be in that class.

        12        Q.  And one of the functional groups is

        13     aldehyde; right?

        14        A.  Yes.

        15        Q.  They give a specific example of

        16     paraldehyde?

        17        A.  Yes.

        18        Q.  And acetaldehyde is an aldehyde; right.

        19        A.  Yes.

        20        Q.  You agree that Modern Therapeutics is a

        21     standard reference that people in your area would

        22     use?

        23        A.  I think it's Modern Pharmaceutics, it is a

        24     standard reference.

1      Q.  Now, Mr. Hoy, could you please go to DDX

2    227.  And on direct, you said acetaldehyde has

3    never been used as, and is not recognized as an

4    antioxidant; right?

5      A.  Yes, I was talking through my

6    understanding of my pharmaceutical experience,

7    correct.

8      Q.  Could you please turn to what's been

9    marked as PTX 401 in your exhibit book?

10      A.  PTX 401?

11      Q.  Yes.  Which has been marked for

12    identification as PTX 401.  And this is --

13          MS. KOH:  We have an objection to

14    the use of PTX 401, the document that was

15    discussed earlier was excluded by Your Honor

16    early this week, or last week, and we believe it

17    also should be Plaintiffs:  Excluded under Rule

18    37(b)(1).

19    Defendant:  Excluded under Rule 37(c)1 as not

20    timely produced to Par.

21          THE COURT:  Well, I'm going let

22    Novartis ask some questions about this, and right

23    now we're on cross-examination, and we'll see,

24    but feel free depending on what they do to renew

1    your objection.

2    BY MR. CONDE:

3        Q.  Dr. Buckton, you see there is a Chinese

4    patent and if you turn about halfway through it,

5    you'll see an English translation.  Could you go

6    to the English translation, please.  Are you

7    there, sir?

8        A.  I am, yes.

9        Q.  And you see that this is patent number ZL

10   92108440.4.  Do you see that?

11       A.  I see that, yes.

12       Q.  And publication date is October 7, 1998?

13             MS. KOH:  Your Honor, we also object

14   to the use of the translation of the Chinese

15   document.

16             THE COURT:  All right.

17             MS. KOH:  It's not a certified

18   translation, Your Honor.

19             THE COURT:  Well, for purposes of

20   cross-examination, I'm going to let him continue,

21   but again, feel free to renew your objection in a

22   little while.  Okay.

23       Q.  So, Dr. Buckton, the publication date is

24   October 7th, 1998; right?

1          A.   That's what it says.

2          Q.   And have you seen this document before?

3          A.   No, I haven't.

4          Q.   Did you run any searches as part of your

5     work to find out if acetaldehyde had ever been

6     referred to as an antioxidant?

7          A.   I did a search of the FDA inactive

8     ingredient list and found nothing there.  I

9     searched the Handbook of Pharmaceutical

10    Excipients.  And, otherwise, I am not sure if I

11    did a search of the pharmaceutical literature.

12               I was using my experience, 30 years

13    as a scientific formulator.

14         Q.   So you only looked at the FDA excipient

15    list and, excuse me -- yes.  The

16    FDA list and you also looked at -- let me restate

17    that.

18               So you only looked at the FDA

19    inactive ingredient list and the Handbook of

20    Pharmaceutical Excipients list; right?

21         A.   I can't swear that's true.  I don't know

22    if I did another search.  It was a long while

23    ago.

24         Q.   So, as far as you recall today, you don't

1    recall looking at -- doing any other search?

2        A.  I don't recall, one way or the other, I'm

3    afraid.  It was a long while ago, but I certainly

4    came to view that it hadn't been used.

5              And all my years of experience was

6    such that, you know, my work as a formulator that

7    I hadn't seen it used.

8        Q.  So could you turn to Page 6 of the English

9    translation, please?  And could we blow up the

10   last paragraph on Page 6?

11             And the last paragraph on Page 6 of

12   this Chinese patent says "said antioxidant and

13   anti-mildew stabilizer is an aldehyde solution

14   such as formaldehyde, acetaldehyde or a

15   combination thereof, it functions to prevent

16   decomposition of iodide and mildewing of

17   chromogenic agent, caused by the presence of air

18   or oxygen dissolved in the system.

19             Do you see that, Dr. Buckton?

20       A.  I see those words.  Yeah.

21       Q.  Prior to today, you hadn't read this

22   paragraph; right?

23       A.  Prior to today, I -- in fact, any time.

24   I'm not sure I would read a paragraph in a

1    Chinese patent on the particular Quick Testing

2    for water purification and preparation method

3    thereof.

4              I don't know why anyone in my field

5    would look at a patent that says that.

6       Q.  Par's lawyers didn't show you this

7    document in the last several days?

8       A.  I haven't seen this document.

9       Q.  Did they talk to you about the document?

10      A.  I have heard there was a document.

11             MS. KOH:  Objection.  Sorry.  I

12   object to counsel's request to ask for privileged

13   conversations between counsel and --

14             THE COURT:  I don't think -- under

15   the circumstances, I'm going to overrule that

16   objection.

17             Go ahead.

18   BY MR. CONDE:

19      Q.  Okay.  So Dr. Buckton, did Par's ANDA

20   lawyers talk to you about this document?

21      A.  Not about this document.  I've heard there

22   was a document that there was debate about

23   whether it would be introduced or not, but I

24   haven't seen this document or talked about this

1  document.

2      Q.  And you heard that the document mentioned

3  that acetaldehyde is used as an antioxidant --

4  can be used as an antioxidant; right?

5      A.  Well, I haven't heard about this document,

6  so it wasn't put before me.  My understanding was

7  it was a discussion that happened and it wasn't

8  going to be included.

9      Q.  Okay.  So, Dr. Buckton, let's look at the

10  stress testing discussed in the '031 patent.  Can

11  we go to JTX 1, Column 4, Lines 20 to 25, please,

12  up on the screen?

13          And in this section, it says that

14  without an antioxidant, degradation products were

15  4.46 percent; right?

16      A.  That's correct.

17      Q.  And it says that the degradation products

18  with an antioxidant were 1.3 percent; right?

19      A.  That's correct.

20      Q.  And when you read this, you understand

21  that when they're referring to degradation

22  products, they were referring to at least

23  Impurity 4 and ECAV?

24      A.  I don't know that I've looked into that,

1    but I don't see why that wouldn't be the case.

2        Q.  And they were comparing the total amount

3    of degradation products with and without an

4    antioxidant; right?

5        A.  Well, the outcome having degradation

6    products.  I have no more information from that

7    paragraph to help me with that.  That's total for

8    sure, not individual named ones.

9        Q.  Now, you agree that the purpose of Par's

10   stability testing was to assess the long-term

11   stability testing of this product; right?

12       A.  That's right.  Yes.

13       Q.  And when you measured the long-term

14   stability testing, it relates to shelf life;

15   right?

16       A.  Ultimately, it does.  Yes.  That's the

17   goal of that kind of experiment.  Correct.

18       Q.  And shelf life refers to the time period

19   over which products remain suitable for

20   commercial use; right?

21       A.  Ultimately, that's true.  Yes.

22       Q.  And there's no analogy between the test in

23   the '031 patent and the stability testing that

24   Par did on its product; right?

1       A.  There's no analogy between?  Sorry.

2       Q.  There's no analogy between the test in the

3    '031 patent, the stress testing in the '031

4    patent and the stability testing on Par's

5    products; right?

6       A.  Well, there's an analogy in as much as

7    what they've done here is undertake the stress

8    condition where they've undertaken a condition

9    that's a 40, 75.  So, in respect to them moving

10    to the conditions that were used in Par's ANDA

11    product, there is an analogy.

12                But in terms of the numbers here for

13    the degradation by products, there's nothing

14    because this data here is 40 degrees C, for

15    example.

16       Q.  And stress tests like those in the '031

17    patent are entirely unrelated to the concept of

18    shelf life, which was the purpose of Par's

19    stability testing; right?

20       A.  I think it's unfair to say they're

21    entirely unrelated to the concept of shelf life.

22    I think the purpose of this kind of study in the

23    patent is to point us in the right direction.

24                Clearly, for the patent application,

1    they're not going to wait two years and run a

2    full shelf life.

3         Q.  All right.  So, Dr. Buckton, could you

4    please turn to what I think is Tab 3 of your

5    deposition book, which is the deposition that was

6    taken on April 4th, 2014?  And turn to Page 106.

7         A.  Please.

8         Q.  Can we have that up on the screen?  It may

9    be easier to follow it on the screen, if you'd

10   like.

11              So starting at Line 8, you were

12   asked to turn to paragraph --

13              THE COURT:  Mr. Conde, hold on a

14   second.

15              THE WITNESS:  The screen is a little

16   blurred so I want to find it on the text.

17   BY MR. CONDE:

18        Q.  Page 106 about Line 8.

19        A.  All right.

20        Q.  You can see at Line 8 this is -- just to

21   set the context of the question, after that --

22        A.  Okay.

23        Q.  -- and in Line 8, it says, You cite two

24   examples from the '031 patent in Paragraph 34?

 1                    And you answered, Yes.

 2                    Do you see that?

 3          A.  Yes, I do.

 4          Q.  And you can see from the context here that

 5   the two examples are the same two examples we

 6   were just talking about from Column 4, Line 20 to

 7   30 regarding the stress testing; right?

 8          A.  Well, I see the numbers therein and the

 9   next question.  So, yes, that possibly is true.

10   Yes.

11          Q.  So let's continue on to Page 107, Line 15.

12   Are you with me, Dr. Buckton?

13          A.  107, 15?

14          Q.  Yes.

15          A.  Yes.

16          Q.  And starting at Line 15 on Page 107, you

17   were asked, "But when there is one percent, 1.09

18   percent degradation, tocopherol was able to

19   reduce that degradation to 0.25 percent

20   degradation; correct?

21                    "Answer:  Sure.  But that's totally

22   unrelated to the concept of an -- of a shelf life

23   of a product.  This is a very short exposure to a

24   certain set of conditions and that's entirely

1    unrelated to the concept of shelf life.

2              So that one percent has no meaning

3    in -- in any analogy to what's happening in Par's

4    product.  Okay.

5              This is an indication that, in this

6    particular test, the degradation was reduced,

7    that that is what they're talking about here.

8    There's no analogy at all to Par's product.

9              "Question:  So when there was --

10   excuse me.  So whether there was degradants --

11   degradation, tocopherol was able to reduce the

12   degradation in the example of the '031 patent?

13             "Answer:  That's correct.  But shelf

14   life is un -- is an unrelated concept."

15             Were you asked those questions and

16   did you give those answers?

17       A.  I think that's -- that is true, but it's

18   out of context, I think, in relation to what I

19   was talking about.

20       Q.  Okay.  Your counsel can do it on redirect.

21   I'm on a clock here.  If he wants to redirect, he

22   can.

23             Okay.  So let's now turn to Slide

24   DDX 242.  And on your direct testimony, you made

1    reference to this question and answer from Dr.

2    Theobald; right?

3        A.  That's correct.

4        Q.  And you didn't put up his entire

5    testimony, did you?

6        A.  I just put this slide up.  Yes.

7        Q.  And you know that there's more testimony

8    that he gave that was played in Court yesterday?

9        A.  I heard that, yes.

10       Q.  Well, you were here for it; right?

11       A.  Yes.

12       Q.  And this testimony relates to whether an

13   antioxidant is effective; right?

14       A.  That's correct.  Yes.

15       Q.  Whether the formulation was stable in a

16   commercial sense; right?

17       A.  I don't know ex -- I don't know that it's

18   necessarily in a commercial sense, but it's

19   effective in the formulation is what he was

20   talking about.

21       Q.  So you can't tell whether he's talking

22   about in a commercial sense or whether he's

23   talking about in some other sense; right?

24       A.  At the moment, I can't.  It may be.

1              If I look further, I might be able

2    to, but just now I can't.

3        Q.  So let's go to DDX 244.  You also put this

4    quote from Dr. Ogorka; correct?

5        A.  Correct.

6        Q.  And, again, you didn't provide all the

7    testimony that he gave in his deposition that was

8    played in Court yesterday, did you?

9        A.  No.  This is an excerpt.

10        Q.  And when he was talking about the

11    unsuitability of ascorbyl palmitate, he was

12    talking about from a commercial perspective;

13    right?

14        A.  I don't remember him saying that.  But if

15    he did, I can be corrected.  But I don't remember

16    him saying so.

17        Q.  So you can't tell from this quote whether

18    he's talking about in a commercial sense or some

19    other sense, can you?

20        A.  I don't remember him qualifying it.  I'm

21    just taking the quote as it stands.

22        Q.  Right.  But from this quote, you can't

23    tell whether it's a commercial sense or some

24    other sense, can you?

1      A.  Well, there's no qualifications, so I

2   can't tell you anymore than the quote.  I'm just

3   telling you what he said, and what he said is in

4   keeping with my thought on the subject.

5      Q.  Okay.  And you can't tell whether -- you

6   know, whether he was talking about the use of

7   ascorbyl palmitate at 0.1 or some other

8   concentration; right?

9      A.  I believe he was talking about data that

10   I've been talking about so that would have --

11      Q.  So it's possible to increase the amount of

12   ascorbyl palmitate and still be within the claims

13   of the '031 patent; right?

14      A.  Well, I guess it's possible to do more

15   experimentation to -- to explore other options.

16   But based on the data that were available, I

17   think this was his conclusion.

18      Q.  So now, let's talk about Dr. Davies' --

19   one second.

20          So let's talk about Dr. Davies'

21   scientific testing.  You respect Dr. Davies as a

22   scientist; right?

23      A.  I do.

24      Q.  He's thought of highly by the scientific

1    community; right?

2         A.  I do.  I do.  That's not the right answer.

3              I think he is.  Yes.

4         Q.  We're not getting married today.

5         A.  No, that's fine.

6         Q.  And you know that Dr. Davies conducted

7    specific tests to determine whether acetaldehyde

8    is an antioxidant; right?

9         A.  I know he carried out tests and I've

10   explained why I don't believe they're relevant.

11   Yes.

12        Q.  And you did not do any testing or

13   experiments in response to Dr. Davies' testing,

14   did you?

15        A.  No.  I looked at the Par's ANDA data.

16        Q.  But you didn't personally do any testing

17   to respond to Dr. Davies' testing; right?

18        A.  So I didn't feel the need to, after having

19   looked at Par's ANDA data.

20        Q.  And you didn't do any testing yourself on

21   Par's product in response to Dr. Davies' testing;

22   right?

23        A.  I didn't feel the need to after looking at

24   the ANDA data.

1          Q.  Now, you said that Dr. Davies' test is a

2     non-standard test; right?

3          A.  That's correct.  Yes.

4          Q.  And on direct, you went to the FDA

5     guidelines for support of that; right?

6          A.  I went to the FDA guidelines to provide a

7     description of what the forced degradation study

8     is.

9          Q.  And you say that Dr. Davies' testing is

10     not reliable based on the FDA guidelines of

11     forced degradation testing; right?

12          A.  There is another step between the two, I

13     went to the guidelines to say what a forced

14     degradation study is.  I said I never seen anyone

15     add an antioxidant to the forced degradation

16     study, and given that forced degradation study

17     itself is inherently unreliable, I also believe

18     that adding an antioxidant to a forced

19     degradation would be unreliable, too.

20          Q.  And the only basis that you say that the

21     forced degradation is unreliable is the FDA

22     guidelines; right?

23          A.  The FDA guidelines I was using to

24     demonstrate the fact that it isn't just my

1    opinion that that would be the case, it's an

2    general view.

3         Q.  Dr. Buckton, that's not my question.  In

4    your expert report, the only reference that you

5    rely on for your opinion that forced degradation

6    stress studies are unreliable are the FDA

7    guidelines; right?

8         A.  In my report that may well be true.

9         Q.  Let's go to those guidelines.  It's at DTX

10   591, please, and go to page 13.  We can put it up

11   on the screen.

12        A.  Is it in my direct folder?

13        Q.  It's in your direct at tab nine?

14        A.  Tremendous.  Thank you.

15        Q.  We can put it up on the screen, DTX 591.

16        A.  What page was it?

17        Q.  Page 13.

18        A.  13.

19        Q.  Okay.  So we're going to do this the old

20   fashion way -- oh, it's coming up?  There we go.

21   Great.  Let's go to page 13, please.  And it

22   looks like we have another -- there is a

23   paragraph that says it is recognized in the

24   middle.  Right there.  Can we blow that up more

```
 1    or not?  Excellent.

 2                 So if you look at the very first

 3    sentence in the paragraph, it says it is

 4    recognized that some degradation pathways can be

 5    complex and that under forcing conditions

 6    decomposition products may be observed which are

 7    unlikely to be formed under accelerated or

 8    long-term testing.  Do you see that?

 9         A.  Yes, I do.

10         Q.  And that's the only sentence from this

11    guidelines that you quoted in your expert report

12    for support that Dr. Davies' stress testing is

13    unreliable; right?

14         A.  That's the only thing I quoted for saying

15    that forced degradation studies are how I

16    described.

17         Q.  And let's look at the sentence a little

18    more closely.  It says under forced conditions,

19    decomposition products may be observed which are

20    unlikely to be formed under accelerated or

21    long-term testing; right?  Do you see that?

22         A.  Yes.

23         Q.  Dr. Davies when you did his stress test,

24    the two impurities that he looked at were
```

1    Impurity 4 and ECAV; right?

2        A.  Those are the two he looked at.  I was

3    here when Dr. Ganem talked yesterday and I'm not

4    going to talk about his mechanism, but my

5    understanding was he said there was a large

6    number of other degradants produced, too, but

7    that's not what I'm going to testify to.

8        Q.  I don't think he actually said how many

9    degradants there were in addition to those, but

10   you agree that Dr. Davies' testing resulted

11   predominantly in two impurities, Impurity 4 and

12   ECAV?

13       A.  I think from my listening to Dr. Ganem that

14   sounded correct.  I think he said there were

15   large amounts of those and large amount of other

16   ones, too, but we would have to go to his

17   testimony, not mine in relation to those

18   degradants.

19       Q.  You agree that Impurity 4 and ECAV were

20   identified in Par's stability testing in both

21   accelerated and long-term testing; right?

22       A.  I agree that they were identified.  I

23   think the spirit of this document is clear in

24   that the mechanism can change by doing the

1     extreme conditions and that can give rise not

2     only to the ones that you wanted to see, but to

3     other degradants arriving to suggesting that you

4     change the mechanism.  That's the way the

5     document reads and that's my understanding of it.

6         Q.  But regardless of with respect to

7     Dr. Davies' testing, he obtained the same two

8     impurities that were found in Par's stability

9     testing, namely Impurity 4 and ECAV?

10        A.  As I said, I think he found other things,

11    too, so it doesn't mean to me it isn't -- I'm not

12    a chemist to do such discussions, but it doesn't

13    mean to me the mechanism of getting there was the

14    same.

15       Q.  So you're not able to provide an opinion

16    whether Dr. Davies' stress testing is reliable

17    because you don't understand the mechanism of the

18    stress testing that he undertook; right?

19       A.  No, I don't agree with that.  I think I

20    can give a very clear answer why I regard it as

21    unreliable and I think Dr. Ganem can talk to you

22    about the mechanism.  For me the mechanism

23    doesn't matter, what matters is can you rely on

24    these kind of tests generally for a

1    pharmaceutical product and my understanding is

2    you can't.

3        Q.  And your understanding is only based on

4    this one sentence; right?

5        A.  This is a distillation of this knowledge.

6        Q.  Let's move on to Par's stability testing.

7    The stability testing was done from nine batches of

8    Par's product; right?

9        A.  I think that's correct.

10       Q.  And in those nine batches, they had between

11   30,000 to over 270,000 patches per batch, do you

12   recall that?

13       A.  They had thousands.  I don't know how

14   many.

15       Q.  You'll take my representation that you

16   went through this in your deposition you recall?

17       A.  I didn't know the number then either, I

18   still don't.  I have got no reason to doubt your

19   number.  If it's wrong, I'm sure someone will

20   point it out.

21       Q.  Mr. Hoy, could you go to slide PDX 205.

22             And Dr. Buckton, you recognize this

23   as part of the specification protocol for Par's

24   ANDA product; right?

1      A.  I do.

2      Q.  And this page tells us how Par studies the

3   impurities when conducting its stability testing;

4   right?

5      A.  Well, it has some aspects of that, yes.

6      Q.  Fair enough.  And what it tells us is that

7   when it looks at Impurity 4 and ECAV, it only

8   tested one patch per batch at any particular

9   time; right?

10     A.  That's correct, the testing protocol is

11  one patch will be pulled at each time point

12  throughout a stability study, that's my

13  understanding of it.

14     Q.  When you did your analysis in this case,

15  did you not conduct any statistical analysis of

16  the data from Par's stability testing with

17  respect to Impurity 4 or ECAV; right?

18     A.  We did talk about this in the deposition,

19  too, obviously, but the two batches for which

20  there was no detectable or zero acetaldehyde, had

21  no degradation, either, at ambient storage

22  conditions, and I don't understand what kind of

23  test I can do to show that something reduces the

24  degradation when there is no degradation.  It's

1    impossible for me to conceive a statistical test

2    to show that you can do that.

3        Q.  So let's move on and talk about the

4    stability data that you examined.

5                    And let's go to PDX 206.  And PDX

6    206 is information from your expert report;

7    correct?

8        A.  I don't know.  It may be.  I can have a

9    look if you want, but I can trust you for it, I'm

10   sure.

11       Q.  I'm sure your counsel will tell me if I'm

12   wrong.

13       A.  I'm sure.

14       Q.  There is table one, and table one is

15   stability data for lots containing no

16   acetaldehyde stored at 40 degrees C, 75 percent

17   relative humidity.  Do you see that?

18       A.  I do.  I was trying to find the reports.

19   Which report was it from?  Sorry.

20       Q.  This is from your rebuttal report.

21       A.  Okay.

22       Q.  And it shows in table two stability data

23   for lots with detectable acetaldehyde stored at

24   40 degrees Celsius, 75 percent relative humidity,

1    do you see that?

2         A.  Just looking through my records, these are

3    a couple of data points selected from the table

4    in my report.

5         Q.  Correct.

6              And the first chart is for lot

7    110111, and it provides data from the stability

8    test for Impurity 4, ECAV, and rivastigmine,

9    initially and at twenty-six weeks.  Do you see

10   that?

11        A.  Just so I'm clear, on my report at C in

12   table one in paragraph 38; is that correct?

13        Q.  Yes.

14              And that data is correct; correct?

15   We have put the correct data for week 26 that's

16   up in yellow there?

17        A.  Yes, that's correct.

18        Q.  Okay.  And then table two is data from lot

19   130108, and again --

20        A.  Sorry, one second, I'm not sure it is

21   correct, actually.  I might be wrong.  I'm

22   struggling.  It is C, is it?

23        Q.  Right.

24        A.  Is it not true -- I'm sorry, I'm looking

1    at the wrong bit.  I'm just trying to translate

2    from my table to your table.  I do agree now it

3    is correct.

4         Q.  Thank you very much.

5              And then we also have table 2C and

6    we have lot 130108, and again we have the

7    information from your chart for Impurity 4, ECAV

8    and rivastigmine, the initial measurements and

9    the twenty-six weeks measurements; right?

10        A.  That is rather better this time.  I'm with

11   you already.

12        Q.  Thanks.

13             If we look at the data of impurity

14   of week twenty-six for 110111, the total

15   degradation at week twenty-six is .3; right?

16        A.  If you take that point of isolation, that

17   is correct.

18        Q.  If you look at the data with acetaldehyde

19   at week twenty-six, the amount of total

20   degradation is basically less than .1; right?

21        A.  Yes.  Again, that's taken one point in

22   isolation, which I think I said at the deposition

23   I wouldn't do.

24        Q.  So if you compare those two batches, it

1    shows there is a reduction in the amount of

2    oxidative degradation in batch 130108 with

3    acetaldehyde versus batch 110111 without

4    acetaldehyde; right?

5        A.  No, I don't conclude that now or at my

6    deposition, because if you take the data set as a

7    whole, which is the right thing to do, so the

8    table, it says -- never mind, if you take the

9    data as a whole, for 40/75 and my report actually

10   says 45/70, it said 40/75, take the data as a

11   whole for 40/75 accelerated stability test, these

12   are both stable and inevitably some degradation

13   will kick in toward the end of this.

14              I don't accept you can interpret a

15   meaningfully thing from one point of an end of a

16   data set such as this.  If you run them longer,

17   both of them will degrade.  It's a point in time

18   and not a review of the whole data set.

19       Q.  Stick with this data that we have that

20   we're looking at with acetaldehyde versus

21   without, and from this data, you can't conclude

22   whether acetaldehyde reduces oxidative

23   degradation or does not reduce oxidative

24   degradation, just from this data; right?

1     A.  Well, I wouldn't.  So I would look at the

2     whole data set.

3     Q.  And you didn't actually do any statistical

4     analysis on the whole data set, did you, Doctor?

5     A.  I think I explained that.  If you take the

6     kind of gold standard test, the ambient

7     conditions, and you have zero degradants

8     throughout the entire shelf life period, how can

9     you demonstrate something has reduced the

10    degradation when it was zero?  I don't understand

11    how you can do that.

12    Q.  You can't use the data set to show that

13    acetaldehyde reduces the degradation of

14    impurities; right?

15    A.  You can't -- you can show that it doesn't

16    reduce it, you can't show that acetaldehyde --

17    what did you say?

18    Q.  You can't show either way whether it

19    reduces or doesn't reduce that because the way

20    the data is; right?

21    A.  If in ambient conditions, the data are

22    perfectly stable, you can't improve on that, so

23    acetaldehyde cannot reduce the oxidative

24    degradation.

1      Q.  That wasn't my question.  I'm talking

2   about stability data.  I'm trying to find out

3   whether you can do a statistical analysis based

4   on any of the data set proving with certainty,

5   statistical significance as Dr. Michniak-Kohn

6   said that, in fact, acetaldehyde does not act to

7   reduce oxidative degradation?

8      A.  I think as I just said, I don't see how I

9   can do that given the best data I can possibly

10  use, the room temperature data and for all of the

11  data points for both of the samples with no

12  detectable acetaldehyde I have no degradation,

13  how can I do any test on that?  The data are so

14  stable, I can't do anything with it.  It's just

15  so clear.

16              MR. CONDE:  I have no further

17  questions at the time, Your Honor.

18              THE COURT:  Thank you.

19              Any redirect?

20                  REDIRECT EXAMINATION

21  BY MS. KOH:

22      Q.  Dr. Buckton, you recall when counsel

23  pointed you to your deposition starting at page

24  106?

1      A.  Yes.

2           MR. CONDE:  Your Honor, I don't

3      believe she is allowed to rehabilitate

4      Dr. Buckton based upon going back to his

5      deposition transcript.  You can ask whatever

6      question you want to clarify, but I don't believe

7      it's proper to use deposition transcript on

8      redirect.

9           THE COURT:  Overrule.

10     BY MS. KOH:

11     Q.  You wanted to explain the context of your

12     answer.  Would you like to explain the context of

13     your answer?

14     A.  Am I allowed to look at this or not?

15          THE COURT:  Yes, you can look at it.

16     A.  Okay.  So I believe, I won't go back and

17     read it in any detail, but I do believe that our

18     discussion was about the amount of degradation

19     that had been produced, and the amount of

20     degradation that was allowable in Par's ANDA

21     product, which is a very different product to the

22     product that's being discussed in the patent

23     application.

24          And in my view, I was being asked to

1    link the data in the patent application for a

2    completely different product in terms of

3    numerical values there to the data in Par's ANDA

4    product when the numerical values have a very

5    clear meaning in terms of shelf life.

6                 So if there was any confusion

7    between us, then that's unfortunate, but my

8    understanding was we were trying to link those

9    two things together and I was trying to

10   demonstrate that the numbers in one particular

11   formulation in the patent are not related to any

12   aspect in relation to Par's specification for

13   shelf life.  That was the -- where I was in my

14   discussion and my thinking and I don't think

15   that's how it was represented to me when we just

16   had a discussion a few moments ago.

17                 MS. KOH:  No further questions on

18   redirect.

19                 THE COURT:  Thank you, Ms. Koh.

20   Thank you, Doctor.  You may step down.  Thank

21   you.

22                 MS. KOH:  Dr. Buckton is our next

23   witness.

24                 THE COURT:  You may step back up.

1    So you're still sworn.

2              Go ahead, Ms. Koh.

3                   DIRECT EXAMINATION

4    BY MS. KOH:

5         Q.  Dr. Buckton, if Dr. Davies is correct that

6    acetaldehyde is an antioxidant, do you have any

7    opinions as to whether the '031 patent is valid

8    or not?

9         A.  Yes, I do.  And I have a slide that

10   because of the written description, definite and

11   enablement requirements, if acetaldehyde is

12   deemed to be within the claims I would regard it

13   as invalid.

14        Q.  Now, let's discuss written description

15   first.  Did you consider the standard for written

16   description in your analysis?

17        A.  The standard I considered is on the slide,

18   and I was considering patent specification must

19   allow one skilled in the art to recognize that

20   the patentees invented what is claimed as of the

21   time the patent application was filed.

22        Q.  Would a person of ordinary skill in the

23   art understand that acetaldehyde was described in

24   the '031 patent as an antioxidant?

1          A.  No, they wouldn't.  Firstly, for the

2     reasons that I did talk about earlier in relation

3     to why I don't view acetaldehyde as an

4     antioxidant.  But also because the patent lists

5     materials that are an antioxidant.

6          Q.  And could you turn to that -- discuss that

7     list of antioxidants?

8          A.  Yes, indeed, so it's column four, lines 10

9     to 15 and I already talked to this, so I won't

10    read the whole list of antioxidants again, but

11    the language is that the antioxidant is selected

12    from, and then it describes the list, and for me

13    reading the patent, this language is very

14    different to the other language I see in the

15    patent, so if I look where other materials are

16    described in the patent, I have other slides for

17    these, as they come through

18         A.  Everywhere else -- this is at Column 2,

19    Lines 10 to 14.  It says, Examples of suitable

20    polymers include and then lists suitable polymers

21    from which you can draw or you can go beyond

22    because they are examples of suitable polymers.

23              And then the next example of

24    materials that are included, examples of

1    commercially available polymers of this type

2    include.  This is Column 2, Lines 22 to Line 50.

3    And these are examples of, obviously, of

4    commercially available polymers.

5              Next place where materials are

6    considered is example of additives include and

7    hereby have a very long list of things that are

8    examples of additives at Column 2, Line 56 to

9    Column 3, Line 24.  Clearly you could go outside

10   of this list, as they are examples.

11             And then the next one is at Column

12   3, Lines 57 to 59 where it says examples of such

13   extenders may include and gives examples which

14   clearly you can go outside of in choosing

15   extenders.

16             If, in summary, the language of

17   antioxidant is selected from.  And for me, that

18   is a descriptive list from which you should

19   select.  Whereas we have examples of suitable

20   polymers include examples of commercially

21   available polymers include, examples of additives

22   include and examples of extenders include.

23             So, for me, the language is

24   sufficiently different, but I believe you should

1    draw only from those antioxidants that are listed

2    in the patent.

3        Q.  So acetaldehyde is an antioxidant.  What

4    is your conclusion as to whether the written

5    description requirement is met?

6        A.  I don't believe it is met.

7        Q.  Now, let's turn to indefiniteness.  Did

8    you consider the definiteness standard in your

9    analysis?

10       A.  Yes, I did.  And that's the slide -- the

11   standard I used.  Standard was -- it requires an

12   analysis of whether one skilled in the art would

13   understand the bounds of the claim when read in

14   light of the specification.

15       Q.  Now, first of all, is there any

16   description in the '031 patent on how to test

17   whether a compound is an antioxidant?

18       A.  There's data, as we have discussed

19   already.  There are accelerated stability testing

20   where the active ingredient is included in a

21   pharmaceutical composition with and without an

22   antioxidant.  So that there's a method that's

23   described in the patent to help you understand

24   whether you're within the claim.

1     Q.  If the patent is not limited to known

2     antioxidants and standard testing described in

3     the patent, can a person of ordinary skill in the

4     art determine the bounds of the asserted claims?

5     A.  No.  I don't believe they can because if

6     you move beyond what is meant to be an

7     antioxidant in the pharmaceutical domain and you

8     move beyond tests that are understood and

9     regarded as standard in the pharmaceutical

10    domain, you move into a range of testing with

11    -- which is essentially unlimited in terms of the

12    kind of conditions you could use and the kind of

13    testing you could apply.

14               And I don't understand if you get

15    one positive result of those how you would know

16    whether you are within the bounds of the claim in

17    light when read in light of the specification.

18    Q.  If Dr. Davies' study can be used to show

19    that acetaldehyde meets the claim limitation,

20    what is your conclusion as to whether Claim 7

21    meets the definiteness requirement?

22    A.  My conclusions is that it does not.

23    Q.  Moving on to the enablement requirement.

24    Did you consider the standard for enablement in

1    your analysis?

2        A.  Yes, I did, and I have a slide for that as

3    well.  Standard was that the patent specification

4    teaches those skilled in the art how to make and

5    use the full scope of the claimed invention

6    without undue experimentation.  And the undue

7    experimentation involves consideration of the

8    following eight factors:  Quantity of

9    experimentation necessary, amount of direction or

10   guidance presented, presence or absence of

11   working examples, nature of the invention, state

12   of the prior art, relative skill of those in the

13   art, predictability or unpredictability of the art

14   and the breadth of the claims.

15       Q.  Now, did the inventors test all of the

16   antioxidants listed in Column 4, Lines 10 through

17   15 of the '031 patent?

18       A.  No, they didn't.  They tested two of them.

19   They tested alpha tocopherol and ascorbyl

20   palmitate.

21            And of those two, as we've already

22   heard and discussed, alpha tocopherol worked and

23   ascorbyl palmitate did not work.

24       Q.  Now, if one antioxidant works in a

1      particular formulation, does that tell you

2      whether a different antioxidant works in that

3      same formulation?

4          A.  No, it doesn't.  As I said in my

5      infringement evidence, I think antioxidants are

6      formulation specific.

7          Q.  Now, did the plaintiffs mention anything

8      about whether an antioxidant would work in a

9      particular formulation?

10         A.  Yes, they did.  And I have some excerpts

11     from the depositions.

12                  Dr. Theobald, the LTS project

13     manager on Exelon, the question is:  So you're

14     saying it was astonishing that an antioxidant

15     would prevent oxidation?

16                  His answer was, It's astonishingly

17     because you can't predict which kind -- I'll skip

18     that -- it's not predictable.  You may be

19     successful.  You may not be successful.

20                  And it's not predictable which kind

21     of antioxidant is working.

22                  Question:  So it's not predictable

23     that an antioxidant stops oxidation?

24                  And the answer is:  It's not

1    predictable that any kind of antioxidant is

2    stopping any kind of oxidation.  And he

3    continues, he does not believe it's a predictable

4    outcome.

5              Second excerpt is from Dr. Theobald.

6    And is his answer on this was:  What I'm saying

7    is it's unpredictable in respect to specific

8    API -- specific formulation which antioxidant is

9    going to work.

10             You can't predict.  You have to run

11   a series of experiments in order to find out

12   whether at all and if anyone is doing the job.

13             So it's clear that Dr. Theobald is

14   saying that there's experimentation that's

15   required to find out whether any antioxidant is

16   going to work in any specific formulation.

17             The next excerpt is from Dr.

18   Tiemmesen, one of the inventors.  And the

19   question is:  We talked just a few minutes ago

20   and it's -- Novartis never assessed ascorbic acid,

21   butyl hydroxytoluene, butyl hydroxy anisole, propyl

22   gallate.

23             How do you know that these

24   antioxidants would have a stabilizing effect on

1    rivastigmine?

2              To which he replied, I think it

3    would have to be investigated.  So it isn't

4    predictable and requires experimentation in order

5    to see whether the other antioxidants would work

6    and in a particular formulation.

7              Next excerpt from Dr. Tiemessen is

8    these antioxidants they can be used in a certain

9    set of circumstances for certain compounds,

10   certain formulations to stabilize and to reduce

11   the level of oxidation.  But it's not that you

12   can just take one and put it in and it works.

13   That's not the case.

14             It can even be worse if you add an

15   antioxidant.  So this is high level of

16   fine-tuning that's required on that.

17             It's very clear, Dr. Tiemessen, one

18   of the inventors is saying a lot of

19   experimentation and fine tuning required in order

20   to work out whether an antioxidant is going to be

21   viable for a certain compound, certain

22   circumstances and certain formulations.

23             The last one is Dr. Ogorka.  I'll

24   just read out the highlighted bit, which says,

1    You cannot predict which antioxidant will be

2    effective.  There requires a lot of

3    experimentation to identify the right antioxidant

4    and even more experimentation to establish the

5    adequate level of this.

6              So, from reading these excerpts from

7    the deposition, I would -- my own view as well is

8    that to understand whether any antioxidant is

9    going to work in any formulation, you have to do

10   what seems to me, at least the amount of

11   experimentation that was done in the patent, in

12   order to demonstrate whether it would be

13   effective.

14   Q.  Did the plaintiffs fail to achieve any

15   embodiments within the scope of the claim?

16   A.  Yes, I believe they did.  We talked about

17   alpha tocopherol and ascorbyl palmitate a few

18   moments ago.  And I presented the data that alpha

19   tocopherol reduced degradation.

20             Ascorbyl palmitate reduced the

21   degradants for one a little bit, but didn't

22   reduce the degradation for the other one.  So it

23   had failed.  And in failing to reduce one

24   degradant is insufficient to produce that product.

1      Q.  Does the patent enable the use of

2   acetaldehyde as an antioxidant?

3      A.  No, it doesn't.  I don't think

4   acetaldehyde's in the patent in each of its own

5   list of antioxidants.  And to allow acetaldehyde

6   would require the level of experimentation that

7   is talked about in the patent.

8      Q.  What is your conclusion as to whether

9   Claim 7 meets the enablement requirement?

10     A.  The conclusion is that it does not.

11             MS. KOH:  No further questions.

12             THE COURT:  All right.  Thank you,

13  Ms. Koh.

14             All right.  Mr. Conde.

15                 CROSS-EXAMINATION

16  BY MR. CONDE:

17     Q.  Now, Dr. Buckton, you say that the claims

18  of the '031 patent include only the specific

19  antioxidants listed in the specification; right?

20     A.  That's my understanding of the language.

21  And my reading of it is that is true.

22     Q.  That would be your interpretation of the

23  term antioxidant is that it only --

24     A.  No.

1      Q.  -- covers the specific antioxidants in the

2   patent?

3      A.  My reading of the specification of the

4   patent is that's what it says.

5      Q.  Okay.  Can we please go to Slide PDX 210?

6           So, Dr. Buckton, let's compare your

7   definition to the definitions that defendant put

8   forward in this case.  And you can see that the

9   defendant put a different definition forward to

10  the Court than yours; right?

11     A.  Yes, I can see that.

12     Q.  So you disagree with defendant's

13  construction?

14     A.  Well, I'm telling you my reading of the

15  patent.

16     Q.  So you disagree with their construction;

17  right?

18     A.  Well, I think it's -- let me read it

19  again.  One moment.

20           I think it's a reasonable

21  construction.  I am telling you from the language

22  of the patent how I interpret the patent

23  specification in this context.

24     Q.  So you think the Court's construction is a

1    reasonable interpretation as well?

2        A.  Obviously, it is the correct

3    interpretation of it.  Agent that reduces

4    oxidative degradation.

5        Q.  And, of course, you know that the number

6    of antioxidants that are available to a

7    formulator is much larger than the list that's in

8    the '031 patent; right?

9        A.  I know that I talked about that in my

10   earlier testimony that the list in the excipients

11   handbook, for example, is larger than the list

12   that's in the '031 patent.

13       Q.  And, in fact, the list that's in Modern

14   Pharma Therapeutics, I think I got the name

15   right?

16       A.  Pharmaceutics.

17       Q.  Oh, Pharmaceutics.  Thank you.

18              The list there is longer than in the

19   patent as well; right?

20       A.  I haven't checked that out.

21       Q.  If we go to PDX 211, you see on PDX 211

22   we've put the example in the '031 patent and the

23   antioxidants listed in Modern Pharmaceutics.  And

24   the list is longer in Modern Pharmaceutics;

1    right?

2         A.  You're quite right.

3         Q.  Now, can we please go to DDX 208, a slide

4    from Dr. Buckton's direct?  And you recall you

5    talked about the specification on direct and you

6    pointed to these three portions of the

7    specification; right?

8         A.  That's correct.

9         Q.  And in the very first one, it says in one

10   aspect, a pharmaceutical composition comprising

11   Compound A in free base or acid addition, salt

12   form and an antioxidant.  So, in the panel that

13   you cite to, it just says antioxidant in general;

14   right?

15        A.  Within that sentence, it does.  The

16   sentence is followed by --

17        Q.  So let's go to the next panel.  So the

18   next panel -- the first one was Column 1, Lines

19   34 to 39.

20             The next one we're going to look at

21   is Column 4, Lines 5 to 7.  And in one of your

22   demonstrative exhibits that you used during your

23   direct, you pointed the Court to this phrase, it

24   says, "In another aspect, the present invention

1    provides the use of an antioxidant to stabilize a

2    pharmaceutical composition containing Compound

3    A."

4              Right?

5        A.  That's correct.  Yes.

6        Q.  So, again, it used the word antioxidant in

7    general without limitation; right?

8        A.  Well, I think the list of antioxidants is

9    in the same specification and it would be

10   reasonable to use that list within the context of

11   these uses of the words.

12       Q.  It also would be reasonable to interpret

13   an antioxidant broadly to include all of the

14   antioxidants that were in Modern Pharmaceutics

15   and the handbook; right?

16       A.  The decision someone has to make, but I

17   think it's for the Court ultimately to make.  But

18   I think the specification lists with peculiar

19   language in the patent that you make only to that

20   list of antioxidants, which to me makes me think

21   that that's the list that it's talking about when

22   it says antioxidant here.

23       Q.  Right.  But in other parts of the patent,

24   it doesn't limit antioxidant to any list.

1          So, one skilled in the art reading

2     these phrases that you use in direct would

3     understand that it's referring to any

4     antioxidant, including those in the textbooks

5     that we've been discussing here today; right?

6          A.  My reading of that definition of

7     antioxidant doesn't, to me, read that it has to

8     be only limited to part of the patent

9     specification.  That definition seems to me to

10    read to the whole patent specification.

11         Q.  Now, you agree that the '031 specification

12    provide examples of patches that include an

13    antioxidant; right?

14         A.  The '031?

15         Q.  It provides examples.  There's examples,

16    for example, example one includes an antioxidant;

17    right?

18         A.  I can't remember what example one is.  Is

19    the patent handy?

20         Q.  Sure.  It's in your book.  It's PTX 1.

21         Can we just put example one up on

22    the screen, please?  I'm sorry, JTX 1.  If we can

23    just put it on the screen.

24         A.  Any way, I've got the patent.  Example one

1    you said?  I have it, example one.

2        Q.  And example one includes an antioxidant;

3    right?

4        A.  Example one has alpha tocopherol, so

5    that's correct.

6        Q.  So one skilled in the art would be able to

7    make a transdermal patch within the meaning of

8    Claim 1 using alpha tocopherol; correct?

9        A.  One skilled in the art would be able to

10   make patch --

11       Q.  Yeah.  Would be able to make a patch

12   within Claim 1 based on example one of the '031

13   patent; right?

14       A.  I haven't read around it, but that sounds,

15   on the face of it, quite true.  Yes.

16       Q.  I'm sorry, I misspoke.  I meant Claim 7.

17              Same answer to Claim 7?

18       A.  Oh.

19       Q.  The only difference between Claim 1 and 7

20   is the addition of the secured by a substrate.

21   So one skilled in the art would be able to

22   practice Claim 7 using what is disclosed in

23   Example one; right?

24       A.  It would seem to me that's true.

1    Q.  Now, you agree that one skilled in the art

2    would be able to perform the stress tests that

3    are disclosed in the '031 patent; right?

4    A.  Yes.  Sorry.

5             It's the storing at 60 degrees and

6    the storing at 40 degrees.

7    Q.  And that type of experimentation is

8    routine?

9    A.  Yes.

10   Q.  Now, can we go to Slide DDX 257, which is

11   some of the testimony that you relied on with

12   respect to your opinions.  And, again, I'm not

13   going to belabor the point, but for all of these

14   slides, you only put a snippet up.  You didn't

15   put up the full amount of testimony that was

16   shown yesterday; right?

17   A.  Just a snippet.

18   Q.  Now, first with regard to this particular

19   snippet, it doesn't even mention Rivastigmine,

20   does it?

21   A.  Within the snippet, it doesn't mention

22   Rivastigmine.

23   Q.  Right.  And within the snippet, it doesn't

24   mention whether he's talking about before the

1    patent was filed or after the patent was filed;

2    right?

3        A.  I agree within the snippet, but I believe

4    that he is talking about Rivastigmine.

5        Q.  But you can't tell whether Dr. Theobald is

6    talking about the period before the patent was

7    filed or after the patent was filed when the

8    inventors discovered the invention of the '031

9    patent; right?

10       A.  But it doesn't, in this section, give me

11   the filing date.  But I -- I believe he's talking

12   about data in relation to the '031 patent.

13       Q.  Data before the patent was filed; right?

14       A.  The data would have been generated before

15   the patent was filed.  I -- I don't know how the

16   data could be.

17       Q.  So he's saying it would be astonishing

18   unpredictable prior to the filing of the patent;

19   right?

20       A.  That's not my reading of it at all.  My

21   reading is that it's unpredictable after the

22   filing of the patent remaining, so --

23       Q.  But he doesn't say that in this snippet?

24       A.  That's my understanding, very clear

1    understanding of what he says is he says

2    something that remains true today.

3       Q.  Can we go to the next slide, please.  And

4    in this slide again, you don't know whether he's

5    talking about activities before the patent was

6    filed or after the patent was filed; right?

7       A.  I have the same view that this is talking

8    about a situation that remains true now as true

9    as it was whenever he was talking about it, so I

10   regard it as a general statement.

11      Q.  But you don't know from this snippet

12   whether he's talking about the period before the

13   patent was filed or the period after the patent

14   was filed; right?

15      A.  The deposition clearly would have been

16   after the patent was filed and my belief is it is

17   his opinion at that time.

18      Q.  You can't tell whether he was talking

19   about the period before the patent was filed from

20   this snippet; right?

21      A.  I don't see how that would have changed

22   his opinion.  I think it's a continuing opinion.

23              MR. CONDE:  I have no further

24   questions, Your Honor.

```
 1                    THE COURT:  All right.  Thank you.

 2                    Any redirect?

 3                    MS. KOH:  No redirect.

 4                    THE COURT:  All right.  Dr. Buckton,

 5      I think we'll try again.  You can step down.

 6                    THE WITNESS:  Thank you very much.

 7                    MR. CONDE:  Before we put on our

 8      next witness, we would respectfully request that

 9      we take a lunch break.

10                    THE COURT:  I was thinking because

11      really all we got left is Dr. Klibanov; right?

12                    MR. CONDE:  Yes, Your Honor.

13                    THE COURT:  And he's only addressing

14      invalidity; right?

15                    MR. CONDE:  Yes, Your Honor.

16                    THE COURT:  And I'm guessing that he

17      probably won't be that long on direct.

18                    MR. CONDE:  My understanding, he'll

19      be around an hour, maybe a little less.

20                    THE COURT:  In any event, we'll take

21      a break until quarter of 2:00.  All right.

22                    (A luncheon recess was taken.)

23                    THE COURT:  All right.  Please be

24      seated.
```

1            Ms. Jacobsen.

2            MR. JACOBSEN:  Your Honor,

3    plaintiffs call Dr. Alexander Klibanov.

4    Dr. Klibanov will be providing testimony on the

5    validity of the '031 patent.

6            THE CLERK:  Please state and spell

7    your full name for the record.

8            THE WITNESS:  Alexander M. Klibanov.

9    A-L-E-X-A-N-D-E-R, Klibanov, K-L-I-B-A-N-O-V.

10

11            ALEXANDER M. KLIBANOV, PH.D.,

12            the deponent herein, having first

13            been duly sworn on oath, was

14            examined and testified as follows:

15            DIRECT EXAMINATION

16    BY MS. JACOBSEN:

17    Q.  Good afternoon, Dr. Klibanov.

18    A.  Good afternoon.

19    Q.  Can you please state your full name for

20    the record?

21    A.  Alexander M. Klibanov.

22            MS. JACOBSEN:  May I approach, Your

23    Honor?

24            THE COURT:  You may.

1    BY MS. JACOBSEN:

2        Q.  So Dr. Klibanov, I have given you a book

3    of documents and can you please turn to tab one.

4        A.  Yes.

5        Q.  And there you will find JTX 5A.  Do you

6    recognize that document?

7        A.  I do.

8        Q.  What is it?

9        A.  It's my curriculum vitae.

10       Q.  Does it accurately reflect your

11   educational and professional experience?

12       A.  Yes, it does.

13       Q.  Would you please explain why you're here

14   today?

15       A.  Well, I'm here to respond to Professor

16   Buckton's allegations for invalidity of the Claim

17   7 of the '031 patent.  And what I have been asked

18   to do is to review this claim, review the '031

19   patent, and then determine whether the written

20   description, enablement and definiteness

21   requirements are met by that claim.

22       Q.  Do you feel your experience and training

23   put you in a position to testify on those topics?

24       A.  Yes, I do.  I have been working in the

1    area of pharmaceutical formulations for over

2    forty years.  In particular relevant to this

3    case, I have extensive research on oxidations,

4    oxidative degradations, antioxidants including

5    these processes occurring in pharmaceutical

6    formulations including transdermal formulations,

7    so I believe that this experience makes me well

8    qualified to testify here today.

9              MS. JACOBSEN:  Your Honor,

10   plaintiffs offer Dr. Klibanov as an expert in

11   chemistry, pharmaceutical formulations including

12   the use of antioxidants and oxidative

13   degradation.

14             MR. BROWN:  No objection, Your

15   Honor.

16             THE COURT:  All right.  You may

17   proceed.

18             MS. JACOBSEN:  Plaintiffs move to

19   introduce JTX 5A, Professor Klibanov's CV into

20   evidence.

21             THE COURT:  I guess without

22   objection.

23             MR. BROWN:  No objection.

24   BY MS. JACOBSEN:

1      Q.  Professor Klibanov, were you here when

2    Professor Buckton testified?

3      A.  Yes, I was.

4      Q.  And do you agree with Professor Buckton's

5    conclusions with respect to the written

6    description, enablement and definiteness

7    requirements?

8      A.  No, I cannot agree with those opinions.

9      Q.  What did you consider to reach your

10   conclusions?

11     A.  Basically what I did was I asked myself a

12   question, who is a person of ordinary skill in

13   the art in this case, and in particular with

14   respect to Claim 7 for which the date, the

15   parties agree, is January 12, 1998.  So then

16   through the eyes of this person, I have

17   determined whether there is clear and convincing

18   evidence that the written description enablement

19   and definiteness requirements are not met with

20   respect to Claim 7.  And my answer to this

21   question is there is no such clear and convincing

22   evidence.

23     Q.  In addition to the '031 patent, did you

24   consider any other materials in reaching those

1    conclusions?

2         A.  Yes.  I also have considered the '023

3    patent.  I considered the prosecution histories

4    of both of these patents.  I also considered the

5    Court's claim construction.

6              In addition to that, I also reviewed

7    Professor Buckton's expert reports, obviously

8    what he said in his testimony here, and I also

9    reviewed the excerpts from Novartis' inventors

10   and witnesses, and also the documents from

11   Novartis' testing that Professor Buckton referred

12   to.

13        Q.  Who would be a person of ordinary skill in

14   the art?

15        A.  In my judgment the person of ordinary

16   skill in the art here, the art which deals with

17   pharmaceutical formulations is somebody who would

18   have a doctoral degree in chemistry, pharmacy, or

19   a related field, and two years, approximately, of

20   practical experience in pharmaceutical

21   formulations.

22              Alternatively, this person could be

23   somebody with a masters degree and about four

24   years of practical experience in pharmaceutical

1    formulations.

2                    Or this person could be somebody

3    with a bachelors degree in chemistry, pharmacy,

4    or related field with approximately six years of

5    practical experience in pharmaceutical

6    formulations.  So I considered the issues and

7    will opine today from the standpoint of such a

8    person.

9

10   BY MS. JACOBSEN:

11       Q.  Before we address each of Par's invalidity

12   arguments, what claim is at issue in this case?

13       A.  My understanding is, Your Honor, that the

14   only claim at issue in this case is Claim 7 of

15   the '031 patent.

16       Q.  And can you summarize what Claim 7 of the

17   '031 patent requires?

18       A.   Yes.  This Court has seen this claim a

19   couple of times over the last day and a half, so

20   I will be very brief.  Essentially, in a

21   nutshell, what Claim 7 of the '031 patent claims

22   is a Rivastigmine transdermal device containing

23   an antioxidant in an amount from about 0.01 to

24   about 0.5 percent by weight.

        1           MS. JACOBSEN:  And, for the record,

        2    Dr. Klibanov, referred to JTX 1, the '031 patent

        3    Claim 7.

        4    BY MS. JACOBSEN:

        5        Q.  Dr. Klibanov, are you aware of how the

        6    Court has construed the term antioxidant?

        7        A.  Yes, I am.

        8           And, in fact, the Court's claim

        9    construction of this term is depicted on the

       10    screen now.  And it says that the term

       11    antioxidant is construed to mean agent that

       12    reduces oxidative degradation.

       13           MS. JACOBSEN:  And for the record,

       14    that's DI-250 at Page 1.

       15    BY MS. JACOBSEN:

       16        Q.  Does Claim 7 require that the antioxidant

       17    provide a stabilizing effect?

       18        A.  No, it does not.  Claim 7 only, as I

       19    understand it, only requires the presence of an

       20    antioxidant.

       21           There are no such words as

       22    stabilizing, stable, stability or the like in the

       23    claimed language of Claim 7.

       24        Q.  And with the Court's claim construction in

1    mind, can we turn to your analysis of the three

2    requirements in question here?

3        A.  Sure.

4        Q.  Written description, enablement and

5    definiteness.

6        A.  Sure.

7        Q.  And let's start with written description.

8        A.  Yes.

9        Q.  What question did you ask with respect to

10   written description?

11       A.  I asked, Your Honor, whether the

12   specification of the '031 patent will reasonably

13   convey to the person of ordinary skill in the art

14   that the inventors were in possession of the

15   invention of Claim 7, which is a Rivastigmine

16   transdermal device containing an antioxidant.

17   That is an agent that reduces oxidative

18   degradation.

19       Q.  Would you explain why Dr. Buckton alleges

20   that Claim 7 does not meet the written

21   description requirement?

22       A.  My understanding of Professor Buckton's

23   position is that Claim 7 -- if Claim 7 includes

24   acetaldehyde within the term antioxidant, then

1    this claim doesn't meet the written description

2    requirement because it includes antioxidants that

3    are neither listed in the patent specification,

4    nor are established to be antioxidants by any

5    known or recognized method.

6         Q.  Do you agree?

7         A.  No, I do not agree.  And the reason that I

8    don't is illustrated on this slide.

9              These, Your Honor, are two excerpts

10   from the '031 patent from Column 1.  The first

11   one says and I quote, "It has now been found

12   after exhaustive testing that Rivastigmine is

13   susceptible to degradation, particularly in the

14   presence of oxygen."

15             The second excerpt says, "In one

16   aspect, the invention provides a pharmaceutical

17   composition comprising Rivastigmine and an

18   antioxidant."

19             So, in my opinion, one of skill in

20   the art having reviewed, for example, these

21   excerpts will understand that the inventors of

22   the '031 patent made at least two discoveries.

23   First discovery is that they found that

24   Rivastigmine is susceptible to oxidative

1     degradation.  The second is they discovered a

2     Rivastigmine transdermal device or Rivastigmine

3     pharmaceutical composition in general which

4     contains an antioxidant.

5               MS. JACOBSEN:  For the record,

6     Dr. Klibanov referred to JTX 1, the '031 patent

7     at Column 1, Lines 22 to 24 and 34 to 36.

8     BY MS. JACOBSEN:

9         Q.  Is the term antioxidant limited to

10    specific antioxidants?

11        A.  No, in my opinion, it isn't.

12              Your Honor, at the time in 1998,

13    there were a lot of different antioxidants known.

14    And it is clear that the specification of the

15    patent doesn't attempt to list them all.

16              Rather, the specification of the

17    patent gives some examples of different types of

18    oxidizing agents or I'm sorry, different types of

19    antioxidants.

20              So, as the Court has heard, for

21    example, ascorbyl palmitate and ascorbic acid are

22    examples of antioxidants that act by working as

23    reducing agents.  In contrast, for example, butyl

24    hydroxytoluene, also known as BHT is another

1    antioxidant, but it acts via a different

2    mechanism, namely by working as a free radical

3    scavenger.

4              So, one of skill in the art, would

5    understand that this is not an exhaustive or

6    limiting list, but rather, these are just some

7    examples of certain types of antioxidants.

8              MS. JACOBSEN:  For the record, Dr.

9    Klibanov referred to JTX 1, the '031 patent at

10   Column 4, Lines 11 to 16.

11   BY MS. JACOBSEN:

12      Q.  Dr. Klibanov, is there any other evidence

13   that the term antioxidant wouldn't be limited?

14      A.  Yes, there is.  In fact, the plain

15   language of in this case, claims of the '023

16   patent reveals that as well.  So these are the

17   first three claims of the '023 patent.  The first

18   and the broadest claim, Claim 1, uses the term

19   antioxidant.  The second claim and the third

20   claim are both dependent from Claim 1, either

21   directly or indirectly, and these two dependent

22   claims, two and three, list all the same

23   antioxidants as were listed in the specification

24   of the patent.

1          So one of skill in the art would

2    understand, therefore, that the term antioxidant

3    as it is used in Claim 1, must be broader than

4    just the list that is provided in the

5    specification of the patent because these two

6    claims, two and three, are dependent from Claim

7    1, and therefore antioxidant, the antioxidant

8    term in Claim 1 must include other antioxidants

9    as well.

10   Q.  Was the meaning of antioxidant in the '023

11   patent relevant to the meaning of antioxidant in

12   the '031 patent?

13   A.  Yes, in my opinion very much so.  Because

14   as this Court knows, the '023 and '031 patents

15   are sister patents, they share essentially the

16   same specification.  My understanding is that the

17   claims must be read in light of the

18   specification.  And, therefore, the term

19   antioxidant, the claim term antioxidant in Claim

20   1 of the '023 patent must be read exactly the

21   same way as the claim term antioxidant in Claim 7

22   of the '031 patent, which is at issue here.

23          MS. JACOBSEN:  For the record,

24   Professor Klibanov referred to JTX 2, the '023

1    patent, Claims 1, 2 and 3.  And Your Honor, I

2    don't believe that the '023 patent is in

3    evidence, so we move to introduce JTX 2, the '023

4    patent.

5              MR. BROWN:  No objection.

6              THE COURT:  Admitted without

7    objection.

8    BY MS. JACOBSEN:

9        Q.  And why does Dr. Buckton argue that the

10   term antioxidant is more limited?

11       A.  Well, my understanding of Professor

12   Buckton's position is that he focuses on the

13   particular expression found in column four of the

14   '031 patent, and specifically where it says that

15   stabilizing effect, that an effective,

16   stabilizing effect is surprisingly achieved when

17   the antioxidant is selected from, and from the

18   basis of this phrase, selected from, Dr. Buckton

19   concludes that the antioxidants within this

20   invention must be limited to only those that are

21   listed here.

22       Q.  And for the record, Dr. Klibanov referred

23   to JTX 1 at column four, lines 11 to 16.

24              Dr. Klibanov, do you agree with

1    Dr. Buckton's reading of this passage?

2         A.  I do not agree.  I don't believe that one

3    of skill in the art would read this passage in

4    the way so limited.  Instead, one of skill in the

5    art would readily understand the Court's claim

6    construction of the term antioxidant, which is an

7    agent that reduces oxidative degradation, and

8    therefore, will understand that any agent that

9    reduces oxidative degradation could be used as an

10   antioxidant with these being just examples.

11        Q.  And do you agree that Claim 7 includes

12   compounds not demonstrated to function as

13   antioxidants by any established testing method?

14        A.  No, I do not agree with that, either,

15   because again, this is an excerpt from the '031

16   patent that this Court has seen already over the

17   last day-and-a-half, and it says specifically,

18   "The pharmaceutical compositions of the present

19   invention show a reduction in degradation

20   by-products in stress stability tests."

21             So this specifically says to one of

22   skill in the art that if he or she wanted to see

23   whether there is a reduction in degradation,

24   oxidative degradation by-products, for example,

1     this person could employ stress stability tests

2     that also have been discussed extensively in this

3     courtroom over the last day-and-a-half and then

4     use the stability test as an example to ascertain

5     that.

6          MS. JACOBSEN:  For the record,

7     Dr. Klibanov referred to JTX 1, the '031 patent,

8     column one, lines 37 to 39.

9     BY MS. JACOBSEN:

10         Q.  Dr. Klibanov, did you understand

11    Dr. Buckton to rely on any other evidence in

12    support of his opinion that the '031 patent does

13    not meet the written description requirement?

14         A.  No, my understanding was there was no

15    other evidence that Professor Buckton relied

16    upon.

17         Q.  So would you please summarize your

18    conclusions on written description?

19         A.  Yes.  My conclusion is that one of skill

20    in the art reading the specification of the '031

21    patent will understand that the inventors were in

22    possession of the invention of Claim 7, which is

23    a rivastigmine transdermal device containing an

24    antioxidant, with an antioxidant being an agent

1    that reduces oxidative degradation.

2        Q.  Let's turn now to enablement.  What

3    question did you ask with respect to enablement?

4        A.  The question

5        A.  The question that I asked is whether one

6    of ordinary skill in the art would be able to

7    practice the invention of Claim 7, that creates a

8    trans -- a Rivastigmine transdermal device

9    containing an antioxidant based on this person's

10   own knowledge in combination with the teachings

11   of the specification of the '031 patent.

12            And my answer to this question is,

13   yes, one of skill in the art will be able to do

14   it.

15       Q.  And would they have been able to do it

16   without undue experimentation?

17       A.  They would be able to do it without undue

18   experimentation, yes.

19       Q.  And how did you reach that conclusion?

20       A.  Well, I reached that conclusion by

21   analyzing the language of Claim 7, by analyzing

22   the specifications of the '031 and '023 patent,

23   by analyzing what one of skill in the art would

24   have known at the time and, of course, in light

1    of the Court's claim construction.

2        Q.  Would you please summarize your

3    understanding of Dr. Buckton's non-enablement

4    argument?

5        A.  My understanding, Your Honor, is that

6    Professor Buckton believes that the written --

7    that the enablement requirement is not met for

8    two reasons.

9            The first reason is that, in

10   Professor Buckton's opinion, one of the

11   antioxidants tested by Novartis ostensibly

12   didn't work.  In fact, today he broadened it to

13   say that two of the antioxidants tested didn't

14   work.  So that's the first reason.

15           And the second reason, as I

16   understand it, is that Professor Buckton believes

17   that if acetaldehyde is included within the term

18   antioxidant in Claim 7, then testing will

19   necessarily be required.

20       Q.  I'd like to start with the first of those

21   reasons.  In your analysis, did you consider

22   plaintiff's testing with ascorbyl palmitate?

23       A.  Yes.

24       Q.  And can you please turn to Tab 6 in your

1    witness binder, and there you should find JTX

2    182.

3        A.  Yes.

4        Q.  Do you recognize this document?

5        A.  I do.

6        Q.  What do you recognize it to be?

7        A.  These are LTS -- this is an LTS letter

8    that was forwarded to Novartis which presents some

9    stability testing studies.

10             MS. JACOBSEN:  Your Honor,

11   plaintiffs move to introduce into evidence JTX

12   182.

13             MR. BROWN:  No objection.

14             THE COURT:  Admitted without

15   objection.

16   BY MS. JACOBSEN:

17       Q.  And do you agree with Dr. Buckton that

18   ascorbyl palmitate didn't work?

19       A.  No.  I do not agree with that.  And, Your

20   Honor, you've heard several times today that

21   ascorbyl palmitate didn't work and Professor

22   Buckton also added that the combination of ascorbyl

23   palmitate and tocopherol didn't work.

24             So I feel that perhaps it would be

1    worthwhile to take sort of a deeper look into

2    what these data are and what they say and don't

3    say.  So these are Novartis' data that address

4    the issue of formation of degradation products of

5    Rivastigmine base in the presence of

6    antioxidants after eight weeks storage at 60

7    degrees.

8                    And what we have here is the results

9    of four head-to-head tests.  These are stress

10   tests and the stress was temperature of 60

11   degrees and the test time of eight weeks.

12                   Now, the Court has heard over the

13   last day and a half several times that when

14   Rivastigmine undergoes degradation, oxidative

15   degradation, there are two oxidative degradation

16   products that are formed.  They are the ketone

17   product and the styrene product.

18                   These are the data that Dr. Buckton

19   showed.  So let's take a look at these data.

20                   The first entry in this table is

21   Rivastigmine alone.  No antioxidant.

22                   This is called formulation 2200.

23   And Your Honor can see that after eight weeks at

24   60 degrees Centigrade, there is a significant

1    amount of the ketone product, of the styrene

2    products and the total amount of the oxidative

3    degradation product exceeds five percent.  So

4    that is what happens in the absence of

5    antioxidants.

6              Next thing that's reported in this

7    table this, is the second entry is the same

8    formulation with the only difference that 0.1

9    percent tocopherol is also present.  The Court

10   can see that the total, and the total column is

11   the one that I added that are added by simply

12   summing up the ketone oxidative product and the

13   styrene oxidative product.

14             The Court can see that the total

15   amount of oxidative products is greatly reduced

16   by a factor of approximately five.  Okay.

17             So tocopherol obviously greatly

18   reduces oxidative degradation.  The second

19   entry -- the third entry is what Professor

20   Buckton opined showed that ascorbyl palmitate

21   didn't work.

22             Well, if we look at the data, so

23   this is the amount of the ketone formed.  This is

24   the amount of the styrene formed, I summed them

1    up.  And the Court can see in blue here that the

2    total amount of oxidative degradation products is

3    3.6 percent, which is about one-third less than

4    in the case of rivastigmine without an

5    antioxidant.

6              Likewise, in the case of

7    rivastigmine containing a combination of ascorbyl

8    palmitate and tocopherol, as opposed to

9    tocopherol alone, we can see that the total

10   amount of degradation products, oxidative

11   degradation products is about 2.79, so we have

12   roughly a twofold reduction in the total amount

13   of degradation products.

14             So if we now review this data and

15   analyze them.  What do we see?  Well, we see

16   several things.  First of all, we see that with

17   each of these antioxidants and the combination of

18   these antioxidants we have a significant

19   reduction in the total number of oxidation

20   products.

21             We can also see that tocopherol is

22   unquestionably the most potent antioxidant here.

23             However, we can also see that

24   ascorbyl palmitate, although not as potent as

1    tocopherol, also reduces the total number of

2    oxidation products as I mentioned a moment ago by

3    about thirty percent.

4              So there is no question -- and the

5    combination of ascorbyl palmitate and tocopherol

6    affords an even greater reduction in oxidation

7    products.

8              So there is no question in my mind,

9    and I think that's how one of skill in the art

10   would also analyze this data that all three

11   antioxidants presented here in these head-to-head

12   tests in fact afforded a significant

13   stabilization, significant reduction in oxidation

14   of rivastigmine in this instance.

15       Q.  Dr. Klibanov, the comparison that you made

16   between the formulation, the comparison you made

17   with the combination of two antioxidants, and I

18   believe you said it caused a twofold reduction,

19   that was relative to no antioxidant?

20       A.  Yes.  We compare everything with respect

21   to no antioxidant present, yes.

22       Q.  And why did you consider the total amount

23   of degradation by-products?

24       A.  Well, the reason, Your Honor, I consider

1    the total amount is because the key question here

2    is how much rivastigmine has been lost to

3    oxidative degradation.  Well, that rivastigmine

4    that has been lost to oxidative degradation,

5    where did it go?

6              Well, it has gone either in the

7    ketone product or into the styrene product.

8    Therefore, if one wants to assess how much

9    rivastigmine has been lost to oxidative

10   degradation, I think it's fairly straightforward

11   that one simply has to take the sum of these two

12   products, rather than just one product, either

13   this one or this one.  That is why from a purely

14   scientific standpoint I think that it's very

15   clear that one has to take the sum of the

16   oxidative degradation products.

17             I just want to say that this

18   rationale is also confirmed by the specification

19   of the patent.

20             MS. JACOBSEN:  And we'll look at

21   that in just a second.

22             For the record, Dr. Klibanov

23   referred to JTX 182 at page 24880.

24   BY MS. JACOBSEN:

1      Q.  You said that was consistent with the

2  patent?

3      A.  Yes.  This scientific rationale, Your

4  Honor, is also confirmed by the plain language of

5  the specification of the patent.

6              For instance, there are three

7  excerpts here on the screen now.  The first one

8  says, "The pharmaceutical compositions of the

9  present invention show a reduction in degradation

10  by-products in stress stability tests."

11             I want to emphasize that it was

12  degradation by-products, plural, not one

13  degradation product, but degradation by-products

14  plural.  It does so again in the next excerpt

15  where it does it repeatedly, it says twice

16  degradation products.  And then, degradation

17  products, again, plural.

18             Finally, in the third excerpt, it

19  says insignificant amounts of degradation

20  products are detected after storage of at least

21  four months at room temperature.  And once again,

22  the inventors used plural, degradation products,

23  which confirms the scientific rationale that I

24  explained a moment ago.

1        MS. JACOBSEN:  For the record,

2    Dr. Klibanov referred to JTX 1, the '031 patent

3    at column one, lines 37 to 39, column four, lines

4    20 to 25, and column seven, lines 40 to 52.

5    BY MS. JACOBSEN:

6        Q.  If we could just put up the slide again

7    with the results.  Do you agree with Dr. Buckton

8    that the increase in the amount of styrene

9    product shows that ascorbyl palmitate didn't

10    work?

11        A.  No, I cannot agree with that because as I

12    said, if you wish to assess how much rivastigmine

13    has undergone oxidative degradation, you must

14    take the sum of the ketone oxidative degradation

15    product and the styrene oxidative degradation

16    product.  Which product predominates in the

17    resulting mixture in my opinion is not relevant

18    to the question of how much rivastigmine has

19    undergone oxidative degradation.

20        Q.  Dr. Klibanov, how much ascorbyl palmitate

21    was tested in this experiment?

22        A.  Well, the Court can see that the amount of

23    ascorbyl palmitate that was tested here is 0.1

24    percent.  And the significance of this number is

1    that the Court will recall that Claim 7 of the

2    '031 patent allows up to about 0.5 percent of

3    antioxidant.

4              So even if we put aside the word

5    "about" just based on 0.5 percent alone, one of

6    skill in the art would understand that the amount

7    of ascorbyl palmitate that could be used was five

8    times greater than that.  In other words, one

9    could use 0.5 percent ascorbyl palmitate.

10        A.   In other words, one could use 0.5 percent

11   ascorbyl palmitate.  If one were to use a larger

12   amount of ascorbyl palmitate, obviously, it will

13   have a greater reducing power; and therefore, one

14   of skill in the art would conclude that it is

15   likely that at 0.5 percent, ascorbyl palmitate will

16   be even more effective than at 0.1 percent.

17              However, I still want to emphasize

18   that even 0.1 percent shown here, a clear

19   comparison of 3.6 percent of degradation products

20   for the ascorbyl palmitate experiment and over

21   five percent for Rivastigmine alone experiment

22   indicates that even 0.1 percent

23   ascorbyl palmitate is a significant -- affords a

24   significant reduction in oxidative degradation

1    and; therefore, in my opinion, is clearly an

2    antioxidant.

3              MS. JACOBSEN:  And for the record,

4    again, Dr. Klibanov referred to JTX 182 at Page

5    24880.

6    BY MS. JACOBSEN:

7       Q.  Dr. Klibanov, did LTS record any

8    conclusions from these tests?

9       A.  Yes, they did.  So in the LTS document

10   that we're discussing, they asserted after they

11   presented the data in the tabular form and the

12   bar chart form, they stated from these

13   experiments it could be concluded that tocopherol

14   seemed to be the most powerful -- emphasis added --

15   antioxidant in order to reduce the formation of

16   ENA degradation products in the TDS.

17              With the ENA being Rivastigmine,

18   Your Honor, and TDS being a transdermal device or

19   transdermal system.  So, reading this sentence,

20   one will understand that what they said here, we

21   should -- which is consistent with what we just

22   concluded a moment ago, is that tocopherol was

23   the most powerful antioxidant.

24              They certainly didn't conclude that

1    ascorbyl palmitate was not a suitable antioxidant

2    or was not an antioxidant.  Nor did they conclude

3    that either combination of tocopherol and ascorbyl

4    palmitate or another compound could not

5    be an antioxidant as well.

6        Q.  In your analysis, did you consider any

7    inventor and witness deposition testimony?

8        A.  Yes, I did.

9        Q.  And did any of that testimony change your

10   opinion?

11       A.  No, it didn't.  And, Your Honor, you heard

12   yesterday you heard some deposition testimony

13   played, and today Professor Buckton presented

14   some excerpts.  The reason they didn't change my

15   opinion is that the way I understood that

16   deposition testimony in particular, when read

17   beyond a snippet that was shown on the screen,

18   was that those folks were talking about either a

19   commercial device, a commercial transdermal

20   device and we're discussing commercial

21   marketing-type issues in terms of what

22   antioxidant will be the most suitable.

23               And in this context concluded that

24   tocopherol was the most suitable, which is hard

1    to disagree with.  On the basis of the test data

2    we just reviewed or some other Novartis

3    personnel, including the inventor, they were

4    discussing what would or would not have been known

5    without the benefit of the invention of the '031

6    patent, which in my opinion, as I understand it, is

7    not probative to the 112 issues of invalidity.

8         Q.  And why is it your understanding that

9    that's not probative to the 112 issues?

10        A.  Because these issues require that one of

11   skill in the art relies not only on his or her

12   own knowledge, but also has the benefit or the

13   teachings of the invention of the patent.  And,

14   of course, one couldn't have the benefit of the

15   teachings of the invention of the patent before

16   the patent.

17        Q.  And was the deposition testimony that you

18   considered the same as the deposition testimony

19   played in Court yesterday?

20        A.  Yes, it was.

21        Q.  So I'd like to turn now to the second

22   reason that Dr. Buckton says that the '031 patent

23   is not enabled.  And in your analysis, did you

24   consider whether a person of ordinary skill in the

1      art would have had to test to determine whether a

2      compound reduced oxidative degradation?

3          A.  Yes, I did consider that.

4          Q.  And what did you conclude?

5          A.  Well, my conclusion was that that is not

6      necessarily the case.  For example, with respect

7      to these compounds that are listed in Column 4,

8      things like tocopherol, esters thereof, ascorbyl

9      palmitate and others, no testing was required.  The

10     inventors told one of skill in the art that they

11     can be used.

12              One could also go to -- one of skill

13     in the art could also go to prior art literature

14     and find some other antioxidants that could be

15     used.  Or alternatively, one could also conduct

16     experimentation, experimentation which, as I

17     already mentioned, is not undue or one could use

18     some kind of a combination of, for example, prior

19     literature, prior art literature and the

20     experimentation.  So experimentation is not

21     definitely required.

22              MS. JACOBSEN:  And for the record,

23     Dr. Klibanov was referring to JTX 1, the '031

24     patent, Column 4, Lines 11 to 16.

1    BY MS. JACOBSEN:

2        Q.  Does the '031 patent provide any guidance

3    on the testing that can be used to determine

4    whether a compound is an antioxidant?

5        A.  Yes, it does.  And, in fact, I showed this

6    excerpt to the Court a few minutes ago.  And it

7    says the pharmaceutical compositions of the

8    present invention show a reduction in degradation

9    by-products in stress stability tests.

10            So one of skill in the art learns

11   from that that, for example, he or she could use

12   stress stability tests to see whether there's a

13   reduction in oxidative degradation products.

14   And, indeed, two examples of the specific

15   examples of such testing are, indeed, shown in

16   Column 4 of the specification of the patent.

17       Q.  And can you describe those examples for

18   me?

19       A.  Sure.

20            So this is the first example, both

21   of these, Your Honor, were stress to stress --

22   I'm sorry, head-to-head tests and they were both

23   stress tests.  In the first one, the stress was

24   60 degrees, and the time was two months.

1          And the Court can see that in these

2     head-to-head experiments, basically there are two

3     samples, one a controlled sample that only has an

4     -- that only has a rivastigmine, no antioxidant.

5     The second sample is everything the same except

6     that in this case it had 0.1 percent tocopherol,

7     the antioxidant.

8          And the Court can see that without

9     an antioxidant, there was about -- there was a

10    4.46 percent amount of oxidative degradation

11    products, whereas with the antioxidant, there was

12    only 1.3 percent.

13         So there was roughly a

14    three-and-a-half fold reduction in the total

15    number of degradation products.  So tocopherol

16    indeed reduced the oxidative degradation.

17         Likewise, in the second test which

18    was carried out under different conditions, so

19    here we have 40 degrees, not 60, 75 percent

20    relative humidity, three months rather than two

21    months, and a different concentration of the

22    tocopherol.

23         But again, in the controlled sample

24    which is rivastigmine with no antioxidant, we

1    have 1.09 percent oxidative degradation

2    products, whereas in the presence of 0.15 percent

3    of tocopherol, we have 0.25 percent degradation

4    products, so in other words four times less.

5                So once again, we can see that in

6    these head-to-head tests, regardless of what

7    conditions, set of conditions was used, this one

8    or this one, we see that a significant

9    stabilization against or significant reduction in

10   oxidative degradation was achieved.

11               There is another important lesson to

12   be learned, Your Honor, from these examples that

13   are provided in the patent.  In addition to the

14   fact that you have to run head-to-head tests

15   where there is only one variable between the two

16   samples, namely the presence or the absence of

17   the antioxidants.  Another important lesson is --

18               MR. BROWN:  Your Honor, we object to

19   this testimony as beyond the scope of

20   Dr. Klibanov's expert reports.  He didn't testify

21   about any opinions in his expert reports about

22   the proper testing being conducted, the necessity

23   for head-to-head testing, anything like that.

24               THE COURT:  Ms. Jacobsen.

1          MS. JACOBSEN:  Two responses to

2     that.  The first is that Dr. Klibanov is

3     responding to the enablement argument that there

4     are tests disclosed in the '031 patent that would

5     enable a person of ordinary skill in the art to

6     identify an agent that reduces oxidative

7     degradation.  And Dr. Klibanov explained in his

8     report that these tests are examples of the kind

9     of tests that can be done.

10          And second, Dr. Buckton went beyond

11    his reports and we raised this issue at the

12    pretrial conference and Your Honor said that

13    Dr. Klibanov could respond to the extent that the

14    infringement arguments are now coming into the

15    112 issues and that's also what Dr. Klibanov is

16    doing here.

17          MR. BROWN:  Your Honor, Dr. Buckton,

18    I believe did not go beyond his expert reports at

19    all.  The invalidity section was by plaintiff's

20    request segregated off.  He testified very

21    closely and carefully to what was in his reports.

22    I didn't hear any objections from plaintiffs that

23    he went beyond his expert reports.

24          THE COURT:  At the pretrial

1    conference as I remember what Ms. Jacobsen said,

2    maybe not a hundred percent of it, there was

3    something where I said that Dr. Klibanov could go

4    beyond.  I think it was Dr. Buckton, not that he

5    had gone beyond, but he did use a supplemental

6    report.  Right?

7              MR. BROWN:  Your Honor as I recall

8    that was not the case, as I recall what happened

9    was plaintiffs were supposing that Dr. Buckton

10   might go beyond his expert reports at the time.

11   Dr. Buckton did not provide a supplemental expert

12   report.  They were relying on our response to

13   their motion in liminae in which we identified

14   other evidence including other portions of

15   Dr. Buckton's testimony that we thought was

16   relevant to the issue of the 112, and they were

17   concerned that in 112 testimony, he would go

18   beyond his expert reports.  He did not.  He

19   provided testimony very much in line with what

20   was in his expert reports.

21              And Dr. Klibanov is now going far

22   beyond what he provided in his expert reports.

23   And I also believe during the pretrial conference

24   in that ruling, the Court noted that you were

1    sure that Dr. Klibanov in formulating his

2    opinions had read our entire reports.

3                THE COURT:  I'm still sure of that.

4                MR. BROWN:  And that I believe that

5    your comment was limited entirely to the

6    situation if Dr. Buckton went beyond his expert

7    reports and his testimony about 112.

8                THE COURT:  Anything further,

9    Ms. Jacobsen?

10               MS. JACOBSEN:  Yes.  One of the

11   first answers in Dr. Buckton's 112 section was

12   for all the reasons I explained during my

13   infringement, acetaldehyde is not an antioxidant.

14   And it seems clear that Par is planning to import

15   his infringement opinions into their validity

16   case in posttrial briefing and trying to bring in

17   the noninfringement elements into 112 even though

18   maybe on the stand Dr. Buckton didn't

19   specifically address or reiterate all of his

20   noninfringement opinions

21

22               MR. BROWN:  What we asserted,

23   post-trial briefing, Par argues an entirely

24   different matter than what Dr. Buckton testified.

1          THE COURT:  Well, actually I think I

2     think Ms. Jacobsen's last response indicated to

3     me that, in fact, Dr. Buckton really hadn't gone

4     beyond what was in his reports.  And I don't

5     think -- I haven't heard so far anything about

6     what he said during his infringement testimony

7     that's going to add weight or significance to

8     anything that he said during his invalidity

9     testimony.

10          So I'm going to sustain the

11    objection.

12    BY MS. JACOBSEN:

13       Q.  So, Dr. Klibanov, would you summarize your

14    conclusions on enablement?

15       A.  Having conducted the analysis that I've

16    just discussed, I concluded that one of skill in

17    the art when he or she uses a combination of his

18    or her own knowledge, and what the inventors

19    discovered and conveyed to one of skill in the

20    art in Claim 7 of the '031 patent using the --

21    when read in light of the specification, would

22    conclude that the inventors would conclude that

23    one of skill in the art could practice the

24    invention of the '031 or the Claim 7 of the '031

1    patent, namely could make Rivastigmine

2    transdermal device without undue experimentation.

3    And, therefore, this claim meets the enablement

4    requirement.

5        Q.  And, Dr. Klibanov, you referred to the

6    stress tests that are mentioned in the patent.

7    Would it have taken undue experimentation to run

8    a stress test to determine whether an agent

9    reduces oxidative degradation?

10       A.  In my opinion, it wouldn't because one

11   simply could repeat what was done by and reported

12   by the inventors in the specification.

13       Q.  And is a stress test standard in the

14   pharmaceutical industry?

15       A.  They are very standard and they're used

16   routinely to determine the extent of oxidative

17   degradation and the effect of antioxidants on

18   that oxidative degradation.

19       Q.  And are the examples in the patent the

20   only way to conduct stress tests?

21       A.  No, these are just examples.  I mean,

22   there are no standard universal ways to conduct

23   these tests.  These are just examples, good

24   examples.  But there are others as well.

1    Q.  Dr. Klibanov, did you provide testimony

2    about the non-obviousness of the claims of the

3    '031 patent during the Watson trial?

4    A.  Yes, I did.

5    Q.  And when you analyzed whether the '031

6    patent was obvious, did you consider what was

7    taught in the '031 patent?

8    A.  No.  For that analysis, I did not because

9    my understanding of the law from the counsel

10   here, Your Honor, is that in analyzing

11   obviousness or non-obviousness, one has to

12   consider only what one of skill in the art would

13   have known without the benefit of the invention

14   in question.

15          Whereas for the enablement analysis

16   and for the enablement analysis, my understanding

17   is that one has to take into account not only a

18   person of ordinary skill in the art's own

19   knowledge, but also the discoveries made in the

20   patent.

21          In other words, a person of ordinary

22   skill in the art relies not only on the prior art

23   literature, but also has the benefit of the

24   invention of the patent-in-suit.

1          Q.  And was that significant to your analysis?

2          A.  It is very significant because, as I

3     mentioned earlier, the inventors made several

4     discoveries and described in the patent,

5     including the fact that Rivastigmine is subject

6     to oxidative degradation.

7               That wasn't known before and

8     including a Rivastigmine transdermal device

9     containing an antioxidant, among others.

10         Q.  Thank you.

11              Dr. Klibanov, finally, let's turn to

12    definiteness.  What question did you ask with

13    regard to definiteness?

14         A.  Well, I asked a question whether a person

15    of ordinary skill in the art would understand the

16    boundaries of the claim term antioxidant within

17    Claim 7 of the '031 patent.

18              And if so, then the definiteness

19    requirement is met.

20         Q.  And why does Dr. Buckton allege that Claim

21    7 of the '031 patent is indefinite?

22         A.  My understanding of Professor Buckton's

23    position is that he believes that if acetaldehyde

24    is included within the term, claim term

```
1     antioxidant of Claim 7, then one of skill in the

2     art, this person will not know the scope of Claim

3     7; and therefore, will not be able to understand

4     this claim term and the claim as a result.

5          Q.  Do you agree?

6          A.  I do not agree.  No.

7          Q.  And why not?

8          A.  I do not agree because I believe that one

9     of skill in the art would be able to clearly

10    understand the Court's claim construction.  That

11    is, antioxidant is an agent that reduces

12    oxidative degradation.

13              And then, for example, using the

14    teachings of the specification of the patent,

15    will be able to readily ascertain what agent is and

16    what agent is not one that reduces oxidative

17    degradation; and therefore, is or is not an

18    antioxidant.

19         Q.  And how would a person of ordinary skill

20    in the art determine that?

21         A.  Well, a person of ordinary skill in the

22    art has several options.  The person of ordinary

23    skill in the art could rely on the list that is

24    provided in the -- in column four of the patent,
```

1    or one could go to the literature, or one could

2    conduct a straightforward testing or use some

3    kind of a combination of the three.

4    Q.  Does the '031 patent provide any guidance

5    as to the testing that can be used?

6    A.  It does.  As already discussed a little

7    earlier, it says, for example, the pharmaceutical

8    compositions of the present invention show a

9    reduction in degradation by-products in stress

10    stability test.  And then it provides an example

11    of both an execution of such a test and the

12    results obtained in such a test.

13         MS. JACOBSEN:  For the record,

14    Dr. Klibanov referred to the '031 patent, JTX 1,

15    column one, lines 37 to 39.

16    Q.  Dr. Klibanov, is there any evidence that

17    different stress tests would yield different or

18    inconsistent results?

19         MR. BROWN:  Objection, Your Honor.

20    This is no where in his expert reports.

21         MS. JACOBSEN:  Your Honor, this is

22    responding to Dr. Buckton's argument that the

23    results of Par's stability data is inconsistent

24    with the results of Dr. Davies' stress test, and

1    that goes to the definiteness 112 analysis.

2              THE COURT:  Hold on a second.  I'm

3    sorry, Mr. Brown, your objection is that this is

4    not in his report?

5              MR. BROWN:  This is not in his

6    expert report.

7              THE COURT:  And Ms. Jacobsen, is it

8    in his expert report.

9              MS. JACOBSEN:  It's not, but it's

10   responding to a new argument that Par has raised

11   at trial.  If Par is no longer advancing the

12   argument that there are inconsistent results

13   between Par's stability data and Dr. Davies'

14   stress test data, then obviously we don't need

15   this testimony, but it's a 112 issue and

16   Dr. Klibanov is opining on the validity issues.

17             MR. BROWN:  Again, Your Honor,

18   they're mixing and matching the difference

19   between what Par is asserting and what

20   Dr. Buckton testified.  Dr. Buckton never

21   testified regarding the specific conflict between

22   those two tests, and there wasn't any.

23             THE COURT:  Would you agree,

24   Ms. Jacobsen, that Dr. Buckton didn't testify

1     that there was any conflict between these two

2     tests?

3              MS. JACOBSEN:  I do disagree, Your

4     Honor.  Dr. Buckton testified that Dr. Davies'

5     stress test does not show that acetaldehyde is an

6     antioxidant and he testified that Par's stability

7     data shows -- sorry, I think I may have said that

8     the wrong way around, that Dr. Buckton testified

9     that Dr. Davies' stress test did not show that

10    acetaldehyde is an antioxidant, and if it did --

11             THE COURT:  I remember that.

12             MS. JACOBSEN:  -- then it's

13    consistent with Par's stability data which shows

14    that it is not.

15             THE COURT:  Hold on a minute.

16             All right.  So my law clerk

17    remembered hearing that.  If you want to pursue

18    it, what I would like to do is get the court

19    reporters, because I don't think it will take

20    very long, to actually go and get me what was

21    said during the indefinite portion of the

22    testimony.  Is that when you're saying it was

23    said?

24             MS. JACOBSEN:  Your Honor, maybe a

 1    shorter way of dealing with it is if Par can say

 2    whether or not they're going to rely on an

 3    allegation of inconsistent results between

 4    different tests and then if they're not, and

 5    they're not advancing that argument, then we

 6    don't need to respond to it and we can leave it

 7    there.

 8                THE COURT:  All right.  I think I

 9    know what Mr. Brown is going to say.  Mr. Brown,

10    what are you going to say?

11                MR. BROWN:  I'm going to say what we

12    argued is very distinct from what Dr. Buckton

13    testified.  We can rely on Dr. Davies' test to

14    support it, we can rely on Dr. Buckton testified

15    very closely, carefully what was in the expert

16    reports, he did not provide any new opinions, and

17    we object to that.

18                THE COURT:  So I'm going to sustain

19    the objection, more or less for the same reason

20    as before, which is I accept what Dr. Buckton

21    said, among other things there was an objection

22    to what was in his expert reports, and I believe

23    it is the case that without saying Dr. Klibanov

24    put this in his reports, so since Dr. Buckton

 1    didn't do beyond the scope of his, I don't think

 2    Dr. Klibanov should go beyond the scope of his.

 3    And as a practical matter it's unlikely that I'm

 4    going to be very impressed by tying things

 5    together with no expert to tie it together.

 6              MS. JACOBSEN:  Thank you, Your

 7    Honor.

 8

 9    BY MS. JACOBSEN:

10       Q.  In which case, Dr. Klibanov, can you

11    summarize your conclusions on definiteness?

12       A.  Well, my conclusion is that one of skill

13    in the art in my judgment having reviewed the

14    claim language, having read it in light of the

15    specification, and relying on his or her own

16    knowledge from the prior art will be able to

17    understand the scope of Claim 7 of the '031

18    patent, and therefore, that claim as I understand

19    it, as I understand the patent law, meets the

20    definiteness requirement.

21              MS. JACOBSEN:  Just one second.

22    Your Honor.

23              We have no further questions at this

24    time.

1          THE COURT:  Before you sit down,

2     Dr. Klibanov, let me ask you a question.  I'm not

3     sure this is actually a relevant question, but I

4     would like to know what your opinion about it is.

5     Is would a person of ordinary skill in the art at

6     the relevant time, 1998, have understood the term

7     antioxidant to include acetaldehyde?

8          THE WITNESS:  In my opinion, yes.

9          THE COURT:  And why is that?

10          THE WITNESS:  In my opinion, yes.

11          THE COURT:  And why is that?

12          THE WITNESS:  Because acetaldehyde

13     is a reducing agent and therefore, it is akin to

14     such expressly exemplified reducing agents as

15     ascorbic acid or ascorbyl palmitate.  So it has,

16     just like those compounds, it has the ability to

17     reduce oxidizing species and there can act as an

18     antioxidant.

19          THE COURT:  So the things like --

20     and I don't have the exact terminology like the

21     pharmaceutical handbooks that have lists of

22     antioxidants and it's not there.  What's your

23     explanation for that?

24          THE WITNESS:  Well, what you have in

1     the pharmaceutical handbooks are some of the most

2     popular well-established antioxidants.  Certainly

3     not all known antioxidants are included there.

4                And what they list are just some

5     particular antioxidants that have been used in

6     pharmaceutical products prior to that.

7                THE COURT:  All right.  So Ms.

8     Jacobsen if that inspires any other questions on

9     your part.  Go ahead.

10               Otherwise, I have no more questions.

11               MS. JACOBSEN:  I have no more

12    questions, either, Your Honor.

13               MR. BROWN:  Your Honor this is a

14    little difficult to do, but I want to move to

15    strike all of Dr. Klibanov's testimony in

16    response to the Court's questions.  Dr. Ganem, in

17    this case, produced expert reports expressly

18    addressing the issue of acetaldehyde was an

19    antioxidant.

20               Dr. Klibanov did not respond.  At no

21    point in this time did Dr. Klibanov offer any

22    expert reports or -- actually Dr. Klibanov is

23    nodding no.  He did respond to narrow issues that

24    Dr. Ganem raised, but it's then been moved out of

1    the case.

2              At no point in the case does

3    Dr. Klibanov in any of his expert reports or

4    otherwise offer that acetaldehyde was an

5    antioxidant.  At no point did Dr. Klibanov ever

6    offer an opinion that Par's product infringed.

7              And we think it's very prejudicial

8    to let on to the record new testimony and new

9    evidence from Dr. Klibanov that we have not had

10   the opportunity to go through discovery and take

11   depositions on.

12             THE COURT:  There may be some merit

13   to what you say.  Ms. Jacobsen.

14             MS. JACOBSEN:  Your Honor, you were

15   asking those questions in the context of the 112

16   analysis and that's exactly what Dr. Klibanov has

17   opined on and put in his expert reports.

18             THE COURT:  Well, I'll tell you

19   what, I will take the motion to strike under

20   advisement.  I will grant it unless there's or

21   what I'm inclined to do is I will grant it,

22   unless in the post-trial phase, Novartis produces

23   a copy of the expert report where he said this.

24   Because, your right, Mr. Brown is he hasn't said

1   this before.

2           MR. BROWN:  Yes, that's correct.

3           THE COURT:  All right.  So if he

4   said it before, it will stand.  And if he hasn't

5   said it before, I'll strike it.

6           Okay?

7           MS. JACOBSEN:  Okay.  Well, he has

8   responded saying that even if the patent is

9   infringed, it's still valid and that doesn't

10  extend the scope of the term antioxidant.  It

11  doesn't make it indefinite or invalid for written

12  description or lack of enablement.

13          THE COURT:  Okay.  You're saying he

14  and you're looking in Mr. Brown's direction.  You

15  are still talking about Dr. Klibanov?

16          MS. JACOBSEN:  No, I'm sorry.

17  Dr. Klibanov in his expert report has respond to

18  the argument that even if the patent is

19  infringed, it is still valid.

20          And that is --

21          THE COURT:  My question was did he

22  say in his expert report that a person of

23  ordinary skill in the art would have understood

24  acetaldehyde to be an antioxidant.

1          MS. JACOBSEN:  I'm not sure if

2     that's in his reports.

3          MR. BROWN:  Your Honor, I'm quite

4     sure it's not.

5          THE COURT:  I'm kind of guessing now

6     that probably it's not because I imagine if I

7     hadn't asked that -- well, I imagine you would

8     have asked what the answer was.

9          All right.  Well, I will take it

10    under advisement, but I will probably grant your

11    motion, Mr. Brown.

12         So, go ahead.

13    BY MR. BROWN:

14    Q.  Good afternoon, Dr. Klibanov.

15    A.  Good afternoon.

16    Q.  I'm Dan Brown.  We met at your deposition.

17         I'm going to ask you a few questions

18    on behalf of Par.  Dr. Klibanov, in addition to

19    being an expert in the current litigation, you

20    were also serving as an expert for Novartis in

21    another litigation pending in this Court against

22    two defendants, Alvogen and Noven; is that

23    correct?

24    A.  I -- definitely, yes, with respect to

1    Noven.  Alvogen, I'm not sure.

2                    It's possible.  I just don't

3    remember.

4        Q.  Noven's good enough.  And in that case,

5    you've submitted declarations in support of claim

6    construction; correct?

7        A.  Yes.

8        Q.  And in that case, Novartis is arguing for

9    the same claim construction of antioxidant that

10   is in this case; correct?

11       A.  Yes.

12       Q.  And in support of that claim construction

13   and your opinions in that case, you have given

14   the opinion, have you not, that there is a class

15   of compounds known in the art as antioxidants

16   based on their generalized ability to reduce

17   oxidative degradation?

18       A.  I need to take a look at it.  I don't

19   remember.

20       Q.  Well --

21       A.  If you tell me that that's what I said,

22   I'll take your word for it.

23       Q.  Let me just ask your opinion.  Do you

24   believe that there is a class of compounds known

1    in the art as antioxidants based on their

2    generalized ability to reduce oxidative

3    degradation?

4        A.  I think it's a reasonable statement.  It

5    depends on the context, but it's a reasonable

6    statement.  Yes.

7        Q.  And do you have an understanding as to

8    what the term generalized means?

9        A.  Could you please read the entire quote

10   again.

11       Q.  There is a class of compounds known in the

12   art as antioxidants based on their generalized

13   ability to reduce oxidative degradation.

14       A.   It means that, regardless of the mechanism

15   of action, they have the ability to reduce

16   oxidative degradation.  Indeed, as I explained

17   during my direct testimony, some of them act as a

18   reducing agent.  Some of them act as free radical

19   scavengers.

20              So, regardless of the mechanism,

21   they reduce oxidative degradation.

22       Q.  Now, Dr. Klibanov, it's your opinion that

23   an antioxidant may react chemically with a drug

24   that is intended to stabilize; correct?

1      A.  It's possible.

2      Q.  And, in fact, it's your opinion that an

3  antioxidant could increase drug degradation;

4  correct?

5      A.  It's possible, if it reacts unfavorably

6  then that's a possibility.

7      Q.  And could I go back to slide ten from your

8  slide deck and you walked through this at length

9  on your direct examination.  I just want to do a

10  comparison between now the second formulation,

11  2200 plus .1 percent tocopherol, and the fourth

12  formulation, no, it's the one above that, 2200

13  plus .1 percent tocopherol, and 2200 plus .1

14  percent ascorbyl palmitate, plus .1 percent

15  tocopherol?

16      A.  Yes.

17      Q.  Now, Doctor, the only difference between

18  these two formulations is the addition of .1

19  percent ascorbyl palmitate; correct?

20      A.  That's correct.

21      Q.  And the difference between total

22  degradation of products here caused by the

23  addition of the .1 percent ascorbyl palmitate is

24  an increase of between two and three times the

1    amount of total degradation products; correct?

2        A.   That's right.

3        Q.   If someone came to you with just these two

4    sets of data, would this demonstrate to you that

5    ascorbyl palmitate is not an antioxidant?

6        A.   No, it won't.  What it would demonstrate

7    to me that ascorbyl palmitate just like I

8    mentioned earlier, an excipient can unfavorably

9    react with the pharmaceutical, an excipient also

10   unfavorably reacts with another excipient.  What

11   it would tell me is ascorbyl palmitate

12   unfavorably reacts with tocopherol, thereby

13   reducing tocopherol's ability to reduce oxidative

14   degradation.

15       Q.   Thank you, Doctor.

16            I would like to now show you another

17   document?

18            MR. BROWN:  May I approach, Your

19   Honor?

20            THE COURT:  Yes.

21   BY MR. BROWN:

22       Q.   This exhibit is JTX 91.  I just want to go

23   to the very last page, or excuse me, I don't

24   think it's the last page, page 123 of the

1    reference where they're reporting their

2    conclusions.  And this is something that we

3    looked at in testimony of Dr. Davies.

4            I would like to highlight the

5    sentence starting with the word surprisingly, and

6    I'll read it into the record.  "Surprisingly the

7    core containing BHT at a concentration equivalent

8    to the 2.0 percent BHT coating had higher levels

9    of the sulfoxide degradant.  Due to the

10   instability of BHT and the stability of the BHT

11   radical species, BHT radicals can enhance the

12   oxidation in the core."

13           Dr. Klibanov, you provided

14   infringement testimony in the Watson trial that

15   BHT is an antioxidant; correct?

16       A.  That's right.

17       Q.  Now, if someone came to you and we assume

18   that the researchers in this publication are

19   correct and came to you with this evidence that

20   in this instance it enhanced the oxidation in the

21   core of their formulation, would that make you

22   change your opinion and conclude that BHT was not

23   an antioxidant?

24       A.  No, it won't.

1          Well, first of all, I would need to

2     read this paper, which I don't remember,

3     certainly haven't read it in many months if at

4     all.

5          Second of all, it would just tell me

6     just like you asked me in the beginning of your

7     cross-examination, it would just tell me that BHT

8     unfavorably interacts with the active

9     pharmaceutical ingredient, and that's why we have

10    the type, the fact that the authors talk about

11    here.

12    Q.  And now, if someone came to you with

13    another formulation in which they had added BHT

14    and they found that it had no effect on the

15    formation of oxidative degradation products,

16    would that convince you it was not an

17    antioxidant?

18    A.  That very much depends on under what

19    conditions they didn't observe it.  Because as I

20    was going to say, but you objected, but I presume

21    that I can say it maybe now, I mean, in response

22    to the question, that the second important rule

23    when you carry out head-to-head tests is that you

24    need to have sufficient oxidizing environment so

1     that the oxidation, the oxidative degradation

2     without an antioxidant is significant, reliable

3     measurable so that one can reliably ascertain

4     whether a compound that is suspected to be an

5     antioxidant indeed substantially reduces it.

6             If you have very little oxidative

7     degradation, it is essentially impossible to

8     determine, as Dr. Buckton said before lunch

9     today, whether or not you have a reduction in the

10    oxidative degradation.  So I would need to see

11    the data that led them to that conclusion.

12    Q.  Dr. Klibanov, you have also provided the

13    opinions to this Court that whether or not a

14    compound is an antioxidant is not defined

15    specifically by its ability to reduce oxidative

16    degradation of rivastigmine; correct?

17    A.  Yes.

18    Q.  For example, a compound would be an

19    antioxidant within the meaning of the '031 patent

20    if it reduced oxidative degradation of an

21    excipient; correct?

22    A.  Yes.

23    Q.  And you agree that there are thousands of

24    excipients, and many categories of excipients;

1    correct?

2         A.  There are a lot of different excipients,

3    yes.

4                   MR. BROWN:  May I approach the

5    witness?

6                   THE COURT:  Yes.

7    BY MR. BROWN:

8         Q.  And, Doctor, you recognize that this is an

9    exhibit you testified about during the Watson

10   trial; correct?

11        A.  I am familiar with this exhibit, yes.

12        Q.  And running from page 111 to 116 of the

13   reference are a long list of categories of

14   excipients with a lot of examples; correct?

15        A.  Yes, that's right.

16                  MR. BROWN:  Thank you, Dr. Klibanov.

17   Par has no further questions.

18                  THE COURT:  Any redirect?

19                  MS. JACOBSEN:  Very briefly.

20                       REDIRECT EXAMINATION

21   BY MS. JACOBSON:

22        Q.  Dr. Klibanov, you were asked some

23   questions about JTX 91.  Do you have that paper

24   in front of you?

1        A.  Yes.

2        Q.  Is that a paper about rivastigmine?

3        A.  No, it's as follows from the title of the

4    paper, I need to read the paper, but the title

5    says peroxide oxidation of a thioester drug,

6    rivastigmine is not a thioester.

7        Q.  I believe you testified that that

8    conclusion may suggest that the API, the active

9    pharmaceutical ingredient in the paper was

10   incompatible with BHT; is that right?

11       A.  That's right.

12       Q.  Have you seen any evidence that

13   rivastigmine is incompatible with any

14   antioxidants?

15       A.  I saw no evidence to that effect.

16            MS. JACOBSEN:  Thank you,

17   Dr. Klibanov.  I have no further questions.

18            THE COURT:  All right.

19   Dr. Klibanov, thank you.  You can step down.

20            THE WITNESS:  Thank you, Your Honor.

21            THE COURT:  Does Novartis have

22   anything more?

23            MR. KALLAS:  No, Your Honor.  But if

24   you would like summation, we're ready to give you

1    one.

2              THE COURT:  I thought we decided we

3    weren't doing that.  But hold on a minute, before

4    we get there, Mr. Brown, does Par have anything

5    more?

6              MR. BROWN:  Nothing further, Your

7    Honor.

8              THE COURT:  All right.

9              MR. KALLAS:  I don't know if we

10   decided or not, it hasn't been mentioned.

11             THE COURT:  I guess in a way I

12   thought because I had booked it for two

13   seven-hour days, not counting closing argument, I

14   wasn't expecting it.  I don't know, Mr. Brown,

15   were you expecting it?

16             MR. BROWN:  I was not expecting it.

17

18             MR. BROWN:  I was not expecting it.

19             THE COURT:  You know, so I

20   appreciate the offer to stand up and talk, but

21   I'm not actually sure that -- while I would not

22   mind listening, I don't actually think it's

23   probably fair to Par to do that since I don't

24   think I don't have any evidence that they were

1    planning on doing that.

2              I assume, Mr. Brown, you'd like to

3    pass on the opportunity?

4              MR. BROWN:  Yes.  I don't think it's

5    the best use of parties or the Court's time.

6              THE COURT:  Well, don't worry about

7    my time.

8              MR. KALLAS:  It would be a good use

9    of our time, Your Honor.

10             THE COURT:  Well, but really, Mr.

11   Brown, it's up to you.  Do you want to have some

12   argument or not?  I won't hold it against you no

13   matter what your answer is.

14             MR. BROWN:  I think, at this point,

15   we prefer to proceed to post-trial briefing.

16             THE COURT:  All right.  Well, I

17   think that, then, that's what we should do.

18             Do the parties have any exhibits

19   that they have -- well, maybe you can -- is there

20   anything -- are the parties sure that the trial

21   is over?

22             MR. KALLAS:  I believe so, Your

23   Honor.  We're going to check on the exhibits, so

24   give us one moment.

1          MR. BROWN:  Any reconciliation of

2     the exhibits we can have with the court

3     reporters.

4          THE COURT:  So what kind of -- I'm

5     sorry.  And I forget these things, even though I

6     know I've asked this before and I have been given

7     the answer:  Is Par the first filer?

8          MR. BROWN:  Par is not.  I believe

9     the first filer, I believe it was -- Watson is

10    the first filer.

11         But I don't think we have definitive

12    information on that.  That's just supposition.

13         THE COURT:  Okay.  All right.

14         So, oh, and I do have a question

15    which is this:  Did I understand the invalidity

16    defenses from Par to be conditioned on a finding

17    that the Par ANDA product infringes.

18         MR. BROWN:  I believe that's

19    correct, Your Honor.  I believe that all of our

20    112 invalidity defenses are premised, they're

21    alternative to acetaldehyde being found an

22    antioxidant based on the evidence in this case.

23         THE COURT:  I mean, that's what I

24    thought I got from the way Dr. Buckman testified,

```
 1    but I just wanted to make sure.  I'm not sure

 2    that it actually affects anything in terms of

 3    briefing or anything else.

 4              MR. BROWN:  I'm fairly certain that

 5    that's all we've asserted.  And --

 6              THE COURT:  I'm sorry.  You're

 7    fairly certain what?

 8              MR. BROWN:  I'm fairly certain that

 9    that's all we have asserted as a defense.

10              THE COURT:  So what kind of briefing

11    schedule did you want to have?

12              MR. BROWN:  We don't think a very

13    long time is necessary.  We haven't discussed

14    this with our opponent, but we don't think a very

15    long time is necessary.

16              THE COURT:  I don't think a very

17    long time.  We have had something in the order of

18    12 hours, at least one of those was openings.  So

19    we had about 11 hours of testimony.

20              So what I'm -- and the court

21    reporters, I'm sure, will have a transcript

22    Monday or -- is that right?  Tonight.  Probably

23    in a few minutes really.

24              So what I was thinking is I don't
```

1    really -- my suggestion would be this:  At some

2    point in time, which I would suggest might be two

3    weeks from today, each side could submit a

4    20-page brief with Novartis' being you, Par,

5    infringes.  Par's being your patent's invalid for

6    the three, 112 defenses we raised.

7              Two weeks after that, each side

8    could submit a 20-page answering brief.  And one

9    week after that, each side could submit a

10   ten-page reply brief.

11             And I would think that would

12   probably cover everything in a reasonable number

13   of pages.  What do you all think?

14             MR. KALLAS:  You're pretty close on

15   the pages.  I guess we could talk about that.

16             I was thinking of maybe five more

17   pages.  I was thinking maybe five more pages,

18   Your Honor.

19             The timing poses a little problem

20   for us.  As you may recall, we agreed with the

21   defendants in the other case to do some expert

22   reports on June 5th.  And you're asking us now to

23   do all this work while we're working on those

24   reports with the same team.

```
 1                    To avoid that, I would suggest a

 2        schedule, rather than two weeks, two weeks, one

 3        week, could we have three weeks, three weeks, one

 4        week or two weeks at the end, so I could stagger

 5        with that expert report?

 6                    THE COURT:  Mr. Brown.

 7                    MR. BROWN:  We're fine with that

 8        schedule.

 9                    THE COURT:  All right.  Well, you

10        know, because Mr. Brown's fine with it, I'm sure

11        that schedule will be fine.

12                    MR. KALLAS:  Thank you, Your Honor.

13                    THE COURT:  I mean, you know, I do

14        see having seen four attorneys appear on your

15        side -- well, in any event, why torture you?  So

16        it's okay, three, three and one.

17                    All right.  Well, so if you got the

18        extra week, why don't you see if you can't fit it

19        into 20 pages.  Okay?

20                    All right.  Hold on a minute.

21                    MR. KALLAS:  Your Honor, may I

22        address the issue of the page number?  I know you

23        said 20, 20, 10.

24                    THE COURT:  Okay.
```

1          MR. KALLAS:  But they've had four

2     witnesses on their side on infringement.  The

3     invalidity side is pretty small and certainly

4     that would be more than enough.

5               But the reply brief of only ten

6     pages, I would like a little more, Your Honor

7     because, obviously, I'll be seeing their

8     arguments, new arguments for the first time

9     maybe.

10               And in terms of the law and cases, I

11     may not be able to fit it in in ten pages.  So

12     I'd like a little more on that.

13          THE COURT:  Mr. Brown.

14          MR. BROWN:  We're amenable to that.

15          THE COURT:  So what is it you want,

16     Mr. Kallas?

17          MR. KALLAS:  I'd like 20 pages, Your

18     Honor, but I'll settle for 15.

19          THE COURT:  All right.  So you're

20     okay with the 20 as opening, but you'd like 15 in

21     reply?

22          MR. KALLAS:  Yes.

23          MR. BROWN:  We think ten pages is

24     fine, Your Honor, no reason to go beyond that,

1     they already have their opening brief.

2              THE COURT:  Well, I'll tell you

3     what, you know, I'm not actually -- I will tell

4     you what, I'll give you twenty-five in your

5     opening brief, but I like to keep the reply at

6     ten because as we have seen much evidence of over

7     the last few days, or you just always have seen

8     this, is the bigger the reply, the more that

9     Mr. Brown is going to want to reply; right?

10             So put into your opening brief the

11    creative arguments, because after you don't

12    really need to repeat in the reply what you said

13    in the opening.  If it really comes up stuff that

14    is out of left field, you know, you will meet and

15    talk about it and see whether we can work

16    something out, if not, you can give me a phone

17    call.  But I think ten is enough on the reply.

18             But you have twenty-five on

19    infringement for the opening brief, so therefore

20    you want twenty-five to answer, you can have

21    that.  Okay.

22             Hold on a minute.

23             MR. KALLAS:  Your Honor, as

24    Mr. Brown and I have agreed for the infringement

1    side will be twenty-five, twenty-five if he wants

2    it and ten for the validity side which is much

3    smaller, it would be twenty, twenty and ten.

4              THE COURT:  All right.  That's what

5    I was -- that's good.  Hold on a minute.  The

6    other thing that I'm just wondering about here is

7    do you recall when we had the claim construction

8    hearing a year-and-a-half ago or whenever it was

9    we had it, as I recall it the main dispute on

10   antioxidant was whether or not it had the

11   function, that that was part of the limitation.

12   And that basically because of claim

13   differentiation, there was some claim where it

14   was clearly written in.  I said you didn't -- the

15   antioxidant by itself didn't have the functional

16   aspect so that's the reason why we have presence

17   claims and functional claims, and of course the

18   only claim that we have been trying here is the

19   presence claim.

20             Was that the main dispute of the

21   claim construction hearing, if you remember?

22             MR. KALLAS:  Your Honor --

23             THE COURT:  And Mr. Kallas, probably

24   it was Mr. Prugo.

1          MR. KALLAS:  I don't remember

2     exactly what the main dispute was.  I know that

3     was a major dispute.  I know we have had -- what

4     I can't do, Your Honor, is separate the dispute

5     we have had in this case with the recent dispute

6     we have had in the claim construction with Noven

7     and Algen, so I'm not certain who argued what

8     when.

9          THE COURT:  So let me just tell you

10     what I was thinking about was I can't tell, you

11     did -- there is an order that's in the book that

12     you handed up with I think it was Dr. Klibanov's

13     testimony which was the order entered June 21st,

14     2013 that followed the claim construction

15     hearing.

16               And what I'm wondering about is

17     whether there was a focus that should have been

18     on whether essentially the way I construed it,

19     agent reduces oxidative degradation, whether that

20     was what a person of ordinary skill in the art

21     would have understood as an antioxidant, and I'm

22     wondering actually how much dispute there was

23     between the parties over that portion.

24               I know Par wanted to have this

1    functional thing added in.  I'm not trying to

2    revisit that.  But I was just wondering whether

3    what I ended up with wasn't perhaps broader than

4    it should have been.  And so not wanting to

5    revisit the functional issue, and now having the

6    understanding after having had the trial as to

7    what the -- having a better understanding of the

8    science that goes along with this, I'm just

9    wondering whether there is some narrower

10   interpretation that I should have been giving to

11   antioxidant, and particularly whether a person of

12   ordinary skill in the art would have thought that

13   antioxidant was essentially -- and if the -- if

14   essentially I did get it right, agent reduces

15   oxidative degradation, whether there are any

16   limits in the sense of is this something, you

17   know, if an agent can reduce oxidative

18   degradation in one unique circumstance, somewhere

19   you can find out in the chemical world, does that

20   make it an antioxidant, or maybe should I have --

21   I don't remember whether this was actually

22   something that was discussed in the claim

23   construction or not.  Possibly it was and it

24   didn't impress me at the time.

1          But whether things like the

2    pharmaceutical handbook saying here is what the

3    antioxidants are, you know, whether that

4    suggested some more limited definition might have

5    been appropriate.  So I don't know.  I can't help

6    you any more than that, which may not help at

7    all.

8          But what I was going to say is --

9    well, other than saying I'm having some second

10   thoughts I guess about that definition.  I don't

11   really have anything more to say.  I am having

12   some second thoughts.  And if there is something

13   that you all either have to say right now or you

14   want to think about and talk to each other, you

15   should let me know, I guess.

16          Is there anything either you want to

17   say right now?

18          MR. BROWN:  Your Honor, we would

19   just propose that we can include that in the

20   twenty-five page briefs that the parties submit

21   and/or we could -- if it would make sense since

22   we have a three-week period for the opening

23   brief, if we want to exchange with each other

24   proposed narrowing claim construction, maybe we

1    could do that in two weeks so that everybody

2    knows what position they have.

3

4              THE COURT:  Mr. Kallas.

5              MR. KALLAS:  Well, you know, we

6    tried the case on your claim construction.  So

7    now if you're going to change the claim

8    construction, I think that would be unfair to us.

9              If you want it rebriefed, Your

10   Honor, we're happy to rebrief it.  We'd have to

11   work out another schedule.  I'm not certain it's

12   going to fit in the pages we presently have,

13   though.

14             THE COURT:  I'm sorry.  Can you

15   speak up?

16             MR. KALLAS:  Yes.  I'm not -- if you

17   want it rebriefed, obviously, we'll rebrief it,

18   Your Honor.  But I don't think it will fit in

19   with the number of pages you've given us and the

20   short reply time, because then I will see their

21   position and I have one week to respond by.  I

22   think it will be unfair.

23             THE COURT:  Well, I think that's

24   right.  So why don't we do this:  Because I'm

1    guessing that Mr. Kallas would likely be

2    perfectly happy with the construction as it

3    stands right now.

4                   And it might be Mr. Brown who says,

5    Geez, I hear something that interests me here.

6    So, Mr. Brown, why don't you and your people

7    think about it and if you've got some different

8    construction that you think is better and that

9    there's support for, why don't you, by the close

10   of business on Tuesday, tell Mr. Kallas what it

11   is, and what your support is and then he can go

12   from there.

13                  MR. BROWN:  We can do that, Your

14   Honor.

15                  MR. KALLAS:  I guess one problem

16   that Dan Silver reminds me, you know, we tried

17   the Watson case under this claim construction.  I

18   have think you gave it the same claim

19   construction in --

20                  THE COURT:  Well, I'm sure I did.

21                  MR. KALLAS: -- the Noven case.  And

22   as soon as we leave, we're going to serve our

23   reports in that case.  So we have a lot of things

24   in the air here.

```
 1                     And changing the construction at

 2        this point may change all of those things.

 3                     THE COURT:  Well, I can only deal

 4        with so many things at once.  You know, part of

 5        the -- so, and if I didn't -- yes, Mr. Silver,

 6        you want to --

 7                     MR. SILVER:  Can I whisper it to Mr.

 8        Kallas?

 9                     MR. BROWN:  Maybe I can --

10                     THE COURT:  Well, wait a second.

11        Let them whisper.

12                     MR. KALLAS:  As I recall, in this

13        case, Your Honor, we were on Judge Robinson's

14        schedule where claim construction came later in

15        the case, not on your schedule, where it comes

16        early in the case.  So all the contentions were

17        out there.

18                     They have the opportunity to argue

19        the claim construction knowing all of what our

20        infringement allegations were, I believe.  So I'm

21        not certain.

22                     THE COURT:  Well, so all right.  Mr.

23        Brown, you wanted to say something?

24                     MR. BROWN:  Just certain I think
```

1    some of these concerns are being -- are not as

2    big as they're being presented to be.  In the

3    Watson --

4               THE COURT:  Well, they're not as big

5    for you.  They are as big for them because

6    they've got lots of different --

7               MR. BROWN:  I'm not underestimating

8    the impact on them.  I mean, as far as

9    inconsistencies or things between cases in the

10   Watson case, BHT, the product at issue, was in

11   the ANDA pharmaceutical example in the patent.

12   And nothing is -- nobody is going to be proposing

13   conflicting claim construction.  It's just a more

14   precise claim construction that would address

15   issues that are in this case.

16               And such that I don't think would

17   have any impact on the Watson case, one way or

18   another or would change the evidence they

19   presented.

20               THE COURT:  And that's not something

21   -- so I hear what you're saying.  And I heard

22   what Mr. Kallas said.  And I appreciate where

23   he's coming from.

24               And so all I guess I would say is it

1     does seem like the case that, as far as claim

2     construction goes, sometimes the fact that claim

3     construction doesn't become a fixed thing at any

4     particular point in time can cause some

5     inconvenience.  And it may be that with some

6     further looking, nothing will change.  I don't

7     know.

8              But I at least -- because, as Mr.

9     Brown says, I think in the other case, the Watson

10    case, I do think, as I recall, BHT is in the

11    pharmaceutical handbook as an antioxidant.  So

12    the definition of antioxidant, it didn't come up

13    the way that it's come up here where, you know,

14    I'm hearing that an antioxidant is something that

15    pharmaceutical references don't call an

16    antioxidant.  And it starts to make me wonder:

17    Did I construe this too broadly?

18             MR. KALLAS:  If I may, Your Honor,

19    help, Your Honor.  I think we -- my recollection,

20    I'm trying to separate the two, the present case

21    and the past case.  The present case being the

22    Noven case, I believe.

23             And it was based on the slide that

24    was put up on the parties' competing claim

1    constructions, the Watson-Par defendants wanted

2    it to be a pharmaceutically acceptable

3    ingredient, which may have meant you go to the

4    Handbook of Pharmaceutical Excipients.

5                    We argued that it is not.  It just

6    had to be in a composition that was going to be

7    approved at the FDA.

8                    So I think this issue whether it has

9    to be in a pharmaceutical book, and it has been

10    litigated and Your Honor chose that you didn't

11    like that.

12                    THE COURT:  Okay.  Well, you know,

13    and --

14                    MR. KALLAS:  If that's where you're

15    going with this.

16                    THE COURT:  I'm not really sure.

17    I'm not necessarily going anywhere.

18                    But I -- but, you know, that's --

19    but so what I'm going to do is I'm actually going

20    to try to retrieve which may -- which may

21    actually be more difficult because I imagine when

22    we did this, that was when sealed documents were

23    not actually available to me electronically, so

24    trying to get hard copies of things are that much

1    more aggravating.  But it may be because this

2    thought, you know, which sort of, I first started

3    wondering about this at lunch time, and so I

4    haven't actually checked to see what happened,

5    and I gather you have somebody who knows for one

6    reason or another.

7              MR. KALLAS:  I just recall from the

8    slide that was put up to cross-examine

9    Dr. Buckton it had ours and there's and there's

10   was a pharmaceutically acceptable ingredient that

11   had to be added to the composition.  And we

12   argued against that just for this reason, Your

13   Honor, and Par was involved, they were

14   represented.  So I think it's been --

15             THE COURT:  But, you know, in any

16   event here is what I'm going to do.  I'm going to

17   spend a little time this afternoon trying to

18   figure out what I knew a year-and-a-half ago, or

19   what I thought I was dealing with a

20   year-and-a-half ago, and maybe this concern will

21   go away.  But I'll do something if not, and maybe

22   not by the end of today, but as soon as I figure

23   out whether I do or do not have this concern,

24   I'll call Mr. Fineman and Mr. Silver and let them

1    know.  And if I call them and say sorry, I got my

2    problems resolved, then just give me a heart

3    attack for no reason.  And if I say no, I still

4    have some concerns, then Mr. Brown can tell you

5    how he would like to construe it and --

6             MR. KALLAS:  Just any claim

7    construction we have had, both sides have put in

8    expert reports, so it may not be as simple as

9    just file a brief, because our expert reports may

10   not raise the new issues that Mr. Brown, or prior

11   ones, so I'm not certain how this will work.

12   Let's see if you have a concern and we'll go from

13   there.

14             THE COURT:  Let's see if I have a

15   concern and you all can go from there.

16             MR. KALLAS:  We'll work it out.

17             THE COURT:  Hopefully.  Anything

18   else?

19             MR. BROWN:  No, Your Honor.

20             THE COURT:  All right.  Well, thank

21   you for all your time and attention.  And I will

22   go back and start working on this little problem.

23             And thank you very much.  Have a

24   good weekend.

1              (Court ended at 3:37 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    State of Delaware)
                     )
2    New Castle County)

3
                    CERTIFICATE OF REPORTER
4
                    I, Heather M. Triozzi, Certified
5    Professional Reporter, Registered Professional
     Reporter and Notary Public in the State of
6    Delaware, do hereby certify that the foregoing
     record, Pages 347 to 631 inclusive, is a true and
7    accurate transcription of the above-referenced
     proceeding on the 2nd day of May, 2014, in
8    Wilmington.
                    IN WITNESS WHEREOF, this 2nd day of
9    May, 2014, at Wilmington.

10

11                     /s/Heather M. Triozzi, CSR, RPR
                       Heather M. Triozzi, CSR, RPR
12                     Cert. No:  184-PS
                       Exp:  Permanent
13

14

15

16   DATED:  May 2, 2014

17

18

19

20

21

22

23

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Index Redacted In Its Entirety.